IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

MICHAELA UNDERWOOD, as the    :
duly appointed Administratrix of the    :
Estate of James Aaron McBrayer,    :
Deceased;    :
SHERRI McBRAYER, Individually    :
and as the surviving spouse of    :
James Aaron McBrayer, Deceased, and;    :
SAMUEL AARON McBRAYER,    :
by and through his mother and natural    :
guardian Angie McBrayer, and    :
JORDAN JANICE McBRAYER,    :
the surviving children of James    :
Aaron McBrayer, Deceased,    :
     Plaintiffs,    :
   :
   :
    v.    :    CIVIL ACTION FILE NO.:
   :
HON. GENE SCARBROUGH,    :
Individually and in his official    :
capacity as Sheriff of Tift County,    :
Georgia, CLIFF HENDERSON,    :
Individually and in his official    :
capacity as a Lieutenant Deputy    :
Sheriff of Tift County, Georgia    :
ANTHONY RAYMOND TRIPP Jr.,    :
Individually and in his official    :
capacity as Deputy Sheriff of    :
Tift County, Georgia,    :
CONNOR BRENNEN SPURGEON,    :
Individually and in his official    :
capacity as Deputy Sheriff of Tift    :
County, Georgia, and    :
AXON ENTERPRISE, INC. of DE,    :
a Delaware Corporation,    :
     Defendants.    :

1

## COMPLAINT FOR DAMAGES

NOW COME the Plaintiffs in the above styled action and herewith states her complaint against the Defendants by showing the Court the following:

## JURISDICTION AND VENUE

1.

Plaintiff MICHAELA UNDERWOOD is the duly appointed Administratix of the Estate of James Aaron McBrayer; appointed by the Probate Court of Tift County, Georgia. Plaintiff SHERRI McBRAYER is a resident of the State of Georgia and is domiciled in Tift County, Georgia which is within the jurisdiction and venue of this court. Neither the Estate of James Aaron McBrayer nor Plaintiff SHERRI McBRAYER own any property outside of the State of Georgia and does not maintain any other residences outside of the State of Georgia. SAMUEL AARON McBRAYER and JORDAN JANICE McBRAYER, the children of the late James Aaron McBrayer named in the caption of this lawsuit are also residents of the State of Georgia and are domiciled in Tift County, Georgia which is within the jurisdiction and venue of this court. Said children do not own any property outside of the State of Georgia and do not maintain any other residences outside of the State of Georgia.

2.

The Defendant Hon. Gene Scarbrough is, and was at all times relevant, the duly elected Sheriff of Tift County, Georgia; a county office created and recognized

by the Constitution of the State of Georgia. GA Const. Art. IX, Sec. I, Par. III. Said Defendant, in his individual and official capacities, is subject to the jurisdiction and venue of this court by service of process upon him at 500 Morgan Drive, Tifton, Georgia 31794.

3.

As the duly elected Sheriff of Tift County, Georgia, Defendant is, in fact and by law, the Constitutional Office of "Tift County Sheriff's Office" and is responsible, under the doctrine of respondeat superior, in his official capacity for the acts and omissions of any deputy sheriff employed by the Defendant Scarbrough. Defendant Scarbrough is the chief policymaker for Tift County Sheriff's Department and is responsible for and did mange, supervise and promulgate the rules, practices, procedures and policies for operating the sheriff's office and for training and supervising all deputy sheriffs and other employees of the sheriff's office. He is and was responsible for the training and supervising of all of the individual Defendants named herein.

4.

Prior to the filing of this action, Plaintiff delivered to the Defendant Scarbrough a sufficient ante litem notice dated July 22, 2019 as required by O.C.G.A. Section 33-11-1. The Defendant received this notice on July 26, 2019.

5.

The Defendant Anthony Raymond Tripp Jr. is a resident of the State of Georgia and is, in his individual and official capacities, subject to the jurisdiction and venue of this court. Said Defendant, in his individual and official capacities, is subject to the jurisdiction and venue of this court by service of process upon him at 500 Morgan Drive, Tifton, Georgia 31794.

6.

The Defendant Connor Brennen Spurgeon is a resident of the State of Georgia and is, in his individual and official capacities, subject to the jurisdiction and venue of this court by service of process upon him at 500 Morgan Drive, Tifton, Georgia 31794.

7.

The Defendant Lt. Cliff Henderson is a resident of the State of Georgia and is, in his individual and official capacities, subject to the jurisdiction and venue of this court by service of process upon him at 500 Morgan Drive, Tifton, Georgia 31794.

8.

The Defendant Axon Enterprise, Inc. of DE (hereinafter referred to as "Axon") is a foreign corporation organized under the laws of Delaware. Said corporation maintains its principal office at 17800 North 85th Street, Scottsdale,

Maricopa County, Arizona 85255. Said corporation is authorized to conduct business in the State of Georgia and does, in fact, conduct business within the State of Georgia by and through marketing, sales and training on the use of Taser Law Enforcement weapons. Said corporation is subject to the jurisdiction and venue of this court by service of process upon its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia.

## **ALLEGATIONS OF FACTS**

9.

On April 24, 2019, Mr. James Aaron McBrayer was involved in a single vehicle accident. As a result of the accident, Mr. McBrayer received a severe head injury. The accident occurred on Hall Road in Tift County, Georgia in the area of his family's property.

10.

Following the accident, Mr. McBrayer exited his vehicle and went onto his family's property. While on that property, he began to yell for help. His cries for help were heard by neighbors in the vicinity of the accident and the neighbors called in to 911 and reported that they heard someone crying out for help. 911 dispatched the Tift County Sheriff's office to the scene. The dispatch was given to Defendant Deputy Connor Spurgeon and Defendant Spurgeon went to the scene.

11.

Upon arriving at the scene, Defendant Spurgeon found Mr. McBrayer's vehicle on the side of the road. Shortly thereafter, Ms. Angie McBrayer came to the scene, identified herself as Mr. McBrayer's ex-wife and began telling Defendant Spurgeon that Mr. McBrayer was involved in this collision and was in need of medical evaluation and treatment.

12.

While Defendant Spurgeon and Ms. Angie McBrayer were talking at the scene of the accident, Defendant Tripp pulled up and announced that he was in assistance to Defendant Spurgeon. Defendant Tripp stayed at the scene of the accident only a matter of a few seconds and then took off in his vehicle to find the person calling out for help.

13.

After leaving the scene of the collision, Defendant Tripp found Mr. McBrayer at large farm out-building located on the property of Mr. McBrayer's family. Defendant Tripp pulled his vehicle up towards Mr. McBrayer with the headlights from the patrol car shining on Mr. McBrayer. There were no emergency lights engaged on Defendant Tripp's vehicle. At the time Defendant Tripp pulled up in his patrol car, Mr. McBrayer was squatted down in front of the building.

14.

After Defendant Tripp exited his vehicle, Mr. McBrayer arose and went around the building to a backhoe that was parked next to the building. Mr. McBrayer was, at that time, obviously mentally disturbed and was shouting "Jesus" and "God help us". Rather than assist Mr. McBrayer and rather than summoning medical assistance for Mr. McBrayer, Defendant Tripp escalated the situation by acting in a confrontational manner. Defendant Tripp responded to Mr. McBrayer's actions by drawing his X26P Taser weapon (which was manufactured and sold by the Defendant Axon) and pointing it at Mr. McBrayer and shouted back at Mr. McBrayer "Show me your hands, show me your hands now". Defendant Tripp was also, at all times relevant, shining a high-powered flashlight at Mr. McBrayer. During this engagement between Mr. McBrayer and Defendant Tripp, Defendant Tripp radioed Defendant Spurgeon and summoned Defendant Spurgeon to the place where Mr. McBrayer and Defendant Tripp were located.

15.

After Defendant Tripp radioed Defendant Spurgeon, Mr. McBrayer emerged from the backhoe and began to run away from Defendant Tripp. Defendant Tripp then yelled at Mr. McBrayer to stop and come to him. Mr. McBrayer then turned and ran toward Defendant Tripp. As Mr. McBrayer was running toward Defendant Tripp, Defendant Tripp discharged his Taser weapon, with the prongs from the Taser

electricity wires piercing Mr. McBrayer in the chest area. Defendant Tripp then attempted four (4) separate, five-second in duration, electric discharges of the weapon.16.

After running by Defendant Tripp, Mr. McBrayer then went to his knees on the ground. Defendant Tripp continued to attempt to deploy his Taser weapon on Mr. McBrayer. Mr. McBrayer then rose up and again ran towards Defendant Tripp. Mr. McBrayer then went back down to the ground on his knees. At that point, Defendant Spurgeon came onto the scene and approached Mr. McBrayer from the rear telling Mr. McBrayer to put his hands behind his back. Mr. McBrayer continued to yell non-sensical religious statements while on his knees. Defendant Spurgeon then pushed Mr. McBrayer face-first onto the ground and began to deploy his X26P Taser weapon (which was also manufactured by the Defendant Axon) in a "drive stun" fashion to invoke pain to Mr. McBrayer. Defendant Tripp then joined Defendant Spurgeon on the ground and the two of them attempted to force Mr. McBrayer's hands behind his back to handcuff him.

17.

During their effort to put handcuffs on Mr. McBrayer, Defendants Spurgeon and Tripp kept Mr. McBrayer face down in the dirt for approximately six (6) to seven (7) minutes, most of which time they had their hands and Defendant Tripp's knee on the back of Mr. McBrayer's neck and chest. After getting the handcuffs on Mr.

McBrayer, Defendants Spurgeon and Tripp continued to press Mr. McBrayer face down in the dirt for an additional three to four minutes, again with their hands, and at times, Defendant Tripp's knee on Mr. McBrayer's neck and chest while other officers put a "hobble" strap on Mr. McBrayer's legs.  During this nine-minute period of time with Mr. McBrayer face down in the dirt and Defendants Spurgeon and Tripp pressing down on Mr. McBrayer's neck and chest, Mr. McBrayer went from constantly yelling non-sensical religious statements to completely silent for the last one (1) to two (2) minutes.

18.

After approximately nine (9) to ten (10) minutes face-down in the dirt, Defendant Tripp and other assisting deputies picked Mr. McBrayer up by his legs and his arms which were handcuffed behind his back and loaded Mr. McBrayer horizontally and face-down into the back seat of a patrol car.  During the process of picking Mr. McBrayer up and loading him into the back seat of the patrol car, Defendant Tripp noticed that Mr. McBrayer had gone "limp" and was not speaking.

19.

Despite the fact that Defendant Tripp noticed that Mr. McBrayer had gone "limp" and was not speaking, said defendant nor any other deputy in attendance conducted any form of medical assessment and did not provide medical assistance

to Mr. McBrayer from the point of lifting Mr. McBrayer up off the ground through the process of loading him into the patrol car.

20.

After loading Mr. McBrayer into the patrol car, the car door was shut with the "hobble" strap purposefully left hanging out of the closed door to prevent Mr. McBrayer from being able to move his legs and feet or to position out of the horizontal and face-down position in which he was placed.

21.

After closing the patrol car door with Mr. McBrayer inside, Defendants Tripp and Spurgeon left Mr. McBrayer in the back seat for over eight and one-half minutes with no medical care whatsoever.

22.

At no time did the Defendants request Tift County EMS for the specific purpose of evaluating or providing medical care or assistance to Mr. McBrayer.

23.

At no time did the Defendants specifically direct EMS to provide medical care or assistance to Mr. McBrayer.

24.

At some point during the handcuffing, Defendant Lt. Henderson arrived at the scene.  At all times relevant, Defendant Lt. Henderson was the superior officer on

the scene and had supervisory authority over all of the other deputies on scene. Defendant Lt. Henderson personally observed Mr. McBrayer on the ground with his hands handcuffed behind his back and his legs "hobbled". Defendant Lt. Henderson also was present as the deputies lifted Mr. McBrayer from the ground and loaded Mr. McBrayer into Defendant Lt. Henderson's patrol car.

25.

After leaving Mr. McBrayer in the back seat of the patrol car without medical care for over eight and one-half minutes, Tift County EMS arrived at the scene after being summoned to assist Defendant Spurgeon. In carrying out his duties as an EMS personnel, Battalion Chief Chuck Cayton went to Defendant Henderson's patrol car to assess Mr. McBrayer. When Chief Cayton assessed Mr. McBrayer, he determined that Mr. McBrayer was not breathing and had no pulse. Chief Cayton then pulled Mr. McBrayer from the back seat of the patrol car, onto a gurney, and took Mr. McBrayer to the ambulance. While in the ambulance, Chief Cayton determined that Mr. McBrayer was dead, despite the EMS efforts to resuscitate Mr. McBrayer.

26.

After it was determined at the scene that Mr. McBrayer was dead, the Georgia Bureau of Investigation was called to the scene for investigation. While at the scene, photographs were taken and the body of Mr. McBrayer was released to the Tift

County Coroner.  Ultimately, however, Mr. McBrayer's body was transported to the
GBI Crime Lab in Macon, Georgia.

27.

An autopsy was performed by the Georgia Bureau of Investigation which
revealed that Mr. McBrayer died as the result of a homicide consisting of excited
delirium secondary to being tasered by the Defendant's deputies and drug toxicity.

28.

At all times relevant, the X26P Taser weapons used by Defendants Tripp and
Spurgeon were designed, manufactured and sold by the Defendant Axon Enterprises,
Inc. of DE.  In addition, Defendant Axon provided extensive written user materials,
training to certified instructors and training materials to be used by law enforcement
officers regarding the operation and use of the X26P Taser weapon.

## COUNT I

## Deprivation of Civil Rights by Defendants Scarbrough and Henderson under

## 42 U.S.C. Section 1983

29.

Plaintiffs re-allege paragraphs one through twenty-eight above as if separately
set forth herein.

30.

At all times relevant, Defendants Scarbrough and Henderson were acting under color of law as law enforcement officers with the Tift County Sheriff's office.

31.

At all times relevant, Defendant Scarbrough exhibited deliberate indifference to hiring, training, supervision and discipline of Defendants Henderson, Tripp and Spurgeon. In particular, Defendant Scarbrough did not perform any reasonable degree of pre-hiring screening of officers such as Defendant Tripp and Spurgeon; did not provide for training of said officers on how to properly deal with mentally injured persons such as Mr. McBrayer or how to effectively recognize and respond to suspects clearly exhibiting symptoms of Excited Delirium; did not properly train officers such as Defendant Tripp and Spurgeon on how to safely load a restrained person into the back seat of a patrol car; did not properly train officers such as Defendant Tripp and Spurgeon on how to recognize the need for medical attention to a restrained person or to actually provide such medical attention to a restrained person who has clearly exhibited signs and symptoms of becoming unresponsive; did not properly train officers such as Defendants Tripp and Spurgeon on First and Second Tier encounters and did not properly train officers such as Defendants Tripp and Spurgeon on unlawful arrests and use of force.

32.

Furthermore, Defendant Scarbrough demonstrated deliberate indifference to the training and discipline of Defendant Henderson. In particular, Defendant Henderson, in his capacity as a supervising officer on the scene of the subject events, knew Mr. McBrayer, knew Mr. McBrayer was on his own family's property at the time of the subject events, witnessed the excessive force utilized by his subordinate deputies in apprehending Mr. McBrayer, witnessed Mr. McBrayer's need for medical care and personally witnessed Mr. McBrayer's physical condition and the manner in which his subordinate deputies loaded Mr. McBrayer into Defendant Henderson's patrol car. In addition, while Mr. McBrayer was prone in the rear seat of Defendant Henderson's patrol car, Defendant Henderson personally witnessed the fact that Mr. McBrayer was unresponsive but did not take any measures to assist Mr. McBrayer or attempt to get Mr. McBrayer to become responsive.

33.

At all times relevant, Defendant Scarbrough was personally aware of the lack of training of Defendant Henderson and was deliberately indifferent to Defendant Henderson's inadequacies as a supervising officer.

34.

Despite the extensive nature of Defendant Henderson's personal knowledge of the subject events leading to Mr. McBrayer's death, Defendant Henderson took

no action to correct the actions of his subordinate deputies and, in fact, participated directly in depriving Mr. McBrayer of his constitutional rights of necessary medical care, and of his Fourth Amendment right to be free from excessive force. Therefore, Defendant Henderson's actual knowledge of the subject events, combined with his complete refusal to take any action to stop and/or correct the unconstitutional acts of his subordinate deputies, demonstrated, even by a clear and convincing standard of proof, his deliberate indifference to the unconstitutional acts of his subordinate deputies and the fatal injuries that those unconstitutional acts caused Mr. McBrayer. At all times relevant, Defendant Henderson deliberately and consciously failed to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by Mr. McBrayer.

35.

While on the scene supervising his subordinate deputies, Defendant Henderson had opportunity and did, in fact, observe the fact that Mr. McBrayer was in serious and dangerous need of prompt medical assessment and care. Despite this knowledge, Defendant Henderson refused to order his men to follow established policy and medically assess Mr. McBrayer and/or provide Mr. McBrayer with medical care. These acts and omissions by Defendant Henderson were deliberately indifferent to Mr. McBrayer's serious medical needs, thereby depriving Mr. McBrayer of due process under the Fourteenth Amendment to the United States

Constitution or constituted an unreasonable seizure prohibited by the Fourth Amendment to the United States Constitution and Article I, Section I, Paragraph 13 of the Constitution of the State of Georgia; all of which is actionable under 42 U.S.C. Section 1983.

36.

At all times relevant, the injuries and death of Mr. McBrayer were the foreseeable consequence of the deliberate indifference shown by the Defendants Scarbrough and Henderson.

**COUNT II**

**Deprivation of Civil Rights by Defendants Tripp and Spurgeon under 42 U.S.C. Section 1983**

37.

Plaintiffs re-allege paragraphs one through thirty-six above as if separately set forth herein.

38.

The entire series of events that led to the deprivation of Mr. McBrayer's constitutional rights and his death began with a phone call to 911 to report that someone in the vicinity of Mr. McBrayer's location was calling for help. 911 dispatched Defendant Spurgeon to the scene in response to that call for help. There was never any allegation in the call to 911 or in the dispatch from 911 that any crime had been committed or was suspected of having been committed.

39.

After Defendant Spurgeon was dispatched to the scene, Defendant Tripp took it upon himself to assist. In so doing, Defendant Tripp came upon Defendant Spurgeon at the scene of Mr. McBrayer's wrecked vehicle while Defendant Spurgeon was interviewing Ms. Angie McBrayer. Rather than waiting for instruction from Defendant Spurgeon, Defendant Tripp again took it upon himself to leave that scene and forge ahead to find the person calling for help.

40.

When Defendant Tripp located Mr. McBrayer at the subject property, Defendant Tripp clearly saw that Mr. McBrayer was leaning up against a building. Rather than calling for assistance from Defendant Spurgeon at that time, Defendant Tripp decided to approach Mr. McBrayer. From the time Defendant Tripp went en route to the scene through the time Defendant Tripp first encountered and approached Mr. McBrayer, Defendant Tripp had no reason to suspect that Mr. McBrayer had committed any crime and, in fact, did not suspect that Mr. McBrayer had committed any crime.

41.

After Defendant Tripp approached Mr. McBrayer, Mr. McBrayer arose and ran around the corner of the building to a backhoe parked next to the building. Defendant Tripp then wielded his Taser weapon and a high beam flashlight, pointing

both of them at Mr. McBrayer and shouting at Mr. McBrayer to "show me your hands". At this point, Defendant Tripp still had no reason to suspect that Mr. McBrayer had committed any crime and, in fact, did not suspect that Mr. McBrayer had committed any crime.

42.

After Defendant Tripp shouted at Mr. McBrayer "show me your hands", Mr. McBrayer ran away from the backhoe and away from Defendant Tripp. Defendant Tripp then yelled at Mr. McBrayer to "stop" at which point Mr. McBrayer stopped and then ran toward Defendant Tripp. As Mr. McBrayer was running past Defendant Tripp, Defendant Tripp discharged his Taser weapon striking Mr. McBrayer in the chest. Defendant Tripp then yelled at Mr. McBrayer to get on the ground. Mr. McBrayer complied by going to his knees with his hands in the air. Defendant Tripp then continued to discharge his Taser weapon with the intent to further electrocute Mr. McBrayer into submission.

43.

After Mr. McBrayer initially went to the ground and Defendant Tripp continued to further electrocute Mr. McBrayer through the Taser weapon, Mr. McBrayer got up again and started running towards Defendant Tripp. Defendant Tripp then ran backwards to avoid Mr. McBrayer but continued to attempt to engage the Taser weapon onto Mr. McBrayer. Mr. McBrayer then gave up and went back

down to the ground where he remained until he was loaded into the patrol car as described above.

44.

After Mr. McBrayer went to the ground the second time, he was on his knees again with his hands in the air. Defendant Spurgeon then approached Mr. McBrayer from the rear instructing Mr. McBrayer to put his hands behind his back. When Mr. McBrayer did not comply to Defendant Spurgeon's satisfaction, Defendant Spurgeon pushed Mr. McBrayer to the ground and used his Taser Weapon to twice "drive stun" Mr. McBrayer into submission. "Drive stun" use of a Taser weapon does not disable the detainee but, instead, provides a serious pain shock to the body in order to gain compliance by the detainee.

45.

With the four (4) attempts by Defendant Tripp to Taser Mr. McBrayer and the two (2) "drive stun" shocks administered by Defendant Spurgeon, the Defendants attempted six (6) different deployments of their Taser weapons, completing at least three and one-half (3 ½) successful electrocutions.

46.

Use of a Taser weapon is prohibited unless the officer using the weapon has been properly trained and certified in the use of said weapon. Defendant Tripp received his Taser certification training on December 18, 2018; just over four (4)

months before the subject encounter with Mr. McBrayer. During that four (4) month period before the encounter with Mr. McBrayer, Defendant Tripp deployed his Taser weapon fourteen (14) separate times; mostly in single intervals but no more than double intervals. In the encounter with Mr. McBrayer, Defendant Tripp deployed his Taser weapon in four (4) consecutive five-second intervals. This conduct was a clear violation of the policies and procedures of the Tift County Sheriff's Office and was a use of excessive force.

47.

Defendant Spurgeon received his Taser certification training on December 18, 2018. Following his certification, Defendant Spurgeon deployed his Taser weapon for nine (9) separate five-second durations. During the encounter with Mr. McBrayer, Defendant Spurgeon deployed his Taser weapon in "drive stun" mode for two (2) consecutive five-second "drive stun" deployments on Mr. McBrayer.

48.

These Defendants use of the Taser weapons, as aforesaid, was a clear violation of the policies and procedures of the Tift County Sheriff's Office and was a use of excessive force.

49.

Training provided by the Tift County Sheriff's Office to Defendants Tripp and Spurgeon, which included specific user instructions from the Defendant Axon,

was designed to protect the Constitutional rights of persons such as Mr. McBrayer. In particular, that training and materials from Defendant Axon provided as follows pertaining to the use of Taser weapons:

(a)     Use of a Taser weapon is prohibited, unless exigent circumstances are present against handcuffed subjects, against subjects fleeing on foot and against subjects who are visibly suffering from a debilitating illness;

(b)     The Taser weapon will not be used for coercion or intimidation or against subjects who are offering on passive resistance;

(c)     Prior to use, when practical, a warning to the subject and other deputies should be given;

(d)     Use of the "drive stun" is discouraged except in situations where the "probe" deployment is not possible.  If initial application is ineffective, deputy will reassess situation and consider other available options;

(e)     Deputies shall evaluate the subject against whom the Taser has been deployed and shall provide emergency medical treatment if needed or requested;

(f)     Subjects who do not appear to be fully recovered within 10 minutes after being tased shall be evaluated by medical personnel;

(g)     Taser exposure causes certain effects, including physiologic and metabolic changes, stress and pain.  The risk of death or serious injury may increase with cumulative Taser exposure.  The longer the Taser exposure, the greater the risk

of serious injury or death.  Repeated, prolonged or continuous Taser applications to the subject may contribute to cumulative exhaustion, stress, cardiac, physiologic, metabolic, respiratory and associated medical risks which could increase the risk of death or serious injury.  The officer must minimize repeated, continuous or simultaneous exposures;

(h)    Subjects susceptible to the adverse effects of Taser use are individuals suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication and over-exertion from physical struggle.  In a metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death;

(i)    To reduce the risk from Taser exposure, minimize the number and duration of Taser exposures to the subject.  Most human Taser lab testing has not exceeded 15 seconds of Taser application and none has exceeded 45 seconds.  Use the shortest duration of Taser exposure objectively reasonable to accomplish lawful objectives and reassess the subject's behavior, reaction and resistance before initiating or continuing the exposure.  If a Taser exposure is ineffective in incapacitating a subject or achieving compliance, consider alternative control measures in conjunction with or separate from the Taser;

(j)    The preferred target areas are below the neck on the back side of the subject and below the chest on the front side of the subject.  Back shots are

22

preferrable to front shots. Taser exposure in the chest area near the heart can cause extra heartbeats known as cardiac capture. Cardiac capture can lead to cardiac arrest. Avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death;

(k)    Do not immediately resort to the use of a Taser weapon. If no exigency or immediate safety risk exists, slow down and consider alternative force options/solutions, including negotiation, commands or physical skills. Physical resistance or mental illness alone does not indicate immediate threat.

50.

Despite the specific training and education they had received, Defendants Tripp and Spurgeon violated every rule and procedure taught them by:

(a)    immediately resorting, without warning, to the use of a Taser weapon against a subject for whom they had no suspicion had committed any crime,

(b)    used the Taser weapon against an obviously mentally ill person who was running,

(c)    specifically targeted the chest area near the heart,

(d)    used multiple cycles through multiple Taser weapons,

(e)    engaged the subject in a lengthy physical alteration after having deployed multiple Taser cycles, and

(f)    negligently loaded Mr. McBrayer into the rear-seat of a patrol car without any medical assessment or medical care, despite the fact that Mr. McBrayer exhibited obvious signs of loss of consciousness and the fact that it had been well over ten (10) minutes after the multiple Taser cycles had been administered from multiple Taser weapons.

51.

At all times relevant, the manner in which the Defendants Tripp and Spurgeon used their Taser weapons against Mr. McBrayer was willful and intentional and was designed to cause Mr. McBrayer injury and pain.  These acts by Defendants Tripp and Spurgeon were objectively unreasonable and constituted excessive force against Mr. McBrayer in violation of Mr. McBrayer's right to be free from all unreasonable seizure as provided by the Fourth Amendment to the United States Constitution and by Article 1, Section 1 of the Constitution of the State of Georgia, enforceable through 42 U.S.C. Section 1983.

52.

In addition to the use of their Taser weapons against Mr. McBrayer as described above, Defendants Tripp and Spurgeon used excessive force in holding Mr. McBrayer face down in loose dirt for over ten (10) minutes until Mr. McBrayer became unconscious; much of the time pressing Mr. McBrayer's chest and neck with their hands and with Defendant Tripp's knee.

53.

At all times relevant, the manner in which the Defendants Tripp and Spurgeon held Mr. McBrayer face down in loose dirt until he became unconscious constituted unnecessarily dangerous and excessive force which was willful and intentional by the Defendants Tripp and Spurgeon. These acts by Defendants Tripp and Spurgeon were objectively unreasonable and constituted excessive force against Mr. McBrayer in violation of Mr. McBrayer's right to be free from all unreasonable seizure as provided by the Fourth Amendment to the United States Constitution and by Article 1, Section 1 of the Constitution of the State of Georgia, enforceable through 42 U.S.C. Section 1983.

54.

At the conclusion of the restraint of Mr. McBrayer and before the officers negligently loaded Mr. McBrayer into the patrol car, Mr. McBrayer had become non-responsive and was obviously in need of prompt medical assessment and care. Defendant Tripp, in particular, observed and appreciated the fact that Mr. McBrayer had become "limp" and non-responsive before Mr. McBrayer was negligently loaded into the patrol car. Despite the obvious nature of Mr. McBrayer's need for prompt medical assessment and care and the fact that Defendant Tripp had observed Mr. McBrayer's non-responsive condition, the Defendants Tripp and Spurgeon refused to provide Mr. McBrayer with any prompt medical assessment or care.

55.

Defendants Tripp and Spurgeon's acts and omissions regarding Mr. McBrayer's obvious need for prompt medical assessment and medical care were deliberately indifferent to Mr. McBrayer's serious medical needs, thereby depriving him of due process under the Fourteenth Amendment of the United States Constitution or constituted an unreasonable seizure prohibited by the Fourth Amendment to the United States Constitution and by Article 1, Section 1, Paragraph 13 of the Constitution of the State of Georgia; all of which is enforceable through 42 U.S.C. Section 1983.

56.

The arrest of Mr. McBrayer as described above was initiated by Defendant Tripp. There was never a relevant warrant issued for Mr. McBrayer's arrest prior to Mr. McBrayer's death.

57.

From the moment Defendant Tripp first encountered Mr. McBrayer until the time Mr. McBrayer was placed in the rear seat of the patrol car, Defendant Tripp never had reasonable suspicion or probable cause to detain or arrest Mr. McBrayer.

58.

At all times relevant, Defendant Tripp's detention and arrest of Mr. McBrayer was unlawful and was in violation of Mr. McBrayer's right to be free from all

unreasonable seizures as provided by the Fourth Amendment to the United States Constitution and by Article 1, Section 1, Paragraph 13 of the Constitution of the State of Georgia, enforceable through 42 U.S.C. Section 1983.

## COUNT III

### Products Liability Claim Against Defendant Axon

59.

Plaintiffs incorporate herein by reference paragraphs one (1) through fifty-eight (58) above as if said paragraphs were specifically set forth herein.

60.

At all times relevant, the Taser weapons utilized by Defendants Tripp and Spurgeon were designed, manufactured and sold by the Defendant Axon. The design of this weapon included instructions on the use of said weapon as well as training materials for both certification instructors and users of the weapon.

61.

The Taser weapon designed, manufactured and sold by the Defendant Axon is an inherently dangerous product in that it carries a high risk of causing injury or death if not properly used. The safe and proper use of this weapon requires such education so that the weapon is only allowed to be used by persons who undergo certification training provided by the Defendant Axon.

62.

While there are certainly beneficial utilities associated with the product, there are extreme risks specifically associated with the use of the weapon against certain groups of individuals; in particular, mentally ill subjects and subjects suffering from a condition known as "Excited Delirium".

63.

The Defendant Axon was, at all times relevant, fully aware of the fact that the Taser Weapon is especially dangerous for use on mentally ill subjects and subjects suffering from "Excited Delirium".  In fact, Defendant Axon acknowledges in its "Warnings, Instructions and Information: Law Enforcement" that subjects suffering from "Excited Delirium" are particularly susceptible to injury or death from exposure to a Taser deployment.

64.

Despite the fact that Defendant Axon was fully aware of the dangers of deploying a Taser weapon on a subject suffering from "Excited Delirium", said defendant took no action to explain in their warnings, instructions, information or training materials what "Excited Delirium" is or how to recognize the displayed symptoms of "Excited Delirium".  In particular, Defendant Axon did not explain in any of their materials that the reason for not using the Taser weapon on persons suffering from "Excited Delirium" is that metabolic and physiologic In fact, all of

the law enforcement defendants named herein, as well as the officer with the Tift County Sheriff's Office certified by the Defendant Axon as an instructor, testified under oath that they did not know what "Excited Delirium" is and could not describe the displayed symptoms normally associated with "Excited Delirium".

65.

At all times relevant, Mr. James Aaron McBrayer was exhibiting classic symptoms of "Excited Delirium" before Defendants Tripp and Spurgeon deployed their Taser weapons. Defendant Tripp stated at the scene of the encounter with Mr. McBrayer that he saw foam around Mr. McBrayer's mouth before he discharged the Taser weapon. Foam around the mouth is a classic displayed symptom of "Excited Delirium". Unfortunately, Defendants Tripp and Spurgeon did not receive adequate training during their Taser certification class to know how to recognize symptoms of "Excited Delirium" before discharging their Taser weapons.

66.

Defendant Axon holds a literal monopoly on the Taser market and has expended large sums of money in the study of their weapon and the effects on various groups of targeted subjects. Defendant Axon alone knows the full extent of the danger of deploying their Taser weapons on subjects suffering from "Excited Delirium". Defendant Axon knows what "Excited Delirium" is and is fully aware of the symptoms displayed by a subject suffering from "Excited Delirium".

Defendant Axon was, at all times, fully aware that law enforcement officers such as Defendants Tripp and Spurgeon do not have sufficient knowledge or information on their own regarding "Excited Delirium" and that such law enforcement officers are in need of detailed explanation and training to be able to recognize a subject suffering from "Excited Delirium" and to not deploy a Taser weapon, particularly in a solo encounter, on a subject suffering from "Excited Delirium". Defendant Axon's warnings, instructions, information and training materials do not adequately explain what "Excited Delirium" is and how to recognize it in subjects upon whom deployment of a Taser weapon is considered by law enforcement officers.

67.

Because the warnings, instructions, information and training materials produced and distributed by Defendant Axon do not adequately explain what "Excited Delirium" is, the warnings, instructions, information and training materials are defective; which said defect proximately causes serious injury or death to subjects suffering from "Excited Delirium", upon whom a Taser weapon is deployed.

68.

The defective warnings, instructions, information and training materials produced and distributed by Defendant Axon proximately caused or contributed to the injuries and death suffered by Mr. James Aaron McBrayer.

## COUNT IV

## Damages Sought In This Action

### 69.

Plaintiffs incorporate herein by reference paragraphs one (1) through sixty-eight (68) above as if said paragraphs were specifically set forth herein.

### 70.

All damages sought herein are brought under the auspices of 42 U.S.C. Sections 1983 and 1988 and through the statutory and common law recognized in the State of Georgia pertaining to damages.

### 71.

Plaintiff Sherri McBrayer, as the surviving spouse of James Aaron McBrayer, deceased, is the proper party for bringing a claim under 42 U.S.C. Sections 1983 and 1988 and the law of the State of Georgia for the wrongful death for the death of James Aaron McBrayer who died on April 24, 2019.  In accordance with the law of the State of Georgia, Plaintiff Sherri McBrayer is entitled to recover, and does hereby claim on her own behalf and on behalf of the surviving children of James Aaron McBrayer, the full value of the life of James Aaron McBrayer as shown by the evidence.

72.

At the time of his death, James Aaron McBrayer was 41 years old and had a life expectancy of 34.22 years according to the Annuity Mortality Table for 1949, Ultimate.

73.

The sole and proximate cause of Mr. McBrayer's death was the unconstitutional conduct committed in violation of the Fourth Amendment and the Fourteenth Amendment to the United States Constitution and of Article I, Section I of the Constitution of the State of Georgia by the law enforcement Defendants named above combined with the strict liability/negligence of Defendant Axon as set forth above.

74.

At all times relevant, SAMUEL AARON McBRAYER and JORDAN JANICE McBRAYER, were the surviving children of James Aaron McBrayer, deceased, and had a constitutionally protected right to family association with their father as guaranteed by the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution and of Article I, Section I of the Constitution of the State of Georgia.

75.

As the direct and proximate result of the unlawful and unconstitutional conduct of the Defendants Scarbrough, Henderson, Tripp and Spurgeon, SAMUEL AARON McBRAYER and JORDAN JANICE McBRAYER were deprived of their right to family association with their father as protected by the Fourteenth Amendment of the United States Constitution and Article I, Section I of the Constitution of the State of Georgia; the violations of which are actionable under 42 U.S.C. Section 1983.

76.

At all times relevant, James Aaron McBrayer had the constitutional right to Life and Liberty as guaranteed by the United States Constitution and Article I, Section I of the Constitution of the State of Georgia; had the constitutional right to be free from unlawful arrest as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section I of the Constitution of the State of Georgia; had the right to be free from excessive force inflicted upon him by persons acting under color of law as guaranteed by the Fourth Amendment to the United States Constitution and by Article I, Section I, Paragraphs II and XIII of the Constitution of the State of Georgia and had the right to medical care for his serious physical and psychological needs while in the custody of the law enforcement defendants as protected under the Fourteenth Amendment to the United

States Constitution and Article I, Section I of the Constitution of the State of Georgia.

77.

At all times relevant, the Defendants Scarbrough, Henderson, Tripp and Spurgeon violated Mr. James Aaron McBrayer's constitutional rights described above by their actions more particularly described herein above.

78.

In addition to the violation of Mr. James Aaron McBrayer's constitutional rights, the unlawful conduct of Defendants Scarbrough, Henderson, Tripp and Spurgeon as well as the strict liability/negligent conduct of the Defendant Axon, caused Mr. James Aaron McBrayer to experience severe physical and mental pain and suffering prior to his death.

79.

As the direct and proximate cause of the conduct of the defendants as described herein above, the estate of James Aaron McBrayer has incurred funeral expenses as shown by the evidence for his burial.

80.

As the duly appointed Administratrix of the Estate of James Aaron McBrayer, deceased, MICHAELA UNDERWOOD is the proper person to bring the action on behalf of Mr. McBrayer's estate to recover compensatory damages including general

damages for physical and mental pain and suffering as well as funeral expenses incurred by the estate. Plaintiff MICHAELA UNDERWOOD herein asserts a claim for these damages on behalf of the estate. Also, Plaintiffs are entitled to recover attorney's fees and various costs under the provisions of 42 U.S.C. § 1988 and other applicable law and are not entitled to recover pre-judgment and post-judgment interest.

## COUNT V

### Punitive Damages

81.

Plaintiffs incorporate herein by reference paragraphs one (1) through fifty-eighty (80) above as if said paragraphs were specifically set forth herein.

82.

At all times relevant, the acts and omissions of Defendants Scarbrough, Henderson, Tripp and Spurgeon as described herein above demonstrated, by clear and convincing evidence, that degree of deliberate indifference, willfulness, wantonness and reckless disregard for the safety of others so as to warrant the imposition of punitive damages to punish and deter them.

83.

Plaintiff MICHAELA UNDERWOOD as the duly appointed Administratrix of the Estate of James Aaron McBrayer is the proper party to bring this claim for the

imposition of punitive damages against the Defendants Scarbrough, Henderson, Tripp and Spurgeon.   Plaintiff MICHAELA UNDERWOOD herein asserts that claim for the imposition of punitive damages against the Defendants Scarbrough, Henderson, Tripp and Spurgeon.

WHEREFORE, Plaintiffs demand a trial by a jury of twelve (12) and pray for judgment against the Defendants, as apportioned in accordance with the law of Georgia, for the following damages:

(1)    Plaintiff SHERRI McBRAYER prays for damages for the full value of the life of James Aaron McBrayer as shown by the evidence and determined by the enlightened conscience of fair and impartial jurors;

(2)    Plaintiffs SAMUEL AARON McBRAYER and JORDAN JANICE McBRAYER pray for damages against the Defendants Scarbrough, Henderson, Tripp and Spurgeon for the deprivation of their constitutional right to family association with their father James Aaron McBrayer;

(3)    Plaintiff MICHAELA UNDERWOOD in her capacity as the duly appointed Administratrix of the Estate of James Aaron McBrayer, deceased, prays for damages suffered by James Aaron McBrayer while in life, the claim for said damages now having survived to his estate, including but not limited to: a) violation of James Aaron McBrayer's constitutional rights by Defendants Scarbrough, Henderson, Tripp and Spurgeon, b) physical and mental pain and suffering caused

by all named defendants and experienced by James Aaron McBrayer prior to his death and, c) as to all defendants, funeral expenses incurred by the estate of James Aaron McBrayer, deceased;

(4)     Plaintiff MICHAELA UNDERWOOD in her capacity as the duly appointed Administratrix of the Estate of James Aaron McBrayer, deceased, prays for punitive damages against the Defendants Scarbrough, Henderson, Tripp and Spurgeon to punish them and deter them from ever committing such egregious conduct again.

(5)     All Plaintiffs seek recovery of attorney's fees and costs as allowed by 42 U.S.C. § 1988 and as assessed by the Clerk of Court pursuant to FRCP 54, as well as pre-judgment and post-judgment interest.

SPURLIN & SPURLIN, LLC
*Attorney for Plaintiffs*

/s/ John C. Spurlin
JOHN C. SPURLIN

1510 Whiddon Mill Road
Post Office Box 7566
Tifton, Georgia 31793-7566
(229) 391-9106 – O
(229) 391-9665 – F
johnspurlin@spurlinlaw.com

CRAIG ALAN WEBSTER
Attorney for Plaintiffs
Ga. State Bar No.: 744950

111 E. 12th Street
Tifton, Georgia 31794
(229) 388-0082 - O
(229) 388-0084 - F
cwebster@twflaw.com