```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF GEORGIA
                   VALDOSTA DIVISION
MICHAELA UNDERWOOD, as the
duly appointed Administratix
of the Estate of James Aaron
McBrayer, Deceased; SHERRI
McBRAYER, Individually and as
the surviving spouse of James
Aaron McBrayer, Deceased, and;
SAMUEL AARON McBRAYER, by and
through his mother and natural
guardian ANGIE McBRAYER, and
JORDAN JANICE McBRAYER, the
surviving children of James
Aaron McBrayer, Deceased,
                                CIVIL ACTION NO.:
      Plaintiffs,               7:21-CV-00040-WLS
vs.

HON. GENE SCARBROUGH,
Individually and in his
official capacity as Sheriff
of Tift County Georgia, CLIFF
HENDERSON, Individually and in
his official capacity as a
Lieutenant Deputy Sheriff of
Tift County, Georgia, ANTHONY
RAYMOND TRIPP, Jr.,
Individually and in his
official capacity as Deputy
Sheriff of Tift County,
Georgia, CONNOR BRENNEN
SPURGEON, Individually and in
his official capacity as
Deputy Sheriff of Tift County,
Georgia, and AXON ENTERPRISE,
INC. of DE, a Deleware
Corporation,

      Defendants.
_____/
    VIDEOTAPED DEPOSITION OF ANTHONY R. TRIPP, JR.
               TAKEN ON 9/22/2021
```



Page 2

```
1
2
3
4          VIDEOTAPED DEPOSITION OF
             ANTHONY R. TRIPP, JR.
5
6      Wednesday, September 22nd, 2021
         Commencing at 10:13 a.m.
7         Concluding at 6:20 p.m.
8
9         Hall Booth Smith, PC
           1564 King Road
10         Tifton, Georgia 31793
11
12
13
14    Reported by Michelle Subia, RPR, CCR
         5817-0834-4721-4080
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
       APPEARANCES:
1
2       FOR THE PLAINTIFFS:
3          JOHN C. SPURLIN, ESQUIRE
            Spurlin & Spurlin
4          1510 Whidden Mill Road
            Tifton, Georgia 31793
5          johnspurlin@spurlinlaw.com
6       CRAIG A. WEBSTER, ESQUIRE
            Henrich Enterprises, Inc.
7          405 Love Avenue
            Tifton, Georgia 31794
8          cwebster@twfl.com
9       FOR DEFENDANT AXON ENTERPRISE, INC.:
10         AMY L. NGUYEN, ESQUIRE
            Axon Enterprise, Inc.
11         17800 N. 85th Street
            Scottsdale, Arizona 85255
12         amynguyen@axon.com
13      FOR DEFENDANTS SCARBROUGH, HENDERSON, TRIPP &
         SPURGEON
14
          TERRY E. WILLIAMS, ESQUIRE
15         Williams Morris Waymire
            4330 South Lee Street
16         Buford, Georgia 30518
            terry@wmwlaw.com
17
18      ALSO APPEARING:
19         FRANK ALTMAN, VIDEOGRAPHER
20
21
22
23
24
25
```

Page 4

```
1           I N D E X
2
3    WITNESS                    PAGE
     ANTHONY R. TRIPP, JR.
4
     Examination by Ms. Nguyen        7
5    Examination by Mr. Spurlin      121
     Further Examination by Ms. Nguyen  359
6    Examination by Mr. Williams     368
7        PLAINTIFF EXHIBITS
8
     NUMBER                     PAGE
9
     Exhibit 8   TASER Instructor Guide    220
10   Exhibit 10  CEW Applicant Certification  223
     Exhibit 11  TASER PowerPoint        225
11   Exhibit 16  Use of Force Policy 3.01   167
     Exhibit 27  Course Attendance Sheet   151
12
13       DEFENDANT EXHIBITS
14
     NUMBER                     PAGE
15
     Exhibit 1   Tifton Incident Report    19
16   Exhibit 2   Aerial               22
              Photographs/Composite
17   Exhibit 2A  Aerial Photograph       30
     Exhibit 2B  Aerial Photograph       30
18   Exhibit 2C  Aerial Photograph       30
     Exhibit 2D  Aerial Photograph       30
19   Exhibit 3   TASER Log             63
     Exhibit 4   TASER Policy           75
20   Exhibit 5   Officer Profile         78
     Exhibit 6   TASER PowerPoint Excerpt   81
21   Exhibit 7   Report of Autopsy        88
     Exhibit 8   10/30/18 TASER Warnings   96
22   Exhibit 9   3/1/13 TASER Warnings    116
23
24
25
```

Page 5

```
1        THE VIDEOGRAPHER:  We are now on the record.
2    This begins videotape number one in the deposition
3    of Deputy Anthony Trip, Jr. in the matter of
4    Michaela Underwood, as the duly appointed
5    Administratrix of the Estate of James Aaron
6    McBrayer, Deceased, et al. vs. Honorable Gene
7    Scarborough, Individually, and in his official
8    capacity as Sheriff of Tift County, Georgia, et
9    al., In The United States District Court for the
10   Middle District of Georgia, Valdosta Division.
11       Today is September 22nd, and the time is
12   10:08.  This deposition is being held at 244 -- I
13   beg your pardon, that is the wrong address -- at
14   1564 King Road, Tifton, Georgia, at the request of
15   Axon Enterprises, Inc.
16       The videographer is Frank Altman of Magna
17   Legal Services.  And the court reporter is --
18       THE COURT REPORTER:  Michelle Subia.
19       THE VIDEOGRAPHER:  Will counsel all -- and
20   all parties present state their appearances and
21   who they represent.
22       MS. NGUYEN:  Amy Nguyen, representing Axon
23   Enterprise, Inc.
24       MR. SPURLIN:  I'm Johnny Spurlin.  And along
25   with Mr. Craig Webster, we represent the
```





Page 6

```
 1    plaintiffs.
 2         MR. WILLIAMS:  Terry Williams, and I
 3    represent Sheriff Scarborough and all the deputies
 4    named as defendants.
 5         THE VIDEOGRAPHER:  Will the court reporter
 6    please swear in the witness.
 7         THE COURT REPORTER:  Please raise your right
 8    hand.
 9         Do you swear or affirm the testimony you're
10    about to give will be the truth, the whole truth,
11    and nothing but the truth?
12         THE WITNESS:  I do.
13         THE COURT REPORTER:  Thank you.
14         (Witness sworn.)
15
16              - - -
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1              ANTHONY R. TRIPP, JR.,
 2    having been produced and first duly sworn,
 3              testified as follows:
 4              EXAMINATION
 5    BY MS. NGUYEN:
 6    Q    Good morning.
 7    A    Good morning.
 8    Q    Can you please state your full name --
 9    A    Yes.
10    Q    -- for the record?
11    A    Yes, ma'am.  My name is Anthony Ray Tripp,
12    Jr.
13    Q    And any aliases you go by, nicknames?
14    A    I go by -- my nickname's TJ.
15    Q    TJ?
16    A    Yes, ma'am.
17    Q    I met you earlier just before this
18    deposition.  My name is Amy Nguyen, and I represent one
19    of the named defendants in this matter, Axon
20    Enterprise, Inc.
21         Do you understand that you are here to
22    testify as both a witness and a named defendant in this
23    matter?
24    A    Yes, ma'am.
25    Q    I understand that you were deposed relating
```

Page 8

```
 1    to this incident in the State Court matter back on
 2    June 10th, 2020?
 3    A    Yes, ma'am.
 4    Q    Do you recall that?
 5    A    I do.  Yes, ma'am.
 6    Q    Okay.  So you're familiar with the rules of a
 7    deposition, correct?
 8    A    Yes, ma'am.
 9    Q    I will just go over just two of the rules
10    that I have, and that is really pertaining to my
11    questioning.  If you have any unclarity or questions
12    about my questions, please do not answer, just ask me
13    to clarify if you don't understand at all, okay?
14    A    Yes, ma'am.
15    Q    If you do answer, I'm going to assume that
16    you understood my question; fair enough?
17    A    Yes, ma'am.
18    Q    And, also, I try to take a break every hour.
19    If you need something sooner than that, just let me
20    know, and we'll take a break.  The only condition to
21    that is if I do have a question pending, I ask that you
22    answer that question first, and then we'll go ahead and
23    take a break; fair enough?
24    A    Yes, ma'am.
25    Q    Okay.  Deputy Tripp, do you understand that
```

Page 9

```
 1    the family of James McBrayer has brought suit against
 2    you, Deputy Spurgeon, Sheriff Scarbrough, and Axon
 3    relating to his death?
 4    A    Yes, ma'am.
 5    Q    Do you understand that the specific
 6    allegation that they have against you, at least one of
 7    them, is that you used excessive force -- excessive and
 8    unreasonable force against Mr. McBrayer?  You
 9    understand that?
10    A    Yes, ma'am.
11         MR. SPURLIN:  Can I just ask a clarification?
12    Are we reserving all objections except as to form
13    and responsiveness?
14         MS. NGUYEN:  Form and foundation, yeah.
15         MR. SPURLIN:  (Nodding head affirmatively.)
16         MR. WILLIAMS:  That's fine.
17         MR. SPURLIN:  I just wanted to make sure.
18         MR. WILLIAMS:  I think that's what the rule
19    provides, whether we say it or not.
20         MR. SPURLIN:  I do too.  But I just wanted to
21    be clear before we get halfway through it.
22         MS. NGUYEN:  Yeah.
23         MR. WILLIAMS:  And we're going to reserve
24    signature, just to note that for the record.
25         MS. NGUYEN:  You want to read and sign?
```



Page 10

1      MR. WILLIAMS:  Read and sign, yeah.
2      MS. NGUYEN:  Yeah.
3  BY MS. NGUYEN:
4      Q   All right.  Deputy Tripp, are you aware that
5  Georgia Bureau of Investigations conducted an
6  investigation into the reasonableness of your
7  interaction with Mr. McBrayer?
8      A   Yes, ma'am.
9      Q   And did you participate in that investigation
10 voluntarily?
11     A   Yes, ma'am, I did.
12     Q   Are you aware of the result of that
13 investigation?
14     A   I mean, I'm not sure that I'm understanding
15 what you're asking as far as the result.
16     Q   Sure.
17     Do you understand that GBI, the Georgia
18 Bureau of Investigations -- you know what GBI is,
19 right?
20     A   Yes, ma'am.
21     Q   Okay.  That they conducted an investigation
22 and they sent it over to the District Attorney's Office
23 to determine whether criminal charges should be brought
24 against you?
25     A   Yes, ma'am.

Page 11

1      Q   And do you understand what the outcome of
2  that determination was?
3      A   It was my understanding that no -- no charges
4  were filed at that time.
5      Q   And was it also your understanding that they
6  were specifically looking at whether you used excessive
7  or unreasonable force against Mr. McBrayer?
8      A   Yes, ma'am.
9      Q   And as a result of that investigation to
10 date, have you been charged with any criminal offense
11 relating to use of force or treatment of Mr. McBrayer?
12     A   No, ma'am.
13     Q   I want to get some background.  You're
14 currently employed at Tift County?
15     A   Yes, ma'am.
16     Q   And how long have you been there?
17     A   I started with Tift County in -- when I
18 graduated the -- I actually started with them before I
19 graduated the academy.  They're the ones that sent me
20 through the academy.  I started with them the end of
21 2017.  I graduated the academy in March of 2018, and I
22 was employed with Tift County Sheriff's Office until
23 December of 2019.
24     Q   Okay.
25     A   In December of 2019, I left Tift County

Page 12

1  Sheriff's Office.  I went to Lenox Police Department.
2      Q   Can you spell that for me, Lenox?
3      A   L-e-n-o-x.
4      Q   Okay.
5      A   I worked there full time.  I worked in Omega
6  Police Department part time at that point.  And then in
7  August of '21 -- no, I'm sorry.  I'm sorry.  August of
8  '20, August of 2020, I came back to Tift County
9  Sheriff's Office full time.
10     Q   Okay.  You originally said that you had
11 worked with Tift County Sheriff's Office prior to going
12 to the academy in 2017; is that correct?
13     A   Yes, ma'am.
14     Q   In what capacity was that in?
15     A   Yes, ma'am.  So I -- I worked in the jail a
16 little bit, and then I was also conducting what they
17 call a pre-academy, just to prepare me for the academy.
18     Q   And how long were you working in the jail
19 prior to going to the academy?
20     A   I just worked in the jail a few days.  Again,
21 it was just part of the pre-academy process.
22     Q   Okay.
23     A   I was never actually employed as a jailer.
24     Q   And then what brought you -- when you went to
25 Lenox PD -- and I understand from reading your prior

Page 13

1  deposition that the benefits were -- were better --
2      A   Yes, ma'am.
3      Q   -- than they were at Tift County; is that
4  right?
5      A   Yes, ma'am.
6      Q   And so what brought you back to Tift County
7  Sheriff's Office in August of 2020?
8      A   I decided to come back to Tift County
9  Sheriff's Office just because the -- the call volume in
10 Lenox just wasn't what I was accustomed to.  It wasn't
11 to my -- to my liking.
12     I think I had eight calls in the nine months
13 that I worked there.  So it just -- it really wasn't a
14 fast enough pace for my liking.
15     Q   And when you were at both Lenox PD and Omega
16 PD, you were at Omega, part time, right?
17     A   Correct.
18     Q   And a patrol officer for both agencies?
19     A   Yes, ma'am.
20     Q   And what is your current position at Tift
21 County?
22     A   I am a traffic deputy with Tift County.
23     Q   And was that the same position that you were
24 in back on April 24th, 2019, the date of this incident?
25     A   No, ma'am.



MAGNA
LEGAL SERVICES

Page 14

1    Q   What position were you in on April 24th?
2    A   I was a patrol deputy.
3    Q   Okay. So tell me what the difference is
4   between a patrol deputy and a traffic deputy.
5    A   Patrol deputy answers calls for service
6   predominantly. You also serve papers, warrants,
7   subpoenas, civil papers, things of that nature.
8        A traffic deputy you mainly focus on traffic
9   stops and interstate -- interstate traffic. As a
10  traffic deputy, I do still answer calls, but that's
11  only when the shift becomes backed up and -- and they
12  need assistance with answering calls. But
13  predominantly my job is to work traffic.
14   Q   And have you been a traffic deputy since you
15  went back to Tift County in August of 2020.
16   A   No, ma'am. I started back out on patrol.
17  And I believe around October of 2020 I was moved back
18  to traffic.
19   Q   When you say "moved back to traffic," had you
20  been a traffic deputy previously?
21   A   I was. I was a traffic deputy when I left.
22  I don't remember when I was put on traffic. I was a
23  traffic deputy when I left Tift County.
24   Q   Okay. You currently carry a TASER conducted
25  energy weapon, correct?

Page 15

1    A   Yes, ma'am.
2    Q   And if I say "CEW," do you know what that
3   means?
4    A   I do. Yes, ma'am.
5    Q   And what does that mean?
6    A   It's a conducted energy weapon.
7    Q   Okay. And so you understand that TASER is
8   the brand of the device but the device is called the
9   conducted energy weapon, correct?
10   A   Yes, ma'am. I do understand that.
11   Q   And what model are you currently carrying?
12   A   I believe it's the X26.
13   Q   And is that the same model that you used in
14  the incident with Mr. McBrayer?
15   A   Yes, ma'am, it is.
16   Q   Have you ever worked in the training
17  department at Tift County?
18   A   No, ma'am.
19   Q   What about the other agencies that you were
20  at?
21   A   No, ma'am.
22   Q   Do you have any additional -- any
23  certifications other than I -- I know you're TASER
24  certified, correct?
25   A   I am, yes, ma'am.

Page 16

1    Q   Any additional certifications?
2    A   I am part of the crisis intervention team.
3   Other than that, I don't have any other specific
4   certifications.
5        I'm sorry, I do have speed detection.
6    Q   Speed detection?
7    A   Yes, ma'am. I'm laser certified, radar
8   certified, Intoxilyzer 9000 certified.
9    Q   What about CPR?
10   A   Yes, ma'am. I am CPR certified.
11   Q   Okay. And when did you become part of the
12  CIT Team?
13   A   I don't remember exactly when it was. It
14  would have been -- I don't know. I don't remember.
15   Q   Now, is there a difference between going
16  through CIT training and then actually becoming part of
17  the team or are they one in the same?
18   A   No, ma'am, they're one in the same.
19   Q   So I think it's in one of your records, the
20  date of that training, so we'll go through that in just
21  a bit.
22   A   Yes, ma'am.
23   Q   As far as your education, what is your
24  highest level of education?
25   A   I have a bachelor's degree, and I'm currently

Page 17

1   working on my second bachelor's degree.
2    Q   And where did you obtain your bachelor's
3   degree?
4    A   University of Phoenix.
5    Q   And that's in criminal justice?
6    A   Yes, ma'am. Yes, I hold a bachelor's degree
7   in criminal justice.
8    Q   And what year did you obtain that?
9    A   2015.
10   Q   You said you were currently working on
11  another bachelor's degree?
12   A   Yes, ma'am.
13   Q   And where -- where are you doing that?
14   A   That's also with the University of Phoenix,
15  and that's for public administration.
16   Q   Is there anything specific that you want to
17  do with that degree?
18   A   My aspiration is to be a sheriff one day.
19   Q   Great.
20       I also understand you were in the military,
21  right?
22   A   Yes, ma'am. I still am.
23   Q   And in the Reserves currently?
24   A   I'm in the Army National Guard.
25   Q   And when did you join the military?



Page 18

1      A    I joined the military February 25th, 2002.
2      Q    And I understand that you were military
3   police?
4      A    Yes, ma'am.
5      Q    In what years were you doing that?
6      A    I was in military police from 2006 until
7   2017.
8      Q    When you were with military police, did you
9   ever receive any training or carry a TASER CEW?
10     A    No, I never did have a TASER when I was in
11  military police.  No, ma'am.
12     Q    Okay.  Going to April 24th, 2019, that's the
13  date of the incident with Mr. McBrayer.  At that time,
14  you were patrol deputy, correct?
15     A    That is correct.
16     Q    And as a patrol deputy, were you assigned to
17  any specific area, or they call them beats?
18     A    We do have zone assignments.
19     Q    Zone.
20     A    I couldn't tell you what zone I was assigned
21  to that night because we shift zones every -- every
22  rotation.  So if we work two days on, I'll be in one
23  zone.  And then the next day that we come on, I'll be
24  in another zone.
25     Q    Okay.  So it was just rotated out?

Page 19

1      A    Yes, ma'am.
2      Q    And were you assigned a partner at that time?
3      A    No, ma'am.
4      Q    And what shift were you working?
5      A    I was on night shift.
6      Q    When did that start and end?
7      A    Night shift is from 6:00 p.m. to 6:00 p.m.
8         MS. NGUYEN:  I'll mark this as Exhibit 1,
9   please.  And I only have one copy for you guys.
10        (Defense Exhibit No. 1 was marked for
11  identification.)
12  BY MS. NGUYEN:
13     Q    Deputy Tripp, I'm showing you what's been
14  marked as Exhibit 1.
15        Do you recognize this document?
16     A    Yes, ma'am, I do.
17     Q    And what is it that we're looking at?
18     A    This is the report that I completed the day
19  of the incident.
20     Q    Is there any other reports that you completed
21  in relation to this incident?
22     A    No, ma'am, I don't think so.
23     Q    Okay.  No supplements?
24     A    No, ma'am.
25     Q    Okay.  Now, according to -- at the top of

Page 20

1   this report -- first of all, you prepared this the same
2   date of the incident, correct?
3      A    Yes, ma'am.  That is correct.
4      Q    And it states there that you responded to the
5   area of 303 Hall Road in Tifton, Georgia.
6         Do you see that?
7      A    Yes, ma'am, I do.
8      Q    And it says it's in reference to a person
9   yelling for help.
10        Is that accurate?
11     A    To the best of my recollection, yes.
12     Q    Can you let me know what information had you
13  received?  I assume the information is coming from
14  dispatch, correct?
15     A    Yes, ma'am.
16        So typically in my reports, I would put
17  exactly what we were dispatched to.  So if I was
18  dispatched, then I would put the information that I
19  had.
20        So my belief at that point is the only
21  information that I had was that somebody was in the
22  area yelling for help.
23     Q    Okay.  And then if we go below where it says,
24  "Investigative Supp" -- do you see that?
25     A    Yes, ma'am, I do.

Page 21

1      Q    It says, "Dispatch received additional call
2   about a person yelling in that area."
3         Do you see that?
4      A    Yes, ma'am.
5      Q    Did you -- had you -- at the time that you
6   arrived to that area, did you have any additional
7   information?
8      A    No, ma'am, I didn't.
9      Q    And were you responding in a -- to also
10  assist Deputy Spurgeon?
11     A    I actually responded as a secondary unit just
12  because of the nature of the call.
13     Q    And what do you mean by that, "the nature of
14  the call"?
15     A    Because it was somebody yelling for help, we
16  were unclear on -- on what the situation was.  We
17  typically would not send one deputy to a call of that
18  nature.  We would send multiple, or at least two, until
19  we get there and determine what's actually going on.
20     Q    Okay.  And so did you already know Deputy
21  Spurgeon was on his way?
22     A    Yes, ma'am.
23        Deputy Spurgeon was actually dispatched to
24  the call.  I went as a secondary unit.
25     Q    Okay.  Can you describe to me when you



MAGNA ▶
LEGAL SERVICES

1  arrived to the area -- and this is 303 Hall Road?
2  That's the first area you went to?
3      A   It was actually in the vicinity of.  I'm not
4  sure exactly what address we went to.  We didn't go to
5  an address initially, but it was in the area of 303
6  Hall Road.
7      Q   And when you arrived, Deputy Spurgeon was
8  already there?
9      A   Yes, ma'am.
10         MS. NGUYEN:  I'm going to mark that as
11  Exhibit 2, please.
12         (Defense Exhibit No. 2 was marked for
13         identification.)
14  BY MS. NGUYEN:
15      Q   Exhibit 2 is several aerial photos of the
16  area.  And I'll just direct your attention to the first
17  one.
18         Do you see there's a structure there with the
19  address 303 Hall Road, Tifton, Georgia?  Do you see
20  that?
21      A   Yes, ma'am, I do.
22      Q   And then there's -- if you look to the left
23  of that photo, it has "Hall Road"?
24      A   Correct.
25      Q   Does that help orient you to the area?

1      A   It does.  Yes, ma'am.
2      Q   And so is the area that you first responded
3  to on this first photo of Exhibit 2?
4      A   Yes, ma'am.
5      Q   Can you mark on that aerial the area where
6  you first arrived and saw Deputy Spurgeon?
7      A   I don't recall.  I'm not sure where it would
8  have been in that area.
9      Q   Okay.  Are you able to narrow it down at all
10  from this aerial in relation to Hall Road and the
11  structure 303 Hall Road?
12      A   No, ma'am.
13         I know that it was -- it was along the
14  roadway.  It wasn't -- it wasn't at 303 Hall Road.
15  Again, the call was in the area of.
16      Q   Okay.
17      A   So I actually go in the area once I hit Hall
18  Road, not -- not that specific address.
19      Q   Understood.
20         So you -- you didn't really pull off of Hall
21  Road into any of these other smaller roads?
22      A   No, ma'am.
23      Q   Okay.
24      A   At this point when I went in the area, I was
25  on Hall Road.

1      Q   Understood.
2         And you see that driveway that -- off of Hall
3  Road that leads to 303 Hall Road?
4      A   I do.
5      Q   That structure?
6      A   Yes, ma'am.
7      Q   Are you able to say in relation to that road
8  off of Hall Road where you were when you met Deputy
9  Spurgeon?
10      A   Again, I don't -- I mean, I don't remember.
11      Q   Okay.  And feel free to look -- I'm just
12  trying to get an idea, because what we also understand
13  is that's where there was a truck that had been in a
14  one vehicle accident; is that right?
15      A   Yes, ma'am.
16         But, again, I don't remember exactly where
17  that took place.
18      Q   Somewhere off of Hall Road?
19      A   Yes, ma'am.  It was on Hall Road.
20      Q   Okay.  Now, looking at page three of
21  Exhibit 2 and also page four of Exhibit 2, there's
22  multiple structures.  And this, I will tell you, is at
23  the address of 381 Hall Road.
24      A   Yes, ma'am.
25      Q   Does that look familiar to you?

1      A   Yes, ma'am, that does.
2      Q   And how does that look familiar?
3      A   Because this is where I encountered
4  Mr. McBrayer.
5      Q   Now, this location where you encountered
6  Mr. McBrayer, where was it in relation to the truck
7  that you found that was involved in this
8  single-incident collision?
9      A   I mean, it was --
10      Q   As far as directionally?
11      A   So that would be west.
12      Q   So 381 Hall Road is west of where the truck
13  was?
14      A   No.  381 is east, I believe.
15      Q   East of where the truck was?
16      A   East of where the truck was.
17      Q   Okay.
18      A   Yes, ma'am.
19      Q   Okay.  So when you arrived there, describe
20  what happened.
21      A   Are you talking about --
22      Q   And I'm referring to when you first met up
23  with Deputy Spurgeon, what conversations were had?
24      A   Okay.  I met up with Deputy Spurgeon, and he
25  was out with a vehicle that was in the ditch.  And I



Page 26

1 explained to Deputy Spurgeon that I was going to
2 continue to ride to see if we could determine who was
3 -- who was asking for help.
4        As I proceeded towards 381, I was driving
5 down the road with LED lights on, which are the lights
6 that illuminate the left and right of my vehicle.  And
7 I was driving slowly with the windows down.
8        As I approached 381, I could hear somebody
9 yelling, so I pulled into the -- forgive me.  I can
10 show you.
11    Q   Yeah.  Let me stop you there because I'm
12 going to ask a few more questions --
13    A   Okay.  I'm sorry.
14    Q   -- prior to that point.
15        No, that's okay.
16    A   Yes, ma'am.
17    Q   This is at approximately 5:00 in the morning,
18 right?
19    A   Yes, ma'am.
20    Q   So what was the lighting like at that time?
21    A   It was relatively dark.
22    Q   At the time that you met up with Deputy
23 Spurgeon, was there anyone else out there that deputy
24 Spurgeon was speaking to?
25    A   Not that I can -- not that I recall, no,

Page 27

1 ma'am.
2    Q   Okay.  Apparently McBrayer's ex-wife had come
3 to the area and had a discussion with Deputy Spurgeon.
4 Did you see that at all?
5    A   No, ma'am, I didn't.
6    Q   Did you investigate the vehicle that was in
7 the ditch at all?
8    A   No, ma'am.
9    Q   Did you see anyone else around other than
10 Deputy Spurgeon?
11    A   No, ma'am.
12    Q   Did you believe the occumant -- occupant of
13 that truck could have been the person that was asking
14 for help?
15    A   That was certainly a possibility.
16    Q   Okay.  So then as you're going down 381 Hall
17 Road with your window down -- excuse me -- just going
18 down Hall Road --
19    A   Yes, ma'am.
20    Q   -- with your window down, then you start to
21 hear yelling in the area of 381?
22    A   Yes, ma'am.
23    Q   Okay.  You were going to show me on Exhibit 2
24 which -- which photo are you looking at?
25    A   I'm looking at number three.

Page 28

1    Q   Okay.
2    A   And it's got the house.  It's got what
3 appears to be like a shed structure.  And then there's
4 a metal structure in it, like a dirt lot.  I entered
5 into that dirt lot.
6    Q   Okay.  Can you just put a large circle --
7    A   Yes, ma'am, I can.
8    Q   -- where you entered from Hall Road?
9        Can I take a look at that, please?
10    A   Yes, ma'am.
11    Q   Okay.  And then just draw a line down,
12 because I'm going to have you mark several things
13 throughout this deposition.
14    A   Yes, ma'am.
15    Q   If you can just draw a line down and indicate
16 that that's the place where you entered.
17    A   Like that?
18    Q   Great.  Thank you.
19    A   Yes, ma'am.
20    Q   Can you write in "entered here" or something
21 like that?
22    A   I can, yes, ma'am.
23    Q   If you can do that.  Thank you.
24        MR. WILLIAMS:  Are we identifying these
25 various photographs collectively as Exhibit 2 by

Page 29

1 individual -- the numbers one, two, three, four
2 or --
3        MS. NGUYEN:  Yeah.  We can go ahead and mark
4 them.  I recognize that they were not numbered.
5 BY MS. NGUYEN:
6    Q   So just in the order that I provided them to
7 you, one, two, three, four.
8    A   I moved them around after I unclipped them.
9 I don't know which one's --
10        MS. NGUYEN:  Madam Court Reporter, would you
11 mind doing that for me?
12        THE COURT REPORTER:  Sure.
13        MS. NGUYEN:  Thank you.
14        MR. WILLIAMS:  You want to do them separately
15 exhibits?  It might be easier if we just mark them
16 separately.  Just my suggestion.
17        MS. NGUYEN:  I prefer to do for the order of
18 the remainder of the deposition just 2 --
19        MR. WILLIAMS:  Exhibit 2?
20        MS. NGUYEN:  We can do A, B, C, D.
21        MR. WILLIAMS:  Okay.  This would be Exhibit
22 2B.
23        THE WITNESS:  You want A, B, C, D?
24        MR. WILLIAMS:  The one you just marked on,
25 that's going to be Exhibit 2C, right?

8  (Pages 26 to 29)



Page 30

1    MS. NGUYEN: Right.
2    MR. WILLIAMS: And then the last page is
3    going to be Exhibit 2D.
4    Now, we can flip back and forth. And you
5    were on 2C, right?
6    THE WITNESS: Yes, sir.
7    MS. NGUYEN: 2C.
8    MR. WILLIAMS: Okay.
9    (Defense Exhibit Nos. 2A, 2B, 2C, 2D were
10    marked for identification.)
11   BY MS. NGUYEN:
12   Q    Okay. So when you were on Hall Road -- I
13   want to make sure I understand your testimony
14   correctly -- the window is down and you hear somebody
15   yelling, and that's when you turn off in the dirt area
16   you indicated?
17   A    Yes, ma'am.
18   Q    Is that right?
19   A    Yes.
20   Q    Okay. When is the first time that you saw
21   Mr. McBrayer?
22   A    When I pulled into that lot, I saw
23   Mr. McBrayer leaned up against this -- the structure in
24   the back of that lot.
25   Q    Okay. Can you put an X and then draw a line

Page 31

1    and say Mr -- first saw Mr. McBrayer as to where his
2    location was?
3    A    (Witness complies.)
4    Q    Do you mind if I take a look at that?
5    A    Yes, ma'am.
6    MS. NGUYEN: Can you see that?
7    MR. SPURLIN: When you get old, you can't
8    see.
9    BY MS. NGUYEN:
10   Q    Did you pull your car in with the headlights
11   pointed to where Mr. McBrayer was at that time?
12   A    No, I did not. And the reason that I didn't
13   is because as soon as I pulled in, Mr. McBrayer took
14   off running around behind the building.
15   Q    So what was he doing right when you saw him?
16   A    When I saw him, he was leaned up against the
17   side of the building. He was kind of in a crouched
18   position. His elbows were on his knees.
19   Q    And was he still yelling at that time?
20   A    I don't remember.
21   Q    At that point, could you make out anything of
22   what he was saying when you heard the yelling, either
23   then or when you were at the road?
24   A    No, ma'am, not at that point.
25   Q    And then you said as soon as you pulled in,

Page 32

1    he ran around the corner?
2    A    Yes.
3    Q    Is that right?
4    A    Yes, ma'am.
5    I believe that he slapped the building. He
6    slapped the side of that metal structure, and then ran
7    around to the right side as if he was running behind
8    the building.
9    Q    Okay. And can you indicate that --
10   A    Yes, ma'am.
11   Q    -- on photo 2C?
12   A    (Witness complies.)
13   Q    Thank you.
14   A    I just placed an arrow. And it's kind of
15   hard to see, but I placed an arrow right here just
16   showing the direction that he went.
17   Q    Okay.
18   A    I'm sorry. Yes, sir. So the direction is
19   this way.
20   Q    Do you know directionally what that would be?
21   A    That would be -- I believe it would be west,
22   the west side of the building that he ran around.
23   Q    And what did you do next?
24   A    I exited my vehicle. I'm sorry. I pulled my
25   vehicle up to this -- this point right here. And

Page 33

1    that's when I angled my headlights towards the
2    direction that he ran.
3    And I exited my patrol vehicle. And at that
4    point, he was already running back around towards the
5    front of the building.
6    Q    Okay. Can you draw kind of a rectangle to
7    indicate where you pulled your patrol vehicle up to?
8    A    Yes, ma'am.
9    Please forgive me, this is not to scale by
10   any means.
11   Q    Oh, that's okay. Can I take a look?
12   A    Yes, ma'am.
13   Q    Thank you.
14   So the purpose of pulling your vehicle up at
15   that point was to get the headlights on him so you
16   could see better?
17   A    Yes, so I can see him.
18   Q    Is that right?
19   A    Yes, ma'am.
20   Q    Okay. You said at that point he started
21   running back?
22   A    Yes, ma'am, he was running back. And, again,
23   forgive me. Like I said, my -- it's not to scale. But
24   if I'm not mistaken, this is a lean-to, and it's
25   actually -- actually, this is where the backhoe was,





Page 34

1  was under the lean-to.
2       Q   I don't know -- I can't see where you're
3  pointing.
4       A   So if I'm not mistaken, the darker part right
5  here is a lean-to. So when he ran around, he actually
6  ran in between here because there's a backhoe parked
7  under that lean-to.
8           THE VIDEOGRAPHER: Can we move these bottles
9  right here?
10          THE WITNESS: Oh, yes, sir. I'm sorry.
11  BY MS. NGUYEN:
12      Q   So it would be kind of underneath --
13      A   Yes, ma'am.
14      Q   -- there where the backhoe was located?
15      A   Yes, ma'am.
16      Q   And when he started running back, where did
17  he go?
18      A   When he started running back towards me, he
19  crouched behind the backhoe bucket underneath the
20  lean-to.
21      Q   How far would you estimate he was from where
22  you were standing at that point?
23      A   If I had to make a rough estimation -- and,
24  again, this is just an estimation -- I would say
25  probably 30 to 35 feet.

Page 35

1       Q   Now, before -- up until this point, did you
2  know if Mr. McBrayer was on drugs?
3       A   No, ma'am.
4       Q   Had anyone told you that he had mental health
5  issues?
6       A   No, ma'am.
7       Q   Did you know if he had any criminal history?
8       A   No, ma'am.
9       Q   Did you know if he had a weapon?
10      A   No, ma'am.
11      Q   Did you know if anyone was with him, whether
12  it be near him or inside the residence?
13      A   No, ma'am.
14      Q   Did you know if he was the one that needed
15  help or if he caused somebody else to need help?
16      A   No, ma'am. There was no way for me to be
17  able to indicate that.
18      Q   Were you intending at that time to make
19  contact with him to learn more information?
20      A   That was my attempt, yes.
21      Q   So when he hid behind the backhoe, describe
22  what happened next.
23      A   He hid behind the backhoe bucket, and I -- I
24  illuminated him with my flashlight to try to get a
25  better view of what he was doing.

Page 36

1           At the same time, I also pulled my TASER out
2  just because of the -- the way he was acting. He was
3  yelling things such as "God hates you." And at that
4  point, again, not knowing any information about what
5  was going on, I decided to pull my TASER.
6           I started giving Mr. McBrayer commands to
7  come out and show me his hands because at this point,
8  he's behind the backhoe bucket. His arms are flailing
9  around.
10          I don't know what's behind that backhoe
11  bucket. All I know is he's not complying with what I'm
12  asking him to do at this point. He's already fled away
13  from me. And now, like I said, I can't -- I can't
14  really see what he's doing.
15          At that point, I do position myself a little
16  better to get a better view of what -- what's he doing
17  behind the backhoe bucket. At least at this point, I
18  can see his hands. I'm still giving Mr. McBrayer
19  commands to come out, show me your hands, come out.
20  And he takes a step from behind the backhoe bucket and
21  he charges directly at me.
22      Q   So you gave the commands for him to come out;
23  is that correct?
24      A   Yes, ma'am, I did.
25      Q   Any other commands that you recall giving at

Page 37

1  that time?
2       A   I do know that I told him to show me his
3  hands several times.
4       Q   Come out and show his hands?
5       A   Yes, ma'am.
6       Q   And did you comply with any of those commands?
7       A   Until the point that he charged at me, no.
8       Q   He was -- you said that he was yelling "God
9  hates you."
10          Can you recall anything else that he was
11  yelling?
12      A   No, ma'am, I -- I don't know.
13      Q   When you say you couldn't see his hands,
14  based upon your training and experience as a law
15  enforcement officer, what does that mean to you?
16      A   I mean, it certainly means to me that there's
17  a possibility of danger. And I say "a possibility"
18  because I don't know for certain what his intent is at
19  that point. But it's the nature of the call and that
20  uncertainty together that definitely heightened my
21  alert.
22      Q   And is it also that if you can't see his
23  hands, you also don't know if he's carrying any weapon?
24      A   Correct.
25          MR. SPURLIN: Object to the form.



Page 38

BY MS. NGUYEN:
Q   In your prior deposition testimony, you testified that he seemed very agitated; is that accurate?
A   Yes, ma'am, it is.
Q   He also seemed angry?
A   I would -- I would use those together, yes, ma'am.
Q   You also testified he was hostile; is that accurate as well?
A   Yes, ma'am.
Q   And very aggressive?
A   Yes, ma'am.
Q   Why would you say that he seemed very agitated?
A   I would say that he seemed very agitated because of the -- his demeanor when I initially got there. When I say that his arms were flailing, he was -- he was throwing them above his head. He was yelling.
       And, again, he was yelling things such as "God hates you." And I don't remember what else he was saying. But just his overall demeanor, you know, the yelling, the flailing of the arms, it appeared to me as if he was -- if he was agitated.

Page 39

Q   You also mentioned that he had already ran from you?
A   Yes, ma'am.
Q   What significance does that have to you?
A   Well, typically -- and, again, with the nature of the call, I wasn't exactly sure what his role in that call was. However, based on my experience, somebody that typically needs help doesn't -- doesn't run away from you. They come towards you.
       So at that point, it just -- it made me concerned that, you know, maybe I wasn't there to help him. Maybe he was the reason that somebody was yelling for help at that point.
Q   Did you see any injuries that you could observe on Mr. McBrayer?
A   No, ma'am.
Q   Based on your training and experience, at that point did you have a suspicion that he was on drugs?
A   I had a suspicion, yes.
Q   And why was that?
A   Just because of his -- again, his demeanor, the way that he was acting. But, again, it was a suspicion. I didn't know anything about Mr. McBrayer prior to this. But I believe that it certainly may

Page 40

have been a possibility.
Q   You testified that once he went behind the backhoe and was hiding and you were observing this agitated behavior, that you had pulled out your TASER X26; is that right?
A   That is correct.
Q   And is that your department issued TASER?
A   Yes, ma'am.
Q   And at that point, did you point it at Mr. McBrayer?
A   I did, yes, ma'am.
Q   And why?
A   At that point, it was to show force to attempt to get him to follow my commands.
Q   Did you intend to deploy your TASER CEW at that time or was it more to be prepared?
A   No, ma'am.
       At that point in time, it was just preemptive. It was to be prepared.
Q   You testified that you were also using your flashlight; is that correct?
A   Yes. Now, I did previously state that I did not have my flashlight. However, I watched the video, and my flashlight was in my hand.
Q   Okay. I was just going to ask you that

Page 41

because that I know --
A   Yes, ma'am.
Q   -- in your prior testimony, you -- you said that you just relied upon the flashlight that was on the TASER, correct?
A   Yes, ma'am.
       So the last time I gave testimony, I wasn't able to see the video prior to. I was able to watch the video, and I did have my flashlight in my hand.
Q   And did that also help refresh your memory when you viewed that video?
A   Yes, ma'am.
Q   So when you activate the TASER -- and I know we aren't there yet -- but you activate the TASER, does that automatically turn the flashlight on as well?
A   Yes, ma'am.
Q   At that point when you had pulled out your X26P, was it activated?
A   Can you elaborate on "activated," for me, please?
Q   Yeah.
       So it's my understanding that when you pull it out, it's not turned on; is that correct?
A   That is correct.
Q   And that you actually have to turn the safety



Page 42

```
 1   off --
 2   A   Correct.
 3   Q   -- for it to become activated?
 4   A   Yes, ma'am.
 5   Q   And then if you actually want to deploy it,
 6   then you pull the trigger; is that accurate?
 7   A   That is correct.
 8   Q   Okay.  So when you -- my question to you is
 9   when you said that you drew your TASER CEW, you pointed
10   it at Mr. McBrayer, was it activated at that time?
11   A   Yes, ma'am, it was.
12   Q   And when activating it, it also provides you
13   with the laser dot.
14   A   Yes, ma'am.
15   Q   Do you recall whether you placed that laser
16   dot on Mr. McBrayer?
17   A   Yes, ma'am, I did.
18   Q   In your training, whether it -- any of your
19   training with the department, including the TASER
20   training that you received, did you -- were you trained
21   that that is a form of deescalation?
22   A   Yes, ma'am, that is.
23   Q   How so?
24   A   Because typically when -- typically if
25   somebody sees that dot, they know that -- they know
```

Page 43

```
 1   that TASER is on them and they -- if they have ever
 2   been tased before, then they understand that there's a
 3   possibility of them being tased.
 4       And typically -- and I say "typically" based
 5   on the experiences that I've had -- typically that
 6   makes them become compliant, because they don't want to
 7   be tased.
 8   Q   And based upon your training and experience,
 9   do most people know what a TASER is?
10   A   Yes, ma'am.
11   Q   And so what you're saying is that can
12   convince them -- just by seeing it -- convince them to
13   comply without actually having to deploy it?
14   A   Yes, ma'am.
15   Q   Is that right?
16       MR. SPURLIN:  Object to the form.
17       MS. NGUYEN:  What is your objection to form?
18       MR. SPURLIN:  Well, how about leading,
19   because it --
20       MS. NGUYEN:  But I'm able to lead.  I'm an
21   adverse.
22       MR. SPURLIN:  Maybe you are.  Maybe you are
23   not.  I'm not sure you all are adverse.  But at
24   the time at the use of this, you certainly may not
25   be adverse.
```

Page 44

```
 1       MS. NGUYEN:  Got it.  So you're reserving
 2   that objection?
 3       MR. SPURLIN:  Aren't I required to?
 4       MS. NGUYEN:  Well, I'm saying if you're going
 5   to continuously -- I mean, you can reserve that
 6   objection throughout the deposition as opposed to
 7   just stating --
 8       MR. WILLIAMS:  That is an objection to form.
 9       MS. NGUYEN:  Right.
10       MR. WILLIAMS:  She's saying that's reserved.
11       MS. NGUYEN:  Right.
12       MR. WEBSTER:  That's what's not reserved.
13       MS. NGUYEN:  That's --
14       MR. SPURLIN:  That's what's not reserved.
15   That's what I have to make or waive.
16       MR. WILLIAMS:  Oh, I see what you're saying.
17   Okay.  Then you all can discuss that.
18       MR. SPURLIN:  Isn't that true?  That's what
19   we stipulated to is --
20       MR. WILLIAMS:  Well, I don't know that it --
21       MR. SPURLIN:  -- that we have to make
22   objections to form or else they're waived.
23       MR. WEBSTER:  That's the rule.
24       MS. NGUYEN:  Right.
25       MR. SPURLIN:  If you want to stipulate that I
```

Page 45

```
 1   can reserve all objections, including leading and
 2   form, I won't have to make them.  And I have not
 3   as --
 4       MS. NGUYEN:  No, we'll go ahead.
 5       MR. SPURLIN:  -- to many of your --
 6       MS. NGUYEN:  No.  I understand.
 7       MR. SPURLIN:  -- preliminary questions.
 8       MS. NGUYEN:  No.  We'll go ahead and
 9   continue.
10       MR. SPURLIN:  All right.  Well, I'm going to
11   make them about every time then.
12       MS. NGUYEN:  Well, you can make them when you
13   feel it's appropriate to make them and you have a
14   good-faith basis to do so.
15       MR. WILLIAMS:  But to save time, you could
16   just say "object to the form" and you don't have
17   to say all the rest.
18       MR. SPURLIN:  That's all I said.
19       MS. NGUYEN:  Yeah, that's all he should be
20   saying.
21       MR. SPURLIN:  That's all I've said every
22   time.
23       MS. NGUYEN:  Otherwise it's a speaking
24   objection.
25       MR. WILLIAMS:  Yeah, that's good.
```

12  (Pages 42 to 45)



Page 46

1    MS. NGUYEN: Okay.
2    MR. SPURLIN: I didn't speak -- just for the
3  record, I didn't speak or make a speaking
4  objection until you inquired. You specifically
5  asked me what was the basis for my objection.
6    MS. NGUYEN: Absolutely. I didn't say that
7  you --
8    MR. SPURLIN: So don't suggest that I made a
9  speaking objection.
10   MS. NGUYEN: I didn't suggest that at all. I
11  said you only would object to form; otherwise, it
12  would be a speaking. I never said that you made a
13  speaking objection. And I, in fact, asked you the
14  basis of the objection.
15   MR. SPURLIN: Yes, you did.
16   MS. NGUYEN: Okay. So there's -- there's no
17  suggestion there.
18   MR. SPURLIN: Okay.
19  BY MS. NGUYEN:
20   Q   Okay. At that point that you have your TASER
21  CEW pointed at Mr. McBrayer, had he complied with your
22  commands, would you have deployed your X26P?
23   A   No, ma'am.
24   Q   Now, at that time that he's hiding behind the
25  backhoe, do you recall whether you had asked for

Page 47

1  backup?
2    A   I had. As soon as he went behind the backhoe
3  bucket and -- I'm sorry, shortly after he went behind
4  the backhoe bucket, I did get on my radio and I called
5  for Deputy Spurgeon to come to my location.
6    Q   And what was the purpose of calling for that
7  backup?
8    A   Because at that point, he had not complied
9  with my lawful orders, as well as his -- again, his
10  demeanor, and the uncertainty of what his role was in
11  this situation that we had. I knew that Deputy
12  Spurgeon was the closest backup that I had.
13   Q   Prior to him charging at you that you've
14  described, when he was hiding behind the backhoe, was
15  there any hurry at that point? Meaning could you have
16  just waited for him to stay behind that backhoe until
17  Deputy Spurgeon arrived?
18   MR. WILLIAMS: Object to the form.
19   Go ahead.
20   THE WITNESS: I certainly could have waited.
21  Yes, I could have waited. There really was no
22  urgency to get him from the backhoe bucket at that
23  point other than the unknown, if there were any
24  weapons behind it, and not knowing if he had any
25  weapons on him.

Page 48

1  BY MS. NGUYEN:
2    Q   And so -- but could you have waited at the
3  time that he charged you?
4    A   No.
5    Q   When he -- you said that he ran straight
6  towards you; is that right?
7    A   Yes, ma'am.
8    MR. SPURLIN: Object to the form.
9  BY MS. NGUYEN:
10   Q   Were you able to see his facial expressions?
11   A   I was. He looked angry. I recall that his
12  hands were above his -- his hands were above his head
13  while he was running at me. And I took his actions as
14  him being hostile towards me.
15   Q   And where was he looking? Do you recall?
16   A   I don't remember.
17   Q   Did you have any reason to believe at that
18  point that he was just going to run right past you?
19   A   No, ma'am.
20   Q   Based upon all of your observations of his
21  conduct, was it your belief that he was actually
22  charging at you?
23   A   Yes, ma'am.
24   MR. SPURLIN: Object to the form.
25  BY MS. NGUYEN:

Page 49

1    Q   Did you have a belief at that point that he
2  was intending to assault you?
3    MR. SPURLIN: Object to the form.
4    THE WITNESS: Yes, ma'am.
5  BY MS. NGUYEN:
6    Q   Why is that?
7    A   Well, again, I have to go back to what his
8  demeanor was when I got there. He seemed to be very
9  angry, very agitated. He did not comply with my
10  commands to come out, other than when he ran directly
11  at me.
12   And, again, it's my belief that, you know, if
13  somebody's seeking assistance from law enforcement,
14  they're not going to run full speed at me and they're
15  not going to run towards me with their -- with their
16  hands in the air as if they're, you know, possibly
17  trying to attack me or strike me.
18   Q   Did you believe him to be an immediate
19  threat?
20   A   Yes.
21   MR. SPURLIN: Object to the form.
22  BY MS. NGUYEN:
23   Q   At that point, did you have an opportunity to
24  find out more information about Mr. McBrayer?
25   A   No, ma'am.

13  (Pages 46 to 49)



Page 50

```
 1        Q    Did you -- other than what you've described
 2   as the deescalation tactic of just displaying your
 3   TASER and putting the laser on him, did you have any
 4   opportunity to engage in any other deescalation
 5   tactics?
 6        A    No, ma'am.
 7        Q    Would you agree that the concept of
 8   deescalation assumes that you have the time to do so?
 9            MR. SPURLIN:  Object to the form.
10            THE WITNESS:  Correct.
11   BY MS. NGUYEN:
12        Q    And why would you agree with that?  What is
13   your training on that?
14        A    Well, in order to deescalate -- deescalation
15   is a technique that you used if the time and
16   circumstances permit.  If they don't, you know, if
17   somebody is actively trying to assault me or if I
18   perceive that they're actively trying to assault me,
19   then I'm not going to -- I'm not going to have time to
20   try to say, sir, please calm down or how can I help
21   you, because I do still have a right and an obligation
22   to defend myself and others.
23        Q    If the subject becomes an immediate threat of
24   arm, is deescalation an option?
25        A    No, ma'am.
```

Page 51

```
 1        Q    Going back to Exhibit 2C, I understand that
 2   you did, in fact, deploy your TASER CEW on
 3   Mr. McBrayer, correct?
 4        A    Yes, ma'am, I did.
 5        Q    On 2C, can you indicate, to your best
 6   recollection, where you were standing and where
 7   Mr. McBrayer was standing at the time of the
 8   deployment?
 9        A    (Witness complies.)
10        Q    And then if you can just --
11        A    So I put an "X" for me and I put an "O" for
12   Mr. McBrayer.
13        Q    Okay.  Thank you.
14            Do you recall --
15        A    Thank you.
16        Q    -- his body position at the time of
17   deployment?
18        A    Can you -- can you elaborate on that, please?
19        Q    Sure.
20            Was he straight on, both shoulders straight
21   towards you?  Was he standing to one side or the other?
22   Were his arms raised or down?  What do you recall about
23   that?
24        A    The best I can recall when I deployed my
25   TASER, Mr. McBrayer was still running towards me.  I
```

Page 52

```
 1   don't recall his arm position or anything of that
 2   nature.
 3        Q    How far would you estimate he was from you at
 4   the time of deployment?
 5        A    At the time of deployment, I would say he
 6   was -- he was somewhere around 10 feet.
 7        Q    Now, does that -- when you deploy, do you
 8   extend your arms out from your body taking the shooting
 9   stance?
10        A    Yes, ma'am.
11        Q    Do you know what I mean when I refer to the
12   "shooting stance"?
13        A    Yes, ma'am, I do.
14        Q    Can you demonstrate that for us?
15        A    Yes, ma'am.
16            So the shooting stance is going to be --
17   typically you would be squared up and you would be with
18   your arms punched out in front of you.
19        Q    And so how long would you estimate your arms
20   are?
21        A    3 feet, 4 feet.
22        Q    Okay.
23        A    I'm not sure.
24        Q    And so that would -- the distance from you
25   and Mr. McBrayer, we would have to then subtract your
```

Page 53

```
 1   arm length --
 2        A    Yes.
 3        Q    -- correct?
 4            MR. SPURLIN:  Object to the form.
 5            THE WITNESS:  Yes, ma'am.
 6   BY MS. NGUYEN:
 7        Q    So that would actually bring the TASER CEW a
 8   little bit closer to Mr. McBrayer?
 9        A    Yes, ma'am.
10            MR. SPURLIN:  Object to the form.
11            THE WITNESS:  Approximately seven.
12   BY MS. NGUYEN:
13        Q    Did you see --
14            Well, first let me ask you, do you recall
15   where you actually targeted the probes?
16        A    No, ma'am.
17        Q    Did you see them actually make contact with
18   Mr. McBrayer?
19        A    No, ma'am, I didn't.
20        Q    Did you give any warning to him that you were
21   going to deploy the TASER before deployment?
22        A    Can you elaborate on "warning"?  So I did --
23        Q    Any type of verbal warning.
24        A    I did state "TASER" three times before I
25   deployed my TASER.
```



Page 54

1  Q   So you actually said "TASER, TASER, TASER"?
2  A   Yes, ma'am.
3  Q   And is that consistent with the training that
4  you received?
5  A   Yes, ma'am.
6  Q   You testified previously that Mr. McBrayer
7  seemed unaffected; is that accurate?
8  A   Yes, ma'am.
9  Q   From the -- from the TASER CEW deployment,
10  correct?
11  A   Yes, ma'am.
12  Q   And why do you say that?
13  A   Because the TASER is designed to manipulate
14  muscles, which typically causes muscle failure.  And in
15  this situation, it never did that.  Mr. McBrayer was
16  still able to move and actually ran away from me
17  initially after I deployed my TASER.
18  Q   Did you have -- first let me ask you, when
19  you went through your TASER certification, did you
20  receive a voluntary exposure yourself?
21  A   Yes, ma'am, I did.
22  Q   And what was the result of your exposure, as
23  far as its effect on you?
24  A   My exposure is I was clipped on the bottom of
25  my -- or on the top of my boot and the back of my

Page 55

1  pants.  And it affected all the muscles between the two
2  probes.  It locked those muscles up, and I was actually
3  not able to get up off the ground at all until it
4  was -- until it completed its cycle.
5  Q   And was it a full five-second cycle?
6  A   Yes, ma'am.
7  Q   And based upon that experience, as well as
8  the additional training that you received, what would
9  you normally expect with an effective TASER CEW
10  deployment?
11  A   I would expect the same type of behavior from
12  someone that I deployed my CEW against.  And I would
13  also -- I would also expect not to be able to hear the
14  electricity.
15      When you have an effective deployment, it's
16  actually relatively quiet and you won't hear that
17  popping sound.
18  Q   And so when it's not effective or not
19  creating neuromuscular incapacitation -- do you
20  understand that to be NMI from your training?
21  A   Yes, ma'am.
22  Q   Okay.  So when it's not creating NMI, what
23  sound does it make?
24  A   It makes like an arcing sound.
25  Q   And when you deployed on Mr. McBrayer, did

Page 56

1  you hear that arcing sound?
2  A   At the time I deployed it, I didn't really
3  take note of the arcing sound initially.  I do remember
4  hearing it after the initial attempt.  But going back
5  and seeing my video, I believe that that sound is there
6  throughout the duration of every iteration.
7  Q   Based upon your training and experience,
8  somebody -- when there is an effective deployment, is
9  that individual able to run?
10  A   No, ma'am.
11  Q   Prior to the deployment, you mention in your
12  report that you were attempting to keep your distance
13  by kind of backtracking or backpedaling?
14  A   Yes, ma'am.
15  Q   Is that right?
16  A   It is.
17  Q   Tell me about that.
18  A   When Mr. McBrayer ran at me initially, I was
19  trying to create distance in hopes that he would -- he
20  would stop or change directions.  And at the point that
21  I realized that he was closing that gap further or
22  faster than I could create it, that's when I made the
23  decision to deploy my TASER.
24  Q   After deployment, you say that Mr. McBrayer
25  ran away.

Page 57

1  Could you -- at that point, could you see the
2  wires?  Are they still attached to the probes?  Do you
3  recall?
4  A   I don't recall.  I don't know.
5  Q   How far -- well, I'll just say your report
6  estimates approximately 20 feet that he ran; is that
7  accurate?
8  A   Yeah, I believe it says 25 but --
9  Q   It's the first page.  It's Exhibit 1, about
10  two-thirds of the way down.  The sentence starts
11  "James" --
12  A   It is -- yes, ma'am.  I'm sorry, it is
13  20 feet.
14  Q   Twenty feet.
15  A   I apologize.
16  Q   That's okay.
17      Is that still accurate --
18  A   Yes, ma'am.
19  Q   -- to your recollection?
20      And then --
21      MR. SPURLIN:  Object to the form.
22  BY MS. NGUYEN:
23  Q   -- you state "Before stopping and dropping to
24  his hands and knees"?
25  A   Correct.



Page 58

1    Q    At that point, did you -- how did you
2    interpret him stopping and dropping to his knees as far
3    as was he intending to comply?
4    A    That was my belief at that point, yes.  My
5    belief is that when he dropped down, that he was
6    submitting to an arrest at that point.
7    Q    And so what did you do next?
8    A    I approached Mr. McBrayer and attempted to
9    take him into custody.  And he rolled over, and he got
10   back up, and he ran at me again, so I attempted to
11   deploy my TASER again.
12        Let me -- by deploying my TASER, I'm assuming
13   that the probes are still in Mr. McBrayer.  I just want
14   to clarify that I'm not reattaching another cartridge.
15   I am still using the same cartridge that I previously
16   deployed.
17   Q    Right.
18        The X26P that you have, it's a single-shot
19   device, correct?
20   A    That is correct.
21   Q    As opposed to one that has two cartridges --
22   A    Yes, ma'am.
23   Q    -- a double shot?
24   A    Correct.
25   Q    And so if you wanted to deploy a second

Page 59

1    cartridge, you would actually have to remove that
2    cartridge, the spent cartridge, and put in a new one,
3    right?
4    A    Correct.
5        MR. SPURLIN:  Object to the form.
6    BY MS. NGUYEN:
7    Q    You did not do that here, correct?
8        MR. SPURLIN:  Object to the form.
9        THE WITNESS:  No, ma'am, I did not.
10   BY MS. NGUYEN:
11   Q    With the X26P, if you make -- made good
12   contact with the probes, you can reactivate it?
13       MR. SPURLIN:  Object to the form.
14       THE WITNESS:  Yes.
15   BY MS. NGUYEN:
16   Q    And how do you do that?
17   A    All you do is just pull the trigger again and
18   it will cycle for another five seconds.
19   Q    And so is it fair to say that the first
20   connection has to be good in order for any subsequent
21   reactivation to work?
22       MR. SPURLIN:  Object to the form.
23       THE WITNESS:  I would assume, yes.
24   BY MS. NGUYEN:
25   Q    So why did you -- oh, go ahead.

Page 60

1    A    Unless -- unless at some point that
2    connection goes from no connection to having a positive
3    connection.  You know, if -- if he gets tangled up in
4    the wires, something like that, then it can be
5    effective afterwards.
6        But typically, yes, if the first -- if the
7    probes don't make that initial contact, then you're not
8    going to have a successful deployment.
9    Q    And so given that the first deployment didn't
10   seem to have any effect on Mr. McBrayer, why did you
11   choose to attempt to reactivate the same probes as
12   opposed to putting in another cartridge?
13       MR. SPURLIN:  Object to the form.
14       THE WITNESS:  Honestly, I just -- I really at
15       that point didn't have time because of everything
16       that was going on, Mr. McBrayer actively coming
17       towards me.  I didn't want to take the risk of
18       trying to change those cartridges and not having
19       any effect because I dropped the new cartridge or,
20       you know, something of that nature.
21   BY MS. NGUYEN:
22   Q    When he was down on his hands and knees and
23   you thought he was going to comply, you said that you
24   attempted to place him under arrest at that point?
25   A    Yes, ma'am.

Page 61

1    Q    Did you give him any commands?
2    A    I don't remember.  I don't recall.
3        MR. WILLIAMS:  Amy, would this be a good
4    point for just a short restroom break?
5        MS. NGUYEN:  Yeah.  Absolutely.
6        THE VIDEOGRAPHER:  Stand by.
7        We're going off the record.  The time is
8    11:09 a.m.
9        (Whereupon, a recess was taken.)
10       THE VIDEOGRAPHER:  We're back on the record.
11   The time is 11:17.
12   BY MS. NGUYEN:
13   Q    Deputy, I believe where we left off, you were
14   describing that Mr. McBrayer was originally down on his
15   hands and knees, you attempted to place him in custody,
16   that he got up and advanced towards you again.
17       Do you recall that?
18   A    Yes, ma'am.
19   Q    Can you describe to me how he advanced toward
20   you again?
21   A    If I remember correctly, he -- he charged at
22   me.  He came running directly at me again.
23   Q    And did you believe him to be an immediate
24   threat at that time?
25       MR. SPURLIN:  Object to the form.

16  (Pages 58 to 61)



Page 62

1    THE WITNESS: Yes, ma'am.
2  BY MS. NGUYEN:
3    Q   Why?
4    A   Because, again, with him previously running
5  towards me with his arms, you know, above his head, he
6  went to the ground. I took that as him submitting. As
7  soon as I touched him, he jumped up and started running
8  at me again. I took that as a hostile act towards me.
9    Q   Your report mentions that he actually hit you
10 in the face; is that right?
11   A   Yes, ma'am, it is. I know that he struck me
12 in the face. I don't recall if it was -- if it was at
13 that point or not. I would have to refer you to the
14 video on that one as far as the time frame. But I do
15 know that he struck me in the face, and it knocked me
16 to the ground.
17   Q   When you attempted to reactivate the TASER
18 deployment by pulling the trigger, did that have any
19 effect on Mr. McBrayer, based upon your observations?
20   A   No, ma'am, it didn't.
21   Q   And why do you say that?
22   A   Because, again, he was -- he was able to --
23 he was able to function, even after I redeployed the
24 TASER. It didn't -- it didn't have the effect that
25 it's supposed to have on your muscles as far as, you

Page 63

1  know, tensing up and becoming immobilized.
2    Q   So what did he do at that point?
3    A   I don't remember. Let me see here.
4      Okay. So --
5    Q   Go ahead.
6    A   According to my report, and looking at my
7  report, after I reactivated my TASER, I do remember
8  that he ran away from me again. He got down on his
9  knees. And that's right -- that's when Deputy Spurgeon
10 arrived on the scene.
11     Deputy Spurgeon and I both took that as him
12 submitting to arrest. And Deputy Spurgeon came up
13 behind him and attempted to take him into custody.
14   Q   When you say "attempted to take him into
15 custody," do you mean place handcuffs on him?
16   A   Yes, ma'am. He attempted to place handcuffs
17 on him.
18     (Defense Exhibit No. 3 was marked for
19 identification.)
20 BY MS. NGUYEN:
21   Q   I believe you have Exhibit 3 there in front
22 of you.
23     Have you seen this document before?
24   A   No, I have not.
25   Q   Are you -- based upon your training, are you

Page 64

1  aware that the TASER X26P creates an internal log of
2  the events of the TASER?
3    A   Yes, ma'am, I did know that.
4    Q   And do you know the serial number to your
5  TASER X26P?
6    A   I do not.
7    Q   Well, I will tell you that this is the event
8  log that was downloaded from your X26P.
9      Do you have any reason to disagree with that?
10     MR. WILLIAMS: You mean the one he had at the
11 time?
12     THE WITNESS: Correct. Yeah. Because I've
13 got a different one now.
14     MS. NGUYEN: At the time, that's correct.
15 Thank you.
16 BY MS. NGUYEN:
17   Q   At the time of this incident?
18   A   I have no reason to disbelieve that, no,
19 ma'am.
20   Q   After the incident, did you turn over your
21 TASER to the GBI?
22   A   I did.
23   Q   Do you know whether or not somebody
24 downloaded it to get the events off of it?
25   A   I would be -- I would be making an

Page 65

1  assumption. I was told they did, but I don't -- I
2  wasn't there when that happened.
3    Q   You didn't have any involvement in the
4  download?
5    A   No, ma'am.
6    Q   Did you have the ability to download your
7  device or would you give that to a superior to do?
8    A   No, I can't download it. No, ma'am.
9    Q   Who has the ability to download it? Who
10 would you give it to?
11   A   I mean, I would utilize my chain of command
12 and give it to my lieutenant. However, he doesn't have
13 the ability to download it either. As far as I can
14 recall, nobody at the sheriff's office has that
15 ability. GBI would have to be the ones to do that.
16   Q   Referring you to page nine of Exhibit 3. Do
17 you see the far left column, it has -- it is titled
18 "SEQ" number or sequence number?
19   A   Yes, ma'am.
20   Q   Now, if you would just follow that down to
21 sequence number 249, and let me know when you're there.
22   A   Yes, ma'am.
23   Q   Okay. And then there it has -- if you go
24 over to the next column -- the date of April 24th,
25 2019.





Page 66

1      Do you see that?
2      A   I do.
3      Q   And would you agree that that's the date of
4   the incident with Mr. McBrayer?
5      A   Yes, ma'am.
6      Q   And then over to the right column of that, it
7   has -- that column is titled "Event Type."
8      Do you see that?
9      A   I do.
10     Q   And it says "Armed"?
11     A   Correct.
12     Q   So according to this, it shows the device was
13  armed at 5:03:40 on April 24th, 2019.
14     Does that sound accurate to you?
15     A   Yes, ma'am.
16     Q   Okay.  Going below to sequence numbers 250,
17  251, 252 and 253.
18     Do you see that?
19     A   I do.
20     Q   Those show the same date of April 24th,
21  correct?
22     A   That is correct.
23     Q   And then if you go over to the next column,
24  it has event type as all of those being triggered.
25     Do you see that?

Page 67

1      A   I do.  Yes, ma'am.
2      Q   So it -- and then actually the next column
3   over shows duration in seconds, where it shows five
4   seconds for each.
5      Do you see that?
6      A   I do.
7      Q   So according to this report, the trigger on
8   your device was pulled four times from 5:04:16 to
9   5:04:46.
10     Do you see that?
11     A   I do.
12     Q   Do you believe that to be accurate with your
13  recollection?
14     A   Yes, ma'am.
15     Q   Now, as you sit here today, do you
16  specifically recall pulling the trigger on your device
17  four times?
18     A   No, ma'am.  I don't recall that specifically,
19  no.
20     Q   So is it your testimony today that you recall
21  pulling the trigger the first time to deploy it,
22  correct?
23     A   Yes, ma'am.  I do recall that.
24     Q   And that you attempted to reactivate but you
25  just don't recall how many attempts you made to --

Page 68

1      A   That --
2      Q   -- reactivate?
3      A   That's correct.
4      Q   Okay.  And then the last sequence number
5   there is 254, event type "Safe"?
6      A   Yes, ma'am.
7      Q   Would that be when you put it -- the safety
8   back on the device?
9      MR. SPURLIN:  Object to the form.
10     THE WITNESS:  Again, I would be making an
11     assumption to say that that's correct.
12  BY MS. NGUYEN:
13     Q   So you don't know if --
14     A   I don't --
15     Q   I'm trying to understand your answer.
16     A   I know that I placed it back on safe.
17     Q   Okay.
18     A   I don't know that that's what that means on
19  this paper.
20     Q   Got you.  Okay.
21     So your recollection, though, is once you
22  deployed and attempted to reactivate, that you had
23  placed the device back in safe mode?
24     A   Yes, ma'am.
25     MR. SPURLIN:  Object to the form.

Page 69

1   BY MS. NGUYEN:
2      Q   So you stated that when Deputy Spurgeon
3   arrived on the scene, he attempted to take Mr. McBrayer
4   in custody, but then he -- what did Mr. McBrayer do
5   after that?
6      A   Mr. McBrayer, at some point, kicked Deputy
7   Spurgeon in the knee.  And I don't know what damage it
8   caused his knee.  He would have to tell you that.
9      I do know that Deputy Spurgeon fell forward
10  onto Mr. McBrayer.  When he -- when he fell, we were
11  able to gain control of his arms and essentially hold
12  him there until other deputies arrived.
13     Q   Were you able to get the handcuffs on
14  Mr. McBrayer?
15     A   Not at that point, no, ma'am.
16     Q   And so at that point, were you on the ground
17  when -- with Mr. McBrayer, attempting to get handcuffs
18  on him?
19     A   Yes, ma'am.
20     Q   How long would you say you were on the ground
21  with Mr. McBrayer until you actually were able to get
22  the handcuffs on him?
23     A   I have no idea, ma'am.  I would have to refer
24  you to the video.
25     Q   Did you ever put your knee on Mr. McBrayer's



## Page 70

1  neck?
2      A  No, I never placed my knee on his neck.
3      Q  Did you ever hold his face down in the dirt?
4      A  No, ma'am.
5      Q  Did you put your hands on his shoulders to
6  hold him down?
7      A  Yes, ma'am.
8      Q  Do you recall putting your hands on his neck
9  at any point?
10     A  Yes, ma'am.
11     Q  And describe those to me.
12     A  So let me -- let me be clear.  After watching
13  the video, it did appear as if I put my hand on the
14  back of Mr. McBrayer's neck.
15         And the purpose for that is because of the
16  training that I have.  Wherever your head goes, your
17  body is going to go.  So even though my hand was on his
18  neck, I was not applying a significant amount of
19  pressure or holding his face in the dirt.  You can
20  actually see in the video that he's able to move his
21  head around.
22         So the reason that I placed my hand on his
23  neck was if he did attempt to get up, then I was able
24  to control his head to keep him from getting up.
25     Q  Were you able to see -- well, let me just ask

## Page 71

1  you.  Deputy Spurgeon, was he also involved in holding
2  Mr. McBrayer down on the ground?
3      A  Yes, ma'am.
4      Q  Were you able to see what kind of contact he
5  had with Mr. McBrayer?
6      A  I know that he was trying to get control of
7  his arm.
8      Q  At that point, were you able to observe
9  Mr. McBrayer breathing?
10     A  Yes.
11     Q  Was he talking?
12     A  He was.
13     Q  Do you know what he was saying?
14     A  He was yelling a lot of the -- or he was
15  saying a lot of the same things that he was saying
16  before "God hates you."  And he was saying other
17  things.  I just -- I don't recall exactly what he was
18  saying.
19     Q  Okay.
20     A  The one that really sticks in my mind is "God
21  hates you."
22     Q  Did you see Deputy Spurgeon pull out his
23  TASER CEW?
24     A  I did.
25     Q  At what point was that?

## Page 72

1          A  When we initially went to the ground,
2  Mr. McBrayer was on his back, and we were trying to get
3  him to roll over because it's easier to control what
4  he's doing when he's on his stomach.  You know, we were
5  also attempting to take him into custody at that point,
6  put handcuffs on him.  And that would be done behind
7  his back.
8          So at that point, we're giving him verbal
9  commands to roll over.  He's still actively trying to
10  pull his arms away from us.  And Deputy Spurgeon did
11  utilize his TASER to try to gain compliance.
12     Q  Did you actually see him attempt to
13  utilize his TASER?
14     A  Yes, ma'am.
15     Q  And how did he do that?
16     A  So he did what they call a drive stun.  So
17  there's two ways to deploy a TASER.  You either deploy
18  the cartridge or you can do what they call a drive
19  stun, which is where you remove the cartridge and you
20  activate the TASER against their skin.  So attempted to
21  do use a drive stun.
22         As soon as -- at some point, Mr. McBrayer was
23  able to just pull away from it.  He was able to move
24  his body away from the TASER so it -- I'm not going to
25  attest to what effect it had because I don't know that.

## Page 73

1  But I do know that once you move away from that
2  contact, then it's no longer effective.
3      Q  Do you know in what location Mr. McBrayer's
4  body that Deputy Spurgeon applied his TASER?
5      A  If I may, I would just rather refer you to
6  the video because I -- I don't recall exactly where,
7  and I don't want to be wrong.
8      Q  Now, in drive stun mode, based upon your
9  training, is that able to cause NMI?
10     A  Not -- no, not to the degree that -- not to
11  the degree that deploying that TASER and actually
12  getting the spread of the probes would.  But, yes, to
13  some degree it does.
14     Q  What is the purpose of a drive stun?
15     A  The purpose of a drive stun is essentially
16  just to -- it gives you that brief moment of
17  connectivity so you can follow on.  Essentially it just
18  buys you time for a follow on.
19     Q  And based upon your training, is it for pain
20  compliance only?
21     A  Yes.
22         MR. SPURLIN:  Object to the form.
23  BY MS. NGUYEN:
24     Q  Based upon your observation, did it have any
25  effect on Mr. McBrayer?

MAGNA ▶
LEGAL SERVICES

Page 74

1      A    Based on my observation, no, because we still
2  didn't gain compliance.
3      Q    How did you -- how were you eventually able
4  to get the handcuffs on?
5      A    Essentially myself and Deputy Spurgeon were
6  just able to hold Mr. McBrayer in place until more
7  deputies got there.  Once more deputies arrived, then
8  we were able to get Mr. McBrayer's arms behind his back
9  and put him in handcuffs.
10     Q    And so did other deputies assist in getting
11  him handcuffed?
12     A    Yes, ma'am.
13     Q    And who was that?
14     A    I don't know directly who was involved in
15  handcuffing him.
16     Q    Do you recall what other deputies arrived to
17  the scene?
18     A    Yes, ma'am, I can tell you who was there.
19  Deputy Calderon was there.  Deputy Hancock was there.
20  It's now Captain Henderson -- he was Lieutenant
21  Henderson at the time -- was there.
22     Q    And so why weren't you able to get the
23  handcuffs on?  Where were his arms?
24     A    Deputy Spurgeon had one arm.  But the arm
25  that I was trying to gain control of was underneath

Page 75

1  Mr. McBrayer.  And the entire time he was actively
2  trying to get his arms away from us.  So we weren't
3  able to pull his arms out from under him and get them
4  behind his back in a manner to be able to handcuff him.
5      Q    I understand from your prior testimony there
6  was also a hobble tie used?
7      A    Yes, ma'am.
8      Q    And why was that?
9      A    A hobble strap was used because, you know,
10  obviously Mr. McBrayer had fled and fought with us to
11  some degree.  And a hobble strap prevents someone from
12  being able to kick.
13     Q    Had he been kicking prior to that?
14     A    I don't recall.  But it also keeps him from
15  being able to flee because it bounds his feet together.
16          And, I'm sorry, let me -- if you don't mind,
17  I would like to make a correction.  He did kick because
18  he kicked Deputy Spurgeon in the knee.
19     Q    Thank you.
20          MS. NGUYEN:  This will be Exhibit 4.
21          (Defense Exhibit No. 4 was marked for
22  identification.)
23  BY MS. NGUYEN:
24     Q    Deputy Tripp, I'm showing you Exhibit No. 4.
25          Do you recognize this?

Page 76

1      A    Yes, I recognize it.
2      Q    What is it?
3      A    This is the Tift County Sheriff's policy for
4  the conducted energy weapon, the TASER.
5      Q    And to your knowledge, is this the policy
6  that was in effect on the date of the incident with
7  Mr. McBrayer?
8      A    Yes, ma'am.
9      Q    Are you familiar with this policy?
10     A    Yes, ma'am.
11     Q    Going down to -- well, first, would you agree
12  that this is the policy that would cover the use of
13  TASER conducted energy weapons?
14          MR. SPURLIN:  Object to the form.
15          THE WITNESS:  Yes, ma'am.
16  BY MS. NGUYEN:
17     Q    And would that include the X26 that you used
18  on Mr. McBrayer?
19     A    That is correct.
20     Q    Under paragraph one, it states there -- well,
21  first, let's back up.
22          The first paragraph, the second sentence
23  states "The TASER M26/X26 may be used when a subject is
24  displaying active, aggressive or active, aggressive
25  resistence to an employee attempting to conduct legal

Page 77

1  law enforcement activities."
2          Do you believe that Mr. McBrayer was
3  displaying that behavior prior to your TASER
4  deployment?
5      A    Yes, ma'am, I do.
6      Q    And which behavior would it be that is listed
7  here on the policy?
8      A    It would be the active, aggressive at the
9  point that I deployed the TASER.
10     Q    And would that be the case both for the
11  initial deployment as well as the subsequent attempts
12  to reactivate?
13     A    Yes, ma'am.
14     Q    Down at paragraph one, it states, "An
15  approved TASER M26/X26 device may only be utilized by
16  employees that have successfully completed the
17  department approved training and its use taught by a
18  certified instructor."
19          Do you see that?
20     A    I do.
21     Q    And was that your understanding, that you had
22  to successfully complete department approved training
23  before using your TASER CEW?
24     A    Yes, ma'am.
25     Q    And at the time of the incident, had you done



Page 78

1   that?
2       A   Yes, ma'am.
3       Q   And so when it says "Department approved
4   training," do you understand that to be your
5   department?  Tift County Sheriff's Office has to
6   approve the training?
7       A   Yes, ma'am.
8           MS. NGUYEN:  This is Exhibit 5.
9           (Defense Exhibit No. 5 was marked for
10      identification.)
11  BY MS. NGUYEN:
12      Q   I'm showing you Exhibit 5.  This is your
13  individual officer profile; is that correct?
14      A   Yes, ma'am.
15      Q   Have you seen this document before?
16      A   I have.
17      Q   Going to page two of that document -- well,
18  first let me ask this.
19          Does this document, to your knowledge,
20  capture all of the training history that you had as
21  of -- it looks like it was created July 16th of 2019?
22      A   Yes, ma'am.
23      Q   So going to the second page, do you see there
24  it looks like the seventh entry down dated December
25  18th, 2018, it says "TASER Certification"?

Page 79

1       A   Yes, ma'am.
2       Q   And is that accurate that you received your
3   TASER certification on that date?
4       A   Yes, ma'am.
5       Q   And over to the right, it has a number of
6   hours.  It shows eight?
7       A   Yes, ma'am.
8       Q   Is that your recollection that it was an
9   eight-hour training?
10      A   Yes, ma'am.
11      Q   Do you recall who was the instructor for that
12  training?
13      A   I do.  It was Major Torres.
14      Q   And is Major Torres still with the
15  department?
16      A   He is.
17      Q   And to your knowledge, at the time of this
18  certification, was Major Torres a certified instructor?
19      A   Yes, ma'am.
20      Q   And at the time Major Torres was employed by
21  Tift County, correct?
22      A   Yes, ma'am.
23      Q   Did your training also take place by Tift
24  County -- or excuse me -- at Tift County?
25      A   Yes, ma'am, it did.

Page 80

1       Q   Where exactly?  Do you have a training --
2       A   It was in the squad -- squad room.
3       Q   To your knowledge, was that training put on
4   in any way by Axon?
5       A   No, ma'am.
6       Q   Was there any Axon or TASER -- formally TASER
7   employees present during that training?
8       A   No, ma'am.
9       Q   Were you certified on the X26P model?
10      A   Yes, ma'am.
11      Q   Any other models?
12      A   Not that I recall, no, ma'am.
13      Q   As part of that certification, do you recall
14  there being both a classroom and a practical portion to
15  the training?
16      A   Yes, ma'am.
17      Q   What did you do in the classroom portion?
18      A   The classroom portion you -- they present a
19  PowerPoint presentation.  And then you take a test at
20  the end of that, at the conclusion of the PowerPoint.
21      Q   And did you understand that as being part of
22  the curriculum required by your department?
23      A   Yes, ma'am.
24          MS. NGUYEN:  That will be exhibit -- I think
25      we're on five.

Page 81

1           THE COURT REPORTER:  Six.
2           MR. WILLIAMS:  Six.
3           THE WITNESS:  Six.
4           MS. NGUYEN:  Six.
5           (Defense Exhibit No. 6 was marked for
6       identification.)
7           MS. NGUYEN:  We actually need to -- before we
8       get into this exhibit, we'll go ahead and take a
9       quick break so the videographer can switch out
10      tapes.
11          THE VIDEOGRAPHER:  Thank you.
12          The time is 11:41.  This ends medium number
13      one.  We're going off the record at 11:41.
14          (Whereupon, a recess was taken.)
15          THE VIDEOGRAPHER:  This is the beginning of
16      medium number two in the deposition of Deputy
17      Anthony Tripp.  The time is 11:54.  We're on the
18      record.
19  BY MS. NGUYEN:
20      Q   Deputy Tripp, where we left off before the
21  break, we were talking about your TASER certification
22  training that was eight hours.
23          You testified that there was a classroom
24  portion and a practical portion, and in the classroom
25  portion you reviewed the PowerPoint that was part of



Page 82

1  the curriculum by Tift County, correct?
2      A   Yes, ma'am.
3      Q   Okay.  So I believe you have Exhibit 6 in
4  front of you.  This is excerpts of the PowerPoint.  But
5  looking at the first page, it says "TASER X26P User
6  Course."  This one is Version 20.2, effective
7  January 15th, 2018.
8          To your knowledge, is this the PowerPoint
9  that would have been in effect during your training in
10 December of 2018?
11     A   Yes, ma'am.
12     Q   And it looks like you've been going through
13 that.  And do you recognize this as in fact the
14 PowerPoint that you would have reviewed during that
15 training?
16     A   Yes, ma'am, I do.
17     Q   Okay.  Going, to that first page of the
18 exhibit, which is actually numbered page five, it
19 states, "Release and Warnings Requirements.  The
20 Warning Acknowledgment:  All students attending TASER
21 User Certification courses will be required to
22 acknowledge that they have read and understand the
23 warnings prior to participating in any hands-on CEW
24 drills required by the certification course."
25         Was that consistent with your understanding?

Page 83

1      A   Yes, ma'am.
2      Q   And did you review the warnings prior to
3  participating in that training?
4      A   Yes, ma'am.
5      Q   And when I say "warnings," I'm referring to
6  the Axon or TASER product warnings about the TASER
7  X26P.
8          Is that your understanding?
9      A   Yes, ma'am.
10     Q   Going to the next page, it states "TASER CEWs
11 are not risk free."
12         Would you agree with that?
13     A   Yes, ma'am.
14     Q   It goes on to say they "Can temporarily
15 incapacitate target."  And this -- I'm sorry, this is
16 under the warning that's in orange.  And there's a
17 picture in yellow to the left.
18         Do you see that?
19     A   I do.
20     Q   And it says they "Can temporarily
21 incapacitate a target and can cause death or serious
22 injury."
23         Deputy Tripp, was that your understanding
24 when you went through this training in 2018?
25     A   Yes, ma'am.

Page 84

1      Q   And you would agree then that you understood
2  TASER energy weapons, or TASER CEWs, can cause serious
3  injury or death?
4      A   Yes, ma'am.
5      Q   Would you agree that all uses of force carry
6  a risk of death or serious injury?
7      A   Yes, ma'am.
8      Q   And then at the bottom of that page, it
9  states "Review and understand TASER current product
10 warnings."
11         And you testified that you -- you reviewed
12 and understood those warnings, correct?
13     A   Yes.
14     Q   Okay.  The next page, which is actually
15 numbered page six, it says -- the first bullet point
16 there "TASER training does not set use of force
17 policies, general orders, or procedures."
18         Do you agree that TASER training did not set
19 those -- your use of force policies?
20     A   I do, yes.
21     Q   What is your understanding as to who set the
22 policies that you had to follow regarding use of force?
23     A   Tift County Sheriff's Office.
24     Q   And specific -- more specifically, what is
25 your understanding as to who set the policies regarding

Page 85

1  your use of TASER CEWs?
2      A   I'm sorry, I don't understand.
3      Q   My first question was general uses of force,
4  who set the policy?
5      A   Okay.
6      Q   And you said Tift County Sheriff's Office.
7      A   Yes, ma'am.
8      Q   My second question is just more specifically
9  as to who sets the policies regarding your use and the
10 standards of use of TASER CEWs?
11     A   Tift County Sheriff's Office.
12     Q   You would agree that Axon or TASER as the
13 manufacturer of TASER CEWs cannot set the policy for
14 you to follow on use of force?
15         MR. SPURLIN:  Object to the form.
16         THE WITNESS:  Correct.
17 BY MS. NGUYEN:
18     Q   And, in fact, it does not set that policy on
19 use of force; is that your understanding?
20         MR. SPURLIN:  Object to the form.
21         THE WITNESS:  Yes, it is.
22 BY MS. NGUYEN:
23     Q   And you agree that you -- do you agree that
24 you must follow your own agency policy when using a
25 TASER CEW?

22  (Pages 82 to 85)




Page 86

1      A   Yes, ma'am.
2           MR. SPURLIN:  Object to the form.
3   BY MS. NGUYEN:
4      Q   On the next page, which is numbered page
5   seven, it states "Each agency is responsible for
6   creating its own use of force policies and procedures."
7           Do you agree with that, Deputy Tripp?
8           MR. SPURLIN:  Object to the -- object to the
9      form.
10          THE WITNESS:  Yes, ma'am.
11  BY MS. NGUYEN:
12     Q   On the next page, which is numbered 17, it
13  talks about neuromuscular incapacitation.
14          Do you see that?
15     A   Yes, ma'am.
16     Q   What do you understand that to mean,
17  neuromuscular incapacitation?
18     A   My understanding of that is that it tenses
19  the muscles in that target area to the point where it
20  creates muscle failure.
21     Q   The first bullet point there states "There
22  are different levels of neuromuscular
23  incapacitation" -- also referred to as NMI -- "ranging
24  from limited area effects to significant body lockup."
25          Is that something that you learned during

Page 87

1   your TASER training?
2      A   It is.
3      Q   The next bullet point states "The greater the
4   probe spread, the higher likelihood of NMI."
5           Is that also something you learned during
6   your training?
7      A   Yes, ma'am.
8      Q   The next bullet point "CEWs may not achieve
9   total NMI."
10          Is that also something that you learned?
11     A   It is.
12     Q   Next bullet point, "Subject may maintain
13  muscle control, particularly in arms and legs,
14  depending on many factors, including probe locations."
15          Is that also something that you learned
16  during your training?
17     A   It is.
18     Q   Next bullet point, "Be prepared with other
19  force options, including a drive stun follow-up to
20  expand NMI in close probe spread situations."
21          Is that also something you learned during
22  your training?
23     A   Yes, ma'am.
24     Q   And then lastly, it states, "Drive stuns
25  alone cause only localized pain, not NMI."

Page 88

1      A   Yes, ma'am.
2      Q   Is that also something that you learned?
3      A   Yes, ma'am.
4      Q   On the next page, which is numbered page 108,
5   it talks about "Deployment Distance Considerations."
6           Do you recall learning about what distances
7   you should obtain prior to deploying your TASER CEW?
8      A   Yes, ma'am.
9      Q   And by the distance, I'm referring to the
10  distance between your device and the subject.
11          Do you understand that?
12     A   Yes, ma'am.
13     Q   The last bullet point of this page states "A
14  minimum 12-inch probe spread is optimal."
15          Do you -- is that something you learned
16  during your training?
17     A   Yes, ma'am.
18     Q   And what do you understand that to mean?
19     A   The distance between the two probes should be
20  at least 12 inches apart in order for you to achieve
21  successful NMI.
22          MS. NGUYEN:  This will be Exhibit 7.
23          (Defense Exhibit No. 7 was marked for
24      identification.)
25  BY MS. NGUYEN:

Page 89

1      Q   Deputy Tripp, Exhibit 7 is the official
2   report of autopsy conducted on Mr. McBrayer.
3           Do you see that on the front page?
4      A   Yes, ma'am, I do.
5      Q   Have you reviewed this document before?
6      A   No, ma'am, I have not.
7      Q   Going to page three of Exhibit 7.  Based upon
8   your training and experience, do you understand that
9   the probes -- if there's a -- for a probe deployment,
10  that the probes will leave a probe wound on the subject
11  that it's deployed on?
12     A   Yes, ma'am.
13     Q   And did you learn that in your training?
14     A   I did.
15     Q   Have you also experienced that in the field?
16     A   Yes, I have.
17     Q   About middle of the page on page three, it
18  states "Conductive energy weapons, paren, TASER
19  injuries."
20          Do you see that?
21     A   I do.
22     Q   It goes on to state "On the right anterior
23  chest, centered 18 inches below the top of the head and
24  2 and one-fourth inches right of the anterior midline,
25  is a one-sixteenth by one-sixteenth-inch puncture wound

23  (Pages 86 to 89)



Page 90

1   with a surrounding five-sixteenth by one-fourth-inch
2   area of superficially abraded/eroded red contusion."
3        Do you see that?
4   A  I do.
5   Q  Okay.  Going to the last sentence of that
6   paragraph, it states, "This injury is consistent with a
7   conductive energy weapon, TASER, probe puncture wound."
8        Do you see that there?
9   A  I do.
10  Q  And then the next paragraph states, "On the
11  right anterior chest centered 23 inches below the top
12  of the head and two and three-fourth inches right of
13  the anterior midline, is a one-sixteenth by
14  one-sixteenth-inch puncture wound with a surrounding
15  one-fourth by one-fourth-inch area of superficially
16  abraded/eroded red contusion."
17       Do you see that there?
18  A  I do.
19  Q  The last sentence of that paragraph, again,
20  states, "This injury is consistent with a conductive
21  energy weapon, TASER, probe puncture wound."
22       Do you see that?
23  A  I do.
24  Q  So putting those paragraphs together, would
25  you agree that that's describing the location of the

Page 91

1   puncture wounds remaining from the TASER CEW probes?
2        MR. SPURLIN:  Object to the form.
3        THE WITNESS:  Yes, ma'am.  That's how it
4   appears.
5   BY MS. NGUYEN:
6   Q  Okay.  And then it states, one of the probe
7   wounds is 18 and a half inches below the top of the
8   head and the other probe wound is 23 inches below the
9   top of the head.
10       Do you see that?
11  A  Yes, ma'am.
12  Q  And they are about the same place as -- from
13  the anterior midline.  One is two and one-fourth inches
14  and one is two and three-fourths inches.
15       Do you see that?
16  A  I do.
17  Q  So would you agree then the difference
18  between the 18 and a half inches and 23 inches is 4 and
19  a half inches between the two puncture wounds?
20  A  Yes, ma'am.
21       MR. SPURLIN:  Object to the form.
22  BY MS. NGUYEN:
23  Q  And so would that also indicate the distance
24  or the probe spread between the two probes?
25  A  Yes.

Page 92

1        MR. SPURLIN:  Object to the form.
2   BY MS. NGUYEN:
3   Q  That being the 4 and a half inches?
4   A  Yes, ma'am.
5   Q  And based upon your training and experience
6   with a 4 and a half inch probe spread, would you expect
7   to receive that amount?
8   A  No, ma'am.
9        MR. SPURLIN:  Object to the form.
10  BY MS. NGUYEN:
11  Q  And why do you say that?
12  A  Because the probes are too close together.
13  And what I -- what I've been taught about TASER is the
14  only affected area is between the two probes.
15  Q  So you would not expect the muscle lockup
16  with only the 4 and a half inches between the probes?
17  A  No, ma'am.
18       MR. SPURLIN:  Object to the form.
19  BY MS. NGUYEN:
20  Q  And would that be consistent then with your
21  observations of Mr. McBrayer's reaction to the TASER
22  deployment during the incident in question?
23       MR. SPURLIN:  Object to the form.
24       THE WITNESS:  Yes, ma'am.
25  BY MS. NGUYEN:

Page 93

1   Q  Going back to Exhibit 6.  That's going to be
2   the PowerPoint.  And it's just the last two pages of
3   that exhibit is where we left off.  And it's numbered
4   page 90.
5        Are you there?
6   A  I am.
7   Q  This is titled "Physiological/Metabolic
8   Effects."
9        Did you learn during your training that there
10  can be physiological and metabolic effects on a subject
11  from the TASER CEW deployment?
12  A  Yes, ma'am.
13  Q  Specifically this slide states "CEWs may
14  produce effects that could increase the risk of sudden
15  death, included changes -- including changes in blood
16  chemistry, blood pressure, respiration, heart rate and
17  rhythm, adrenaline, and stress hormones."
18       Is that something that you learned during
19  your TASER training?
20  A  Yes, ma'am.
21       MR. SPURLIN:  Object to the form.
22  BY MS. NGUYEN:
23  Q  On the next page, which is number 94, it's
24  titled medic -- "Medically Compromised Person."
25       Do you see that?

24  (Pages 90 to 93)





Page 94

1    A   Yes, ma'am, I do.
2    Q   It states, "Any law enforcement use of force,
3 including a CEW, may cause or contribute to death or
4 serious injury."
5         Is that something that you learned during
6 your training?
7         MR. SPURLIN:  Object to the form.
8         THE WITNESS:  Yes, ma'am.
9 BY MS. NGUYEN:
10   Q   The next bullet point states, "Law
11 enforcement personnel are called upon to deal with
12 individuals in crisis that are often medically
13 compromised and who may be susceptible to
14 arrest-related death."
15        Is that something that you learned during
16 your training?
17   A   It is.
18        MR. SPURLIN:  Object to the form.
19 BY MS. NGUYEN:
20   Q   And would you agree with that statement that
21 you're often called upon to deal with individuals in
22 crisis that are often medically compromised?
23   A   Yes, ma'am, I would agree with that.
24   Q   The next bullet point.  "The subject may
25 already be at risk of death or serious injury as a

Page 95

1 result of preexisting conditions, individual
2 susceptibilities, or other factors."
3         Is that something that you learned during
4 your training?
5    A   Yes, ma'am.
6         MR. SPURLIN:  Object to the form.
7 BY MS. NGUYEN:
8    Q   And would you agree that you -- as far as
9 preexisting conditions, individual susceptibilities, or
10 other factors, that that is not information that you
11 were always privy to during your interactions with
12 subjects in the field?
13   A   That is correct.
14        MR. SPURLIN:  Object to the form.
15 BY MS. NGUYEN:
16   Q   And, in fact, with regard to the incident
17 with Mr. McBrayer, did you have any knowledge about his
18 medical condition at the time?
19   A   No, ma'am, I did not.
20   Q   Did you have any knowledge as to whether he
21 was on drugs at the time?
22   A   No, ma'am.
23   Q   Did you have any knowledge as to his mental
24 health status at the time?
25   A   No, ma'am.

Page 96

1    Q   And so would you agree that this is talking
2 about those medical conditions that you are made aware
3 of?
4         MR. SPURLIN:  Object to the form.
5         THE WITNESS:  Yes, ma'am.
6         MS. NGUYEN:  This will be Exhibit 8.
7         (Defense Exhibit No. 8 was marked for
8 identification.)
9 BY MS. NGUYEN:
10   Q   Okay.  I'm showing you Exhibit 8.  Take a
11 moment just to review that.
12   A   Okay.
13   Q   Deputy Tripp, have you had a moment to
14 familiarize yourself with Exhibit 8?
15   A   Yes, ma'am.
16   Q   And do you recognize the exhibit?
17   A   I do.
18   Q   And what do you recognize it as?
19   A   These are the TASER warnings that are part of
20 the class before you do the practical application
21 course.
22   Q   And kind of two -- or excuse me -- one-third
23 of the way down, the paragraph starts, "These warnings
24 and instructions are effective October 30th, 2018."
25        Do you see that?

Page 97

1    A   I do.
2    Q   So do you recall these being the warnings
3 that you reviewed during your TASER training in
4 December of 2018?
5    A   Yes, ma'am.
6    Q   Down at the bottom of the page, there's two
7 footnotes.  I'm going to direct your attention to
8 footnote two.
9         Do you see that?
10   A   I do.
11   Q   It states, "Law enforcement agencies are
12 force experts and are solely responsible for their own
13 guidance.  Guidance includes policy, custom, procedure,
14 rule, order, directive, training, continuum and
15 standard.  Axon has no authority to mandate guidance,
16 set policy, require training, or establish standards of
17 care or conduct."
18        Is that something that you reviewed during
19 your TASER training in December of 2018?
20   A   It is.
21   Q   Then on page one, it's the second paragraph,
22 the first sentence states, "When used as directed in
23 probe deployment mode, CEWs are designed to temporarily
24 incapacitate a person from a safer distance than some
25 other force options, while reducing the likelihood of

25  (Pages 94 to 97)




Page 98

1  death or serious injury.  However, any use of force,
2  including the use of a CEW, involves risks that a
3  person may get hurt or die due to the effects of the
4  CEW.  Physical incapacitation, physical exertion,
5  unforeseen circumstances, or individual
6  susceptibilities."
7      Is that something that you reviewed during
8  your TASER training in December of 2018?
9      A  Yes, ma'am, it is.
10     Q  And are those, in fact, things that you were
11  aware of, that CEWs, while reducing the likelihood of
12  death or serious injury, they still involve that risk?
13     A  Yes, ma'am.
14     Q  On page --
15     MR. WILLIAMS:  If I may, I just want to
16  interject here for a second just to clarify for
17  the record.  I'm not sure that this is the version
18  -- because the version that was produced with part
19  of our discovery on their training, the materials
20  are dated March 2013, when he had his training, as
21  I understand it.
22     I don't know if there's any difference.
23  Reading it so far, I don't see any difference.
24  But just to note that this may be different from
25  what he actually received.

Page 99

1      MS. NGUYEN:  You know, I -- I noticed that,
2  but --
3      We can -- we can go off the record.
4      THE VIDEOGRAPHER:  Stand by.
5      The time is 12:14.  We're going off the
6  record.
7      (Whereupon, a recess was taken.)
8      THE VIDEOGRAPHER:  The time is 12:15.  We're
9  back on the record.
10     MR. SPURLIN:  This is Johnny Spurlin.  Let me
11  say something on the record.  And I am not
12  accusing Mr. Williams of doing anything
13  inappropriate, but he handed another set of TASER
14  warnings and said he thought the 2013 were the
15  ones he was actually trained on.  And an
16  off-the-record discussion occurred suggesting that
17  they were similar so far in the comparison.
18     My only point is Deputy Tripp has sworn under
19  oath that Exhibit No. 8 is the one that he was
20  trained on.  So to the extent that we're trying to
21  provide assistance, I think that's inappropriate.
22  I mean, he can swear to what he can swear to.
23     MS. NGUYEN:  All right.  Ready to --
24     MR. WILLIAMS:  Yeah.  I just noted to counsel
25  that they looked the same.  That's why I'm saying

Page 100

1  so far they looked and appeared the same.  So it
2  certainly could appear that way to the witness.
3      But I think the training records that we have
4  that were actually in his file would be the better
5  source of the accuracy of that.  But that's --
6      MS. NGUYEN:  Yeah.  Either way, the comments
7  of counsel are really irrelevant and aren't part
8  of the record and so I'm going to, as I stated on
9  the record, clarify it with the witness.
10     MR. WILLIAMS:  Fine with me.
11     MR. SPURLIN:  Well, my comments are not
12  irrelevant.  My comments are made to put on the
13  record what may be inappropriate discussions to
14  coach the witness into changing his testimony.
15     He's already sworn under oath that the
16  exhibit you handed him was the one he used in
17  training.  Any communications to suggest another
18  answer to him that maybe that's not accurate, he
19  had a different set, is improper.
20     And what I said is not irrelevant.  It's made
21  to perfect what occurred.  That's the intent of my
22  comments.  And that's the reason you have a record
23  is so the judge will know what was done.
24     MS. NGUYEN:  And although I had --
25     MR. SPURLIN:  Did I state inaccurately -- did

Page 101

1  I state anything inaccurately about what happened,
2  Mr. Williams?
3      MR. WILLIAMS:  That's perfectly fine.  It
4  will all sort out.  It's not a big deal.
5      MS. NGUYEN:  We're going to sort it out
6  through the deputy's testimony.
7      MR. WILLIAMS:  Sure.
8      MS. NGUYEN:  But I will say that counsel
9  simply is pointing out that there was another
10  warnings document produced that has a date of
11  March 1, 2013 and that thus far what I have
12  reviewed appears to be the same in both documents.
13  BY MS. NGUYEN:
14     Q  Okay.  So I think where we left off, we're
15  still on Exhibit 8, we are on page two.  And it's the
16  paragraph titled "Physiologic and Metabolic Effects."
17     Do you see that?
18     A  I do.
19     Q  Okay.  And it says there, "CEW causes
20  physiologic and/or metabolic effects that may increase
21  the risk of death or serious injury."
22     Is that something that you learned during
23  your December 2018 training?
24     A  Yes, ma'am, it is.
25     Q  Going on to the next paragraph, it states



1  "Some individuals may be particularly susceptible to
2  the effects of CEW use.  These susceptible individuals
3  include those with heart conditions, asthma, or other
4  pulmonary conditions, and people suffering from excited
5  delirium, profound agitation, severe exhaustion, drug
6  intoxication, or chronic drug abuse, and/or
7  overexertion from physical struggle."
8      Do you see that?
9  A  I do.
10  Q  And is that something that you learned in
11  conjunction with your December 2018 TASER training?
12  A  Yes, ma'am.
13  Q  It goes on to state, "In a physiologically or
14  metabolic -- metabolically compromised person, any
15  physiologic or metabolic change may cause or contribute
16  to sudden death."
17      Is that also something that you learned
18  during your December 2018 training?
19  A  Yes, ma'am, it is.
20  Q  Now, with regard to this list of conditions
21  for particularly susceptible individuals, it first
22  states it can include those with heart conditions,
23  asthma, or pulmonary conditions, and people suffering
24  from excited delirium."
25      Do you see that?

1  A  I do.
2  Q  You previously testified that you didn't know
3  what excited delirium is; is that correct?
4  A  That is correct.
5  Q  Is that still accurate as you sit here today?
6  A  It is.
7  Q  Do you know whether that's -- excited
8  delirium is even a formal medical diagnosis?
9  A  I'm not sure.  I can't speak on that.
10  Q  Do you know whether it's recognized by
11  American Medical Association?
12  A  Again, I can't speak on that.
13  Q  American Psychiatric Association?
14  A  No, ma'am.
15  Q  World Health Organization?
16  A  I'm not sure.
17  Q  Okay.  Deputy Spurgeon testified that Major
18  Torres discussed excited delirium in his TASER
19  training, which also took place in December of 2018.
20      My question to you is do you recall the same,
21  that is, Major Torres discussing excited delirium
22  during the training?
23      MR. SPURLIN:  Object to the form.
24      THE WITNESS:  It was December of 2018.  I
25  don't remember if that was specifically discussed.

1  BY MS. NGUYEN:
2  Q  Is it possible that it was discussed but you
3  just don't remember it as you sit here today?
4  A  It is possible.
5  Q  The next thing listed here is -- after
6  excited delirium, profound agitation.
7      Do you see that?
8  A  I do.
9  Q  And you already testified in this case that
10  Mr. McBrayer was very agitated, correct?
11  A  Yes, ma'am.
12  Q  The next thing is severe exhaustion.
13      Do you know whether Mr. McBrayer was severely
14  exhausted?
15  A  I can't attest to whether he was or wasn't.
16  Q  Did you -- you don't know what he was doing
17  prior to your interaction with him, right?
18  A  No, ma'am.
19  Q  Do you know whether he had been running
20  before you came into contact with him?
21  A  I don't know.
22  Q  Drug intoxication.  You testified that you
23  did suspect he may be on drugs, right?
24  A  Yes, ma'am.
25  Q  But did you have any information confirming

1  that he was in fact on drugs?
2  A  No, ma'am, I did not.
3  Q  All right.  I believe I recall testimony or
4  prior testimony that at some point you noticed that
5  Mr. McBrayer was foaming at the mouth.
6      Do you recall that?
7  A  Yes, ma'am, I recall saying that.
8  Q  And do you recall when it was that you
9  observed the foaming at the mouth?
10  A  I don't remember.
11  Q  Do you -- what did you -- at the time
12  whenever you observed that during your interaction with
13  Mr. McBrayer, did that indicate anything to you?
14  A  I would say, no, it didn't really indicate.
15  I mean, it -- that is what caused me -- that's one of
16  the contributing factors that caused me to suspect that
17  he may be on drugs.
18      But I'm not a drug professional.  I'm not a
19  medical professional.  I don't know what would cause
20  somebody to foam at the mouth.
21  Q  Based upon your training and experience, had
22  you ever learned that people on drugs can foam at the
23  mouth?
24  A  Yes, ma'am.  I mean, I've seen it before.
25  Q  You said you've seen it before based upon



Page 106

1  your experience as a law enforcement officer?
2      A   Yes, ma'am.
3      Q   The next thing listed, chronic drug abuse.
4          Did you know anything about Mr. McBrayer's
5  history of drug use?
6      A   No, ma'am.
7      Q   Overexertion from physical struggle.
8          Well, you knew Mr. McBrayer was obviously in
9  a physical struggle with you and Deputy Spurgeon,
10 correct?
11     A   Yes, ma'am.
12     Q   Did you have any information whether he was
13 experiencing overexertion from that physical struggle?
14     A   No, ma'am.
15     Q   Knowing everything that we've reviewed that
16 you had learned during your December 2018 training, so
17 including in the PowerPoint, as well as the warnings,
18 knowing that information and the risks associated with
19 using TASER CEWs, once Mr. McBrayer chose to attack
20 you, did you have any option but to use force?
21         MR. SPURLIN:  Object to the form.
22         THE WITNESS:  No, ma'am.
23 BY MS. NGUYEN:
24     Q   And why do you say that?
25     A   I mean, I say that because, I mean,

Page 107

1  Mr. McBrayer was advancing towards me in what I
2  believed was an attempt to assault me.  So I -- at some
3  point, I would have had to defend myself.
4      Q   Did you have time to stop and ask him
5  questions about his medical or mental health condition?
6      A   No, ma'am.
7      Q   Did you have time to ask him if he was on
8  drugs?
9      A   No, ma'am.
10     Q   If he was mentally unstable?
11     A   No, ma'am.
12     Q   If he had an elevated temperature?
13     A   No, ma'am.
14     Q   Elevated heart rate?
15     A   No, ma'am.
16     Q   And whether his adrenaline was high?
17     A   No, ma'am.
18     Q   Whether he was exhausted or overexerted?
19     A   No, ma'am.
20     Q   Would you agree that you only had time to
21 defend yourself with the tools that you had?
22         MR. SPURLIN:  Object to the form.
23         THE WITNESS:  Yes, ma'am.
24 BY MS. NGUYEN:
25     Q   And what tools did you have on your belt that

Page 108

1  day when you came into contact with Mr. McBrayer?
2      A   I had my TASER, my OC spray, and my duty
3  weapon, my firearm.
4      Q   Did you have a baton?
5      A   No, ma'am.
6      Q   OC spray.  Based upon your training -- I
7  assume you've been trained on the use of OC spray?
8      A   Yes, ma'am.
9      Q   And what have you learned about OC spray and
10 its effectiveness on the subject?
11     A   Typically OC spray is -- I mean, it's
12 effective at preventing someone from being able to see,
13 but it's not going to neutralize somebody's actions.
14 It's not going to stop them from -- typically when you
15 spray somebody, they run around.  And it doesn't stop
16 them and gain compliance.
17     Q   Can OC spray also affect others
18 unintentionally?
19     A   Yes, ma'am.
20     Q   Would that --
21     A   And it typically does.
22     Q   Would that include yourself?
23     A   Yes, ma'am.
24     Q   Firearm, would a firearm -- would a firearm
25 have been appropriate to use during your interaction

Page 109

1  with Mr. McBrayer?
2      A   I believe, yes.
3      Q   And why did you choose to use a TASER CEW
4  rather than a firearm?
5      A   Because my intent was to use a less lethal
6  means, not to take Mr. McBrayer's life.
7      Q   And does your department classify a TASER CEW
8  as less lethal as opposed to lethal use of force?
9      A   Yes, ma'am, they do.
10     Q   And then lastly, were you able to go -- is
11 hands on considered to be a use of force?
12     A   It is.
13     Q   And based upon your training and experience,
14 going hands on, does that create injury to either
15 yourself or the subject?
16         MR. SPURLIN:  Object to the form.
17         THE WITNESS:  It can, yes.
18 BY MS. NGUYEN:
19     Q   And in this instance, why did you choose to
20 use the TASER CEW as opposed to going hands on
21 immediately with Mr. McBrayer?
22     A   Number one, I don't know what Mr. McBrayer --
23 Mr. McBrayer's training or experience level is.  So
24 it's commonly my practice not to -- not to try to get
25 into a physical confrontation with someone who I don't

28  (Pages 106 to 109)



Page 110

1  know, you know, his stamina, I don't know his
2  experience, his training.  So inherently it's more
3  dangerous for both of us to get into a physical
4  altercation than it is for me to deploy the CEW.
5      Q    And with regard to hands on, does that
6  require you to get in close proximity to the subject?
7      A    Yes.
8      Q    Does the use of a TASER CEW require you to
9  get in -- to close proximity with the subject?
10     A    No, it does not.
11     Q    Once Mr. McBrayer was finally detained, I
12 understand from your past testimony that he was placed
13 in a patrol vehicle; is that right?
14     A    That is correct.
15     Q    And why was he placed in the vehicle?
16     A    Because at that point, we hadn't had the
17 ability to do any investigation on what we were called
18 out there for.  And with Mr. McBrayer's -- with
19 everything that went on -- and we were still unclear
20 whether he was going to be pending charges at that time
21 or not -- we detained him and placed him into the
22 vehicle.
23     Q    Up until that point of being placed in the
24 vehicle, was Mr. McBrayer talking?
25     A    Yes.

Page 111

1      Q    Was he moving?
2      A    He was.
3      Q    Was he breathing, to your knowledge?
4      A    He was.
5      Q    So during the entire interaction with
6  Mr. McBrayer, up until the time that he was placed in
7  the vehicle, did you observe anything that made you
8  believe he was in medical distress?
9      A    No, ma'am.
10     Q    Is it Tift County Sheriff's Office policy to
11 obtain medical assistance whenever needed or requested?
12     A    Yes, ma'am.
13     Q    And did you do that here?
14     A    I personally did not.  Deputy Spurgeon was
15 the one that called for EMS.
16     Q    And I watched the video, and it appeared that
17 while Deputy Spurgeon was calling for EMS, that you
18 were assisting him with holding the radio button down.
19         Is that -- was that you?
20     A    Yes, ma'am.
21     Q    Okay.  So that was -- he was -- his hands
22 were on Mr. McBrayer and you were reaching over and
23 pushing the button for him to speak on his radio?
24     A    Yes, ma'am.  That way we didn't lose control
25 of that arm that we were able to get control of.

Page 112

1      Q    And do you recall during that time him
2  specifically requesting EMS?
3      A    Yes, ma'am.
4      Q    Do you recall at that time discussion of EMS
5  saying that they were staged until they received the
6  clear to come in?
7      A    I don't recall that, no.
8      Q    Did you ask any other officers to check on
9  Mr. McBrayer while he was in the car?
10     A    I did.
11     Q    And who did you ask?
12     A    Deputy Hancock.
13     Q    And what did you ask Deputy Hancock to do?
14     A    I asked him to make sure that he was
15 breathing and had a pulse.
16     Q    And to your knowledge, did he do that?
17     A    Yes, ma'am.
18     Q    Did Deputy Hancock tell you when he checked
19 on him, the results?  You know, if he went and checked
20 on him, what he found?
21     A    I don't remember exactly how he worded it.  I
22 would have to refer you to the video on that.  But he
23 indicated that Mr. McBrayer was okay.  He had a pulse
24 and was breathing.
25     Q    Do you know how many times Deputy Hancock

Page 113

1  checked on him?
2      A    No, ma'am, I don't.
3      Q    Did you also check on Mr. McBrayer while he
4  was in the vehicle?
5      A    I did.
6      Q    And what did you -- what did you do to check
7  on him?
8      A    I checked Mr. McBrayer's carotid artery for a
9  pulse, at which point I felt what I believed to be a
10 pulse.
11     Q    During that check, was there anything that
12 you observed that made you believe that he was in
13 serious medical distress?
14     A    No, ma'am.
15     Q    At some point, EMS alerts you to the fact
16 that they're concerned about Mr. McBrayer's condition?
17     A    Yes, ma'am.
18     Q    Is that fair enough?
19     A    (Nodding head affirmatively.)
20     Q    What was your reaction to when they said
21 that, to hearing that?
22     A    Can you -- can you reword that?
23     Q    Yeah.
24     A    I'm not sure I understand what you're asking
25 me.



Page 114

1      Q   Yeah.  First of all, let me ask you, was that
2  the first time that you heard that there was something
3  going on, something's wrong possibly with Mr. McBrayer?
4      A   Yes, ma'am.
5      Q   That would have been when EMS personnel let
6  you know that?
7      A   Yes, ma'am.
8      Q   Were you surprised to hear that?
9      A   I was.
10     Q   Why?
11     A   Because we had checked on him several times.
12  You know, there was no indication that he was in any
13  kind of medical distress as far as I -- as far as I
14  knew.  So for them to say that, you know, he didn't
15  have a pulse, or however they worded it -- I don't
16  recall how they worded it -- it was completely
17  unexpected.
18     Q   According to the video, the -- there was ten
19  minutes and 20 seconds between the time of your first
20  TASER CEW deployment to the time that Mr. McBrayer was
21  placed in the vehicle.
22          Does that sound about right to you?
23     A   I can't really attest to the time frame.
24     Q   Okay.
25     A   I don't know.

Page 115

1          I mean, if that's what the video states, then
2  I have no reason to dispute what the video says.
3      Q   Okay.  We'll go ahead and take five minutes.
4  I'm just going to review my outline and make sure I
5  don't have anymore questions for you.
6      A   Thank you.
7          THE VIDEOGRAPHER:  The time is 12:33.  We're
8  going off the record.
9          (Whereupon, a recess was taken.)
10          THE VIDEOGRAPHER:  The time is 12:39.  We're
11  back on the record.
12  BY MS. NGUYEN:
13     Q   Deputy Tripp, just a couple more things I
14  failed to go over with you thus far.
15          First, on your X26P that you used on
16  Mr. McBrayer, did it have an automatic stop after five
17  seconds?
18     A   Yes, ma'am.
19          MS. NGUYEN:  I'm going to have to use that as
20  an exhibit.
21          MR. WILLIAMS:  Let me make copies of that
22  first.  I should have done that, because I
23  actually have annotated this one.  I'll copy it.
24          THE VIDEOGRAPHER:  Should we go off the
25  record?

Page 116

1          MS. NGUYEN:  Yeah.  Sorry.
2          MR. WILLIAMS:  Sorry.
3          THE VIDEOGRAPHER:  The time is 12:39.  We're
4  going off the record.
5          (Whereupon, a recess was taken.)
6          THE VIDEOGRAPHER:  The time is 12:45.  We're
7  back on the record.
8  BY MS. NGUYEN:
9      Q   Deputy Tripp, you should have in front of you
10  Exhibit 9.
11          Do you see that?
12     A   I don't believe I got a copy of it.
13          MR. WILLIAMS:  Did somebody just give it to
14  him?
15          MS. NGUYEN:  I'm actually going to pull
16  out -- did we give -- did you mark one?
17          THE COURT REPORTER:  I didn't.
18          MR. WILLIAMS:  I was going to say, did
19  somebody actually give it to him?
20          MS. NGUYEN:  Here's an extra one.  Here you
21  go.  Okay.
22          (Defense Exhibit No. 9 was marked for
23  identification.)
24  BY MS. NGUYEN:
25     Q   Now you have Exhibit 9.

Page 117

1      A   Yes, ma'am.
2      Q   I'm also going to have you pull out Exhibit 8
3  that we just reviewed.
4          Okay.  So Exhibit 9 are also the TASER
5  warnings; would you agree with that?
6      A   Yes, ma'am.
7      Q   But if you go about one-third, maybe almost
8  halfway down the page, the date states "These warnings
9  and instructions are effective March 1, 2013."
10          Do you see that?
11     A   Yes, I do.
12     Q   Whereas, on Exhibit 8 that we just reviewed,
13  that one has the effective date of October 30th, 2018?
14     A   Correct.
15     Q   Okay.  So I want you to take a moment and
16  just kind of go through each page together, so looking
17  at page one of both exhibits.  And I'm not going to ask
18  you anything specific right now, but just kind of
19  generally go through them.
20          And I'm going to ask you if they look
21  similar.  I'm not going to ask you if there's like
22  small differences, but generally would you agree that
23  Exhibit 8 and Exhibit 9 look similar?
24     A   Yes, I would agree they look similar.
25     Q   Okay.  So as you sit here today, are you able



Page 118

1  to say whether the warnings that you reviewed in
2  relation to your December 2018 TASER training were the
3  warnings dated March 1, 2013 or the warnings dated
4  October 30th, 2018?
5      A  I don't recall which ones they were.
6      Q  Okay.  So you -- you wouldn't have paid
7  attention to the specific effective date on the
8  warnings that you reviewed?
9      A  I may have three years -- almost three years
10  ago.  But today, I couldn't tell you --
11     Q  Okay.
12     A  -- what the date was on that paper.
13     Q  But you're confident that you did in fact
14  review warnings prior your TASER training in December
15  of 2018?
16     A  Yes, ma'am, I'm positive.
17     Q  Okay.  And as to the portions that we
18  reviewed, I'm just going to go over those in Exhibit 9,
19  because we did review portions of Exhibit 8, so I want
20  to make sure those are the same in Exhibit 9.
21     A  Yes, ma'am.
22     Q  Understand?
23     A  I do.
24         MR. WILLIAMS:  I'll stipulate to that so we
25  can save time.  I don't -- I mean, there's no --

Page 119

1  they are the same.  I can stipulate to that.
2         MS. NGUYEN:  The portions that I --
3         MR. WILLIAMS:  Yeah, the portions we
4  discussed.
5         MS. NGUYEN:  I'm going to be quick.  I'm not
6  going over it in detail.
7         MR. WILLIAMS:  Okay.  I was going to say
8  we --
9         MS. NGUYEN:  I appreciate that, but I'd
10  rather just have it on the record real quick.
11  BY MS. NGUYEN:
12     Q  Okay.  So on Exhibit 9, first it has the same
13  picture of "Warning" at the top where it says,
14  conducted energy weapons "can cause death or serious
15  injury."
16         Do you see that?
17     A  Yes.  It says, "Conducted electrical
18  weapons," yes.
19     Q  Right.
20         That's the difference, conducted energy
21  weapons versus conducted electrical weapons, right?
22     A  Correct.
23     Q  But the warning is still the same, "Can cause
24  death or serious injury," right?
25     A  Correct.

Page 120

1      Q  Footnote two that we reviewed regarding law
2  enforcement agencies setting their own guidance, would
3  you agree that's the same on Exhibit 8 and Exhibit 9?
4      A  Where is that one at again?  I'm sorry.
5      Q  Footnote two at the bottom of the page.
6      A  Oh, okay.  I'm sorry.
7      Q  That's okay.
8      A  Yes.  Notably it just -- there's a difference
9  between TASER and Axon.
10     Q  Right.
11     A  But the warning is still the same, yes.
12     Q  Okay.  And then we also reviewed the second
13  paragraph of page -- on page one.
14         Would you agree that that second paragraph is
15  the same on both Exhibit 8 and 9?
16     A  I do, yes.
17     Q  Okay.  And then the last thing we reviewed is
18  on page two.  We reviewed the first paragraph
19  "Physiologic and Metabolic Effects," and then the next
20  paragraph which talks about particularly susceptible
21  individuals?
22     A  Yes.
23     Q  Would you agree that those two paragraph are
24  the same between Exhibit 8 and Exhibit 9?
25     A  I do, yes.

Page 121

1         MS. NGUYEN:  That's all the questions I have.
2         MR. WILLIAMS:  All right.
3         MR. SPURLIN:  Do you all want to take a
4  break?
5         MR. WILLIAMS:  Let's take a lunch break.
6         THE VIDEOGRAPHER:  There's no follow-up
7  questions?
8         MR. WILLIAMS:  There's going to be, but we're
9  going to take a lunch break first.
10        MR. SPURLIN:  There's going to be.
11        THE VIDEOGRAPHER:  We're coming back on the
12  record?
13        MR. WILLIAMS:  Yes.
14        THE VIDEOGRAPHER:  This is the medium number
15  two in the deposition of Deputy Anthony Tripp.
16  The time is 12:52.  We're going off the record.
17        (Whereupon, a recess was taken.)
18        THE VIDEOGRAPHER:  This is the beginning of
19  medium number three in the deposition of Deputy
20  Anthony Tripp.  The time is 1:44 p.m.  We are on
21  the record.
22             EXAMINATION
23  BY MR. SPURLIN:
24     Q  All right, Mr -- Deputy Tripp.  My name is
25  Johnny Spurlin.  I'm one of the attorneys who





Page 122

1   represents the plaintiffs, and I've got quite a few
2   questions.  Sorry to keep you so long, but --
3        A   Yes, sir.
4        Q   -- but I need to fill in quite a few
5   blanks --
6        A   Yes, sir.
7        Q   -- in what was said.
8            You previously answered some written
9   questions through your counsel in this case, and they
10  were kind enough to send me a verification that you
11  were swearing to those answers.
12           You intended to give sworn answers to those
13  written questions, did you not?
14       A   Yes, sir.
15       Q   Okay.  And in preparation for today's
16  deposition, did you look at any documents?
17           Nothing wrong with it.  I just want to know
18  what you looked at.
19       A   I mean, I did.  I reviewed my report.
20       Q   Okay.  You reviewed the incident report that
21  you were asked to see earlier; is that correct?
22       A   Yes, sir.
23       Q   Plaintiffs -- I mean, Defendants' Exhibit No.
24  1, right?
25       A   Yes, sir.

Page 123

1        Q   Did you look at any other documents?
2        A   I did.  I was able to review the previous
3   deposition.
4        Q   Okay.  And is that the first time you had
5   reviewed your previous deposition?
6        A   Yes, sir.
7        Q   Okay.  Did you read and sign that previous
8   deposition?  Do you know what that means?
9        A   I don't --
10       Q   I'll help you.
11           Your counsel had indicated before we started
12  this deposition that you wanted to read and sign the
13  deposition.  What that means is you can get a copy and
14  have 30 days to read it.  And if you want to attach an
15  explanation to it on the back, you can say on page 24
16  where I gave this testimony, I should have added this.
17  I should have said it like that.
18           My question to you is -- I wasn't involved in
19  the other case where you were deposed.
20       A   Right.
21       Q   Did you read and sign it in that case as
22  well?
23       A   I'm not sure.
24       Q   And do you remember attaching any
25  explanations on an errata sheet to that deposition?

Page 124

1        A   No, sir.
2        Q   Okay.  All right.  So you made no attempt to
3   correct anything in that deposition at the time it
4   was -- it was done, correct?
5        A   Not that I -- not that I recall, no, sir.
6        Q   But today you wanted to correct one thing
7   that you said about not having your flashlight,
8   correct?
9        A   Yes, sir.
10       Q   Okay.  And having now seen the video or the
11  body camera footage, you are clear that you in fact did
12  have your flashlight out when you approached
13  Mr. McBrayer the first time, correct?
14       A   Yes, sir.
15       Q   Okay.  So that testimony was not correct in
16  that first deposition, correct?
17       A   Accurate.  That was not correct.
18       Q   All right.  And was there anything else that
19  you noticed when you reviewed the deposition yesterday
20  that you wanted to correct from your first deposition?
21       A   Yes, sir.  There were a couple of things.  I
22  know that previously I indicated that when Mr. McBrayer
23  and -- when the incident occurred with Deputy Spurgeon,
24  myself and Mr. McBrayer, Mr. McBrayer went to the
25  ground.  And the question was asked whether he was on

Page 125

1   his stomach or his back.  And I indicated in my
2   previous deposition that he was on his stomach.
3            That was in fact inaccurate.  After watching
4   the video, I did determine that initially he was on his
5   back and then he was rolled over to his stomach.
6        Q   Thank you.
7            Anything else you noted when you reviewed the
8   prior deposition that you would like to correct?
9        A   Yes, sir.  The -- the question was asked --
10  initially the question was asked if I placed my knee on
11  to Mr. McBrayer's neck.  And my -- my answer was no.
12  And my answer is still no to that.
13           However, what I did notice in the video was
14  that initially I placed my knee onto Mr. McBrayer's
15  shoulder area.  And it did at some point slide towards
16  his neck.  However, it was removed as soon as it was
17  identified that it was around the base of his neck.
18       Q   In fact, on the body cam, Deputy Spurgeon
19  tells you --
20       A   Yes, sir.
21       Q   -- to remove it, does he not?
22       A   He does.  Yes, sir.
23       Q   And he specifically said the reason you need
24  to remove it is so that we don't interfere with his
25  breathing, correct?



Page 126

```
 1      A   Yes, sir.
 2          MR. WILLIAMS:  I object to the form.
 3  BY MR. SPURLIN:
 4      Q   Did I accurately relay what he said to you on
 5  that the body camera?
 6      A   I would have to listen to the body cam
 7  footage, sir.
 8      Q   Okay.  But he said something to you?  He's
 9  the one that alerted you to move your knee, correct?
10      A   He is the one that alerted me to move it,
11  yes.
12      Q   All right.  You've identified the flashlight,
13  whether he was initially on his stomach, and whether
14  your knee ever was on the shoulder or neck area.
15          Anything else you need to correct that you've
16  reviewed in the deposition?
17      A   Yes, sir.  The last thing notably that I can
18  recall at this point in time is the question was asked
19  whether my hand was on his neck.  I did indicate
20  earlier that it was in fact on his neck.  And I also
21  gave my explanation of why.
22      Q   All right.  Let me -- let me see if I
23  understand what you said.
24          Today you said your hand was on his neck?
25      A   Yes, sir.
```

Page 127

```
 1      Q   In the first deposition, you denied that your
 2  hand was on his neck; is that correct?
 3      A   Yes, sir.  I told you that my recollection
 4  was that it was not.
 5      Q   Okay.  And do you remember where in the
 6  deposition it was given the first time you said your
 7  hand was?
 8          You said, I said in the deposition it was not
 9  on his neck.
10      A   Oh, no, I --
11      Q   When did you say it was?
12      A   I previously stated today that it was.
13      Q   I got that.
14      A   Yes, sir.
15      Q   Is that a -- is that a correction for what --
16  from what you said in the first deposition?
17      A   Yes, sir.
18      Q   So in the first deposition when asked if your
19  hand was on the neck, you said no?
20      A   I said it was not.
21      Q   Okay.  In the first deposition, where did you
22  say your hand was?
23      A   I don't recall that.
24      Q   Okay.  All right.  Are those the only four
25  things that you identified in your previous deposition
```

Page 128

```
 1  that you want to correct today?
 2      A   That I want to correct at this point in time,
 3  yes.
 4      Q   All right.  Now, did you also review the body
 5  camera footage in preparation for today's --
 6      A   Yes.
 7      Q   -- deposition?
 8      A   Yes, sir, I did.
 9      Q   Did you review the Tripp body camera footage?
10      A   Yes, sir, I did.
11      Q   Did you review anyone else's body camera
12  footage?
13      A   I believe that we looked at Deputy
14  Spurgeon's.
15      Q   Okay.  Did you look at anyone else's?
16      A   Not that I recall.
17      Q   Okay.
18      A   I don't remember.
19      Q   You -- have you ever seen Deputy Henderson or
20  Deputy Hancock's body camera footage?
21      A   We may have taken it.  I don't know if we
22  took a look at that yesterday or not.
23      Q   Have you ever reviewed Deputy Calderon's
24  footage?
25      A   No, sir, I haven't seen Deputy Calderon's
```

Page 129

```
 1  footage.
 2      Q   Okay.  Now, is there anything you observed in
 3  reviewing the body camera footage of you and the body
 4  camera footage of Spurgeon that you would like to
 5  correct testimony given in the first deposition?  It
 6  may be the same four things.
 7          MR. WILLIAMS:  You mean other than what he's
 8  already discussed?
 9          MR. SPURLIN:  Yes.
10  BY MR. SPURLIN:
11      Q   Because you specifically looked at the body
12  camera footage?
13      A   Yes, sir.  I think -- at this point in time,
14  I think those are the only notable things that I
15  recall.  However, I mean, as we go through this, there
16  may be another thing or two that I recall.
17      Q   All right.
18      A   But at this point, I think that that's all
19  that I remember.
20      Q   Were there any cameras on any vehicles that
21  were activated that night?
22      A   I can't attest to that.  What I can tell you
23  is my vehicle was not equipped with a dash camera.
24      Q   Okay.  Do you know if Spurgeon's was?
25      A   I don't know.
```



Page 130

1    Q   Okay.  Have you ever reviewed any footage
2  from a vehicle camera?
3    A   No, sir.
4    Q   Okay.  All right.  Tell me when your body
5  camera footage is activated.  Is it manually?
6    A   Yes, sir, it's manually.
7    Q   Okay.  Do you recall when you manually turned
8  on your camera that night?
9    A   I don't, no, sir.  What I can tell you is it
10  backs up 30 seconds.  So whenever it picked up, 30
11  seconds after that is when I actually activated it.  So
12  30 seconds from what you start seeing in the video, 30
13  seconds after that is when I activated the camera.  It
14  backs up 30 seconds.
15    Q   Thank you.  Let me repeat what you said and
16  see if I understand it.
17       The camera is always taking footage, it just
18  may not record it unless you activate it; is that true?
19    A   That is my understanding, yes.
20    Q   So as you get out of the vehicle, even if you
21  haven't activated it, it is recording?  And as long as
22  I activate within 30 seconds, what it sees and observes
23  through the cameras for the previous 30 seconds will
24  now be recorded and kept?
25    A   That is correct.

Page 131

1    Q   Okay.  So if the camera -- I'm just making
2  the numbers up.  If the camera starts and it has 00:1,
3  you would have activated it at 00:30?
4    A   Correct.
5    Q   Got you.  Okay.
6       Do you remember in this case when you
7  activated your body camera?
8    A   No, sir, I don't.
9    Q   Do you know why you activated your body
10  camera?
11    A   I activated my body camera because I was out
12  at a call, which is typical for our policy.
13    Q   Okay.  Was it when you got out of the
14  vehicle?
15    A   No, sir.  It wouldn't have been when I got
16  out of the vehicle.
17    Q   Would it have been after you observed
18  McBrayer?
19    A   Yes, sir.
20    Q   Okay.  Was it anything in particular he did
21  that made you activate your body camera?
22    A   I don't think necessarily anything he did,
23  sir.  I think that the events -- the events up to the
24  point where I activated my body camera affected the
25  time frame.

Page 132

1    Q   I understand.
2       I'm just asking you from your memory.
3    A   Yes, sir.
4    Q   Do you remember him doing something and you
5  said, oh, I think that's a crime and then you turn on
6  your camera?
7    A   No, sir.
8    Q   You can't remember any specific event that
9  caused you to turn on the camera?
10    A   No, sir.
11    Q   Got you.  All right.
12       Now, I'm going to ask you a question about
13  the TASER itself because I'm not a TASER guy.  You were
14  asked a question about what safe mode is.
15       Is that where the safety is on?
16    A   Yes, sir.
17    Q   Okay.  And then you were asked a question by
18  Ms. Nguyen about what is armed.
19       Is that once you take the safety off?
20    A   That is my understanding for armed, yes.
21    Q   Got you.
22       And then that just means like a gun, it's
23  ready to shoot but you may or may not apply the trigger
24  and shoot, correct?
25    A   Correct.

Page 133

1    Q   And then the third number or phrase she asked
2  you about was triggered.  And that would be when you
3  actually aim it at somebody and apply the trigger to
4  shoot, correct?
5    A   That would be my understanding, yes.
6    Q   Got you.  All right.
7       And is there any policy or procedure that
8  you've been taught by anyone as to when you should arm
9  your TASER?
10    A   No, sir.
11    Q   Is it the policy of the sheriff's department
12  not to arm the TASER until such time as you believe you
13  have the right to use it?
14    A   Not that I -- not that I recall, no, sir.
15    Q   Okay.  Well, what about with a gun, I mean,
16  do you carry your pistol with the safety on?
17    A   Yes, sir.
18    Q   Okay.  So as the pistol is in the holster,
19  the safety is on --
20    A   Yes, sir.
21    Q   -- is that right?
22       And as the TASER's in the holster, the TASER
23  is on?
24    A   Yes, sir.
25    Q   The safety's on?





Page 134

1    A    (Nodding head affirmatively.)
2    Q    And then when you pull your pistol, do you
3  take the safety off immediately or is it permissible to
4  take the weapon out as a deescalation tactic to make
5  somebody stand down so you don't have to take the
6  safety off and use the gun?
7    A    Well, sir, if I can just correct you for a
8  moment.  The Glock 22 does not have an external safety.
9    Q    Okay.
10   A    So I understand what your question is asking;
11  however, I wanted to identify that --
12   Q    No.  Thank you.
13   A    -- when my weapon comes out of the holster,
14  there is no safety.
15   Q    All right.  Well, then the question as to the
16  TASER weapon.
17   A    Yes, sir.
18   Q    When you pull it out, it still has the safety
19  on?
20   A    It does.
21   Q    Okay.  And is there any policy or procedure
22  of the sheriff's department not to release the safety
23  until you're ready to aim and shoot?
24   A    No, sir, not that I'm aware of.
25   Q    Okay.  Have you been trained that you should

Page 135

1  not release the safety until you're ready to aim and
2  know you're fixing to shoot?
3    A    No, sir.
4    Q    Why would you arm it and release the safety
5  if you're not ready to aim it and shoot it?
6    A    Because releasing that safety illuminates the
7  laser.  And as we discussed earlier, that laser alone
8  is a deescalation technique because a typical and
9  reasonable person would understand, or anyone that has
10  any kind of experience with law enforcement with
11  TASERs, they would understand that that is the -- the
12  laser, the aiming laser for a TASER, and it's used as a
13  deescalation technique.
14   Q    I understand.
15       Now, you didn't need the laser?  You had a
16  flashlight, correct?
17       MR. WILLIAMS:  Object to form.
18       MS. NGUYEN:  Join.
19       THE WITNESS:  So it --
20  BY MR. SPURLIN:
21   Q    To illuminate?
22   A    The laser is not used to illuminate.
23       MS. NGUYEN:  Same objection.
24       THE WITNESS:  The laser is used for an aiming
25  device.

Page 136

1  BY MR. SPURLIN:
2    Q    Okay.  So until such time as you're going to
3  point and aim the weapon, you don't need to arm the
4  weapon; is that true?
5        MR. WILLIAMS:  Object to form.
6        MS. NGUYEN:  Object to form.  Mistakes
7  testimony.
8        THE WITNESS:  That's not necessarily true
9  either.
10  BY MR. SPURLIN:
11   Q    Okay.
12   A    No, sir.
13   Q    I'm just following your thought process.  You
14  said the reason to arm it is because then the laser dot
15  will be activated, correct?
16   A    Yes, sir.
17   Q    And that is used to aim?
18   A    Yes, sir.
19   Q    Okay.  That's the very purpose of it is to
20  aim, correct?
21   A    Yes, sir.
22   Q    Okay.  Well, would it be fair to say that
23  until you're ready to aim, you don't need to arm the
24  weapon?
25       MR. WILLIAMS:  Object to form.

Page 137

1        MS. NGUYEN:  Join.
2        THE WITNESS:  I mean, I -- I mean, I don't
3  necessarily agree with that.  I mean, it --
4  BY MR. SPURLIN:
5    Q    Okay.  Well, what other purpose would arming
6  it do other than to assist you in aiming it?
7    A    Well, I mean, arming it does -- it does
8  numerous things.  It illuminates the flashlight so I
9  would be able to use that flashlight in the event that
10  I needed some additional light.
11   Q    Let me stop you there.
12   A    Yes, sir.
13   Q    I'm going to let you tell me everything.
14       But in this case, that was not the reason you
15  would have armed it, because you already had your
16  flashlight out, correct?
17   A    In this case, I don't think that I armed it
18  prior to actually pointing it at Mr. McBrayer.  But
19  your question to me was what is it used for and --
20   Q    I'm going to let you tell me that.
21       Well, in this case, do you believe you armed
22  the weapon at the same time you pointed and then shot
23  at Mr. McBrayer?
24       MS. NGUYEN:  Object to form.
25       THE WITNESS:  No, sir, I don't.



Page 138

```
 1    BY MR. SPURLIN:
 2        Q   How long of a gap was there between arming it
 3    and shooting Mr. McBrayer?
 4            MS. NGUYEN:  Same objection.
 5            THE WITNESS:  I'm not sure of that, sir.  I
 6    don't know.  I'm sure that the log, along with my
 7    video, would be able to give you that.
 8    BY MR. SPURLIN:
 9        Q   Was it a short period of time?
10        A   Again, I don't -- I don't recall.  It's been
11    two years ago.
12        Q   Okay.  All right.  I'm going to change gears.
13    I'm was going through some preliminaries and chase
14    rabbits.
15            Let me ask you, have you spoken to any of the
16    other officers about their deposition testimony?
17        A   No, sir.
18        Q   Have you read any of the other officers'
19    deposition testimony?
20        A   No, sir.
21        Q   Okay.  Have you become aware, through any
22    source, of any of the other officers' deposition
23    testimony?
24        A   No, sir.
25        Q   Were you aware that Deputy Spurgeon said that
```

Page 139

```
 1    you and he utilized excessive force?
 2        A   No, sir, I wasn't.
 3            MS. NGUYEN:  Object to form.
 4    BY MR. SPURLIN:
 5        Q   Were you aware that he testified that using
 6    six TASER applications was excessive?
 7        A   No, sir.  I wasn't aware of that.
 8        Q   Were you aware that he testified that that
 9    violated the policy of the sheriff's department?
10        A   No, sir.  I wasn't aware of that.
11        Q   Six applications does violate the policy of
12    the sheriff's department, does it not?
13        A   No, sir, it does not.
14        Q   Does that -- is the policy of the sheriff's
15    department you should limit it to two applications in
16    15 seconds?
17        A   No, sir, that is not.
18        Q   Okay.  You've never been trained in that way?
19        A   No, sir.
20        Q   Never been told that?
21        A   No, sir.
22        Q   Okay.  Major Torres never told you that?
23        A   No, sir.
24        Q   Okay.  Were you aware that Deputy Spurgeon
25    testified that application of the TASER for 30 seconds
```

Page 140

```
 1    was excessive?
 2        A   No, sir.  I'm not privy to anything that
 3    Deputy Spurgeon testified to.
 4        Q   Were you aware that he testified that
 5    violated the sheriff's department policy?
 6        A   No, sir.
 7        Q   Okay.  Does it violate the sheriff's
 8    department policy?
 9        A   I'm sorry, what are you asking specifically?
10        Q   Thirty seconds of application of the TASER?
11        A   No, sir.  Not a policy that I'm aware of.
12        Q   Okay.  Have you ever been trained as to how
13    many different applications of the TASER are
14    appropriate?
15        A   I have, yes, sir.
16        Q   And what is that training?
17        A   There is a recommendation for no more than 15
18    seconds.  However, it also states that if there's
19    exigent circumstances, that there is no -- no dedicated
20    number.
21        Q   Okay.
22        A   And, again, that's -- I mean, that's not even
23    a part of our policy that I'm aware.
24        Q   The recommendation came from who?
25        A   That's from TASER.
```

Page 141

```
 1        Q   Okay.  And we're going to get into this more
 2    in a minute.  But the sheriff's department has adopted
 3    TASER's warnings from Axon, correct?
 4        A   Yes, sir.
 5            MS. NGUYEN:  Object to form.
 6            MR. WILLIAMS:  Object to form.
 7    BY MR. SPURLIN:
 8        Q   Major Torres uses TASER's information in
 9    training, correct?
10            MS. NGUYEN:  Object to form.
11            THE WITNESS:  I mean, he -- he uses the
12    information given from TASER, yes.
13    BY MR. SPURLIN:
14        Q   Okay.  You were already handed three
15    different exhibits by Ms. Nguyen that TASER produces,
16    correct?
17        A   Yes, sir.
18        Q   And you said that's what was used in your
19    training, correct?
20        A   Yes, sir.
21        Q   And one of the statements said that you are
22    requested to read and obey it, correct?
23        A   Yes, sir.
24        Q   And one of them says that you are supposed to
25    certify that you have read it and fully understand it,
```



Page 142

1  correct?
2      A   Yes, sir.
3      Q   And you signed those papers saying you read
4  it and fully understood it, correct?
5          MS. NGUYEN:  Object to form.
6          THE WITNESS:  Yes, sir.
7  BY MR. SPURLIN:
8      Q   And you also certified that you would read
9  and obey those warnings, correct?
10         MS. NGUYEN:  Object to form.
11         MR. WILLIAMS:  Object to form.
12         THE WITNESS:  Yes, sir.
13 BY MR. SPURLIN:
14     Q   And one of those recommendations was no more
15 than 15 seconds in duration, correct?
16         MS. NGUYEN:  Object to form.
17         MR. WILLIAMS:  Object to form.
18         THE WITNESS:  But it also states that the --
19         that TASER does not write policy and we should
20         follow our department's policy.
21 BY MR. SPURLIN:
22     Q   I agree with that.  That is what it says.
23         But your department has adopted that,
24 correct?
25         MS. NGUYEN:  Object to form.

Page 143

1          MR. WILLIAMS:  Object to form.
2  Misrepresents --
3          MS. NGUYEN:  Misstates testimony.
4          MR. WILLIAMS:  Misrepresents what the policy
5  says.  Completely inappropriate.
6          MR. SPURLIN:  Well, that's a speaking
7  objection now.  What we agreed to is say "object
8  to the form."
9          MR. WILLIAMS:  And I'm not going to sit here
10 and let you misrepresent things.  And I don't
11 think the Court would appreciate that too when the
12 document is right in front of us and you have the
13 ability to look at it and use it with the witness
14 instead of trying to represent something that's
15 not in the document.
16         MR. SPURLIN:  You know, Terry, that's not
17 even the question.
18         MR. WILLIAMS:  You don't think that --
19         MR. SPURLIN:  The question is did the
20 sheriff's department adopt that as its policy.
21         MR. WILLIAMS:  And you said --
22         MR. SPURLIN:  And you're referencing a TASER
23 document.
24         MR. WILLIAMS:  And you represented what the
25 policy was, which was completely incorrect.

Page 144

1          MR. SPURLIN:  Hasn't -- isn't --
2          MR. WILLIAMS:  So I'm not going to let you
3  sit here and misrepresent things.
4          MR. SPURLIN:  I'm not.
5          MR. WILLIAMS:  And neither is the Court.
6          MR. SPURLIN:  I am not.
7  BY MR. SPURLIN:
8      Q   Sir, isn't it true that the sheriff's
9  department could write their own policy and they could
10 decide how they want to train, but instead of doing
11 that, they have chosen to take information provided by
12 TASER, warnings provided by TASER, and slide shows
13 provided by TASER and make that the policy?
14         MR. WILLIAMS:  Object to form.
15         MS. NGUYEN:  Object to form and foundation.
16         THE WITNESS:  No, sir.
17 BY MR. SPURLIN:
18     Q   That's not true?
19     A   No, sir.  So they use that for training.
20 This is actually the Tift County's policy.  It doesn't
21 have TASER written on it anywhere.
22     Q   I understand.
23     A   So I can't attest to whether they adopted
24 TASER's policy.
25     Q   Okay.  But the training that the sheriff's

Page 145

1  department had provided you by Major Torres utilizes
2  100 percent documents prepared and provided by Axon,
3  correct?
4          MR. WILLIAMS:  Object to form.
5          MS. NGUYEN:  Object to form and foundation.
6          THE WITNESS:  Again, sir, I -- I'm not part
7  of that training section.  I don't know where
8  these documents come from.  I don't -- all I know
9  is I get a PowerPoint presentation.
10 BY MR. SPURLIN:
11     Q   I understand.
12         Well, look with me and let's go through them.
13 Look at -- you've got the policy in front of you,
14 Defendants' Exhibit No. 4, the Tift County Sheriff's
15 policy, correct?
16     A   Yes, sir.
17     Q   It says, "An approved TASER M26/X26 device
18 may only be used by employees that have successfully
19 completed the department approved training in its use
20 taught by a certified instructor," correct?
21     A   Yes, sir.
22     Q   So that's the policy of the sheriff's
23 department, right?
24     A   Yes, sir.
25     Q   Okay.  And the TASER that you used, you were



Page 146

1  trained to use by Major Torres, correct?
2      A    That is correct.
3      Q    Okay.  And the training material he used was
4  provided by TASER, correct?
5      A    That is my understanding.
6          MS. NGUYEN:  Object to form and foundation.
7  BY MR. SPURLIN:
8      Q    Defendants' Exhibit No. 6, for instance, the
9  PowerPoint Ms. Nguyen question you about, you affirmed
10  that was the documents used by Major Torres when he
11  trained me, right?
12     A    Yes, sir.
13     Q    And on the very first page of that document
14  it says, "TASER Training," correct?
15     A    It does.
16     Q    And it says, "TASER X26P User Course,"
17  correct?
18     A    Yes, sir.
19     Q    Okay.  And it says at the top "Axon," does it
20  not?
21     A    Absolutely.
22     Q    So when you had the training, the materials
23  that were used and the PowerPoint were provided by
24  Axon, right?
25     A    Correct.

Page 147

1      Q    Okay.  And Torres was certified by Axon,
2  correct?
3      A    I don't know that to be --
4          MS. NGUYEN:  Object to form and foundation.
5          THE WITNESS:  I don't know that to be a fact.
6  BY MR. SPURLIN:
7      Q    Okay.  And you had to sign forms that said
8  you understood and had read and would obey those
9  warnings and recommendations, correct?
10         MR. WILLIAMS:  Object to form.
11         MS. NGUYEN:  Object to form.
12         THE WITNESS:  I mean, I would have to look at
13  the paper to see exactly what it states.
14  BY MR. SPURLIN:
15     Q    Let me show you -- ask you to look at
16  Defendants' Exhibit No. 8.  You've already identified
17  this as the warnings that were utilized in your
18  training when Ms. Nguyen asked you questions, correct?
19     A    I think --
20         MS. NGUYEN:  Object to form.
21         THE WITNESS:  I think that we discussed we
22  weren't sure --
23         MS. NGUYEN:  Misstates testimony.
24         THE WITNESS:  -- which one was used.
25  BY MR. SPURLIN:

Page 148

1      Q    I understand.
2          And Mr. Williams said, no, he thought it was
3  Defendants' Exhibit No. 9, right?
4      A    Yes, sir.
5          MS. NGUYEN:  Object to form.
6  BY MR. SPURLIN:
7      Q    And then a comparison was made of the two to
8  see if they were almost 100 percent identical, correct?
9      A    Yes, sir.
10     Q    And you were asked on the record under oath
11  to identify if they were practically identical,
12  correct?
13     A    Yes, sir.
14     Q    And you were asked about every one of those
15  warnings that she went through with you to see if they
16  were identical, correct?
17     A    Yes, sir, I was.
18     Q    And they were?
19     A    Yes.
20     Q    And those were the warnings and
21  recommendations that you were given in your training by
22  Major Torres, correct?
23     A    Yes, sir.  That's correct.
24     Q    That was provided by the sheriff's department
25  of Tift County?

Page 149

1      A    Correct.
2      Q    Okay.  And on page one of whichever one you
3  want to look at, No. 2 said that you have to certify
4  that you will read and obey these recommendations and
5  warnings, correct?
6      A    Yes, sir.
7      Q    And it said that you have read and understand
8  and will follow all current instructions, warnings, and
9  training materials, correct?
10     A    Yes, sir.
11     Q    Okay.  And you have done that, right?
12     A    Yes, sir.
13     Q    And you've done that because the sheriff's
14  department has mandated that you do that?
15     A    No.  I don't see --
16         MR. WILLIAMS:  Object to form.
17         THE WITNESS:  -- anything in the policy that
18  says that.
19  BY MR. SPURLIN:
20     Q    Okay.  Well, it says in No. 1 that you have
21  to approve -- be approved and take this training,
22  correct?
23     A    Yes, sir, which I did.
24     Q    And then the training materials say you have
25  to sign and certify that you read and understand and



| Page 150 |
| --- |

1 will follow and obey them, right?
2      MS. NGUYEN: Object to form.
3      THE WITNESS: Yes, sir.
4 BY MR. SPURLIN:
5      Q   Okay. All right. Has anyone with the
6 sheriff's department told you that you do not have to
7 follow the warnings, instructions, and relevant TASER
8 training materials that you were trained with?
9      A   No, sir.
10      Q   In fact, Major Torres told you that's what
11 you did have to follow, did he not?
12      MR. WILLIAMS: Object to form.
13      MS. NGUYEN: Join.
14      THE WITNESS: I don't recall him saying that.
15 BY MR. SPURLIN:
16      Q   Okay. But no one's ever told you you didn't?
17      A   No, sir.
18      Q   Okay. All right. And do you remember as
19 part of that that you had to sign a document certifying
20 that you understood and would follow those?
21      A   Yes, sir.
22      Q   Okay. And you did, in fact, do that, right?
23      A   To the best of my recollection, yes.
24      Q   Okay. All right. And I, for some reason,
25 have not gotten your signed paperwork. But we have the

| Page 151 |
| --- |

1 one for Mr. Spurgeon, so I'm going to ask you about
2 Deputy Spurgeon.
3      (Plaintiffs' Exhibit No. 27 was marked for
4 identification.)
5      MR. SPURLIN: And, I'm sorry, guys, I don't
6 have but one of these. I just got these documents
7 a few days ago.
8      Hand that to him, if you would.
9      MS. NGUYEN: Can I -- I'm going to take a
10 look at that.
11      MR. SPURLIN: Sure.
12      MS. NGUYEN: Bates numbers -- oh, this has no
13 Bates numbers.
14      MR. SPURLIN: That was used in Mr. Spurgeon's
15 deposition in the other case. And if you've
16 read -- if you've gotten his deposition, it's
17 attached.
18      MR. WILLIAMS: So then that's not the
19 documents you got most recently then? This is
20 something you had before from McBrayer, because we
21 Bates stamped the ones we just sent out, another
22 copy recently.
23      MR. SPURLIN: I got it from the old
24 deposition. I'm certain it should be the same
25 document, right?

| Page 152 |
| --- |

1      MR. WILLIAMS: I know. But you just
2 represented you just got it a few days ago when
3 you actually got it from the previous deposition
4 that you all had for over a year and a half.
5      MR. SPURLIN: That's false. I just got it
6 from Mr. Webster yesterday.
7      MR. WILLIAMS: Well, then that's what you
8 should say.
9      MR. SPURLIN: What I said was true. I just
10 got it. I mean, I'm not going to write a book
11 every time I make a statement. I made a truthful
12 statement that I just got it.
13      MR. WILLIAMS: The implications was that we
14 had just turned it over, is what I took you as
15 saying.
16      MR. SPURLIN: Terry, I didn't get the
17 documents from you all until about ten days ago.
18      MR. WILLIAMS: I know that.
19      MR. SPURLIN: I granted you two extensions.
20 So, I mean --
21      MR. WILLIAMS: I know that.
22      MR. SPURLIN: -- I have just gotten them.
23      MR. WILLIAMS: But I'm just -- and that's
24 what you seem to be trying to implicate. But yet
25 you're pulling out something that you and

| Page 153 |
| --- |

1 Mr. Webster, plaintiffs, have had for a year and a
2 half.
3      MR. SPURLIN: There no need to argue about
4 it.
5      MR. WILLIAMS: So just don't try to twist --
6      MR. SPURLIN: I'm not.
7      MR. WILLIAMS: Yeah. I see what you're
8 doing. Just don't --
9      MR. SPURLIN: You don't see what I'm doing.
10      MR. WILLIAMS: Let's play by the book here.
11      MS. NGUYEN: What was that marked?
12      MR. SPURLIN: Twenty-seven.
13      MR. WILLIAMS: This actually has Plaintiffs'
14 Exhibit 3 also attached to the end of it, so it's
15 a compilation. I don't know what it --
16      MS. NGUYEN: I don't know how it's 27 --
17      MR. WILLIAMS: So this one is actually --
18      MS. NGUYEN: -- because I have it in my
19 records as it was marked as Exhibit 2 to
20 Spurgeon's deposition.
21      MR. SPURLIN: I'll tell you exactly what it
22 is. There's no secret to it. It is my Exhibit 27
23 in this case, which is a combination of two and
24 three --
25      MR. WILLIAMS: Okay.




Page 154

1      MR. SPURLIN: -- from Mr. Spurgeon's prior
2  deposition.
3      MS. NGUYEN: Okay.
4      MR. WILLIAMS: Now I understand. All right.
5      MS. NGUYEN: Got it. Give me a moment. I'm
6  just pulling those up.
7      And three would be the same as Exhibit 9,
8  which we already went over, the warnings?
9      MR. SPURLIN: Yeah. I -- some of your
10  exhibits and mine are going to overlap. I'll give
11  them back to you.
12      MR. WILLIAMS: Yeah. So Plaintiffs'
13  Exhibit 27 actually does exclude the March 1, 2013
14  version of the TASER Handheld CEW Warnings,
15  Instructions, Information.
16      MR. SPURLIN: Right.
17  BY MR. SPURLIN:
18      Q    All right. Mr. Tripp, I just had two
19  questions about that document.
20      The course attendance sheet there has a date
21  on it of 12/18/2018.
22      Do you see that?
23      A    I do.
24      Q    And it doesn't have your name there, correct?
25      A    That is correct.

Page 155

1      Q    But you're certain that's when you did your
2  training, correct?
3      A    According to my training record, that's when
4  I completed it.
5      Q    Right.
6      And you would have done it with these
7  gentlemen whose names are listed here?
8      A    I can't tell you that for a fact. I don't
9  know how many courses they did. I don't know why --
10  why it was set up this way. I don't know why my name's
11  not on here.
12      Q    Okay. And the primary instructor listed for
13  these eight -- seven people are Daniel Torres, correct?
14      A    That is correct.
15      Q    So if Daniel Torres taught them and if he
16  taught you on December 18th, 2018, you all would have
17  been together?
18      A    Not necessarily.
19      Q    Well, how could we be in two rooms?
20      A    Well, because there's 24 hours in a day.
21      Q    Okay. All right. Look at the next page of
22  that document. This is the certification form that I
23  was referring to.
24      You believe you signed a form just like this,
25  correct?

Page 156

1      A    I can't attest to that because I don't have
2  one that I signed.
3      Q    I don't either, and that's the reason I'm
4  asking the question.
5      A    Well, I'm not going to attest that I signed
6  this document.
7      Q    All right, sir. I thought you told me
8  earlier that you did remember being asked to certify,
9  to finish the course, that you had read, you understood
10  and you would follow and obey all of the training
11  materials and precautions that were provided in the
12  training; is that correct?
13      MS. NGUYEN: Object to form and foundation.
14      MR. WILLIAMS: Object to the form.
15      THE WITNESS: And what you're asking me is if
16  I signed this exact paper. And I don't know that
17  to be a fact.
18  BY MR. SPURLIN:
19      Q    All right, sir. This one is signed by Connor
20  Spurgeon, though, correct?
21      A    It appears that way, yes, sir.
22      Q    Okay. All right. And then it's certified by
23  Daniel Torres, correct?
24      A    Yes, sir.
25      Q    Okay.

Page 157

1      MS. NGUYEN: When you say "this" --
2      MR. SPURLIN: Page two.
3  BY MR. SPURLIN:
4      Q    All right. And then look at page three of
5  the document. It is an Instructor and User Warning
6  Risk and Release Agreement, correct?
7      A    Yes, sir.
8      Q    This one is signed by Connor Spurgeon,
9  correct?
10      A    Yes, sir.
11      Q    It has "TASER" at the top, correct?
12      A    It does.
13      Q    Okay. And do you remember having to sign a
14  form like that?
15      MS. NGUYEN: Object to form and foundation.
16      THE WITNESS: I mean, I don't remember what
17  forms I signed in 2018.
18  BY MR. SPURLIN:
19      Q    Okay. You told Ms. Nguyen earlier you did
20  remember having to take a test?
21      A    Yes, sir.
22      Q    And you did remember having to sign documents
23  before you could be a person who was tased, correct?
24      A    Yes, sir.
25      Q    You had to sign consent forms before you



Page 158

1  would allow them to do that, right?
2      A   I had to sign documents.  I don't recall
3  exactly what those documents were.
4      Q   All right, sir.  Okay.
5          MR. WILLIAMS:  Can we -- we need to take a
6  break.  I just got a text that the school is
7  trying to reach you about one of your children.
8  You can give them a call.  Let's take a break for
9  a second.
10         MS. NGUYEN:  Let's go off the record.
11         THE VIDEOGRAPHER:  Go off the record?
12         MR. WILLIAMS:  Yeah.
13         THE VIDEOGRAPHER:  Okay.  The time is 2:17.
14  We're going off the record.
15         (Whereupon, a recess was taken.)
16         THE VIDEOGRAPHER:  The time is 2:30.  We're
17  back on the record.
18  BY MR. SPURLIN:
19     Q   Deputy, I want to get a couple of
20  preliminaries out of the way.  I know most of these
21  were asked when you were deposed previously.
22         Your education for your degrees has been
23  online?
24     A   Yes, sir.
25     Q   And do you have any relatives over 18 who

Page 159

1  live in south Georgia?
2      A   Are you talking -- what kind of -- I mean, I
3  have a lot of relatives that live in south Georgia.
4      Q   Okay.
5      A   I mean, are you talking immediately family or
6  are you talking --
7      Q   Do your parents live in south Georgia?
8      A   My mother does.  My dad's deceased.
9      Q   Where does your mama live?
10     A   She lives in Lenox.
11     Q   Okay.  And her last name is --
12     A   Tripp.
13     Q   Okay.  What's her first name?
14     A   Tammy.
15     Q   Do you have any brothers and sisters who live
16  in south Georgia?
17     A   No, sir.
18     Q   Do you have any children over 18 who live in
19  south Georgia?
20     A   No, sir.
21     Q   Okay.  Do you have any siblings who live in
22  south Georgia, brothers and sisters?  I may have asked
23  you that.
24     A   No, sir, I don't.
25     Q   Do you have any aunts and uncles?

Page 160

1      A   Yes.
2      Q   Many?
3      A   Yeah.  My whole family is from south Georgia.
4      Q   And their last names would be?
5      A   Ward, Webb.  I don't remember.  My aunt's
6  married.  She just recently got married.  I don't
7  remember the last name.
8      Q   What county would they live in?
9      A   Tift.
10     Q   Okay.  Any live in Cook County?
11     A   My mom.
12     Q   Lowndes County?
13     A   No, not that I'm aware of.
14     Q   Brooks County?
15     A   No, sir.  I've got some family up in Turner
16  County.
17     Q   Okay.  Have you ever been arrested?
18     A   No, sir.
19     Q   Have you ever had any family dispute where
20  law enforcement has been called?
21     A   No, sir.
22     Q   Have you ever been taken to jail?
23     A   No, sir.
24     Q   Have you ever been party to any kind of
25  domestic TPO or anything like that?

Page 161

1      A   No, sir.
2      Q   Okay.  How many children do you have?
3      A   I have five.
4      Q   And how many do you have custody of?
5      A   Three.
6      Q   Okay.  And where are the other two?
7      A   In North Carolina.
8      Q   Okay.  And quickly tell me who the children's
9  mothers are.
10     A   Yes, sir.  So the three that live with me,
11  their mother is Desiree Tripp.
12     Q   Okay.  Where does she live?
13     A   She lives in South Carolina.
14     Q   Okay.  And --
15     A   I have a daughter with my ex-wife.  Her name
16  is Autumn Tripp.
17     Q   Where does she live?
18     A   She lives in Swansboro, North Carolina.
19     Q   And your daughter's name and age?
20     A   Her name is Arissa, and she is seven.
21     Q   Okay.  And your fifth child?
22     A   My fifth child, her mother's name is Mary
23  Milligan.
24     Q   And they live in?
25     A   She lives in North Carolina.



1    Q   And the fifth child is?
2    A   Reagan.
3    Q   And Reagan is?
4    A   Reagan is three.  Sorry.
5    Q   Okay.  All right.  Your initial training in
6  law enforcement, was that at the police academy?
7    A   Yes, sir.
8        Are you asking civilian law enforcement?
9    Q   (Nodding head affirmatively.)
10   A   Yes, sir.
11   Q   All right.  And that was in 2018?
12   A   Correct.
13   Q   Okay.  And how long was that course?
14   A   I believe it's 12 weeks.
15   Q   Did you receive any training while there in
16  how to use a conducted energy weapon?
17   A   No, sir.
18   Q   Okay.  Now, at Tift County, have you ever had
19  any training using a conducted energy weapon other than
20  the course we've talked about with Major Torres?
21   A   I did a refresher course, yes.
22   Q   Okay.  When did you do that?
23   A   I'm not sure exactly what the date was.  It
24  was after I returned back to Tift County.
25   Q   Okay.  How many hours was the initial course?

1  Do you remember?
2    A   It's an eight-hour course.
3    Q   Does that mean you're actually in class or in
4  some kind of practical training for all eight hours?
5    A   Yes, sir.
6    Q   Okay.  The refresher course, how many hours
7  was that?
8    A   I don't remember.
9    Q   Okay.  Did you receive the same type
10  instructions in the refresher course about when you
11  should use it and how you should use it?
12   A   I received the same type of training.
13   Q   Okay.  And was it the same type information
14  and warnings that we've already gone through that were
15  provided by Axon?
16       MS. NGUYEN:  Object to the form and
17  foundation.
18       THE WITNESS:  To my recollection.
19  BY MR. SPURLIN:
20   Q   Okay.  Basically the same course, just to
21  refresh, correct?
22       MS. NGUYEN:  Same objections.
23       THE WITNESS:  Yes, sir.
24  BY MR. SPURLIN:
25   Q   No major changes that you can recall?

1        MS. NGUYEN:  Object to form and foundation.
2        THE WITNESS:  Not that I recall.
3  BY MR. SPURLIN:
4    Q   Okay.  Do you know when you did that
5  refresher course?
6    A   No, sir, I don't.  I don't remember the date.
7    Q   Was it before or after this event?
8    A   It would have been after this event.
9    Q   Okay.  All right.  Have you ever received any
10  other training from the Tift County Sheriff's Office
11  regarding the use of a conducted energy weapon other
12  than those two courses?
13   A   Not that I recall.
14   Q   Okay.  So never had any meeting with other
15  deputies where they specifically discuss the Tift
16  County Sheriff's Department policies?
17   A   Not that I recall.
18   Q   No specific course taught by Major Torres or
19  anyone else where they specifically discussed the Tift
20  County policy on the use of a conducted energy weapon,
21  correct?
22   A   Not that I recall, no, sir.
23   Q   The only training you've received since
24  you've been a deputy in Tifton regarding a conducted
25  energy weapon has been the two courses that Major

1  Torres has given that utilize the Axon materials,
2  correct?
3    A   To my recollection.
4    Q   Okay.  All right.  Did you ever receive any
5  training at the Lenox Police Department or the Omega
6  Police Department or anywhere else on how, when and
7  under what circumstances you could use a conducted
8  energy weapon?
9    A   No, sir.
10   Q   Okay.  Have you ever received any training
11  from anyone else inconsistent with that training and
12  those instructions, warnings, and training materials
13  that you were provided by Major Torres in your training
14  in Tift County?
15   A   No, sir.
16   Q   Okay.  Has Major Torres or anyone else with
17  the sheriff's department ever reviewed or discussed any
18  of those training materials or training warnings with
19  you independent of those two courses?
20   A   Not that I can recall, no, sir.
21   Q   All right, sir.  Have you ever had an
22  investigation or an incident regarding use of force
23  that involved you?
24   A   No, sir.
25   Q   Okay.  So this was the only time that you



Page 166

1    ever had any investigation?
2        A    Yes, sir.
3        Q    Okay.  And I'm not saying you're wrong, but I
4    have read some of the statements last night, and other
5    deputies said to GBI agents they were aware that you
6    had another investigation regarding use of force.
7            Does that refresh your memory in any way?
8            MR. WILLIAMS:  Object to form.
9            THE WITNESS:  No, sir, it doesn't.
10   BY MR. SPURLIN:
11       Q    Okay.  All right.  Can you define for me what
12   is excessive force?
13           MR. WILLIAMS:  Object to form.
14           THE WITNESS:  Excessive force is any force
15       that is not reasonably objective.
16   BY MR. SPURLIN:
17       Q    Okay.  Is it force that is more than
18   necessary?
19           MR. WILLIAMS:  Object to form.
20           THE WITNESS:  No, sir.  It's defined as any
21       force that is not reasonable.
22   BY MR. SPURLIN:
23       Q    Okay.  Is there any reason you should use
24   more force than is necessary?
25           MR. WILLIAMS:  Object to form.

Page 167

1            THE WITNESS:  I mean, I don't -- I don't
2        understand what you mean by more than necessary.
3    BY MR. SPURLIN:
4        Q    Well, for instance -- and I'll just hand you
5    the document.  And we can go ahead and talk about it.
6            You have been trained some in the use of
7    deadly force, have you not?
8        A    I have, yes, sir.
9        Q    And you've received that training from who?
10       A    I mean, I've received training on deadly
11   force from the Tift County Sheriff's Office and the --
12   in GPSTC.
13           MS. NGUYEN:  Do you want to see this too?
14           THE WITNESS:  I'm sorry, the academy.
15   BY MR. SPURLIN:
16       Q    Okay.  What did you say, just so I know?
17       A    GPSTC.
18       Q    What?
19       A    GPSTC is the Georgia --
20           MR. WILLIAMS:  Peace Officer Standard
21       Training.
22           THE WITNESS:  Right.
23           (Plaintiffs' Exhibit No. 16 was marked for
24       identification.)
25   BY MR. SPURLIN:

Page 168

1        Q    It's an acronym?
2        A    Yes, sir.  I'm sorry.
3        Q    That's all right.
4            I'm going to show you what's been marked as
5    Exhibit 16, Plaintiffs' 16, and ask you is that the Use
6    of Force Policy 3.01 in force through the Tift County
7    Sheriff's Office?
8            MS. NGUYEN:  You said that's marked as
9        Plaintiffs' Exhibit 16?
10           MR. SPURLIN:  Yes.
11           MS. NGUYEN:  And so that would have been
12       Exhibit 4, I believe, to Spurgeon's deposition,
13       right, the same one?
14           MR. WILLIAMS:  Right.  I know I had this
15       here.
16           MR. SPURLIN:  It is supposed to be the
17       document that you all recently produced, not from
18       the other deposition, but --
19           MR. WILLIAMS:  Let's make sure it's the same
20       one.  Yeah.
21           MS. NGUYEN:  I need to look at it.  You don't
22       have copies?
23           MR. SPURLIN:  I'm sorry.
24           MR. WILLIAMS:  This is defendants' Bates
25       stamp one, it looks like.

Page 169

1            MS. NGUYEN:  Okay.
2            MR. WILLIAMS:  It's at the bottom of it.
3            MS. NGUYEN:  Got it.
4            MR. WILLIAMS:  Production.
5            MS. NGUYEN:  Defendants' one.
6            MR. WILLIAMS:  It's the use of -- just
7        general use of force standard -- I mean, policy.
8    BY MR. SPURLIN:
9        Q    The question is simply is that the use of
10   force policy currently in effect with respect to the
11   Tift County Sheriff's Office?
12       A    I believe it is.
13       Q    And if you'll look on the first page, it said
14   it was amended on February 5th, 2016, correct?
15       A    Correct.
16       Q    And this was just produced to me.  So that
17   would have been the policy in force when this incident
18   happened with Mr. McBrayer, correct?
19       A    To the best of my knowledge, yes.
20       Q    Okay.  And deadly force is restricted to
21   certain circumstances, correct?
22           Do you want me to be more specific?
23       A    Yes, sir, please.
24       Q    You can't use deadly force if somebody has
25   committed a speeding violation, correct?



Page 170

1    A  No, sir.
2    Q  You can't use deadly force if somebody has a
3  traffic ticket, right?
4    A  Correct.
5    Q  You can't use deadly force if somebody is
6  littering, correct?
7    A  Correct.
8    Q  You can't use deadly force for misdemeanors,
9  correct?
10        MR. WILLIAMS:  Object to the form.  I mean,
11    to the extent that's an incomplete -- I don't
12    think the -- use of force is not contingent upon
13    the offense being committed.  It's more of the
14    circumstances, right?  So I object to -- go ahead.
15        MR. SPURLIN:  Well, I would respectfully
16    disagree.
17  BY MR. SPURLIN:
18    Q  The questions were you cannot use deadly
19  force for traffic tickets or misdemeanors.  That is, in
20  fact, a true statement, is it not?
21        MR. WILLIAMS:  Object to form.
22        MS. NGUYEN:  Join.
23        THE WITNESS:  I mean, I guess it would depend
24    on the circumstances.
25  BY MR. SPURLIN:

Page 171

1    Q  Well, so you believe it's appropriate for you
2  apprehending someone who has committed a traffic
3  violation to use deadly force?
4    A  I didn't say that.
5    Q  I'm asking.
6        MR. WILLIAMS:  Object to form.
7        MS. NGUYEN:  Object to the form.
8        THE WITNESS:  No, sir.  If they've merely
9    committed a traffic infraction, no.
10  BY MR. SPURLIN:
11    Q  Okay.  Because the overriding thing you have
12  to do is balance the risk and the benefit, correct?
13    A  Well, it's not objectively reasonable.
14    Q  I understand.
15        Because you have to balance the law
16  enforcement's need to arrest them for that ticket
17  versus the harm, right?
18        MR. WILLIAMS:  Object to form.
19        THE WITNESS:  Correct.
20  BY MR. SPURLIN:
21    Q  Okay.  In fact, isn't that in the policy
22  on -- the pages I have are not numbered.  It looks like
23  page one, two, three, four, under 3B specifically.  It
24  says, "Shots shall not be fired at persons who have
25  committed or are committing traffic violations, comma,

Page 172

1  misdemeanors, comma, non-forcible felonies, and
2  forcible felonies not in progress except as defined in"
3  two sections above.
4        Did I read that accurately?
5    A  Yes, sir.  That's correct.
6    Q  I mean, the force has got to be balanced
7  against what you all's need to arrest them, right?
8    A  Yes.
9    Q  And to be fair, if a guy has just killed two
10  people and he's fleeing, you can use deadly force
11  because of the nature of the crime, right?
12    A  Correct.
13    Q  But you can't use deadly force because he ran
14  a stop sign and he's going to get away, right?
15    A  I mean, I guess that -- for that situation
16  specifically, no.  But, again, it depends on the
17  circumstances.  It depends on a totality of the
18  circumstances, not just a -- one specific infraction or
19  charge, okay.
20    Q  That's not what it says, is it?
21        MR. WILLIAMS:  Object to the form.
22  BY MR. SPURLIN:
23    Q  It doesn't say in B2 that you can use deadly
24  force any time for a traffic violation or a
25  misdemeanor, does it?

Page 173

1    A  No.
2    Q  Okay.  So -- I mean, don't you agree the
3  overall policy is you got to balance the harm they have
4  committed, the nature of the law enforcement's need to
5  get them now versus how much harm you could potentially
6  do to them or to someone else, right?
7        MR. WILLIAMS:  Object to form.
8        THE WITNESS:  Okay.  I mean, you're using it
9    as a past tense, the crime they committed.  Let's
10    look at the harm that they could be doing at that
11    point in time or in the future.  You have to
12    balance those things as well.
13  BY MR. SPURLIN:
14    Q  Let me ask you this.  Isn't there a policy
15  that you all aren't supposed to chase people at high
16  speeds if you know who they are and they've only
17  committed a misdemeanor?
18    A  Yes, sir.
19    Q  Okay.  So that's a balancing?  We know who he
20  is.  We can pick him up next week.  We don't need to
21  have a 90 mile per hour chase and kill Johnny Spurlin
22  who's driving along peaceably, right?
23    A  Yes, sir.
24    Q  Okay.  So generally you do agree there's a
25  balancing of the crime they've committed and the harm



Page 174

```
1    they may have committed versus how much harm you might
2    commit or harm to them or others, right?
3         MR. WILLIAMS:  Object to form.
4         THE WITNESS:  Yes.
5    BY MR. SPURLIN:
6         Q    Okay.  Well, isn't that part of, you said --
7    what was your -- what was your definition, reasonably
8    objective?
9         A    Reason -- yes, sir.
10        Q    The reasonableness is the balancing, right?
11        A    Correct.
12        Q    If I'm -- if I'm chasing a guy who has
13   committed two murders, I can use more force than I can
14   from chasing somebody who has a run a stop sign ticket,
15   right?
16        MR. WILLIAMS:  Object to form.
17        THE WITNESS:  I mean, not necessarily,
18   because you have to weigh the balance between what
19   your -- how it's going to affect the population as
20   well.
21   BY MR. SPURLIN:
22        Q    Okay.
23        A    You know, if I'm chasing this guy through a
24   subdivision, then, no, it doesn't make any sense to
25   chase this murder suspect through a subdivision or a
```

Page 175

```
1    school zone with children out playing.
2         Q    Okay.
3         A    You know, because now you're looking at
4    causing more damage to these people than you are, you
5    know, maybe trying to catch that guy another time or
6    catch up with him later.
7         Q    Is it ever objectively reasonable to use
8    deadly force against someone whose only crime is
9    running a stop sign?
10        MR. WILLIAMS:  Object to form.
11        THE WITNESS:  I mean, the only crime they
12   committed at that point in time?
13   BY MR. SPURLIN:
14        Q    Yeah.
15        A    I mean, are they a hazard to other people?  I
16   mean, it's -- you're asking me to -- you're asking me
17   to tell you if it's objectively reasonable to use
18   deadly force against somebody who has only ran a stop
19   sign.  You know, if that is the only circumstance, then
20   I would say no.
21        Q    Okay.  All right.  Based on your education,
22   training and experience, you believe you're capable of
23   determining in a factual situation what is excessive
24   force?
25        A    Yes.
```

Page 176

```
1         Q    And in this case, do you believe that six
2    TASER applications for 30 seconds is excessive force?
3         A    No, sir, I don't.
4         Q    Okay.  You would agree that it is the policy
5    of the sheriff's department, based on this document,
6    not to use excessive force?
7         A    Correct.
8         Q    You've been trained not to use excessive
9    force?
10        A    Correct.
11        Q    Okay.  You understand Sheriff Scarbrough's
12   policy is not to use excessive force?
13        A    Yes, sir.
14        Q    You were taught that at the police academy?
15        A    Yes, sir.
16        Q    You utilize that in your work every day,
17   correct?
18        A    That is correct.
19        Q    Okay.  And your training was so that you
20   would not use excessive force, correct?
21        A    Correct.
22        Q    Now, do you agree that a citizen has a right
23   to be free from excessive force?
24        A    Yes, sir, I agree with that.
25        Q    You've known that ever since you went to the
```

Page 177

```
1    police academy, right?
2         A    Yes, sir.
3         Q    Okay.  And do you agree that a person has a
4    right to be free from excessive TASER applications?
5         MR. WILLIAMS:  Object to form.
6         MS. NGUYEN:  Join.
7         THE WITNESS:  Can you define what excessive
8    TASER applications is.
9    BY MR. SPURLIN:
10        Q    Can you define for me what you think
11   excessive TASER application is?
12        MR. WILLIAMS:  Object to form.
13        THE WITNESS:  No, sir.  You're the one asking
14   me the questions.  I would like --
15   BY MR. SPURLIN:
16        Q    And I just asked you.
17        A    I would like for you to define to me what you
18   consider excessive TASER applications.
19        Q    Okay.  I'm trying to.  I'm trying to clarify
20   your thought process.
21        In your mind, how many TASER applications
22   would be excessive?
23        MR. WILLIAMS:  Object to form.
24        THE WITNESS:  In my mind, I --
25        MS. NGUYEN:  Join.
```





Page 178

```
1        THE WITNESS: -- I would not put a number on
2   TASER applications as far as being excessive.  And
3   the reason I say that is because if that person is
4   still an imminent danger to other people, then
5   I -- I can still apply that TASER, especially when
6   it hasn't been effective up to that point.
7   BY MR. SPURLIN:
8        Q   Okay.
9        A   I can still apply that TASER because that
10  person is still a danger to the people around.
11       Q   Okay.  So if, in this factual situation, Mr.
12  McBrayer was still fighting with you, you believe you
13  could have tasered him more than ten times and not been
14  excessive?
15       A   Yes, sir, I do believe that.
16       Q   And you believe if Mr. McBrayer had been
17  actively resisting, you could have tasered him up to 15
18  times without it being excessive?
19       A   No, sir.  There's a difference between
20  actively resisting and creating a hazard for other
21  people.
22       Q   Okay.  Well, if he's actively resisting you
23  and Deputy Spurgeon, is he a risk to you two?
24       MS. NGUYEN: Object to form.
25       THE WITNESS: Your initial was not actively
```

Page 179

```
1   resisting.  Your initial question was at what
2   point do I think it's excessive.  And my answer to
3   you was if that person is still a danger to other
4   people.
5   BY MR. SPURLIN:
6        Q   Okay.  If Mr. McBrayer was a danger to you or
7   Deputy Spurgeon, do you believe you could have applied
8   your TASER 15 times?
9        A   As many times as necessary to subdue him and
10  control that situation, yes, sir.
11       Q   Okay.  So your training and experience has
12  been that there is no limitation on the number of TASER
13  applications you can give to someone who's still a
14  danger; is that correct?
15       A   As long as the exigent circumstances still
16  exist.
17       Q   Okay.  And the same question with respect to
18  number of seconds, is there any limitation on how many
19  seconds you can apply the TASER to the person if
20  they're still a danger to you or others?
21       A   No, sir.
22       MR. WILLIAMS: Object to form and foundation.
23       THE WITNESS:  If exigent -- if exigent
24  circumstances still exist, there is no limit --
25  BY MR. SPURLIN:
```

Page 180

```
1        Q   Okay.
2        A   -- that I'm aware of.
3        Q   All right.  So in your manner of practicing
4   law enforcement, you don't believe there's any
5   limitation on the number of times or the number of
6   seconds that you can apply a TASER, correct?
7        A   Under exigent circumstances.
8        MS. NGUYEN: Object to form and foundation.
9   BY MR. SPURLIN:
10       Q   Okay.  So as long as you believe the person
11  to be dangerous to either themselves or others, you
12  believe there is no limitation on the number of TASER
13  applications and the number of times or seconds that
14  you can apply the TASER; is that right?
15       MR. WILLIAMS: Object to form.
16       MS. NGUYEN: Same objections.
17       THE WITNESS: Rephrase that for me, please.
18  BY MR. SPURLIN:
19       Q   As long as you believe the danger still
20  exists to you or to the person, you believe there's no
21  limitations on the number of applications or on number
22  of seconds in applying a TASER; is that correct?
23       MR. WILLIAMS: Object to form.
24       THE WITNESS: I believe that --
25       MS. NGUYEN: Object to form and foundation.
```

Page 181

```
1        THE WITNESS: I believe that as long as that
2   person is -- as long as the exigent circumstances
3   still exist where that person could potentially
4   harm someone else, I would agree that there is no
5   limit to how many times that that person can be
6   tasered.
7   BY MR. SPURLIN:
8        Q   Did Major Torres ever tell you that as long
9   as there is some risk of danger, that you could apply
10  it as many times as needed for as many seconds needed?
11       A   I would have to refer back to the policies,
12  but I believe that the policies state that if there's
13  exigent circumstances.
14       Q   Yes, sir.
15       A   Even the -- I'll stop right there because I
16  don't want to misrepresent what the policy says.
17       Q   And that's.  I'm just going to try to keep
18  you on the question.
19       The question wasn't what the policy says.  It
20  was what did Major Torres tell you in the training?
21       A   Well, if Major Torres follows the policy,
22  then I would believe that Major Torres would follow
23  what the policy says about exigent circumstances.
24       Q   Do you have recollection of what he told you
25  in either your first training with the TASER or your
```

46 (Pages 178 to 181)



Page 182

1  refresher course training?
2    A  No, sir, I don't.
3    Q  Okay.  Was there ever a discussion that you
4  could have an unlimited number of applications for an
5  unlimited amount of seconds as long as you perceived
6  the danger to continue to exist?
7    A  Again, I would have to refer back to what the
8  policy says before I can tell you if there was anything
9  that stated that.
10   Q  You don't remember him saying anything in
11  either course?
12   A  No, sir.  I mean, I don't -- I don't remember
13  exactly word for word what was stated.
14   Q  In either course, did you all have
15  hypotheticals where a fact situation was set out and
16  the class was asked to discuss is that excessive or is
17  that not?
18   A  I don't recall.
19   Q  Never had -- never done that in any course?
20   A  I never said that I didn't.  I said I don't
21  recall.
22   Q  I understand.
23      I'm asking you have you ever done that in any
24  other course?
25   A  I don't know.  I don't remember.

Page 183

1    Q  Okay.  Was there ever any discussion on
2  either course on the use of a conducted energy weapon
3  about a hypothetical fact situation and the number of
4  applications or the number of seconds?
5    A  Again, I just told you.  I just answered the
6  same question.
7      MR. WILLIAMS:  If you don't know, you can say
8  that.
9      THE WITNESS:  I don't recall.
10     MR. WILLIAMS:  That's fine.
11  BY MR. SPURLIN:
12   Q  Okay.  Have you ever discussed that with
13  anyone else with the sheriff's department in any
14  official capacity or any training session?
15   A  Not that I recall.
16   Q  Okay.  All right.  Do you remember having any
17  discussion with Major Torres about the recommendation
18  of a 15 second limitation?
19     MS. NGUYEN:  Object to form and foundation.
20     THE WITNESS:  I believe that's in the policy.
21  BY MR. SPURLIN:
22   Q  Okay.  That that is the recommendation?
23   A  I'm sorry.  I believe that is in TASER's
24  policy.
25   Q  That is the recommendation from Axon,

Page 184

1  correct?
2    A  I would --
3      MS. NGUYEN:  Object to form.
4      THE WITNESS:  I mean, I would have --
5      MR. WILLIAMS:  Same object.
6      THE WITNESS:  -- to read over the policy and
7  tell you.
8      MR. SPURLIN:  All right.  What are you
9  pointing at?  Now, you can't coach the witness.
10     MR. WILLIAMS:  No.  He said he would need to
11  look at the policy, so I was just pointing out --
12     MR. SPURLIN:  No, he did not.
13     MR. WILLIAMS:  -- where that portion is.
14  Yeah, he did.
15     MR. SPURLIN:  He said he needed to look at
16  the Axon training.  The question on the floor --
17     MR. WILLIAMS:  That's what I'm pointing to is
18  the training.
19     THE WITNESS:  On this.
20     MR. SPURLIN:  What exhibit do you have in
21  front of you?
22     MR. WILLIAMS:  It's the TASER -- what you
23  were just referring to.
24     THE WITNESS:  Exhibit 8.
25     MR. WILLIAMS:  The TASER warnings.

Page 185

1      MR. SPURLIN:  What exhibit number is that?
2  Is that a hard question to answer?
3      MR. WILLIAMS:  I don't know, man.
4      THE WITNESS:  It's Exhibit 8.
5      MR. WILLIAMS:  This one's Exhibit 8.
6      MR. SPURLIN:  All right.
7  BY MR. SPURLIN:
8    Q  Tell me what was just pointed out to you.
9  Let me see it.
10   A  He pointed out No. 1, "Minimize the number
11  and duration of CEW exposures."
12   Q  Okay.  And keep reading.  "Most human CEW lab
13  testing has not exceeded 15 seconds"?
14   A  Yes, sir.
15   Q  "And none has exceeded 45 seconds," correct?
16   A  Yes, sir.
17   Q  Then the recommendation from Axon is use the
18  shortest duration objectively reasonable, correct?
19   A  But let's --
20     MR. WILLIAMS:  Object to form.
21     THE WITNESS:  But let's keep reading.  "To
22  accomplish lawful objectives."
23  BY MR. SPURLIN:
24   Q  Okay.  And if you will look --
25     MS. NGUYEN:  What page is that?




Page 186

```
1            THE WITNESS:  It's going to be page two.
2    BY MR. SPURLIN:
3        Q    All right, sir.  Okay.  Let me go back where
4    I was.
5            Are there any -- excuse me.  Strike that.
6            Does a citizen have a right to be free from
7    being drive stunned?
8        A    Sir, I -- I mean --
9            MR. WILLIAMS:  Object to form.
10           MS. NGUYEN:  Join.
11           THE WITNESS:  Do they have a right to be free
12       from being drive stunned?
13   BY MR. SPURLIN:
14       Q    (Nodding head affirmatively.)
15       A    Yes, sir.
16       Q    You were aware and testified, I think, when
17   you were asked by Ms. Nguyen that you knew drive stun
18   was for pain compliance only, correct?
19       A    Yes, sir.
20       Q    It doesn't have the neuromuscular
21   incapacitation feature, correct?
22       A    Correct.
23       Q    Okay.  And you agree that it's clearly
24   established that a person has a right to be free from
25   an officer utilizing any type of force just to cause
```

Page 187

```
1    pain, correct?
2            MR. WILLIAMS:  Object to form.
3            THE WITNESS:  I never stated that.
4    BY MR. SPURLIN:
5        Q    I'm asking you.  You disagree with what I
6    said?
7        A    I do disagree with that.
8        Q    Okay.  Well, the purpose of any use of force
9    is to obtain compliance, correct?
10       A    That is correct.
11       Q    It is not to inflict pain, correct?
12       A    I don't --
13           MR. WILLIAMS:  Object to form.
14           THE WITNESS:  I don't agree with that because
15       you have pain compliance.
16   BY MR. SPURLIN:
17       Q    Okay.
18       A    I mean, that's actually a defensive tactic
19   technique that we're taught.
20       Q    Okay.  So if you have control of a person,
21   you agree that person is entitled to be free from any
22   type of force you would utilize just to cause them
23   pain?
24           MR. WILLIAMS:  Object to form.
25           MS. NGUYEN:  Join.
```

Page 188

```
1            THE WITNESS:  Can you elaborate on -- you
2        said if you have control.
3    BY MR. SPURLIN:
4        Q    Right.
5        A    Okay.  Can you elaborate on control and what
6    you mean by having control?
7        Q    Okay.  Well, let's assume you have someone
8    handcuffed.
9        A    Okay.
10       Q    You can't just go up and kick them?  You wold
11   agree that would be excessive force?
12       A    I would agree that you can't just go up and
13   kick somebody --
14       Q    Okay.
15       A    -- that you have handcuffed for no reason.
16       Q    And if you have them handcuffed and under
17   control, you can't hit them upside the head?
18           MR. WILLIAMS:  Object to form.
19           MS. NGUYEN:  Join.
20   BY MR. SPURLIN:
21       Q    You agree that would be clearly excessive?
22       A    If I just walk up and hit them in the head
23   for no reason?
24       Q    Right.
25       A    Yeah.  Absolutely.
```

Page 189

```
1        Q    Okay.  And if you have control of someone,
2    that you can't drive stun them just because they happen
3    to hit you, correct?
4            MR. WILLIAMS:  Object to form.
5            THE WITNESS:  Again, you're not really
6        defining to me what you mean by having control of
7        someone.
8    BY MR. SPURLIN:
9        Q    I just want you to assume for the purpose of
10   the question that you have control.  If you have
11   control --
12       A    Okay.  But your definition of --
13           MR. WILLIAMS:  We don't know what that means.
14           THE WITNESS:  -- having control --
15           MR. WILLIAMS:  Object to form.
16           THE WITNESS:  -- might be different than
17       mine.
18   BY MR. SPURLIN:
19       Q    Okay.
20       A    You know, I would like to know what you
21   determine to be having control to be able to
22   appropriately answer that question.
23       Q    Well, do you believe that you and
24   Spurgeon had control of McBrayer when you had one of
25   his hands, you were holding him by his neck down in the
```



Page 190

1    dirt and Spurgeon has his weight upon him? Did you
2    have control of him at that time?
3         MR. WILLIAMS: Object to form.
4         MS. NGUYEN: Join.
5         THE WITNESS: I don't agree that -- that's
6    not my recollection of the events.
7    BY MR. SPURLIN:
8         Q    Okay. Is it your testimony that you never
9    had control of McBrayer until the other deputies
10   arrived?
11        A    I would agree with that.
12        Q    Okay. So would it be your testimony that for
13   ten minutes that we had him on the ground he was not
14   under control?
15        MR. WILLIAMS: Object to form.
16        THE WITNESS: I would say that he's not under
17   control because I didn't have control of his
18   hands.
19   BY MR. SPURLIN:
20        Q    Well, let's talk about that. Spurgeon had
21   one hand, correct?
22        A    You would have to ask Deputy Spurgeon about
23   that.
24        Q    Okay.
25        A    I don't know. I mean, I don't --

Page 191

1         Q    Well, you testified to it this morning. You
2    said detective -- you said Deputy Spurgeon had one hand
3    and the other hand was underneath him and I could not
4    get it out to handcuff him.
5         A    Okay.
6         Q    Is that not what you said?
7         A    Yes, sir. So I'll agree with that. Deputy
8    Spurgeon had one hand, yes, sir.
9         Q    Okay. And you had the other, you just did
10   not have it behind his back, correct?
11        MR. WILLIAMS: Object to form.
12        THE WITNESS: There was --
13        MS. NGUYEN: Join.
14        THE WITNESS: -- at some point that I
15   couldn't have had a hand on his arm because you're
16   claiming that I had one on his neck and there was
17   one on his back.
18   BY MR. SPURLIN:
19        Q    I don't think I've said you had one hand on
20   his neck and one hand on his back at the same time.
21   I've never said that.
22        A    Okay.
23        Q    I've never said that.
24        A    I disagree that I -- that I had control of
25   his arm at all points, at all times.

Page 192

1         Q    I didn't ask you at all times.
2         Did you ever have control of his hand?
3         MR. WILLIAMS: Object to form.
4         THE WITNESS: I don't know that. I don't
5    know.
6    BY MR. SPURLIN:
7         Q    Okay. And it's your testimony that when he
8    was on the ground and you were holding him by his neck
9    and Spurgeon had one hand, he was not under control?
10        MR. WILLIAMS: Object to form.
11        Go ahead.
12        THE WITNESS: Again, I don't -- I don't think
13   he was under control until we actually got him in
14   handcuffs.
15   BY MR. SPURLIN:
16        Q    Okay. And was he under control once he was
17   handcuffed?
18        A    It is my belief that, yes, he would have been
19   under control after that point.
20        Q    Okay. So you would agree that the law is
21   clearly established that at that point when he's
22   handcuffed, no one could inflict pain on him?
23        MR. WILLIAMS: Object to form.
24        THE WITNESS: No, sir. Again, I'm telling
25   you that my perception is he was under control at

Page 193

1    that point.
2    BY MR. SPURLIN:
3         Q    I understand.
4         At that point, was there any reason for any
5    deputy to inflict pain on him at that point?
6         A    Sir, I can't speak for other deputies. I can
7    speak for me.
8         Q    Okay.
9         A    And I don't think that it would have been
10   reasonable for me to inflict unnecessary pain, no.
11        Q    Okay. Once he was handcuffed, you believe
12   that there should have been no further use of force
13   with respect to him; is that correct?
14        A    That's correct.
15        Q    All right. And can a person be under
16   control by a deputy without being handcuffed?
17        MR. WILLIAMS: Object to form.
18        THE WITNESS: Yes.
19   BY MR. SPURLIN:
20        Q    Under what circumstances?
21        MR. WILLIAMS: Object to the form.
22        THE WITNESS: I mean, there's a lot of
23   different -- there's a lot of different
24   circumstances where you can be under control. I
25   mean, if you're compliant and you're doing the



Page 194

```
 1    things that I asked you to do, it's reasonable
 2    that you're under control because you're complying
 3    to directives.
 4        THE VIDEOGRAPHER: Hold on. Can we go off
 5    the record?
 6        MR. SPURLIN: Uh-huh.
 7        THE VIDEOGRAPHER: The time is 3:04. We're
 8    going off the record.
 9        (Whereupon, a recess was taken.)
10        THE VIDEOGRAPHER: The time is 3:05. We're
11    back on the record.
12   BY MR. SPURLIN:
13    Q   All right. Have you ever been given any
14    training that you need to balance the government
15    interests against the nature and quality of the force
16    utilized?
17    A   Can you elaborate what you mean by that?
18    Q   I think that's the whole line of questions I
19    asked you earlier. You can't use deadly force if the
20    only crime the guy's committed is a traffic violation,
21    correct?
22        MR. WILLIAMS: Object to form.
23        THE WITNESS: Yes, sir, I would have -- yes.
24   BY MR. SPURLIN:
25    Q   That's balancing the government interest --
```

Page 195

```
 1    A   Okay.
 2    Q   -- how dangerous the person is versus the
 3    type of force that you're going to use, right?
 4    A   Yes, sir.
 5    Q   The same hypothetical you answered, the need
 6    to arrest someone for a traffic ticket and endangering
 7    an entire subdivision of children would be clearly
 8    excessive? You can't chase them through the
 9    subdivision in that factual situation, correct?
10    A   Correct.
11        MR. WILLIAMS: Object to form.
12   BY MR. SPURLIN:
13    Q   Generally that's what you do? You balance
14    the nature of the force you're going to use with the
15    government interest in getting the guy, right?
16    A   Yes.
17    Q   I got you.
18        Okay. Now, I want to ask you something about
19    this TASER training. When you first came on board, did
20    the sheriff's department utilize TASERs regularly?
21    A   As far as I know, yes, sir.
22    Q   Okay. Was there any change in policy or push
23    to utilize more TASERs or to equip deputies with more
24    TASERs?
25        MR. WILLIAMS: Object to the form.
```

Page 196

```
 1        THE WITNESS: I mean, I can't speak to that.
 2   BY MR. SPURLIN:
 3    Q   Okay. There's a document that your lawyer
 4    has provided that shows that shortly before your
 5    training, I believe, in October, the sheriff's
 6    department purchased 50 TASERs.
 7        Do you have any knowledge of that?
 8    A   No, sir.
 9    Q   Okay. Was there any instruction from above
10    that said you all need to go get your TASER training,
11    we just bought 50 of these and you all need to know how
12    to use them?
13    A   Not that I would have been privy to.
14    Q   Okay.
15    A   No, sir.
16    Q   The time is why I asked the question.
17        Shortly after those were purchased, a lot of
18    you all went through that training on December 18th,
19    2018?
20    A   Yes, sir.
21    Q   But you never were told you needed to do that
22    or that needs to be part of what you take this year?
23    A   I mean, I was told be at training on this
24    day, I mean.
25    Q   Okay. So it wasn't an elective course? You
```

Page 197

```
 1    were told to be there and you were?
 2    A   Yes, sir.
 3    Q   Was it the policy that every officer and
 4    deputy had to be trained in how to use a TASER?
 5    A   The only thing that I'm aware of is if you're
 6    going to carry a TASER, you have to be trained to use
 7    it.
 8    Q   Okay.
 9    A   I don't know if there was ever a policy
10    stating that you have to do it.
11    Q   Is there a policy that every patrol deputy
12    has to carry a TASER?
13    A   Not that I'm aware of.
14    Q   And what is your current title?
15    A   A traffic deputy.
16    Q   Is there a policy that every traffic deputy
17    has to carry a TASER?
18    A   Not that I'm aware of, no, sir.
19    Q   But who told you be there on December 18th
20    for this training?
21    A   It would have been my supervisor, whoever
22    that was at the time.
23    Q   Okay. Now, generally law enforcement
24    personnel have to have so many hours of training each
25    year; is that correct?
```



Page 198

1    A   Yes, sir.
2    Q   And what do you all call it, continuing
3  education?
4    A   It's just annual required training that I
5  know of.
6    Q   Do you know how many hours it is?
7    A   No, sir, I'm not -- I'm not sure.
8    Q   Okay. And typically would you have the right
9  to choose what hours you pick? What classes you pick?
10   A   No, sir. Tift County Sheriff's Office,
11  they -- they tell us when to be there and what training
12  we're doing.
13   Q   I see. I see.
14       And if you want to, you can look at
15  Defendants' Exhibit No. 5 with me.
16   A   Yes, sir.
17   Q   Does this appear to be your training through
18  June 28th of 2019?
19   A   It does.
20   Q   Okay. All right, sir. And if you'll look at
21  the second page, December 18th is the first time you
22  ever had any TASER certification training, correct?
23   A   Correct.
24   Q   Okay. And you received eight hours; is that
25  right?

Page 199

1    A   Yes, sir.
2    Q   Do you have any recollection of the class?
3    A   No, sir, I don't.
4    Q   Do you have any recollection of anything
5  specifically that Major Torres told you?
6    A   No, sir, I don't.
7    Q   Okay. Did you all just go through and you
8  watched the slides? Is that all that it consisted of?
9        MS. NGUYEN: Object to form.
10       THE WITNESS: Again, sir, I just told you I
11  don't remember exactly what was stated.
12  BY MR. SPURLIN:
13   Q   The classroom portion, how many hours of the
14  eight hours was it, as opposed to the actual use of the
15  weapon?
16   A   Sir, that would be a Major Torres question.
17   Q   Okay. You don't remember?
18   A   No, sir.
19   Q   Was it all done on one day or was it done on
20  two days?
21   A   My recollection is it was done on one.
22   Q   Okay. And do you recall if the classroom
23  portion was first?
24   A   Yes, sir.
25   Q   Okay. All right. Let's go to the second

Page 200

1  portion, the tactical portion.
2        I'm assuming they taught you how to handle
3  the weapon; is that right?
4    A   Yes, sir.
5    Q   How to holster and arm it and how to use the
6  trigger, right?
7    A   Yes, sir.
8    Q   And part of that was a discussion?
9    A   Yes, sir.
10   Q   And then part of it they let you shoot; it is
11  that right?
12   A   We were required to shoot two cartridges,
13  yes.
14   Q   Okay. And you were trained on how you were
15  supposed to shoot it?
16   A   Yes.
17   Q   And how you were supposed to target it?
18   A   Yes.
19   Q   The stance and everything?
20   A   Yes, sir.
21   Q   Okay. And then did everyone who participated
22  in your course also allow themselves to be shot?
23   A   No. You're not shot with the TASER. We
24  actually -- they clip it to you.
25   Q   They clip it to you?

Page 201

1    A   Yes, sir.
2    Q   Okay. And so did everyone allow them to have
3  it applied to them?
4    A   I did. I can't speak for everybody else in
5  the class.
6    Q   There were some others who did?
7    A   Yes. I mean, there were other people that --
8  yes. There were other people that had voluntary
9  exposure. I can't attest that everybody did.
10   Q   Okay. Were the voluntary exposures all done
11  at the same time? Like they do --
12   A   They were all done the same day.
13   Q   Tripp first, they do Spurgeon later, all at
14  the same --
15   A   Yes, sir.
16   Q   Okay. And do you remember how long the
17  classroom portion was?
18   A   I don't.
19   Q   Okay. Now, did Major Torres give you any
20  training other than going through the slides?
21   A   I don't -- I don't remember.
22   Q   Okay. Did he allow questions?
23   A   I'm not sure. I'm -- I would be speculating.
24  I don't remember.
25   Q   Okay. Did he go through any hypothetical

51 (Pages 198 to 201)



Page 202

1  fact situations to talk about what you should or should
2  not do in those hypothetical fact situations?
3      A  I don't remember.
4      Q  Okay.  All right.  Ms. Nguyen used Exhibit 6
5  that has only a portion of these slides.  I've got a
6  much bigger exhibit.  The one that she has apparently
7  has 94 separate slides.
8          Is that consistent with what you remember or
9  do you just not remember anything?
10     A  I mean, I remember it was a lengthy
11 PowerPoint.  I don't remember exactly how many slides
12 it was.
13     Q  Okay.  When you all had training at the
14 sheriff's department, do you take notes?
15     A  Sometimes.  It depends on the class.
16     Q  Did you have to take an exam that day or was
17 it later?
18     A  It was that day.
19     Q  Okay.  And did you take it immediately after
20 the coursework with the teacher or did you do it after
21 the application section?
22     A  No, sir.  We did it after the classroom
23 instruction.
24     Q  Okay.  Were you allowed any materials out
25 when you took the test?

Page 203

1      A  No, sir.
2      Q  Do you remember any of the questions?
3      A  I don't.
4      Q  Do you remember your grade?
5      A  No, sir.
6      Q  Okay.  Do you know if there's a specific
7  number grade you have to have to pass it?
8      A  I'm not sure.  I don't know how the grading
9  works on it.
10     Q  All right, sir.  Now, the TASER exhibit that
11 was utilized, I want to go through that with you for
12 just a minute, Defendants' Exhibit No. 3.
13     A  Yes, sir.
14     Q  Do you recall if this was the same TASER that
15 you had from the start or did someone else have it
16 before you got it?  Does that make sense to you?
17     A  I wouldn't know the answer to that question.
18     Q  The reason I ask it is -- I'll tell you what
19 it looks like to me.  If you'll look on the first page
20 of Exhibit 3, it shows that on September 30th, 2018,
21 the trigger was pulled one, two, three, four, five,
22 six, seven, eight, nine, ten, 11, 12, 13, 14 times
23 almost in succession from 6:46 to 6:47.
24         Do you see that?
25     A  I do.

Page 204

1      Q  Would that suggest to you that that's
2  somebody in the field using that or was that somebody
3  in a class?
4          MS. NGUYEN:  Object to the form and
5  foundation.
6          THE WITNESS:  I mean, it could be -- it could
7  be a number of things.  I don't know.  I can't
8  answer that.
9  BY MR. SPURLIN:
10     Q  Do you know if that was you pulling the
11 trigger all those times on September 30, 2018?
12     A  No, sir, I don't.
13     Q  Okay.  Now, if you weren't trained until
14 December 18th, 2018, that would tell me that this
15 wasn't you; is that fair?
16     A  I think that's a fair assessment.
17     Q  All right.  You never utilized it until you
18 were trained, correct?
19     A  That is correct.
20     Q  So this one was used by somebody else on that
21 date, right?
22     A  Yes, sir.
23     Q  Is there any way for us to know when this was
24 issued to you?
25     A  I wouldn't know the answer to that question.

Page 205

1      Q  Do you know if you had ever utilized this
2  particular model before the episode with Mr. McBrayer?
3      A  You're talking about have I ever used it in
4  what capacity?
5      Q  All right.  That's a good question.
6          In the field have you ever utilized it?
7      A  As far as deploying it against a person?
8      Q  Yes.
9      A  I've never deployed a TASER against a person
10 at all before this incident.
11     Q  Thank you.
12         Have you since?
13     A  No, sir.
14     Q  Okay.  So in your life as a deputy here and
15 Omega and in Lenox, this is the only time you've ever
16 utilized a TASER weapon; is that correct?
17     A  That is correct.
18     Q  Have you ever pulled and aimed the TASER
19 weapon at anybody?
20     A  I have.
21     Q  Okay.  How many times have you done that?
22     A  I don't know for sure.  I can think of two
23 other instances where I did right off the top of my
24 head, but that's --
25     Q  Let's talk about those two incidents.

52 (Pages 202 to 205)



Page 206

```
1        A   Okay.
2        Q   Were they both after the McBrayer episode?
3        A   One of them was.  I don't know if the first
4   one was or not.  I don't recall.
5        Q   All right.  Describe the first one that you
6   can recall to me.
7        A   Yes, sir.  The first one that I recall is we
8   were going into a house to serve a warrant.  The
9   individual that we were serving the warrant on we knew
10  was in the house.  We got confirmation from somebody
11  else that he was already in the house.
12            He had a violent history with law
13  enforcement.  So when we went into the house, I went in
14  with my TASER already out.  And the deputy behind me
15  went in -- went in with lethal force, already out.  And
16  when we made contact, he was not compliant.  I aimed my
17  TASER at him, and we gained compliance that way.
18       Q   You said the second deputy had lethal force
19  out.  What do you mean by that?
20       A   He had his duty weapon drawn.
21       Q   Okay.  So he had his pistol drawn?
22       A   Yes, sir.
23       Q   Do you not believe the TASER is lethal force?
24       A   I believe it is a less lethal means, but I do
25  believe that it can be lethal, yes.
```

Page 207

```
1        Q   And who was the other deputy with you?
2        A   I don't -- I don't remember that.
3        Q   Okay.  And do you know who the person you
4   were trying to control was?
5        A   No, sir, I don't remember his name either.
6        Q   All right.  And would it be fair to say the
7   reason you had your weapon drawn was that he had a
8   history of violence?
9        A   I would say that a history of violence.  The
10  fact that he was hiding in the residence, not complying
11  to our commands to come out.
12       Q   Okay.  I didn't hear you say that earlier.
13  That's why I asked.
14       A   I'm sorry.  I didn't.
15       Q   Okay.  What were the reasons why you had your
16  weapon drawn and aimed before you entered?
17       A   Yes, sir.  Number one, he was hiding in the
18  house.  We knew that he was in the house.  He actually
19  told the person, the homeowner, not to let us in.  He
20  had a violent history with law enforcement.
21       Q   What type?
22       A   As far as -- I'm sorry, he had a combative
23  history, not necessarily a violent history, where he
24  would try to flee and he would -- you know, he would
25  push past us, if he needed to, to get out of the house,
```

Page 208

```
1   things like that.
2        Q   You mean he had a history of fleeing?
3        A   No, sir.  He had a history of being
4   aggressive in nature.
5        Q   Ever strike a law enforcement officer?
6        A   I don't remember.
7        Q   I'm trying to distinguish by what you mean by
8   combative versus violent, because you said --
9        A   Yes, sir.
10       Violent, I don't mean that he -- he would try
11  to avoid confrontation.  However, once we get our hands
12  on him, he will, you know, pull away from us, push us
13  away from him, things of that nature.
14       Q   Did you have your weapon armed that day?
15       A   Yes, sir.
16       Q   Okay.  And when did you --
17           MS. NGUYEN:  Weapon, are you referring to the
18  TASER?
19           MR. SPURLIN:  That's the weapon he said he
20  had.  Yes, ma'am.
21  BY MR. SPURLIN:
22       Q   And did you all knock and say Tift County
23  Sheriff's Department, we have a search warrant?
24       A   It wasn't a search warrant.  It was an arrest
25  warrant.
```

Page 209

```
1        Q   Oh, you said search warrant.  But anyway,
2   that's okay.  I thought you said --
3        A   I'm sorry.  It was an arrest warrant.
4        Q   It was an arrest warrant, okay.
5        A   We made contact with the homeowner, yes.
6        Q   And were you all able to arrest him that day?
7        A   We did.
8        Q   Okay.  All right.  What about the second
9   incident?
10       A   The second incident, we had an individual at
11  a business.  He was under the influence of -- suspected
12  to be under the influence of drugs.  He was acting
13  irrational.
14           We went in.  We tried to talk to him.  He
15  actually pushed one of my other deputies.  I drew my
16  TASER, and I armed my TASER.  I pointed it at him.  I
17  never deployed it in that situation either, not because
18  he complied, but because I didn't -- I didn't -- I
19  couldn't safely deploy it.
20       Q   You said "we"?
21       A   Yes.
22       Q   Who were the --
23       A   Myself and another deputy.
24       Q   And who was that?
25       A   Deputy Bello.  He's on my shift.
```



Page 210

1    Q    And was that after the incident with
2    McBrayer?
3    A    Yes, sir.
4    Q    Okay.  And you said the person was acting
5    irrational.  Describe that to me.
6    A    This gentleman was -- he was pacing around
7    the room.  He wasn't complying with orders.  He -- you
8    know, we actually at one point tried to detain him.  He
9    shoved my other deputy away from him, and then he
10   jumped out a window.
11   Q    Is that the irrational behavior, shoving the
12   deputy?
13   A    Well, the irrational behavior is not
14   complying with the commands, shoving the deputy.
15   Q    Okay.  Is not -- is not complying with a
16   command irrational behavior in your mind?
17   A    I don't think that a rational person would
18   not comply.
19   Q    Okay.  Did he do anything else other than not
20   complying that made you believe he was acting
21   irrationally?
22   A    I mean, there was numerous events that
23   happened.  I mean, I can get the report, if you would
24   like to see it.
25   Q    Okay.  What -- was it your practice that when

Page 211

1    you pulled the weapon that you automatically arm it or
2    do you pull it and then wait to see what circumstances
3    dictate?
4    A    No, sir.  Typically if I -- if I get to the
5    point where I feel that I need to draw my TASER, I go
6    ahead and arm it.
7    Q    Okay.
8    A    Just because if they're -- if I'm at the
9    point where I feel like I need to draw my TASER from
10   the holster, then I believe there is a possibility I
11   may need to use it, and I don't want to take the time
12   that it would take to lift it from beside me.
13   Q    Have you ever drive stunned anyone?
14   A    Not that I can recall, no, sir.
15   Q    Okay.  Do you remember what your training
16   about using drive stun was from Major Torres?
17   A    Can you be specific?
18   Q    I mean, did he give you any circumstances
19   when you should or should not drive stun someone?
20   A    Not that I recall.  I know we discussed the
21   drive stun and the purpose of it and things of that
22   nature.  But I don't recall any situations because a
23   situation is not dictated by a specific action.  It's
24   dictated by the totality of the circumstances.
25        So for me to sit here and say, well, if

Page 212

1    somebody does this, you need to do this, that is not
2    practical in law enforcement.
3    Q    Okay.
4    A    And especially when you're talking use of any
5    weapons.
6    Q    Is drive stun a lesser effective technique
7    than actually shooting and applying the prongs and the
8    electrical force?
9    A    Yes, sir.
10   Q    Okay.  Were you ever given any instructions
11   about do not repeat drive stun?
12   A    No, sir, I've never heard that.
13   Q    Okay.  Were you ever given any instruction in
14   your training on December 18, 2018 about target area
15   that you should aim for?
16   A    Yes, sir.
17        MR. WILLIAMS:  In a drive stun?
18        MR. SPURLIN:  No.
19        MR. WILLIAMS:  Okay.  Object to form.  It's
20   unclear.
21   BY MR. SPURLIN:
22   Q    Let me ask again.  In the use of the TASER
23   with the prongs and the electrical force to
24   incapacitate muscularly, were you ever given any
25   instructions on the target areas?

Page 213

1    A    Yes, sir.
2    Q    What?
3    A    Target areas, I mean, typically -- typically
4    your target area would be the back, if you can get
5    that.  However, that's not practical in most
6    situations.
7        So there are places that you try to avoid,
8    the groin area, the head, the center of the chest,
9    things of that nature are areas that you try to avoid
10   if you can.
11   Q    Okay.  The groin, the head area, and the
12   center of the chest?
13   A    Yes, sir.
14   Q    Were you ever told what the prime target area
15   was for someone advancing towards you?
16   A    I don't -- I don't think there's an
17   optimal --
18   Q    Okay.  What --
19   A    -- area.
20   Q    What were you told about why you should avoid
21   the chest area?
22   A    Well, you want to avoid the chest area
23   because of the heart.
24   Q    Okay.  Were you trained that the electrical
25   impulses could have an effect on someone's heart?



Page 214

1     A   Yes, typically with a preexisting condition.
2     Q   And you were told that could be a negative
3 effect?
4     A   Yes.
5     Q   That could cause sudden death?
6     A   Yes.
7     Q   And it could cause the heart to race?
8     A   Yes.
9     Q   Which would increase someone's exhaustion if
10 they were also exerting themselves, correct?
11         MS. NGUYEN:  Object to form and foundation.
12         THE WITNESS:  I don't know that to be a fact.
13 BY MR. SPURLIN:
14     Q   If someone's tired, having already run for
15 ten minutes or exerted themselves for ten minutes, and
16 the electrical impulse speeds the heart up even
17 further, do you need medical training to know that
18 that's going to be bad for them?
19         MR. WILLIAMS:  Object to form.
20         MS. NGUYEN:  Object to form and foundation.
21         THE WITNESS:  I mean, I -- I don't know
22     what's good.  I don't know.
23 BY MR. SPURLIN:
24     Q   When you decided to deploy at McBrayer, what
25 area did you target?

Page 215

1     A   Honestly, I didn't have a specific target
2 area in mind because he was advancing towards me so
3 rapidly.
4     Q   Okay.  Do you remember when you were deposed
5 by Mr. Webster in the previous case?  I'm going to hand
6 you this.
7     A   Yes, sir.
8     Q   Okay.  I want you to turn with me to page 40.
9 And if you'll look with me on page 40, I'm going to
10 read some.  Reading page 40, line 16:
11         "So you hit him in the chest area with the
12 prongs, if they hit, the front, they call it interior,
13 but the front chest area?
14         "ANSWER:  Yes, sir.
15         "Okay.  Have you seen the autopsy in this
16 case?
17         "I have not."
18         And then he says, "I'll tell you that the
19 autopsy report reflects two different prong injuries
20 from the TASER to his chest."
21         I'm going to stop there.
22     A   Okay.
23     Q   So far have I read that accurately?
24     A   Yes, sir.
25     Q   And Ms. Nguyen asked you this morning about

Page 216

1 the autopsy and marked it as an exhibit, correct?
2     A   Yes, sir.
3     Q   And the two prongs were both in his chest
4 area, correct?
5     A   Yes, sir.
6     Q   One was 23 inches from the top of his head
7 and one was 18 and a half inches from the top of his
8 head, correct?
9     A   No, sir.
10     Q   You have no doubt you shot him in the chest
11 area, correct?
12         MR. WILLIAMS:  Object to form.
13         MS. NGUYEN:  Join.
14         THE WITNESS:  According to -- according to
15     the autopsy report and my recollection, yes.
16 BY MR. SPURLIN:
17     Q   Okay.  Now I want you to look at page 41 with
18 me.  I'm reading about line 12.
19         "QUESTION:  Did you intend to hit him in the
20 chest or was that just kind of how it happened?
21         "ANSWER:  My intention was, yes, for one of
22 the prongs to go toward the chest area."
23         Did I read that accurately?
24     A   You did.
25     Q   Okay.  Now, I'm going to skip down for right

Page 217

1 now.  Look at line 25.  Your answer went -- continued.
2         "Ideally, I would want one toward the chest
3 area and maybe one lower on the stomach area if I'm
4 going to tase somebody from the front."
5     A   Yes, sir.
6     Q   Did I read that accurately?
7     A   You did.
8     Q   Now, this deposition was taken much closer in
9 time to the event than today, correct?
10     A   Yes, sir.
11     Q   It was taken about a year and six months
12 after the event, correct?
13     A   Yes, sir.
14     Q   And you understood the question did you aim
15 for the chest area when you said, "My intention was,
16 yes, for one of the prongs to go to the chest area,"
17 right?
18     A   Yes, sir.
19     Q   And you, in fact, went further and said,
20 ideally, if you had a choice when shooting someone from
21 the front, you want to hit them one time in the chest
22 and one time lower on the stomach area, correct?
23     A   That is what I stated, yes, sir.
24     Q   And you had the right to say anything in the
25 world you wanted to say, and you said that was an ideal



Page 218

```
1    shot?
2       A   Yes, sir.
3       Q   One in the chest and one lower, correct?
4       A   Yes, sir.
5       Q   Okay.
6          MR. SPURLIN:  We can take a break.  He's got
7    to change --
8          THE VIDEOGRAPHER:  I got to change tapes.
9       This is the end of medium number three in
10   the deposition of Deputy Anthony Tripp.  The time
11   is 3:29.  And we're going off the record.
12         (Whereupon, a recess was taken.)
13         THE VIDEOGRAPHER:  This is the beginning of
14      medium number four in the deposition of Deputy
15      Anthony Tripp.  The time is 3:37.  We're on the
16      record.
17   BY MR. SPURLIN:
18      Q   Deputy Tripp, we were talking about targeting
19   the chest area.  Look with me at Defendants' Exhibit
20   No. 9 which was previously tendered.  And turn, if you
21   will, to the top of the third page.
22         Do you see the little drawing -- and this
23   one's not in color -- where there are green areas for
24   preferred target areas and yellow areas for areas to
25   avoid?
```

Page 219

```
1       A   Yes, sir.
2       Q   And have you seen that and did you see that
3    in your training?
4       A   Yes, sir, I have.
5       Q   And you recall that the chest area was
6    yellow, to avoid, correct?
7       A   Yes, sir.
8       Q   And No. 1 for "To reduce risk of injury," you
9    should used preferred target areas.  And it says,
10   "Lower center mass, parenthesis, below the chest,"
11   correct?
12      A   Yes, sir.
13      Q   And for sensitive areas, No. 2, it says,
14   avoid intentionally targeting sensitive areas "such as
15   the face, eyes, head, throat, chest area, parenthesis,
16   area of the heart" --
17      A   Yes, sir.
18      Q   -- "comma, breast."
19         Did I read that accurately?
20      A   You did.
21      Q   And that's how you where are trained by
22   Daniel Torres, correct?
23      A   Yes, sir.
24      Q   Okay.  Yet you told Mr. Webster that ideally
25   you would always shoot one prong into the chest area,
```

Page 220

```
1    correct?
2       A   I don't believe that I said always.
3       Q   Ideally.  What does ideally mean to you?
4       A   Well, ideally means given the circumstances
5    that were presented.
6       Q   Okay.  Ideally means that's the best aiming
7    and shooting you can ever achieve?  Ideally means the
8    best, right?
9       A   That's your perception of it.
10      Q   What does that mean to you?
11      A   Again, I just told you ideally to me means
12   given the circumstances that were presented.  That was
13   my target area because that's -- that's what I had.
14      Q   All right.
15         (Plaintiffs' Exhibit No. 8 was marked for
16      identification.)
17   BY MR. SPURLIN:
18      Q   Now, I'm going to show you what has been
19   marked as Plaintiffs' Exhibit No. 8 that's been
20   provided to me by Axon.  I just want to identify a
21   bunch of documents.
22         MS. NGUYEN:  By Axon?  I don't think you got
23   this from me.
24         MR. WILLIAMS:  What is it?
25         MR. SPURLIN:  Maybe not.
```

Page 221

```
1          MR. WILLIAMS:  Defendants' 8, you said?
2          MR. SPURLIN:  Eight.
3          MS. NGUYEN:  Yeah.  It says a "Practical
4       Session Instructor Guide," Version 21, effective
5       January 14th, 2019.  There's the exhibit.
6          Yeah, I haven't seen that before.
7          MR. WILLIAMS:  Okay.  So it's obviously after
8       when he received his training, but it's --
9          MR. SPURLIN:  Okay.
10         MR. WILLIAMS:  I don't know where this came
11      from.
12         MS. NGUYEN:  What is the point of this?
13         MR. WILLIAMS:  You can review it and testify
14      the best you can.
15   BY MR. SPURLIN:
16      Q   The date on there says January 14th, 2019,
17   correct?  That is before you had your refresher course,
18   correct?
19      A   Yes, sir.
20      Q   Okay.  Now, turn with me to page 95, if you
21   would.
22         Now, in that one, there's the same drawing of
23   the man with green areas and yellow areas for sensitive
24   areas and preferred targets, correct?
25      A   Yes, sir.
```



Page 222

1    Q    And it actually says the preferred target is
2  the green area, correct?
3    A    It does.
4    Q    And the yellow area in this case, it's his
5  groin, his head and his chest, correct?
6    A    Yes, sir.
7    Q    And that is, in fact, where both of the
8  prongs were on Mr. McBrayer, correct?
9         MR. WILLIAMS:  Object to form.
10        THE WITNESS:  In the yellow?
11  BY MR. SPURLIN:
12    Q    Yes, sir.  In his chest.
13    A    My under -- my understanding is they were in
14  that area, but I don't know exactly where.
15    Q    All right.  And if you turn with me to page
16  109, again, it says, "Avoid face, throat, genitals,
17  breast, chest or heart area," correct?
18    A    It does.
19    Q    Now, regardless of whether that was the
20  document that you had when you were trained by Torres,
21  that's the same training he gave you, right?
22    A    I can't attest to that.
23    Q    Well, you've already told me that he told
24  you.  And Exhibit No. 9, it says those same avoid
25  areas, right?

Page 223

1    A    Yes, sir.
2         But you're asking me if this specifically is
3  what I was given by Major Torres, and I can't attest to
4  that.
5    Q    No, I didn't say that.  I said that may not
6  be the same document.  But the same training to avoid
7  the chest, throat, head and genital areas --
8    A    Okay.
9    Q    -- is the same that Torres gave you, right?
10    A    Yes, sir.
11    Q    And the green areas and the yellow areas is
12  the same drawing that's on this one that Torres gave
13  you, right?
14    A    Yes, sir.
15    Q    Just like your attorney compared the two
16  documents when Ms. Nguyen was questioning you, that
17  information has not changed?
18    A    Right.
19    Q    The same training that's in that one is the
20  training Torres gave you in December of 2018, right?
21         MR. WILLIAMS:  Object to form.
22         THE WITNESS:  In regards to that specific
23  question, yes.
24         (Plaintiffs' Exhibit No. 10 was marked for
25  identification.)

Page 224

1  BY MR. SPURLIN:
2    Q    Right.  Okay.  Now, I want to just ask you --
3  and we'll show you what's marked as Plaintiffs' Exhibit
4  No. 10.  It is a document that's similar to the one
5  Spurgeon signed.
6         Do you recall being handed a document like
7  that to acknowledge that you have read and understand
8  the warnings of CEW drills when you went through the
9  course with Torres?
10         MS. NGUYEN:  Can I have -- take a look at it,
11  please?
12         This is also Version 21, so this would have
13  been effective January of 2019.
14  BY MR. SPURLIN:
15    Q    The question is simple.  Did you ask to sign
16  a similar document to that when you went through the
17  training with Daniel Torres?
18    A    I did sign something similar.  However,
19  again, without my signed, I can't tell you.  I can't
20  attest that it was --
21    Q    Okay.
22    A    -- the same document.
23    Q    And you have -- you should have a signed
24  document at the Tift County Sheriff's Department?
25    A    I mean, I should, yes.

Page 225

1    Q    Okay.
2         (Plaintiffs' Exhibit No. 11 was marked for
3  identification.)
4  BY MR. SPURLIN:
5    Q    Okay.  Let me show you what's marked as
6  Plaintiffs' Exhibit No. 11.  And this one doesn't have
7  page numbers, so it's going to be a little more
8  tedious.
9         If you'll turn, I think, to the third page.
10         MS. NGUYEN:  Counsel, respectfully, if you're
11  going to hand the witness a new exhibit, because
12  you are not providing us copies, I need to be able
13  to see it first so I know what you're questioning
14  the witness about.
15         For the record, this is also Version 21
16  effective January 14th, 2019.
17         MR. WILLIAMS:  Let me see that.  Which page
18  were you --
19         MR. SPURLIN:  The third one, course
20  objectives.
21         MR. WILLIAMS:  Course objectives.  All right.
22  Let me put this to the side.
23  BY MR. SPURLIN:
24    Q    Now, the next to the last one says, "Explain
25  probe placement and aiming requirements."




Page 226

```
 1          That was part of the course Torres taught
 2   you, correct?
 3          MR. WILLIAMS:  Object to form.
 4          MS. NGUYEN:  Join, and foundation.
 5          THE WITNESS:  I don't -- I mean, I don't know
 6   that to be factual.
 7   BY MR. SPURLIN:
 8      Q   Well, we've already gone through Exhibit 9.
 9      A   But you're asking me if this is what I was --
10      Q   No.
11      A   I don't know that.
12      Q   I'm asking you was that the same thing that
13   he did?  Did he go over and explain proper plobe --
14   probe placement and aiming requirements as part of your
15   training?  Did he do that?
16      A   I believe he would, yes.
17      Q   And he explained to, try to avoid the chest
18   area, correct?
19      A   Yes, sir.
20      Q   Did he explain to you why you should avoid
21   the chest slash heart area?
22      A   Yes, sir.  He did explain to me why you would
23   try to avoid that area.
24      Q   And what did he explain?
25      A   Well, he explained that the heart's in that
```

Page 227

```
 1   area and that the TASER can affect the heart rhythm.
 2      Q   Okay.  Now, if you'll turn about eight or ten
 3   pages into it, you're going to see one with a stop sign
 4   on it.
 5          Did he provide those warnings that the TASER
 6   could cause death or serious injury?
 7      A   You're looking at TASER CEWs are not risk
 8   free?  Is that what you're looking at?
 9          MS. NGUYEN:  Yeah, it's the same.
10   BY MR. SPURLIN:
11      Q   Yes.  Yes.  Yes.
12      A   Okay.  And you're asking if he covered that
13   they could cause death or serious injury?
14      Q   Right.
15      A   Yes, I believe that he would have covered
16   that.
17      Q   And did he also discuss with you the fourth
18   item, that you needed to comply with the current
19   training materials and requirements?
20      A   I can't state for a fact that he covered that
21   direct bullet.
22      Q   Okay.  But the document you were asked to
23   sign made you certify that you read and understand
24   those materials and that would you would obey them,
25   correct?
```

Page 228

```
 1      A   I mean, I guess we're --
 2          MS. NGUYEN:  Object to form and foundation.
 3          MR. WILLIAMS:  Object to form.
 4          THE WITNESS:  -- making an assumption that --
 5   we're making an assumption that this is a document
 6   that I signed.  I don't know what the document I
 7   signed says.  So you're asking me to testify to
 8   something that I don't know for a fact, and I'm
 9   not going to do that.
10   BY MR. SPURLIN:
11      Q   Okay.  Well, I thought you had already
12   acknowledged to me that as part of the training Torres
13   made you sign something --
14      A   Yes, sir.
15      Q   -- saying that you read and understood and
16   would obey the training recommendations and warnings of
17   Axon.
18          Is that not true?
19          MR. WILLIAMS:  Object to form.
20          MS. NGUYEN:  Object to form and foundation.
21          THE WITNESS:  And I explained to you that I
22   signed a document.  I don't know what it said.
23   BY MR. SPURLIN:
24      Q   Okay.  All right.  Well, look at your
25   Exhibit 9, which you have acknowledged that you had
```

Page 229

```
 1   when you had the training.  Let's go back through it
 2   again.
 3      A   Okay.
 4      Q   You said to me that you had this document.
 5      A   I never stated that.
 6          MS. NGUYEN:  Object to form and foundation.
 7          MR. WILLIAMS:  Object to form.
 8          MS. NGUYEN:  In fact, he said he didn't know
 9   which one he had, whether it be Exhibit 8 or 9.
10          MR. SPURLIN:  He had one.  He said, I had one
11   of those documents.
12          MS. NGUYEN:  Correct.
13          MR. SPURLIN:  Let's don't recreate his
14   testimony.
15          MS. NGUYEN:  No.  No.  No.  You said -- you
16   are recreating his testimony.  You said he had
17   Exhibit 9.  What his testimony was that he didn't
18   know whether he had Exhibit 8 or 9.
19   BY MR. SPURLIN:
20      Q   All right.  Look with me at eight and nine.
21      A   Yes, sir.
22      Q   There's no need for this to be so tedious.
23          MS. NGUYEN:  Well, don't misstate testimony
24   and it won't be.
25          MR. SPURLIN:  I'm not.
```



Page 230

1    MS. NGUYEN: Yes, you did.
2    MR. SPURLIN: Don't coach him into what you
3  want him to say.
4    MS. NGUYEN: I am not coaching him at all.
5  What I'm asking is that you be honest with the
6  witness and not misstate testimony.
7  BY MR. SPURLIN:
8    Q   Look at No. 8 and No. 9 side by side.
9    A   Yes, sir.
10   Q   Are No. 2 on those two identical?
11   A   They do appear to be identical, yes.
12   Q   Do they begin with the three words "Read and
13  obey"?
14   A   Yes, sir.
15   Q   And do they both say, "Read, comma,
16  understand and follow all current instructions,
17  warnings, and relevant TASER training materials"?
18   A   They do.
19   Q   And does it say, "Failure to do so could
20  increase the risk of death"? Does it say that?
21   A   It does.
22   Q   Did Daniel Torres ever tell you not to read,
23  obey, and follow the recommendations, instructions and
24  warnings that were given on this document?
25   A   Not that I recall.

Page 231

1    Q   Okay. Did he in fact tell you that you
2  should follow those?
3    A   I don't recall if he stated that.
4    Q   Okay. All right. Now, you were asked on
5  direct examination by Ms. Nguyen about the term
6  "excited delirium."
7      Do you remember those questions?
8    A   I don't.
9    Q   Okay. Your testimony was I never knew what
10  excited delirium meant.
11     Is that true?
12   A   I don't recall exactly what my response was.
13   Q   Do you have a definition now of excited
14  delirium?
15   A   No, sir.
16   Q   Has anyone ever defined the term for you?
17   A   Not that I recall.
18   Q   Did Major Torres explain to you what the term
19  "excited delirium" meant?
20   A   Not that I recall.
21   Q   When you completed the course with Major
22  Torres in December of 2018, do you believe you had
23  proficiency at that time to understand the training
24  materials and warnings provided by Axon?
25     MS. NGUYEN: Object to form and foundation.

Page 232

1    THE WITNESS: You said when I completed the
2  training?
3  BY MR. SPURLIN:
4    Q   In December of 2018 --
5    A   Okay.
6    Q   -- did you believe that you were proficient
7  in using the TASER and following the warnings and
8  instructions?
9    A   I believe that I had a basic understanding.
10   Q   A basic understanding?
11   A   Yes, sir.
12   Q   And did you have a basic understanding that
13  was sufficient to allow you to carry and utilize a
14  TASER weapon for the sheriff's department?
15   A   I was authorized to carry a TASER, yes.
16   Q   Okay. And did you believe that you fully
17  understood and could obey and follow the instructions
18  and training materials?
19   A   Yes.
20   Q   Was there any clarification that needed, in
21  your mind, before you left that course that day?
22   A   No, sir.
23   Q   Do you recall anyone asking Major Torres to
24  define excited delirium?
25   A   I don't know.

Page 233

1    Q   Now, Mrs. Nguyen asked you the question if
2  you knew if that term was recognized by the AMA.
3      Do you remember those questions?
4    A   Yes, sir.
5    Q   And asked you if it was a recognized medical
6  term.
7      Do you remember those questions?
8    A   Yes, sir.
9    Q   Your answer was "I don't know," right?
10   A   Correct.
11   Q   The person who chose to use the word "excited
12  delirium" in this training materials was someone with
13  Axon, right?
14     MS. NGUYEN: Object to form and foundation.
15     THE WITNESS: I mean, I don't know who wrote
16  that policy.
17  BY MS. NGUYEN:
18   Q   Okay. All right. And all of the training
19  material says on it from Axon, how to use their TASER,
20  right?
21     MS. NGUYEN: Are you referring to -- what
22  materials, warnings or the PowerPoint?
23     MR. SPURLIN: Every single document.
24  BY MR. SPURLIN:
25   Q   Hasn't it been provided with the TASER



Page 234

1    weapons to the purchaser, Tift County Sheriff's
2    Department?
3        MS. NGUYEN: No. What I'm asking -- object
4    to form and foundation.
5    BY MR. SPURLIN:
6        Q    Sir?
7        MR. WILLIAMS: Is that a question to him?
8        MR. SPURLIN: Yeah.
9        THE WITNESS: I'm sorry?
10       MR. WILLIAMS: I thought you were talking to
11   her.
12   BY MR. SPURLIN:
13       Q    The choice of what words to put in their
14   warnings was made by Axon, right?
15       MS. NGUYEN: Object to form and foundation.
16       THE WITNESS: You have to ask Axon.
17   BY MR. SPURLIN:
18       Q    And you left that course not knowing what
19   excited delirium meant, right?
20       MR. WILLIAMS: Object to form.
21       THE WITNESS: I mean, that -- no, I didn't
22   know what excited delirium was.
23   BY MR. SPURLIN:
24       Q    And you still don't know?
25       A    No, sir.

Page 235

1        Q    And it gave you a warning that some people
2    are particularly susceptible to TASERs and that you
3    should avoid using them in those populations, correct?
4        A    Yes, sir.
5        MR. WILLIAMS: Object to form.
6        MS. NGUYEN: Object. That mistakes the
7    document. Object to form and foundation.
8    BY MR. SPURLIN:
9        Q    But you -- you had no understanding of how
10   you could identify those susceptible people who were
11   suffering from excited delirium because you didn't know
12   what it was?
13       A    There's so much controversy against excited
14   delirium right now that nobody knows what it is.
15   Nobody can give a clear definition of what excited
16   delirium is because doctors don't even agree what it
17   is.
18       Q    Well, what's the basis for that last
19   statement? Where is your knowledge gained about the
20   controversy about excited delirium and that no doctor
21   can agree on what it is?
22       A    Sir, I've done -- I've done research on
23   excited delirium since this case and I've tried to
24   research excited delirium.
25       Q    Okay. What research have you done?

Page 236

1        A    I mean, I've done Google searches. I don't
2    know exactly what websites I've went to.
3        Q    Did you print them?
4        A    I don't have any need to, no.
5        Q    Did you print them?
6        A    No.
7        Q    Did you discuss them with Major Torres?
8        A    What relevance does that have on my
9    knowledge, me trying to gain knowledge on excited
10   delirium?
11       Q    Did you --
12       A    Why do I need to discuss that with Major
13   Torres?
14       Q    I'm just asking. Did you?
15       A    I have no reason to.
16       Q    Okay. You don't have any reason to improve
17   the policies, procedures and practices of the Tift
18   County Sheriff's Defendant?
19       A    That's not my job.
20       MR. WILLIAMS: Object to form.
21   BY MR. SPURLIN:
22       Q    Okay. So the question is not what research
23   you've done since this incident. When you walked out
24   on December 18th, 2018, you had no ability to identify
25   and refrain from using a TASER application on someone

Page 237

1    suffering from excited delirium because you had no idea
2    what it was, true?
3        MR. WILLIAMS: Object to form.
4        THE WITNESS: I did not know what excited
5    delirium was.
6    BY MR. SPURLIN:
7        Q    Okay. And you had no ability to identify
8    whether a person was suffering from it or not?
9        A    That's right. As far as I know, there are no
10   definitive symptoms of excited delirium.
11       Q    And on the day of the McBrayer incident, you
12   had no understanding what excited delirium was?
13       A    No, sir.
14       Q    You had no way to identify if he was
15   suffering from excited delirium?
16       A    Again, I don't know -- there are no
17   definitive symptoms of excited delirium.
18       Q    You don't know and didn't know at that time
19   whether any symptoms he displayed could be symptoms of
20   excited delirium?
21       A    I didn't have a chance to see any symptoms he
22   had.
23       Q    Okay.
24       A    Mr. McBrayer didn't give me an opportunity to
25   do any kind of assessment on how he was doing or



Page 238

```
 1   even -- or even check to see if he was okay.  So I
 2   didn't have the opportunity to do any kind of
 3   assessment.  I think that's fair.
 4       Q   Okay.  Let me -- you didn't answer the
 5   question.
 6           On the day of the incident with McBrayer, you
 7   had no way of determining if he was suffering from
 8   excited delirium because you did not understand the
 9   term; true or false?
10       MS. NGUYEN:  Object to form.
11       THE WITNESS:  I did not understand what
12       excited delirium was.
13   BY MR. SPURLIN:
14       Q   Okay.  All right, sir.  Now, has anybody at
15   the sheriff's department given you any independent
16   training outside the course with Axon about what
17   excited delirium was?
18       A   No, sir.
19       Q   Did Major Torres define for you what profound
20   agitation meant?
21       A   I don't know.
22       Q   Did he define for you what severe exhaustion
23   was?
24       A   I don't know.
25       Q   Did he define for you what drug intoxication
```

Page 239

```
 1   was?
 2       A   I don't know.
 3       Q   Okay.  In this case before you deployed your
 4   TASER weapon, you concluded that Mr. McBrayer may be
 5   under the influence of drugs, correct?
 6       MR. WILLIAMS:  Object to form.
 7       THE WITNESS:  I suspected.  I did not
 8   conclude.
 9   BY MR. SPURLIN:
10       Q   Okay.  All right.  And you were aware that
11   persons who you suspected were under the influence of
12   drugs were particularly susceptible to injury from CEW
13   use, were you not?
14       A   I mean, it's my understanding that it's a --
15   I mean, anybody's susceptible to injury from a CEW.
16       Q   I understand.
17           But you knew that people who might be under
18   the influence were in the more susceptible populations,
19   right?
20       A   I'm fairly certain that says that somebody
21   under the influence is.
22       Q   Okay.
23       A   Not possible.
24       Q   All right.  And you knew that he was
25   agitated?
```

Page 240

```
 1       MR. WILLIAMS:  Object to form.
 2       Go ahead.
 3       THE WITNESS:  I mean, I -- I knew that he was
 4       agitated, yes.
 5   BY MR. SPURLIN:
 6       Q   Okay.  All right.  Are you familiar with the
 7   physiological effects of the TASER on individuals?
 8       A   Can you explain to me what you mean?
 9       Q   Yeah.
10           And let me ask you this before I go there.
11   You indicated that the TASER applications by you had
12   absolutely no effect on him; is that correct?
13       A   That is my understanding, yes.
14       Q   Okay.  And part of your testimony was that
15   you don't think that the probes were far enough apart;
16   is that correct?
17       A   Yes.
18       Q   To completely incapacitate him, correct?
19       MR. WILLIAMS:  Object to form.
20       MS. NGUYEN:  Join.
21       THE WITNESS:  I don't think I ever stated to
22   completely incapacitate him.
23   BY MR. SPURLIN:
24       Q   All right.  Well, let me make sure I
25   understand.
```

Page 241

```
 1           The optimal result from your standpoint is
 2   that the neuromuscular incapacitation occur and they
 3   lose control of their muscles, right?
 4       A   Correct.
 5       Q   And then you can handcuff them, right?
 6       A   Correct.
 7       Q   That's the optimal result, the ideal result,
 8   correct?
 9       A   Yes, sir.
10       Q   That doesn't mean if you have a less optimal
11   application that there's no effect on their body, does
12   it?
13       MR. WILLIAMS:  Object to form.
14       MS. NGUYEN:  Join, and foundation.
15       THE WITNESS:  I don't know that to be
16   factual.
17   BY MR. SPURLIN:
18       Q   The electricity is still going through their
19   body, is it not?
20       A   Not to --
21       MS. NGUYEN:  Object to form and foundation.
22       THE WITNESS:  Not necessarily.  I mean,
23   you're making the assumption that the probes were
24   actually -- actually had a good connection.
25   BY MR. SPURLIN:
```

61  (Pages 238 to 241)





Page 242

1     Q   Are you making the assumption they did not?
2     A   I'm saying that there's no -- by my
3  understanding and the training that I've received, the
4  sound of that popping noise tells me that it did not
5  completely -- complete that circuit, yes.
6     Q   To have an optimal, ideal result that he lose
7  control of his muscles, right?
8         MR. WILLIAMS:  Object to form.
9         THE WITNESS:  From my understanding is that
10        that meant that I did not have a connectivity.
11 BY MR. SPURLIN:
12    Q   Okay.  So you're --
13    A   Now, what I can tell you is, is I know that
14 there is -- I know there's a report that was generated
15 that tells you the effectiveness.  Now, I don't have
16 that.
17    Q   Okay.
18    A   And I would have to refer you to that for you
19 to know what the effectiveness was.
20    Q   Is it your belief that there was absolutely
21 zero effect on him?  He didn't feel any electricity at
22 all?
23    A   I'm not Mr. McBrayer.  I don't know that.
24    Q   Well, do you know from your education,
25 training and experience whether your four applications

Page 243

1  for 20 seconds had any electrical charge felt by his
2  body?
3     A   Again, I don't know that.
4     Q   Okay.
5     A   I mean, you're asking me to speculate.
6     Q   Didn't he get down on his knees twice and you
7  thought he was going to comply?
8     A   He did.
9     Q   After you pulled the trigger and applied the
10 TASER?
11        MR. WILLIAMS:  Object to form.
12        MS. NGUYEN:  Join.
13        THE WITNESS:  You can watch my video to get
14        that information.
15 BY MR. SPURLIN:
16    Q   Okay.
17    A   I don't know.
18    Q   Now, Exhibit 6 that you were shown by
19 Ms. Nguyen that state that --
20        MR. WILLIAMS:  Which one is that?
21 BY MR. SPURLIN:
22    Q   On page 90.  The one on the bottom.
23    A   There it is.  Okay.
24    Q   State that the effects include changes in
25 blood chemistry, blood pressure, respiration, heart

Page 244

1  rate, rhythm, adrenaline, and stress hormones.
2         Did I read that accurately?
3     A   You did.
4     Q   Now, do you know if your four applications
5  had any effect on any of those in him simply because
6  you didn't get an ideal neuromuscular incapacitation?
7         MR. WILLIAMS:  Object to form.
8         MS. NGUYEN:  Object to the form and
9  foundation.
10        THE WITNESS:  I mean, I don't -- I don't know
11        that he didn't have any of those issues
12        beforehand.  I don't know that he didn't have them
13        then.  I don't know.  You're asking me to
14        speculate again.
15 BY MR. SPURLIN:
16    Q   Okay.  Well, did you ever receive training
17 that if you don't get a complete neuromuscular
18 incapacitation that there's no effect on the person?
19    A   I mean, I don't recall.
20    Q   Okay.  All right.  So when you left your
21 training and began to tote a TASER, you didn't
22 understand the physiological effects on the person if
23 you didn't get a complete neuromuscular incapacitation,
24 true?
25        MS. NGUYEN:  Object to form.

Page 245

1         MR. WILLIAMS:  Object to form.
2         THE WITNESS:  I mean, again, I had a basic
3         understanding of how to use the TASER.
4  BY MR. SPURLIN:
5     Q   I understand.  That's not the question.
6     A   Okay.
7     Q   Did you understand if you didn't get a
8  complete optimal neuromuscular incapacitation whether
9  there would still be some effects on the person that
10 you shot with the TASER; yes or no?
11        MS. NGUYEN:  Object to the form.
12        MR. WILLIAMS:  Object to form.
13        THE WITNESS:  No.  You're -- I don't agree
14        with that statement, no.
15 BY MR. SPURLIN:
16    Q   Okay.  Did you receive any training where you
17 understood what the term "excited delirium" meant?
18    A   I know that we discussed excited delirium.
19 But, again, there was really no definitive definition
20 nor symptoms of excited delirium that were given to me
21 that I recall.
22    Q   Do you recall the word being used by Torres
23 and you all discussing its meaning or how to recognize
24 it?
25    A   I do know that it was mentioned.  But, again,



Page 246

```
1    I don't know to what degree.
2        Q   Did you do any research after you left that
3    class so that you would be proficient in knowing if a
4    person was under the influence of excited delirium
5    before you utilized the weapon on McBrayer?
6        MR. WILLIAMS:  Object to form.
7        MS. NGUYEN:  Join.
8        THE WITNESS:  No, sir.
9    BY MR. SPURLIN:
10       Q   Okay.
11       A   There's a lot of other things, I don't know
12   what they mean, that I don't go out and research.  I
13   mean, I don't understand a lot of medical terms.
14       Q   Okay.  Deescalation training, you had had
15   some deescalation training before this episode,
16   correct?
17       A   Yes, sir.
18       Q   Who taught you that course?
19       A   I don't -- I don't know.
20       Q   Do you remember the specific methods of
21   deescalating a situation so you don't have to use force
22   or a weapon?
23       A   I mean, there's a lot of deescalation
24   techniques.
25       Q   Can you tell me what they are?
```

Page 247

```
1        A   I mean, can I tell you what every
2    deescalation technique is?  No, not likely.
3        Q   Can you tell me any?
4        A   I mean, yes.  I mean, you -- the idea behind
5    deescalation is to talk to people and try to -- and try
6    to, you know, figure out what's going on, you know.
7        Q   Right.
8            Is tone of voice a method of deescalating a
9    situation?
10       A   It can be.
11       Q   Is reasoning with someone a method of
12   deescalating?
13       A   It can be.
14       Q   Is trying to let them know that you
15   understand their issue and you're there to help?
16       A   But in order to understand their issue, I
17   have to know their issue.
18       Q   So you would have to ask questions, right?
19       A   Right.
20       Q   Appear interested in them?
21       A   Yes, sir.
22       Q   Appear that you're there to help and not
23   harm?
24       A   Yes.
25       Q   Did you ever any utilize any deescalation
```

Page 248

```
1    techniques with McBrayer?
2        A   I never had the opportunity.
3        Q   So the answer is no?
4        A   The answer is no.  I never had an
5    opportunity.
6        Q   Okay.  When you first saw him, you said he
7    was leaning against the lean-to; is that right?
8        A   No, sir.  That's incorrect.  He was leaning
9    against the building.
10       Q   The building next to the lean-to; is that
11   correct?
12       A   Yes, sir.
13       Q   At that point in time, you had no reason to
14   suspect him of a crime?
15       A   No, sir.
16       Q   You had no evidence anyone had committed a
17   crime, correct?
18       A   That's correct.
19       Q   You did not identify yourself as an officer,
20   correct?
21       A   Are you talking about verbally?
22       Q   Yes.
23       A   No.  I never stated I was a law enforcement
24   officer, no.
25       Q   You did not have lights and siren on as you
```

Page 249

```
1    approached?
2        A   That's correct.
3        Q   You had no search warrant?
4        A   That's correct.
5        Q   You had no arrest warrant?
6        A   Correct.
7        Q   You didn't know whose property it was?
8        A   That is correct.
9        Q   You didn't know who he was?
10       A   That is correct.
11       Q   Leaning against the building was not a
12   criminal activity?
13       A   It's not.
14       Q   What legal right did you have to go on to
15   that property without probable cause of a crime being
16   committed?
17       MS. NGUYEN:  Object to form.
18       MR. WILLIAMS:  Object to form.
19       THE WITNESS:  As I'm sure you're aware, I
20   don't have to have probable cause.  All I have to
21   have is articular, reasonable suspicion.
22       The fact that we received a call in that area
23   and the fact that that person was yelling for help
24   at 4:00 a.m. is what led me to that area.
25   Mr. McBrayer being the only person in sight would
```



Page 250

1    lead me to believe -- it would lead a reasonable
2    person to believe that he had some involvement in
3    the call for service, whether it be a victim or
4    whether it be a suspect.
5        My belief is that he had some kind of
6    involvement.  It's not really typical for somebody
7    to be leaned up against a building at 4:00 a.m. in
8    the dark yelling.
9    BY MR. SPURLIN:
10       Q    Let me make sure I had understand.  Are you
11   saying that you had articulable, reasonable suspicion
12   that a crime had been committed?
13       A    No, sir.
14       Q    You said, "All I have to have is articulable,
15   reasonable suspicion."
16       Did I accurately repeat what you said?
17       A    Yes, sir.
18       Q    Articulable, reasonable suspicion of what?
19       A    Articulable, reasonable suspicion that,
20   okay -- I mean, even that a crime had occurred.  You
21   know, one can articulate that obviously something is
22   going on because people don't just call 911 and say
23   somebody's yelling for help.
24       Q    All right.
25       A    That's not typical.

Page 251

1        Q    Let me -- I'm missing a word.  You said
2    articulable, reasonable suspicion?
3        A    Yes, sir.
4        Q    But you didn't say of what.
5        Is it articulable, reasonable suspicion that
6    a crime has been committed?
7        A    It's that a crime is being or has been
8    committed.
9        Q    Okay.  At that time, what reasonable,
10   articulable suspicion did you have that a crime had
11   been committed?
12       A    Or is being?
13       Q    Or is being committed?
14       A    Okay.  The fact that somebody called 911 and
15   said somebody is yelling for help.
16       Q    Okay.
17       A    Okay.  I understand that in itself is not a
18   crime.  Yelling for help is not crime.
19       However, I can articulate that if somebody is
20   yelling for help, there's obviously a reason they're
21   yelling for help.
22       Q    Okay.  You knew there had been a car
23   accident, true?
24       A    Yes.
25       Q    You had been given that information that

Page 252

1    there was a car accident, right?
2        A    Yes.
3        Q    You had not been given any information that a
4    crime had been committed, right?
5        A    Well, fleeing the scene of an accident is a
6    crime.
7        Q    Oh, really?
8        A    Duty to report an accident is a crime, yes.
9        Q    Okay.  So if I get in an accident three
10   blocks from my house and I walk to my house to call the
11   police, you think I've committed a crime?
12       A    No, because you're reporting the accident.
13   Duty to report an accident is a crime.
14       At this point, Mr. McBrayer, or whoever was
15   driving this vehicle, had not reported this accident.
16       Q    Okay.  How far was your encounter with him
17   from the scene of where the vehicle was found?
18       A    I don't know the answer to that.
19       Q    You don't know?
20       A    No.
21       Q    Do you know where the person was at that was
22   calling for help?
23       A    No, sir.
24       Q    In fact, you had no idea?  That's why you
25   rolled your windows down and were listening, right?

Page 253

1        A    Yes, sir.
2        Q    At the time that you went on your search, you
3    had no probable cause or articulable suspicion that a
4    crime had been committed, right?
5        MR. WILLIAMS:  Object to form.
6        MS. NGUYEN:  Join.
7        THE WITNESS:  The reason that I approached
8    Mr. McBrayer in the first place was not because of
9    a crime.  It was to render assistance.
10   BY MR. SPURLIN:
11       Q    I understand.
12       But you said -- the reason we chased that
13   rabbit is you said I had articulable, reasonable
14   suspicion.  And I said of what?
15       A    No, sir.  No, sir.
16       Q    And you said that a crime had been or is
17   being committed?
18       A    No, sir.
19       Q    That's what you said.
20       A    I would like to make a correction.  I never
21   said that I had.  You asked me -- your question to me
22   was did you have probable cause to go on that property.
23   And I said I do not need probable cause.  All I need is
24   ARS or probable cause, okay.
25       Q    You had neither?



Page 254

1    A    I never said -- I never said that I did.  You
2  assumed that I did.
3    Q    You had neither?
4    A    At that point, no, sir.
5        MR. WILLIAMS:  Objection.  Whatever that is,
6  I object to it.
7  BY MR. SPURLIN:
8    Q    All right.  So what legal right did you have
9  to go on the property?
10    A    Because I was offering assistance to the
11  person in need of help.  That is part of my job.
12    Q    And you offered assistance to McBrayer?
13    A    I attempted to, yes.
14    Q    Okay.  Did you ever say, hey, man, I'm here
15  to help you?
16    A    I never got the opportunity.
17    Q    Did you ever ask him his name?
18    A    I never got the opportunity.
19    Q    Did you ever say, hey, man, don't run,
20  everything's fine?
21    A    Never got the opportunity.
22    Q    Did you ever say, hey, I'll call your family?
23    A    I'm going to resort back to I never got the
24  opportunity.
25    Q    Did you ever say were you in the car wreck?

Page 255

1    A    Never got the opportunity.
2    Q    Did you say, hey, you've been calling for
3  help, I'm here to help?
4    A    Never got the opportunity.
5    Q    Did you immediately draw your TASER weapon
6  when you got out of the car?
7    A    No, sir, I did not.
8    Q    How much time elapsed before you drew your
9  TASER weapon?
10    A    I'm not sure.
11    Q    Okay.  What specifically did he do that made
12  you draw your TASER weapon?
13    A    Well, when I initially got there, he was
14  yelling.  He slapped the side of the building.  He ran
15  around behind it.
16    Q    Okay.  Let me stop you.  Did you draw your
17  TASER because he slapped the building?
18    A    No, sir.  I drew my TASER because he ran
19  around behind the building and I didn't know where he
20  was going or what he was doing.
21    Q    Okay.  Now, were you specifically summoned by
22  dispatch to go to the scene?
23    A    No, sir, I was not.
24    Q    Okay.  Did Spurgeon specifically call you to
25  go to the scene?

Page 256

1    A    No, sir, he did not.
2    Q    Was that area in your zone?
3    A    I -- I don't know.
4    Q    You just heard dispatch and went out there on
5  your own; is that right?
6    A    I went as a secondary unit to assist the
7  other deputy.
8    Q    I understand.
9        But were you summoned by the other deputy?
10    A    No, sir, I wasn't.
11    Q    The decision to go was yours and yours alone?
12    A    Yes, sir.
13    Q    Okay.  All right.  When you stopped by
14  Spurgeon, was he speaking to someone else?
15    A    No, sir.  Not that I recall.
16    Q    Did you gather any information from him?
17    A    No, sir.
18    Q    Did he give you any information?
19    A    No, sir.
20    Q    Did you just tell him what you were going to
21  do?
22    A    Yes, sir.
23    Q    Who was in control of that situation, you or
24  Spurgeon?
25        MR. WILLIAMS:  Object to form.

Page 257

1        THE WITNESS:  Which situation are you
2  speaking of?
3  BY MR. SPURLIN:
4    Q    I mean, is he superior to you?  Was that --
5    A    I mean, we're both the same.  We're both
6  deputies.
7    Q    Okay.  So neither one of you would be the one
8  telling the other one what to do in that situation?
9    A    No, sir.
10    Q    And you just told him I'm going on a --
11  seeing what's going on, right?
12    A    I told him that I was going to go try to
13  locate the party.
14    Q    And what was he doing?
15    A    You would have to ask Deputy Spurgeon that.
16    Q    Was he at the car?
17    A    Again, you would have to ask him that.  I
18  don't recall.
19    Q    You just don't remember?
20    A    No, sir.
21    Q    Did you ever have any CIT training before
22  this episode?
23    A    No, sir, I did not.
24    Q    Okay.  What is CIT training?
25    A    It's crisis intervention training.



1    Q    And who is it -- what is it used for?
2    A    It's used to determine if someone is in
3  crisis.
4    Q    Crisis because of what?
5    A    I mean, it could be a number of things.
6    Q    Anything?
7    A    Typically mental health issues is the
8  majority of what you cover.
9    Q    And what have you been trained in how to deal
10  with those persons?
11    A    Can you elaborate on that question?
12    Q    I mean, do they need different behavior from
13  a deputy than a person who's thinking rationally needs?
14        MR. WILLIAMS:  Object to form.
15        THE WITNESS:  It depends on the totality of
16    the situation.
17  BY MR. SPURLIN:
18    Q    And are there different techniques that
19  you've been trained to use in those situations with
20  mentally ill persons?
21    A    Yes, sir, there are.
22    Q    What are those techniques?
23    A    Again, it depends on the totality.  You're
24  asking me to give you how I would handle a situation --
25    Q    No, I'm not.

1    A    -- without a situation.
2    Q    I'm just giving me -- asking you the tools in
3  your tool belt.
4        MR. WILLIAMS:  Object to form.
5  BY MR. SPURLIN:
6    Q    What are some of the methods that you use?
7        MR. WILLIAMS:  Object to form.
8        THE WITNESS:  Again, it depends on -- it
9    depends on what's going on.
10  BY MR. SPURLIN:
11    Q    I didn't ask you which one you would use.  I
12  asked you which tools do you have that you're aware of
13  and have been trained about for dealing with persons
14  with mental health issues?  Can you tell me any of them
15  now as we sit here today?
16    A    Yes, sir.
17        There's a lot of tools that you have.  I
18  mean, the way you talk to them is different.  I mean,
19  the way you talk to them.  The way that you interact
20  with them.  You have other agencies that you can call
21  to assist you, you know.
22    Q    In this situation, how long did it take you
23  to realize that McBrayer was not behaving rationally?
24        MR. WILLIAMS:  Object to form.
25        THE WITNESS:  I mean, what is your definition

1    of rationally?
2  BY MR. SPURLIN:
3    Q    Well, I appreciate that clarification.  But
4  you've already told me you have a definition because
5  you told me that the other time you drew your TASER,
6  the person was acting irrationally.
7    A    Yes, sir.
8    Q    And I asked you what that meant.
9    A    Okay.
10    Q    So in your mind, under whatever definition
11  you apply, was McBrayer acting rationally or
12  irrationally?
13        MR. WILLIAMS:  Object to form.
14        MS. NGUYEN:  Join.
15        THE WITNESS:  I would say he was acting
16    irrationally.
17  BY MR. SPURLIN:
18    Q    Okay.  And what factors did you determine led
19  you to the conclusion he was acting irrationally?
20        MR. WILLIAMS:  Same objection.
21        THE WITNESS:  Well, Mr. McBrayer was yelling
22    things like "God hates you."
23  BY MR. SPURLIN:
24    Q    Okay.
25    A    He was hiding behind a backhoe bucket.  He

1  was flailing his arms.  And then he charged at me.
2    Q    Okay.
3    A    Which I don't think is rational.
4    Q    All right.  So all four of the things you
5  observed initially led you to conclude he was acting
6  irrationally, right?
7    A    Yes, sir.
8    Q    Sometimes behavior can be ambiguous?
9    A    What does that mean?
10    Q    A couple of things look rational and a couple
11  of things they do are irrational.
12        In this case, 100 percent of the things you
13  just observed with him led you to conclude he was
14  acting irrationally, right?
15    A    Yes.
16    Q    You thought the yelling things that didn't
17  make sense was irrational, right?
18    A    Yes, sir.
19    Q    What he was yelling didn't make sense, did
20  it?
21        MR. WILLIAMS:  Object to form.
22        Go ahead.
23        THE WITNESS:  No.
24  BY MR. SPURLIN:
25    Q    Did he ever say anything to you that made



MAGNA
LEGAL SERVICES

Page 262

```
1    sense to you?
2        A   No, sir.
3        Q   You thought hiding was an irrational act,
4    correct?
5        A   Yes.
6        Q   You thought flailing his arms was an
7    irrational act, correct?
8        A   Yes.
9        Q   Now, at that point in time before he charged
10   you, did you make any attempt to summon anybody with
11   mental health expertise?
12       MR. WILLIAMS:  Object to form.
13       THE WITNESS:  No, sir.
14   BY MR. SPURLIN:
15       Q   Did you call in that you have a person with a
16   mental health issue?
17       A   No, sir, because at that point, I hadn't
18   determined that he had a mental health issue, nor did I
19   have a reason to believe that he did.
20       Q   Well, you said the yelling irrational things
21   was a reason to believe it, right?
22       MR. WILLIAMS:  Object to form.
23       MS. NGUYEN:  Join.
24       MR. WILLIAMS:  He didn't say that.
25       THE WITNESS:  I never stated -- I never said
```

Page 263

```
1    that.
2    BY MR. SPURLIN:
3        Q   You said -- I said every single thing you
4    observed led you to believe he was irrational?
5        A   Right.
6        Q   And you said yes?
7        A   I never said that irrational thinking is
8    definitely a mental illness.
9        Q   Okay.  It's a symptom of that, right?
10       MR. WILLIAMS:  Object to form.
11       MS. NGUYEN:  Join.
12       THE WITNESS:  Possibly.
13   BY MR. SPURLIN:
14       Q   Possibly?
15       A   It could be a symptom of many other things.
16       Q   Okay.  So at least there was reasonable
17   suspicion that he might have a mental health issue,
18   right?
19       MR. WILLIAMS:  Object to form.
20       MS. NGUYEN:  Join.
21       THE WITNESS:  In your mind, maybe.  In my
22   mind, at that point in time, no.
23   BY MR. SPURLIN:
24       Q   Well, aren't you trained --
25       A   I wasn't trained at the time.
```

Page 264

```
1        Q   Hang on.
2            Aren't you trained to consider possibilities?
3    With reasonable, articulable suspicion doesn't mean you
4    know someone's committed a crime?  It means there are
5    facts that might suggest a crime; isn't that true?
6        MR. WILLIAMS:  Object to form.
7        THE WITNESS:  Okay.  But what you're asking
8    me to do --
9    BY MR. SPURLIN:
10       Q   Answer my question.
11       A   That is true, yes.
12       Q   That's true.
13           And probable cause doesn't mean I know a
14   crime has been committed, it just means a crime may
15   have been committed, true?
16       A   True.
17       Q   So all of these irrational things doesn't
18   mean he was having a mental illness crisis, but it
19   certainly led you to believe that was a strong
20   possibility, true?
21       MR. WILLIAMS:  Object to form.
22   BY MR. SPURLIN:
23       Q   True?
24       A   No, sir.
25       Q   You disagree with that?
```

Page 265

```
1        A   I disagree with that.
2        Q   Okay.  Did you ever summon Spurgeon and say
3    this guy is acting irrationally, I need you to come on
4    up here?
5        A   I never said he was acting irrationally.
6        Q   Okay.
7        A   I don't recall that, no.
8        Q   Okay.
9        MR. WILLIAMS:  I need a break, bathroom
10   break.
11       MR. SPURLIN:  All right.  Okay.
12       MR. WILLIAMS:  You keep going rapid fire.
13   I've been trying to wait for a break, but there
14   wasn't one.
15       THE VIDEOGRAPHER:  The time is 4:22.  We're
16   going off the record.
17       (Whereupon, a recess was taken.)
18       THE VIDEOGRAPHER:  We're back on the record.
19   The time is 4:27.
20   BY MR. SPURLIN:
21       Q   Deputy, did you ever, at any point in the
22   encounter with McBrayer, determine that he was having a
23   mental health crisis?
24       A   No, sir.
25       Q   Did you ever summon anyone to deal with that?
```



Page 266

```
 1        A    Summon anyone to deal with --
 2        Q    Yeah.  A mental health crisis?
 3             MR. WILLIAMS:  Object to form.
 4             THE WITNESS:  No, sir.
 5   BY MR. SPURLIN:
 6        Q    Did you ever contact any supervisor or shift
 7   supervisor or over deputy to give you any advice on
 8   how to deal with someone who you thought was acting
 9   irrationally?
10        A    I just want to clarify again that -- I'm
11   sorry, you said acting irrationally.  No, sir.
12        Q    Okay.  Did you ever summon anyone to provide
13   any medical training -- or excuse me, let me start
14   over.
15             Did you ever summon anyone to provide any
16   medical care or evaluation of any kind to McBrayer?
17        A    No, sir.
18        Q    Did you ever determine that he needed any
19   medical evaluation or care?
20             MR. WILLIAMS:  Hold on a second.  What is
21   that?
22             MS. NGUYEN:  It's a car.
23             THE COURT REPORTER:  Somebody's base.
24             (Whereupon, the record was paused.)
25             MR. SPURLIN:  Do you want me to start over?
```

Page 267

```
 1             THE VIDEOGRAPHER:  Yes.
 2   BY MR. SPURLIN:
 3        Q    Did you ever summon anyone to provide any
 4   health evaluation or health care of any kind to
 5   McBrayer?
 6        A    No, sir, I did not.
 7        Q    Did you ever determine that he needed any
 8   medical care or mental evaluation of any kind?
 9        A    No, sir, I did not.
10        Q    Okay.  You never contacted dispatch or anyone
11   else and said this guy needs to be evaluated, someone
12   needs to come out here, correct?
13        A    No, sir, I did not.
14        Q    Okay.  Did you know EMS had been summoned?
15        A    Yes, sir.
16        Q    You heard Spurgeon contact EMS, correct?
17        A    Yes, sir.
18        Q    You heard him specifically say I need EMS,
19   he's busted my knee, or something to that effect,
20   correct?
21        A    I believe it was send EMS 10-18.
22        Q    What does that mean?
23        A    10-18 is quickly.
24        Q    You don't remember him saying, it's for me,
25   my knee got busted?
```

Page 268

```
 1        A    I don't recall who he said it was for, I
 2   mean.
 3        Q    Do you remember Spurgeon saying we need EMS
 4   for Mr. McBrayer?
 5        A    No, sir.
 6        Q    Okay.  Did you all ever get Mr. McBrayer to
 7   identify himself?
 8        A    I did not personally, no.
 9             MR. WILLIAMS:  Object to form.
10   BY MR. SPURLIN:
11        Q    Now, you concluded in your own mind that he
12   was on something, correct?
13        A    Yes, sir.
14        Q    Okay.  Did you ever seek out anyone to come
15   and provide him any care for some type of drug usage?
16        A    No, sir, I did not.
17        Q    Do you all have the capability to provide any
18   kind of care for drug usage?
19        A    I do at this point, yes.
20        Q    And what is that?
21        A    I have Narcan.
22        Q    What is Narcan?
23        A    Narcan is medication that reverses the
24   effects of opioids.
25        Q    And can you -- can you utilize that yourself?
```

Page 269

```
 1        A    Yes, sir.
 2        Q    Are you authorized by the sheriff's
 3   department to do that?
 4        A    I am.
 5        Q    How long have deputies, not you, been
 6   authorized to utilize that?
 7        A    That would be a sheriff's office, honestly.
 8        Q    You just weren't trained at that time?
 9        A    Correct.
10        Q    Was Spurgeon?
11        A    You would have to ask Deputy Spurgeon.
12        Q    How do you do that?  Do you give them a shot?
13        A    No, sir.  So the -- I mean, I can show you,
14   if you would like.
15        Q    You can just tell me.
16        A    So it's a -- it's actually given nasally.
17   It's almost like a nasal spray.  It is a nasal spray.
18   I take it out.  It's got a place that I put my fingers
19   on the top, my thumb goes on the bottom.  And all I do
20   is insert it in your nose, squeeze the bottom, and it
21   shoots that spray into your nose.
22        Q    I'm trying to get through this without
23   showing every video there is, but I think you said
24   three times on the -- on the body cam, I know he's on
25   something.  I'm certain he's on something, something to
```

68 (Pages 266 to 269)



Page 270

1 that effect.
2    Did you ask anyone else, including Henderson,
3 to utilize Narcan?
4        MR. WILLIAMS: Object to form.
5        THE WITNESS: No, sir, I didn't.
6        MS. NGUYEN: Join.
7 BY MR. SPURLIN:
8    Q   Was there anyone there that night that was
9 authorized to do that?
10   A   That's -- I don't know the answer to that
11 question.
12   Q   Was there any discussion about calling
13 someone to the scene that was authorized to do that?
14   A   No, sir.
15   Q   Okay. When the EMS people first arrived, did
16 you tell them he's on something, you all need to check
17 on him?
18   A   No, sir.
19   Q   Do you know who told them finally to go check
20 on somebody in Henderson's vehicle?
21   A   No, sir, I don't.
22   Q   It was not you?
23   A   No, sir.
24   Q   You do agree that when the EMS came, all
25 three of them checked on Spurgeon first?

Page 271

1    A   I believe the -- I don't know exactly how
2 many did.
3    Q   Okay. Do you agree Spurgeon was checked on
4 first?
5    A   Yes, sir.
6    Q   Okay. And you don't remember anyone saying
7 you all better go check on that guy, he's unconscious?
8        MR. WILLIAMS: Object to form.
9        THE WITNESS: No, sir.
10 BY MR. SPURLIN:
11   Q   You knew he was unconscious when he was
12 loaded into the car, right?
13       MR. WILLIAMS: Object to form.
14       THE WITNESS: No, sir, I don't know that to
15   be a fact.
16 BY MR. SPURLIN:
17   Q   Did you believe he was unconscious?
18       MR. WILLIAMS: Object to form.
19       THE WITNESS: I believed that he had passed
20   out.
21 BY MR. SPURLIN:
22   Q   Passed out?
23   A   Yes, sir.
24   Q   Okay. What's the difference in unconscious
25 and passed out?

Page 272

1    A   I mean, in my mind passed out, unconscious --
2 or I'm sorry. In my mind, passed out is -- I mean, if
3 you drink too much, you pass out.
4    Q   Does it mean not awake?
5    A   In my mind, yes.
6        MR. WILLIAMS: Object to form.
7 BY MR. SPURLIN:
8    Q   Okay. I mean, isn't that the same thing as
9 being unconscious?
10       MR. WILLIAMS: Object to the form.
11       THE WITNESS: I don't know. I'm not sure
12   what unconscious -- I mean, I don't know the
13   definition of unconscious.
14 BY MR. SPURLIN:
15   Q   But you didn't tell the EMS to go check on
16 him, he's unconscious?
17   A   No, sir.
18   Q   You didn't tell them he's limp as we put him
19 into the car?
20   A   No, sir.
21   Q   Okay. All right. You said you had OC spray
22 with you that night but you didn't want to utilize it
23 because it could have an effect on you?
24   A   Among other reasons. That's not the only
25 reason I stated it, but yes.

Page 273

1    Q   And one time a deputy accidentally pepper
2 sprayed a whole room full of lawyers in a cattle call,
3 so I know what happens.
4        But isn't true that the risk of affecting
5 others is much less in an open, outdoor space than in a
6 confined area?
7    A   Not necessarily.
8    Q   Okay. You would agree that if somebody
9 pepper sprays in this small room, it's more likely to
10 have an effect on all six of us than if you applied
11 your pepper spray outside?
12   A   Yes, sir, I agree with that.
13   Q   Okay.
14   A   But there's no physical contact.
15   Q   Okay.
16   A   Physical contact is going to change that
17 exposure.
18   Q   Okay. So did you consider OC spray or did it
19 just not hit your mind that night?
20   A   No, sir, I didn't -- I'll be honest with you,
21 Mr. Spurlin, I don't use OC spray.
22   Q   Okay. I understand.
23       It's not your choice anywhere?
24   A   Correct.
25   Q   I understand.



Page 274

1          Have you ever used it?
2     A   No.
3     Q   Okay.
4     A   I'm sorry, correction.  I have.  Not in
5  civilian law enforcement.
6     Q   I see.
7          Have you ever received any training anywhere,
8  the academy, Lenox, Omega, or Tift Sheriff's Department
9  on what white foam coming from someone's mouth means?
10    A   No, sir, I haven't.
11    Q   Okay.  Was that the first time you had ever
12  observed white foam coming from anyone's mouth?
13    A   No, sir, it's not.
14    Q   Okay.  Had you done independent research to
15  determine what white foam meant?
16    A   No, sir.
17    Q   Okay.  That night you had no idea what it
18  meant?
19    A   I made an assumption, correct.
20    Q   Okay.  And that assumption was it was drug
21  use, correct?
22    A   Yes, sir.
23    Q   And you, in fact, were certain and used the
24  words I'm certain he's on something, I've seen white
25  foam coming from his mouth, right?

Page 275

1     A   Yes, sir.
2     Q   I don't want to show every video.  That's --
3  that's the terms you remember using, isn't it?
4     A   Yes, sir.
5     Q   In fact, any time somebody would bring
6  something up, you would volunteer, well, he's on
7  something, I'm certain of it, right?
8          MR. WILLIAMS:  Object to form.
9  BY MR. SPURLIN:
10    Q   Is that right?
11    A   I made that statement, yes.
12    Q   Okay.  And no one at the sheriff's department
13  had ever given you any training that that means drug
14  use?
15    A   No, sir.
16    Q   That means any particular drug use?
17    A   No, sir.
18    Q   That means somebody's mentally ill?
19    A   No, sir.
20    Q   That means somebody's on some kind of mental
21  illness medication?
22    A   No, sir.
23    Q   That means somebody's exhausted, they've ran
24  3 miles and they're struggling to breathe?  You don't
25  know what it meant?

Page 276

1     A   No, sir.
2     Q   Okay.  Well, what was your assumption based
3  on?
4     A   I had a case before where somebody was under
5  the influence of drugs and I saw the same thing.
6     Q   What drug?
7     A   I don't know.
8     Q   All drugs make you have white foam come out
9  of your mouth?
10    A   I never said that.
11         MR. WILLIAMS:  Object to form.
12         THE WITNESS:  What I'm telling you is I
13  don't --
14  BY MR. SPURLIN:
15    Q   I'm asking.  Do all drugs make you have white
16  foam come out of your mouth?
17         MR. WILLIAMS:  Object to form.
18         THE WITNESS:  I don't know.
19  BY MR. SPURLIN:
20    Q   Do you have any education, training or
21  experience what drugs might cause someone to have white
22  foam coming out of their mouth?
23    A   No, sir, I don't.
24    Q   Okay.  Okay.  You didn't know anything about
25  McBrayer?

Page 277

1     A   No, sir.
2     Q   No previous experience with him?
3     A   No, sir.
4     Q   Okay.  You never read any Miranda warnings to
5  McBrayer?
6     A   No, sir.
7     Q   Was he placed under arrest?
8     A   At that point, no.
9     Q   Was he ever placed under arrest?
10    A   No, sir.
11    Q   When he was handcuffed, he was not under
12  arrest?
13    A   No, sir.
14    Q   Did you have any belief at that time he had
15  committed a crime?
16    A   Yes.
17    Q   What crime?
18    A   Well, I mean, there's -- there's several
19  crimes that were committed.  Obstruction is the first
20  one.  And then, I mean, he also assaulted me.  He
21  struck me in my face.
22    Q   Okay.  Let's talk about both of those.
23         Why do you believe he committed obstruction?
24    A   Because he fled upon sight of law
25  enforcement.  He failed to -- failed to follow my



Page 278

1    commands that I was giving him.
2        Q   Okay.  Well, let me just ask you a couple of
3    hypotheticals.
4            Right now, if you start giving me commands,
5    do I have a duty to follow your commands?
6            MR. WILLIAMS:  Object to form.
7            THE WITNESS:  It depends on what they are.
8    BY MR. SPURLIN:
9        Q   Okay.  Well, what had he done to give you any
10   reason to be entitled to give him commands?
11       A   Because I was investigating a call for
12   service.
13       Q   Okay.
14       A   In which he was the only person that was
15   around.
16       Q   Okay.
17       A   Which led me to believe and suspect that the
18   call for service was either for him or about him.
19       Q   Okay.
20       A   So I was trying to conduct an investigation
21   to determine if he needed assistance or if he was the
22   reason somebody else needed assistance.
23       Q   Okay.  You indicated -- you said he assaulted
24   you.  But you told Ms. Nguyen you weren't sure when he
25   hit you; is that true?

Page 279

1        A   I'm not sure at what point during what we
2    were stating that he hit me.
3        Q   Okay.  You testified that he charged towards
4    you the first time; is that right?
5        A   Correct.
6        Q   And that's when you first applied your TASER,
7    correct?
8        A   That is correct.
9        Q   And there's no dispute in your mind, having
10   seen the report, that you dis -- discharged your TASER
11   four times, correct?
12       A   Correct.
13       Q   For 20 seconds total, correct?
14       A   Correct.
15       Q   And there's no dispute in your mind that
16   Spurgeon drive stunned him twice for five seconds each;
17   is that right?
18           MR. WILLIAMS:  Object to form.
19           THE WITNESS:  I don't agree with that because
20   he pulled away from the TASER at some point.
21   BY MR. SPURLIN:
22       Q   Okay.  Which time?  The first time he drive
23   stunned him or the second?
24       A   You would -- I would have to refer you to the
25   video.  I'm not sure.

Page 280

1        Q   Do you know what part of his body he drive
2    stunned him?
3        A   Again, sir, I would ask you to watch the
4    video.
5        Q   Okay.  You can't tell me neck, shoulder,
6    back?
7        A   I don't want to misspeak.
8        Q   You don't remember from observation?
9        A   I don't remember, no.
10       Q   Okay.  But you knew for a fact he had drive
11   stunned him?
12       A   Yes, sir.  I know that he drive stunned him.
13       Q   You saw it?
14       A   Yes.
15       Q   And heard it?
16       A   Correct.
17       Q   Okay.  Now, where did he hit you?
18       A   I'm sorry?
19       Q   Where did he hit you?
20           MR. WILLIAMS:  Object to form.
21           You're referring to McBrayer now, right, back
22   to what he was talking --
23           MR. SPURLIN:  I'll go back.
24   BY MR. SPURLIN:
25       Q   You said he hit you in your face?

Page 281

1        A   Yes, sir.
2        Q   Where did he hit you?
3        A   In my face.
4        Q   Where?  Top?  Side?  Left?  Right?  Middle?
5    Nose?  Where did he hit you?
6        A   I'm sorry, two years later I don't remember.
7        Q   You don't remember?
8        A   No.
9        Q   Did he hit you with an open hand or a closed
10   fist?
11       A   Again, I don't remember.
12       Q   Did he hit you with a left or a right?
13       A   I forgot to ask him.
14       Q   You don't remember?
15       A   No.
16       Q   Did you block it?
17       A   No, sir.  I didn't have the opportunity to.
18       Q   All right.  Did he hit you from the side you
19   were holding your TASER or the side you were holding
20   the flashlight?
21           MR. WILLIAMS:  Object to form.
22           THE WITNESS:  Sir, you're asking me to
23   remember things that happened in the blink of an
24   eye, okay, in a high stress situation.  And I'm
25   sorry, I don't remember the facts.



Page 282

BY MR. SPURLIN:
1
2      Q    Did you document those anywhere that night,
3  like in an incident report?
4          MR. WILLIAMS:  Object to form.
5          THE WITNESS:  I don't recall.
6  BY MR. SPURLIN:
7      Q    Okay.  Did you have any bruises, cuts,
8  contusions, cuts or lacerations?
9      A    No, sir.
10     Q    Okay.  Did you seek medical care?
11     A    No, sir, I did not.
12     Q    Did you have any redness on your face?
13     A    I -- I don't know.
14     Q    Did you seek any medical attention?
15     A    No, sir.
16     Q    Did you provide any medical attention to
17  yourself?
18     A    I don't know.
19     Q    Did you need a Band-Aid?
20     A    No, sir.
21     Q    Did you have a bruise the next day?
22     A    Not that I recall.
23     Q    Okay.  Did you tell anyone where he hit you?
24         MR. WILLIAMS:  Object to form.
25         THE WITNESS:  I don't recall.

Page 283

BY MR. SPURLIN:
1
2      Q    Did you hit him?
3      A    No, sir.
4      Q    Okay.  You said -- you said he hit you.  What
5  happened when he hit you?
6      A    He knocked -- I know he knocked me to the
7  ground.  And it actually --
8      Q    You fell to the ground?
9      A    I'm sorry?
10     Q    Did you fall to the ground?  Completely to
11  the ground?
12     A    Yes.
13     Q    On your back?
14     A    I don't recall.
15     Q    Were you on your side?
16     A    I don't recall where I fell.
17     Q    How long did it take you to get up?
18     A    I don't know.
19     Q    Did he go to the ground with you?
20     A    No.
21     Q    Did he try to hit or kick you when you were
22  on the ground?
23     A    I don't remember.
24     Q    What did he do while you were on the ground?
25     A    I don't remember.

Page 284

1      Q    How long were you on the ground?
2      A    You already asked me that.
3      Q    You don't remember?  Is that the answer, "I
4  don't remember"?
5      A    Yes.  I don't remember.
6      Q    Okay.  All right.  When you got up off the
7  ground, what did you do?  Did you discharge your TASER
8  again?
9      A    Yes, sir, I did.  And that's when he went
10  away from me.  He got on his knees.  And that's when
11  Deputy Spurgeon attempted to take him into custody.
12     Q    Okay.  Now, the record will reflect that you
13  were reading your incident report; is that correct?
14     A    Yes, sir.
15     Q    Is that Exhibit No. 1?
16     A    It is.
17     Q    Okay.  All right.  So is it fair to say that
18  you could not remember the answer to that question when
19  I asked it so then you referred to your incident
20  report?
21     A    It's fair to say, yes.
22     Q    Okay.  So that's why you needed, to refer to
23  the report, because you can't remember; is that right?
24     A    I don't remember exactly what I did minute by
25  minute, no.

Page 285

1      Q    Okay.  Now, what was he doing when you were
2  first able to determine that he had some white foam in
3  his mouth?
4      A    I believe it was as he was running at me.  I
5  don't remember.
6      Q    Okay.  So you observed him yelling things,
7  hiding, flailing his arms first?  Those were the three
8  facts you observed first, correct?
9      A    In regard -- I mean, I observed a lot of
10  things.
11         MS. NGUYEN:  Object to form.
12  BY MR. SPURLIN:
13     Q    Okay.  Well, I was asking --
14     A    That was not the first thing I observed, no.
15     Q    Okay.  You didn't observe when he was by the
16  building any white foam in his mouth?
17     A    No, sir.
18     Q    You couldn't see him well from that distance,
19  right?
20     A    No, sir.
21     Q    You couldn't see white foam when he was
22  behind the backhoe?
23     A    No, sir.
24     Q    You couldn't see the white foam until he got
25  close to you, right?



Page 286

```
 1      A   That would be my assumption, yes.
 2      Q   How close?
 3      A   I don't know.
 4      Q   Okay.  So the discharge of the TASER was not
 5   because you had observed the white foam, correct?
 6      A   No, sir.
 7      Q   Okay.  It was because of the other factors,
 8   right?
 9      A   Yes.
10      Q   Okay.  Primarily running in your direction?
11      A   He was running at me, not -- I mean.
12      Q   Now, you said this morning that he
13   immediately charged straight towards you.
14          Do you remember when you saw the body cam
15   last, that he first ran to your left and then turned
16   and -- stopped and turned and then ran in your
17   direction?
18          MR. WILLIAMS:  Object to form.
19   BY MR. SPURLIN:
20      Q   Do you remember that?
21      A   I don't.  No, sir.
22      Q   Do you remember him just swinging his arms
23   wildly and not drawing back like he was going to hit
24   you?  Do you remember that behavior?
25          MR. WILLIAMS:  Object to form.
```

Page 287

```
 1          THE WITNESS:  No, sir, I don't.
 2   BY MR. SPURLIN:
 3      Q   Okay.  Did you ever see him draw his fist
 4   back to strike you?
 5      A   That's not -- no, sir.  No.  But that's not
 6   the only way to strike somebody to cause injury.
 7      Q   I understand that.
 8      A   Okay.
 9      Q   Did you ever see him draw his hands back in
10   any way that made you think he was going to strike you?
11      A   I absolutely thought he was going to strike
12   me.  That's the reason that I deployed my TASER.
13      Q   What did he do?  What makes you think he's
14   fixing to hit me?
15      A   The fact that he was running at me with his
16   arms above his head.
17      Q   Above his head, like this, hands up?
18          MR. WILLIAMS:  Object to form.
19          THE WITNESS:  You can watch the video and
20   see.
21          MS. NGUYEN:  Join.
22   BY MR. SPURLIN:
23      Q   I'm asking what you remember.
24      A   Sir, and I'm telling you that you can watch
25   the video because it's going to be able to articulate
```

Page 288

```
 1   better of what I mean --
 2      Q   I know I can watch the video.
 3      A   -- by hands above his head.
 4      Q   I can also ask you questions.
 5      A   Okay.  Yes, sir.
 6      Q   Do you remember if his hands were above his
 7   head --
 8          MR. WILLIAMS:  If you can recall.  It's
 9   perfectly fine to say you don't recall.
10          THE WITNESS:  No, sir, I don't remember.
11          MR. SPURLIN:  Well, you can't coach him.
12          MR. WILLIAMS:  No.  I'm just reminding him
13   he's -- he doesn't have to respond to your
14   browbeating over something --
15          MR. SPURLIN:  I'm not browbeating him.
16          MR. WILLIAMS:  -- that's clearly shown in a
17   video.
18          MR. SPURLIN:  So you don't want him to
19   remember anything, is that it?
20          MR. WILLIAMS:  No.  I'm just telling him if
21   he --
22          MR. SPURLIN:  So you --
23          MR. WILLIAMS:  He's struggling.  He said
24   numerous times he doesn't recall.  But you want to
25   keep --
```

Page 289

```
 1          MR. SPURLIN:  Not that.  Not that.
 2          MR. WILLIAMS:  Yes, he has.
 3   BY MR. SPURLIN:
 4      Q   So you don't remember where his arms were?
 5   You say you remember his arms being above his head, but
 6   you can't remember where above his head, right?
 7      A   I don't remember in what nature, no.
 8      Q   That's an unnatural way to run; is it not?
 9      A   It is.
10      Q   Okay.  Did that make you think he was acting
11   irrationally?
12      A   That made me believe that he intended to harm
13   me.
14      Q   Okay.  Now, running with your hands up does
15   not in and of itself suggest that you're going to hit
16   somebody, does it?
17          MR. WILLIAMS:  Object to form.
18          THE WITNESS:  No, sir.  But, again, he wasn't
19   running with his hands straight up like that.
20   BY MR. SPURLIN:
21      Q   Okay.  So the reason you shot him was because
22   he was running towards you; is that right?
23      A   I didn't shoot him.
24          MR. WILLIAMS:  Object to form.
25          MS. NGUYEN:  Join.
```



Page 290

```
1    BY MR. SPURLIN:
2         Q   You didn't?  You didn't deploy the TASER?
3         A   That's not what you asked.  You asked if I
4    shot him.
5         Q   You shot him with a TASER?
6         A   I deployed my TASER, yes, sir.
7         Q   Okay.  All right.  Now, at what point -- you
8    said he was angry.  At what point did you conclude that
9    he was angry?
10        A   Well, I mean, there were several reasons that
11   I believe that.  Number one, he was yelling.
12        Q   Okay.  Did he ever yell anything directly at
13   you?  Officer, I'm going to hurt you?  Officer, I'm
14   going to hit you?
15        A   No, sir, he did not.
16        Q   Did he ever yell anything that made you even
17   think he was acknowledging your presence?
18        A   No, sir, not verbally.
19        Q   Okay.  Did he ever say anything that made you
20   think he was thinking rationally?
21            MR. WILLIAMS:  Object to form.
22            Go ahead.
23            THE WITNESS:  No, sir.
24   BY MR. SPURLIN:
25        Q   Nothing he said made any sense to you, did
```

Page 291

```
1    it?
2            MR. WILLIAMS:  Object to form.
3            THE WITNESS:  No, sir.
4    BY MR. SPURLIN:
5         Q   Okay.  All right.  And you said he was
6    agitated.
7            What makes you think he was agitated?
8         A   The same mannerisms that made me think he was
9    aggressive.
10        Q   Okay.  Do you recall how long you were there
11   before the interaction between you and him where he
12   came towards you and you deployed your weapon?
13        A   No, sir, I don't recall how long it was
14   before I deployed my TASER.
15        Q   Okay.  Well, let's look at it.  You keep
16   saying you don't recall and look at the video, so let's
17   look at it.
18            (Whereupon, video playing.)
19        Q   All right.  I'm going to stop it there and
20   ask you some questions.
21        A   Okay.
22        Q   All right.  The body camera seemed to
23   indicate that as soon as your body camera was on, your
24   TASER weapon was out.
25            Do you agree with that?
```

Page 292

```
1         A   Yes, sir.
2         Q   Okay.  And did you have it armed at that
3    point?
4         A   It appears so.  I don't -- I don't know.
5         Q   And your camera, you said, backs up 30
6    seconds, correct?
7         A   Yes, sir.
8         Q   So you would have applied it at about the 30
9    second mark of this, right?
10        A   Yes.
11        Q   Now, when this one started, it looked like he
12   was behind the backhoe; is that right?
13        A   Yes, sir.
14        Q   So the video does not capture him hitting the
15   building; is that correct?
16        A   That's correct.
17        Q   And the video does not capture him leaning
18   against the building, correct?
19        A   Correct.
20        Q   And you said the third thing, I think, was he
21   ran to his right under the --
22        A   Yes.
23        Q   -- lean-to or near the backhoe; is that
24   right?
25        A   Correct.
```

Page 293

```
1         Q   That's not captured on the video, is it?
2         A   No, sir.
3         Q   Okay.  Do you know why you didn't immediately
4    turn on your body camera at that point?
5         A   No, sir.  I mean, I guess just because of the
6    circumstances with everything going on.
7         Q   Does it mean you forgot to or you didn't
8    think it was necessary?
9         A   No, sir.  That means I forgot to until we got
10   to this point.
11        Q   Isn't it the policy to always turn it on?
12            MR. WILLIAMS:  Object to the form.
13            THE WITNESS:  At what point?
14   BY MR. SPURLIN:
15        Q   When you're having some encounter with
16   someone.
17            MR. WILLIAMS:  Object to form.
18            Go ahead.
19            THE WITNESS:  It is, yes.
20   BY MR. SPURLIN:
21        Q   Okay.  All right.  Let me back this up.  And
22   I'm not very good with computers, so I may have to
23   watch it several times.
24            Here we go.  And I'm going to stop it and ask
25   you some questions.
```



Page 294

```
 1          (Whereupon, video playing.)
 2      Q   All right.  Let me stop right there.  We've
 3   gone eight seconds, right?
 4      A   Yes, sir.
 5      Q   You've already pulled out your TASER weapon,
 6   correct?
 7      A   I just pulled it out, yeah.
 8      Q   And is it armed?
 9      A   I don't know at this point.
10      Q   At that point, what had he done to make you
11   arm the weapon?
12      A   Well, I mean, I can't see what's going on at
13   this point in the video.
14      Q   All right.  Well, he certainly hadn't done
15   anything threatening towards you, correct?
16          MR. WILLIAMS:  Object to form.
17   BY MR. SPURLIN:
18      Q   I'll play it again, if you need me.  I mean,
19   at this point he --
20          MR. WILLIAMS:  Asked and answered.
21          THE WITNESS:  No.  He hasn't threatened me at
22   this point, no.
23   BY MR. SPURLIN:
24      Q   Okay.  In fact, all he's done is hidden from
25   you, right?
```

Page 295

```
 1      A   And fled.
 2      Q   Do you think that's a crime?
 3          MR. WILLIAMS:  Object to form.
 4          THE WITNESS:  What, fleeing?
 5   BY MR. SPURLIN:
 6      Q   (Nodding head affirmatively.)
 7      A   If you're obstructing my investigation, yes.
 8      Q   Okay.
 9          (Whereupon, video playing.)
10      Q   Now we're up to 11 seconds.  He's hiding
11   behind the backhoe?
12      A   Right.
13      Q   At this point, has he done anything
14   threatening toward you?
15      A   Well, at this point, I don't know what's
16   behind that backhoe bucket.
17      Q   You know it's him?
18      A   I don't know what he's got in his hands.  I
19   don't know what he has behind that bucket.  At this
20   point, I don't know if he has anything that he is able
21   to use against me offensively.
22      Q   Okay.  All right.  We're to the 15 second
23   mark.  At about the 14 second mark, you said "Show me
24   your hands"?
25      A   Yes, sir.
```

Page 296

```
 1      Q   Okay.  Have you at this point, in the first
 2   15 seconds, tried to use any kind of deescalation
 3   technique?
 4      A   No, sir.
 5      Q   Haven't spoken to him in a calm voice?
 6      A   I actually did initially, yes.
 7      Q   What did you say?
 8      A   I told him to stop.
 9      Q   Okay.
10      A   And at that point is when he ran up behind
11   the backhoe bucket and started yelling and refused to
12   show me his hands.  So at that point, deescalation is
13   out the window.
14      Q   All right.  Prior to you turning on your
15   camera, you had not attempted any deescalation
16   techniques?
17      A   No, sir.  I hadn't even made contact with him
18   at that point.
19      Q   And prior to turning on your camera, he
20   hadn't done anything to justify you pulling your
21   weapon, correct?
22      A   No, sir.
23      Q   Okay.
24          (Whereupon, video playing.)
25      A   And, I'm sorry, correction.  He had -- I'm
```

Page 297

```
 1   sorry.  You said prior to me turning on my camera, he
 2   had not done anything to warrant me pulling my TASER?
 3      Q   Right.
 4      A   Okay.  Well, that's incorrect because prior
 5   to me turning my camera on, he fled away from me, which
 6   in itself is not -- is not a crime.
 7          However, you know, the nature of the call,
 8   not knowing who he is, not being able to identify who
 9   he is and him fleeing away from me, it definitely
10   heightens my alert.
11      Q   Okay.  So if you walked up to me on the
12   street and give me a command and I just walk away to
13   get in my car, do you think I've committed a crime?
14          MR. WILLIAMS:  Object to form.
15          THE WITNESS:  That's not the same situation
16   as this.
17   BY MR. SPURLIN:
18      Q   I know.  I'm just asking you.
19          Have I?
20      A   If I walk up to you to talk to you on the
21   street and you walk away from me, no, sir.
22      Q   Okay.  Well -- okay.
23          (Whereupon, video playing.)
24      Q   All right.  We're to 31 seconds.
25          At this point, has he done anything
```



Page 298

1  threatening towards you?
2      A   No, sir.
3      Q   Okay.  Now, you were asked by Ms. Nguyen was
4  there any hurry to apprehend him.
5          There was not?
6      A   No.
7      Q   You could have simply waited until another
8  deputy arrived?
9      A   Yes, sir.
10     Q   Okay.  I want to show you a document before I
11  turn that back on and ask you a question to make sure I
12  understand.
13         Do you have in front of you your Exhibit 3 on
14  the TASER application, page nine?
15         MR. WILLIAMS:  TASER application?  You mean
16  the log thing?
17         MR. SPURLIN:  The electrical impulse.
18         MS. NGUYEN:  Event log.
19         MR. WILLIAMS:  Event log.
20         THE WITNESS:  Yes.
21  BY MR. SPURLIN:
22     Q   All right.  Look at the ninth page with me,
23  if you will.  You were asked questions by Ms. Nguyen
24  about number -- line number 249.
25         Do you see that?

Page 299

1      A   I do.
2      Q   That's when you armed it at 05:03 and 40
3  seconds, correct?
4      A   Yes, sir.
5      Q   And then when was the first time you pulled a
6  trigger?
7      A   05:04:16.
8      Q   So it was armed with the safety off for 36
9  seconds before you shot the first time, correct?
10     A   Yes, sir.
11     Q   Okay.  And then you applied the trigger and
12  he got a five second duration, correct?
13         MS. NGUYEN:  Object to form.
14         THE WITNESS:  I deployed the -- I deployed
15  the trigger, yes.  I pulled the trigger and the --
16  it appears that he would have --
17  BY MR. SPURLIN:
18     Q   Would have received a five second charge?
19         MR. WILLIAMS:  Object to form.
20         MS. NGUYEN:  Object to form, foundation.
21         THE WITNESS:  It appeared he would have, if
22  the TASER was effective.
23  BY MR. SPURLIN:
24     Q   All right.  Then how many seconds later did
25  you pull the trigger the second time?

Page 300

1      A   Five seconds.
2      Q   Okay.  So it says at 05:04 and 16 seconds you
3  pulled the trigger and he got a five second duration,
4  which would have taken --
5          MR. WILLIAMS:  Object.
6  BY MR. SPURLIN:
7      Q   -- you to 05:04 and 21 seconds, right?
8          MR. WILLIAMS:  Object to form.
9          THE WITNESS:  Yes, sir.  That's correct.
10  BY MR. SPURLIN:
11     Q   And then one second later, at 05:04 and 22
12  seconds, you pulled the trigger a second time, right?
13     A   Yes, sir.
14     Q   One second after the five second duration,
15  correct?
16     A   Yes, sir.
17     Q   And then that five second duration would have
18  taken you up to 05:04 and 27 seconds, correct?
19     A   Correct.
20     Q   And then eight seconds later, you pulled the
21  trigger a third time, correct?
22     A   Yes, sir.
23     Q   And he got a five second duration that time,
24  which would take you up to 05:04 and 40 seconds,
25  correct?

Page 301

1          MR. WILLIAMS:  Object to form.
2          THE WITNESS:  Yes, but --
3          MS. NGUYEN:  Join.
4  BY MR. SPURLIN:
5      Q   I'm sorry, yes?
6      A   The time frame is correct, but you keep
7  saying that he got a five second duration.  I don't
8  agree with that.
9      Q   Does that mean the weapon was sending out a
10  charge for five seconds?
11     A   For five seconds, yes.  That is correct.
12     Q   Okay.  And then at six seconds later,
13  05:04:46, you pulled the trigger the fourth time,
14  correct?
15     A   Yes, sir.
16     Q   And the machine sent out another five second
17  duration, correct?
18     A   Correct.
19     Q   Okay.  So your application of the trigger
20  occurred four times for a 20 second duration, correct?
21     A   Correct.
22     Q   Okay.  Back to back to back to back, right?
23         MR. WILLIAMS:  Object to form.
24         MS. NGUYEN:  Object to form.
25         THE WITNESS:  Not necessarily, no.

76 (Pages 298 to 301)



Page 302

1  BY MR. SPURLIN:
2      Q   Well, there's a one second difference the
3  first time and a, what, five second difference the last
4  time?
5      A   Yes, sir.
6      Q   Is that right?
7      A   Yes, sir.
8      Q   Okay.  All right.  I'm going to back -- show
9  the video again.
10         (Whereupon, video playing.)
11     Q   All right.  We're up to 35 seconds.  At this
12  point, he hasn't done anything threatening toward you,
13  correct?
14     A   Correct.
15     Q   Okay.  All he's done is hid from you; is that
16  right?
17     A   Correct.
18         MS. NGUYEN:  Object to form.
19  BY MR. SPURLIN:
20     Q   And acting irrationally; is that right?
21     A   Correct.
22     Q   Acting irrationally?
23     A   But, again, I don't know if he has any
24  weapons behind that backhoe bucket.
25     Q   Okay.

Page 303

1      A   Or on his person.
2          (Whereupon, video playing.)
3      Q   All right.  Now, do you see him running to
4  the -- to your left?
5          And I'll back it up because I messed that up.
6          (Whereupon, video playing.)
7      Q   All right.  I'm going to try and start it at
8  35 seconds.  This is 33, okay.
9          (Whereupon, video playing.)
10     Q   Does he run to your left first?
11     A   I would -- I would say that he -- my
12  perception is he is just clearing that backhoe bucket,
13  that he is -- I don't believe that he is running to his
14  left or to my left.
15     Q   Okay.
16     A   It looks like he takes a couple of steps to
17  clear that backhoe bucket.
18     Q   Now, did it appear that the movements
19  of his hands were slapping at the TASER?
20         MR. WILLIAMS:  Object to form.
21         THE WITNESS:  No, sir.
22  BY MR. SPURLIN:
23     Q   Did he strike the TASER?
24     A   Not that I recall, no, sir.
25     Q   Okay.  I want you to look and tell me what

Page 304

1  he's doing the second time you apply the TASER trigger,
2  okay?
3          (Whereupon, video playing.)
4      Q   Have you shot more than once at that point or
5  just once?
6      A   I don't know.
7      Q   Can you tell?
8      A   I don't know.
9      Q   Okay.
10         (Whereupon, video playing.)
11     Q   All right.  Now, he's on the ground, and you
12  can hear the weapon deploying electric, correct?
13     A   Yes, sir.
14     Q   Okay.  Is that the point when you thought he
15  was compliant?
16     A   Yes, sir.
17     Q   Can you tell at that point if you have
18  deployed the trigger more than once?
19     A   It sounds like that was the second time.
20     Q   Okay.
21         (Whereupon, video playing.)
22     Q   At this point, we're at the 1-0 something
23  mark, two mark.
24         Have you made any determination in your mind
25  as to how many times you've tased him?

Page 305

1      A   No, sir.
2          MR. WILLIAMS:  Object to form.
3  BY MR. SPURLIN:
4      Q   And have you, in your mind, determined that
5  it matters how many times you've tased him or it
6  matters how long you've tased him?
7      A   No, sir.  At this point, he is still actively
8  coming at me.
9      Q   And consistent with your prior testimony, you
10  think you can tase him an unlimited amount of time for
11  an unlimited duration to obtain control of him?
12     A   No, sir.
13         MS. NGUYEN:  Object to form.
14         MR. WILLIAMS:  Object to form.
15         THE WITNESS:  I didn't say that.
16  BY MR. SPURLIN:
17     Q   What is your testimony?
18     A   My testimony was I can -- I can tase him
19  until the point that he is no longer a threat to me.
20  And at that point, he is still a threat.
21     Q   And you think you can tase him an unlimited
22  amount of times for an unlimited duration until he's no
23  longer a threat to you?
24     A   Yes, sir.
25     Q   Okay.



MAGNA
LEGAL SERVICES

Page 306

```
 1          (Whereupon, video playing.)
 2     Q   And you just tased him a fourth time?
 3     A   And that was where he knocked me to the
 4  ground.
 5     Q   Is he complying at that point?
 6     A   It is my belief that he is going to.
 7     Q   All right.
 8     A   He got on his knees, and it is my belief that
 9  he is going to.  But at that point, no, he is not
10  compliant.
11     Q   Well, you've testified repeatedly that you
12  don't think the weapon had any effect on him at all,
13  right?
14     A   Correct.
15     Q   Why would he have gotten on the ground twice
16  if he felt no electrical charge and he had no effect on
17  him?
18          MR. WILLIAMS:  Object to form.
19          MS. NGUYEN:  Form and foundation.
20          THE WITNESS:  Sir, I'm --
21          MR. SPURLIN:  I don't understand the
22  foundation when he would know the answer to that.
23          MR. WILLIAMS:  He can't -- he can't
24  possibly --
25          MS. NGUYEN:  No, he can't.
```

Page 307

```
 1          MR. WILLIAMS:  -- know the answer to what he
 2  was thinking.
 3          THE WITNESS:  I can't speak --
 4          MS. NGUYEN:  You keep him asking him why he
 5  did something.
 6          THE WITNESS:  I can't speculate why
 7  Mr. McBrayer did anything.
 8  BY MR. SPURLIN:
 9     Q   Okay.  Well, you've reached conclusions as to
10  all of his other activities.  You've reached a
11  conclusion that you thought he was going to harm you
12  and you thought he was going to assault you, and you
13  thought he was going to flee.
14          Why can you reach all of those conclusions as
15  to his behavior, but when I ask a question about what
16  his behavior is, you can't reach a conclusion?  Explain
17  that to me.
18          MR. WILLIAMS:  Object to form.
19          THE WITNESS:  You're asking me to --
20          MR. WILLIAMS:  You didn't.  You asked him why
21  he would do something, not what his behavior was.
22  That's totally improper.
23          MR. SPURLIN:  I don't even think that was the
24  question.
25          THE WITNESS:  You asked me why
```

Page 308

```
 1     Mr. McBrayer --
 2  BY MR. SPURLIN:
 3     Q   What?
 4     A   You asked me why Mr. McBrayer got on his
 5  knees.  I don't know why Mr. McBrayer got on his knees.
 6  Only he would know that.
 7     Q   Okay.  And you don't believe --
 8          MS. NGUYEN:  He also testified that he
 9  thought he was going to comply.  So he can testify
10  to him impressions.  He can't testify to what --
11  why Mr. McBrayer did something.
12          MR. SPURLIN:  Well, you asked him every one
13  of those, what did he think he was doing.
14          MS. NGUYEN:  I'm not going to argue with you.
15          MR. SPURLIN:  Well, you are arguing with me.
16          MS. NGUYEN:  The record speaks for itself.
17  We objected to form.
18          MR. SPURLIN:  I understand.
19          MS. NGUYEN:  And explained why.
20  BY MR. SPURLIN:
21     Q   So at this point in time, did you know how
22  many times you had applied your TASER?
23     A   No, sir, I did not.
24     Q   Okay.  When Spurgeon arrived, did you ever
25  explain to him that you thought Mr. McBrayer was having
```

Page 309

```
 1  a mental illness episode?
 2     A   I never stated I thought he was having a
 3  mental illness episode.
 4     Q   Did you explain to Spurgeon, when you all
 5  were trying to handcuff him, that you thought he was
 6  under the influence of a drug?
 7     A   I don't think so, no.
 8     Q   Okay.  Did you ever give any recitation of
 9  what had happened to Spurgeon before he arrived?
10     A   Before Deputy Spurgeon arrived?
11          MR. WILLIAMS:  What?
12  BY MR. SPURLIN:
13     Q   When Deputy Spurgeon arrived, did you ever
14  say, hey, he did this, he did that?
15     A   No, sir.
16     Q   Did you fill Spurgeon in?
17     A   No, sir.  I mean, at what point would I have
18  had to do that?
19     Q   Okay.  Well, you all were laying on the
20  ground with him for ten minutes, right?
21          MR. WILLIAMS:  Object to form.
22          MS. NGUYEN:  Object to form.
23  BY MR. SPURLIN:
24     Q   Having a conversation, right?
25     A   No, sir, we weren't having a conversation.
```



Page 310

```
 1          MR. WILLIAMS: Object to form.
 2   BY MR. SPURLIN:
 3       Q   Okay. All right. Did you ever at any point,
 4   while he was on the ground, check Mr. McBrayer's vital
 5   signs?
 6       A   No, sir.
 7       Q   Did you at any point try to measure his
 8   pulse?
 9       A   No, sir.
10       Q   Okay. At that point in time, did he appear
11   to be exhausted?
12       A   I mean, I don't know.
13       Q   Was he breathing heavily?
14       A   Yes.
15       Q   Was he gasping for breath?
16       A   No.
17          MR. WILLIAMS: Object to form.
18          THE WITNESS: Not that I recall.
19   BY MR. SPURLIN:
20       Q   Okay. What -- were you tired from the
21   ten-minute struggle?
22       A   I was.
23       Q   Okay. Was Deputy Spurgeon breathing
24   difficult -- with difficulty?
25          MR. WILLIAMS: Object to form.
```

Page 311

```
 1          THE WITNESS: You would have to ask Deputy
 2   Spurgeon that.
 3   BY MR. SPURLIN:
 4       Q   You don't remember him gasping for breath or
 5   trying to catch his breath?
 6          MR. WILLIAMS: Object to form.
 7          THE WITNESS: No, sir.
 8   BY MR. SPURLIN:
 9       Q   What about Mr. McBrayer, was he having
10   difficulty breathing when he was on the ground?
11       A   Not that I identified, no.
12       Q   Okay. Before he was taken to the vehicle,
13   did you ever check his vitals?
14       A   No, sir.
15       Q   Did you ever measure his pulse?
16       A   No, sir. Not before he went to the vehicle,
17   no.
18       Q   Did anyone else?
19       A   No, sir.
20       Q   Okay. Did anyone call in on the radio to
21   send EMS for Mr. McBrayer?
22       A   We called in that the TASER was deployed.
23       Q   Okay. Now, do you know who picked him up and
24   loaded him in the car?
25       A   No, sir. I know that I was -- I was one of
```

Page 312

```
 1   the ones that assisted him picking him up.
 2       Q   Okay. How did he appear when he was picked
 3   up?
 4       A   When we picked him up, he appeared to go
 5   limp.
 6       Q   Okay. Was he talking at that point?
 7       A   No, sir.
 8       Q   He had been talking continuously from the
 9   beginning of your encounter until that time, correct?
10       A   Yes, sir.
11       Q   How long before you all hobble strapped him
12   before he stopped talking?
13       A   I don't know.
14       Q   Okay. But he was no longer talking before
15   you all picked him up, right?
16          MR. WILLIAMS: Object to form.
17          THE WITNESS: I don't know. I don't recall
18   that.
19   BY MR. SPURLIN:
20       Q   Do you know what body part you got to pick
21   him up?
22       A   I picked up his -- I believe it was his right
23   arm.
24       Q   Okay. Who had his left arm?
25       A   I don't know.
```

Page 313

```
 1       Q   Well, was he -- was he picked up facedown?
 2       A   Yes, sir.
 3       Q   Okay. By his arms?
 4       A   By his upper arms.
 5       Q   So he was picked up and his arms went way up
 6   behind him; is that right?
 7          MR. WILLIAMS: Object to form.
 8          THE WITNESS: I don't -- I don't know. I
 9   don't remember.
10   BY MR. SPURLIN:
11       Q   You saw the body cam when, last night?
12       A   Yes, sir.
13       Q   You didn't see how he was picked up by his
14   arms with him handcuffed facedown?
15          MR. WILLIAMS: Object to the form.
16          THE WITNESS: No, sir. I don't know exactly
17   how he was picked up, no.
18   BY MR. SPURLIN:
19       Q   Do you all have any procedures for how you
20   lift unconscious people and put them in cars?
21          MR. WILLIAMS: Object to form.
22          THE WITNESS: Not that I'm aware of, no.
23   BY MR. SPURLIN:
24       Q   Was he passed out at the point you picked him
25   up?
```



Page 314

1      A   I don't know that he was passed out.  It was
2  my belief that he was, yes.
3      Q   Okay.  He wasn't speaking?
4      A   Correct.
5      Q   He wasn't resisting?
6      A   Correct.
7      Q   He was limp?
8      A   Correct.
9      Q   Okay.  Who decided he needed to be put in the
10 car?
11     A   I don't know the answer to that.
12     Q   Why did he need to be put in the car?
13     A   Because at that point, we still had not
14 completed investigating why we were out there to begin
15 with.
16     Q   Okay.  Laying on the ground limp, handcuffed,
17 and hobble strapped and passed out, would he have been
18 dangerous to anyone?
19         MR. WILLIAMS:  Object to form.
20         THE WITNESS:  In that condition, not
21     necessarily.  However, again, it was my assumption
22     that he was passed out.  I don't know that to be
23     fact or I didn't know that to be fact.
24 BY MR. SPURLIN:
25     Q   Okay.  If he were awake but handcuffed and

Page 315

1  hobble strapped, would he have been dangerous to anyone
2  laying on the ground?
3      A   Potentially.
4      Q   How?  How could a handcuffed, hobble strapped
5  person laying on the ground harm any of you five
6  deputies?
7      A   Well, he's got teeth in his mouth.  He could
8  bite you.
9      Q   You would have to go up and put your hand
10 near his mouth, right?
11     A   I mean, you didn't ask all of that.  You
12 asked how he could harm you, and I'm telling you how he
13 can harm you.
14     Q   Okay.  How else?
15     A   I mean, he's got feet, he can kick you.
16     Q   He's hobble strapped, right?
17     A   Correct, he is hobble strapped, which means
18 he's going to kick you with the force of two feet, not
19 just one.
20     Q   If you walk up within the distance of him
21 kicking you, right?
22         MR. WILLIAMS:  Object to form.
23         THE WITNESS:  Again, your question to me was
24     how can he harm me.
25 BY MR. SPURLIN:

Page 316

1      Q   Okay.
2      A   Okay.  I'm telling you how he can harm you.
3      Q   All right.  That night limp, passed out,
4  handcuffed and hobble strapped, how could he have
5  harmed any deputy?
6          MR. WILLIAMS:  Object to form.
7  BY MR. SPURLIN:
8      Q   He wasn't dangerous at that point?
9      A   Okay.
10     Q   Do you agree?
11         MR. WILLIAMS:  He's asking at the point that
12     all those conditions are met.
13 BY MR. SPURLIN:
14     Q   Was he dangerous at that point?
15     A   No.
16     Q   Was he dangerous when you all picked him up
17 and put him in the car?
18     A   No.
19     Q   Okay.  Why did he have to be in the car?  Why
20 couldn't you leave him on the ground?
21         MR. WILLIAMS:  Object to form.
22         MR. SPURLIN:  What's wrong with the form?
23         THE WITNESS:  "Why could" calls for
24     speculation, I mean.
25         MR. SPURLIN:  He's the officer who makes the

Page 317

1  decisions.
2          MR. WILLIAMS:  I'm objecting to form.
3          MR. SPURLIN:  That is not speculation.  You
4      can object to every one.  Go ahead.
5          MR. WILLIAMS:  Yeah, I can.
6          THE WITNESS:  Well, again, I just told you I
7      don't know who made the decision to put him in the
8      car.
9  BY MR. SPURLIN:
10     Q   Okay.
11     A   I didn't make that decision that I'm aware
12 of.
13     Q   I understand.
14         If you had of made the decision, was there
15 any absolute reason he needed to be loaded into the
16 car?
17         MR. WILLIAMS:  Object to form.
18         THE WITNESS:  I mean, you're asking me a
19     hypothetical situation.
20 BY MR. SPURLIN:
21     Q   You were there.  Was there any reason he had
22 to be loaded into the car?
23         MR. WILLIAMS:  Object to form.
24         THE WITNESS:  But what I'm telling you is I'm
25     here to answer facts of the case, not





Page 318

```
 1        hypotheticals.
 2   BY MR. SPURLIN:
 3        Q   This is facts of the case.  Was there any
 4   reason that he had to be loaded into the car at that
 5   point?
 6           MR. WILLIAMS:  Object to form.
 7           THE WITNESS:  That -- you would have to ask
 8        whoever made the decision to load him into the
 9        car.
10   BY MR. SPURLIN:
11        Q   Did you know of any facts that necessitated
12   him being loaded into the car at that time?
13        A   At that point, no.  However --
14        Q   Okay.  Didn't he need medical care at that
15   point?
16           MR. WILLIAMS:  Object to form.
17           THE WITNESS:  Not that I was aware of, no.
18   BY MR. SPURLIN:
19        Q   You didn't believe at that point limp, passed
20   out, handcuffed, hobble strapped, and tased six times
21   with 30 second duration necessitated him being seen for
22   medical care and evaluation?
23           MR. WILLIAMS:  Object to form.
24           THE WITNESS:  First, you keep going back to
25        the tased for 30 seconds.  But you can see clearly
```

Page 319

```
 1   in the video that those were not effective because
 2   of the sound coming from the TASER.
 3   BY MR. SPURLIN:
 4        Q   Okay.
 5        A   Okay.  Number two, I've seen defendants, I've
 6   seen -- I've seen suspects go limp just because they
 7   don't want to comply and get in the vehicle, which was
 8   not -- I mean, he hadn't complied to that point.
 9        Q   Have you ever seen anyone tased six times for
10   30 seconds?
11        A   I've never seen anybody tased at all --
12        Q   Okay.
13        A   -- before this.
14        Q   So you really didn't have any training and
15   experience provided by the sheriff's department to help
16   you evaluate his need for medical care and attention,
17   correct?
18           MR. WILLIAMS:  Object to form.
19           THE WITNESS:  I didn't believe at that point
20        that there was any need for medical care because I
21        didn't see any -- any distress, any signs of
22        distress.
23   BY MR. SPURLIN:
24        Q   Did Major Torres, or anyone else at the
25   sheriff's department, ever tell you that someone who
```

Page 320

```
 1   has been tased more than twice for 15 seconds needs
 2   medical care and attention?
 3           MR. WILLIAMS:  Object to form.
 4           THE WITNESS:  Not that I recall, no, sir.
 5   BY MR. SPURLIN:
 6        Q   Has Major Torres, or anyone else with the
 7   sheriff's department, ever told you that anyone tased
 8   more than twice for more than 15 seconds needs to be
 9   medically evaluated?
10        A   That's the same question you just asked me.
11   Not that I'm ware of, no.
12        Q   Okay.  You thought he needed to be medically
13   evaluated yourself because of his irrational behavior,
14   correct?
15           MR. WILLIAMS:  Object to form.
16           THE WITNESS:  No, sir, I never stated that.
17           MS. NGUYEN:  Join.
18   BY MR. SPURLIN:
19        Q   I'm asking you.  Didn't you think that?
20        A   No, sir.  You're -- are you asking me or are
21   you telling me?
22        Q   Yeah.
23           Did you think he needed to be medically
24   evaluated because of his behavior?
25        A   Okay.  No, sir, I did not.
```

Page 321

```
 1        Q   Did you think he needed a mental health
 2   evaluation because of his behavior?
 3        A   No, sir, I did not.
 4        Q   Did you think he needed a medical evaluation
 5   because of potential drug use?
 6        A   No, sir, I did not.
 7        Q   Okay.  So as we sit here today, having gone
 8   through there and seen the body camera footage, you
 9   don't believe Mr. McBrayer needed any medical care or
10   evaluation at the time he was loaded into the car?
11        A   Mr. Spurling, you're asking me --
12           MR. WILLIAMS:  Object to form.
13           THE WITNESS:  -- to look at something from
14        hindsight, okay.  And I can't do that because now
15        I know all the facts and circumstances beyond that
16        night, okay.
17           What I'm telling you is that night, given the
18        situation, no, I did not see any need for medical
19        attention.
20   BY MR. SPURLIN:
21        Q   All right.  Let me repeat what I think you
22   said.
23           That night at the scene when he was loaded in
24   the car, you did not believe he needed any medical
25   attention, correct?
```



Page 322

1    A   That is correct.
2    Q   Now, having seen the video and knowing all
3  these facts, do you believe that he needed medical
4  attention when he was loaded into the car?
5        MR. WILLIAMS: Object to form.
6        THE WITNESS: I don't know that to be a fact.
7        MS. NGUYEN: Join.
8        THE WITNESS: I know obviously he did need
9     medical attention at some point. But at the point
10    that he was loaded into the car, I don't know
11    that.
12 BY MR. SPURLIN:
13    Q   Okay. Do you believe that a person who's
14  passed out needs medical attention?
15        MR. WILLIAMS: Object to form.
16        THE WITNESS: Not necessarily, no.
17 BY MR. SPURLIN:
18    Q   Do you believe the combination of someone
19  limp and passed out who he has been in at least a
20  ten-minute struggle and tased at least six times for 30
21  second durations needs to be medically evaluated?
22        MR. WILLIAMS: Object to form. Gosh, you've
23    asked this --
24        MS. NGUYEN: Join.
25        MR. WILLIAMS: -- question about ten times.

Page 323

1        MR. SPURLIN: It's different.
2        THE WITNESS: Sir, again --
3  BY MR. SPURLIN:
4    Q   Yes or no first.
5    A   I'm not going to answer that yes or no.
6    Q   You got to.
7        THE VIDEOGRAPHER: I have to change tapes.
8        MR. WILLIAMS: No, he doesn't if he doesn't
9     feel like he can.
10        MS. NGUYEN: All right.
11        THE VIDEOGRAPHER: I have to change tapes.
12        MR. SPURLIN: Okay.
13        THE VIDEOGRAPHER: I'm sorry. This is the
14    end of medium number four of the deposition of
15    Deputy Anthony Tripp. The time is 5:17. We are
16    going off the record.
17        (Whereupon, a recess was taken.)
18        THE VIDEOGRAPHER: This is the beginning of
19    medium number five in the deposition of Deputy
20    Anthony Tripp. The time is 5:25. We're on the
21    record.
22 BY MR. SPURLIN:
23    Q   Deputy Tripp, at some point you walked to the
24  car where he was and say you checked his vital signs;
25  is that correct?

Page 324

1    A   Yes, sir.
2    Q   What did you check?
3    A   I checked his corotid artery.
4    Q   Okay. For his pulse?
5    A   Yes, sir.
6    Q   Okay. Did you measure it?
7    A   No, sir, I didn't.
8    Q   Did you -- how long did you keep your finger
9  there to measure it?
10    A   Just a few seconds.
11    Q   Okay. I don't know what a few means to you.
12    A   I don't know exactly how long.
13    Q   Less than five?
14    A   I'm not -- I don't remember.
15    Q   You didn't try to compute his pulse rate per
16  minute?
17    A   No, sir.
18    Q   Did you record what his pulse rate was?
19    A   No, sir.
20    Q   Was it normal or abnormal?
21    A   It felt a little rapid.
22    Q   A little rapid meaning what?
23    A   Like it was a little fast, I mean.
24    Q   Do you normally take people's pulses?
25    A   I take mine all the time.

Page 325

1        MR. WILLIAMS: Object to the form. I don't
2    know what normally means.
3        MR. SPURLIN: That's what I'm trying to get
4    at.
5        MR. WILLIAMS: Experience.
6  BY MR. SPURLIN:
7    Q   I don't know what normally is. Is it more
8  than 50 beats a minute or is more than 80 beats a
9  minute? What does a little rapid mean to you?
10    A   A little rapid to me means that it was
11  obvious that he was just in a -- in a physical type
12  altercation and his heart rate was a little higher than
13  it would be at rest.
14    Q   Okay. A little rapid or a lot rapid?
15    A   I would say it was a little rapid.
16    Q   Okay. Now, how many minutes after the
17  altercation was over and he was put in the car was it
18  before you went and checked his pulse?
19    A   I'm not sure.
20    Q   It was several minutes, wasn't it?
21    A   Yes, sir, it was.
22    Q   Okay. So there was time for his pulse rate
23  to return to normal?
24    A   I mean, I don't know at what rate his pulse
25  would return to normal.



Page 326

1    Q    So you don't know whether his was rapid for
2  him or not?
3    A    Correct.
4    Q    And you didn't call in to anybody and say,
5  hey, he's got a rapid pulse?
6    A    No, sir.
7    Q    And at that point, did you try to determine
8  how many breaths per minute he was taking?
9    A    No, sir.
10   Q    Did you try to determine if he was breathing
11 at all?
12   A    I couldn't see if he was breathing or not by
13 the way he was.
14   Q    Now, was he laying on his side or on his
15 back?
16   A    He was laying on his side.
17   Q    His left side or his right side?
18   A    It would have been his left side.
19   Q    So his face was facing the front of the
20 vehicle?
21   A    Correct.
22   Q    Okay.  And when you reached in, you got his
23 pulse on the right side of his neck?
24   A    Yes, sir.
25   Q    He would have been laying on the left side of

Page 327

1  his neck?
2    A    Yes, sir.
3    Q    And at that point, his hands were still
4  behind his back?
5    A    Yes, sir.
6    Q    So his mouth wasn't far from where your hand
7  was to check his pulse, right?
8    A    No, sir.
9    Q    What I said was false?
10        MR. WILLIAMS:  Object to form.
11 BY MR. SPURLIN:
12   Q    Was the -- was your hand near his mouth when
13 you took his pulse?
14   A    Yes, sir.
15        Your question was my hand was not far from
16 his mouth.  And I said, no, it was not.  No, sir.
17   Q    Okay.  You agree that it was not far?
18   A    I agree with you, yes.
19   Q    Did you feel any breath coming in his mouth
20 or nose?
21   A    Honestly, I didn't check.
22   Q    You didn't check?
23   A    No, sir.
24   Q    Was he, at that point, attempting to breathe
25 or gasping for breath that you could observe?

Page 328

1    A    No, sir.
2    Q    Okay.  Did you attempt to determine if he was
3  breathing?
4    A    No, sir.  Again, I didn't -- I didn't see.
5    Q    How would one determine if he was trying to
6  breathe?
7    A    You would look for rising and falling in the
8  chest.
9    Q    Okay.  What about just sticking your hand in
10 front of his nose?  Couldn't you feel the air coming in
11 and out?
12        MR. WILLIAMS:  Object to form.
13        THE WITNESS:  I mean, I assume you could.
14 BY MR. SPURLIN:
15   Q    You didn't do that?
16   A    No, sir.
17   Q    Okay.  Did you do anything else to evaluate
18 him at that time?
19   A    Sir, I'm not -- I'm not medical personnel.
20   Q    I know that.
21        I'm just asking, you didn't make any attempt
22 to do anything but take a pulse, right?
23   A    Correct.
24   Q    Why did you do that?
25   A    To ensure that he was okay.

Page 329

1    Q    But that wasn't what you were assigned to do?
2  Hancock was assigned to do that, right?
3    A    I was the one that told Deputy Hancock to do
4  that, so I -- there -- there is no specific
5  assignments.  I mean, we -- we don't have a roster that
6  says Deputy Tripp checks this, Deputy Hancock checks
7  this.
8    Q    Okay.
9    A    I think that the intent and the idea behind
10 it was to ensure that somebody checked on him multiple
11 times, regardless of who did that.
12   Q    When you walked up to take his pulse, isn't
13 it true that Henderson was there --
14   A    He was.
15   Q    -- and checked him?
16        Why did Henderson need you if he's checking
17 him?
18   A    Sir, that would be a question for Captain
19 Henderson.
20   Q    But you chose -- you didn't get summoned, you
21 chose to go over there while Henderson was evaluating
22 him, correct?
23   A    Yes, sir.
24   Q    And you reached in while Henderson was doing
25 that and said, oh, he's got a pulse, right?



Page 330

1        MR. WILLIAMS:  Object to form.
2        THE WITNESS:  I mean, I don't know exactly
3    what was said or what transpired.
4    BY MR. SPURLIN:
5        Q   Okay.  Did you conclude that Henderson
6    couldn't make an evaluation himself without your
7    assistance?
8        A   No, sir.  I mean, that's -- that's not my
9    conclusion to make.
10       Q   Okay.  Well, then why did you go over there
11   if Henderson was doing that?
12       A   I don't know, sir.
13       Q   Okay.  All right.  I want to show you some
14   more of this video.
15           (Whereupon, video playing.)
16       Q   All right.  At that point, do you have your
17   hand on his neck holding him down?
18       MR. WILLIAMS:  Object to form.
19       THE WITNESS:  I have my hand on his neck.
20   BY MR. SPURLIN:
21       Q   Okay.  Keeping him from getting up?
22       A   Yes, sir.
23       MR. WILLIAMS:  Object to form.
24   BY MR. SPURLIN:
25       Q   Okay.  And how close to the ground is his

Page 331

1    face?
2        A   I mean, his face is turned.
3        Q   Okay.  I mean, is his face on the ground?
4        MR. WILLIAMS:  Object to form.
5        THE WITNESS:  His cheek appears to be, yes.
6    BY MR. SPURLIN:
7        Q   Okay.  Now, the autopsy report referred to
8    some contusions and abrasions to his face.
9           Is that when he was on the ground?
10       MR. WILLIAMS:  Object to form.
11       THE WITNESS:  I can't -- I don't know.
12   BY MR. SPURLIN:
13       Q   You don't know of any other cause?
14       MR. WILLIAMS:  Object to form.
15       THE WITNESS:  I mean, you stated earlier he
16   was involved in a motor vehicle accident.
17   BY MR. SPURLIN:
18       Q   Okay.
19       A   So, I mean, if there was abrasions and
20   contusions on his face, they could have came from that.
21   I don't know.
22       Q   Okay.  Did you at any point in time, when you
23   were on the ground trying to handcuff him, ask him his
24   name?
25       A   No.

Page 332

1        Q   Did you ever say, hey, man, we're here to
2    help you?  Were you in a car wreck?
3        A   No, sir.
4        Q   Did you ever say, don't fight us, man, we're
5    here to help you?
6        A   No sir.
7           (Whereupon, video playing.)
8    BY MR. SPURLIN:
9        Q   Now, at that point does -- it appears
10   Spurgeon has his left arm?
11       A   It does.
12       Q   And you have him by the scruff of his neck?
13       A   I had my hand on his neck, yes.
14       Q   Okay.  Where's your other hand?
15       A   I don't know.
16       Q   Where is your legs?
17       A   I don't know.
18       Q   Were you on top of him in any way?
19       A   No, sir, I don't believe so.
20       Q   Anybody sitting on his legs?
21       A   No, sir.
22       Q   Okay.
23           (Whereupon, video playing.)
24       Q   All right.  I'm going to ask you about --
25           All right.  Now, I think Spurgeon is fixing

Page 333

1    to drive stun him, so I'm going to ask you to pay
2    attention to that, if I can.
3        A   Okay.
4        Q   Because that's my question.  All right.
5           (Whereupon, video playing.)
6        Q   All right.  Now, did you witness him drive
7    stunning him that time?
8        A   I did.
9        Q   And did it appear to you that he was able to
10   drive stun him that time?
11       MR. WILLIAMS:  Object to form.
12       MS. NGUYEN:  Join.
13       THE WITNESS:  It does.  It looks like
14   Mr. McBrayer pulled away from him at some point.
15   BY MR. SPURLIN:
16       Q   Okay.  And you don't whether that was after
17   the full duration or on four and a half seconds or when
18   it was?
19       A   It sounds like you can hear the beep right
20   there.
21       Q   Okay.
22       A   So it was still currently going.
23           (Whereupon, video playing.)
24       Q   Do you know if this was the first or second
25   time he was drive stunned?



Page 334

```
 1       A   I don't know that.
 2          (Whereupon, video playing.)
 3       Q   All right.  I'm going to back that up for us
 4   to see if we can tell how long he had the weapon stuck
 5   to his body.
 6          (Whereupon, video playing.)
 7       Q   Did you know that night that he had been
 8   tased twice?
 9          MR. WILLIAMS:  Object to form.
10          THE WITNESS:  I'm sorry?
11   BY MR. SPURLIN:
12       Q   Did you know that night he had been drive
13   stunned two times by Spurgeon?
14       A   No, sir, I didn't.
15       Q   You didn't see that that night?
16       A   I mean, yes.  I assumed that I would have
17   seen it, yes.
18       Q   Okay.  So what I'm asking you is did you know
19   that night that he had been drive stunned twice by
20   Spurgeon?
21       A   Yes.
22       Q   Okay.  Okay.  All right.
23       A   You said that you had question about the
24   duration.
25          MR. WILLIAMS:  No.
```

Page 335

```
 1          THE WITNESS:  Okay.  I'm sorry.
 2          (Whereupon, video playing.)
 3   BY MR. SPURLIN:
 4       Q   Could you tell how long he was -- could you
 5   tell how long he had tased him before he rolled over
 6   away from it in watching that?
 7          MR. WILLIAMS:  Object to form.
 8          THE WITNESS:  No, sir.
 9   BY MR. SPURLIN:
10       Q   Did it appear that he had it against his body
11   from 2:04 to 2:08 before he rolled over?
12       A   No, sir.
13          MS. NGUYEN:  Object to form.
14   BY MR. SPURLIN:
15       Q   You couldn't see that?
16       A   (Shaking head negatively.)
17       Q   Okay.  All right.  I want you to watch this.
18          (Whereupon, video playing.)
19       Q   Is everybody breathing heavily at that point?
20       A   I can't speak for everybody.
21       Q   You can't hear it?
22       A   Well, I can't hear everybody breathing
23   individually, no.
24       Q   Okay.  There's just a couple I want to show
25   you so I'm going to try to --
```

Page 336

```
 1          (Whereupon, video playing.)
 2       Q   That's not true?  That's not why you pulled
 3   his TASER, because he had white foam around his mouth,
 4   correct?
 5       A   Correct.
 6       Q   That statement you made to the other officers
 7   "I pulled my TASER because he had white foam around his
 8   mouth" is not true?
 9       A   No, sir.
10       Q   In fact, you had pulled your TASER for about
11   36 seconds before he got close enough for you to see
12   any white foam, true?
13       A   Yes, sir.
14       Q   Why did you tell the other officers that
15   then?
16       A   Sir, with -- I mean, with everything
17   happening the way it did, that was just my account at
18   that point in time with everything happening as fast as
19   it did.
20       Q   Okay.
21          (Whereupon, video playing.)
22       Q   Is that true, "I'm the only one that
23   deployed"?
24       A   That deployed, yes.
25       Q   Okay.
```

Page 337

```
 1          MS. NGUYEN:  Object to form.
 2   BY MR. SPURLIN:
 3       Q   Okay.  What do you mean by "deployed"?
 4       A   That deployed my TASER cartridge.
 5       Q   Okay.  So what you mean by that is that drive
 6   stuns would not be included in what you're saying; is
 7   that right?
 8       A   That is correct.
 9       Q   Okay.
10       A   Because at that point, they're looking for
11   the pieces to my TASER cartridge.
12       Q   Okay.  I want you to listen to the
13   conversation with the EMS person.
14       A   Yes, sir.
15          (Whereupon, video playing.)
16       Q   Is that your voice saying "I didn't realize
17   he was unresponsive"?
18       A   Yes, sir.
19       Q   Was that true?
20       A   Yes, sir.  I mean, it depends on what you
21   define as unresponsive.
22       Q   Well, you said he passed out?
23       A   Right.
24       Q   Passed out is unresponsive?
25          MS. NGUYEN:  Object to form.
```



Page 338

```
 1          MR. WILLIAMS:  Object to form.
 2          THE WITNESS:  That's your definition of
 3   unresponsive.
 4   BY MR. SPURLIN:
 5       Q   Have you ever -- have you ever spoken to
 6   anyone who's passed out?
 7          MR. WILLIAMS:  Object to form.
 8          THE WITNESS:  No, sir.
 9   BY MR. SPURLIN:
10       Q   Have you ever had anyone who's passed out
11   talk to you?
12       A   No, sir.
13       Q   Passed out means they're not aware, awake,
14   and verbalizing, correct?
15       A   That is absolutely correct.
16          MR. WILLIAMS:  Object to form.
17   BY MR. SPURLIN:
18       Q   You just told him that you didn't know he was
19   unresponsive.  But you said he was limp and passed out
20   when he was carried to the car, correct?
21       A   Right.
22       Q   And he was limp and passed out when you
23   checked his vital signs, correct?
24       A   Correct.
25       Q   You couldn't see his chest rising or him
```

Page 339

```
 1   breathing when he was in the car, right?
 2       A   Correct.
 3       Q   He was unresponsive in the car?
 4       A   No, sir.
 5       Q   He never responded to you when you checked
 6   his corotid, did he?
 7       A   No, sir.  However, when you talk about
 8   responsiveness, you're talking about more than just
 9   verbal.  If he would have said verbally responsive,
10   then I would have said, yes, he was never verbally
11   responsive.
12          However, responsive can mean a number of
13   different things.  Responsiveness could mean that he
14   responds to pain, things like that, you know.  Maybe
15   they tried a sternum rub, maybe they didn't -- I don't
16   know -- and he was unresponsive to that.  I can't
17   determine what they meant by unresponsive.
18       Q   When he was lifted by his arms and put in the
19   car, did he respond?
20          MR. WILLIAMS:  Object to form.
21          MS. NGUYEN:  Join.
22          THE WITNESS:  He did not say anything.
23   BY MR. SPURLIN:
24       Q   Did he jerk away?
25       A   No, sir.
```

Page 340

```
 1       Q   Did he respond as if he was in pain?
 2       A   No, sir.
 3       Q   Did he make any response, verbal or
 4   otherwise?
 5       A   No, sir.
 6       Q   When you checked his corotid in the vehicle,
 7   did he respond to you in any way whatsoever?
 8       A   I did not summons a response.
 9       Q   Did he verbalize a response?
10       A   No, sir.
11       Q   Did he jerk away when you touched his
12   corotid?
13       A   No, sir.
14       Q   Did he try to turn away from you?
15       A   No, sir.
16       Q   Did he grunt or groan in any way?
17       A   No, sir.
18       Q   So you still believe that your statement to
19   the EMS Cayton was true, "I didn't know he's un -- he
20   was unresponsive"?
21       A   Yes, sir, I do.
22       Q   Okay.  Because you def -- your definition of
23   unresponsive includes what?
24          MR. WILLIAMS:  Object to form.
25          THE WITNESS:  What I -- what I think or what
```

Page 341

```
 1   I assume he meant by unresponsive was -- was not
 2   verbally.  I thought he was speaking from a
 3   medical standpoint.  And I don't have any basis to
 4   determine if he's unresponsive based on a medical
 5   standpoint.
 6   BY MR. SPURLIN:
 7       Q   Well, why did you respond that way then,
 8   because you had no information to contradict what
 9   Cayton said?
10       A   No, sir.  I stated I did not know he was
11   unresponsive, which is a true fact.
12       Q   Okay.  All right.  Did you ever tell McBrayer
13   if you'll quit resisting, we'll let you up?
14       A   No, sir.
15       Q   Did you ever ask him if he was the one in the
16   car?
17       A   No, sir.
18       Q   Did you ever ask him if he was hurt in any
19   way?
20       A   No, sir.
21       Q   Did you ever ask him if he had used any drugs
22   that night?
23       A   No, sir.
24       Q   Okay.  All right.  I'm going to change videos
25   because it doesn't show up well on this one.
```



| | |
|---|---|
| Page 342 | Page 343 |

**Page 342**

1          (Whereupon, video playing.)
2     Q   Do you see that lady's car in the roadway?
3     A   I do.
4     Q   In the right-hand lane?
5     A   It appears to be, yes.
6     Q   And she's talking to who?
7     A   My assumption would be Deputy Spurgeon.
8     Q   Well, you recognize his voice, don't you?
9     A   Yes.
10    Q   That's not an assumption, that's a fact,
11   right?
12    A   Okay.  Yes, she's talking to Deputy Spurgeon.
13    Q   And you never saw her vehicle at all that
14   night?
15    A   Not that I recall, no.
16    Q   Okay.  Did you have to go around Spurgeon's
17   car or her vehicle to go where you went?
18    A   No, sir.
19    Q   Do you know how far from where they were or
20   where you went around Spurgeon or where you left
21   Spurgeon it was until you heard the voice?
22    A   No, sir.
23    Q   Was it quickly?
24    A   I don't remember.
25    Q   Okay.  Now, do you know if this is body cam

**Page 343**

1   footage from Spurgeon or --
2     A   Yes, sir.  It is body camera footage.
3     Q   Okay.  All right.
4          MR. WILLIAMS:  It shows it on the thing
5   there.
6          (Whereupon, video playing.)
7     Q   Did Spurgeon ever tell you that she thought
8   he was having a mental breakdown?
9     A   No, sir.
10    Q   Would that information have been helpful to
11   you?
12    A   Yes, sir.
13    Q   Would you have done anything differently when
14   you approached out there if you thought there was
15   someone out calling for help that had a mental
16   breakdown going on?
17         MS. NGUYEN:  Object to form.
18         MR. WILLIAMS:  Object to form.
19         THE WITNESS:  No, sir, I don't.  No, sir.
20   BY MR. SPURLIN:
21    Q   Wouldn't it have been prudent to summon
22   mental health people?
23         MS. NGUYEN:  Object to form.
24         THE WITNESS:  Some of the mental health
25   people's not going to do anything because they're

| | |
|---|---|
| Page 344 | Page 345 |

**Page 344**

1   not going to come on scene until we control that
2   scene.
3          (Whereupon, video playing.)
4   BY MR. SPURLIN:
5     Q   Okay.  What I want you to look for is do you
6   ever apply any pressure to his body when he's down?
7     A   Okay.
8     Q   Do you at this point put your right knee on
9   his neck?
10    A   No, sir.  It's on his back at that point.
11    Q   On his back.  What part of his back?
12    A   It's his upper part of his back, around the
13   shoulder blades.
14    Q   His right shoulder blade, if he's facedown?
15    A   I can't tell which shoulder blade it would
16   be.  I don't know.
17    Q   If he's facedown --
18    A   Right.
19    Q   -- his right side would be to you, his left
20   side would be to Spurgeon, correct?
21    A   Yes, sir.
22         (Whereupon, video playing.)
23    Q   Can you hear the heavy breathing?
24    A   Yes, sir.  I mean, that's us.
25    Q   All of you?

**Page 345**

1     A   Yes, sir.
2          (Whereupon, video playing.)
3     Q   Is your knee still on his shoulder blade?
4     A   It is.
5     Q   Is his face in the dirt?
6     A   His cheek is, yes.
7     Q   Is that where Spurgeon told you to move, you
8   might restrict his breathing?
9     A   Yes, sir.
10    Q   Okay.  And you did that?
11    A   Yes, sir.  And at that point, you can see
12   that my knee had slipped to his neck.
13    Q   Okay.  And to be fair, when he told you to
14   move the knee off that area, it had been there for a
15   minute or so, correct?
16         MR. WILLIAMS:  Object to the form.
17         THE WITNESS:  No, sir.
18   BY MR. SPURLIN:
19    Q   How long had it been there?
20    A   It was applied to the upper part of his back.
21   However, you can see in the video clearly I'm not
22   putting much pressure there.  The majority of the
23   pressure -- the majority of my weight is on my other
24   knee.
25    Q   Okay.



Page 346

1     (Whereupon, video playing.)
2     Q   I may not have backed that up long enough.
3     What I'm asking is did Spurgeon tell them he
4  needs EMS for him or for McBrayer?
5     Could you hear that or was I talking over it?
6     A   No, sir, I heard that.
7     Also, what I would like to note is we already
8  identified that the TASER was deployed, so EMS was
9  already prepared to handle that situation as well.
10    Q   Was it your testimony that anytime a TASER is
11 deployed, the policy of the sheriff's department is
12 that the person get medical care and attention?
13    A   Yes, sir.
14    Q   Okay.  Well, earlier I asked you that.  I
15 said, did he need medical care and attention if he had
16 been in the dirt struggling for ten minutes, if he was
17 having a mental health episode, if had been tased six
18 times for a 30 second duration, if he was limp, and if
19 he was unconscious.  And your answer was, no, I didn't
20 know of any reason he needed medical evaluation or
21 care?
22    MR. WILLIAMS:  Object to form because you
23    strung all those things together --
24 BY MR. SPURLIN:
25    Q   Is that -- is that what you said?

Page 347

1     MR. WILLIAMS:  -- and I objected.
2     THE WITNESS:  That is what I stated, yes,
3  sir.
4  BY MR. SPURLIN:
5     Q   But now you're saying that anytime anybody's
6  tased, it's the policy that they get medical
7  evaluation, right?
8     A   Yes, sir.
9     Q   Okay.  Bright-line rule, if anybody is tased
10 and they're not limp, they're not unconscious, they're
11 not having a mental health episode, they get care and
12 evaluation, right?
13    MR. WILLIAMS:  Object to form.
14    THE WITNESS:  Yes, sir.
15 BY MR. SPURLIN:
16    Q   All right.  How many officers were present
17 when he was loaded into the vehicle?
18    A   I'm not sure, sir.
19    Q   Wasn't it you, Spurgeon, Hancock, Calderon,
20 and the other guy that got down on his legs?  I forgot
21 his name.  What's his name?  Do you remember?
22    A   I believe it was -- was that Scott Parker?
23    Q   Yes.  Thank you.  That was five, right?
24    A   Yes, sir.
25    Q   Henderson was there too, right, six?

Page 348

1     A   I don't know if he was there.  Well, he was
2  there when we loaded him in the car, yes.
3     Q   Okay.  Now, let me ask you this question.  Do
4  you understand in this case that Axon's position is
5  that they have clearly, thoroughly and completely
6  warned everybody who uses the TASER of all the risks,
7  training materials and instructions that should be
8  followed when using the TASER?
9     Do you understand that?
10    MS. NGUYEN:  Object to form and foundation.
11    THE WITNESS:  Well, I can't be clear on
12    Axon's position on anything.
13 BY MR. SPURLIN:
14    Q   You don't have any understanding on that?
15    MS. NGUYEN:  Same objections.
16    THE WITNESS:  You asked -- you asked me if I
17    was clear on their position.  I can't be clear on
18    Axon's position.
19 BY MR. SPURLIN:
20    Q   Okay.  But as we sit here, the night that you
21 deployed this, you had no understanding of what excited
22 delirium was, right?
23    MR. WILLIAMS:  Object to form.
24    THE WITNESS:  Correct.  I didn't know enough
25    about excited delirium.

Page 349

1  BY MR. SPURLIN:
2     Q   Your testimony is that you targeted the chest
3  area, correct?
4     MR. WILLIAMS:  Wait a minute.  Wait a minute.
5     You're not going to go back and ask these
6     questions again.
7     MR. SPURLIN:  If you don't hush, I might.
8     MR. WILLIAMS:  He has asked and answered that
9     numerous times.  I'm going to call off the
10    deposition.
11    MR. SPURLIN:  If you want to.
12    MR. WILLIAMS:  I don't think the Judge is
13    going allow you to continue.  If we were in the
14    courtroom, he would, counselor, move on.  You've
15    asked that and he's already testified numerous
16    times.  And now you're wanting to go back and --
17    MR. SPURLIN:  No, I'm not.
18    MR. WILLIAMS:  -- review what he testified
19    to, no.  No.
20    MR. SPURLIN:  I'm trying to find out was he
21    adequately warned.
22    MR. WILLIAMS:  Don't ask the same questions.
23    You can ask that question and he already answered
24    it before you --
25    MR. SPURLIN:  Are you instructing him not to



Page 350

1  answer that question?
2      MR. WILLIAMS:  The same questions you've
3  asked about ten times, yes.
4      MR. SPURLIN:  All right.  That question?
5      MR. WILLIAMS:  No.  You've already -- no,
6  the --
7  BY MR. SPURLIN:
8      Q  Did you target his chest area that night?
9      MR. WILLIAMS:  He's already answer --
10 answered that question.
11     MR. SPURLIN:  You're instructing him not to
12 answer?
13     MR. WILLIAMS:  Yes.
14 BY MR. SPURLIN:
15     Q  Had you ever been trained that you should not
16 target the chest area --
17     MR. WILLIAMS:  He's already answered that
18 question multiple times, and we've gone over the
19 policies and the warnings.  Come on, man.
20 BY MR. SPURLIN:
21     Q  -- by Major Torres?
22     MR. WILLIAMS:  You've already asked him those
23 questions.
24 BY MR. SPURLIN:
25     Q  Yes or no?

Page 351

1      MS. NGUYEN:  Object to form.
2      THE WITNESS:  I was advised -- I was advised
3  that it is not ideal to target the chest area.
4  However, it's going to be -- the situation is
5  going to dictate it.  So it is not ideal to target
6  the chest area, no.
7  BY MR. SPURLIN:
8      Q  All right.  I'm going to ask you a question
9  about Exhibit 1, I believe it is.
10     Did you prepare this report that night?
11     A  It would -- no, sir.  It would have been the
12 day -- that day.
13     Q  Okay.  Like this happened early in the
14 morning, and you prepared it that same day?
15     A  Correct.
16     Q  Okay.  At some point later in that day,
17 correct?
18     A  Correct.
19     Q  Okay.  Had you ever received any training
20 from Torres or anyone else that drive stun should not
21 be repeated more than once?
22     A  No, sir.
23     Q  Did the drive stun ever appear to have any
24 effect on him for compliance or control?
25     A  No, sir.

Page 352

1      Q  Did he respond to that as if it was painful
2  by rolling away from it?
3      MS. NGUYEN:  Object to form.
4      THE WITNESS:  It appears as if he did.
5  BY MR. SPURLIN:
6      Q  Okay.  So based on your observations of the
7  scene, you do think current went into him through the
8  drive stun?
9      A  Yes, sir.
10     Q  Okay.  Is it your testimony that you targeted
11 the chest or that happened to be where he got shot?
12     MR. WILLIAMS:  Object to form.
13     MS. NGUYEN:  Object to form.
14     THE WITNESS:  I don't think that I would
15 deliberately target the chest.  I mean, in that
16 situation, I really didn't have any other choice
17 or any other option as far as a target area.
18 BY MR. SPURLIN:
19     Q  Okay.  So because you had no other choice,
20 you aimed for his chest?
21     A  No, sir, I didn't.  I didn't have time to aim
22 for anything.
23     Q  Your testimony today is you did not aim at
24 all?
25     A  I didn't have time to aim.  If you look at

Page 353

1  the proximity, I really --
2      Q  I just want to be clear.  You did not aim?
3  You just --
4      A  No, sir.
5      Q  -- turned and shot?
6      A  I mean, I --
7      MS. NGUYEN:  Object to form.
8      THE WITNESS:  Yeah.
9      MR. WILLIAMS:  Object to form.
10     THE WITNESS:  To some degree, yes, I aimed.
11 Was I deliberately aiming for his chest, not
12 specifically.
13 BY MR. SPURLIN:
14     Q  Okay.  And, again, I'm going to remind you of
15 what you said and make sure I understand.
16     MR. WILLIAMS:  We've already actually gone
17 through this one time.
18     MR. WILLIAMS:  No.  No.  No.
19     MR. WILLIAMS:  You did the same thing.  You
20 pulled it out and asked him about it.
21     MR. SPURLIN:  He has now changed his story to
22 say I didn't have time to aim.
23     MR. WILLIAMS:  Go ahead.
24     MR. SPURLIN:  I'm going to get this part
25 clear and then we're going to end.



Page 354

1        MR. WILLIAMS:  Go ahead.
2   BY MR. SPURLIN:
3        Q   Your statement was my intention was, yes, for
4   one of the prongs to go toward the chest area.
5   Ideally, I would want one toward the chest area and one
6   lower on the stomach area.
7        A   Okay.
8        Q   That's what you told Mr. Webster?
9        A   Okay.
10       Q   Now, after all of this you're repeating it,
11  your answer has been in the last hour, I didn't have
12  time, he was running toward me?
13       A   No, sir.  That -- that doesn't specifically
14  state anything about aiming.  I'm telling you that I
15  did not have time to aim at a specific target area.
16       Q   Okay.
17       A   However, with the position that he was
18  running at me, the chest area is all I had available.
19       Q   I understand in exigent circumstances you may
20  have to aim quickly.
21       A   Yes, sir.
22       Q   But you said my intention -- my intention,
23  not accidentally, not because of lack of time -- my
24  intention was for one of the prongs to go towards the
25  chest area.

Page 355

1        Is that not aiming?
2        A   No, sir.
3        Q   Okay.
4        A   When you say "aiming," you -- you indicate
5   that I am looking down that TASER and I am -- and I am
6   deliberately shooting for a specific area, okay.
7        What I'm telling you is Mr. McBrayer was
8   running at me, okay.  He was in a crouched position as
9   if you would be if you were sprinting towards somebody,
10  okay, meaning leaving the only area that I have being
11  in that chest area.
12       Q   Okay.  So are you saying because it was the
13  only area I had, I intended to shoot him in the chest?
14  Is that what you're saying?
15       MR. WILLIAMS:  Chest area.
16       THE WITNESS:  Chest area, yes.
17  BY MR. SPURLIN:
18       Q   So you told Ms. Nguyen that you in
19  fact were in a position with your arms extended to
20  shoot him, right?
21       A   No, sir.  She asked me to demonstrate what
22  the position should be.
23       Q   Were you in that position that night?
24       A   I clearly was not.
25       Q   Okay.  So when she was trying to say you

Page 356

1   weren't 10 feet away, you said you were 10 feet away
2   when you deployed, correct?
3        MR. WILLIAMS:  Object to form.
4        MS. NGUYEN:  Join.
5        MR. WILLIAMS:  It's an approximation --
6   BY MR. SPURLIN:
7        Q   Isn't that what you said?
8        MR. WILLIAMS:  -- with his prior testimony.
9   And you're going back again to prior testimony.
10       MR. SPURLIN:  I am because he keeps changing.
11       THE WITNESS:  I stated that I was
12  approximately.  Again, I don't know exactly how
13  far I was away.
14  BY MR. SPURLIN:
15       Q   Okay.  And after you gave that testimony, she
16  then tried to get you to say you had your arms out
17  extended and how many feet is it from the end of your
18  hand to your chest.
19       Do you remember that question?
20       MS. NGUYEN:  Object to the form.
21       THE WITNESS:  That is the answer I answered.
22       MS. NGUYEN:  I did not try to get him to say
23  anything.
24  BY MR. SPURLIN:
25       Q   And you said 3 to 3 and a half feet from your

Page 357

1   chest to your hand, right?
2        MR. WILLIAMS:  Object to form.
3        THE WITNESS:  Yes, sir.
4        MR. WILLIAMS:  Actually, I think he said 3 to
5   4 feet --
6        THE WITNESS:  I never --
7        MR. WILLIAMS:  -- which is probably a little
8   long.
9        MR. SPURLIN:  Way long.
10       MR. WILLIAMS:  Object.
11       THE WITNESS:  I never indicated --
12       MR. WILLIAMS:  So it's possibly --
13       THE WITNESS:  I never indicated that that's
14  where I deployed that TASER from.
15  BY MR. SPURLIN:
16       Q   Okay.  Well, were your arms extended or not
17  when you deployed the TASER?
18       A   You would have to look at the video.
19       Q   You don't know?
20       A   I don't recall.
21       Q   Okay.  So a minute ago when you told me you
22  were not in that position with your arms extended -- do
23  you remember that or not remember that?
24       A   Clearly I wasn't in that position.
25       Q   Okay.  So do you remember Ms. Nguyen then





Page 358

1  saying you were within 7 feet then and that's not ideal
2  for deployment?  Do you remember that?
3      A   Yes, sir.
4          MS. NGUYEN:  Object to the form.
5  BY MR. SPURLIN:
6      Q   It's not your testimony that you deployed
7  from 7 feet away, is it?
8          MS. NGUYEN:  Object to form.
9          MR. WILLIAMS:  Object to form.
10         THE WITNESS:  Sir, my testimony is I don't
11  know how far I was away.
12 BY MR. SPURLIN:
13     Q   And when you were asked by Ms. Nguyen, you
14 said 10 feet.  That was your best estimate, correct?
15     A   That is an estimate.
16     Q   Do you know if your hands were extended in
17 front of your chest?
18     A   I believe they were, but not --
19     Q   How far?
20     A   I mean, you can get a tape measure and
21 measure it, if you like.
22     Q   Can you show me?
23     A   No, I can't.
24     Q   They were not fully extended?
25     A   I don't know.

Page 359

1      Q   You don't know if they were half extended?
2      A   I don't know.
3      Q   Okay.  Thank you, sir.
4      A   Yes, sir.  Thank you.
5          MS. NGUYEN:  Do you have anything?
6          MR. WILLIAMS:  No.
7          MS. NGUYEN:  I hate to do this.
8          MR. WILLIAMS:  And I hope you don't.
9          MS. NGUYEN:  I do, but it's going to be
10 quick.
11         MR. WILLIAMS:  All right.
12         MS. NGUYEN:  Just a couple of things.
13         FURTHER EXAMINATION
14 BY MS. NGUYEN:
15     Q   And, Deputy, I know that you've had a very
16 long day, and I appreciate you hanging in there.
17     A   Yes, ma'am.
18     Q   I only just want to -- have a couple of
19 things.  But this is the last time that I'll get to
20 speak with you so I just need to cover these real
21 quick.
22         THE VIDEOGRAPHER:  Can you put your mic on,
23 please.
24         MS. NGUYEN:  Oh, sure.
25         MR. SPURLIN:  You can have mine.

Page 360

1  BY MS. NGUYEN:
2      Q   Okay.  You were asked a lot of questions by
3  Mr. Spurlin about why you activated your TASER, why you
4  activate it -- activated it at the time that you did.
5          Do you remember that line of questioning?
6      A   I do.
7      Q   By activating the TASER or taking the safety
8  off, doesn't it also turn on the central information
9  display, that little screen on the front of the TASER?
10     A   It does.
11         MR. SPURLIN:  Object to the form.
12 BY MS. NGUYEN:
13     Q   Did you learn about that screen in your TASER
14 training?
15     A   Yes, I did.
16     Q   And that screen will actually tell you
17 whether there's any faults with your -- your device,
18 correct?
19     A   Yes, it will.
20         MR. SPURLIN:  Object to the form.
21 BY MS. NGUYEN:
22     Q   And doesn't your training entail and include
23 that you should activate your device when you pull it
24 out so that way you know if there's a fault before you
25 actually have to deploy it?

Page 361

1          MR. SPURLIN:  Object to the form.
2          THE WITNESS:  I don't recall.
3  BY MS. NGUYEN:
4      Q   By activating the device, you can see if
5  there is --
6      A   Yes.
7      Q   -- a fault error on your device, right?
8      A   Yes, ma'am.
9          MR. SPURLIN:  Object to the form.  He ain't
10 testified to anything.
11 BY MS. NGUYEN:
12     Q   And it can also tell you whether there's
13 actually a cartridge in your device, right?
14         MR. SPURLIN:  Object to the form.
15         THE WITNESS:  Yes.
16 BY MS. NGUYEN:
17     Q   So by activating, you testified it activates
18 the flashlight, it activates the laser and it also
19 activates the CID screen?
20         MR. SPURLIN:  Object to the form.  That's
21 your testimony, not his.
22         MS. NGUYEN:  You can -- I do not want your
23 speaking objections.  You can object to the
24 form --
25         MR. SPURLIN:  I'm making what I want.



Page 362

1      MS. NGUYEN: -- and that's it.  And that's
2  all that's permitted under the rules.
3      MR. SPURLIN:  You sitting here objecting and
4  he says he doesn't remember anything about his
5  training until you start questioning him.
6      MS. NGUYEN:  That's your -- that's your
7  opinion.
8      MR. SPURLIN:  Okay.
9      MS. NGUYEN:  Keep your objections to what
10  we've already agreed to and what's permitted under
11  the rules.
12  BY MS. NGUYEN:
13      Q    Okay.  Drive stuns.  Based upon your
14  training, do drive stuns work if only one probe is
15  touching the skin?
16      A    No, ma'am.
17      Q    What is required for a drive stun to even
18  have the potential of having pain compliance?
19      A    Both probes have to be connected to the skin.
20      Q    And if one probe disconnects?
21      A    Then it doesn't have any effect.
22      Q    Doesn't activate?
23      A    No, ma'am.
24      Q    In listening to the video, did you hear the
25  -- you started to testify, but I think you were cut off

Page 363

1  by Mr. Spurlin.
2      Q    But did you hear the beeping sound toward the
3  end of the cycle?
4      A    I didn't.
5      Q    What does that beeping sound mean?
6      A    That indicates that you're coming to the end
7  of that cycle.
8      Q    And does that beeping sound -- do you know
9  when it starts at the end of the cycle?
10      A    I don't remember it.
11      Q    Okay.  That's fine.
12      But it will start beeping when you get to the
13  end of the cycle, right?
14      MR. SPURLIN:  Object to the form.
15      THE WITNESS:  Correct.
16  BY MS. NGUYEN:
17      Q    Now, the warnings -- do you have Exhibit 8 in
18  front of you?
19      A    I do.
20      Q    Page two, that second paragraph where it
21  talks about "Some individuals may be particularly
22  susceptible."
23      Do you see that?
24      A    You said the second paragraph?
25      Q    Correct, of page two.

Page 364

1      A    Yea.  Oh, page two, yes.
2      Q    Do you remember --
3      MR. SPURLIN:  Let me make -- let me make an
4  objection for the record.  When I questioned him
5  about Exhibit 8, you all screamed and hollered at
6  me and said it's already been established that he
7  wasn't trained with eight, he was trained with
8  nine.  And now you want to use the one that you
9  and Mr. Williams said he wasn't trained with.
10      MR. WILLIAMS:  I didn't say he wasn't trained
11  with it.
12      MR. SPURLIN:  So at least let's be fair.
13      MR. WILLIAMS:  I just said --
14      MS. NGUYEN:  Oh, my gosh.
15      MR. WILLIAMS:  I just said this is the one
16  that we produced.  I didn't know which one he was.
17      MR. SPURLIN:  No.  No.
18      MR. WILLIAMS:  So I just wanted you to know
19  that's --
20      MR. SPURLIN:  You all told me not to question
21  him with eight, to use nine.
22      MR. WILLIAMS:  No, I didn't.
23      MS. NGUYEN:  No, we didn't.
24      MR. SPURLIN:  Yes, you did.
25      MR. WILLIAMS:  I just said the one that we

Page 365

1  produced is this one --
2      MS. NGUYEN:  No, we didn't.
3      MR. WILLIAMS:  -- so I don't know which one
4  he was trained on.  That's what he said.  I didn't
5  say that.
6      Why are you misrepresenting what we even say?
7      MR. SPURLIN:  Oh, I remember what you said.
8      MR. WILLIAMS:  Is that your MO?  I mean,
9  that's what I've heard about you.  And you seem to
10  have --
11      MR. SPURLIN:  Oh, you've heard?
12      MR. WILLIAMS:  You seem to have demonstrated
13  that.
14      MR. SPURLIN:  Okay.  Who told you?
15      MR. WILLIAMS:  I don't know who --
16      MR. SPURLIN:  You don't know?  You're going
17  to make it up.
18      MR. WILLIAMS:  I don't know who hadn't told
19  me.
20      MS. NGUYEN:  All right.
21      MR. WILLIAMS:  I don't know who hadn't told
22  me, but, you know.
23      MS. NGUYEN:  For the sake of saving time.
24      MR. WILLIAMS:  I'm trying to make sure that
25  the record is clear of what we produced and what





| | |
|---|---|
| **Page 366** | **Page 367** |

<table>
<tr><td>

1   the possible issue might be.  Now you're
2   representing that we said something else, and
3   that's completely improper.
4       MR. SPURLIN:  I know what you said.
5       MS. NGUYEN:  All right.  For the record --
6       MR. SPURLIN:  Do you not remember --
7       MR. WILLIAMS:  We'll look at the record.
8       MR. SPURLIN:  -- when you look back at
9   Spurgeon's exhibit that I used, that you pulled
10  through it and said, yeah, see, there's the --
11  it's the -- it's the March one.  You said that.
12      MR. WILLIAMS:  That's what I said.
13      MR. SPURLIN:  Yes.
14      MR. WILLIAMS:  I said this is the one that we
15  produced.
16      MR. SPURLIN:  No.
17      MR. WILLIAMS:  I never said this is not the
18  one that he was trained on.
19      MR. SPURLIN:  Go ahead.
20      MS. NGUYEN:  Okay.  For the record, he
21  testified he doesn't know which one he's trained
22  on.  For the record, I'm asking him about a
23  paragraph he's already testified, and we've all
24  acknowledged is the exact same --
25      MR. WILLIAMS:  Same thing.

</td><td>

1       MS. NGUYEN:  -- in both Exhibit 8 and 9.  So
2   it doesn't matter which exhibit I question him on.
3  BY MS. NGUYEN:
4    Q  So going back to Exhibit 8, page two,
5  paragraph two.
6    A  Yes, ma'am.
7    Q  Deputy Tripp, you've already stated that that
8  paragraph is that exact same paragraph in Exhibit 9,
9  right?
10    A  Correct.
11    Q  Okay.  So Mr. Spurlin asked you some
12  questions about this and whether this prohibited you
13  from using a TASER device on any of these individuals
14  known to be susceptible.
15      Do you recall that line of questioning?
16      MR. SPURLIN:  Object to the form.
17      THE WITNESS:  I do.
18      MR. SPURLIN:  That wasn't the question asked.
19  BY MS. NGUYEN:
20    Q  Okay.  Now, we've already identified and
21  you've already testified today that you did not know
22  any of Mr. McBrayer's medical conditions, you didn't
23  have an opportunity to learn more, correct?
24      MR. SPURLIN:  Object to the form.
25      THE WITNESS:  That is correct.

</td></tr>
</table>

| | |
|---|---|
| **Page 368** | **Page 369** |

<table>
<tr><td>

1  BY MS. NGUYEN:
2    Q  Okay.  So even assuming you did, is there
3  anything in this paragraph that prohibits you from
4  deploying a TASER CEW on an individual that is
5  attacking you?
6      MR. SPURLIN:  Object to the form.
7      THE WITNESS:  No, there's not.
8  BY MS. NGUYEN:
9    Q  The white foam on the mouth, the first time
10  that you noticed that was as he was attacking you and
11  running at you, correct?
12      MR. SPURLIN:  Object to the form.
13      THE WITNESS:  Correct.
14  BY MR. SPURLIN:
15    Q  So right before a second, maybe two seconds
16  before you deployed your TASER CEW?
17      MR. SPURLIN:  Object to the form.
18      THE WITNESS:  Yes, ma'am.
19      MS. NGUYEN:  That's all I have, Deputy Tripp.
20  I appreciate your time today.
21      MR. WILLIAMS:  I do actually.  I thought of
22  one thing I just wanted to make clear for the
23  record.
24            EXAMINATION
25  BY MR. WILLIAMS:

</td><td>

1    Q  Deputy Tripp, earlier when Mr. Spurlin was
2  playing Spurgeon's body cam, did you hear him dispatch
3  71 or sound the radio 71 dispatch TASER deploy?
4    A  That was me.
5    Q  Oh, that was you?
6    A  Yes.
7    Q  Okay.  Well, I heard it on his --
8    A  Yeah, I'm Tip 71.
9    Q  Okay.  And what does that mean to dispatch?
10    A  Any time that I deploy a TASER, it identifies
11  that they need to have EMS en route to our location to
12  check that patient.
13    Q  Okay.  All right.
14      MR. WILLIAMS:  No further questions.  Thanks.
15      THE VIDEOGRAPHER:  Okay.  Do we close the
16  session?
17      MS. NGUYEN:  Yes.
18      THE VIDEOGRAPHER:  All right.  Stand by,
19  please.
20      This concludes the deposition of Deputy
21  Anthony Tripp, consisting of five mediums.  The
22  time is 6:13 we're going off the record.
23      (Whereupon, video record was concluded.)
24      THE COURT REPORTER:  I just have to get any
25  transcript orders on the record.

</td></tr>
</table>




Page 370

1      Are you ordering?
2      MS. NGUYEN:  Yeah, we do the bundle.
3      THE COURT REPORTER:  Oh, you have a standing
4  order?
5      MS. NGUYEN:  Yes.
6      THE COURT REPORTER:  Mr. Spurlin, you already
7  told me what you wanted, a condensed emailed.
8      MR. SPURLIN:  Yes.
9      THE COURT REPORTER:  Mr. Williams, do you
10  need a copy?
11      MR. WILLIAMS:  Yes, of course.  And I'll have
12  the errata sheet for reading.
13      THE COURT REPORTER:  Do you prefer
14  electronic?
15      MR. WILLIAMS:  Yes, you can send it
16  electronic.  I still like to get the condensed and
17  the full sized.
18      THE COURT REPORTER:  Okay.
19      MR. WILLIAMS:  I do not need the video.
20      THE COURT REPORTER:  Okay.  Thank you all.
21      (Whereupon, the deposition was concluded at
22  6:20 p.m. and signature was reserved.)
23
24          - - -
25

Page 371

1              DISCLOSURE
2  STATE OF GEORGIA:
3  COUNTY OF TIFT:
4
5      Pursuant to Article 10.B. of the Rules and
   Regulations of the Board of Court Reporting of the
   Judicial Council of Georgia, I make the following
6  disclosure:
7      I am a Georgia Certified Court Reporter
   reporting for Magna Legal Services, Seven Penn Center,
8  8th Floor, Philadelphia, Pennsylvania 19103,
   866-624-6221.
9
10      Magna Legal Services is not disqualified from
   a relationship of interest under the provisions of
   O.C.G.A. 9-11-28(c).
11
12      Magna Legal Services was contacted by the
   offices of Axon Enterprise, Inc. to provide court
   reporting services for this deposition.
13
14      Magna Legal Services will not be taking this
   deposition under any contract that is prohibited by
15  O.C.G.A. 15-14-37 (a) and (b).
16      Magna Legal Services has no exclusive
   contract to provide reporting services with any party
17  to the case, any counsel in the case, or any reporter
   or reporting agency from whom a referral might have
18  been made to cover this deposition.
19      Magna Legal Services will charge its usual
   and customary rates to all parties in the case, and a
20  financial discount will not be given to any party to
   this litigation.
21      A review of the transcript was requested.
22
23
24      _____
        Michelle Subia, RPR, CCR
        Certificate No. 5817-0834-4721-4080
25

Page 372

1              CERTIFICATE
2  STATE OF GEORGIA:
3  COUNTY OF TIFT:
4
5      I, Michelle Subia, Certified Court Reporter,
6  State of Georgia, Certificate No. Certificate No.
7  5817-0834-4721-4080, CERTIFY that, acting in such
8  capacity, I reported the testimony herein and, on the
9  foregoing pages, have transcribed a true and correct
10  transcript thereof.  A review of the transcript was
11  requested.
12      I FURTHER CERTIFY that I am not counsel for,
13  nor am I related to any party to the above case, nor am
14  I interested in the event or outcome.
15      WITNESS my hand and official seal as
16  Certified Court Reporter, State of Georgia, this 5th
17  day of October, 2021.
18
19
20      _____
21      Michelle Subia, RPR, CCR
        Certificate No. 5817-0834-4721-4080
22
23
24
25

Page 373

1          E R R A T A  P A G E
2      IN RE:  McBrayer vs. Scarbrough, et al.
3  I, ANTHONY R. TRIPP, JR.,  the witness herein, have
       read the transcript of my testimony and
4      the same is true and correct, to the best
       of my knowledge, with the exception of the
5      following changes noted below, if any:
6  Page / Line /     Change      / Reason
7  _____  _____
8  _____  _____
9  _____  _____
10  _____  _____
11  _____  _____
12  _____  _____
13  _____  _____
14  _____  _____
15  _____  _____
16  _____  _____
17  _____  _____
18  _____  _____
19  _____  _____
20  _____  _____
21  _____  _____
22  _____  _____
23  _____  _____
24  _____  _____
25





Page 374

1           E R R A T A   P A G E  (Continued)
2      Page / Line /        Change        / Reason
3      _____    _____
4      _____    _____
5      _____    _____
6      _____    _____
7      _____    _____
8      _____    _____
9      _____    _____
10     _____    _____
11     _____    _____
12     _____    _____
13     _____    _____
14     _____    _____
15     _____    _____
16     _____    _____
17     _____    _____
18     _____    _____
19     _____    _____
20

       _____
21              ANTHONY R. TRIPP, JR.
22     Sworn to and subscribed before me,
       this the _____ day of _____, 20___.
23

       _____
24              Notary Public
               My commission expires:
25





**A**

**a.m** 2:6 61:8 249:24
250:7
**Aaron** 1:4,6,6,9 5:5
**ability** 65:6,9,13,15
110:17 143:13
236:24 237:7
**able** 23:9 24:7
35:17 41:8,8
43:20 48:10 54:16
55:3,13 56:9
62:22,23 69:11,13
69:21 70:20,23,25
71:4,8 72:23,23
73:9 74:3,6,8,22
75:3,4,12,15
108:12 109:10
111:25 117:25
123:2 137:9 138:7
189:21 209:6
225:12 285:2
287:25 295:20
297:8 333:9
**abnormal** 324:20
**abraded/eroded**
90:2,16
**abrasions** 331:8,19
**absolute** 317:15
**absolutely** 46:6
61:5 146:21
188:25 240:12
242:20 287:11
338:15
**abuse** 102:6 106:3
**academy** 11:19,20
11:21 12:12,17,19
162:6 167:14
176:14 177:1
274:8
**accident** 24:14
251:23 252:1,5,8
252:9,12,13,15
331:16
**accidentally** 273:1
354:23

**accomplish** 185:22
**account** 336:17
**accuracy** 100:5
**accurate** 20:10
38:4,10 42:6 54:7
57:7,17 66:14
67:12 79:2 100:18
103:5 124:17
**accurately** 126:4
172:4 215:23
216:23 217:6
219:19 244:2
250:16
**accusing** 99:12
**accustomed** 13:10
**achieve** 87:8 88:20
220:7
**acknowledge** 82:22
224:7
**acknowledged**
228:12,25 366:24
**acknowledging**
290:17
**Acknowledgment**
82:20
**acronym** 168:1
**act** 62:8 262:3,7
**acting** 36:2 39:23
209:12 210:4,20
260:6,11,15,19
261:5,14 265:3,5
266:8,11 289:10
302:20,22 372:7
**action** 1:9 211:23
**actions** 48:13
108:13
**activate** 41:13,14
72:20 130:18,22
131:21 360:4,23
362:22
**activated** 41:18,19
42:3,10 129:21
130:5,11,13,21
131:3,7,9,11,24
136:15 360:3,4
**activates** 361:17,18

361:19
**activating** 42:12
360:7 361:4,17
**active** 76:24,24
77:8
**actively** 50:17,18
60:16 72:9 75:1
178:17,20,22,25
305:7
**activities** 77:1
307:10
**activity** 249:12
**actual** 199:14
**added** 123:16
**additional** 15:22
16:1 21:1,6 55:8
137:10
**address** 5:13 22:4,5
22:19 23:18 24:23
**adequately** 349:21
**administration**
17:15
**Administratix** 1:3
**Administratrix** 5:5
**adopt** 143:20
**adopted** 141:2
142:23 144:23
**adrenaline** 93:17
107:16 244:1
**advanced** 61:16,19
**advancing** 107:1
213:15 215:2
**adverse** 43:21,23
43:25
**advice** 266:7
**advised** 351:2,2
**aerial** 4:16,17,17
4:18,18 22:15
23:5,10
**affect** 108:17
174:19 227:1
**affirm** 6:9
**affirmatively** 9:15
113:19 134:1
162:9 186:14
295:6

**affirmed** 146:9
**age** 161:19
**agencies** 13:18
15:19 97:11 120:2
259:20
**agency** 85:24 86:5
371:17
**agents** 166:5
**aggressive** 38:12
76:24,24 77:8
208:4 291:9
**agitated** 38:3,15,16
38:25 40:4 49:9
104:10 239:25
240:4 291:6,7
**agitation** 102:5
104:6 238:20
**ago** 118:10 138:11
151:7 152:2,17
357:21
**agree** 50:7,12 66:3
76:11 83:12 84:1
84:5,18 85:12,23
85:23 86:7 90:25
91:17 94:20,23
95:8 96:1 107:20
117:5,22,24 120:3
120:14,23 137:3
142:22 173:2,24
176:4,22,24 177:3
181:4 186:23
187:14,21 188:11
188:12,21 190:5
190:11 191:7
192:20 235:16,21
245:13 270:24
271:3 273:8,12
279:19 291:25
301:8 316:10
327:17,18
**agreed** 143:7
362:10
**Agreement** 157:6
**ahead** 8:22 29:3
45:4,8 47:19
59:25 63:5 81:8

115:3 167:5
170:14 192:11
211:6 240:2
261:22 290:22
293:18 317:4
353:23 354:1
366:19
**aim** 133:3 134:23
135:1,5 136:3,17
136:20,23 212:15
217:14 352:21,23
352:25 353:2,22
354:15,20
**aimed** 205:18
206:16 207:16
352:20 353:10
**aiming** 135:12,24
137:6 220:6
225:25 226:14
353:11 354:14
355:1,4
**ain't** 361:9
**air** 49:16 328:10
**al** 5:6,9 373:2
**alert** 37:21 297:10
**alerted** 126:9,10
**alerts** 113:15
**aliases** 7:13
**all's** 172:7
**allegation** 9:6
**allow** 158:1 200:22
201:2,22 232:13
349:13
**allowed** 202:24
**altercation** 110:4
325:12,17
**Altman** 3:18 5:16
**AMA** 233:2
**ambiguous** 261:8
**amended** 169:14
**American** 103:11
103:13
**amount** 70:18 92:7
182:5 305:10,22
**Amy** 3:10 5:22 7:18
61:3



amynguyen@axo...
3:12
and/or 101:20
102:6
ANGIE 1:7
angled 33:1
angry 38:6 48:11
49:9 290:8,9
annotated 115:23
annual 198:4
answer 8:12,15,22
14:10 68:15
100:18 125:11,12
179:2 185:2
189:22 203:17
204:8,25 215:14
216:21 217:1
233:9 238:4 248:3
248:4 252:18
264:10 270:10
284:3,18 306:22
307:1 314:11
317:25 323:5
346:19 350:1,9,12
354:11 356:21
answered 122:8
183:5 195:5
294:20 349:8,23
350:10,17 356:21
answering 14:12
answers 14:5
122:11,12
anterior 89:22,24
90:11,13 91:13
Anthony 1:15,23
2:4 4:3 5:3 7:1,11
81:17 121:15,20
218:10,15 323:15
323:20 369:21
373:3 374:21
anybody 205:19
238:14 262:10
319:11 326:4
332:20 347:9
anybody's 239:15
347:5

anymore 115:5
anyone's 274:12
anytime 346:10
347:5
anyway 209:1
apart 88:20 240:15
apologize 57:15
apparently 27:2
202:6
appear 70:13 100:2
198:17 230:11
247:20,22 303:18
310:10 312:2
333:9 335:10
351:23
appearances 3:1
5:20
appeared 38:24
100:1 111:16
299:21 312:4
APPEARING 3:17
appears 28:3 91:4
101:12 156:21
292:4 299:16
331:5 332:9 342:5
352:4
Applicant 4:10
application 96:20
139:25 140:10
177:11 202:21
236:25 241:11
298:14,15 301:19
applications 139:6
139:11,15 140:13
176:2 177:4,8,18
177:21 178:2
179:13 180:13,21
182:4 183:4
240:11 242:25
244:4
applied 73:4 179:7
201:3 243:9
273:10 279:6
292:8 299:11
308:22 345:20
apply 132:23 133:3

178:5,9 179:19
180:6,14 181:9
260:11 304:1
344:6
applying 70:18
180:22 212:7
appointed 1:3 5:4
appreciate 119:9
143:11 260:3
359:16 368:20
apprehend 298:4
apprehending
171:2
approached 26:8
58:8 124:12 249:1
253:7 343:14
appropriate 45:13
108:25 140:14
171:1
appropriately
189:22
approve 78:6
149:21
approved 77:15,17
77:22 78:3 145:17
145:19 149:21
approximately
26:17 53:11 57:6
356:12
approximation
356:5
April 13:24 14:1
18:12 65:24 66:13
66:20
arcing 55:24 56:1,3
area 18:17 20:5,22
21:2,6 22:1,2,5,16
22:25 23:2,5,8,15
23:17,24 27:3,21
30:15 86:19,24
90:2,15 92:14
125:15 126:14
212:14 213:4,8,11
213:14,19,21,22
214:25 215:2,11
215:13 216:4,11

216:22 217:3,3,15
217:16,22 218:19
219:5,15,16,25
220:13 222:2,4,14
222:17 226:18,21
226:23 227:1
249:22,24 256:2
273:6 345:14
349:3 350:8,16
351:3,6 352:17
354:4,5,6,15,18
354:25 355:6,10
355:11,13,15,16
areas 212:25 213:3
213:9 218:23,24
218:24,24 219:9
219:13,14 221:23
221:23,24 222:25
223:7,11,11
argue 153:3 308:14
arguing 308:15
Arissa 161:20
Arizona 3:11
arm 50:24 52:1
53:1 71:7 74:24
74:24 111:25
133:8,12 135:4
136:3,14,23
191:15,25 200:5
211:1,6 294:11
312:23,24 332:10
armed 66:10,13
132:18,20 137:15
137:17,21 208:14
209:16 292:2
294:8 299:2,8
arming 137:5,7
138:2
arms 36:8 38:18,24
51:22 52:8,18,19
62:5 69:11 72:10
74:8,23 75:2,3
87:13 261:1 262:6
285:7 286:22
287:16 289:4,5
313:3,4,5,14

339:18 355:19
356:16 357:16,22
Army 17:24
arrest 58:6 60:24
63:12 171:16
172:7 195:6
208:24 209:3,4,6
249:5 277:7,9,12
arrest-related
94:14
arrested 160:17
arrived 21:6 22:1,7
23:6 25:19 47:17
63:10 69:3,12
74:7,16 190:10
270:15 298:8
308:24 309:9,10
309:13
arrow 32:14,15
ARS 253:24
artery 113:8 324:3
Article 371:4
articulable 250:11
250:14,18,19
251:2,5,10 253:3
253:13 264:3
articular 249:21
articulate 250:21
251:19 287:25
asked 46:5,13,25
112:14 122:21
124:25 125:9,10
126:18 127:18
132:14,17 133:1
147:18 148:10,14
156:8 158:21
159:22 177:16
182:16 186:17
194:1,19 196:16
207:13 215:25
227:22 231:4
233:1,5 253:21
259:12 260:8
284:2,19 290:3,3
294:20 298:3,23
307:20,25 308:4



308:12 315:12
320:10 322:23
346:14 348:16,16
349:8,15 350:3,22
353:20 355:21
358:13 360:2
367:11,18
**asking** 10:15 26:3
27:13 36:12
113:24 132:2
134:10 140:9
156:4,15 162:8
171:5 175:16,16
177:13 182:23
187:5 223:2 226:9
226:12 227:12
228:7 230:5
232:23 234:3
236:14 243:5
244:13 258:24
259:2 264:7
276:15 281:22
285:13 287:23
297:18 307:4,19
316:11 317:18
320:19,20 321:11
328:21 334:18
346:3 366:22
**aspiration** 17:18
**assault** 49:2 50:17
50:18 107:2
307:12
**assaulted** 277:20
278:23
**assessment** 204:16
237:25 238:3
**assigned** 18:16,20
19:2 329:1,2
**assignments** 18:18
329:5
**assist** 21:10 74:10
137:6 256:6
259:21
**assistance** 14:12
49:13 99:21
111:11 253:9

254:10,12 278:21
278:22 330:7
**assisted** 312:1
**assisting** 111:18
**associated** 106:18
**Association** 103:11
103:13
**assume** 8:15 20:13
59:23 108:7 188:7
189:9 328:13
341:1
**assumed** 254:2
334:16
**assumes** 50:8
**assuming** 58:12
200:2 368:2
**assumption** 65:1
68:11 228:4,5
241:23 242:1
274:19,20 276:2
286:1 314:21
342:7,10
**asthma** 102:3,23
**attach** 123:14
**attached** 57:2
151:17 153:14
**attaching** 123:24
**attack** 49:17
106:19
**attacking** 368:5,10
**attempt** 35:20
40:14 56:4 60:11
70:23 72:12 107:2
124:2 262:10
328:2,21
**attempted** 58:8,10
60:24 61:15 62:17
63:13,14,16 67:24
68:22 69:3 72:20
254:13 284:11
296:15
**attempting** 56:12
69:17 72:5 76:25
327:24
**attempts** 67:25
77:11

**attendance** 4:11
154:20
**attending** 82:20
**attention** 22:16
97:7 118:7 282:14
282:16 319:16
320:2 321:19,25
322:4,9,14 333:2
346:12,15
**attest** 72:25 104:15
114:23 129:22
144:23 156:1,5
201:9 222:22
223:3 224:20
**attorney** 223:15
**Attorney's** 10:22
**attorneys** 121:25
**August** 12:7,7,8
13:7 14:15
**aunt's** 160:5
**aunts** 159:25
**authority** 97:15
**authorized** 232:15
269:2,6 270:9,13
**automatic** 115:16
**automatically**
41:15 211:1
**autopsy** 4:21 89:2
215:15,19 216:1
216:15 331:7
**Autumn** 161:16
**available** 354:18
**Avenue** 3:7
**avoid** 208:11 213:7
213:9,20,22
218:25 219:6,14
222:16,24 223:6
226:17,20,23
235:3
**awake** 272:4
314:25 338:13
**aware** 10:4,12 64:1
96:2 98:11 134:24
138:21,25 139:5,7
139:8,10,24 140:4
140:11,23 160:13

166:5 180:2
186:16 197:5,13
197:18 239:10
249:19 259:12
313:22 317:11
318:17 338:13
**Axon** 1:19 3:9,10
5:15,22 7:19 9:2
80:4,6 83:6 85:12
97:15 120:9 141:3
145:2 146:19,24
147:1 163:15
165:1 183:25
184:16 185:17
220:20,22 228:17
231:24 233:13,19
234:14,16 238:16
371:12
**Axon's** 348:4,12,18

———————
**B**
**b** 29:20,23 371:14
**B2** 172:23
**bachelor's** 16:25
17:1,2,6,11
**back** 8:1 12:8 13:6
13:8,24 14:15,16
14:17,19 30:4,24
33:4,21,22 34:16
34:18 49:7 51:1
54:25 56:4 58:10
61:10 68:8,16,23
70:14 72:2,7 74:8
75:4 76:21 93:1
99:9 115:11 116:7
121:11 123:15
125:1,5 154:11
158:17 162:24
181:11 182:7
186:3 191:10,17
191:20 194:11
213:4 229:1
254:23 265:18
280:6,21,23
283:13 286:23
287:4,9 293:21

298:11 301:22,22
301:22,22 302:8
303:5 318:24
326:15 327:4
334:3 344:10,11
344:11,12 345:20
349:5,16 356:9
366:8 367:4
**backed** 14:11 346:2
**background** 11:13
**backhoe** 33:25 34:6
34:14,19 35:21,23
36:8,10,17,20
40:3 46:25 47:2,4
47:14,16,22
260:25 285:22
292:12,23 295:11
295:16 296:11
302:24 303:12,17
**backpedaling**
56:13
**backs** 130:10,14
292:5
**backtracking** 56:13
**backup** 47:1,7,12
**bad** 214:18
**balance** 171:12,15
173:3,12 174:18
194:14 195:13
**balanced** 172:6
**balancing** 173:19
173:25 174:10
194:25
**Band-Aid** 282:19
**base** 125:17 266:23
**based** 37:14 39:7
39:17 43:4,8
48:20 55:7 56:7
62:19 63:25 73:8
73:19,24 74:1
89:7 92:5 105:21
105:25 108:6
109:13 175:21
176:5 276:2 341:4
352:6 362:13
**basic** 232:9,10,12



245:2
**Basically** 163:20
**basis** 45:14 46:5,14
  235:18 341:3
**Bates** 151:12,13,21
  168:24
**bathroom** 265:9
**baton** 108:4
**beats** 18:17 325:8,8
**becoming** 16:16
  63:1
**beep** 333:19
**beeping** 363:2,5,8
  363:12
**beg** 5:13
**began** 244:21
**beginning** 81:15
  121:18 218:13
  312:9 323:18
**begins** 5:2
**behaving** 259:23
**behavior** 40:4
  55:11 77:3,6
  210:11,13,16
  258:12 261:8
  286:24 307:15,16
  307:21 320:13,24
  321:2
**belief** 20:20 48:21
  49:1,12 58:4,5
  192:18 242:20
  250:5 277:14
  306:6,8 314:2
**believe** 14:17 15:12
  25:14 27:12 32:5
  32:21 39:25 48:17
  49:18 56:5 57:8
  61:13,23 63:21
  67:12 77:2 82:3
  105:3 109:2 111:8
  113:12 116:12
  128:13 133:12
  137:21 155:24
  162:14 168:12
  169:12 171:1
  175:22 176:1

178:12,15,16
  179:7 180:4,10,12
  180:19,20,24
  181:1,12,22
  183:20,23 189:23
  193:11 196:5
  206:23,24,25
  210:20 211:10
  220:2 226:16
  227:15 231:22
  232:6,9,16 250:1
  250:2 262:19,21
  263:4 264:19
  267:21 271:1,17
  277:23 278:17
  285:4 289:12
  290:11 303:13
  308:7 312:22
  318:19 319:19
  321:9,24 322:3,13
  322:18 332:19
  340:18 347:22
  351:9 358:18
**believed** 107:2
  113:9 271:19
**Bello** 209:25
**belt** 107:25 259:3
**benefit** 171:12
**benefits** 13:1
**best** 20:11 51:5,24
  150:23 169:19
  220:6,8 221:14
  358:14 373:4
**beyond** 321:15
**big** 101:4
**bigger** 202:6
**bit** 12:16 16:21
  53:8
**bite** 315:8
**blade** 344:14,15
  345:3
**blades** 344:13
**blanks** 122:5

**blink** 281:23
**block** 281:16
**blocks** 252:10
**blood** 93:15,16
  243:25,25
**board** 195:19 371:5
**body** 51:16 52:8
  70:17 72:24 73:4
  86:24 124:11
  125:18 126:5,6
  128:4,9,11,20
  129:3,3,11 130:4
  131:7,9,11,21,24
  241:11,19 243:2
  269:24 280:1
  286:14 291:22,23
  293:4 312:20
  313:11 321:8
  334:5 335:10
  342:25 343:2
  344:6 369:2
**book** 152:10 153:10
**boot** 54:25
**Booth** 2:9
**bottles** 34:8
**bottom** 54:24 84:8
  97:6 120:5 169:2
  243:22 269:19,20
**bought** 196:11
**bounds** 75:15
**brand** 15:8
**break** 8:18,20,23
  61:4 81:9,21
  121:4,5,9 158:6,8
  218:6 265:9,10,13
**breakdown** 343:8
  343:16
**breast** 219:18
  222:17
**breath** 310:15
  311:4,5 327:19,25
**breathe** 275:24
  327:24 328:6
**breathing** 71:9
  111:3 112:15,24
  125:25 310:13,23

311:10 326:10,12
  328:3 335:19,22
  339:1 344:23
  345:8
**breaths** 326:8
**BRENNEN** 1:17
**brief** 73:16
**Bright-line** 347:9
**bring** 53:7 275:5
**Brooks** 160:14
**brothers** 159:15,22
**brought** 9:1 10:23
  12:24 13:6
**browbeating**
  288:14,15
**bruise** 282:21
**bruises** 282:7
**bucket** 34:19 35:23
  36:8,11,17,20
  47:3,4,22 260:25
  295:16,19 296:11
  302:24 303:12,17
**Buford** 3:16
**building** 31:14,17
  32:5,8,22 33:5
  248:9,10 249:11
  250:7 255:14,17
  255:19 285:16
  292:15,18
**bullet** 84:15 86:21
  87:3,8,12,18
  88:13 94:10,24
  227:21
**bunch** 220:21
**bundle** 370:2
**Bureau** 10:5,18
**business** 209:11
**busted** 267:19,25
**button** 111:18,23
**buys** 73:18

───────────
      **C**
───────────
**C** 3:3 29:20,23
**Calderon** 74:19
  347:19
**Calderon's** 128:23

128:25
**call** 12:17 13:9
  18:17 21:1,12,14
  21:17,24 23:15
  37:19 39:6,7
  72:16,18 131:12
  158:8 198:2
  215:12 249:22
  250:3,22 252:10
  254:22 255:24
  259:20 262:15
  273:2 278:11,18
  297:7 311:20
  326:4 349:9
**called** 15:8 47:4
  94:11,21 110:17
  111:15 160:20
  251:14 311:22
**calling** 47:6 111:17
  252:22 255:2
  270:12 343:15
**calls** 13:12 14:5,10
  14:12 316:23
**calm** 50:20 296:5
**cam** 125:18 126:6
  269:24 286:14
  313:11 342:25
  369:2
**camera** 124:11
  126:5 128:5,9,11
  128:20 129:3,4,12
  129:23 130:2,5,8
  130:13,17 131:1,2
  131:7,10,11,21,24
  132:6,9 291:22,23
  292:5 293:4
  296:15,19 297:1,5
  321:8 343:2
**cameras** 129:20
  130:23
**capability** 268:17
**capable** 175:22
**capacity** 1:12,14,16
  1:18 5:8 12:14
  183:14 205:4
  372:8



**Captain** 74:20
329:18
**capture** 78:20
292:14,17
**captured** 293:1
**car** 31:10 112:9
251:22 252:1
254:25 255:6
257:16 266:22
271:12 272:19
297:13 311:24
314:10,12 316:17
316:19 317:8,16
317:22 318:4,9,12
321:10,24 322:4
322:10 323:24
325:17 332:2
338:20 339:1,3,19
341:16 342:2,17
348:2
**care** 97:17 266:16
266:19 267:4,8
268:15,18 282:10
318:14,22 319:16
319:20 320:2
321:9 346:12,15
346:21 347:11
**Carolina** 161:7,13
161:18,25
**carotid** 113:8
**carried** 338:20
**carry** 14:24 18:9
84:5 133:16 197:6
197:12,17 232:13
232:15
**carrying** 15:11
37:23
**cars** 313:20
**cartridge** 58:14,15
59:1,2,22 60:12,19
72:18,19 337:4,11
361:13
**cartridges** 58:21
60:18 200:12
**case** 77:10 104:9
122:9 123:19,21

131:6 137:14,17
137:21 151:15
153:23 176:1
215:5,16 222:4
235:23 239:3
261:12 276:4
317:25 318:3
348:4 371:16,16
371:19 372:13
**catch** 175:5,6 311:5
**cattle** 273:2
**cause** 73:9 83:21
84:2 87:25 94:3
102:15 105:19
119:14,23 186:25
187:22 214:5,7
227:6,13 249:15
249:20 253:3,22
253:23,24 264:13
276:21 287:6
331:13
**caused** 35:15 69:8
105:15,16 132:9
**causes** 54:14
101:19
**causing** 175:4
**Cayton** 340:19
341:9
**CCR** 2:14 371:24
372:21
**center** 213:8,12
219:10 371:7
**centered** 89:23
90:11
**central** 360:8
**certain** 37:18
151:24 155:1
169:21 239:20
269:25 274:23,24
275:7
**certainly** 27:15
37:16 39:25 43:24
47:20 100:2
264:19 294:14
**Certificate** 371:24
372:1,6,6,21

**certification** 4:10
54:19 78:25 79:3
79:18 80:13 81:21
82:21,24 155:22
198:22
**certifications** 15:23
16:1,4
**certified** 15:24 16:7
16:8,8,10 77:18
79:18 80:9 142:8
145:20 147:1
156:22 371:7
372:5,16
**certify** 141:25
149:3,25 156:8
227:23 372:7,12
**certifying** 150:19
**CEW** 4:10 15:2
18:9 40:15 42:9
46:21 51:2 53:7
54:9 55:9,12
71:23 77:23 82:23
85:25 88:7 91:1
93:11 94:3 98:2,4
101:19 102:2
109:3,7,20 110:4
110:8 114:20
154:14 185:11,12
224:8 239:12,15
368:4,16
**CEWs** 83:10 84:2
85:1,10,13 87:8
93:13 97:23 98:11
106:19 227:7
**chain** 65:11
**chance** 237:21
**change** 56:20 60:18
102:15 138:12
195:22 218:7,8
273:16 323:7,11
341:24 373:6
374:2
**changed** 223:17
353:21
**changes** 93:15,15
163:25 243:24

373:5
**changing** 100:14
356:10
**charge** 172:19
243:1 299:18
301:10 306:16
371:18
**charged** 11:10 37:7
48:3 61:21 261:1
262:9 279:3
286:13
**charges** 10:23 11:3
36:21 110:20
**charging** 47:13
48:22
**chase** 138:13
173:15,21 174:25
195:8
**chased** 253:12
**chasing** 174:12,14
174:23
**check** 112:8 113:3
113:6,11 238:1
270:16,19 271:7
272:15 310:4
311:13 324:2
327:7,21,22
369:12
**checked** 112:18,19
113:1,8 114:11
270:25 271:3
323:24 324:3
325:18 329:10,15
338:23 339:5
340:6
**checking** 329:16
**checks** 329:6,6
**cheek** 331:5 345:6
**chemistry** 93:16
243:25
**chest** 89:23 90:11
213:8,12,21,22
215:11,13,20
216:3,10,20,22
217:2,15,16,21
218:3,19 219:5,10

219:15,25 222:5
222:12,17 223:7
226:17,21 328:8
338:25 349:2
350:8,16 351:3,6
352:11,15,20
353:11 354:4,5,18
354:25 355:11,13
355:15,16 356:18
357:1 358:17
**child** 161:21,22
162:1
**children** 1:8 158:7
159:18 161:2
175:1 195:7
**children's** 161:8
**choice** 217:20
234:13 273:23
352:16,19
**choose** 60:11 109:3
109:19 198:9
**chose** 106:19
233:11 329:20,21
**chosen** 144:11
**chronic** 102:6
106:3
**CID** 361:19
**circle** 28:6
**circuit** 242:5
**circumstance**
175:19
**circumstances**
50:16 98:5 140:19
165:7 169:21
170:14,24 172:17
172:18 179:15,24
180:7 181:2,13,23
193:20,24 211:2
211:18,24 220:4
220:12 293:6
321:15 354:19
**CIT** 16:12,16
257:21,24
**citizen** 176:22
186:6
**civil** 1:9 14:7



**civilian** 162:8 274:5
**claiming** 191:16
**clarification** 9:11
232:20 260:3
**clarify** 8:13 58:14
98:16 100:9
177:19 266:10
**class** 96:20 163:3
182:16 199:2
201:5 202:15
204:3 246:3
**classes** 198:9
**classify** 109:7
**classroom** 80:14,17
80:18 81:23,24
199:13,22 201:17
202:22
**clear** 9:21 70:12
112:6 124:11
235:15 303:17
348:11,17,17
353:2,25 365:25
368:22
**clearing** 303:12
**clearly** 186:23
188:21 192:21
195:7 288:16
318:25 345:21
348:5 355:24
357:24
**CLIFF** 1:13
**clip** 200:24,25
**clipped** 54:24
**close** 87:20 92:12
110:6,9 285:25
286:2 330:25
336:11 369:15
**closed** 281:9
**closer** 53:8 217:8
**closest** 47:12
**closing** 56:21
**coach** 100:14 184:9
230:2 288:11
**coaching** 230:4
**collectively** 28:25
**collision** 25:8

**color** 218:23
**column** 65:17,24
66:6,7,23 67:2
**combative** 207:22
208:8
**combination**
153:23 322:18
**come** 13:8 18:23
27:2 36:7,19,19
36:22 37:4 39:9
47:5 49:10 112:6
145:8 207:11
265:3 267:12
268:14 276:8,16
344:1 350:19
**comes** 134:13
**coming** 20:13 60:16
121:11 274:9,12
274:25 276:22
305:8 319:2
327:19 328:10
363:6
**comma** 171:25
172:1 219:18
230:15
**command** 65:11
210:16 297:12
**commands** 36:6,19
36:22,25 37:6
40:14 46:22 49:10
61:1 72:9 207:11
210:14 278:1,4,5
278:10
**Commencing** 2:6
**comments** 100:6,11
100:12,22
**commission** 374:24
**commit** 174:2
**committed** 169:25
170:13 171:2,9,25
173:4,9,17,25
174:1,13 175:12
194:20 248:16
249:16 250:12
251:6,8,11,13
252:4,11 253:4,17

264:4,14,15
277:15,19,23
297:13
**committing** 171:25
**commonly** 109:24
**communications**
100:17
**compared** 223:15
**comparison** 99:17
148:7
**compilation** 153:15
**complete** 77:22
242:5 244:17,23
245:8
**completed** 19:18,20
55:4 77:16 145:19
155:4 231:21
232:1 314:14
**completely** 114:16
143:5,25 240:18
240:22 242:5
283:10 348:5
366:3
**compliance** 72:11
73:20 74:2 108:16
186:18 187:9,15
206:17 351:24
362:18
**compliant** 43:6
193:25 206:16
304:15 306:10
**complied** 46:21
47:8 209:18 319:8
**complies** 31:3
32:12 51:9
**comply** 37:6 43:13
49:9 58:3 60:23
210:18 227:18
243:7 308:9 319:7
**complying** 36:11
194:2 207:10
210:7,14,15,20
306:5
**compromised**
93:24 94:13,22
102:14

**compute** 324:15
**computers** 293:22
**concept** 50:7
**concerned** 39:11
113:16
**conclude** 239:8
261:5,13 290:8
330:5
**concluded** 239:4
268:11 369:23
370:21
**concludes** 369:20
**Concluding** 2:7
**conclusion** 80:20
260:19 307:11,16
330:9
**conclusions** 307:9
307:14
**condensed** 370:7
370:16
**condition** 8:20
95:18 107:5
113:16 214:1
314:20
**conditions** 95:1,9
96:2 102:3,4,20
102:22,23 316:12
367:22
**conduct** 48:21
76:25 97:17
278:20
**conducted** 10:5,21
14:24 15:6,9 76:4
76:13 89:2 119:14
119:17,20,21
162:16,19 164:11
164:20,24 165:7
183:2
**conducting** 12:16
**conductive** 89:18
90:7,20
**confident** 118:13
**confined** 273:6
**confirmation**
206:10
**confirming** 104:25

**confrontation**
109:25 208:11
**conjunction** 102:11
**connected** 362:19
**connection** 59:20
60:2,2,3 241:24
**connectivity** 73:17
242:10
**Connor** 1:17
156:19 157:8
**consent** 157:25
**consider** 177:18
264:2 273:18
**Considerations**
88:5
**considered** 109:11
**consisted** 199:8
**consistent** 54:3
82:25 90:6,20
92:20 202:8 305:9
**consisting** 369:21
**contact** 35:19 53:17
59:12 60:7 71:4
73:2 104:20 108:1
206:16 209:5
266:6 267:16
273:14,16 296:17
**contacted** 267:10
371:11
**contingent** 170:12
**continue** 26:2 45:9
182:6 349:13
**continued** 217:1
374:1
**continuing** 198:2
**continuously** 44:5
312:8
**continuum** 97:14
**contract** 371:14,16
**contradict** 341:8
**contribute** 94:3
102:15
**contributing**
105:16
**control** 69:11 70:24
71:6 72:3 74:25



87:13 111:24,25
179:10 187:20
188:2,5,6,17
189:1,6,10,11,14
189:21,24 190:2,9
190:14,17,17
191:24 192:2,9,13
192:16,19,25
193:16,24 194:2
207:4 241:3 242:7
256:23 305:11
344:1 351:24
**controversy** 235:13
235:20
**contusion** 90:2,16
**contusions** 282:8
331:8,20
**conversation**
309:24,25 337:13
**conversations**
25:23
**convince** 43:12,12
**Cook** 160:10
**copies** 115:21
168:22 225:12
**copy** 19:9 115:23
116:12 123:13
151:22 370:10
**corner** 32:1
**corotid** 324:3 339:6
340:6,12
**Corporation** 1:20
**correct** 8:7 12:12
13:17 14:25 15:9
15:24 18:14,15
20:2,3,14 22:24
36:23 37:24 40:6
40:21 41:5,23,24
42:2,7 50:10 51:3
53:3 54:10 57:25
58:19,20,24 59:4
59:7 64:12,14
66:11,21,22 67:22
68:3,11 76:19
78:13 79:21 82:1
84:12 85:16 95:13

103:3,4 104:10
106:10 110:14
117:14 119:22,25
122:21 124:3,4,6
124:8,13,15,16,17
124:20 125:8,25
126:9,15 127:2
128:1,2 129:5
130:25 131:4
132:24,25 133:4
134:7 135:16
136:15,20 137:16
141:3,9,16,19,22
142:1,4,9,15,24
145:3,15,20 146:1
146:2,4,14,17,25
147:2,9,18 148:8
148:12,16,22,23
149:1,5,9,22
154:24,25 155:2
155:13,14,25
156:12,20,23
157:6,9,11,23
162:12 163:21
164:21 165:2
169:14,15,18,21
169:25 170:4,6,7
170:9 171:12,19
172:5,12 174:11
176:7,10,17,18,20
176:21 179:14
180:6,22 184:1
185:15,18 186:18
186:21,22 187:1,9
187:10,11 189:3
190:21 191:10
193:13,14 194:21
195:9,10 197:25
198:22,23 204:18
204:19 205:16,17
214:10 216:1,4,8
216:11 217:9,12
217:22 218:3
219:6,11,22 220:1
221:17,18,24
222:2,5,8,17

226:2,18 227:25
229:12 233:10
235:3 239:5
240:12,16,18
241:4,6,8 246:16
248:11,17,18,20
249:2,4,6,8,10
262:4,7 267:12,16
267:20 268:12
269:9 273:24
274:19,21 279:5,7
279:8,11,12,13,14
280:16 284:13
285:8 286:5 292:6
292:15,16,18,19
292:25 294:6,15
296:21 299:3,9,12
300:9,15,18,19,21
300:25 301:6,11
301:14,17,18,20
301:21 302:13,14
302:17,21 304:12
306:14 312:9
314:4,6,8 315:17
319:17 320:14
321:25 322:1
323:25 326:3,21
328:23 329:22
336:4,5 337:8
338:14,15,20,23
338:24 339:2
344:20 345:15
348:24 349:3
351:15,17,18
356:2 358:14
360:18 363:15,25
367:10,23,25
368:11,13 372:9
373:4
**correction** 75:17
127:15 253:20
274:4 296:25
**correctly** 30:14
61:21
**Council** 371:5
**counsel** 5:19 99:24

100:7 101:8 122:9
123:11 225:10
371:16 372:12
**counselor** 349:14
**county** 1:13,15,17
1:19 5:8 11:14,17
11:22,25 12:8,11
13:3,6,8,21,22
14:15,23 15:17
76:3 78:5 79:21
79:24,24 82:1
84:23 85:6,11
111:10 145:14
148:25 160:8,10
160:12,14,16
162:18,24 164:10
164:16,20 165:14
167:11 168:6
169:11 198:10
208:22 224:24
234:1 236:18
371:3 372:3
**County's** 144:20
**couple** 115:13
124:21 158:19
261:10,10 278:2
303:16 335:24
359:12,18
**course** 4:11 82:6,24
96:21 146:16
154:20 156:9
162:13,20,21,25
163:2,6,10,20
164:5,18 182:1,11
182:14,19,24
183:2 196:25
200:22 221:17
224:9 225:19,21
226:1 231:21
232:21 234:18
238:16 246:18
370:11
**courses** 82:21
155:9 164:12,25
165:19
**coursework** 202:20

**court** 1:1 5:9,17,18
6:5,7,13 8:1 29:10
29:12 81:1 116:17
143:11 144:5
266:23 369:24
370:3,6,9,13,18
370:20 371:5,7,12
372:5,16
**courtroom** 349:14
**cover** 76:12 258:8
359:20 371:17
**covered** 227:12,15
227:20
**CPR** 16:9,10
**Craig** 3:6 5:25
**create** 56:19,22
109:14
**created** 78:21
**creates** 64:1 86:20
**creating** 55:19,22
86:6 178:20
**crime** 132:5 172:11
173:9,25 175:8,11
194:20 248:14,17
249:15 250:12,20
251:6,7,10,18,18
252:4,6,8,11,13
253:4,9,16 264:4
264:5,14,14
277:15,17 295:2
297:6,13
**crimes** 277:19
**criminal** 10:23
11:10 17:5,7 35:7
249:12
**crisis** 16:2 94:12,22
257:25 258:3,4
264:18 265:23
266:2
**crouched** 31:17
34:19 355:8
**current** 13:20 84:9
149:8 197:14
227:18 230:16
352:7
**currently** 11:14



14:24 15:11 16:25
17:10,23 169:10
333:22
**curriculum** 80:22
82:1
**custody** 58:9 61:15
63:13,15 69:4
72:5 161:4 284:11
**custom** 97:13
**customary** 371:19
**cut** 362:25
**cuts** 282:7,8
**cwebster@twfl.c...**
3:8
**cycle** 55:4,5 59:18
363:3,7,9,13

**D**

**D** 4:1 29:20,23
**dad's** 159:8
**damage** 69:7 175:4
**danger** 37:17 178:4
178:10 179:3,6,14
179:20 180:19
181:9 182:6
**dangerous** 110:3
180:11 195:2
314:18 315:1
316:8,14,16
**Daniel** 155:13,15
156:23 219:22
224:17 230:22
**dark** 26:21 250:8
**darker** 34:4
**dash** 129:23
**date** 11:10 13:24
16:20 18:13 20:2
65:24 66:3,20
76:6 79:3 101:10
117:8,13 118:7,12
154:20 162:23
164:6 204:21
221:16
**dated** 78:24 98:20
118:3,3
**daughter** 161:15

**daughter's** 161:19
**day** 17:18 18:23
19:18 108:1
155:20 176:16
196:24 199:19
201:12 202:16,18
208:14 209:6
232:21 237:11
238:6 282:21
351:12,12,14,16
359:16 372:17
374:22
**days** 12:20 18:22
123:14 151:7
152:2,17 199:20
**DE** 1:20
**deadly** 167:7,10
169:20,24 170:2,5
170:8,18 171:3
172:10,13,23
175:8,18 194:19
**deal** 94:11,21 101:4
258:9 265:25
266:1,8
**dealing** 259:13
**death** 9:3 83:21
84:3,6 93:15 94:3
94:14,25 98:1,12
101:21 102:16
119:14,24 214:5
227:6,13 230:20
**deceased** 1:4,6,9
5:6 159:8
**December** 11:23,25
78:24 82:10 97:4
97:19 98:8 101:23
102:11,18 103:19
103:24 106:16
118:2,14 155:16
196:18 197:19
198:21 204:14
212:14 223:20
231:22 232:4
236:24
**decide** 144:10
**decided** 13:8 36:5

214:24 314:9
**decision** 56:23
256:11 317:7,11
317:14 318:8
**decisions** 317:1
**dedicated** 140:19
**deescalate** 50:14
**deescalating**
246:21 247:8,12
**deescalation** 42:21
50:2,4,8,14,24
134:4 135:8,13
246:14,15,23
247:2,5,25 296:2
296:12,15
**def** 340:22
**defend** 50:22 107:3
107:21
**defendant** 3:9 4:13
7:22 236:18
**defendants** 1:21
3:13 6:4 7:19
319:5
**defendants'** 122:23
145:14 146:8
147:16 148:3
168:24 169:5
198:15 203:12
218:19 221:1
**Defense** 19:10
22:12 30:9 63:18
75:21 78:9 81:5
88:23 96:7 116:22
**defensive** 187:18
**define** 166:11 177:7
177:10,17 232:24
238:19,22,25
337:21
**defined** 166:20
172:2 231:16
**defining** 189:6
**definitely** 37:20
263:8 297:9
**definition** 174:7
189:12 231:13
235:15 245:19

259:25 260:4,10
272:13 338:2
340:22
**definitive** 237:10
237:17 245:19
**degree** 16:25 17:1,3
17:6,11,17 73:10
73:11,13 75:11
246:1 353:10
**degrees** 158:22
**Deleware** 1:20
**deliberately** 352:15
353:11 355:6
**delirium** 102:5,24
103:3,8,18,21
104:6 231:6,10,14
231:19 232:24
233:12 234:19,22
235:11,14,16,20
235:23,24 236:10
237:1,5,10,12,15
237:17,20 238:8
238:12,17 245:17
245:18,20 246:4
348:22,25
**demeanor** 38:17,23
39:22 47:10 49:8
**demonstrate** 52:14
355:21
**demonstrated**
365:12
**denied** 127:1
**department** 12:1,6
15:17 40:7 42:19
77:17,22 78:3,5
79:15 80:22 109:7
133:11 134:22
139:9,12,15 140:5
140:8 141:2
142:23 143:20
144:9 145:1,19,23
148:24 149:14
150:6 164:16
165:5,6,17 176:5
183:13 195:20
196:6 202:14

208:23 224:24
232:14 234:2
238:15 269:3
274:8 275:12
319:15,25 320:7
346:11
**department's**
142:20
**depend** 170:23
**depending** 87:14
**depends** 172:16,17
202:15 258:15,23
259:8,9 278:7
337:20
**deploy** 40:15 42:5
43:13 51:2 52:7
53:21 56:23 58:11
58:25 67:21 72:17
72:17 110:4
209:19 214:24
290:2 360:25
369:3,10
**deployed** 46:22
51:24 53:25 54:17
55:12,25 56:2
58:16 68:22 77:9
89:11 205:9
209:17 239:3
287:12 290:6
291:12,14 299:14
299:14 304:18
311:22 336:23,24
337:3,4 346:8,11
348:21 356:2
357:14,17 358:6
368:16
**deploying** 58:12
73:11 88:7 205:7
304:12 368:4
**deployment** 51:8
51:17 52:4,5
53:21 54:9 55:10
55:15 56:8,11,24
60:8,9 62:18 77:4
77:11 88:5 89:9
92:22 93:11 97:23



114:20 358:2
**deposed** 7:25
  123:19 158:21
  215:4
**deposition** 1:23 2:4
  5:2,12 7:18 8:7
  13:1 28:13 29:18
  38:2 44:6 81:16
  121:15,19 122:16
  123:3,5,8,12,13
  123:25 124:3,16
  124:19,20 125:2,8
  126:16 127:1,6,8
  127:16,18,21,25
  128:7 129:5
  138:16,19,22
  151:15,16,24
  152:3 153:20
  154:2 168:12,18
  217:8 218:10,14
  323:14,19 349:10
  369:20 370:21
  371:12,14,17
**deputies** 6:3 69:12
  74:7,7,10,16
  164:15 166:5
  190:9 193:6
  195:23 209:15
  257:6 269:5 315:6
**deputy** 1:14,16,19
  5:3 8:25 9:2 10:4
  13:22 14:2,4,4,5,8
  14:10,14,20,21,23
  18:14,16 19:13
  21:10,17,20,23
  22:7 23:6 24:8
  25:23,24 26:1,22
  26:23 27:3,10
  47:5,11,17 61:13
  63:9,11,12 69:2,6
  69:9 71:1,22
  72:10 73:4 74:5
  74:19,19,24 75:18
  75:24 81:16,20
  83:23 86:7 89:1
  96:13 99:18

103:17 106:9
111:14,17 112:12
112:13,18,25
115:13 116:9
121:15,19,24
124:23 125:18
128:13,19,20,23
128:25 138:25
139:24 140:3
151:2 158:19
164:24 178:23
179:7 190:22
191:2,7 193:5,16
197:4,11,15,16
205:14 206:14,18
207:1 209:23,25
210:9,12,14
218:10,14,18
256:7,9 257:15
258:13 265:21
266:7 269:11
273:1 284:11
298:8 309:10,13
310:23 311:1
316:5 323:15,19
323:23 329:3,6,6
342:7,12 359:15
367:7 368:19
369:1,20
**deputy's** 101:6
**describe** 21:25
  25:19 35:21 61:19
  70:11 206:5 210:5
**described** 47:14
  50:1
**describing** 61:14
  90:25
**designed** 54:13
  97:23
**Desiree** 161:11
**detail** 119:6
**detain** 210:8
**detained** 110:11,21
**detection** 16:5,6
**detective** 191:2
**determination** 11:2

304:24
**determine** 10:23
  21:19 26:2 125:4
  189:21 258:2
  260:18 265:22
  266:18 267:7
  274:15 278:21
  285:2 326:7,10
  328:2,5 339:17
  341:4
**determined** 262:18
  305:4
**determining**
  175:23 238:7
**device** 15:8,8 58:19
  65:7 66:12 67:8
  67:16 68:8,23
  77:15 88:10
  135:25 145:17
  360:17,23 361:4,7
  361:13 367:13
**diagnosis** 103:8
**dictate** 211:3 351:5
**dictated** 211:23,24
**die** 98:3
**difference** 14:3
  16:15 91:17 98:22
  98:23 119:20
  120:8 178:19
  271:24 302:2,3
**differences** 117:22
**different** 64:13
  86:22 98:24
  100:19 140:13
  141:15 189:16
  193:23,23 215:19
  258:12,18 259:18
  323:1 339:13
**differently** 343:13
**difficult** 310:24
**difficulty** 310:24
  311:10
**direct** 22:16 97:7
  227:21 231:5
**directed** 97:22
**direction** 32:16,18

33:2 286:10,17
**directionally** 25:10
  32:20
**directions** 56:20
**directive** 97:14
**directives** 194:3
**directly** 36:21
  49:10 61:22 74:14
  290:12
**dirt** 28:4,5 30:15
  70:3,19 190:1
  345:5 346:16
**dis** 279:10
**disagree** 64:9
  170:16 187:5,7
  191:24 264:25
  265:1
**disbelieve** 64:18
**discharge** 284:7
  286:4
**discharged** 279:10
**disclosure** 371:1,6
**disconnects** 362:20
**discount** 371:19
**discovery** 98:19
**discuss** 44:17
  164:15 182:16
  227:17 236:7,12
**discussed** 103:18
  103:25 104:2
  119:4 129:8 135:7
  147:21 164:19
  165:17 183:12
  211:20 245:18
**discussing** 103:21
  245:23
**discussion** 27:3
  99:16 112:4 182:3
  183:1,17 200:8
  270:12
**discussions** 100:13
**dispatch** 20:14 21:1
  255:22 256:4
  267:10 369:2,3,9
**dispatched** 20:17
  20:18 21:23

**display** 360:9
**displayed** 237:19
**displaying** 50:2
  76:24 77:3
**dispute** 115:2
  160:19 279:9,15
**disqualified** 371:9
**distance** 52:24
  56:12,19 88:5,9
  88:10,19 91:23
  97:24 285:18
  315:20
**distances** 88:6
**distinguish** 208:7
**distress** 111:8
  113:13 114:13
  319:21,22
**District** 1:1,1 5:9
  5:10 10:22
**ditch** 25:25 27:7
**Division** 1:2 5:10
**doctor** 235:20
**doctors** 235:16
**document** 19:15
  63:23 78:15,17,19
  89:5 101:10
  143:12,15,23
  146:13 150:19
  151:25 154:19
  155:22 156:6
  157:5 167:5
  168:17 176:5
  196:3 222:20
  223:6 224:4,6,16
  224:22,24 227:22
  228:5,6,22 229:4
  230:24 233:23
  235:7 282:2
  298:10
**documents** 101:12
  122:16 123:1
  145:2,8 146:10
  151:6,19 152:17
  157:22 158:2,3
  220:21 223:16
  229:11



**doing** 17:13 18:5
    29:11 31:15 35:25
    36:14,16 72:4
    99:12 104:16
    132:4 144:10
    153:8,9 173:10
    193:25 198:12
    237:25 255:20
    257:14 285:1
    304:1 308:13
    329:24 330:11
**domestic** 160:25
**dot** 42:13,16,25
    136:14
**double** 58:23
**doubt** 216:10
**download** 65:4,6,8
    65:9,13
**downloaded** 64:8
    64:24
**draw** 28:11,15
    30:25 33:6 211:5
    211:9 255:5,12,16
    287:3,9
**drawing** 218:22
    221:22 223:12
    286:23
**drawn** 206:20,21
    207:7,16
**drew** 42:9 209:15
    255:8,18 260:5
**drills** 82:24 224:8
**drink** 272:3
**drive** 72:16,18,21
    73:8,14,15 87:19
    87:24 186:7,12,17
    189:2 211:13,16
    211:19,21 212:6
    212:11,17 279:16
    279:22 280:1,10
    280:12 333:1,6,10
    333:25 334:12,19
    337:5 351:20,23
    352:8 362:13,14
    362:17
**driveway** 24:2

**driving** 26:4,7
    173:22 252:15
**dropped** 58:5 60:19
**dropping** 57:23
    58:2
**drug** 102:5,6
    104:22 105:18
    106:3,5 238:25
    268:15,18 274:20
    275:13,16 276:6
    309:6 321:5
**drugs** 35:2 39:19
    95:21 104:23
    105:1,17,22 107:8
    209:12 239:5,12
    276:5,8,15,21
    341:21
**due** 98:3
**duly** 1:3 5:4 7:2
**duration** 56:6 67:3
    142:15 185:11,18
    299:12 300:3,14
    300:17,23 301:7
    301:17,20 305:11
    305:22 318:21
    333:17 334:24
    346:18
**durations** 322:21
**duty** 108:2 206:20
    252:8,13 278:5

---

**E**

**E** 3:14 4:1 373:1,1
    374:1,1
**earlier** 7:17 122:21
    126:20 135:7
    156:8 157:19
    194:19 207:12
    331:15 346:14
    369:1
**early** 351:13
**easier** 29:15 72:3
**east** 25:14,15,16
**education** 16:23,24
    158:22 175:21
    198:3 242:24

276:20
**effect** 54:23 60:10
    60:19 62:19,24
    72:25 73:25 76:6
    82:9 169:10
    213:25 214:3
    240:12 241:11
    242:21 244:5,18
    267:19 270:1
    272:23 273:10
    306:12,16 351:24
    362:21
**effective** 55:9,15,18
    56:8 60:5 73:2
    82:6 96:24 108:12
    117:9,13 118:7
    178:6 212:6 221:4
    224:13 225:16
    299:22 319:1
**effectiveness**
    108:10 242:15,19
**effects** 86:24 93:8
    93:10,14 98:3
    101:16,20 102:2
    120:19 240:7
    243:24 244:22
    245:9 268:24
**eight** 13:12 79:6
    81:22 155:13
    163:4 198:24
    199:14 203:22
    221:2 227:2
    229:20 294:3
    300:20 364:7,21
**eight-hour** 79:9
    163:2
**either** 31:22 65:13
    72:17 100:6
    109:14 136:9
    156:3 180:11
    181:25 182:11,14
    183:2 207:5
    209:17 278:18
**elaborate** 41:19
    51:18 53:22 188:1
    188:5 194:17

258:11
**elapsed** 255:8
**elbows** 31:18
**elective** 196:25
**electric** 304:12
**electrical** 119:17,21
    212:8,23 213:24
    214:16 243:1
    298:17 306:16
**electricity** 55:14
    241:18 242:21
**electronic** 370:14
    370:16
**elevated** 107:12,14
**else's** 128:11,15
**emailed** 370:7
**employed** 11:14,22
    12:23 79:20
**employee** 76:25
**employees** 77:16
    80:7 145:18
**EMS** 111:15,17
    112:2,4 113:15
    114:5 267:14,16
    267:18,21 268:3
    270:15,24 272:15
    311:21 337:13
    340:19 346:4,8
    369:11
**en** 369:11
**encounter** 252:16
    265:22 293:15
    312:9
**encountered** 25:3,5
**endangering** 195:6
**ends** 81:12
**energy** 14:25 15:6,9
    76:4,13 84:2
    89:18 90:7,21
    119:14,20 162:16
    162:19 164:11,20
    164:25 165:8
    183:2
**enforcement** 37:15
    49:13 77:1 94:2
    94:11 97:11 106:1

120:2 135:10
    160:20 162:6,8
    180:4 197:23
    206:13 207:20
    208:5 212:2
    248:23 274:5
    277:25
**enforcement's**
    171:16 173:4
**engage** 50:4
**ensure** 328:25
    329:10
**entail** 360:22
**entered** 28:4,8,16
    28:20 207:16
**Enterprise** 1:19 3:9
    3:10 5:23 7:20
    371:12
**Enterprises** 3:6
    5:15
**entire** 75:1 111:5
    195:7
**entitled** 187:21
    278:10
**entry** 78:24
**episode** 205:2
    206:2 246:15
    257:22 309:1,3
    346:17 347:11
**equip** 195:23
**equipped** 129:23
**errata** 123:25
    370:12
**error** 361:7
**especially** 178:5
    212:4
**ESQUIRE** 3:3,6,10
    3:14
**essentially** 69:11
    73:15,17 74:5
**establish** 97:16
**established** 186:24
    192:21 364:6
**Estate** 1:4 5:5
**estimate** 34:21 52:3
    52:19 358:14,15



estimates 57:6
estimation 34:23
  34:24
et 5:6,8 373:2
evaluate 319:16
  328:17
evaluated 267:11
  320:9,13,24
  322:21
evaluating 329:21
evaluation 266:16
  266:19 267:4,8
  318:22 321:2,4,10
  330:6 346:20
  347:7,12
event 64:7 66:7,24
  68:5 132:8 137:9
  164:7,8 217:9,12
  298:18,19 372:14
events 64:2,24
  131:23,23 190:6
  210:22
eventually 74:3
everybody 201:4,9
  335:19,20,22
  348:6
everything's
  254:20
evidence 248:16
ex-wife 27:2 161:15
exact 156:16
  366:24 367:8
exactly 16:13 20:17
  22:4 24:16 39:6
  71:17 73:6 80:1
  112:21 147:13
  153:21 158:3
  162:23 182:13
  199:11 202:11
  222:14 231:12
  236:2 271:1
  284:24 313:16
  324:12 330:2
  356:12
exam 202:16
examination 4:4,5

4:5,6 7:4 121:22
  231:5 359:13
  368:24
exceeded 185:13,15
exception 373:4
Excerpt 4:20
excerpts 82:4
excessive 9:7,7 11:6
  139:1,6 140:1
  166:12,14 175:23
  176:2,6,8,12,20
  176:23 177:4,7,11
  177:18,22 178:2
  178:14,18 179:2
  182:16 188:11,21
  195:8
excited 102:4,24
  103:3,7,18,21
  104:6 231:6,10,13
  231:19 232:24
  233:11 234:19,22
  235:11,13,15,20
  235:23,24 236:9
  237:1,4,10,12,15
  237:17,20 238:8
  238:12,17 245:17
  245:18,20 246:4
  348:21,25
exclude 154:13
exclusive 371:15
excuse 27:17 79:24
  96:22 186:5
  266:13
exerted 214:15
exerting 214:10
exertion 98:4
exhausted 104:14
  107:18 275:23
  310:11
exhaustion 102:5
  104:12 214:9
  238:22
exhibit 4:9,10,10
  4:11,11,15,16,17
  4:17,18,18,19,19
  4:20,20,21,21,22

19:8,10,14 22:11
  22:12,15 23:3
  24:21,21 27:23
  28:25 29:19,21,25
  30:3,9 51:1 57:9
  63:18,21 65:16
  75:20,21,24 78:8
  78:9,12 80:24
  81:5,8 82:3,18
  88:22,23 89:1,7
  93:1,3 96:6,7,10
  96:14,16 99:19
  100:16 101:15
  115:20 116:10,22
  116:25 117:2,4,12
  117:23,23 118:18
  118:19,20 119:12
  120:3,3,15,24,24
  122:23 145:14
  146:8 147:16
  148:3 151:3
  153:14,19,22
  154:7,13 167:23
  168:5,9,12 184:20
  184:24 185:1,4,5
  198:15 202:4,6
  203:10,12,20
  216:1 218:19
  220:15,19 221:5
  222:24 223:24
  224:3 225:2,6,11
  226:8 228:25
  229:9,17,18
  243:18 284:15
  298:13 351:9
  363:17 364:5
  366:9 367:1,2,4,8
exhibits 4:7,13
  29:15 117:17
  141:15 154:10
exigent 140:19
  179:15,23,23
  180:7 181:2,13,23
  354:19
exist 179:16,24
  181:3 182:6

exists 180:20
exited 32:24 33:3
expand 87:20
expect 55:9,11,13
  92:6,15
experience 37:14
  39:7,17 43:8 55:7
  56:7 89:8 92:5
  105:21 106:1
  109:13,23 110:2
  135:10 175:22
  179:11 242:25
  276:21 277:2
  319:15 325:5
experienced 89:15
experiences 43:5
experiencing
  106:13
expertise 262:11
experts 97:12
expires 374:24
explain 225:24
  226:13,20,22,24
  231:18 240:8
  307:16 308:25
  309:4
explained 26:1
  226:17,25 228:21
  308:19
explanation 123:15
  126:21
explanations
  123:25
exposure 54:20,22
  54:24 201:9
  273:17
exposures 185:11
  201:10
expressions 48:10
extend 52:8
extended 355:19
  356:17 357:16,22
  358:16,24 359:1
extensions 152:19
extent 99:20 170:11
external 134:8

extra 116:20
eye 281:24
eyes 219:15

F

face 62:10,12,15
  70:3,19 219:15
  222:16 277:21
  280:25 281:3
  282:12 326:19
  331:1,2,3,8,20
  345:5
facedown 313:1,14
  344:14,17
facial 48:10
facing 326:19
fact 46:13 51:2
  82:13 85:18 95:16
  98:10 105:1
  113:15 118:13
  124:11 125:3,18
  126:20 147:5
  150:10,22 155:8
  156:17 170:20
  171:21 182:15
  183:3 202:1,2
  207:10 214:12
  217:19 222:7
  227:20 228:8
  229:8 231:1
  249:22,23 251:14
  252:24 271:15
  274:23 275:5
  280:10 287:15
  294:24 314:23,23
  322:6 336:10
  341:11 342:10
  355:19
factors 87:14 95:2
  95:10 105:16
  260:18 286:7
facts 264:5 281:25
  285:8 317:25
  318:3,11 321:15
  322:3
factual 175:23



178:11 195:9
226:6 241:16
**failed** 115:14
277:25,25
**failure** 54:14 86:20
230:19
**fair** 8:16,23 59:19
113:18 136:22
172:9 204:15,16
207:6 238:3
284:17,21 345:13
364:12
**fairly** 239:20
**fall** 283:10
**falling** 328:7
**false** 152:5 238:9
327:9
**familiar** 8:6 24:25
25:2 76:9 240:6
**familiarize** 96:14
**family** 9:1 159:5
160:3,15,19
254:22
**far** 10:15 16:23
25:10 34:21 52:3
54:23 57:5 58:2
62:14,25 65:13,17
95:8 98:23 99:17
100:1 101:11
114:13,13 115:14
178:2 195:21
205:7 207:22
215:23 237:9
240:15 252:16
327:6,15,17
342:19 352:17
356:13 358:11,19
**fast** 13:14 324:23
336:18
**faster** 56:22
**fault** 360:24 361:7
**faults** 360:17
**feature** 186:21
**February** 18:1
169:14
**feel** 24:11 45:13

211:5,9 242:21
323:9 327:19
328:10
**feet** 34:25 52:6,21
52:21 57:6,13,14
75:15 315:15,18
356:1,1,17,25
357:5 358:1,7,14
**fell** 69:9,10 283:8
283:16
**felonies** 172:1,2
**felt** 113:9 243:1
306:16 324:21
**field** 89:15 95:12
204:2 205:6
**fifth** 161:21,22
162:1
**fight** 332:4
**fighting** 178:12
**figure** 247:6
**file** 100:4
**filed** 11:4
**fill** 122:4 309:16
**finally** 110:11
270:19
**financial** 371:19
**find** 49:24 349:20
**fine** 9:16 100:10
101:3 183:10
254:20 288:9
363:11
**finger** 324:8
**fingers** 269:18
**finish** 156:9
**fire** 265:12
**firearm** 108:3,24
108:24,24 109:4
**fired** 171:24
**first** 7:2 8:22 20:1
22:2,16 23:2,3,6
25:22 30:20 31:1
53:14 54:18 57:9
59:19 60:6,9
67:21 76:11,21,22
78:18 82:5,17
84:15 85:3 86:21

97:22 102:21
114:1,2,19 115:15
115:22 119:12
120:18 121:9
123:4 124:13,16
124:20 127:1,6,16
127:18,21 129:5
146:13 159:13
169:13 181:25
195:19 198:21
199:23 201:13
203:19 206:3,5,7
225:13 248:6
253:8 270:15,25
271:4 274:11
277:19 279:4,6,22
285:2,7,8,14
286:15 296:1
299:5,9 302:3
303:10 318:24
323:4 333:24
368:9
**fist** 281:10 287:3
**five** 59:18 67:3
80:25 82:18 115:3
115:16 161:3
203:21 279:16
299:12,18 300:1,3
300:14,17,23
301:7,10,11,16
302:3 315:5
323:19 324:13
347:23 369:21
**five-second** 55:5
**five-sixteenth** 90:1
**fixing** 135:2 287:14
332:25
**flailing** 36:8 38:18
38:24 261:1 262:6
285:7
**flashlight** 35:24
40:21,23,24 41:4
41:9,15 124:7,12
126:12 135:16
137:8,9,16 281:20
361:18

**fled** 36:12 75:10
277:24 295:1
297:5
**flee** 75:15 207:24
307:13
**fleeing** 172:10
208:2 252:5 295:4
297:9
**flip** 30:4
**floor** 184:16 371:8
**foam** 105:20,22
274:9,12,15,25
276:8,16,22 285:2
285:16,21,24
286:5 336:3,7,12
368:9
**foaming** 105:5,9
**focus** 14:8
**follow** 40:14 65:20
73:17,18 84:22
85:14,24 142:20
149:8 150:1,7,11
150:20 156:10
181:22 230:16,23
231:2 232:17
277:25 278:5
**follow-up** 87:19
121:6
**followed** 348:8
**following** 136:13
232:7 371:5 373:5
**follows** 7:3 181:21
**footage** 124:11
126:7 128:5,9,12
128:20,24 129:1,3
129:4,12 130:1,5
130:17 321:8
343:1,2
**footnote** 97:8 120:1
120:5
**footnotes** 97:7
**force** 4:11 9:7,8
11:7,11 40:13
84:5,16,19,22
85:3,14,19 86:6
87:19 94:2 97:12

97:25 98:1 106:20
109:8,11 139:1
165:22 166:6,12
166:14,14,17,21
166:24 167:7,11
168:6,6 169:7,10
169:17,20,24
170:2,5,8,12,19
171:3 172:6,10,13
172:24 174:13
175:8,18,24 176:2
176:6,9,12,20,23
186:25 187:8,22
188:11 193:12
194:15,19 195:3
195:14 206:15,18
206:23 212:8,23
246:21 315:18
**forcible** 172:2
**foregoing** 372:9
**forgive** 26:9 33:9
33:23
**forgot** 281:13 293:7
293:9 347:20
**form** 9:12,14 37:25
42:21 43:16,17
44:8,22 45:2,16
46:11 47:18 48:8
48:24 49:3,21
50:9 53:4,10
57:21 59:5,8,13
59:22 60:13 61:25
68:9,25 73:22
76:14 85:15,20
86:2,9 91:2,21
92:1,9,18,23
93:21 94:7,18
95:6,14 96:4
103:23 106:21
107:22 109:16
126:2 135:17
136:5,6,25 137:24
139:3 141:5,6,10
142:5,10,11,16,17
142:25 143:1,8
144:14,15 145:4,5



146:6 147:4,10,11
147:20 148:5
149:16 150:2,12
155:22,24 156:13
156:14 157:14,15
163:16 164:1
166:8,13,19,25
170:10,21 171:6,7
171:18 172:21
173:7 174:3,16
175:10 177:5,12
177:23 178:24
179:22 180:8,15
180:23,25 183:19
184:3 185:20
186:9 187:2,13,24
188:18 189:4,15
190:3,15 191:11
192:3,10,23
193:17,21 194:22
195:11,25 199:9
204:4 212:19
214:11,19,20
216:12 222:9
223:21 226:3
228:2,3,19,20
229:6,7 231:25
233:14 234:4,15
234:20 235:5,7
236:20 237:3
238:10 239:6
240:1,19 241:13
241:21 242:8
243:11 244:7,8,25
245:1,11,12 246:6
249:17,18 253:5
256:25 258:14
259:4,7,24 260:13
261:21 262:12,22
263:10,19 264:6
264:21 266:3
268:9 270:4 271:8
271:13,18 272:6
272:10 275:8
276:11,17 278:6
279:18 280:20

281:21 282:4,24
285:11 286:18,25
287:18 289:17,24
290:21 291:2
293:12,17 294:16
295:3 297:14
299:13,19,20
300:8 301:1,23,24
302:18 303:20
305:2,13,14
306:18,19 307:18
308:17 309:21,22
310:1,17,25 311:6
312:16 313:7,15
313:21 314:19
315:22 316:6,21
316:22 317:2,17
317:23 318:6,16
318:23 319:18
320:3,15 321:12
322:5,15,22 325:1
327:10 328:12
330:1,18,23 331:4
331:10,14 333:11
334:9 335:7,13
337:1,25 338:1,7
338:16 339:20
340:24 343:17,18
343:23 345:16
346:22 347:13
348:10,23 351:1
352:3,12,13 353:7
353:9 356:3,20
357:2 358:4,8,9
360:11,20 361:1,9
361:14,20,24
363:14 367:16,24
368:6,12,17
**formal** 103:8
**formally** 80:6
**forms** 147:7 157:17
157:25
**forth** 30:4
**forward** 69:9
**fought** 75:10
**found** 25:7 112:20

252:17
**foundation** 9:14
144:15 145:5
146:6 147:4
156:13 157:15
163:17 164:1
179:22 180:8,25
183:19 204:5
214:11,20 226:4
228:2,20 229:6
231:25 233:14
234:4,15 235:7
241:14,21 244:9
299:20 306:19,22
348:10
**four** 24:21 29:1,7
67:8,17 127:24
129:6 171:23
203:21 218:14
242:25 244:4
261:4 279:11
301:20 323:14
333:17
**fourth** 227:17
301:13 306:2
**frame** 62:14 114:23
131:25 301:6
**Frank** 3:18 5:16
**free** 24:11 83:11
176:23 177:4
186:6,11,24
187:21 227:8
**front** 33:5 52:18
63:21 82:4 89:3
116:9 143:12
145:13 184:21
215:12,13 217:4
217:21 298:13
326:19 328:10
358:17 360:9
363:18
**full** 7:8 12:5,9
49:14 55:5 273:2
333:17 370:17
**fully** 141:25 142:4
232:16 358:24

**function** 62:23
**further** 4:5 56:21
193:12 214:17
217:19 359:13
369:14 372:12
**future** 173:11

**G**
G 373:1 374:1
**gain** 69:11 72:11
74:2,25 108:16
236:9
**gained** 206:17
235:19
**gap** 56:21 138:2
**gasping** 310:15
311:4 327:25
**gather** 256:16
**GBI** 10:17,18 64:21
65:15 166:5
**gears** 138:12
**Gene** 1:11 5:6
**general** 84:17 85:3
169:7
**generally** 117:19
117:22 173:24
195:13 197:23
**generated** 242:14
**genital** 223:7
**genitals** 222:16
**gentleman** 210:6
**gentlemen** 155:7
**Georgia** 1:1,13,15
1:17,19 2:10 3:4,7
3:16 5:8,10,14
10:5,17 20:5
22:19 159:1,3,7
159:16,19,22
160:3 167:19
371:2,5,7 372:2,6
372:16
**getting** 70:24 73:12
74:10 195:15
330:21
**give** 6:10 53:20
61:1 65:7,10,12

116:13,16,19
122:12 138:7
154:5,10 158:8
179:13 201:19
211:18 235:15
237:24 256:18
258:24 266:7
269:12 278:9,10
297:12 309:8
**given** 60:9 127:6
129:5 141:12
148:21 165:1
194:13 212:10,13
212:24 220:4,12
223:3 230:24
238:15 245:20
251:25 252:3
269:16 275:13
321:17 371:19
**gives** 73:16
**giving** 36:6,18,25
72:8 259:2 278:1
278:4
**Glock** 134:8
**go** 7:13,14 8:9,22
16:20 20:23 22:4
23:17 29:3 34:17
45:4,8 47:19 49:7
59:25 63:5 65:23
66:23 70:17 81:8
99:3 109:10 115:3
115:14,24 116:21
117:7,16,19
118:18 129:15
145:12 158:10,11
167:5 170:14
186:3 188:10,12
192:11 194:4
196:10 199:7,25
201:25 203:11
211:5 216:22
217:16 226:13
229:1 240:2,10
246:12 249:14
253:22 254:9
255:22,25 256:11



257:12 261:22
270:19 271:7
272:15 280:23
283:19 290:22
293:18,24 312:4
315:9 317:4 319:6
329:21 330:10
342:16,17 349:5
349:16 353:23
354:1,4,24 366:19
**God** 36:3 37:8
38:22 71:16,20
260:22
**goes** 60:2 70:16
83:14 89:22
102:13 269:19
**going** 8:15 9:23
12:11,19 16:15
18:12 21:19 22:10
26:1,12 27:16,17
27:23 28:12 29:25
30:3 36:5 40:25
44:4 45:10 48:18
49:14,15 50:19,19
51:1 52:16 53:21
56:4 60:8,16,23
61:7 66:16 70:17
72:24 76:11 78:17
78:23 81:13 82:12
82:17 83:10 89:7
90:5 93:1,1 97:7
99:5 100:8 101:5
101:25 108:13,14
109:14,20 110:20
114:3 115:4,8,19
116:4,15,18 117:2
117:17,20,21
118:18 119:5,6,7
121:8,9,10,16
132:12 136:2
137:13,20 138:12
138:13 141:1
143:9 144:2 151:1
151:9 152:10
154:10 156:5
158:14 168:4

172:14 174:19
181:17 186:1
194:8 195:3,14
197:6 201:20
206:8 214:18
215:5,9,21 216:25
217:4 218:11
220:18 225:7,11
227:3 228:9
241:18 243:7
247:6 250:22
254:23 255:20
256:20 257:10,11
257:12 259:9
265:12,16 273:16
286:23 287:10,11
287:25 289:15
290:13,14 291:19
293:6,24 294:12
302:8 303:7 306:6
306:9 307:11,12
307:13 308:9,14
315:18 318:24
323:5,16 332:24
333:1,22 334:3
335:25 341:24
343:16,25 344:1
349:5,9,13 351:4
351:5,8 353:14,24
353:25 356:9
359:9 365:16
367:4 369:22
**good** 7:6,7 45:25
59:11,20 61:3
205:5 214:22
241:24 293:22
**good-faith** 45:14
**Google** 236:1
**gosh** 322:22 364:14
**gotten** 150:25
151:16 152:22
306:15
**government** 194:14
194:25 195:15
**GPSTC** 167:12,17
167:19

**grade** 203:4,7
**grading** 203:8
**graduated** 11:18,19
11:21
**granted** 152:19
**Great** 17:19 28:18
**greater** 87:3
**green** 218:23
221:23 222:2
223:11
**groan** 340:16
**groin** 213:8,11
222:5
**ground** 55:3 62:6
62:16 69:16,20
71:2 72:1 124:25
190:13 192:8
283:7,8,10,11,19
283:22,24 284:1,7
304:11 306:4,15
309:20 310:4
311:10 314:16
315:2,5 316:20
330:25 331:3,9,23
**grunt** 340:16
**Guard** 17:24
**guardian** 1:7
**guess** 170:23
172:15 228:1
293:5
**guidance** 97:13,13
97:15 120:2
**Guide** 4:9 221:4
**gun** 132:22 133:15
134:6
**guy** 132:13 172:9
174:12,23 175:5
195:15 265:3
267:11 271:7
347:20
**guy's** 194:20
**guys** 19:9 151:5

---

**H**

**half** 91:7,18,19
92:3,6,16 152:4

153:2 216:7
333:17 356:25
359:1
**halfway** 9:21 117:8
**Hall** 2:9 20:5 22:1,6
22:19,23 23:10,11
23:14,17,20,25
24:2,3,8,18,19,23
25:12 27:16,18
28:8 30:12
**Hancock** 74:19
112:12,13,18,25
329:2,3,6 347:19
**Hancock's** 128:20
**hand** 6:8 40:24
41:9 70:13,17,22
126:19,24 127:2,7
127:19,22 151:8
167:4 190:21
191:2,3,8,15,19
191:20 192:2,9
215:5 225:11
281:9 315:9 327:6
327:12,15 328:9
330:17,19 332:13
332:14 356:18
357:1 372:15
**handcuff** 75:4
191:4 241:5 309:5
331:23
**handcuffed** 74:11
188:8,15,16
192:17,22 193:11
193:16 277:11
313:14 314:16,25
315:4 316:4
318:20
**handcuffing** 74:15
**handcuffs** 63:15,16
69:13,17,22 72:6
74:4,9,23 192:14
**handed** 99:13
100:16 141:14
224:6
**Handheld** 154:14
**handle** 200:2

258:24 346:9
**hands** 36:7,18,19
37:3,4,13,23
48:12,12 49:16
57:24 60:22 61:15
70:5,8 109:11,14
109:20 110:5
111:21 189:25
190:18 208:11
287:9,17 288:3,6
289:14,19 295:18
295:24 296:12
303:19 327:3
358:16
**hands-on** 82:23
**Hang** 264:1
**hanging** 359:16
**happen** 189:2
**happened** 25:20
35:22 65:2 101:1
169:18 210:23
216:20 281:23
283:5 309:9
351:13 352:11
**happening** 336:17
336:18
**happens** 273:3
**hard** 32:15 185:2
**harm** 171:17 173:3
173:5,10,25 174:1
174:2 181:4
247:23 289:12
307:11 315:5,12
315:13,24 316:2
**harmed** 316:5
**hate** 359:7
**hates** 36:3 37:9
38:22 71:16,21
260:22
**hazard** 175:15
178:20
**head** 9:15 38:19
48:12 62:5 70:16
70:21,24 89:23
90:12 91:8,9
113:19 134:1



162:9 186:14
188:17,22 205:24
213:8,11 216:6,8
219:15 222:5
223:7 287:16,17
288:3,7 289:5,6
295:6 335:16
**headlights** 31:10
33:1,15
**health** 35:4 95:24
103:15 107:5
258:7 259:14
262:11,16,18
263:17 265:23
266:2 267:4,4
321:1 343:22,24
346:17 347:11
**hear** 26:8 27:21
30:14 55:13,16
56:1 114:8 207:12
304:12 333:19
335:21,22 344:23
346:5 362:24
363:2 369:2
**heard** 31:22 114:2
212:12 256:4
267:16,18 280:15
342:21 346:6
365:9,11 369:7
**hearing** 56:4
113:21
**heart** 93:16 102:3
102:22 107:14
213:23,25 214:7
214:16 219:16
222:17 226:21
227:1 243:25
325:12
**heart's** 226:25
**heavily** 310:13
335:19
**heavy** 344:23
**heightened** 37:20
**heightens** 297:10
**held** 5:12
**help** 20:9,22 21:15

22:25 26:3 27:14
35:15,15 39:8,11
39:13 41:10 50:20
123:10 247:15,22
249:23 250:23
251:15,18,20,21
252:22 254:11,15
255:3,3 319:15
332:2,5 343:15
**helpful** 343:10
**Henderson** 1:13
3:13 74:20,21
128:19 270:2
329:13,16,19,21
329:24 330:5,11
347:25
**Henderson's**
270:20
**Henrich** 3:6
**hey** 254:14,19,22
255:2 309:14
326:5 332:1
**hid** 35:21,23 302:15
**hidden** 294:24
**hiding** 40:3 46:24
47:14 207:10,17
260:25 262:3
285:7 295:10
**high** 107:16 173:15
281:24
**higher** 87:4 325:12
**highest** 16:24
**hindsight** 321:14
**history** 35:7 78:20
106:5 206:12
207:8,9,20,23,23
208:2,3
**hit** 23:17 62:9
188:17,22 189:3
215:11,12 216:19
217:21 273:19
278:25 279:2
280:17,19,25
281:2,5,9,12,18
282:23 283:2,4,5
283:21 286:23

287:14 289:15
290:14
**hitting** 292:14
**hobble** 75:6,9,11
312:11 314:17
315:1,4,16,17
316:4 318:20
**hold** 17:6 69:11
70:3,6 74:6 194:4
266:20
**holding** 70:19 71:1
111:18 189:25
192:8 281:19,19
330:17
**hollered** 364:5
**holster** 133:18,22
134:13 200:5
211:10
**homeowner** 207:19
209:5
**HON** 1:11
**honest** 230:5
273:20
**honestly** 60:14
215:1 269:7
327:21
**Honorable** 5:6
**hope** 359:8
**hopes** 56:19
**hormones** 93:17
244:1
**hostile** 38:9 48:14
62:8
**hour** 8:18 173:21
354:11
**hours** 79:6 81:22
155:20 162:25
163:4,6 197:24
198:6,9,24 199:13
199:14
**house** 28:2 206:8
206:10,11,13
207:18,18,25
252:10,10
**human** 185:12
**hurry** 47:15 298:4

**hurt** 98:3 290:13
341:18
**hush** 349:7
**hypothetical** 183:3
195:5 201:25
202:2 317:19
**hypotheticals**
182:15 278:3
318:1

---

**I**
**idea** 24:12 69:23
237:1 247:4
252:24 274:17
329:9
**ideal** 217:25 241:7
242:6 244:6 351:3
351:5 358:1
**ideally** 217:2,20
219:24 220:3,3,4
220:6,7,11 354:5
**identical** 148:8,11
148:16 230:10,11
**identification** 19:11
22:13 30:10 63:19
75:22 78:10 81:6
88:24 96:8 116:23
151:4 167:24
220:16 223:25
225:3
**identified** 125:17
126:12 127:25
147:16 311:11
346:8 367:20
**identifies** 369:10
**identify** 134:11
148:11 220:20
235:10 236:24
237:7,14 248:19
268:7 297:8
**identifying** 28:24
**ill** 258:20 275:18
**illness** 263:8 264:18
275:21 309:1,3
**illuminate** 26:6
135:21,22

**illuminated** 35:24
**illuminates** 135:6
137:8
**immediate** 49:18
50:23 61:23
**immediately**
109:21 134:3
159:5 202:19
255:5 286:13
293:3
**imminent** 178:4
**immobilized** 63:1
**implicate** 152:24
**implications**
152:13
**impressions** 308:10
**improper** 100:19
307:22 366:3
**improve** 236:16
**impulse** 214:16
298:17
**impulses** 213:25
**inaccurate** 125:3
**inaccurately**
100:25 101:1
**inappropriate**
99:13,21 100:13
143:5
**incapacitate** 83:15
83:21 97:24
212:24 240:18,22
**incapacitation**
55:19 86:13,17,23
98:4 186:21 241:2
244:6,18,23 245:8
**inch** 92:6
**inches** 88:20 89:23
89:24 90:11,12
91:7,8,13,14,18
91:18,19 92:3,16
216:6,7
**incident** 4:15 8:1
13:24 15:14 18:13
19:19,21 20:2
64:17,20 66:4
76:6 77:25 92:22



95:16 122:20
124:23 165:22
169:17 205:10
209:9,10 210:1
236:23 237:11
238:6 282:3
284:13,19
**incidents** 205:25
**include** 76:17 102:3
102:22 108:22
243:24 360:22
**included** 93:15
337:6
**includes** 97:13
340:23
**including** 42:19
45:1 87:14,19
93:15 94:3 98:2
106:17 270:2
**incomplete** 170:11
**inconsistent** 165:11
**incorrect** 143:25
248:8 297:4
**increase** 93:14
101:20 214:9
230:20
**independent**
165:19 238:15
274:14
**indicate** 28:15 32:9
33:7 35:17 51:5
91:23 105:13,14
126:19 291:23
355:4
**indicated** 30:16
112:23 123:11
124:22 125:1
240:11 278:23
357:11,13
**indicates** 363:6
**indication** 114:12
**individual** 29:1
56:9 78:13 95:1,9
98:5 206:9 209:10
368:4
**individually** 1:5,12

1:13,16,18 5:7
335:23
**individuals** 94:12
94:21 102:1,2,21
120:21 240:7
363:21 367:13
**inflict** 187:11
192:22 193:5,10
**influence** 209:11,12
239:5,11,18,21
246:4 276:5 309:6
**information** 20:12
20:13,18,21 21:7
35:19 36:4 49:24
95:10 104:25
106:12,18 141:8
141:12 144:11
154:15 163:13
223:17 243:14
251:25 252:3
256:16,18 341:8
343:10 360:8
**infraction** 171:9
172:18
**inherently** 110:2
**initial** 56:4 60:7
77:11 162:5,25
178:25 179:1
**initially** 22:5 38:17
54:17 56:3,18
72:1 125:4,10,14
126:13 255:13
261:5 296:6
**injuries** 39:14
89:19 215:19
**injury** 83:22 84:3,6
90:6,20 94:4,25
98:1,12 101:21
109:14 119:15,24
219:8 227:6,13
239:12,15 287:6
**inquired** 46:4
**insert** 269:20
**inside** 35:12
**instance** 109:19
146:8 167:4

**instances** 205:23
**instructing** 349:25
350:11
**instruction** 196:9
202:23 212:13
**instructions** 96:24
117:9 149:8 150:7
154:15 163:10
165:12 212:10,25
230:16,23 232:8
232:17 348:7
**instructor** 4:9
77:18 79:11,18
145:20 155:12
157:5 221:4
**intend** 40:15
216:19
**intended** 122:12
289:12 355:13
**intending** 35:18
49:2 58:3
**intent** 37:18 100:21
109:5 329:9
**intention** 216:21
217:15 354:3,22
354:22,24
**intentionally**
219:14
**interact** 259:19
**interaction** 10:7
104:17 105:12
108:25 111:5
291:11
**interactions** 95:11
**interest** 194:25
195:15 371:10
**interested** 247:20
372:14
**interests** 194:15
**interfere** 125:24
**interior** 215:12
**interject** 98:16
**internal** 64:1
**interpret** 58:2
**interstate** 14:9,9
**intervention** 16:2

257:25
**intoxication** 102:6
104:22 238:25
**Intoxilyzer** 16:8
**investigate** 27:6
**investigating**
278:11 314:14
**investigation** 10:6
10:9,13,21 11:9
110:17 165:22
166:1,6 278:20
295:7
**Investigations** 10:5
10:18
**Investigative** 20:24
**involve** 98:12
**involved** 25:7 71:1
74:14 123:18
165:23 331:16
**involvement** 65:3
250:2,6
**involves** 98:2
**irrational** 209:13
210:5,11,13,16
261:11,17 262:3,7
262:20 263:4,7
264:17 320:13
**irrationally** 210:21
260:6,12,16,19
261:6,14 265:3,5
266:9,11 289:11
302:20,22
**irrelevant** 100:7,12
100:20
**issue** 247:15,16,17
262:16,18 263:17
366:1
**issued** 40:7 204:24
**issues** 35:5 244:11
258:7 259:14
**item** 227:18
**iteration** 56:6

────────────
**J**
────────────
**jail** 12:15,18,20
160:22

**jailer** 12:23
**James** 1:4,5,8 5:5
9:1 57:11
**JANICE** 1:8
**January** 82:7 221:5
221:16 224:13
225:16
**jerk** 339:24 340:11
**job** 14:13 236:19
254:11
**JOHN** 3:3
**Johnny** 5:24 99:10
121:25 173:21
**johnspurlin@sp…**
3:5
**join** 17:25 135:18
137:1 150:13
170:22 177:6,25
186:10 187:25
188:19 190:4
191:13 216:13
226:4 240:20
241:14 243:12
246:7 253:6
260:14 262:23
263:11,20 270:6
287:21 289:25
301:3 320:17
322:7,24 333:12
339:21 356:4
**joined** 18:1
**JORDAN** 1:8
**Jr** 1:15,23 2:4 4:3
5:3 7:1,12 373:3
374:21
**judge** 100:23
349:12
**Judicial** 371:5
**July** 78:21
**jumped** 62:7
210:10
**June** 8:2 198:18
**justice** 17:5,7
**justify** 296:20

────────────
**K**
────────────



**keep** 56:12 70:24
122:2 181:17
185:12,21 265:12
288:25 291:15
301:6 307:4
362:9
**Keeping** 330:21
**keeps** 75:14 356:10
**kept** 130:24
**kick** 75:12,17
188:10,13 283:21
315:15,18
**kicked** 69:6 75:18
**kicking** 75:13
315:21
**kill** 173:21
**killed** 172:9
**kind** 31:17 32:14
33:6 34:12 56:13
71:4 96:22 114:13
117:16,18 122:10
135:10 159:2
160:24 163:4
216:20 237:25
238:2 250:5
266:16 267:4,8
268:18 275:20
296:2
**King** 2:9 5:14
**knee** 69:7,8,25 70:2
75:18 125:10,14
126:9,14 267:19
267:25 344:8
345:3,12,14,24
**knees** 31:18 57:24
58:2 60:22 61:15
63:9 243:6 284:10
306:8 308:5,5
**knew** 47:11 106:8
114:14 186:17
206:9 207:18
231:9 233:2
239:17,24 240:3
251:22 271:11
280:10

**knock** 208:22
**knocked** 62:15
283:6,6 306:3
**know** 8:20 10:18
15:2,23 16:14
20:12 21:20 23:13
29:9 32:20 34:2
35:2,7,9,11,14
36:10,11 37:2,12
37:18,23 38:23
39:11,24 41:1,13
42:25,25 43:9
44:20 49:12,16
50:16 52:11 57:4
60:3,20 62:5,11
62:15 63:1 64:3,4
64:23 65:21 68:13
68:16,18 69:7,9
71:6,13 72:4,25
73:1,3 74:14 75:9
98:22 99:1 100:23
103:2,7,10 104:13
104:16,19,21
105:19 106:4
109:22 110:1,1,1
112:19,25 114:6
114:12,14,25
122:17 123:8
124:22 128:21
129:24,25 131:9
135:2 138:6
143:16 145:7,8
147:3,5 152:1,18
152:21 153:15,16
155:9,9,10 156:16
158:20 164:4
167:16 168:14
173:16,19 174:23
175:3,5,19 182:25
183:7 185:3
189:13,20,20
190:25 192:4,5
195:21 196:11
197:9 198:5,6
203:6,8,17 204:7
204:10,23,25

205:1,22 206:3
207:3,24 208:12
210:8 211:20
214:12,17,21,22
221:10 222:14
225:13 226:5,11
228:6,8,22 229:8
229:18 232:25
233:9,15 234:22
234:24 235:11
236:2 237:4,9,16
237:18,18 238:21
238:24 239:2
241:15 242:13,14
242:19,23,24
243:3,17 244:4,10
244:12,13 245:18
245:25 246:1,11
246:19 247:6,6,14
247:17 249:7,9
250:21 252:18,19
252:21 255:19
256:3 259:21
264:4,13 267:14
269:24 270:10,19
271:1,14 272:11
272:12 273:3
275:25 276:7,18
276:24 280:1,12
282:13 283:6,18
286:3 288:2 292:4
293:3 294:9
295:15,17,18,19
295:20 297:7,18
302:23 304:6,8
306:22 307:1
308:5,6,21 310:12
311:23,25 312:13
312:17,20,25
313:8,16 314:1,11
314:22,23 317:7
318:11 321:15
322:6,8,10 324:11
324:12 325:2,7,24
326:1 328:20
330:2,12 331:11

331:13,21 332:15
332:17 333:24
334:1,7,12,18
338:18 339:14,16
340:19 341:10
342:19,25 344:16
346:20 348:1,24
356:12 357:19
358:11,16,25
359:1,2,15 360:24
363:8 364:16,18
365:3,15,16,18,21
365:22 366:4,21
367:21
**knowing** 36:4
47:24 106:15,18
234:18 246:3
297:8 322:2
**knowledge** 76:5
78:19 79:17 80:3
82:8 95:17,20,23
111:3 112:16
169:19 196:7
235:19 236:9,9
373:4
**known** 176:25
367:14
**knows** 235:14

---

**L**

**L** 3:10
**L-e-n-o-x** 12:3
**lab** 185:12
**lacerations** 282:8
**lack** 354:23
**lady's** 342:2
**lane** 342:4
**large** 28:6
**laser** 16:7 42:13,15
50:3 135:7,7,12
135:12,15,22,24
136:14 361:18
**lastly** 87:24 109:10
**law** 37:14 49:13
77:1 94:2,10
97:11 106:1 120:1

135:10 160:20
162:6,8 171:15
173:4 180:4
192:20 197:23
206:12 207:20
208:5 212:2
248:23 274:5
277:24
**lawful** 47:9 185:22
**lawyer** 196:3
**lawyers** 273:2
**laying** 309:19
314:16 315:2,5
326:14,16,25
**lead** 43:20 250:1,1
**leading** 43:18 45:1
**leads** 24:3
**lean-to** 33:24 34:1
34:5,7,20 248:7
248:10 292:23
**leaned** 30:23 31:16
250:7
**leaning** 248:7,8
249:11 292:17
**learn** 35:19 89:13
93:9 360:13
367:23
**learned** 86:25 87:5
87:10,15,21 88:2
88:15 93:18 94:5
94:15 95:3 101:22
102:10,17 105:22
106:16 108:9
**learning** 88:6
**leave** 89:10 316:20
**leaving** 355:10
**led** 26:5 249:24
260:18 261:5,13
263:4 264:19
278:17
**Lee** 3:15
**left** 11:25 14:21,23
22:22 26:6 61:13
65:17 81:20 83:17
93:3 101:14
232:21 234:18



244:20 246:2
281:4,12 286:15
303:4,10,14,14
312:24 326:17,18
326:25 332:10
342:20 344:19
**legal** 5:17 76:25
249:14 254:8
371:7,9,11,13,15
371:18
**legs** 87:13 332:16
332:20 347:20
**length** 53:1
**lengthy** 202:10
**Lenox** 12:1,2,25
13:10,15 159:10
165:5 205:15
274:8
**lesser** 212:6
**let's** 76:21 121:5
145:12 153:10
158:8,10 168:19
173:9 185:19,21
188:7 190:20
199:25 205:25
229:1,13 277:22
291:15,16 364:12
**lethal** 109:5,8,8
206:15,18,23,24
206:25
**level** 16:24 109:23
**levels** 86:22
**lieutenant** 1:14
65:12 74:20
**life** 109:6 205:14
**lift** 211:12 313:20
**lifted** 339:18
**light** 137:10
**lighting** 26:20
**lights** 26:5,5 248:25
**likelihood** 87:4
97:25 98:11
**liking** 13:11,14
**limit** 139:15 179:24
181:5
**limitation** 179:12

179:18 180:5,12
183:18
**limitations** 180:21
**limited** 86:24
**limp** 272:18 312:5
314:7,16 316:3
318:19 319:6
322:19 338:19,22
346:18 347:10
**line** 28:11,15 30:25
194:18 215:10
216:18 217:1
298:24 360:5
367:15 373:6
374:2
**list** 102:20
**listed** 77:6 104:5
106:3 155:7,12
**listen** 126:6 337:12
**listening** 252:25
362:24
**litigation** 371:20
**littering** 170:6
**little** 12:16 36:15
53:8 218:22 225:7
324:21,22,23
325:9,10,12,14,15
357:7 360:9
**live** 159:1,3,7,9,15
159:18,21 160:8
160:10 161:10,12
161:17,24
**lives** 159:10 161:13
161:18,25
**load** 318:8
**loaded** 271:12
311:24 317:15,22
318:4,12 321:10
321:23 322:4,10
347:17 348:2
**localized** 87:25
**locate** 257:13
**located** 34:14
**location** 25:5 31:2
47:5 73:3 90:25
369:11

**locations** 87:14
**locked** 55:2
**lockup** 86:24 92:15
**log** 4:19 64:1,8
138:6 298:16,18
298:19
**long** 11:16 12:18
52:19 69:20 122:2
130:21 138:2
162:13 179:15
180:10,19 181:1,2
181:8 182:5
201:16 259:22
269:5 283:17
284:1 291:10,13
305:6 312:11
324:8,12 334:4
335:4,5 345:19
346:2 357:8,9
359:16
**longer** 73:2 305:19
305:23 312:14
**look** 22:22 24:11,25
25:2 28:9 31:4
33:11 117:20,23
117:24 122:16
123:1 128:15,22
143:13 145:12,13
147:12,15 149:3
151:10 155:21
157:4 168:21
169:13 173:10
184:11,15 185:24
198:14,20 203:19
215:9 216:17
217:1 218:19
224:10 228:24
229:20 230:8
261:10 291:15,16
291:17 298:22
303:25 321:13
328:7 344:5
352:25 357:18
366:7,8
**looked** 48:11 99:25
100:1 122:18

128:13 129:11
292:11
**looking** 11:6 19:17
24:20 27:24,25
48:15 63:6 82:5
117:16 175:3
227:7,8 337:10
355:5
**looks** 78:21,24
82:12 168:25
171:22 203:19
303:16 333:13
**lose** 111:24 241:3
242:6
**lot** 28:4,5 30:22,24
71:14,15 159:3
193:22,23 196:17
246:11,13,23
259:17 285:9
325:14 360:2
**Love** 3:7
**lower** 217:3,22
218:3 219:10
354:6
**Lowndes** 160:12
**lunch** 121:5,9

—————————————

**M**

**M26/X26** 76:23
77:15 145:17
**ma'am** 7:11,16,24
8:3,5,8,14,17,24
9:4,10 10:8,11,20
10:25 11:8,12,15
12:13,15 13:2,5
13:19,25 14:16
15:1,4,10,15,18
15:21,25 16:7,10
16:18,22 17:6,12
17:22 18:4,11
19:1,3,16,22,24
20:3,7,15,25 21:4
21:8,22 22:9,21
23:1,4,12,22 24:6
24:15,19,24 25:1
25:18 26:16,19

27:1,5,8,11,19,22
28:7,10,14,19,22
30:17 31:5,24
32:4,10 33:8,12
33:19,22 34:13,15
35:3,6,8,10,13,16
36:24 37:5,12
38:5,8,11,13 39:3
39:16 40:8,11,17
41:2,6,12,16 42:4
42:11,14,17,22
43:10,14 46:23
48:7,19,23 49:4
49:25 50:6,25
51:4 52:10,13,15
53:5,9,16,19 54:2
54:5,8,11,21 55:6
55:21 56:10,14
57:12,18 58:22
59:9 60:25 61:18
62:1,11,20 63:16
64:3,19 65:5,8,19
65:22 66:5,15
67:1,14,18,23
68:6,24 69:15,19
69:23 70:4,7,10
71:3 72:14 74:12
74:18 75:7 76:8
76:10,15 77:5,13
77:24 78:2,7,14
78:22 79:1,4,7,10
79:19,22,25 80:5
80:8,10,12,16,23
82:2,11,16 83:1,4
83:9,13,25 84:4,7
85:7 86:1,10,15
87:7,23 88:1,3,8
88:12,17 89:4,6
89:12 91:3,11,20
92:4,8,17,24
93:12,20 94:1,8
94:23 95:5,19,22
95:25 96:5,15
97:5 98:9,13
101:24 102:12,19
103:14 104:11,18



104:24 105:2,7,24
106:2,6,11,14,22
107:6,9,11,13,15
107:17,19,23
108:5,8,19,23
109:9 111:9,12,20
111:24 112:3,17
113:2,14,17 114:4
114:7 115:18
117:1,6 118:16,21
208:20 359:17
361:8 362:16,23
367:6 368:18
**machine** 301:16
**Madam** 29:10
**Magna** 5:16 371:7
371:9,11,13,15,18
**maintain** 87:12
**major** 79:13,14,18
79:20 103:17,21
139:22 141:8
145:1 146:1,10
148:22 150:10
162:20 163:25
164:18,25 165:13
165:16 181:8,20
181:21,22 183:17
199:5,16 201:19
211:16 223:3
231:18,21 232:23
236:7,12 238:19
319:24 320:6
350:21
**majority** 258:8
345:22,23
**making** 64:25
68:10 131:1 228:4
228:5 241:23
242:1 361:25
**mama** 159:9
**man** 185:3 221:23
254:14,19 332:1,4
350:19
**mandate** 97:15
**mandated** 149:14
**manipulate** 54:13

**manner** 75:4 180:3
**mannerisms** 291:8
**manually** 130:5,6,7
**manufacturer**
85:13
**March** 11:21 98:20
101:11 117:9
118:3 154:13
366:11
**mark** 19:8 22:10
23:5 28:12 29:3
29:15 116:16
292:9 295:23,23
304:23,23
**marked** 19:10,14
22:12 29:24 30:10
63:18 75:21 78:9
81:5 88:23 96:7
116:22 151:3
153:11,19 167:23
168:4,8 216:1
220:15,19 223:24
224:3 225:2,5
**married** 160:6,6
**Mary** 161:22
**mass** 219:10
**material** 146:3
233:19
**materials** 98:19
146:22 149:9,24
150:8 156:11
165:1,12,18
202:24 227:19,24
230:17 231:24
232:18 233:12,22
348:7
**matter** 5:3 7:19,23
8:1 367:2
**matters** 305:5,6
**McBrayer** 1:4,5,6,6
1:7,8,9 5:6 9:1,8
10:7 11:7,11
15:14 18:13 25:4
25:6 30:21,23
31:1,11,13 35:2
36:6,18 39:15,24

40:10 42:10,16
46:21 49:24 51:3
51:7,12,25 52:25
53:8,18 54:6,15
55:25 56:18,24
58:8,13 60:10,16
61:14 62:19 66:4
69:3,4,6,10,14,17
69:21 71:2,5,9
72:2,22 73:25
74:6 75:1,10 76:7
76:18 77:2 89:2
95:17 104:10,13
105:5,13 106:8,19
107:1 108:1 109:1
109:21,22 110:11
110:24 111:6,22
112:9,23 113:3
114:3,20 115:16
124:13,22,24,24
131:18 137:18,23
138:3 151:20
169:18 178:12,16
179:6 189:24
190:9 205:2 206:2
210:2 214:24
222:8 237:11,24
238:6 239:4
242:23 246:5
248:1 249:25
252:14 253:8
254:12 259:23
260:11,21 265:22
266:16 267:5
268:4,6 276:25
277:5 280:21
307:7 308:1,4,5
308:11,25 311:9
311:21 321:9
333:14 341:12
346:4 355:7 373:2
**McBrayer's** 27:2
69:25 70:14 73:3
74:8 92:21 106:4
109:6,23 110:18
113:8,16 125:11

125:14 310:4
367:22
**mean** 10:14 15:5
21:13 24:10 25:9
37:15,16 44:5
52:11 63:15 64:10
65:11 86:16 88:18
99:22 105:15,24
106:25,25 108:11
115:1 118:25
122:19,23 129:7
129:15 133:15
137:2,2,3,7
140:22 141:11
147:12 152:10,20
157:16 159:2,5
163:3 167:1,2,10
169:7 170:10,23
172:6,15 173:2,8
174:17 175:11,15
175:16 182:12
184:4 186:8
187:18 188:6
189:6 190:25
193:22,25 194:17
196:1,23,24 201:7
202:10 204:6
206:19 208:2,7,10
210:22,23 211:18
213:3 214:21
220:3,10 224:25
226:5 228:1
233:15 234:21
236:1 239:14,15
240:3,8 241:10,22
243:5 244:10,19
245:2 246:12,13
246:23 247:1,4,4
250:20 257:4,5
258:5,12 259:18
259:18,25 261:9
264:3,13,18
267:22 268:2
269:13 272:1,2,4
272:8,12 277:18
277:20 285:9

286:11 288:1
290:10 293:5,7
294:12,18 298:15
301:9 309:17
310:12 315:11,15
316:24 317:18
319:8 324:23
325:9,24 328:13
329:5 330:2,8
331:2,3,15,19
334:16 336:16
337:3,5,20 339:12
339:13 344:24
352:15 353:6
358:20 363:5
365:8 369:9
**meaning** 47:15
245:23 324:22
355:10
**means** 15:3 33:10
37:16 68:18 109:6
123:8,13 132:22
189:13 206:24
220:4,6,7,11
264:4,14 274:9
275:13,16,18,20
275:23 293:9
315:17 324:11
325:2,10 338:13
**meant** 231:10,19
234:19 238:20
242:10 245:17
260:8 274:15,18
275:25 339:17
341:1
**measure** 310:7
311:15 324:6,9
358:20,21
**medic** 93:24
**medical** 95:18 96:2
103:8,11 105:19
107:5 111:8,11
113:13 114:13
214:17 233:5
246:13 266:13,16
266:19 267:8



282:10,14,16
318:14,22 319:16
319:20 320:2
321:4,9,18,24
322:3,9,14 328:19
341:3,4 346:12,15
346:20 347:6
367:22
**medically** 93:24
94:12,22 320:9,12
320:23 322:21
**medication** 268:23
275:21
**medium** 81:12,16
121:14,19 218:9
218:14 323:14,19
**mediums** 369:21
**meeting** 164:14
**memory** 41:10
132:2 166:7
**mental** 35:4 95:23
107:5 258:7
259:14 262:11,16
262:18 263:8,17
264:18 265:23
266:2 267:8
275:20 309:1,3
321:1 343:8,15,22
343:24 346:17
347:11
**mentally** 107:10
258:20 275:18
**mention** 56:11
**mentioned** 39:1
245:25
**mentions** 62:9
**merely** 171:8
**messed** 303:5
**met** 7:17 24:8 25:22
25:24 26:22
316:12
**metabolic** 93:10
101:16,20 102:14
102:15 120:19
**metabolically**
102:14

**metal** 28:4 32:6
**method** 247:8,11
**methods** 246:20
259:6
**mic** 359:22
**Michaela** 1:3 5:4
**Michelle** 2:14 5:18
371:24 372:5,21
**middle** 1:1 5:10
89:17 281:4
**midline** 89:24
90:13 91:13
**mile** 173:21
**miles** 275:24
**military** 17:20,25
18:1,2,6,8,11
**Mill** 3:4
**Milligan** 161:23
**mind** 29:11 31:4
71:20 75:16
177:21,24 210:16
215:2 232:21
260:10 263:21,22
268:11 272:1,2,5
273:19 279:9,15
304:24 305:4
**mine** 154:10 189:17
324:25 359:25
**Minimize** 185:10
**minimum** 88:14
**minute** 141:2
203:12 284:24,25
324:16 325:8,9
326:8 345:15
349:4,4 357:21
**minutes** 114:19
115:3 190:13
214:15,15 309:20
325:16,20 346:16
**Miranda** 277:4
**misdemeanor**
172:25 173:17
**misdemeanors**
170:8,19 172:1
**misrepresent**
143:10 144:3

181:16
**misrepresenting**
365:6
**Misrepresents**
143:2,4
**missing** 251:1
**misspeak** 280:7
**misstate** 229:23
230:6
**Misstates** 143:3
147:23
**mistaken** 33:24
34:4
**mistakes** 136:6
235:6
**MO** 365:8
**mode** 68:23 73:8
97:23 132:14
**model** 15:11,13
80:9 205:2
**models** 80:11
**mom** 160:11
**moment** 73:16
96:11,13 117:15
134:8 154:5
**months** 13:12
217:11
**morning** 7:6,7
26:17 191:1
215:25 286:12
351:14
**Morris** 3:15
**mother** 1:7 159:8
161:11
**mother's** 161:22
**mothers** 161:9
**motor** 331:16
**mouth** 105:5,9,20
105:23 274:9,12
274:25 276:9,16
276:22 285:3,16
315:7,10 327:6,12
327:16,19 336:3,8
368:9
**move** 34:8 54:16
70:20 72:23 73:1

126:9,10 345:7,14
349:14
**moved** 14:17,19
29:8
**movements** 303:18
**moving** 111:1
**multiple** 21:18
24:22 329:10
350:18
**murder** 174:25
**murders** 174:13
**muscle** 54:14 86:20
87:13 92:15
**muscles** 54:14 55:1
55:2 62:25 86:19
241:3 242:7
**muscularly** 212:24

---

### N

N 3:11 4:1
**name** 7:8,11,18
121:24 154:24
159:11,13 160:7
161:15,19,20,22
207:5 254:17
331:24 347:21,21
**name's** 155:10
**named** 6:4 7:19,22
**names** 155:7 160:4
**Narcan** 268:21,22
268:23 270:3
**narrow** 23:9
**nasal** 269:17,17
**nasally** 269:16
**National** 17:24
**natural** 1:7
**nature** 14:7 21:12
21:13,18 37:19
39:6 52:2 60:20
172:11 173:4
194:15 195:14
208:4,13 211:22
213:9 289:7 297:7
**near** 35:12 292:23
315:10 327:12
**necessarily** 131:22

136:8 137:3
155:18 174:17
207:23 241:22
273:7 301:25
314:21 322:16
**necessary** 166:18
166:24 167:2
179:9 293:8
**necessitated** 318:11
318:21
**neck** 70:1,2,8,14,18
70:23 125:11,16
125:17 126:14,19
126:20,24 127:2,9
127:19 189:25
191:16,20 192:8
280:5 326:23
327:1 330:17,19
332:12,13 344:9
345:12
**need** 8:19 14:12
35:15 81:7 122:4
125:23 126:15
135:15 136:3,23
153:3 158:5
168:21 171:16
172:7 173:4,20
184:10 194:14
195:5 196:10,11
211:5,9,11 212:1
214:17 225:12
229:22 236:4,12
253:23,23 254:11
258:12 265:3,9
267:18 268:3
270:16 282:19
294:18 314:12
318:14 319:16,20
321:18 322:8
329:16 346:15
359:20 369:11
370:10,19
**needed** 35:14
111:11 137:10
181:10,10 184:15
196:21 207:25



227:18 232:20
266:18 267:7
278:21,22 284:22
314:9 317:15
320:12,23 321:1,4
321:9,24 322:3
346:20
**needs** 39:8 196:22
258:13 267:11,12
320:1,8 322:14,21
346:4
**negative** 214:2
**negatively** 335:16
**neither** 144:5
253:25 254:3
257:7
**neuromuscular**
55:19 86:13,17,22
186:20 241:2
244:6,17,23 245:8
**neutralize** 108:13
**never** 12:23 18:10
46:12 54:15 70:2
139:18,20,22
164:14 182:19,19
182:20 187:3
190:8 191:21,23
196:21 204:17
205:9 209:17
212:12 229:5
231:9 248:2,4,23
253:20 254:1,1,16
254:18,21,23
255:1,4 262:25,25
263:7 265:5
267:10 276:10
277:4 309:2
319:11 320:16
339:5,10 342:13
357:6,11,13
366:17
**new** 59:2 60:19
225:11
**Nguyen** 3:10 4:4,5
5:22,22 7:5,18
9:14,22,25 10:2,3

19:8,12 22:10,14
29:3,5,10,13,17
29:20 30:1,7,11
31:6,9 34:11 38:1
43:17,20 44:1,4,9
44:11,13,24 45:4
45:6,8,12,19,23
46:1,6,10,16,19
48:1,9,25 49:5,22
50:11 53:6,12
57:22 59:6,10,15
59:24 60:21 61:5
61:12 62:2 63:20
64:14,16 68:12
69:1 73:23 75:20
75:23 76:16 78:8
78:11 80:24 81:4
81:7,19 85:17,22
86:3,11 88:22,25
91:5,22 92:2,10
92:19,25 93:22
94:9,19 95:7,15
96:6,9 99:1,23
100:6,24 101:5,8
101:13 104:1
106:23 107:24
109:18 115:12,19
116:1,8,15,20,24
119:2,5,9,11
121:1 132:18
135:18,23 136:6
137:1,24 138:4
139:3 141:5,10,15
142:5,10,16,25
143:3 144:15
145:5 146:6,9
147:4,11,18,20,23
148:5 150:2,13
151:9,12 153:11
153:16,18 154:3,5
156:13 157:1,15
157:19 158:10
163:16,22 164:1
167:13 168:8,11
168:21 169:1,3,5
170:22 171:7

177:6,25 178:24
180:8,16,25
183:19 184:3
185:25 186:10,17
187:25 188:19
190:4 191:13
199:9 202:4 204:4
208:17 214:11,20
215:25 216:13
220:22 221:3,12
223:16 224:10
225:10 226:4
227:9 228:2,20
229:6,8,12,15,23
230:1,4 231:5,25
233:1,14,17,21
234:3,15 235:6
238:10 240:20
241:14,21 243:12
243:19 244:8,25
245:11 246:7
249:17 253:6
260:14 262:23
263:11,20 266:22
270:6 278:24
285:11 287:21
289:25 298:3,18
298:23 299:13,20
301:3,24 302:18
305:13 306:19,25
307:4 308:8,14,16
308:19 309:22
320:17 322:7,24
323:10 333:12
335:13 337:1,25
339:21 343:17,23
348:10,15 351:1
352:3,13 353:7
355:18 356:4,20
356:22 357:25
358:4,8,13 359:5
359:7,9,12,14,24
360:1,12,21 361:3
361:11,16,22
362:1,6,9,12
363:16 364:14,23

365:2,20,23 366:5
366:20 367:1,3,19
368:1,8,19 369:17
370:2,5
**nickname's** 7:14
**nicknames** 7:13
**night** 18:21 19:5,7
129:21 130:8
166:4 270:8
272:22 273:19
274:17 282:2
313:11 316:3
321:16,17,23
334:7,12,15,19
341:22 342:14
348:20 350:8
351:10 355:23
**nine** 13:12 65:16
203:22 229:20
298:14 364:8,21
**ninth** 298:22
**NMI** 55:20,22 73:9
86:23 87:4,9,20
87:25 88:21
**Nodding** 9:15
113:19 134:1
162:9 186:14
295:6
**noise** 242:4
**non-forcible** 172:1
**normal** 324:20
325:23,25
**normally** 55:9
324:24 325:2,7
**North** 161:7,18,25
**Nos** 30:9
**nose** 269:20,21
281:5 327:20
328:10
**notable** 129:14
**notably** 120:8
126:17
**Notary** 374:24
**note** 9:24 56:3
98:24 346:7
**noted** 99:24 125:7

373:5
**notes** 202:14
**notice** 125:13
**noticed** 99:1 105:4
124:19 368:10
**number** 4:8,14 5:2
27:25 64:4 65:18
65:18,21 68:4
79:5 81:12,16
93:23 109:22
121:14,19 133:1
140:20 178:1
179:12,18 180:5,5
180:12,13,21,21
182:4 183:3,4
185:1,10 203:7
204:7 207:17
218:9,14 258:5
290:11 298:24,24
319:5 323:14,19
339:12
**numbered** 29:4
82:18 84:15 86:4
86:12 88:4 93:3
171:22
**numbers** 29:1
66:16 131:2
151:12,13 225:7
**numerous** 137:8
210:22 288:24
349:9,15

## O

**O** 51:11
**O.C.G.A** 371:10,14
**oath** 99:19 100:15
148:10
**obey** 141:22 142:9
147:8 149:4 150:1
156:10 227:24
228:16 230:13,23
232:17
**object** 37:25 43:16
45:16 46:11 47:18
48:8,24 49:3,21
50:9 53:4,10



57:21 59:5,8,13
59:22 60:13 61:25
68:9,25 73:22
76:14 85:15,20
86:2,8,8 91:2,21
92:1,9,18,23
93:21 94:7,18
95:6,14 96:4
103:23 106:21
107:22 109:16
126:2 135:17
136:5,6,25 137:24
139:3 141:5,6,10
142:5,10,11,16,17
142:25 143:1,7
144:14,15 145:4,5
146:6 147:4,10,11
147:20 148:5
149:16 150:2,12
156:13,14 157:15
163:16 164:1
166:8,13,19,25
170:10,14,21
171:6,7,18 172:21
173:7 174:3,16
175:10 177:5,12
177:23 178:24
179:22 180:8,15
180:23,25 183:19
184:3,5 185:20
186:9 187:2,13,24
188:18 189:4,15
190:3,15 191:11
192:3,10,23
193:17,21 194:22
195:11,25 199:9
204:4 212:19
214:11,19,20
216:12 222:9
223:21 226:3
228:2,3,19,20
229:6,7 231:25
233:14 234:3,15
234:20 235:5,6,7
236:20 237:3
238:10 239:6

240:1,19 241:13
241:21 242:8
243:11 244:7,8,25
245:1,11,12 246:6
249:17,18 253:5
254:6 256:25
258:14 259:4,7,24
260:13 261:21
262:12,22 263:10
263:19 264:6,21
266:3 268:9 270:4
271:8,13,18 272:6
272:10 275:8
276:11,17 278:6
279:18 280:20
281:21 282:4,24
285:11 286:18,25
287:18 289:17,24
290:21 291:2
293:12,17 294:16
295:3 297:14
299:13,19,20
300:5,8 301:1,23
301:24 302:18
303:20 305:2,13
305:14 306:18
307:18 309:21,22
310:1,17,25 311:6
312:16 313:7,15
313:21 314:19
315:22 316:6,21
317:4,17,23 318:6
318:16,23 319:18
320:3,15 321:12
322:5,15,22 325:1
327:10 328:12
330:1,18,23 331:4
331:10,14 333:11
334:9 335:7,13
337:1,25 338:1,7
338:16 339:20
340:24 343:17,18
343:23 345:16
346:22 347:13
348:10,23 351:1
352:3,12,13 353:7

353:9 356:3,20
357:2,10 358:4,8
358:9 360:11,20
361:1,9,14,20,23
363:14 367:16,24
368:6,12,17
**objected** 308:17
347:1
**objecting** 317:2
362:3
**objection** 43:17
44:2,6,8 45:24
46:4,5,9,13,14
135:23 138:4
143:7 254:5
260:20 364:4
**objections** 9:12
44:22 45:1 163:22
180:16 348:15
361:23 362:9
**objective** 166:15
174:8
**objectively** 171:13
175:7,17 185:18
**objectives** 185:22
225:20,21
**obligation** 50:21
**observation** 73:24
74:1 280:8
**observations** 48:20
62:19 92:21 352:6
**observe** 39:15 71:8
111:7 285:15
327:25
**observed** 105:9,12
113:12 129:2
131:17 261:5,13
263:4 274:12
285:6,8,9,14
286:5
**observes** 130:22
**observing** 40:3
**obstructing** 295:7
**obstruction** 277:19
277:23
**obtain** 17:2,8 88:7

111:11 187:9
305:11
**obvious** 325:11
**obviously** 75:10
106:8 221:7
250:21 251:20
322:8
**OC** 108:2,6,7,9,11
108:17 272:21
273:18,21
**occumant** 27:12
**occupant** 27:12
**occur** 241:2
**occurred** 99:16
100:21 124:23
250:20 301:20
**October** 14:17
96:24 117:13
118:4 196:5
372:17
**off-the-record**
99:16
**offense** 11:10
170:13
**offensively** 295:21
**offered** 254:12
**offering** 254:10
**office** 10:22 11:22
12:1,9,11 13:7,9
65:14 78:5 84:23
85:6,11 111:10
164:10 167:11
168:7 169:11
198:10 269:7
**officer** 4:20 13:18
37:15 78:13 106:1
167:20 186:25
197:3 208:5
248:19,24 290:13
290:13 316:25
**officers** 112:8
138:16 336:6,14
347:16
**officers'** 138:18,22
**offices** 371:12
**official** 1:12,14,16

1:18 5:7 89:1
183:14 372:15
**oh** 33:11 34:10
44:16 59:25 120:6
127:10 132:5
151:12 209:1
252:7 329:25
359:24 364:1,14
365:7,11 369:5
370:3
**okay** 8:6,13,25
10:21 11:24 12:4
12:10,22 14:3,24
15:7 16:11 18:12
18:25 19:23,25
20:23 21:20,25
23:9,16,23 24:11
24:20 25:17,19,24
26:13,15 27:2,16
27:23 28:1,4,6,11
29:21 30:8,12,20
30:25 32:9,17
33:6,11,20 40:25
42:8 44:17 46:1
46:16,18,20 51:13
52:22 55:22 57:16
63:4 65:23 66:16
68:4,17,20 71:19
82:3,17 84:14
85:5 90:5 91:6
96:10,12 101:14
101:19 103:17
111:21 112:23
114:24 115:3
116:21 117:4,15
117:25 118:6,11
118:17 119:7,12
120:6,7,12,17
122:15,20 123:4,7
124:2,10,15 126:8
127:5,21,24
128:15,17 129:2
129:24 130:1,4,7
131:1,5,13,20
132:17 133:15,18
134:9,21,25 136:2



136:11,19,22
137:5 138:12,21
139:18,22,24
140:7,12,21 141:1
141:14 144:25
145:25 146:3,19
147:1,7 149:2,11
149:20 150:5,16
150:18,22,24
153:25 154:3
155:12,21 156:22
156:25 157:13,19
158:4,13 159:4,11
159:13,21 160:10
160:17 161:2,6,8
161:12,14,21
162:5,13,18,22,25
163:6,9,13,20
164:4,9,14 165:4
165:10,16,25
166:3,11,17,23
167:16 169:1,20
171:11,21 172:19
173:2,8,19,24
174:6,22 175:2,21
176:4,11,19 177:3
177:10,19 178:8
178:11,22 179:6
179:11,17 180:1
180:10 182:3
183:1,12,16,22
185:12,24 186:3
186:23 187:8,17
187:20 188:5,7,9
188:14 189:1,12
189:19,23 190:8
190:12,24 191:5,9
191:22 192:7,16
192:20 193:8,11
193:15 195:1,18
195:22 196:3,9,14
196:25 197:8,23
198:8,20,24 199:7
199:17,22,25
200:14,21 201:2
201:10,16,19,22

201:25 202:4,13
202:19,24 203:6
204:13 205:14,21
206:1,21 207:3,12
207:15 208:16
209:2,4,8 210:4
210:15,19,25
211:7,15 212:3,10
212:13,19 213:11
213:18,24 215:4,8
215:15,22 216:17
216:25 218:5
219:24 220:6
221:7,9,20 223:8
224:2,21 225:1,5
227:2,12,22
228:11,24 229:3
231:1,4,9 232:5
232:16 233:18
235:25 236:16,22
237:7,23 238:1,4
238:14 239:3,10
239:22 240:6,14
242:12,17 243:4
243:16,23 244:16
244:20 245:6,16
246:10,14 248:6
250:20 251:9,14
251:16,17,22
252:9,16 253:24
254:14 255:11,16
255:21,24 256:13
257:7,24 260:9,18
260:24 261:2
263:9,16 264:7
265:2,6,8,11
266:12 267:10,14
268:6,14 270:15
271:3,6,24 272:8
272:21 273:8,13
273:15,18,22
274:3,11,14,17,20
275:12 276:2,24
276:24 277:4,22
278:2,9,13,16,19
278:23 279:3,22

280:5,10,17
281:24 282:7,10
282:23 283:4
284:6,12,17,22
285:1,6,13,15
286:4,7,10 287:3
287:8 288:5
289:10,14,21
290:7,12,19 291:5
291:10,15,21
292:2 293:3,21
294:24 295:8,22
296:1,9,23 297:4
297:11,22,22
298:3,10 299:11
300:2 301:12,19
301:22 302:8,15
302:25 303:8,15
303:18,25 304:2,9
304:14,20 305:25
307:9 308:7,24
309:8,19 310:3,10
310:20,23 311:12
311:20,23 312:2,6
312:14,24 313:3
314:3,9,16,25
315:14 316:1,2,9
316:19 317:10
318:14 319:4,5,12
320:12,25 321:7
321:14,16 322:13
323:12 324:4,6,11
325:14,16,22
326:22 327:17
328:2,9,17,25
329:8 330:5,10,13
330:21,25 331:3,7
331:18,22 332:14
332:22 333:3,16
333:21 334:18,22
334:22 335:1,17
335:24 336:20,25
337:3,5,9,12
340:22 341:12,24
342:12,16,25
343:3 344:5,7

345:10,13,25
346:14 347:9
348:3,20 351:13
351:16,19 352:6
352:10,19 353:14
354:7,9,16 355:3
355:6,8,10,12,18
355:25 356:15
357:16,21,25
359:3 360:2 362:8
362:13 363:11
365:14 366:20
367:11,20 368:2
369:7,9,13,15
370:18,20
**old** 31:7 151:23
**Omega** 12:5 13:15
  13:16 165:5
  205:15 274:8
**once** 23:17 40:2
  68:21 73:1 74:7
  106:19 110:11
  132:19 192:16
  193:11 208:11
  304:4,5,18 351:21
**one's** 29:9 150:16
  185:5 218:23
**one-fourth** 89:24
  90:15 91:13
**one-fourth-inch**
  90:1,15
**one-sixteenth** 89:25
  90:13
**one-sixteenth-inch**
  89:25 90:14
**one-third** 96:22
  117:7
**ones** 11:19 65:15
  99:15 118:5
  151:21 312:1
**online** 158:23
**open** 273:5 281:9
**opinion** 362:7
**opioids** 268:24
**opportunity** 49:23
  50:4 237:24 238:2

248:2,5 254:16,18
254:21,24 255:1,4
281:17 367:23
**opposed** 44:6 58:21
  60:12 109:8,20
  199:14
**optimal** 88:14
  213:17 241:1,7,10
  242:6 245:8
**option** 50:24
  106:20 352:17
**options** 87:19 97:25
**orange** 83:16
**order** 29:6,17 50:14
  59:20 88:20 97:14
  247:16 370:4
**ordering** 370:1
**orders** 47:9 84:17
  210:7 369:25
**Organization**
  103:15
**orient** 22:25
**originally** 12:10
  61:14
**outcome** 11:1
  372:14
**outdoor** 273:5
**outline** 115:4
**outside** 238:16
  273:11
**overall** 38:23 173:3
**overexerted** 107:18
**overexertion** 102:7
  106:7,13
**overlap** 154:10
**overriding** 171:11

**P**

**P** 373:1 374:1
**p.m** 2:7 19:7,7
  121:20 370:22
**pace** 13:14
**pacing** 210:6
**page** 4:2,8,14 24:20
  24:21 30:2 57:9
  65:16 78:17,23



82:5,17,18 83:10
84:8,14,15 86:4,4
86:12 88:4,4,13
89:3,7,17,17 93:4
93:23 97:6,21
98:14 101:15
117:8,16,17 120:5
120:13,13,18
123:15 146:13
149:2 155:21
157:2,4 169:13
171:23 185:25
186:1 198:21
203:19 215:8,9,10
216:17 218:21
221:20 222:15
225:7,9,17 243:22
298:14,22 363:20
363:25 364:1
367:4 373:6 374:2
**pages** 93:2 171:22
227:3 372:9
**paid** 118:6
**pain** 73:19 87:25
186:18 187:1,11
187:15,23 192:22
193:5,10 339:14
340:1 362:18
**painful** 352:1
**pants** 55:1
**paper** 68:19 118:12
147:13 156:16
**papers** 14:6,7 142:3
**paperwork** 150:25
**paragraph** 76:20
76:22 77:14 90:6
90:10,19 96:23
97:21 101:16,25
120:13,14,18,20
120:23 363:20,24
366:23 367:5,8,8
368:3
**paragraphs** 90:24
**pardon** 5:13
**paren** 89:18
**parenthesis** 219:10

219:15
**parents** 159:7
**parked** 34:6
**Parker** 347:22
**part** 12:6,21 13:16
16:2,11,16 34:4
80:13,21 81:25
96:19 98:18 100:7
140:23 145:6
150:19 174:6
196:22 200:8,10
226:1,14 228:17
240:14 254:11
280:1 312:20
344:11,12 345:20
353:24
**participate** 10:9
**participated**
200:21
**participating** 82:23
83:3
**particular** 131:20
205:2 275:16
**particularly** 87:13
102:1,21 120:20
235:2 239:12
363:21
**parties** 5:20 371:19
**partner** 19:2
**party** 160:24
257:13 371:16,19
372:13
**pass** 203:7 272:3
**passed** 271:19,22
271:25 272:1,2
313:24 314:1,17
314:22 316:3
318:19 322:14,19
337:22,24 338:6
338:10,13,19,22
**patient** 369:12
**patrol** 13:18 14:2,4
14:5,16 18:14,16
33:3,7 110:13
197:11
**paused** 266:24

**pay** 333:1
**PC** 2:9
**PD** 12:25 13:15,16
**Peace** 167:20
**peaceably** 173:22
**pending** 8:21
110:20
**Penn** 371:7
**Pennsylvania** 371:8
**people** 43:9 102:4
102:23 105:22
155:13 172:10
173:15 175:4,15
178:4,10,21 179:4
201:7,8 235:1,10
239:17 247:5
250:22 270:15
313:20 343:22
**people's** 324:24
343:25
**pepper** 273:1,9,11
**perceive** 50:18
**perceived** 182:5
**percent** 145:2
148:8 261:12
**perception** 192:25
220:9 303:12
**perfect** 100:21
**perfectly** 101:3
288:9
**period** 138:9
**permissible** 134:3
**permit** 50:16
**permitted** 362:2,10
**person** 20:8 21:2
27:13 93:24 97:24
98:3 102:14 135:9
157:23 177:3
178:3,10 179:3,19
180:10,20 181:2,3
181:5 186:24
187:20,21 193:15
195:2 205:7,9
207:3,19 210:4,17
233:11 237:8
244:18,22 245:9

246:4 249:23,25
250:2 252:21
254:11 258:13
260:6 262:15
278:14 303:1
315:5 322:13
337:13 346:12
**personally** 111:14
268:8
**personnel** 94:11
114:5 197:24
328:19
**persons** 171:24
239:11 258:10,20
259:13
**pertaining** 8:10
**Philadelphia** 371:8
**Phoenix** 17:4,14
**photo** 22:23 23:3
27:24 32:11
**Photograph** 4:17
4:17,18,18
**photographs** 28:25
**Photographs/Co...**
4:16
**photos** 22:15
**phrase** 133:1
**physical** 98:4,4
102:7 106:7,9,13
109:25 110:3
273:14,16 325:11
**physiologic** 101:16
101:20 102:15
120:19
**physiological** 93:10
240:7 244:22
**Physiological/Me...**
93:7
**physiologically**
102:13
**pick** 173:20 198:9,9
312:20
**picked** 130:10
311:23 312:2,4,15
312:22 313:1,5,13
313:17,24 316:16

**picking** 312:1
**picture** 83:17
119:13
**pieces** 337:11
**pistol** 133:16,18
134:2 206:21
**place** 24:17 28:16
60:24 61:15 63:15
63:16 74:6 79:23
91:12 103:19
253:8 269:18
**placed** 32:14,15
42:15 68:16,23
70:2,22 110:12,15
110:21,23 111:6
114:21 125:10,14
277:7,9
**placement** 225:25
226:14
**places** 213:7
**PLAINTIFF** 4:7
**plaintiffs** 1:10 3:2
6:1 122:1,23
153:1
**Plaintiffs'** 151:3
153:13 154:12
167:23 168:5,9
220:15,19 223:24
224:3 225:2,6
**play** 153:10 294:18
**playing** 175:1
291:18 294:1
295:9 296:24
297:23 302:10
303:2,6,9 304:3
304:10,21 306:1
330:15 332:7,23
333:5,23 334:2,6
335:2,18 336:1,21
337:15 342:1
343:6 344:3,22
345:2 346:1 369:2
**please** 6:6,7 7:8
8:12 19:9 22:11
28:9 33:9 41:20
50:20 51:18



169:23 180:17
224:11 359:23
369:19
**plobe** 226:13
**point** 12:6 20:20
  23:24 26:14 31:21
  31:24 32:25 33:4
  33:15,20 34:22
  35:1 36:4,7,12,15
  36:17 37:7,19
  39:10,13,18 40:9
  40:9,13,18 41:17
  46:20 47:8,15,23
  48:18 49:1,23
  56:20 57:1 58:1,4
  58:6 60:1,15,24
  61:4 62:13 63:2
  69:6,15,16 70:9
  71:8,25 72:5,8,22
  77:9 84:15 86:19
  86:21 87:3,8,12
  87:18 88:13 94:10
  94:24 99:18 105:4
  107:3 110:16,23
  113:9,15 125:15
  126:18 128:2
  129:13,18 131:24
  136:3 173:11
  175:12 178:6
  179:2 191:14
  192:19,21 193:1,4
  193:5 210:8 211:5
  211:9 221:12
  248:13 252:14
  254:4 262:9,17
  263:22 265:21
  268:19 277:8
  279:1,20 290:7,8
  292:3 293:4,10,13
  294:9,10,13,19,22
  295:13,15,20
  296:1,10,12,18
  297:25 302:12
  304:4,14,17,22
  305:7,19,20 306:5
  306:9 308:21

309:17 310:3,7,10
312:6 313:24
314:13 316:8,11
316:14 318:5,13
318:15,19 319:8
319:19 322:9,9
323:23 326:7
327:3,24 330:16
331:22 332:9
333:14 335:19
336:18 337:10
344:8,10 345:11
351:16
**pointed** 31:11 42:9
  46:21 137:22
  185:8,10 209:16
**pointing** 34:3 101:9
  137:18 184:9,11
  184:17
**points** 191:25
**police** 12:1,6 18:3,6
  18:8,11 162:6
  165:5,6 176:14
  177:1 252:11
**policies** 84:17,19,22
  84:25 85:9 86:6
  164:16 181:11,12
  236:17 350:19
**policy** 4:11,19 76:3
  76:5,9,12 77:7
  85:4,13,18,24
  97:13,16 111:10
  131:12 133:7,11
  134:21 139:9,11
  139:14 140:5,8,11
  140:23 142:19,20
  143:4,20,25 144:9
  144:13,20,24
  145:13,15,22
  149:17 164:20
  168:6 169:7,10,17
  171:21 173:3,14
  176:4,12 181:16
  181:19,21,23
  182:8 183:20,24
  184:6,11 195:22

197:3,9,11,16
233:16 293:11
346:11 347:6
**popping** 55:17
  242:4
**population** 174:19
**populations** 235:3
  239:18
**portion** 80:14,17,18
  81:24,24,25
  184:13 199:13,23
  200:1,1 201:17
  202:5
**portions** 118:17,19
  119:2,3
**position** 13:20,23
  14:1 31:18 36:15
  51:16 52:1 348:4
  348:12,17,18
  354:17 355:8,19
  355:22,23 357:22
  357:24
**positive** 60:2
  118:16
**possibilities** 264:2
**possibility** 27:15
  37:17,17 40:1
  43:3 211:10
  264:20
**possible** 104:2,4
  239:23 366:1
**possibly** 49:16
  114:3 263:12,14
  306:24 357:12
**potential** 321:5
  362:18
**potentially** 173:5
  181:3 315:3
**PowerPoint** 4:10
  4:20 80:19,20
  81:25 82:4,8,14
  93:2 106:17 145:9
  146:9,23 202:11
  233:22
**practical** 80:14
  81:24 96:20 163:4

212:2 213:5 221:3
**practically** 148:11
**practice** 109:24
  210:25
**practices** 236:17
**practicing** 180:3
**pre-academy** 12:17
  12:21
**precautions** 156:11
**predominantly**
  14:6,13
**preemptive** 40:19
**preexisting** 95:1,9
  214:1
**prefer** 29:17
  370:13
**preferred** 218:24
  219:9 221:24
  222:1
**preliminaries**
  138:13 158:20
**preliminary** 45:7
**preparation** 122:15
  128:5
**prepare** 12:17
  351:10
**prepared** 20:1
  40:16,19 87:18
  145:2 346:9
  351:14
**presence** 290:17
**present** 5:20 80:7
  80:18 347:16
**presentation** 80:19
  145:9
**presented** 220:5,12
**pressure** 70:19
  93:16 243:25
  344:6 345:22,23
**preventing** 108:12
**prevents** 75:11
**previous** 123:2,5,7
  125:2 127:25
  130:23 152:3
  215:5 277:2
**previously** 14:20

40:22 54:6 58:15
62:4 103:2 122:8
124:22 127:12
158:21 218:20
**Primarily** 286:10
**primary** 155:12
**prime** 213:14
**print** 236:3,5
**prior** 12:11,19,25
  26:14 38:2 39:25
  41:3,8 47:13
  56:11 75:5,13
  77:3 82:23 83:2
  88:7 104:17 105:4
  118:14 125:8
  137:18 154:1
  296:14,19 297:1,4
  305:9 356:8,9
**privy** 95:11 140:2
  196:13
**probable** 249:15,20
  253:3,22,23,24
  264:13
**probably** 34:25
  357:7
**probe** 87:4,14,20
  88:14 89:9,10
  90:7,21 91:6,8,24
  92:6 97:23 225:25
  226:14 362:14,20
**probes** 53:15 55:2
  57:2 58:13 59:12
  60:7,11 73:12
  88:19 89:9,10
  91:1,24 92:12,14
  92:16 240:15
  241:23 362:19
**procedure** 97:13
  133:7 134:21
**procedures** 84:17
  86:6 236:17
  313:19
**proceeded** 26:4
**process** 12:21
  136:13 177:20
**produce** 93:14



**produced** 7:2 98:18
  101:10 168:17
  169:16 364:16
  365:1,25 366:15
**produces** 141:15
**product** 83:6 84:9
**Production** 169:4
**professional** 105:18
  105:19
**proficiency** 231:23
**proficient** 232:6
  246:3
**profile** 4:20 78:13
**profound** 102:5
  104:6 238:19
**progress** 172:2
**prohibited** 367:12
  371:14
**prohibits** 368:3
**prong** 215:19
  219:25
**prongs** 212:7,23
  215:12 216:3,22
  217:16 222:8
  354:4,24
**proper** 226:13
**property** 249:7,15
  253:22 254:9
**provide** 99:21
  227:5 266:12,15
  267:3 268:15,17
  282:16 371:12,16
**provided** 29:6
  144:11,12,13
  145:1,2 146:4,23
  148:24 156:11
  163:15 165:13
  196:4 220:20
  231:24 233:25
  319:15
**provides** 9:19
  42:12
**providing** 225:12
**provisions** 371:10
**proximity** 110:6,9
  353:1

**prudent** 343:21
**Psychiatric** 103:13
**public** 17:15
  374:24
**pull** 23:20 31:10
  36:5 41:22 42:6
  59:17 71:22 72:10
  72:23 75:3 116:15
  117:2 134:2,18
  208:12 211:2
  299:25 360:23
**pulled** 26:9 30:22
  31:13,25 32:24
  33:7 36:1 40:4
  41:17 67:8 203:21
  205:18 211:1
  243:9 279:20
  294:5,7 299:5,15
  300:3,12,20
  301:13 333:14
  336:2,7,10 353:20
  366:9
**pulling** 33:14 62:18
  67:16,21 152:25
  154:6 204:10
  296:20 297:2
**pulmonary** 102:4
  102:23
**pulse** 112:15,23
  113:9,10 114:15
  310:8 311:15
  324:4,15,18
  325:18,22,24
  326:5,23 327:7,13
  328:22 329:12,25
**pulses** 324:24
**punched** 52:18
**puncture** 89:25
  90:7,14,21 91:1
  91:19
**purchased** 196:6
  196:17
**purchaser** 234:1
**purpose** 33:14 47:6
  70:15 73:14,15
  136:19 137:5

  187:8 189:9
  211:21
**Pursuant** 371:4
**push** 195:22 207:25
  208:12
**pushed** 209:15
**pushing** 111:23
**put** 14:22 20:16,18
  28:6 30:25 51:11
  51:11 59:2 68:7
  69:25 70:5,13
  72:6 74:9 80:3
  100:12 178:1
  225:22 234:13
  269:18 272:18
  313:20 314:9,12
  315:9 316:17
  317:7 325:17
  339:18 344:8
  359:22
**putting** 50:3 60:12
  70:8 90:24 345:22

_____

**Q**

**quality** 194:15
**question** 8:16,21,22
  42:8 85:3,8 92:22
  103:20 123:18
  124:25 125:9,10
  126:18 132:12,14
  132:17 134:10,15
  137:19 143:17,19
  146:9 156:4 169:9
  179:1,17 181:18
  181:19 183:6
  184:16 185:2
  189:10,22 196:16
  199:16 203:17
  204:25 205:5
  216:19 217:14
  223:23 224:15
  233:1 234:7
  236:22 238:5
  245:5 253:21
  258:11 264:10
  270:11 284:18

  298:11 307:15,24
  315:23 320:10
  322:25 327:15
  329:18 333:4
  334:23 348:3
  349:23 350:1,4,10
  350:18 351:8
  356:19 364:20
  367:2,18
**questioned** 364:4
**questioning** 8:11
  223:16 225:13
  360:5 362:5
  367:15
**questions** 8:11,12
  26:12 45:7 107:5
  115:5 121:1,7
  122:2,9,13 147:18
  154:19 170:18
  177:14 194:18
  201:22 203:2
  231:7 233:3,7
  247:18 288:4
  291:20 293:25
  298:23 349:6,22
  350:2,23 360:2
  367:12 369:14
**quick** 81:9 119:5,10
  359:10,21
**quickly** 161:8
  267:23 342:23
  354:20
**quiet** 55:16
**quit** 341:13
**quite** 122:1,4

_____

**R**

**R** 1:23 2:4 4:3 7:1
  373:1,1,3 374:1,1
  374:21
**rabbit** 253:13
**rabbits** 138:14
**race** 214:7
**radar** 16:7
**radio** 47:4 111:18
  111:23 311:20

**369:3**
**raise** 6:7
**raised** 51:22
**ran** 32:1,6,22 33:2
  34:5,6 39:1 48:5
  49:10 54:16 56:18
  56:25 57:6 58:10
  63:8 172:13
  175:18 255:14,18
  275:23 286:15,16
  292:21 296:10
**ranging** 86:23
**rapid** 265:12
  324:21,22 325:9
  325:10,14,14,15
  326:1,5
**rapidly** 215:3
**rate** 93:16 107:14
  244:1 324:15,18
  325:12,22,24
**rates** 371:19
**rational** 210:17
  261:3,10
**rationally** 258:13
  259:23 260:1,11
  290:20
**Ray** 7:11
**RAYMOND** 1:15
**reach** 158:7 307:14
  307:16
**reached** 307:9,10
  326:22 329:24
**reaching** 111:22
**reaction** 92:21
  113:20
**reactivate** 59:12
  60:11 62:17 67:24
  68:2,22 77:12
**reactivated** 63:7
**reactivation** 59:21
**read** 9:25 10:1
  82:22 123:7,12,14
  123:21 138:18
  141:22,25 142:3,8
  147:8 149:4,7,25
  151:16 156:9



166:4 172:4 184:6
215:10,23 216:23
217:6 219:19
224:7 227:23
228:15 230:12,15
230:22 244:2
277:4 373:3
**reading** 12:25
98:23 185:12,21
215:10 216:18
284:13 370:12
**ready** 99:23 132:23
134:23 135:1,5
136:23
**Reagan** 162:2,3,4
**real** 119:10 359:20
**realize** 259:23
337:16
**realized** 56:21
**really** 8:10 13:13
23:20 36:14 47:21
56:2 60:14 71:20
100:7 105:14
114:23 189:5
245:19 250:6
252:7 319:14
352:16 353:1
**reason** 31:12 39:12
48:17 64:9,18
70:22 100:22
115:2 125:23
136:14 137:14
150:24 156:3
166:23 174:9
178:3 188:15,23
193:4 203:18
207:7 236:15,16
248:13 251:20
253:7,12 262:19
262:21 272:25
278:10,22 287:12
289:21 317:15,21
318:4 346:20
373:6 374:2
**reasonable** 135:9
166:21 171:13

175:7,17 185:18
193:10 194:1
249:21 250:1,11
250:15,18,19
251:2,5,9 253:13
263:16 264:3
**reasonableness**
10:6 174:10
**reasonably** 166:15
174:7
**reasoning** 247:11
**reasons** 207:15
272:24 290:10
**reattaching** 58:14
**recall** 8:4 23:7
26:25 36:25 37:10
42:15 46:25 48:11
48:15 51:14,22,24
52:1 53:14 57:3,4
61:2,17 62:12
65:14 67:16,18,20
67:23,25 70:8
71:17 73:6 74:16
75:14 79:11 80:12
80:13 88:6 97:2
103:20 105:3,6,7
105:8 112:1,4,7
114:16 118:5
124:5 126:18
127:23 128:16
129:15,16 130:7
133:14 138:10
150:14 158:2
163:25 164:2,13
164:17,22 165:20
182:18,21 183:9
183:15 199:22
203:14 206:4,6,7
211:14,20,22
219:5 224:6
230:25 231:3,12
231:17,20 232:23
244:19 245:21,22
256:15 257:18
265:7 268:1 282:5
282:22,25 283:14

283:16 288:8,9,24
291:10,13,16
303:24 310:18
312:17 320:4
342:15 357:20
361:2 367:15
**receive** 18:9 54:20
92:7 162:15 163:9
165:4 244:16
245:16
**received** 20:13 21:1
42:20 54:4 55:8
79:2 98:25 112:5
163:12 164:9,23
165:10 167:9,10
198:24 221:8
242:3 249:22
274:7 299:18
351:19
**recess** 61:9 81:14
99:7 115:9 116:5
121:17 158:15
194:9 218:12
265:17 323:17
**recitation** 309:8
**recognize** 19:15
29:4 75:25 76:1
82:13 96:16,18
245:23 342:8
**recognized** 103:10
233:2,5
**recollection** 20:11
51:6 57:19 67:13
68:21 79:8 127:3
150:23 163:18
165:3 181:24
190:6 199:2,4,21
216:15
**recommendation**
140:17,24 183:17
183:22,25 185:17
**recommendations**
142:14 147:9
148:21 149:4
228:16 230:23
**record** 5:1 7:10

9:24 46:3 61:7,10
81:13,18 98:17
99:3,6,9,11 100:8
100:9,13,22 115:8
115:11,25 116:4,7
119:10 121:12,16
121:21 130:18
148:10 155:3
158:10,11,14,17
194:5,8,11 218:11
218:16 225:15
265:16,18 266:24
284:12 308:16
323:16,21 324:18
364:4 365:25
366:5,7,20,22
368:23 369:22,23
369:25
**recorded** 130:24
**recording** 130:21
**records** 16:19
100:3 153:19
**recreate** 229:13
**recreating** 229:16
**rectangle** 33:6
**red** 90:2,16
**redeployed** 62:23
**redness** 282:12
**reduce** 219:8
**reducing** 97:25
98:11
**refer** 52:11 62:13
69:23 73:5 112:22
181:11 182:7
242:18 279:24
284:22
**reference** 20:8
**referencing** 143:22
**referral** 371:17
**referred** 86:23
284:19 331:7
**referring** 25:22
65:16 83:5 88:9
155:23 184:23
208:17 233:21
280:21

**reflect** 284:12
**reflects** 215:19
**refrain** 236:25
**refresh** 41:10
163:21 166:7
**refresher** 162:21
163:6,10 164:5
182:1 221:17
**refused** 296:11
**regard** 95:16
102:20 110:5
285:9
**regarding** 84:22,25
85:9 120:1 164:11
164:24 165:22
166:6
**regardless** 222:19
329:11
**regards** 223:22
**regularly** 195:20
**Regulations** 371:5
**related** 372:13
**relating** 7:25 9:3
11:11
**relation** 19:21
23:10 24:7 25:6
118:2
**relationship** 371:10
**relatively** 26:21
55:16
**relatives** 158:25
159:3
**relay** 126:4
**release** 82:19
134:22 135:1,4
157:6
**releasing** 135:6
**relevance** 236:8
**relevant** 150:7
230:17
**relied** 41:4
**remainder** 29:18
**remaining** 91:1
**remember** 14:22
16:13,14 24:10,16
31:20 38:22 48:16



56:3 61:2,21 63:3
63:7 103:25 104:3
105:10 112:21
123:24 127:5
128:18 129:19
131:6 132:4,8
150:18 156:8
157:13,16,20,22
160:5,7 163:1,8
164:6 182:10,12
182:25 183:16
199:11,17 201:16
201:21,24 202:3,8
202:9,10,11 203:2
203:4 207:2,5
208:6 211:15
215:4 231:7 233:3
233:7 246:20
257:19 267:24
268:3 271:6 275:3
280:8,9 281:6,7
281:11,14,23,25
283:23,25 284:3,4
284:5,18,23,24
285:5 286:14,20
286:22,24 287:23
288:6,10,19 289:4
289:5,6,7 311:4
313:9 324:14
342:24 347:21
356:19 357:23,23
357:25 358:2
360:5 362:4
363:10 364:2
365:7 366:6
**remind** 353:14
**reminding** 288:12
**remove** 59:1 72:19
125:21,24
**removed** 125:16
**render** 253:9
**repeat** 130:15
212:11 250:16
321:21
**repeated** 351:21
**repeatedly** 306:11

**repeating** 354:10
**Rephrase** 180:17
**report** 4:15,21
19:18 20:1 56:12
57:5 62:9 63:6,7
67:7 89:2 122:19
122:20 210:23
215:19 216:15
242:14 252:8,13
279:10 282:3
284:13,20,23
331:7 351:10
**reported** 2:14
252:15 372:8
**reporter** 5:17,18
6:5,7,13 29:10,12
81:1 116:17
266:23 369:24
370:3,6,9,13,18
370:20 371:7,16
372:5,16
**reporting** 252:12
371:5,7,12,16,17
**reports** 19:20 20:16
**represent** 5:21,25
6:3 7:18 143:14
**represented** 143:24
152:2
**representing** 5:22
366:2
**represents** 122:1
**request** 5:14
**requested** 111:11
141:22 371:21
372:11
**requesting** 112:2
**require** 97:16
110:6,8
**required** 44:3
80:22 82:21,24
198:4 200:12
362:17
**requirements**
82:19 225:25
226:14 227:19
**research** 235:22,24

235:25 236:22
246:2,12 274:14
**reserve** 9:23 44:5
45:1
**reserved** 44:10,12
44:14 370:22
**Reserves** 17:23
**reserving** 9:12 44:1
**residence** 35:12
207:10
**resistence** 76:25
**resisting** 178:17,20
178:22 179:1
314:5 341:13
**resort** 254:23
**respect** 169:10
179:17 193:13
**respectfully** 170:15
225:10
**respiration** 93:16
243:25
**respond** 288:13
339:19 340:1,7
341:7 352:1
**responded** 20:4
21:11 23:2 339:5
**responding** 21:9
**responds** 339:14
**response** 231:12
340:3,8,9
**responsible** 86:5
97:12
**responsive** 339:9
339:11,12
**responsiveness**
9:13 339:8,13
**rest** 45:17 325:13
**restrict** 345:8
**restricted** 169:20
**restroom** 61:4
**result** 10:12,15
11:9 54:22 95:1
241:1,7,7 242:6
**results** 112:19
**return** 325:23,25
**returned** 162:24

**reverses** 268:23
**review** 83:2 84:9
96:11 115:4
118:14,19 123:2
128:4,9,11 221:13
349:18 371:21
372:10
**reviewed** 81:25
82:14 84:11 89:5
97:3,18 98:7
101:12 106:15
117:3,12 118:1,8
118:18 120:1,12
120:17,18 122:19
122:20 123:5
124:19 125:7
126:16 128:23
130:1 165:17
**reviewing** 129:3
**reword** 113:22
**rhythm** 93:17
227:1 244:1
**ride** 26:2
**right** 6:7 10:4,19
13:4,16 17:21
24:14 26:6,18
29:25 30:1,5,18
31:15 32:3,7,15
32:25 33:18 34:4
34:9 40:5 43:15
44:9,11,24 45:10
48:6,18 50:21
56:15 58:17 59:3
62:10 63:9 66:6
79:5 89:22,24
90:11,12 99:23
104:17,23 105:3
110:13 114:22
117:18 119:19,21
119:24 120:10
121:2,24 122:24
123:20 124:2,18
126:12,22 127:24
128:4 129:17
130:4 132:11
133:6,13,21

134:15 138:12
143:12 145:23
146:11,24 148:3
149:11 150:1,5,18
150:22,24 151:25
154:4,16,18 155:5
155:21 156:7,19
156:22 157:4
158:1,4 162:5,11
164:9 165:4,21
166:11 167:22
168:3,13,14 170:3
170:14 171:17
172:7,11,14 173:6
173:22 174:2,10
174:15 175:21
176:22 177:1,4
180:3,14 181:15
183:16 184:8
185:6 186:3,6,11
186:24 188:4,24
193:15 194:13
195:3,15 198:8,20
198:25 199:25
200:3,6,11 202:4
203:10 204:17,21
205:5,23 206:5
207:6 209:8
216:25 217:17,24
220:8,14 222:15
222:21,25 223:9
223:13,18,20
224:2 225:21
227:14 228:24
229:20 231:4
233:9,13,18,20
234:14,19 235:14
237:9 238:14
239:10,19,24
240:6,24 241:3,5
242:7 244:20
247:7,18,19 248:7
249:14 250:24
252:1,4,25 253:4
254:8,8 256:5,13
257:11 261:4,6,14



261:17 262:21
263:5,9,18 265:11
271:12 272:21
274:25 275:7,10
278:4 279:4,17
280:21 281:4,12
281:18 284:6,17
284:23 285:19,25
286:8 289:6,22
290:7 291:5,19,22
292:9,12,21,24
293:21 294:2,2,3
294:14,25 295:12
295:22 296:14
297:3,24 298:22
299:24 300:7,12
301:22 302:6,8,11
302:16,20 303:3,7
304:11 306:7,13
309:20,24 310:3
312:15,22 313:6
315:10,16,21
316:3 321:21
323:10 326:17,23
327:7 328:22
329:2,25 330:13
330:16 332:24,25
333:4,6,19 334:3
334:22 335:17
337:7,23 338:21
339:1 341:12,24
342:11 343:3
344:8,14,18,19
347:7,12,16,23,25
348:22 350:4
351:8 355:20
357:1 359:11
361:7,13 363:13
365:20 366:5
367:9 368:15
369:13,18
**right-hand** 342:4
**rising** 328:7 338:25
**risk** 60:17 83:11
84:6 93:14 94:25
98:12 101:21

157:6 171:12
178:23 181:9
219:8 227:7
230:20 273:4
**risks** 98:2 106:18
348:6
**road** 2:9 3:4 5:14
20:5 22:1,6,19,23
23:10,11,14,18,21
23:25 24:3,3,7,8
24:18,19,23 25:12
26:5 27:17,18
28:8 30:12 31:23
**roads** 23:21
**roadway** 23:14
342:2
**role** 39:6 47:10
**roll** 72:3,9
**rolled** 58:9 125:5
252:25 335:5,11
**rolling** 352:2
**room** 80:2 210:7
273:2,9
**rooms** 155:19
**roster** 329:5
**rotated** 18:25
**rotation** 18:22
**rough** 34:23
**route** 369:11
**RPR** 2:14 371:24
372:21
**rub** 339:15
**rule** 9:18 44:23
97:14 347:9
**rules** 8:6,9 362:2,11
371:4
**run** 39:9 48:18
49:14,15 56:9
108:15 174:14
214:14 254:19
289:8 303:10
**running** 31:14 32:7
33:4,21,22 34:16
34:18 48:13 51:25
61:22 62:4,7
104:19 175:9

285:4 286:10,11
287:15 289:14,19
289:22 303:3,13
354:12,18 355:8
368:11

---

## S

**safe** 68:5,16,23
132:14
**safely** 209:19
**safer** 97:24
**safety** 41:25 68:7
132:15,19 133:16
133:19 134:3,6,8
134:14,18,22
135:1,4,6 299:8
360:7
**safety's** 133:25
**sake** 365:23
**SAMUEL** 1:6
**save** 45:15 118:25
**saving** 365:23
**saw** 23:6 30:20,22
31:1,15,16 248:6
276:5 280:13
286:14 313:11
342:13
**saying** 31:22 38:23
43:11 44:4,10,16
45:20 71:13,15,15
71:16,18 99:25
105:7 112:5 142:3
150:14 152:15
166:3 182:10
228:15 242:2
250:11 267:24
268:3 271:6
291:16 301:7
337:6,16 347:5
355:12,14 358:1
**says** 20:8,23 21:1
57:8 66:10 78:3
78:25 82:5 83:20
84:15 101:19
115:2 119:13,17
141:24 142:22

143:5 145:17
146:14,16,19
149:18,20 171:24
172:20 181:16,19
181:23 182:8
215:18 219:9,13
221:3,16 222:1,16
222:24 225:24
228:7 233:19
239:20 300:2
329:6 362:4
**scale** 33:9,23
**Scarborough** 5:7
6:3
**Scarbrough** 1:11
3:13 9:2 373:2
**Scarbrough's**
176:11
**scene** 63:10 69:3
74:17 252:5,17
255:22,25 270:13
321:23 344:1,2
352:7
**school** 158:6 175:1
**Scott** 347:22
**Scottsdale** 3:11
**screamed** 364:5
**screen** 360:9,13,16
361:19
**scruff** 332:12
**seal** 372:15
**search** 208:23,24
209:1 249:3 253:2
**searches** 236:1
**second** 17:1 58:25
76:22 78:23 85:8
97:21 98:16
120:12,14 158:9
183:18 198:21
199:25 206:18
209:8,10 266:20
279:23 292:9
295:22,23 299:12
299:18,25 300:3
300:11,12,14,14
300:17,23 301:7

301:16,20 302:2,3
304:1,19 318:21
322:21 333:24
346:18 363:20,24
368:15
**secondary** 21:11,24
256:6
**seconds** 59:18 67:3
67:4 114:19
115:17 130:10,11
130:12,13,14,22
130:23 139:16,25
140:10,18 142:15
176:2 179:18,19
180:6,13,22
181:10 182:5
183:4 185:13,15
243:1 279:13,16
292:6 294:3
295:10 296:2
297:24 299:3,9,24
300:1,2,7,12,18
300:20,24 301:10
301:11,12 302:11
303:8 318:25
319:10 320:1,8
324:10 333:17
336:11 368:15
**secret** 153:22
**section** 145:7
202:21
**sections** 172:3
**see** 20:6,24 21:3
22:18,19 24:2
26:2 27:4,9 31:6,8
32:15 33:16,17
34:2 36:14,18
37:13,22 39:14
41:8 44:16 48:10
53:13,17 57:1
63:3 65:17 66:1,8
66:18,25 67:5,10
70:20,25 71:4,22
72:12 77:19 78:23
83:18 86:14 89:3
89:20 90:3,8,17



90:22 91:10,15
93:25 96:25 97:9
98:23 101:17
102:8,25 104:7
108:12 116:11
117:10 119:16
122:21 126:22
130:16 147:13
148:8,15 149:15
153:7,9 154:22
167:13 185:9
198:13,13 203:24
210:24 211:2
218:22 219:2
225:13,17 227:3
237:21 238:1
274:6 285:18,21
285:24 287:3,9,20
294:12 298:25
303:3 313:13
318:25 319:21
321:18 326:12
328:4 334:4,15
335:15 336:11
338:25 342:2
345:11,21 361:4
363:23 366:10
**seeing** 43:12 56:5
130:12 257:11
**seek** 268:14 282:10
282:14
**seeking** 49:13
**seen** 63:23 78:15
105:24,25 124:10
128:19,25 215:15
219:2 221:6
274:24 279:10
318:21 319:5,6,6
319:9,11 321:8
322:2 334:17
**sees** 42:25 130:22
**send** 21:17,18
122:10 267:21
311:21 370:15
**sending** 301:9
**sense** 174:24

203:16 261:17,19
262:1 290:25
**sensitive** 219:13,14
221:23
**sent** 10:22 11:19
151:21 301:16
**sentence** 57:10
76:22 90:5,19
97:22
**separate** 202:7
**separately** 29:14,16
**September** 2:6 5:11
203:20 204:11
**SEQ** 65:18
**sequence** 65:18,21
66:16 68:4
**serial** 64:4
**serious** 83:21 84:2
84:6 94:4,25 98:1
98:12 101:21
113:13 119:14,24
227:6,13
**serve** 14:6 206:8
**service** 14:5 250:3
278:12,18
**services** 5:17 371:7
371:9,11,12,13,15
371:16,18
**serving** 206:9
**session** 183:14
221:4 369:16
**set** 84:16,18,21,25
85:4,13,18 97:16
99:13 100:19
155:10 182:15
**sets** 85:9
**setting** 120:2
**seven** 53:11 86:5
155:13 161:20
203:22 371:7
**seventh** 78:24
**severe** 102:5
104:12 238:22
**severely** 104:13
**Shaking** 335:16
**shed** 28:3

**sheet** 4:11 123:25
154:20 370:12
**sheriff** 1:12,14,17
1:19 5:8 6:3 9:2
17:18 176:11
**sheriff's** 11:22 12:1
12:9,11 13:7,9
65:14 76:3 78:5
84:23 85:6,11
111:10 133:11
134:22 139:9,12
139:14 140:5,7
141:2 143:20
144:8,25 145:14
145:22 148:24
149:13 150:6
164:10,16 165:17
167:11 168:7
169:11 176:5
183:13 195:20
196:5 198:10
202:14 208:23
224:24 232:14
234:1 236:18
238:15 269:2,7
274:8 275:12
319:15,25 320:7
346:11
**SHERRI** 1:4
**shift** 14:11 18:21
19:4,5,7 209:25
266:6
**shoot** 132:23,24
133:4 134:23
135:2,5 200:10,12
200:15 219:25
289:23 355:13,20
**shooting** 52:8,12,16
138:3 212:7
217:20 220:7
355:6
**shoots** 269:21
**short** 61:4 138:9
**shortest** 185:18
**shortly** 47:3 196:4
196:17

**shot** 58:23 137:22
200:22,23 216:10
218:1 245:10
269:12 289:21
290:4,5 299:9
304:4 352:11
353:5
**Shots** 171:24
**shoulder** 125:15
126:14 280:5
344:13,14,15
345:3
**shoulders** 51:20
70:5
**shoved** 210:9
**shoving** 210:11,14
**show** 26:10 27:23
36:7,19 37:2,4
40:13 66:20
147:15 168:4
220:18 224:3
225:5 269:13
275:2 295:23
296:12 298:10
302:8 330:13
335:24 341:25
358:22
**showing** 19:13
32:16 75:24 78:12
96:10 269:23
**shown** 243:18
288:16
**shows** 66:12 67:3,3
79:6 144:12 196:4
203:20 343:4
**siblings** 159:21
**side** 31:17 32:6,7
32:22 51:21
225:22 230:8,8
255:14 281:4,18
281:19 283:15
326:14,16,17,17
326:18,23,25
344:19,20
**sight** 249:25 277:24
**sign** 9:25 10:1

123:7,12,21 147:7
149:25 150:19
157:13,22,25
158:2 172:14
174:14 175:9,19
224:15,18 227:3
227:23 228:13
**signature** 9:24
370:22
**signed** 142:3
150:25 155:24
156:2,5,16,19
157:8,17 224:5,19
224:23 228:6,7,22
**significance** 39:4
**significant** 70:18
86:24
**signs** 310:5 319:21
323:24 338:23
**similar** 99:17
117:21,23,24
224:4,16,18
**simple** 224:15
**simply** 101:9 169:9
244:5 298:7
**single** 233:23 263:3
**single-incident**
25:8
**single-shot** 58:18
**sir** 30:6 32:18 34:10
50:20 122:3,6,14
122:22,25 123:6
124:1,5,9,14,21
125:9,20,22 126:1
126:7,17,25 127:3
127:14,17 128:8
128:10,25 129:13
130:3,6,9 131:8
131:15,19,23
132:3,7,10,16
133:10,14,17,20
133:24 134:7,17
134:24 135:3
136:12,16,18,21
137:12,25 138:5
138:17,20,24



139:2,7,10,13,17
139:19,21,23
140:2,6,11,15
141:4,17,20,23
142:2,6,12 144:8
144:16,19 145:6
145:16,21,24
146:12,18 148:4,9
148:13,17,23
149:6,10,12,23
150:3,9,17,21
156:7,19,21,24
157:7,10,21,24
158:4,24 159:17
159:20,24 160:15
160:18,21,23
161:1,10 162:7,10
162:17 163:5,23
164:6,22 165:9,15
165:20,21,24
166:2,9,20 167:8
168:2 169:23
170:1 171:8 172:5
173:18,23 174:9
176:3,13,15,24
177:2,13 178:15
178:19 179:10,21
181:14 182:2,12
185:14,16 186:3,8
186:15,19 191:7,8
192:24 193:6
194:23 195:4,21
196:8,15,20 197:2
197:18 198:1,7,10
198:16,20 199:1,3
199:6,10,16,18,24
200:4,7,9,20
201:1,15 202:22
203:1,5,10,13
204:12,22 205:13
206:7,22 207:5,17
208:3,9,15 210:3
211:4,14 212:9,12
212:16 213:1,13
215:7,14,24 216:2
216:5,9 217:5,10

217:13,18,23
218:2,4 219:1,4,7
219:12,17,23
221:19,25 222:6
222:12 223:1,10
223:14 226:19,22
228:14 229:21
230:9,14 231:15
232:11,22 233:4,8
234:6,25 235:4,22
237:13 238:14,18
241:9 246:8,17
247:21 248:8,12
248:15 250:13,17
251:3 252:23
253:1,15,15,18
254:4 255:7,18,23
256:1,10,12,15,17
256:19,22 257:9
257:20,23 258:21
259:16 260:7
261:7,18 262:2,13
262:17 264:24
265:24 266:4,11
266:17 267:6,9,13
267:15,17 268:5
268:13,16 269:1
269:13 270:5,14
270:18,21,23
271:5,9,14,23
272:17,20 273:12
273:20 274:10,13
274:16,22 275:1,4
275:15,17,19,22
276:1,23 277:1,3
277:6,10,13 280:3
280:12 281:1,17
281:22 282:9,11
282:15,18,20
283:3 284:9,14
285:17,20,23
286:6,21 287:1,5
287:24 288:5,10
289:18 290:6,15
290:18,23 291:3
291:13 292:1,7,13

293:2,5,9 294:4
295:25 296:4,17
296:22 297:21
298:2,9 299:4,10
300:9,13,16,22
301:15 302:5,7
303:21,24 304:13
304:16 305:1,7,12
305:24 306:20
308:23 309:15,17
309:25 310:6,9
311:7,14,16,19,25
312:7,10 313:2,12
313:16 320:4,16
320:20,25 321:3,6
323:2 324:1,5,7
324:17,19 325:21
326:6,9,24 327:2
327:5,8,14,16,23
328:1,4,16,19
329:18,23 330:8
330:12,22 332:3,6
332:19,21 334:14
335:8,12 336:9,13
336:16 337:14,18
337:20 338:8,12
339:4,7,25 340:2
340:5,10,13,15,17
340:21 341:10,14
341:17,20,23
342:18,22 343:2,9
343:12,19,19
344:10,21,24
345:1,9,11,17
346:6,13 347:3,8
347:14,18,24
351:11,22,25
352:9,21 353:4
354:13,21 355:2
355:21 357:3
358:3,10 359:3,4
**siren** 248:25
**sisters** 159:15,22
**sit** 67:15 103:5
104:3 117:25
143:9 144:3

211:25 259:15
321:7 348:20
**sitting** 332:20
362:3
**situation** 21:16
47:11 54:15
172:15 175:23
178:11 179:10
182:15 183:3
195:9 209:17
211:23 246:21
247:9 256:23
257:1,8 258:16,24
259:1,22 281:24
297:15 317:19
321:18 346:9
351:4 352:16
**situations** 87:20
202:1,2 211:22
213:6 258:19
**six** 81:1,2,3,4 84:15
139:6,11 176:1
203:22 217:11
273:10 301:12
318:20 319:9
322:20 346:17
347:25
**sized** 370:17
**skin** 72:20 362:15
362:19
**skip** 216:25
**slapped** 32:5,6
255:14,17
**slapping** 303:19
**slash** 226:21
**slide** 93:13 125:15
144:12
**slides** 199:8 201:20
202:5,7,11
**slipped** 345:12
**slowly** 26:7
**small** 117:22 273:9
**smaller** 23:21
**Smith** 2:9
**solely** 97:12
**somebody** 20:21

21:15 26:8 30:14
35:15 39:8,12
42:25 50:17 56:8
64:23 105:20
108:15 116:13,19
133:3 134:5
169:24 170:2,5
174:14 175:18
188:13 204:2,2,20
206:10 212:1
217:4 239:20
250:6 251:14,15
251:19 270:20
273:8 275:5 276:4
278:22 287:6
289:16 329:10
355:9
**somebody's** 49:13
108:13 250:23
266:23 275:18,20
275:23
**someone's** 213:25
214:9,14 264:4
274:9
**something's** 114:3
**soon** 31:13,25 47:2
62:7 72:22 125:16
291:23
**sooner** 8:19
**sorry** 12:7,7 16:5
26:13 32:18,24
34:10 47:3 57:12
75:16 83:15 85:2
116:1,2 120:4,6
122:2 140:9 151:5
162:4 167:14
168:2,23 183:23
207:14,22 209:3
234:9 266:11
272:2 274:4
280:18 281:6,25
283:9 296:25
297:1 301:5
323:13 334:10
335:1
**sort** 101:4,5



**sound** 55:17,23,24
  56:1,3,5 66:14
  114:22 242:4
  319:2 363:2,5,8
  369:3
**sounds** 304:19
  333:19
**source** 100:5
  138:22
**south** 3:15 159:1,3
  159:7,16,19,22
  160:3 161:13
**space** 273:5
**speak** 46:2,3 103:9
  103:12 111:23
  193:6,7 196:1
  201:4 307:3
  335:20 359:20
**speaking** 26:24
  45:23 46:3,9,12
  46:13 143:6
  256:14 257:2
  314:3 341:2
  361:23
**speaks** 308:16
**specific** 9:5 16:3
  17:16 18:17 23:18
  84:24 117:18
  118:7 132:8
  164:18 169:22
  172:18 203:6
  211:17,23 215:1
  223:22 246:20
  329:4 354:15
  355:6
**specifically** 11:6
  46:4 67:16,18
  84:24 85:8 93:13
  103:25 112:2
  125:23 129:11
  140:9 164:15,19
  171:23 172:16
  199:5 223:2
  255:11,21,24
  267:18 353:12
  354:13

**speculate** 243:5
  244:14 307:6
**speculating** 201:23
**speculation** 316:24
  317:3
**speed** 16:5,6 49:14
**speeding** 169:25
**speeds** 173:16
  214:16
**spell** 12:2
**spent** 59:2
**spoken** 138:15
  296:5 338:5
**spouse** 1:5
**spray** 108:2,6,7,9
  108:11,15,17
  269:17,17,21
  272:21 273:11,18
  273:21
**sprayed** 273:2
**sprays** 273:9
**spread** 73:12 87:4
  87:20 88:14 91:24
  92:6
**sprinting** 355:9
**Spurgeon** 1:18 3:13
  9:2 21:10,21,23
  22:7 23:6 24:9
  25:23,24 26:1,23
  26:24 27:3,10
  47:5,12,17 63:9
  63:11,12 69:2,7,9
  71:1,22 72:10
  73:4 74:5,24
  75:18 103:17
  106:9 111:14,17
  124:23 125:18
  129:4 138:25
  139:24 140:3
  151:1,2 156:20
  157:8 178:23
  179:7 189:24
  190:1,20,22 191:2
  191:8 192:9
  201:13 224:5
  255:24 256:14,24

257:15 265:2
  267:16 268:3
  269:10,11 270:25
  271:3 279:16
  284:11 308:24
  309:4,9,10,13,16
  310:23 311:2
  332:10,25 334:13
  334:20 342:7,12
  342:20,21 343:1,7
  344:20 345:7
  346:3 347:19
**Spurgeon's** 128:14
  129:24 151:14
  153:20 154:1
  168:12 342:16
  366:9 369:2
**Spurlin** 3:3,3,3 4:5
  5:24,24 9:11,15
  9:17,20 31:7
  37:25 43:16,18,22
  44:3,14,18,21,25
  45:5,7,10,18,21
  46:2,8,15,18 48:8
  48:24 49:3,21
  50:9 53:4,10
  57:21 59:5,8,13
  59:22 60:13 61:25
  68:9,25 73:22
  76:14 85:15,20
  86:2,8 91:2,21
  92:1,9,18,23
  93:21 94:7,18
  95:6,14 96:4
  99:10,10 100:11
  100:25 103:23
  106:21 107:22
  109:16 121:3,10
  121:23,25 126:3
  129:9,10 135:20
  136:1,10 137:4
  138:1,8 139:4
  141:7,13 142:7,13
  142:21 143:6,16
  143:19,22 144:1,4
  144:6,7,17 145:10

146:7 147:6,14,25
  148:6 149:19
  150:4,15 151:5,11
  151:14,23 152:5,9
  152:16,19,22
  153:3,6,9,12,21
  154:1,9,16,17
  156:18 157:2,3,18
  158:18 163:19,24
  164:3 166:10,16
  166:22 167:3,15
  167:25 168:10,16
  168:23 169:8
  170:15,17,25
  171:10,20 172:22
  173:13,21 174:5
  174:21 175:13
  177:9,15 178:7
  179:5,25 180:9,18
  181:7 183:11,21
  184:8,12,15,20
  185:1,6,7,23
  186:2,13 187:4,16
  188:3,20 189:8,18
  190:7,19 191:18
  192:6,15 193:2,19
  194:6,12,24
  195:12 196:2
  199:12 204:9
  208:19,21 212:18
  212:21 214:13,23
  216:16 218:6,17
  220:17,25 221:2,9
  221:15 222:11
  224:1,14 225:4,19
  225:23 226:7
  227:10 228:10,23
  229:10,13,19,25
  230:2,7 232:3
  233:23,24 234:5,8
  234:12,17,23
  235:8 236:21
  237:6 238:13
  239:9 240:5,23
  241:17,25 242:11
  243:15,21 244:15

245:4,15 246:9
  250:9 253:10
  254:7 257:3
  258:17 259:5,10
  260:2,17,23
  261:24 262:14
  263:2,13,23 264:9
  264:22 265:11,20
  266:5,25 267:2
  268:10 270:7
  271:10,16,21
  272:7,14 273:21
  275:9 276:14,19
  278:8 279:21
  280:23,24 282:1,6
  283:1 285:12
  286:19 287:2,22
  288:11,15,18,22
  289:1,3,20 290:1
  290:24 291:4
  293:14,20 294:17
  294:23 295:5
  297:17 298:17,21
  299:17,23 300:6
  300:10 301:4
  302:1,19 303:22
  305:3,16 306:21
  307:8,23 308:2,12
  308:15,18,20
  309:12,23 310:2
  310:19 311:3,8
  312:19 313:10,18
  313:23 314:24
  315:25 316:7,13
  316:22,25 317:3,9
  317:20 318:2,10
  318:18 319:3,23
  320:5,18 321:20
  322:12,17 323:1,3
  323:12,22 325:3,6
  327:11 328:14
  330:4,20,24 331:6
  331:12,17 332:8
  333:15 334:11
  335:3,9,14 337:2
  338:4,9,16,17



339:23 341:6
343:20 344:4
345:18 346:24
347:4,15 348:13
348:19 349:1,7,11
349:17,20,25
350:4,7,11,14,20
350:24 351:7
352:5,18 353:13
353:18,21,24
354:2 355:17
356:6,10,14,24
357:9,15 358:5,12
359:25 360:3,11
360:20 361:1,9,14
361:20,25 362:3,8
363:1,14 364:3,12
364:17,20,24
365:7,11,14,16
366:4,6,8,13,16
366:19 367:11,16
367:18,24 368:6
368:12,14,17
369:1 370:6,8
**Spurling** 321:11
**squad** 80:2,2
**squared** 52:17
**squeeze** 269:20
**staged** 112:5
**stamina** 110:1
**stamp** 168:25
**stamped** 151:21
**stance** 52:9,12,16
200:19
**stand** 61:6 99:4
134:5 369:18
**standard** 97:15
167:20 169:7
**standards** 85:10
97:16
**standing** 34:22
51:6,7,21 370:3
**standpoint** 241:1
341:3,5
**start** 19:6 27:20
130:12 203:15

266:13,25 278:4
303:7 362:5
363:12
**started** 11:17,18,20
14:16 33:20 34:16
34:18 36:6 62:7
123:11 292:11
296:11 362:25
**starts** 57:10 96:23
131:2 363:9
**state** 5:20 7:8 8:1
40:22 53:24 57:23
89:22 100:25
101:1 102:13
181:12 227:20
243:19,24 354:14
371:2 372:2,6,16
**stated** 69:2 100:8
127:12 182:9,13
187:3 199:11
217:23 229:5
231:3 240:21
248:23 262:25
272:25 309:2
320:16 331:15
341:10 347:2
356:11 367:7
**statement** 94:20
152:11,12 170:20
235:19 245:14
275:11 336:6
340:18 354:3
**statements** 141:21
166:4
**states** 1:1 5:9 20:4
76:20,23 77:14
82:19 83:10 84:9
86:5,21 87:3,24
88:13 89:18 90:6
90:10,20 91:6
93:13 94:2,10
97:11,22 101:25
102:22 115:1
117:8 140:18
142:18 147:13
**stating** 44:7 197:10

279:2
**status** 95:24
**stay** 47:16
**step** 36:20
**steps** 303:16
**sternum** 339:15
**sticking** 328:9
**sticks** 71:20
**stipulate** 44:25
118:24 119:1
**stipulated** 44:19
**stomach** 72:4 125:1
125:2,5 126:13
217:3,22 354:6
**stop** 26:11 56:20
107:4 108:14,15
115:16 137:11
172:14 174:14
175:9,18 181:15
215:21 227:3
255:16 291:19
293:24 294:2
296:8
**stopped** 256:13
286:16 312:12
**stopping** 57:23
58:2
**stops** 14:9
**story** 353:21
**straight** 48:5 51:20
51:20 286:13
289:19
**strap** 75:9,11
**strapped** 312:11
314:17 315:1,4,16
315:17 316:4
318:20
**street** 3:11,15
297:12,21
**stress** 93:17 244:1
281:24
**strike** 49:17 186:5
208:5 287:4,6,10
287:11 303:23
**strong** 264:19
**struck** 62:11,15

277:21
**structure** 22:18
23:11 24:5 28:3,4
30:23 32:6
**structures** 24:22
**struggle** 102:7
106:7,9,13 310:21
322:20
**struggling** 275:24
288:23 346:16
**strung** 346:23
**stuck** 334:4
**students** 82:20
**stun** 72:16,19,21
73:8,14,15 87:19
186:17 189:2
211:16,19,21
212:6,11,17 333:1
333:10 351:20,23
352:8 362:17
**stunned** 186:7,12
211:13 279:16,23
280:2,11,12
333:25 334:13,19
**stunning** 333:7
**stuns** 87:24 337:6
362:13,14
**subdivision** 174:24
174:25 195:7,9
**subdue** 179:9
**Subia** 2:14 5:18
371:24 372:5,21
**subject** 50:23 76:23
87:12 88:10 89:10
93:10 94:24
108:10 109:15
110:6,9
**subjects** 95:12
**submitting** 58:6
62:6 63:12
**subpoenas** 14:7
**subscribed** 374:22
**subsequent** 59:20
77:11
**subtract** 52:25
**successful** 60:8

88:21
**successfully** 77:16
77:22 145:18
**succession** 203:23
**sudden** 93:14
102:16 214:5
**suffering** 102:4,23
235:11 237:1,8,15
238:7
**sufficient** 232:13
**suggest** 46:8,10
100:17 204:1
264:5 289:15
**suggesting** 99:16
**suggestion** 29:16
46:17
**suit** 9:1
**summon** 262:10
265:2,25 266:1,12
266:15 267:3
343:21
**summoned** 255:21
256:9 267:14
329:20
**summons** 340:8
**Supp** 20:24
**supplements** 19:23
**supposed** 62:25
141:24 168:16
173:15 200:15,17
**sure** 9:17 10:14,16
22:4 23:7 29:12
30:13 39:6 43:23
51:19 52:23 98:17
101:7 103:9,16
112:14 113:24
115:4 118:20
123:23 138:5,6
147:22 151:11
162:23 168:19
198:7 201:23



203:8 205:22
240:24 249:19
250:10 255:10
272:11 278:24
279:1,25 298:11
325:19 347:18
353:15 359:24
365:24
**surprised** 114:8
**surrounding** 90:1
90:14
**surviving** 1:5,8
**susceptibilities**
95:2,9 98:6
**susceptible** 94:13
102:1,2,21 120:20
235:2,10 239:12
239:15,18 363:22
367:14
**suspect** 104:23
105:16 174:25
248:14 250:4
278:17
**suspected** 209:11
239:7,11
**suspects** 319:6
**suspicion** 39:18,20
39:24 249:21
250:11,15,18,19
251:2,5,10 253:3
253:14 263:17
264:3
**Swansboro** 161:18
**swear** 6:6,9 99:22
99:22
**swearing** 122:11
**swinging** 286:22
**switch** 81:9
**sworn** 6:14 7:2
99:18 100:15
122:12 374:22
**symptom** 263:9,15
**symptoms** 237:10
237:17,19,19,21
245:20

**T**
**T** 373:1 374:1
**tactic** 50:2 134:4
187:18
**tactical** 200:1
**tactics** 50:5
**take** 8:18,20,23
28:9 31:4 33:11
56:3 58:9 60:17
63:13,14 69:3
72:5 79:23 80:19
81:8 96:10 109:6
115:3 117:15
121:3,5,9 132:19
134:3,4,5 144:11
149:21 151:9
157:20 158:5,8
196:22 202:14,16
202:19 211:11,12
218:6 224:10
259:22 269:18
283:17 284:11
300:24 324:24,25
328:22 329:12
**taken** 1:23 61:9
81:14 99:7 115:9
116:5 121:17
128:21 158:15
160:22 194:9
217:8,11 218:12
265:17 300:4,18
311:12 323:17
**takes** 36:20 303:16
**talk** 167:5 190:20
202:1 205:25
209:14 247:5
259:18,19 277:22
297:20 338:11
339:7
**talked** 162:20
**talking** 25:21 71:11
81:21 96:1 110:24
159:2,5,6 205:3
212:4 218:18
234:10 248:21

280:22 312:6,8,12
312:14 339:8
342:6,12 346:5
**talks** 86:13 88:5
120:20 363:21
**Tammy** 159:14
**tangled** 60:3
**tape** 358:20
**tapes** 81:10 218:8
323:7,11
**target** 83:15,21
86:19 200:17
212:14,25 213:3,4
213:14 214:25
215:1 218:24
219:9 220:13
222:1 350:8,16
351:3,5 352:15,17
354:15
**targeted** 53:15
349:2 352:10
**targeting** 218:18
219:14
**targets** 221:24
**tase** 217:4 305:10
305:18,21
**tased** 43:2,3,7
157:23 304:25
305:5,6 306:2
318:20,25 319:9
319:11 320:1,7
322:20 334:8
335:5 346:17
347:6,9
**TASER** 4:9,10,19
4:19,20,21,22
14:24 15:7,23
18:9,10 36:1,5
40:4,7,15 41:5,13
41:14 42:9,19
43:1,9 46:20 50:3
51:2,25 53:7,21
53:24,25 54:1,1,1
54:9,13,17,19
55:9 56:23 58:11
58:12 62:17,24

63:7 64:1,2,5,21
71:23 72:11,13,17
72:20,24 73:4,11
76:4,13,23 77:3,9
77:15,23 78:25
79:3 80:6,6 81:21
82:5,20 83:6,6,10
84:2,2,9,16,18
85:1,10,12,13,25
87:1 88:7 89:18
90:7,21 91:1
92:13,21 93:11,19
96:19 97:3,19
98:8 99:13 102:11
103:18 106:19
108:2 109:3,7,20
110:8 114:20
117:4 118:2,14
120:9 132:13,13
133:9,12,22
134:16 135:12
139:6,25 140:10
140:13,25 141:12
141:15 142:19
143:22 144:12,12
144:13,21 145:17
145:25 146:4,14
146:16 150:7
154:14 157:11
176:2 177:4,8,11
177:18,21 178:2,5
178:9 179:8,12,19
180:6,12,14,22
181:25 184:22,25
195:19 196:10
197:4,6,12,17
198:22 200:23
203:10,14 205:9
205:16,18 206:14
206:17,23 208:18
209:16,16 211:5,9
212:22 215:20
227:1,5,7 230:17
232:7,14,15
233:19,25 236:25
239:4 240:7,11

243:10 244:21
245:3,10 255:5,9
255:12,17,18
260:5 279:6,10,20
281:19 284:7
286:4 287:12
290:2,5,6 291:14
291:24 294:5
297:2 298:14,15
299:22 303:19,23
304:1 308:22
311:22 319:2
336:3,7,10 337:4
337:11 346:8,10
348:6,8 355:5
357:14,17 360:3,7
360:9,13 367:13
368:4,16 369:3,10
**TASER's** 133:22
141:3,8 144:24
183:23
**tasered** 178:13,17
181:6
**TASERs** 135:11
195:20,23,24
196:6 235:2
**taught** 77:17 92:13
133:8 145:20
155:15,16 164:18
176:14 187:19
200:2 226:1
246:18
**teacher** 202:20
**team** 16:2,12,17
**technique** 50:15
135:8,13 187:19
212:6 247:2 296:3
**techniques** 246:24
248:1 258:18,22
296:16
**tedious** 225:8
229:22
**teeth** 315:7
**tell** 14:3 18:20
24:22 56:17 64:7
69:8 74:18 112:18



118:10 129:22
130:4,9 137:13,20
153:21 155:8
161:8 175:17
181:8,20 182:8
184:7 185:8
198:11 203:18
204:14 215:18
224:19 230:22
231:1 242:13
246:25 247:1,3
256:20 259:14
269:15 270:16
272:15,18 280:5
282:23 303:25
304:7,17 319:25
334:4 335:4,5
336:14 341:12
343:7 344:15
346:3 360:16
361:12
**telling** 192:24
257:8 276:12
287:24 288:20
315:12 316:2
317:24 320:21
321:17 354:14
355:7
**tells** 125:19 242:4
242:15
**temperature**
107:12
**temporarily** 83:14
83:20 97:23
**ten** 114:18 152:17
178:13 190:13
203:22 214:15,15
227:2 309:20
322:25 346:16
350:3
**ten-minute** 310:21
322:20
**tendered** 218:20
**tense** 173:9
**tenses** 86:18
**tensing** 63:1

**term** 231:5,16,18
233:2,6 238:9
245:17
**terms** 246:13 275:3
**Terry** 3:14 6:2
143:16 152:16
**terry@wmwlaw....**
3:16
**test** 80:19 157:20
202:25
**testified** 7:3 38:3,9
40:2,20 54:6
81:23 84:11 103:2
103:17 104:9,22
139:5,8,25 140:3
140:4 186:16
191:1 279:3
306:11 308:8
349:15,18 361:10
361:17 366:21,23
367:21
**testify** 7:22 221:13
228:7 308:9,10
362:25
**testimony** 6:9
30:13 38:2 41:3,7
67:20 75:5 100:14
101:6 105:3,4
110:12 123:16
124:15 129:5
136:7 138:16,19
138:23 143:3
147:23 190:8,12
192:7 229:14,16
229:17,23 230:6
231:9 240:14
305:9,17,18
346:10 349:2
352:10,23 356:8,9
356:15 358:6,10
361:21 372:8
373:3
**testing** 185:13
**text** 158:6
**Thank** 6:13 28:18
28:23 29:13 32:13

33:13 51:13,15
64:15 75:19 81:11
115:6 125:6
130:15 134:12
205:11 347:23
359:3,4 370:20
**Thanks** 369:14
**thereof** 372:10
**thing** 104:5,12
106:3 120:17
124:6 126:17
129:16 171:11
197:5 226:12
263:3 272:8 276:5
285:14 292:20
298:16 343:4
353:19 366:25
368:22
**things** 14:7 28:12
36:3 38:21 71:15
71:17 98:10
115:13 124:21
127:25 129:6,14
137:8 143:10
144:3 173:12
194:1 204:7 208:1
208:13 211:21
213:9 246:11
258:5 260:22
261:4,10,11,12,16
262:20 263:15
264:17 281:23
285:6,10 339:13
339:14 346:23
359:12,19
**think** 9:18 13:12
16:19 19:22 80:24
99:21 100:3
101:14 129:13,14
129:18 131:22,23
132:5 137:17
143:11,18 147:19
147:21 170:12
177:10 179:2
186:16 191:19
192:12 193:9

194:18 204:16
205:22 210:17
213:16 220:22
225:9 238:3
240:15,21 252:11
261:3 269:23
287:10,13 289:10
290:17,20 291:7,8
292:20 293:8
295:2 297:13
305:10,21 306:12
307:23 308:13
309:7 320:19,23
321:1,4,21 329:9
332:25 340:25
349:12 352:7,14
357:4 362:25
**thinking** 258:13
263:7 290:20
307:2
**third** 133:1 218:21
225:9,19 292:20
300:21
**Thirty** 140:10
**thoroughly** 348:5
**thought** 60:23
99:14 136:13
148:2 156:7
177:20 209:2
228:11 234:10
243:7 261:16
262:3,6 266:8
287:11 304:14
307:11,12,13
308:9,25 309:2,5
320:12 341:2
343:7,14 368:21
**threat** 49:19 50:23
61:24 305:19,20
305:23
**threatened** 294:21
**threatening** 294:15
295:14 298:1
302:12
**three** 24:20 27:25
29:1,7 53:24 89:7

89:17 118:9,9
121:19 141:14
153:24 154:7
157:4 161:5,10
162:4 171:23
203:21 218:9
230:12 252:9
269:24 270:25
285:7
**three-fourth** 90:12
**three-fourths** 91:14
**throat** 219:15
222:16 223:7
**throwing** 38:19
**thumb** 269:19
**ticket** 170:3 171:16
174:14 195:6
**tickets** 170:19
**tie** 75:6
**Tift** 113,15,17,19
5:8 11:14,17,22
11:25 12:8,11
13:3,6,8,20,22
14:15,23 15:17
76:3 78:5 79:21
79:23,24 82:1
84:23 85:6,11
111:10 144:20
145:14 148:25
160:9 162:18,24
164:10,15,19
165:14 167:11
168:6 169:11
198:10 208:22
224:24 234:1
236:17 274:8
371:3 372:3
**Tifton** 2:10 3:4,7
4:15 5:14 20:5
22:19 164:24
**time** 5:11 11:4 12:5
12:6,9 13:16
18:13 19:2 21:5
26:20,22 30:20
31:11,19 35:18
36:1 37:1 40:16



40:18 41:7 42:10
43:24 45:11,15,22
46:24 48:3 50:8
50:15,19 51:7,16
52:4,5 56:2 60:15
61:7,11,24 62:14
64:11,14,17 67:21
73:18 74:21 75:1
77:25 79:17,20
81:12,17 95:18,21
95:24 99:5,8
105:11 107:4,7,20
110:20 111:6
112:1,4 114:2,19
114:20,23 115:7
115:10 116:3,6
118:25 121:16,20
123:4 124:3,13
126:18 127:6
128:2 129:13
131:25 133:12
136:2 137:22
138:9 152:11
158:13,16 165:25
172:24 173:11
175:5,12 190:2
191:20 194:7,10
196:16 197:22
198:21 201:11
205:15 211:11
217:9,21,22
218:10,15 231:23
237:18 248:13
251:9 253:2 255:8
260:5 262:9
263:22,25 265:15
265:19 269:8
273:1 274:11
275:5 277:14
279:4,22,22 299:5
299:9,25 300:12
300:21,23 301:6
301:13 302:3,4
304:1,19 305:10
306:2 308:21
310:10 312:9

318:12 321:10
323:15,20 324:25
325:22 328:18
331:22 333:7,10
333:25 336:18
352:21,25 353:17
353:22 354:12,15
354:23 359:19
360:4 365:23
368:9,20 369:10
369:22
**times** 37:3 53:24
67:8,17 112:25
114:11 178:13,18
179:8,9 180:5,13
181:5,10 191:25
192:1 203:22
204:11 205:21
269:24 279:11
288:24 293:23
301:20 304:25
305:5,22 308:22
318:20 319:9
322:20,25 329:11
334:13 346:18
349:9,16 350:3,18
**Tip** 369:8
**tired** 214:14 310:20
**title** 197:14
**titled** 65:17 66:7
93:7,24 101:16
**TJ** 7:14,15
**today** 5:11 67:15,20
103:5 104:3
117:25 118:10
124:6 126:24
127:12 128:1
217:9 259:15
321:7 352:23
367:21 368:20
**today's** 122:15
128:5
**told** 35:4 37:2 65:1
127:3 139:20,22
150:6,10,16 156:7
157:19 181:24

183:5 196:21,23
197:1,19 199:5,10
207:19 213:14,20
214:2 219:24
220:11 222:23,23
257:10,12 260:4,5
270:19 278:24
296:8 317:6 320:7
329:3 338:18
345:7,13 354:8
355:18 357:21
364:20 365:14,18
365:21 370:7
**tone** 247:8
**tool** 259:3
**tools** 107:21,25
259:2,12,17
**top** 19:25 54:25
89:23 90:11 91:7
91:9 119:13
146:19 157:11
205:23 216:6,7
218:21 269:19
281:4 332:18
**Torres** 79:13,14,18
79:20 103:18,21
139:22 141:8
145:1 146:1,10
147:1 148:22
150:10 155:13,15
156:23 162:20
164:18 165:1,13
165:16 181:8,20
181:21,22 183:17
199:5,16 201:19
211:16 219:22
222:20 223:3,9,12
223:20 224:9,17
226:1 228:12
230:22 231:18,22
232:23 236:7,13
238:19 245:22
319:24 320:6
350:21 351:20
**total** 87:9 279:13
**totality** 172:17

211:24 258:15,23
**totally** 307:22
**tote** 244:21
**touched** 62:7
340:11
**touching** 362:15
**TPO** 160:25
**traffic** 13:22 14:4,8
14:8,9,10,13,14
14:18,19,20,21,22
14:23 170:3,19
171:2,9,25 172:24
194:20 195:6
197:15,16
**train** 144:10
**trained** 42:20 99:15
99:20 108:7
134:25 139:18
140:12 146:1,11
150:8 167:6 176:8
197:4,6 200:14
204:13,18 213:24
219:21 222:20
258:9,19 259:13
263:24,25 264:2
269:8 350:15
364:7,7,9,10
365:4 366:18,21
**training** 15:16
16:16,20 18:9
37:14 39:17 42:18
42:19,20 43:8
50:13 54:3 55:8
55:20 56:7 63:25
70:16 73:9,19
77:17,22 78:4,6
78:20 79:9,12,23
80:1,3,7,15 81:22
82:9,15 83:3,24
84:16,18 87:1,6
87:16,22 88:16
89:8,13 92:5 93:9
93:19 94:6,16
95:4 97:3,14,16
97:19 98:8,19,20
100:3,17 101:23

102:11,18 103:19
103:22 105:21
106:16 108:6
109:13,23 110:2
118:2,14 140:16
141:9,19 144:19
144:25 145:7,19
146:3,14,22
147:18 148:21
149:9,21,24 150:8
155:2,3 156:10,12
162:5,15,19 163:4
163:12 164:10,23
165:5,10,11,12,13
165:18,18 167:9
167:10,21 175:22
176:19 179:11
181:20,25 182:1
183:14 184:16,18
194:14 195:19
196:5,10,18,23
197:20,24 198:4
198:11,17,22
201:20 202:13
211:15 212:14
214:17 219:3
221:8 222:21
223:6,19,20
224:17 226:15
227:19 228:12,16
229:1 230:17
231:23 232:2,18
233:12,18 238:16
242:3,25 244:16
244:21 245:16
246:14,15 257:21
257:24,25 266:13
274:7 275:13
276:20 319:14
348:7 351:19
360:14,22 362:5
362:14
**transcribed** 372:9
**transcript** 369:25
371:21 372:10,10
373:3



**transpired** 330:3
**treatment** 11:11
**tried** 209:14 210:8
235:23 296:2
339:15 356:16
**trigger** 42:6 59:17
62:18 67:7,16,21
132:23 133:3
200:6 203:21
204:11 243:9
299:6,11,15,15,25
300:3,12,21
301:13,19 304:1
304:18
**triggered** 66:24
133:2
**Trip** 5:3
**Tripp** 1:15,23 2:4
3:13 4:3 7:1,11
8:25 10:4 19:13
75:24 81:17,20
83:23 86:7 89:1
96:13 99:18
115:13 116:9
121:15,20,24
128:9 154:18
159:12 161:11,16
201:13 218:10,15
218:18 323:15,20
323:23 329:6
367:7 368:19
369:1,21 373:3
374:21
**truck** 24:13 25:6,12
25:15,16 27:13
**true** 44:18 130:18
136:4,8 144:8,18
152:9 170:20
228:18 231:11
237:2 238:9
244:24 251:23
264:5,11,12,15,16
264:20,23 273:4
278:25 329:13
336:2,8,12,22
337:19 340:19

341:11 372:9
373:4
**truth** 6:10,10,11
**truthful** 152:11
**try** 8:18 35:24
50:20 72:11
109:24 153:5
181:17 207:24
208:10 213:7,9
226:17,23 247:5,5
257:12 283:21
303:7 310:7
324:15 326:7,10
335:25 340:14
356:22
**trying** 24:12 49:17
50:17,18 56:19
60:18 68:15 71:6
72:2,9 74:25 75:2
99:20 143:14
152:24 158:7
175:5 177:19,19
207:4 208:7 236:9
247:14 265:13
269:22 278:20
309:5 311:5 325:3
328:5 331:23
349:20 355:25
365:24
**turn** 30:15 41:15,25
64:20 132:5,9
215:8 218:20
221:20 222:15
225:9 227:2 293:4
293:11 298:11
340:14 360:8
**turned** 41:23 130:7
152:14 286:15,16
331:2 353:5
**Turner** 160:15
**turning** 296:14,19
297:1,5
**Twenty** 57:14
**Twenty-seven**
153:12
**twice** 243:6 279:16

306:15 320:1,8
334:8,19
**twist** 153:5
**two** 8:9 18:22 21:18
29:1,7 55:1 58:21
72:17 78:17 81:16
88:19 90:12 91:13
91:14,19,24 92:14
93:2 96:22 97:6,8
101:15 120:1,5,18
120:23 121:15
129:16 138:11
139:15 148:7
152:19 153:23
154:18 155:19
157:2 161:6
164:12,25 165:19
171:23 172:3,9
174:13 178:23
186:1 199:20
200:12 203:21
205:22,25 215:19
216:3 223:15
230:10 281:6
304:23 315:18
319:5 334:13
363:20,25 364:1
367:4,5 368:15
**two-thirds** 57:10
**type** 53:23 55:11
66:7,24 68:5
163:9,12,13
186:25 187:22
195:3 207:21
268:15 325:11
**typical** 131:12
135:8 250:6,25
**typically** 20:16
21:17 39:5,8
42:24,24 43:4,4,5
52:17 54:14 60:6
108:11,14,21
198:8 211:4 213:3
213:3 214:1 258:7

_____
U
_____

**Uh-huh** 194:6
**un** 340:19
**unaffected** 54:7
**uncertainty** 37:20
47:10
**unclarity** 8:11
**unclear** 21:16
110:19 212:20
**uncles** 159:25
**unclipped** 29:8
**unconscious** 271:7
271:11,17,24
272:1,9,12,13,16
313:20 346:19
347:10
**underneath** 34:12
34:19 74:25 191:3
**understand** 7:21,25
8:13,25 9:5,9
10:17 11:1 12:25
15:7,10 17:20
18:2 24:12 30:13
43:2 45:6 51:1
55:20 68:15 75:5
78:4 80:21 82:22
84:9 85:2 86:16
88:11,18 89:8
98:21 110:12
113:24 118:22
126:23 130:16
132:1 134:10
135:9,11,14
141:25 144:22
145:11 148:1
149:7,25 154:4
167:2 171:14
176:11 182:22
193:3 224:7
227:23 230:16
231:23 238:8,11
239:16 240:25
244:22 245:5,7
246:13 247:15,16
250:10 251:17
253:11 256:8
273:22,25 287:7

298:12 306:21
308:18 317:13
348:4,9 353:15
354:19
**understanding**
10:14 11:3,5
41:22 77:21 82:25
83:8,23 84:21,25
85:19 86:18
130:19 132:20
133:5 146:5
222:13 232:9,10
232:12 235:9
237:12 239:14
240:13 242:3,9
245:3 348:14,21
**understood** 8:16
23:19 24:1 84:1
84:12 142:4 147:8
150:20 156:9
217:14 228:15
232:17 245:17
**Underwood** 1:3 5:4
**unexpected** 114:17
**unforeseen** 98:5
**unintentionally**
108:18
**unit** 21:11,24 256:6
**United** 1:1 5:9
**University** 17:4,14
**unknown** 47:23
**unlimited** 182:4,5
305:10,11,21,22
**unnatural** 289:8
**unnecessary**
193:10
**unreasonable** 9:8
11:7
**unresponsive**
337:17,21,24
338:3,19 339:3,16
339:17 340:20,23
341:1,4,11
**unstable** 107:10
**upper** 313:4 344:12
345:20



**upside** 188:17
**urgency** 47:22
**usage** 268:15,18
**use** 4:11 11:11 38:7
  43:24 72:21 76:12
  77:17 84:16,19,22
  85:1,9,10,14,19
  86:6 94:2 98:1,2
  102:2 106:5,20
  108:7,25 109:3,5
  109:8,11,20 110:8
  115:19 133:13
  134:6 137:9
  143:13 144:19
  145:19 146:1
  162:16 163:11,11
  164:11,20 165:7
  165:22 166:6,23
  167:6 168:5 169:6
  169:7,9,24 170:2
  170:5,8,12,18
  171:3 172:10,13
  172:23 174:13
  175:7,17 176:6,8
  176:12,20 183:2
  185:17 187:8
  193:12 194:19
  195:3,14 196:12
  197:4,6 199:14
  200:5 211:11
  212:4,22 233:11
  233:19 239:13
  245:3 246:21
  258:19 259:6,11
  273:21 274:21
  275:14,16 295:21
  296:2 321:5 364:8
  364:21
**User** 82:5,21
  146:16 157:5
**uses** 84:5 85:3
  141:8,11 348:6
**usual** 371:18
**utilize** 65:11 72:11
  72:13 165:1
  176:16 187:22

195:20,23 232:13
  247:25 268:25
  269:6 270:3
  272:22
**utilized** 77:15
  139:1 147:17
  194:16 203:11
  204:17 205:1,6,16
  246:5
**utilizes** 145:1
**utilizing** 186:25

—————————
**V**
—————————
**Valdosta** 1:2 5:10
**various** 28:25
**vehicle** 24:14 25:25
  26:6 27:6 32:24
  32:25 33:3,7,14
  110:13,15,22,24
  111:7 113:4
  114:21 129:23
  130:2,20 131:14
  131:16 252:15,17
  270:20 311:12,16
  319:7 326:20
  331:16 340:6
  342:13,17 347:17
**vehicles** 129:20
**verbal** 53:23 72:8
  339:9 340:3
**verbalize** 340:9
**verbalizing** 338:14
**verbally** 248:21
  290:18 339:9,10
  341:2
**verification** 122:10
**version** 82:6 98:17
  98:18 154:14
  221:4 224:12
  225:15
**versus** 119:21
  171:17 173:5
  174:1 195:2 208:8
**vicinity** 22:3
**victim** 250:3
**video** 40:23 41:8,9

41:11 56:5 62:14
  69:24 70:13,20
  73:6 111:16
  112:22 114:18
  115:1,2 124:10
  125:4,13 130:12
  138:7 243:13
  269:23 275:2
  279:25 280:4
  287:19,25 288:2
  288:17 291:16,18
  292:14,17 293:1
  294:1,13 295:9
  296:24 297:23
  302:9,10 303:2,6
  303:9 304:3,10,21
  306:1 319:1 322:2
  330:14,15 332:7
  332:23 333:5,23
  334:2,6 335:2,18
  336:1,21 337:15
  342:1 343:6 344:3
  344:22 345:2,21
  346:1 357:18
  362:24 369:23
  370:19
**videographer** 3:18
  5:1,16,19 6:5 34:8
  61:6,10 81:9,11
  81:15 99:4,8
  115:7,10,24 116:3
  116:6 121:6,11,14
  121:18 158:11,13
  158:16 194:4,7,10
  218:8,13 265:15
  265:18 267:1
  323:7,11,13,18
  359:22 369:15,18
**videos** 341:24
**videotape** 5:2
**VIDEOTAPED**
  1:23 2:4
**view** 35:25 36:16
**viewed** 41:11
**violate** 139:11
  140:7

**violated** 139:9
  140:5
**violation** 169:25
  171:3 172:24
  194:20
**violations** 171:25
**violence** 207:8,9
**violent** 206:12
  207:20,23 208:8
  208:10
**vital** 310:4 323:24
  338:23
**vitals** 311:13
**voice** 247:8 296:5
  337:16 342:8,21
**volume** 13:9
**voluntarily** 10:10
**voluntary** 54:20
  201:8,10
**volunteer** 275:6
**vs** 1:10 5:6 373:2

—————————
**W**
—————————
**wait** 211:2 265:13
  349:4,4
**waited** 47:16,20,21
  48:2 298:7
**waive** 44:15
**waived** 44:22
**walk** 188:22 252:10
  297:12,20,21
  315:20
**walked** 236:23
  297:11 323:23
  329:12
**want** 9:25 11:13
  17:16 29:14,23
  30:13 42:5 43:6
  44:25 58:13 60:17
  73:7 98:15 117:15
  118:19 121:3
  122:17 123:14
  128:1,2 144:10
  149:3 158:19
  167:13 169:22
  181:16 189:9

195:18 198:14
  203:11 211:11
  213:22 215:8
  216:17 217:2,21
  220:20 224:2
  230:3 266:10,25
  272:22 275:2
  280:7 288:18,24
  298:10 303:25
  319:7 330:13
  335:17,24 337:12
  344:5 349:11
  353:2 354:5
  359:18 361:22,25
  364:8
**wanted** 9:17,20
  58:25 123:12
  124:6,20 134:11
  217:25 364:18
  368:22 370:7
**wanting** 349:16
**Ward** 160:5
**ware** 320:11
**warned** 348:6
  349:21
**warning** 53:20,22
  53:23 82:20 83:16
  119:13,23 120:11
  157:5 235:1
**warnings** 4:21,22
  82:19,23 83:2,5,6
  84:10,12 96:19,23
  97:2 99:14 101:10
  106:17 117:5,8
  118:1,3,3,8,14
  141:3 142:9
  144:12 147:9,17
  148:15,20 149:5,8
  150:7 154:8,14
  163:14 165:12,18
  184:25 224:8
  227:5 228:16
  230:17,24 231:24
  232:7 233:22
  234:14 277:4
  350:19 363:17



**warrant** 206:8,9
    208:23,24,25
    209:1,3,4 249:3,5
    297:2
**warrants** 14:6
**wasn't** 13:10,10,13
    23:14,14 39:6,11
    41:7 65:2 104:15
    123:18 139:2,7,10
    181:19 196:25
    204:15 208:24
    210:7 256:10
    263:25 265:14
    289:18 314:3,5
    316:8 325:20
    327:6 329:1
    347:19 357:24
    364:7,9,10 367:18
**watch** 41:8 243:13
    280:3 287:19,24
    288:2 293:23
    335:17
**watched** 40:23
    111:16 199:8
**watching** 70:12
    125:3 335:6
**way** 21:21 32:19
    35:16 36:2 39:23
    57:10 80:4 96:23
    100:2,6 111:24
    139:18 155:10
    156:21 158:20
    166:7 204:23
    206:17 237:14
    238:7 259:18,19
    259:19 287:6,10
    289:8 313:5
    326:13 332:18
    336:17 340:7,16
    341:7,19 357:9
    360:24
**Waymire** 3:15
**ways** 72:17
**we'll** 8:20,22 16:20
    45:4,8 81:8 115:3
    224:3 341:13

366:7
**we're** 9:23 19:17
    61:7,10 72:8
    80:25 81:13,17
    99:5,8,20 101:5
    101:14 115:7,10
    116:3,6 121:8,11
    121:16 141:1
    158:14,16 187:19
    194:7,10 198:12
    218:11,15 228:1,5
    257:5,5 265:15,18
    295:10,22 297:24
    302:11 304:22
    323:20 332:1,4
    353:25 369:22
**we've** 106:15
    162:20 163:14
    226:8 294:2
    350:18 353:16
    362:10 366:23
    367:20
**weapon** 14:25 15:6
    15:9 35:9 37:23
    76:4 90:7,21
    108:3 134:4,13,16
    136:3,4,24 137:22
    162:16,19 164:11
    164:20,25 165:8
    183:2 199:15
    200:3 205:16,19
    206:20 207:7,16
    208:14,17,19
    211:1 232:14
    239:4 246:5,22
    255:5,9,12 291:12
    291:24 294:5,11
    296:21 301:9
    304:12 306:12
    334:4
**weapons** 47:24,25
    76:13 84:2 89:18
    119:14,18,21,21
    212:5 234:1
    302:24
**Webb** 160:5

**websites** 236:2
**Webster** 3:6 5:25
    44:12,23 152:6
    153:1 215:5
    219:24 354:8
**Wednesday** 2:6
**week** 173:20
**weeks** 162:14
**weigh** 174:18
**weight** 190:1
    345:23
**went** 12:1,24 14:15
    21:24 22:2,4
    23:24 32:16 40:2
    47:2,3 54:19 62:6
    72:1 83:24 110:19
    112:19 124:24
    148:15 154:8
    176:25 196:18
    206:13,13,15,15
    209:14 217:1,19
    224:8,16 236:2
    253:2 256:4,6
    284:9 311:16
    313:5 325:18
    342:17,20 352:7
**weren't** 74:22 75:2
    147:22 204:13
    269:8 278:24
    309:25 356:1
**west** 25:11,12 32:21
    32:22
**whatsoever** 340:7
**whichever** 149:2
**Whidden** 3:4
**white** 274:9,12,15
    274:24 276:8,15
    276:21 285:2,16
    285:21,24 286:5
    336:3,7,12 368:9
**wildly** 286:23
**Williams** 3:14,15
    4:6 6:2,2 9:16,18
    9:23 10:1 28:24
    29:14,19,21,24
    30:2,8 44:8,10,16

44:20 45:15,25
    47:18 61:3 64:10
    81:2 98:15 99:12
    99:24 100:10
    101:2,3,7 115:21
    116:2,13,18
    118:24 119:3,7
    121:2,5,8,13
    126:2 129:7
    135:17 136:5,25
    141:6 142:11,17
    143:1,4,9,18,21
    143:24 144:2,5,14
    145:4 147:10
    148:2 149:16
    150:12 151:18
    152:1,7,13,18,21
    152:23 153:5,7,10
    153:13,17,25
    154:4,12 156:14
    158:5,12 166:8,13
    166:19,25 167:20
    168:14,19,24
    169:2,4,6 170:10
    170:21 171:6,18
    172:21 173:7
    174:3,16 175:10
    177:5,12,23
    179:22 180:15,23
    183:7,10 184:5,10
    184:13,17,22,25
    185:3,5,20 186:9
    187:2,13,24
    188:18 189:4,13
    189:15 190:3,15
    191:11 192:3,10
    192:23 193:17,21
    194:22 195:11,25
    212:17,19 214:19
    216:12 220:24
    221:1,7,10,13
    222:9 223:21
    225:17,21 226:3
    228:3,19 229:7
    234:7,10,20 235:5
    236:20 237:3

239:6 240:1,19
    241:13 242:8
    243:11,20 244:7
    245:1,12 246:6
    249:18 253:5
    254:5 256:25
    258:14 259:4,7,24
    260:13,20 261:21
    262:12,22,24
    263:10,19 264:6
    264:21 265:9,12
    266:3,20 268:9
    270:4 271:8,13,18
    272:6,10 275:8
    276:11,17 278:6
    279:18 280:20
    281:21 282:4,24
    286:18,25 287:18
    288:8,12,16,20,23
    289:2,17,24
    290:21 291:2
    293:12,17 294:16
    294:20 295:3
    297:14 298:15,19
    299:19 300:5,8
    301:1,23 303:20
    305:2,14 306:18
    306:23 307:1,18
    307:20 309:11,21
    310:1,17,25 311:6
    312:16 313:7,15
    313:21 314:19
    315:22 316:6,11
    316:21 317:2,5,17
    317:23 318:6,16
    318:23 319:18
    320:3,15 321:12
    322:5,15,22,25
    323:8 325:1,5
    327:10 328:12
    330:1,18,23 331:4
    331:10,14 333:11
    334:9,25 335:7
    338:1,7 339:20
    340:24 343:4,18
    345:16 346:22



347:1,13 348:23
349:4,8,12,18,22
350:2,5,9,13,17
350:22 352:12
353:9,16,19,23
354:1 355:15
356:3,5,8 357:2,4
357:7,10,12 358:9
359:6,8,11 364:9
364:10,13,15,18
364:22,25 365:3,8
365:12,15,18,21
365:24 366:7,12
366:14,17,25
368:21,25 369:14
370:9,11,15,19
**window** 27:17,20
30:14 210:10
296:13
**windows** 26:7
252:25
**wires** 57:2 60:4
**witness** 4:2 6:6,12
6:14 7:22 29:23
30:6 31:3 32:12
34:10 47:20 49:4
50:10 51:9 53:5
53:11 59:9,14,23
60:14 62:1 64:12
68:10 76:15 81:3
85:16,21 86:10
91:3 92:24 94:8
96:5 100:2,9,14
103:24 106:22
107:23 109:17
135:19,24 136:8
137:2,25 138:5
141:11 142:6,12
142:18 143:13
144:16 145:6
147:5,12,21,24
149:17 150:3,14
156:15 157:16
163:18,23 164:2
166:9,14,20 167:1
167:14,22 170:23

171:8,19 173:8
174:4,17 175:11
177:7,13,24 178:1
178:25 179:23
180:17,24 181:1
183:9,20 184:4,6
184:9,19,24 185:4
185:21 186:1,11
187:3,14 188:1
189:5,14,16 190:5
190:16 191:12,14
192:4,12,24
193:18,22 194:23
196:1 199:10
204:6 214:12,21
216:14 222:10
223:22 225:11,14
226:5 228:4,21
230:6 232:1
233:15 234:9,16
234:21 237:4
238:11 239:7
240:3,21 241:15
241:22 242:9
243:13 244:10
245:2,13 246:8
249:19 253:7
257:1 258:15
259:8,25 260:15
260:21 261:23
262:13,25 263:12
263:21 264:7
266:4 270:5 271:9
271:14,19 272:11
276:12,18 278:7
279:19 281:22
282:5,25 287:1,19
288:10 289:18
290:23 291:3
293:13,19 294:21
295:4 297:15
298:20 299:14,21
300:9 301:2,25
303:21 305:15
306:20 307:3,6,19
307:25 310:18

311:1,7 312:17
313:8,16,22
314:20 315:23
316:23 317:6,18
317:24 318:7,17
318:24 319:19
320:4,16 321:13
322:6,8,16 323:2
328:13 330:2,19
331:5,11,15 333:6
333:13 334:10
335:1,8 338:2,8
339:22 340:25
343:19,24 345:17
347:2,14 348:11
348:16,24 351:2
352:4,14 353:8,10
355:16 356:11,21
357:3,6,11,13
358:10 361:2,15
363:15 367:17,25
368:7,13,18
372:15 373:3
**wold** 188:10
**word** 182:13,13
233:11 245:22
251:1
**worded** 112:21
114:15,16
**words** 230:12
234:13 274:24
**work** 14:13 18:22
59:21 176:16
362:14
**worked** 12:5,5,11
12:15,20 13:13
15:16
**working** 12:18 17:1
17:10 19:4
**works** 203:9
**world** 103:15
217:25
**wouldn't** 118:6
131:15 203:17
204:25 343:21
**wound** 89:10,25

90:7,14,21 91:8
**wounds** 91:1,7,19
**wreck** 254:25 332:2
**write** 28:20 142:19
144:9 152:10
**written** 122:8,13
144:21
**wrong** 5:13 73:7
114:3 122:17
166:3 316:22
**wrote** 233:15

---

**X**

**X** 4:1 30:25 51:11
**X26** 15:12 40:5
76:17
**X26P** 41:18 46:22
58:18 59:11 64:1
64:5,8 80:9 82:5
83:7 115:15
146:16

---

**Y**

**Yea** 364:1
**yeah** 9:14,22 10:1,2
26:11 29:3 41:21
45:19,25 57:8
61:5 64:12 99:24
100:6 113:23
114:1 116:1 119:3
153:7 154:9,12
158:12 160:3
168:20 175:14
184:14 188:25
221:3,6 227:9
234:8 240:9 266:2
294:7 317:5
320:22 353:8
366:10 369:8
370:2
**year** 17:8 152:4
153:1 196:22
197:25 217:11
**years** 18:5 118:9,9
138:11 281:6
**yell** 290:12,16

**yelling** 20:9,22 21:2
21:15 26:9 27:21
30:15 31:19,22
36:3 37:8,11
38:20,21,24 39:12
71:14 249:23
250:8,23 251:15
251:18,20,21
255:14 260:21
261:16,19 262:20
285:6 290:11
296:11
**yellow** 83:17
218:24 219:6
221:23 222:4,10
223:11
**yesterday** 124:19
128:22 152:6

---

**Z**

**zero** 242:21
**zone** 18:18,19,20,23
18:24 175:1 256:2
**zones** 18:21

---

**0**

**00:1** 131:2
**00:30** 131:3
**05:03** 299:2
**05:04** 300:2,7,11,18
300:24
**05:04:16** 299:7
**05:04:46** 301:13

---

**1**

**1** 4:15 19:8,10,14
57:9 101:11 117:9
118:3 122:24
149:20 154:13
185:10 219:8
284:15 351:9
**1-0** 304:22
**1:44** 121:20
**10** 4:10 52:6 223:24
224:4 356:1,1
358:14



**10-18** 267:21,23
**10.B** 371:4
**10/30/18** 4:21
**10:08** 5:12
**10:13** 2:6
**100** 145:2 148:8
  261:12
**108** 88:4
**109** 222:16
**10th** 8:2
**11** 4:10 203:22
  225:2,6 295:10
**11:09** 61:8
**11:17** 61:11
**11:41** 81:12,13
**11:54** 81:17
**116** 4:22
**12** 88:20 162:14
  203:22 216:18
**12-inch** 88:14
**12/18/2018** 154:21
**12:14** 99:5
**12:15** 99:8
**12:33** 115:7
**12:39** 115:10 116:3
**12:45** 116:6
**12:52** 121:16
**121** 4:5
**13** 203:22
**14** 203:22 295:23
**14th** 221:5,16
  225:16
**15** 139:16 140:17
  142:15 178:17
  179:8 183:18
  185:13 295:22
  296:2 320:1,8
**15-14-37** 371:14
**151** 4:11
**1510** 3:4
**1564** 2:9 5:14
**15th** 82:7
**16** 4:11 167:23
  168:5,5,9 215:10
  300:2
**167** 4:11

**16th** 78:21
**17** 86:12
**17800** 3:11
**18** 89:23 91:7,18
  158:25 159:18
  212:14 216:7
**18th** 78:25 155:16
  196:18 197:19
  198:21 204:14
  236:24
**19** 4:15
**19103** 371:8

___

**2**

**2** 4:16 22:11,12,15
  23:3 24:21,21
  27:23 28:25 29:18
  29:19 89:24 149:3
  153:19 219:13
  230:10
**2:04** 335:11
**2:08** 335:11
**2:17** 158:13
**2:30** 158:16
**20** 12:8 57:6,13
  114:19 243:1
  279:13 301:20
  374:22
**20.2** 82:6
**2002** 18:1
**2006** 18:6
**2013** 98:20 99:14
  101:11 117:9
  118:3 154:13
**2015** 17:9
**2016** 169:14
**2017** 11:21 12:12
  18:7
**2018** 11:21 78:25
  82:7,10 83:24
  96:24 97:4,19
  98:8 101:23
  102:11,18 103:19
  103:24 106:16
  117:13 118:2,4,15
  155:16 157:17

162:11 196:19
  203:20 204:11,14
  212:14 223:20
  231:22 232:4
  236:24
**2019** 11:23,25
  13:24 18:12 65:25
  66:13 78:21
  198:18 221:5,16
  224:13 225:16
**2020** 8:2 12:8 13:7
  14:15,17
**2021** 2:6 372:17
**21** 12:7 221:4
  224:12 225:15
  300:7
**22** 4:16 134:8
  300:11
**220** 4:9
**223** 4:10
**225** 4:10
**22nd** 2:6 5:11
**23** 90:11 91:8,18
  216:6
**24** 123:15 155:20
**244** 5:12
**249** 65:21 298:24
**24th** 13:24 14:1
  18:12 65:24 66:13
  66:20
**25** 57:8 217:1
**250** 66:16
**251** 66:17
**252** 66:17
**253** 66:17
**254** 68:5
**25th** 18:1
**27** 4:11 151:3
  153:16,22 154:13
  300:18
**28th** 198:18
**2A** 4:17 30:9
**2B** 4:17 29:22 30:9
**2C** 4:18 29:25 30:5
  30:7,9 32:11 51:1
  51:5

**2D** 4:18 30:3,9

___

**3**

**3** 4:19 52:21 63:18
  63:21 65:16
  153:14 203:12,20
  275:24 298:13
  356:25,25 357:4
**3.01** 4:11 168:6
**3/1/13** 4:22
**3:04** 194:7
**3:05** 194:10
**3:29** 218:11
**3:37** 218:15
**30** 4:17,17,18,18
  34:25 123:14
  130:10,10,12,12
  130:14,22,23
  139:25 176:2
  204:11 292:5,8
  318:21,25 319:10
  322:20 346:18
**303** 20:5 22:1,5,19
  23:11,14 24:3
**30518** 3:16
**30th** 96:24 117:13
  118:4 203:20
**31** 297:24
**31793** 2:10 3:4
**31794** 3:7
**33** 303:8
**35** 34:25 302:11
  303:8
**359** 4:5
**36** 299:8 336:11
**368** 4:6
**381** 24:23 25:12,14
  26:4,8 27:16,21
**3B** 171:23

___

**4**

**4** 4:19 52:21 75:20
  75:21,24 91:18
  92:3,6,16 145:14
  168:12 357:5
**4:00** 249:24 250:7

**4:22** 265:15
**4:27** 265:19
**40** 215:8,9,10 299:2
  300:24
**405** 3:7
**41** 216:17
**4330** 3:15
**45** 185:15

___

**5**

**5** 4:20 78:8,9,12
  198:15
**5:00** 26:17
**5:03:40** 66:13
**5:04:16** 67:8
**5:04:46** 67:9
**5:17** 323:15
**5:25** 323:20
**50** 196:6,11 325:8
**5817-0834-4721-...**
  2:14 371:24 372:7
  372:21
**5th** 169:14 372:16

___

**6**

**6** 4:20 81:5 82:3
  93:1 146:8 202:4
  243:18
**6:00** 19:7,7
**6:13** 369:22
**6:20** 2:7 370:22
**6:46** 203:23
**6:47** 203:23
**63** 4:19

___

**7**

**7** 4:4,21 88:22,23
  89:1,7 358:1,7
**7:21-CV-00040-...**
  1:10
**71** 369:3,3,8
**754** 4:19
**78** 4:20

___

**8**

**8** 4:9,21 96:6,7,10



96:14 99:19
101:15 117:2,12
117:23 118:19
120:3,15,24
147:16 184:24
185:4,5 220:15,19
221:1 229:9,18
230:8 363:17
364:5 367:1,4
**80** 325:8
**81** 4:20
**85255** 3:11
**85th** 3:11
**866-624-6221** 371:8
**88** 4:21
**8th** 371:8

### 9

**9** 4:22 116:10,22,25
117:4,23 118:18
118:20 119:12
120:3,15,24 148:3
154:7 218:20
222:24 226:8
228:25 229:9,17
229:18 230:8
367:1,8
**9-11-28(c)** 371:10
**9/22/2021** 1:23
**90** 93:4 173:21
243:22
**9000** 16:8
**911** 250:22 251:14
**94** 93:23 202:7
**95** 221:20
**96** 4:21

