# Exhibit 1

## Official Report



**Division of Forensic Sciences**
**Georgia Bureau of Investigation**
**State of Georgia**

**Central Regional Lab**
DOFS Case #: 2019-4001768
Report Date: 08/26/2019

Kathryn P. Lee
Deputy Director

* NAME Accredited *



**Requested Service:** Autopsy
  Agency: Tift Co. Coroner
  Agency Ref#:
  Requested by: J. Thompson

**Case Individuals:**
  Victim: James A. McBrayer

**Evidence:**
  2019-4001768-001    Decedent

**Results and Conclusions:**
  Evidence Submission: 001
    In accordance with the Georgia Death Investigation Act, an autopsy is performed on the body of James Aaron McBrayer at the Georgia Bureau of Investigation, Central Regional Medical Examiner's Office on 04/25/19. The autopsy is begun at 0730 and the prosector is Dr. Maryanne Gaffney-Kraft.

**Cause of Death:**
Excited delirium in conjunction with physical altercation including Taser use, and cocaine and mitragynine toxicity

**Pathologic Diagnoses:**
Blunt force injuries:
  Thin diffuse subdural hemorrhage (<10 ml)
  Subgaleal hemorrhages of the occipital and posterior parietal scalp
  Abrasions, superficial lacerations and contusions of the head, neck, torso and extremities
Conductive energy weapon (Taser) injuries:
  Probe puncture wounds x2 of the right anterior chest
  Drive-stun prong defects of the right lateral anterior lower chest and upper abdomen
Cardiomegaly (400 grams)
Pulmonary congestion (1375 grams)
Overweight BMI (29)
Postmortem peripheral blood positive for cocaine and mitragynine

**Presentation of Body:**
The body is received in a body bag. Body identification consists of two identification tags, one on the zipper-pulls of the body bag and the other loose within the body bag. A black material strap loosely encircles the bilateral ankles/distal lower legs (hobble strap); the strap has a dark metal spring-loaded pinch-type fastener on one end and a yellow metal spring-loaded gate-type fastener on the other end. The body is clothed in white with gray trim and blue logo socks, blue denim jeans, a brown belt with a white metal buckle, black with gray trim boxer-brief underwear, a black, short-sleeved, button-front collared shirt, a white T-shirt, and a white sleeveless undershirt. The clothing shows variable dirt soiling, and the right front pocket of the jeans is pulled out. The shirts show medical disarray with previous anterior cutting and tearing exposing the chest. Accompanying the body on the left ring finger is a gray metal band ring. Evidence of medical intervention consists of two defibrillator pads on the torso and four ECG leads, one each on the bilateral shoulders and lower legs; a white sheet is additionally present.



EXHIBIT
9-22-21
7
Defense

External Examination:
Body Condition: Intact
Length: 67 inches
Weight: 185 pounds
Body Heat: Room temperature
Rigor: +1 out of 2
Livor: Red/purple, posterior
Hair: Shaved with scattered brown-toned stubble
Eyes: Hazel-gray, corneae are clear, sclerae and conjunctivae are pale; no petechiae present
Teeth: Natural in fair to good condition
Facial Hair: Brown with scattered gray moustache and beard
Fingernails: Intact and worn short

The body is that of a well-developed, overweight, adult white male appearing compatible with the reported age of 41 years; BMI = 29. The skin shows scattered nonspecific scarring, pigmentation changes and variably pigmented lesions/growths. The head is normally formed and the nose and ears are not unusual. The lips, gums and oral cavity are without obvious focal lesions. The neck is without masses, and the larynx is in the midline. The chest and back are well developed and symmetrical. The abdomen is overweight; no obvious fluid collection is present. The external genitalia are that of a normal adult male. The testes are descended within the scrotum, and the penis is unremarkable. The anus and perineum are without focal lesions. The upper and lower extremities are well developed and symmetrical without absence of digits. Identifying marks and scars consist of a hypopigmented linear scar of the right lateral eyebrow.

Evidence of Injury:
Blunt Force Injuries:
On the right lateral lower forehead is a 9/16 x <¼ inch, brown-toned, variably depressed, dried, superficial abrasion/erosion-type defect with patchy surrounding red discoloration. On the right lateral orbital rim/zygomatic cheek is a ½ x ½ inch area of faint red superficial abrasion. On the left maxillary cheek is a <1/8 x <1/8 inch, red-brown-toned, dried superficial abrasion-type defect. On the left lateral jawline/upper neck located just below the left earlobe are three superficial abrasions ranging from 1/8 to 3/16 x 1/16 to 3/16 inch in size.

On the left occipital scalp is a 2½ x 2 inch full-thickness subgaleal hemorrhage, and on the superiorly adjacent left posterior parietal scalp is a 1 x 1 inch, patchy, partial-thickness subgaleal hemorrhage; the overlying skin is without evidence of injury. On the right occipital scalp is a 1 x ¾ inch partial-thickness subgaleal hemorrhage; the overlying skin is without evidence of injury.

The brain shows thin, diffuse subdural hemorrhage measuring <10 mL. The skull and brain parenchyma are without evidence of injury.

On the right anterior-lateral chest are two superficial abrasions measuring ¼ x 1/8 inch and ½ x 1/16 inch. On the left lateral axillary chest are two red-purple contusions measuring 5/8 x 3/8 inch and ¾ x 5/8 inch. On the left lateral lower chest is a red-purple contusion measuring 1¼ x 1¼ inches. On the right lateral back are scattered superficial abrasions ranging from <1/8 to ¼ inch x <1/8 to 3/16 inch in size.

On the right medial proximal upper arm is a ½ x 3/8 inch blue-toned superficially abraded contusion. On the right medial distal upper arm are a 1½ x 1¼ inch purple-blue-toned faint contusion and a <¼ x 1/16 inch superficial abrasion. On the right elbow are scattered superficial abrasions measuring up to 1/16 inch in greatest dimension. On the right medial elbow and proximal forearm is a 1¾ x up to 3/16 inch faint, focally contused abrasion. On the right medial posterior mid forearm is a 2½ x up to ½ inch superficial abrasion. On the right medial posterior distal forearm are a ½ x <½ inch contusion and two abrasions measuring 3/8 x 1/8 inch and 5/16 x <1/16 inch. On the right medial posterior wrist is a 3/16 x <3/16 inch superficial abrasion. On the right hand, overlying the posterior medial 5th metacarpophalangeal joint is a 5/16 x <3/16 inch superficial avulsion-type laceration, and

overlying the posterior 5th proximal interphalangeal joint is a ¼ x <1/8 inch superficial laceration.

On the left posterior medial distal upper arm are two superficial abraded contusions measuring 1¼ x 1 inch and 1 x 1 inch. On the left anterior medial distal upper arm is a ¾ x 5/8 inch faint purple-red contusion. On the left posterior proximal forearm is a 1 x ¾ inch area of patchy superficial abrasion. On the left anterior lateral mid forearm are two superficial abrasions measuring <3/16 x <3/16 inch in size. On the left anterior medial wrist are a 5/16 x <1/8 inch dried superficial avulsion-type laceration, a 3/16 x up to 1/8 inch purple-red superficial contusion, and two superficial linear abrasions measuring 7/16 x <1/16 inch and 3/16 x <1/16 inch. On the left posterior hand overlying the 2nd metacarpophalangeal joint is a 1/16 x 1/16 inch superficial abrasion.

On the right knee is a 9/16 x <¼ inch superficial abrasion.

On the left distal knee and proximal lower leg are three superficial abrasions ranging from 3/16 to 5/8 inch x 3/16 to 5/16 inch in size. On the left anterior distal lower leg is a 3/8 x <3/8 inch faint red contusion.

The bilateral wrists show variable, horizontally oriented indentation marks with and without associated superficial abrasions/erosions right greater than left. These findings are consistent with marks/injuries sustained from wearing handcuffs.

The bilateral ankles and distal lower legs show variable, horizontally oriented indentation marks. These findings are consistent with marks sustained from wearing an ankle/distal lower leg 'hobble' strap.

Conductive Energy Weapon (Taser) Injuries:
On the right anterior chest, centered 18½ inches below the top of the head and 2¼ inches right of the anterior midline, is a <1/16 x <1/16 inch puncture wound with a surrounding <5/16 x ¼ inch area of superficially abraded/eroded red contusion. The puncture wound extends through the epidermis and dermis into the superficial subcutaneous tissue; localized hemorrhage is present. This injury is consistent with a conductive energy weapon (Taser) probe puncture wound.

On the right anterior chest, centered 23 inches below the top of the head and 2¾ inches right of the anterior midline, is a 1/16 x <1/16 inch puncture wound with a surrounding <¼ x <¼ inch area of superficially abraded/eroded red contusion. The puncture wound extends through the epidermis and dermis into the superficial subcutaneous tissue; localized hemorrhage is present. This injury is consistent with a conductive energy weapon (Taser) probe puncture wound.

Examination of the decedent's shirts reveals defects in the approximate locations of the above-noted probe puncture wounds.

On the right lateral anterior lower chest and upper abdomen, extending from 24½ to 26½ inches below the top of the head and 5 to 6 inches right of the anterior midline, are multiple, <1/8 to <¼ inch, variably rounded, superficially abraded/eroded red defects which are arranged in two, vertically-oriented, curvilinear bands. The medially located band measures 1½ inches in length and consists of 6 defects. The laterally located band measures 2½ inches in length and consists of 5 defects. The underlying dermis and subcutaneous tissue are without evidence of injury. These defects are consistent with conductive energy weapon (Taser) drive-stun prong injuries.

Additional Procedures:
Photographs: Documentary photographs are obtained.

Evidence Collected:
The clothing, bloodstain card, plucked head/facial hair, fingerprints and ankle strap are collected as evidence. Postmortem blood, urine and vitreous are obtained at autopsy.

Personal Effects Disposition:
The ring is released with the body. The dissected organs are forwarded with the body.

Internal Examination:
Internal examination documentation is exclusive of the above-noted injuries.

Body Cavities:
A Y-shaped thoraco-abdominal incision is made and the organs are examined in-situ and eviscerated in the usual fashion. The bilateral pleural and peritoneal cavities are free of significant fluid and adhesions. All body organs, excluding the appendix, are present and in their normal anatomical positions.

Cardiovascular System:
The pericardial sac is free of significant fluid and adhesions. The heart weighs 400 grams; expected weight based on height = 321 +/- 40 grams. The epicardium is smooth and glistening with moderate amounts of epicardial adipose tissue. The coronary arteries arise normally, follow the usual distribution and are widely patent, without evidence of significant atherosclerosis or thrombosis. The heart is mildly enlarged, but the chambers and valves bear the usual size-position relationships and are unremarkable. The myocardium is uniform and shows no evidence of acute infarction, scarring, or focal lesion. The aorta and its major branches arise normally, follow the usual distribution and are without significant atherosclerosis.

Neck:
A layered dissection of the anterior neck is performed. Examination of the soft tissues of the neck, including the strap muscles and large vessels, reveals no abnormalities. The hyoid bone and laryngeal cartilages are intact. The larynx is clear. The lingual mucosa is intact; the underlying musculature is devoid of hemorrhage. A posterior neck dissection is performed and is without evidence of hemorrhage or abnormality.

Respiratory System:
The right and left lungs weigh 725 and 650 grams respectively. The upper and lower airways are free of debris and foreign material; the surface mucosa is unremarkable. The pleural surfaces are smooth and glistening. The lungs are normally formed. The parenchyma of both lungs shows moderate congestion; no obvious consolidation or focal lesions are identified. The pulmonary arteries are free of thrombi or emboli.

Gastrointestinal Tract:
The GI tract shows normal configuration and is intact throughout its length. The esophageal mucosa is unremarkable without focal lesions. The stomach contains a minimal amount of bilious mucoid fluid; the mucosa is unremarkable. The small and large bowels are unremarkable and contain progressively formed stool. The appendix is surgically absent; intact clips are present.

Hepatobiliary System:
The liver weighs 1450 grams. The capsule is intact and the parenchyma is red-brown and uniform without focal lesions; moderate congestion is present. The gallbladder contains a large amount of bile; the mucosa is unremarkable. The extrahepatic biliary tree is patent.

Genitourinary System:
The right and left kidneys are of normal size and shape weighing 125 and 150 grams respectively. The capsules strip with ease from the underlying smooth cortical surfaces. The renal architecture is intact and is without focal lesions. The cortices are of normal thickness and the cortical-medullary junctions are sharp. The ureters are intact and unremarkable. The

bladder contains a small amount of yellow urine; the mucosa is unremarkable. The prostate, seminal vesicles and testes are unremarkable without focal lesions.

Endocrine System:
The thyroid and bilateral adrenal glands are unremarkable without focal lesions. The pancreas is of normal size, shape and consistency without focal lesions.

Immunologic System:
The spleen weighs 150 grams. The capsule is intact and the parenchyma is congested but without obvious focal lesions. No significant lymphadenopathy is identified.

Central Nervous System:
The dura mater is intact and is unremarkable without focal lesions. The leptomeninges are thin, delicate and congested without evidence of purulent infection. The vasculature at the base of the brain is normally formed and is intact without evidence of significant atherosclerosis. The brain weighs 1350 grams. The cerebral hemispheres are symmetrical, show a normal gyral pattern, and are unremarkable. Coronal sections reveal normal architecture of the cortical gray matter, subcortical white matter, basal ganglia and thalami; no focal lesions are present. The ventricular system is symmetrical and not dilated. The brainstem and cerebellum are unremarkable.

Musculoskeletal System:
The bony framework, supporting musculature and soft tissues are well developed and without obvious natural disease processes.

Microscopic Examination:
Sections of the heart show vascular congestion, patchy increased perivascular fibrosis and occasional mild foci of plexiform fibrosis. Sections of the lungs show vascular congestion and anthracotic pigment deposition. A section of the liver shows vascular congestion and patchy mild macrosteatosis. Sections of the pancreas, spleen, right kidney, right adrenal gland and brain are unremarkable except for varying amounts of vascular congestion and autolysis.

Summary and Interpretation:
The decedent is a 41-year-old white male who was pronounced on 04/24/19 at 0612. The decedent's Georgia Bureau of Investigation Region 15 Investigative Summary including scene videos and photos is received and reviewed.

Per Investigative reports, around 0430 in the morning on 04/24/19, 911 dispatch was called by a local resident who reported they heard a man yelling for help. Upon arrival to the scene law enforcement found a wrecked pick-up truck which had apparently run off the road into a drainage ditch; the airbags had deployed. One deputy stayed with the truck and the other deputy went to look for the driver. The driver (decedent) was located further up the road at a closed business. When the deputy attempted to make contact with the decedent, the decedent acted erratic and paranoid, hiding/crouching behind buildings and construction equipment, and growling and yelling about 'devils'. The decedent suddenly charged, running full speed at the deputy, and the deputy deployed his Taser. Initially, the Taser appeared to have no effect on the decedent and he started to run away, but then the decedent stopped and crouched on the ground. When the deputy walked up to the decedent and placed his hand on the decedent's back, the decedent got up, charged, and hit the deputy pushing him to the ground. The deputy reengaged/recycled the Taser, and the decedent again began to run away. At this time, another deputy arrived to assist the first deputy. The deputies and the decedent were physically struggling in a standing position; the deputies were trying to put handcuffs on the decedent. At some point during the struggle, the decedent kicked the second deputy, injuring the deputy's knee, and they (the decedent and deputies) all fell to the ground where the struggle continued. During the struggle on the ground, the second deputy drive-stunned the decedent with his Taser, but again, the Taser appeared to have no effect on the decedent. A third deputy arrived to help, and the deputies were finally able to get the handcuffs on the decedent while he was on the ground; the decedent was in a prone position. The decedent

started kicking and thrashing his legs/feet, and a fourth deputy placed a material 'hobble' strap around the decedent's ankles/feet (only) to secure/control them.

A short time later (less than one minute), the decedent was lifted off the ground and placed in the back seat of a patrol car. The decedent was positioned lying on his left side with his face facing forward towards the front of the vehicle. Per reports, the decedent was checked on multiple times and was found to be breathing. Per body cam video documentation, when the decedent was checked on at approximately four minutes after he was placed in the patrol car, the decedent appeared to move and make a sound after verbal and touch stimulation. Per reports, over the next few minutes, the decedent was periodically checked. At approximately 6 minutes after the body cam video sound/movement documentation, the decedent was found to be unresponsive and without a pulse. EMS was already at the scene (caring for the injured deputy) when the decedent was found unresponsive. Per EMS documentation, upon their evaluation, the decedent was found to be in cardiac arrest, was warm to touch and had normal coloration; despite medical intervention, the decedent was pronounced at the scene.

Per interviews with the decedent's ex-wife who arrived at the scene, the decedent was with her prior to his accident and appeared to be having a 'mental episode', acting paranoid and hearing 'sounds'. The decedent had run off and she (ex-wife) had been looking for him. She reports that the decedent has a history of 'mental episodes' but had never been medically diagnosed. Additionally, per the decedent's ex-wife and father, the decedent has a history of illicit drug abuse.

The significant findings at autopsy are blunt force injuries consisting of a thin diffuse subdural hemorrhage (<10 ml), subgaleal hemorrhages of the occipital and posterior parietal scalp, and abrasions, superficial lacerations and contusions of the head, neck, torso and extremities, and conductive energy weapon (Taser) injuries consisting of probe puncture wounds x2 of the right anterior chest and drive-stun prong defects of the right lateral anterior lower chest and upper abdomen. Cardiomegaly, pulmonary congestion and overweight BMI are additionally present.

Toxicological analysis of postmortem peripheral blood for ethyl alcohol is negative. Analysis of postmortem peripheral blood for drug screen testing is indicative for cocaine/cocaine metabolites and negative for barbiturates, cannabinoids, certain benzodiazepines, and common opioids. Analysis of postmortem peripheral blood for drug confirmation testing is positive for cocaine at a level of 0.60 mg/L (+/- 0.17 mg/L) and its metabolite benzoylecgonine at a level of 2.8 mg/L (+/- 0.8 mg/L); analysis is additionally positive for the presence of mitragynine. Toxicological analysis of postmortem peripheral blood for mitragynine is positive at a level of 6.2 ng/mL; this testing is performed by NMS labs.

Postmortem vitreous chemistry testing is performed and shows glucose 25 mg/dL, sodium 149 mEq/L, potassium >10.0 mEq/L, chloride 122 mEq/L, creatinine 0.5 mg/dL and urea nitrogen 14 mg/dL. The glucose and potassium levels are most consistent with postmortem change.

Given the autopsy and investigative findings, it is my opinion the cause of death in this case is best diagnosed as excited delirium in conjunction with physical altercation including Taser use, and cocaine and mitragynine toxicity. The manner of death is best classified as homicide.

---

Only those items discussed in the results above were analyzed for this report. The above represents the interpretations/opinions of the undersigned analyst. Unless noted above, evidence analyzed in this report will be returned to the submitting agency. Biological evidence (body fluids and tissues) and proof determination evidence will be destroyed after one year. This report may not be reproduced except in full without written permission of the laboratory.

Technical notes and data supporting the conclusions and findings in this report are maintained within the laboratory case records.

This case may contain evidence that must be preserved in accordance with O.C.G.A. § 17-5-56.

*Maryanne Gaffney-Kraft*
Maryanne Gaffney-Kraft
Regional Medical Examiner
478-752-1100
Maryanne.Gaffney@gbi.ga.gov

**Related Agencies:**
Tift Co. Sheriff's Office
GSP-Post 13-Tifton
GBI-Medical Examiner Central
Tift Co. District Attorney
GBI-Reg. 15-Sylvester
Tifton Judicial Circuit

ACN: 1501733419

**End of Official Report**