1              IN THE SUPERIOR COURT OF TIFT COUNTY
                     STATE OF GEORGIA
2

3    SHERRI MCBRAYER, Individually    )
     and as the surviving spouse of  )
4    JAMES AARON MCBRAYER, Deceased   )
     and on behalf of Samuel Aaron    )
5    McBrayer and Jordan Janice       )
     McBrayer, as the surviving       )
6    children of James Aaron          )
     McBrayer, Deceased,              )
7                                     )
          Plaintiff,                  ) CIVIL ACTION FILE
8                                     ) NO.:  2019CV347
     vs.                              )
9                                     )
     HON. GENE SCARBROUGH in His      )
10   Official Capacity as Sheriff of  )
     Tift County, Georgia,            )
11                                    )
          Defendant.                  )
12   _____)

13

14

15              Videotaped Deposition of

16            MARYANNE GAFFNEY-KRAFT, DO

17

18                  July 15, 2020

19                    2:04 p.m.

20

21              5615 Riggins Mill Road

22            Dry Branch, Georgia 31020

23

24

25         Susan W. Tarpley, CCR B-1489



1                    APPEARANCES OF COUNSEL:

2

    On behalf of the Plaintiff:
3
    CRAIG ALAN WEBSTER, Esquire
4   The Webster Firm, PC
    405 Love Avenue
5   Tifton, Georgia 31794
    229.388.0082
6   cwebster@twflaw.com

7

8   On behalf of the Defendant:

9   TERRY E. WILLIAMS, Esquire
    Williams, Morris & Waymire, LLC
10  4330 South Lee Street
    Building 400, Suite A
11  Buford, Georgia 30518
    678.541.0790
12  terry@wmwlaw.com

13

14  ALSO PRESENT:  Sherri McBrayer

15

16  VIDEOGRAPHER:  Tyler Tam

17

18

19

20

21

22

23

24

25



```
 1                         INDEX

 2                                              PAGE

 3    MARYANNE GAFFNEY-KRAFT

 4         Examination by Mr. Webster              6

 5         Examination by Mr. Williams            53

 6         Further Examination by Mr. Webster     67

 7

 8                       *  *  *

 9

10                    EXHIBIT INDEX

11    EXHIBIT                                   PAGE

12    Plaintiff's 1      Report                   10

13    Plaintiff's 2      Article                  41

14

15

16

17

18

19

20

21

22

23

24

25
```



| | |
|---|---|
| 1 | MR. WEBSTER:  This will be the |
| 2 | deposition of Dr. Maryanne Gaffney-Kraft, |
| 3 | taken by the plaintiffs in this action. |
| 4 | This deposition is being taken for purposes |
| 5 | of discovery and any other purpose allowed |
| 6 | by the Georgia Civil Practice Act, the |
| 7 | Georgia Rules of Evidence, and to whatever |
| 8 | degree applicable, and possibly the federal |
| 9 | rules of procedure and evidence. |
| 10 | We noticed this deposition and Doctor |
| 11 | -- do you go by Dr. Gaffney-Kraft or just |
| 12 | Dr. Kraft? |
| 13 | THE WITNESS:  You can call me Kraft. |
| 14 | That's fine. |
| 15 | MR. WEBSTER:  Okay. |
| 16 | THE WITNESS:  Uh-huh. |
| 17 | MR. WEBSTER:  Dr. Kraft is here under |
| 18 | subpoena, as is required by the rules of |
| 19 | the Georgia Bureau of Investigation. |
| 20 | THE WITNESS:  Yes. |
| 21 | MR. WEBSTER:  All objections, except |
| 22 | to the form of the question and |
| 23 | responsiveness of the answer, will be |
| 24 | reserved.  The qualifications of the court |
| 25 | reporter and videographer will be waived. |

1      And Dr. Kraft, do you choose to read

2   and sign your deposition?

3      THE WITNESS:  Yes, please.  Uh-huh.

4      MR. WEBSTER:  We'll stipulate, of

5   course, that -- as I think the rule allows

6   anyway, that Dr. Kraft can read -- can sign

7   her deposition in front of any notary

8   public instead of having to get with the

9   court reporter herself.

10      THE WITNESS:  Yes.

11      MR. WEBSTER:  Terry, you want to add

12   anything to that?

13      MR. WILLIAMS:  No.  That's good.

14   That's agreeable.

15      MR. WEBSTER:  Okay.

16      Now we're ready to begin.

17      THE VIDEOGRAPHER:  Stand by.

18      We are on the record at 2:04.  Today's

19   date is July 15th, 2020.  This is the

20   beginning of Disk Number 1 in the

21   deposition of Maryanne Gaffney-Kraft, MD.

22      My name is Tyler Tam, and I'm the

23   videographer.  The court reporter is Susan

24   Tarpley.

25      Counsel, please state your appearance,



1     including who you represent, beginning with

2     the plaintiff's counsel.

3          MR. WEBSTER:  I'm Craig Webster; and I

4     represent the plaintiff, Ms. Sherri

5     McBrayer, who is also present in the room

6     today with us.

7          MR. WILLIAMS:  I'm Terry Williams; and

8     I represent the defendant, Sheriff Gene

9     Scarbrough.

10          THE VIDEOGRAPHER:  Will the court

11     reporter please swear in the witness.

12          (Witness sworn.)

13               MARYANNE GAFFNEY-KRAFT,

14  having been first duly sworn, was examined and

15  testified as follows:

16                    EXAMINATION

17  BY MR. WEBSTER:

18     Q.  Tell us your full name, please.

19     A.  Yes.  My name is Dr. Maryanne

20  Gaffney-Kraft.

21     Q.  All right.

22          Dr. Kraft, where do you currently work?

23     A.  I work for the Georgia Bureau of

24  Investigation.  I'm a central regional medical

25  examiner for the state of Georgia.



 1      Q.   Okay.

 2           How long have you been with the Georgia

 3      Bureau of Investigation in this capacity?

 4      A.   Yeah.   Since two thousand -- November

 5      2009.

 6      Q.   Okay.

 7           Would you give us your educational and

 8      experience background in becoming a medical

 9      examiner.

10      A.   Yes.   As a medical examiner, I am a medical

11      doctor.   I've had four years of premedical training,

12      majoring in biochemistry, at Temple University,

13      Philadelphia, Pennsylvania; four years of medical

14      school at the Philadelphia College of Osteopathic

15      Medicine; one year of medical internship at the

16      William Beaumont Army Medical Center, El Paso,

17      Texas; four years of anatomical and clinical

18      pathology training, Scott & White Hospital, Temple,

19      Texas, Texas A&M; my first year of forensic training

20      at the Wake Forest Baptist Medical Center in

21      Winston-salem, North Carolina; and then a second

22      year of forensic training at the University of

23      Chapel Hill, North Carolina.

24           I am licensed to practice medicine in the

25      state of Georgia.   I am licensed as a board



1   certified pathologist in anatomical pathology,

2   clinical pathology and forensic pathology.  I've

3   actually started my forensic pathology course back

4   in 2001 in North Carolina.  I was there from 2001 to

5   2009 when I came to Georgia in 2009.

6       Q.  All right.

7           And you've been licensed in the state of

8   Georgia consistently since 2009?

9       A.  That is correct.

10      Q.  Okay.

11          Why don't you begin by telling us what a

12  medical examiner does.

13      A.  Yes.  A medical examiner is the -- is the

14  -- is the everyday term for a forensic pathologist.

15  As a forensic pathologist, I am board certified as a

16  medical doctor to determine cause and manner of

17  death.

18          A cause of death is why somebody dies when

19  they die, exactly when they die.  And then the

20  manner of death comes into play, the circumstances

21  surrounding their death.

22          In Georgia we have five different manners.

23  You have natural, accident, suicide, homicide or

24  undetermined.

25          I perform autopsies.  During an autopsy I



1  will start with an external examination, the seeing
2  and documenting any clothing they have, any personal
3  belongings, any medical intervention that they used
4  to try to save their life, go on to characteristics,
5  height, weight, hair color, eye color, things of
6  that sort, body habitus, move on to an evidence of
7  injury section where every injury the decedent has,
8  something simple like a scratch that I call an
9  abrasion or something major like a gunshot wound or
10  something of that sort, will be documented, it will
11  be photographed and measured.  And then I will go on
12  to the internal part of the examination.
13       During the internal part of examination,
14  the body is dissected, the body is opened and the
15  organs are removed.  If I see an external injury,
16  something like a bruise or a scratch or something of
17  that sort, I'm going to see, during my internal part
18  of examination, how the internal or- -- internal
19  organs of the body are affected from that injury.
20  I'm also going to look for any natural disease,
21  heart disease, cancers, things of that sort.
22       I will also draw toxicology samples.
23  Standard tox is blood and urine from the decedent.
24  And then we will submit them as needed for --
25  depending on the case circumstances.



1        Once that is finished I will actually put

2    an autopsy report out documenting all my findings,

3    also toxicology results or any other results that I

4    needed to receive.  Sometimes I'll do vitreous,

5    which is a fluid in the eye, to check for

6    electrolytes testing.  And then I will determine

7    what the cause and manner of death is.

8        Q.  All right.

9        Did you, in fact, perform an autopsy on a

10   man named James Aaron McBrayer on about 4/25/2019?

11       A.  Yes, I did.

12           (Whereupon, Plaintiff's Exhibit 1 was

13       marked for identification.)

14           MR. WEBSTER:  All right.  Let me show

15       you what we've marked Exhibit Kraft Number

16       1.

17           Terry, I've got you a copy here.

18           MR. WILLIAMS:  I've got two.

19           MR. WEBSTER:  Okay.  That's fine.

20           MR. WILLIAMS:  Yeah.

21   BY MR. WEBSTER:

22       Q.  Take a look at that, Doctor, if you will,

23   and tell us, is that your report of that autopsy on

24   Mr. McBrayer?

25           And when I say report, I'm not including



 1  the toxicology results other than what you referred
 2  to in your report.
 3       A.  That is correct, yes.  This is the official
 4  report of my autopsy.
 5       Q.  Okay.
 6           Dr. Kraft, let me ask you this question.
 7  Having performed the autopsy on Mr. McBrayer on
 8  April 25th, 2019, did you determine a cause of death
 9  for Mr. McBrayer?
10       A.  Yes, I did.
11       Q.  And would you tell us what that cause of
12  death was.
13       A.  Yes.
14           The cause of death of Mr. McBrayer was
15  excited delirium in conjunction with physical
16  altercation, including (pronunciation) -- including
17  taser use and cocaine and mitragynine
18  (pronunciation) -- mitragynine toxicity.
19       Q.  All right.
20           And did you classify this death?
21       A.  Yes, I did.
22       Q.  And would you tell us in what category you
23  classified this death.
24       A.  This was classified as a homicide.
25       Q.  All right.



1         What do you mean by the term homicide?

2         A.  A homicide is a death that occurs either

3    partially or fully secondary to the action of

4    others.

5         Q.  Okay.

6         In this case did you determine whether or

7    not Mr. McBrayer's death was either partially or

8    completely caused by the actions of other people?

9         A.  Yes, I did.

10        Q.  And which would you say it was, partial

11   or --

12        A.  I would say partial.

13        Q.  And would you tell us why you -- you

14   characterize it as partial.

15        A.  I characterize it as partial because of the

16   autopsy findings.  The individual injuries which

17   were found during this autopsy in themselves would

18   not have necessarily caused his death.

19        We have injuries called blunt force

20   injuries, which are things -- when something blunt

21   strikes a body or the body strikes something blunt

22   like a fall or a -- or a hit of something -- you

23   know, somebody hitting somebody.  These are blunt

24   force injuries.  There are abrasions, contusions,

25   and lacerations, scrapes, tears in the skin or



```
 1    bruising and then subsequent injuries internally,

 2    such as hemorrhages, that you might see in the

 3    internal tissues.

 4         Mr. McBrayer did have blunt force injuries,

 5    but the injuries in themselves were not enough to

 6    cause his death.

 7    Q.  All right.

 8    A.  Other injuries that were found were

 9    entitled under conductive energy weapon injuries,

10    which is classically known as taser.  A taser is a

11    -- is a device that is used that puts electrical

12    shock through the body.  It is done via either

13    probes that are shot out of a weapon and impale

14    themselves into the skin of the body or by the --

15    the instrument itself, which has two metal probes on

16    it that you can touch a body with.

17         These injuries were seen; but again, those

18    injuries in themselves, when taken with the

19    investigative findings, would not have caused

20    Mr. McBrayer's death.

21         Other findings that I found is natural

22    disease findings, cardiomegaly, which is the other

23    term for enlarged heart.  That in itself could cause

24    somebody's death; but again, usually when I see just

25    an enlarged heart, it's going to have to have
```



```
 1   something else going on with it.
 2           And then in Mr. McBrayer's autopsy I also
 3   found drugs in his system.  Cocaine was in his
 4   system; and mitra- -- mitragynine, which was one I
 5   had to actually look up, was in his system.  And
 6   these drugs actually would have been additive to his
 7   cause of death.
 8           So them in themselves -- again, them in
 9   themselves may have caused his death by themselves,
10   but I have to take -- when I look at a cause of
11   death, I have to look at everything that's occurring
12   of why somebody dies when they die.  I can't just
13   pull certain things out.
14      Q.  All right.
15           Let's talk about a few of the things that
16   you've just mentioned.
17           Number 1, you mentioned that Mr. McBrayer
18   had a condition known as enlarged heart,
19   cardiomegaly?
20      A.  Yes.
21      Q.  And had he died from that -- that -- that
22   anatomical or disease process by itself, how would
23   you have classified this death?
24      A.  That would be a natural death.
25      Q.  Okay.
```



1              And you also mentioned that the toxicology
2    reports indicated the presence of some drugs, namely
3    cocaine and --
4         A.  Met- --
5         Q.  I'm going to use the street -- not the
6    street but the marketing name of it, kratom.  Is
7    that --
8         A.  Yes.  That's fine.
9         Q.  -- also what you -- okay.
10        A.  That's much easier.
11             (Cross-talk.)
12        Q.  It's a little easier to say.
13             Which is -- if you had decided that
14   Mr. McBrayer's death was exclusively due to the
15   presence of cocaine and kratom in his blood,
16   how would you have classified that?
17        A.  That would have been an accidental death.
18        Q.  Okay.
19             In this case you chose not to classify it
20   as either of natural cause or accidental death by
21   reason of what was in his blood.  Why in this case
22   did you choose homicide as the classification of
23   this death?
24        A.  Homicide was chosen because we do have
25   actions of others -- again, this is part of -- part



1   of this is through the investigation findings --

2   others, again, resulting in the blunt force

3   injuries -- I can't say all the blunt force injuries

4   occurred secondary to the actions of others, 'cause

5   some of them may have been brought on by himself --

6   but the conductive energy weapon, the taser

7   injuries, also.

8          So if I have injuries or external forces

9   acting on the body, then that brings it into the

10  homicide classification.

11       Q.  Okay.

12          And in this case you know for fact -- know

13  from the history given to you that the officers

14  detaining Mr. McBrayer did, in fact, discharge taser

15  weapons, conductive energy weapons?

16       A.  Yes.

17       Q.  Okay.

18          All right.  Let's -- let's shift gears just

19  a little bit and talk about something that we

20  haven't really discussed other than in your

21  inclusion of it in the cause of death description,

22  and that is excited delirium.

23       A.  Yes.

24       Q.  Would you tell us what excited delirium is.

25       A.  Excited delirium is a physiological



1   response of the body to a struggle.  In the classic

2   form of excited delirium, you have a person, a

3   decedent in this case, that prior to death was

4   hyperactive, irrational -- acting irrational, acting

5   just kind of out of their mind; and because of this

6   there is a struggle that ensues secondary to either

7   somebody trying to subdue the decedent to prevent

8   him from hurting himself or others.

9        When the struggle occurs, no matter if it's

10  a physical struggle or anything of that sort -- in

11  this case we have the physical altercation which is

12  both the blunt force injuries, the physical struggle

13  and the electrical taser -- taser use.  Because of

14  those -- because of the struggle, because of those

15  happenings, things happen in the body and it's a

16  physiological response.

17        Basically you have release of what --

18  things called catecholamines, which classically are

19  epinephrine and norepinephrine.  These are hormones

20  that are released through the adrenal glands and

21  these are the ones we always hear about when you

22  hear of fight or flight that your -- your adrenal

23  glands -- you know, your epinephrine goes up.

24        Epinephrine and norepinephrine have certain

25  effects on the body.  They actually are used to



 1 │ increase the heart rate, to increase the contraction
 2 │ of the heart.  So they make the heart contract more
 3 │ efficiently and harder.
 4 │         Secondary to this, you're going to have a
 5 │ blood pressure rise and you're also going to have
 6 │ more demand of oxygen to the heart.  So as your
 7 │ heart goes faster, just like if you're exercising,
 8 │ if your heart starts pumping faster and faster,
 9 │ you're going to need more oxygen to keep the heart
10 │ pumping and you're going to have, you know, a higher
11 │ blood pressure.
12 │         Also secondary to the struggle, you have
13 │ release of potassium from the -- from the muscle
14 │ cells.  Potassium, as you use muscles, you're
15 │ actually breaking down your muscles.  That's what
16 │ happens when you do physical activity, too.  So
17 │ potassium gets released into the bloodstream.
18 │         So during a physical struggle, you're going
19 │ to have epinephrine and norepinephrine increased,
20 │ which makes the heart contract more, high blood
21 │ pressure, heart rate up, more oxygen demand of the
22 │ heart; and the potassium's going to go up.
23 │         Classically, after -- well, what happens is
24 │ during the struggle these things are happening.  The
25 │ problem comes in after the struggle.  Once the body



1  is done struggling, two things happen.  Your

2  epinephrine and norepinephrine actually continue to

3  go up for a period of time.  So they don't just stop

4  being in the bloodstream.  They actually increase

5  after the struggle, where your potassium actually

6  decreases after the struggle and drops rapidly.

7       The norepinephrine and epinephrine can be

8  increased for minutes to -- to hours or a couple

9  hours after the physical struggle and the potassium

10  actually can be decreased actually to a level where

11  it's what we call hypokalemia where it's low

12  potassium, subnormal level, for a period of hours,

13  also.

14       Q.  Can I interrupt you one second on that.

15       What's the importance of potassium as to

16  what's happening with the heart?

17       A.  Because potassium is a -- is a electrolyte

18  which can become a cardio arrhythmogenic, it can

19  cause arrhythmias, irregular heartbeats.  Whether

20  it's high or low, it's not good.

21       Q.  Okay.

22       A.  You need to have it within a certain level.

23       So again, the struggle itself will make it

24  go high and then after the struggle it'll drop low.

25  Low potassium's actually more severe than high



1    potassium.

2         So you have a struggle that's goes on.  No

3    matter what's happening in the struggle, physical

4    altercation, again electrical impulses.  After the

5    struggle the person is at rest or -- or being -- you

6    know, meaning that they're not struggling anymore,

7    you have these things going on in the body.  The

8    norepinephrine and epinephrine stay high, the

9    catecholamines, the potassium drops low and drops

10   lower than normal.

11        So this is setting the heart up for an area

12   of what they call peril.  They actually say

13   post-exercise peril.  In this case it would be

14   post-struggle peril, because we have these two

15   physiological things happening in the body.  And

16   both of these things -- one is making the heart pump

17   harder, high blood pressure, high heart rate, more

18   oxygen demand, which is going to make the heart

19   stressed more, and then you have the low potassium

20   which is going to make the -- make the heart more

21   irritable and easy to go into an arrhythmia.

22        These two things together, again, would be

23   the excited delirium.

24   Q.  Okay.

25   A.  Now, if you had added factors to those



 1  excited delirium -- and we do in this case, which is

 2  the drugs -- that just potentiates that problem.

 3  Cocaine is -- is a drug that is a stimulant.  It

 4  actually causes the release of catecholamines.  So

 5  you also -- you have your normal heart, your normal

 6  physiological body result or response and then you

 7  have the chol- -- the cocaine on top which is even

 8  pushing it more to that level.

 9           The mitragynine, or kratom, which is the

10  common name for it, is a herbal drug which is used

11  in Southeast Asia.  I actually had to look it up

12  myself 'cause I'm not real familiar with it 'cause

13  it's not -- we don't see it that often.

14           But it is a drug that, although it is used

15  through the opiates receptors of the body, it's a

16  drug that at certain levels is actually used for

17  excitement.  It's a drug that is -- usually the leaf

18  is chewed for somebody to get energy.  It becomes

19  excited, things of that sort.  And then at a certain

20  level -- at low levels, it's excitability; at higher

21  levels it tends to act as an analgesic for pain

22  relief.

23           Kratom in itself actually has caused

24  deaths.  Because of that, it can cause seizures, it

25  can cause sudden death, especially of people with



1   underlying heart disease.

2           So again, we still have that excitability

3   in there.  The cocaine's going to cause the

4   excitability of the heart, the kratom's going to

5   cause excitability of the heart, the physical

6   struggle's going to cause it and then you have this,

7   without -- lack of better words, perfect storm being

8   set up where somebody is going to be at high risk

9   for having an arrhythmia and -- and sudden death.

10      Q.  Where does the taser fit into all of that

11  description that you just gave us?

12      A.  The taser in itself, again the electrical

13  impulse, you know, there has been -- there have been

14  some history of cases that they have caused the

15  cause of death because of the electrical impulse

16  itself.  Those type of cases, you die right after

17  the impulse.  So what happened is the electrical

18  impulse of the taser is interfering with the

19  electrical impulse of the heart and you die then.

20          But if you if get tased and then -- and you

21  don't die and then minutes later, half an hour, ten

22  minutes later or something and then you die, then

23  the way the taser comes into play on that one is

24  because again, it's just increasing the struggle,

25  increasing all these things.  Again, if I -- if I

 1  hit you with an electrical impulse, it's going to

 2  make your catecholamines go up.  It's just -- you

 3  know, it's the body's response to it.

 4      Q.  Catecholamines being the epinephrine?

 5      A.  And norepinephrine.  Correct.

 6      Q.  And norepinephrine somehow.  Okay.

 7          All right.  Let me first ask you before we

 8  go any further, did you actually view the body cam

 9  video from the police officers regarding the

10  detention and struggle with Mr. McBrayer?

11      A.  I have viewed parts of them, not all of

12  them.

13      Q.  Okay.

14      A.  Basically what -- I had asked for the GBI,

15  who did the investigation, to send me everything.

16  Some of it was in written report and some of it were

17  -- were -- some of that was video cam.

18      Q.  Uh-huh.

19      A.  So I've seen pieces of all.  Otherwise,

20  I've looked at the GBI report where they actually

21  document what the individual shows.

22      Q.  Did you -- do you remember seeing the --

23  the video cam -- cam video -- body cam video --

24  excuse me.  I couldn't get that out right.

25      A.  Sure.



1      Q.  -- of Officer Tripp, who was the first

2  officer to arrive and see and record Mr. McBrayer's

3  actions before a struggle actually ensued?

4      A.  That one, I do not -- I did not see.

5          MR. WEBSTER:  Okay.

6          All right.  Let's go off the record

7      just a second.

8          THE VIDEOGRAPHER:  Off the record at

9      2:24.

10         (Off the record.)

11         THE VIDEOGRAPHER:  Back on the record

12     at 2:28.

13         MR. WEBSTER:  Okay.  Before we go

14     further in questions, I just want to state

15     on the record that we, during the break,

16     viewed the first three minutes of the -- of

17     Officer Tripp's body cam.

18         Do you need to verify that, or no?

19         MR. WILLIAMS:  No.  That's all

20     right.

21         MR. WEBSTER:  All right.

22  BY MR. WEBSTER:

23     Q.  All right.  All right.  Dr. Kraft, my first

24  question to you is this -- well, did you look at the

25  video that we just talked about?



1      A.  Yes, I did.

2      Q.  Okay.

3          From the first visions of Mr. McBrayer in

4   that video to the point at which they had him on the

5   ground, about three minutes into the video, did you

6   see enough there to -- to render an opinion as to

7   whether or not Mr. McBrayer was suffering from

8   excited delirium prior to a struggle?

9      A.  Well, again, the excited delirium is -- is

10  the whole situation.  So it -- meaning excited

11  delirium also brings in the struggle.

12     Q.  Okay.

13     A.  But again, the classic definition of

14  excited delirium is that you start with somebody who

15  is irrational, who is confused, who is hyperexcited

16  and then becomes violent.  And for those that -- for

17  that definition, yes --

18     Q.  Okay.

19     A.  -- then I saw evidence of that.

20     Q.  Okay.

21          Did -- did you see enough evidence to

22  decide whether or not he was -- that Mr. McBrayer

23  was experiencing diminished capacity?  And by that I

24  mean diminished ability to form criminal intent and

25  to make effective decisions for his own life.



 1           MR. WILLIAMS:  I object to the form.
 2           THE WITNESS:  I would -- my answer to
 3      that was he appeared to be acting
 4      irrational.
 5  BY MR. WEBSTER:
 6      Q.  Okay.  All right.
 7           Have you seen excited delirium in other
 8  autopsies you've performed with the GBI?
 9      A.  For the GBI, yes, actually yes.
10      Q.  Okay.
11           And what is the prevalence of excited
12  delirium, in cases that you see, first of all?
13           MR. WILLIAMS:  I object to the form,
14      just -- I don't know -- vague, ambiguous.
15           Go ahead, if you can respond.
16           THE WITNESS:  Again, I'm not sure what
17      the prevalence is as far -- as far as my
18      experience, it's -- it's not very common.
19  BY MR. WEBSTER:
20      Q.  Okay.
21           All right.  Is it a medical condition, in
22  your opinion?
23      A.  Well, it is a -- it -- no, meaning -- no, I
24  mean, it's not a medical diagnosis per se -- well,
25  it's a diagnosis based on multiple factors.  So --

1  and again, I don't think -- and as far as I

2  understand it and I have related it as far as my

3  understanding and teaching or -- is that it is used

4  for somebody who dies.

5          So again, it's -- you know, it's a

6  medical -- medical-legal diagnosis for somebody's

7  death; but as far as would a doctor diagnose

8  somebody with excited delirium, you know, I don't

9  know about that.

10     Q.  Well, first of all, do you know whether or

11 not there is a medical response to excited delirium

12 before it becomes fatal; in other words, is there a

13 way to treat it to make sure that it doesn't lead to

14 death, to your knowledge?

15     A.  As far as -- it's just going to be

16 observation.

17     Q.  Okay.

18     A.  Yeah.

19     Q.  Have you not -- have you seen any medical

20 literature that talks about the use of carotene

21 injections or other injections to bring the delirium

22 down within a few minutes to increase the

23 survivability of that condition?

24     A.  No, I haven't.  But again, you would have

25 to -- you have to have somebody observing that to be



 1  able to diag- -- to be able to -- to make that

 2  diagnosis, meaning a heart monitor and everything

 3  else.  So...

 4       Q.  Okay.  All right.

 5           So in Mr. McBrayer's case, the excited

 6  delirium process, in your mind, started with what

 7  you first saw in this video and ended with the end

 8  of the struggle and, at some point, his death; is

 9  that a fair synopsis of what you consider to be the

10  excited delirium episode?

11       A.  Yes.

12           Excited delirium is basically the whole

13  situation encompassed in one, again, his -- you

14  know, his actions leading to, you know, a struggle,

15  again to whether to prevent him from hurting himself

16  or others and then -- and then the subsequent, you

17  know, struggle, different things that happened

18  during the struggle and then the stop of the

19  struggle.

20       Q.  Okay.

21           Let me go to the beginning -- potential

22  beginning points of the ex- -- excited delirium.

23  Were you aware of the fact that Mr. McBrayer had

24  been involved in a automobile collision prior to the

25  police arriving at the scene or the sheriff's



1  arriving at the scene?

2       A.  Yes.  Yes, I was.

3       Q.  And in your autopsy of Mr. McBrayer, did

4  you, in fact, find evidence of trauma to his head?

5       A.  He did have trauma to his head, yes.

6       Q.  Can you describe for us what that trauma

7  consisted of.

8       A.  Yes.

9            Mr. McBrayer had multiple blunt force

10  injuries -- again, these are injuries that occur

11  when something blunt strikes the body or the body

12  strikes something blunt -- consisting of superficial

13  abrasion of his right lateral lower forehead.

14       Q.  Can you point to your head and show us

15  where that would be.

16       A.  Yes.  That would be in the general of the

17  forehead, of course, above the eyes; and right

18  lateral would be right side of the forehead.

19       Q.  Okay.

20       A.  And then he had, on the right lateral

21  orbit -- orbital rim, which is, again, right lat- --

22  towards the side of the right eye, he had a

23  superficial abrasion.  On his maxillary cheek, which

24  is the main cheek area, he had a small abrasion.

25  And then on his left lateral jaw line/upper neck



1  area -- so again, around the upper neck on the

2  side -- jaw line, of course, is just following your

3  jaw -- he had superficial abrasions, also, multiple

4  -- three superficial abrasions.

5          He also had what's called subgaleal

6  hemorrhages -- subgaleal hemorrhages are bruises of

7  the scalp.  So basically during the autopsy the

8  scalp is reflected off the skull so I can look at

9  it -- on the left occipital scalp, which is the left

10 back of the scalp, and also on the left posterior

11 parietal scalp, the -- occipital's the lower part,

12 the posterior parietal's the upper part of the back

13 of your head -- he did have subgaleal hemorrhages,

14 which are, again, bruises of the soft tissue,

15 measuring two and a half times two inches on the

16 occipital and one times one inch on the parietal.

17 And then he had a small occipital right-sided

18 occipital subgaleal hemorrhage of one times

19 three-fourths inches.

20         The skull itself was intact; but when I

21 opened the skull and looked at the brain, he did

22 have a thin, diffuse subdural hemorrhage.  Your

23 brain is surrounded by multiple membranes, the pia,

24 this -- arachnoid and the dura.  The dura is the

25 thicker membrane.  It's a fibrous membrane.  So it



1   sits between the skull and the brain.  And subdural

2   just means hemorrhage under that membrane.

3        Q.  And where was that on his head?

4        A.  And that was diffuse.  It was all around

5   the head.  And it was thin and it was diffuse and it

6   measured less than 10 millimeters or 10 ccs in

7   measurement.

8        Q.  Okay.

9        A.  Otherwise, the skull and the brain

10  parenchyma, which is the tissue of the brain, was

11  without evidence of injury.

12       Q.  The subdural bleeding, thin as it was, do

13  you have an opinion, within a reasonable degree of

14  medical probability, as to how that occurred to his

15  brain?

16       A.  It is a result of a blunt force injury.

17       Q.  How so?  How does that happen in a blunt --

18  blunt force injury?

19       A.  It's -- it's -- it's a motion type of

20  injury.  Basically you have vessels that -- veins

21  that come from the brain area into the -- into the

22  dura area.  And with turning -- a motion of the

23  head, whether it be forward backward motion, side,

24  side, but a rapid type of motion that the brain

25  actually -- the brain's in the skull, it's floating



1    in some fluid.  Now, there's not a lot of space but

2    there's some space.  So it actually is able to move

3    a little bit.

4          So with a swift -- with a swift movement of

5    the head, a rapid acceleration/deceleration, either

6    lateral or forward or backward, you can have that

7    brain shift.  And when that brain shifts, it can

8    tear these veins and you'll get a subdural

9    hemorrhage.

10         So in -- in this case, the car accident --

11   or the truck accident may have caused it or the

12   falls to the ground may have caused it.

13        Q.  Okay.

14         If you were to assume that the results of

15   his automobile collision were a shattered windshield

16   on the driver's side where it appears to some to

17   look like somebody's head hit that windshield, would

18   that be a sufficient trauma to explain the subdural

19   bleeding that you saw?

20        A.  Yes, it would.

21        Q.  Okay.

22         When you looked at the film here, the video

23   that we just looked at during the break, did you see

24   any actions that suggested to you that maybe that

25   subdural bleeding came from what you saw on the



 1 | video?
 2 |     A.  From the video, it seems like every time he
 3 | went to the ground he went to -- he actually did the
 4 | falling to the ground.  So I did not see a distinct
 5 | head injury occurring on the ground; but again, I'd
 6 | have to look at it a little bit better.
 7 |     Q.  Right.  I understand that.
 8 |     A.  But -- yeah.
 9 |     Q.  But -- so from what you've seen, would you
10 | agree that it's most likely that the subdural
11 | bleeding came from the automobile collision he was
12 | involved in?
13 |     A.  Looking at the mechanisms of injury, then
14 | the -- the motor vehicle accident would have been
15 | the more substantial as far as causing that injury,
16 | yes.
17 |     Q.  Okay.
18 |         If, hypothetically, Mr. McBrayer did, in
19 | fact, sustain that injury from the car wreck and
20 | sustained -- I'm going to use the word diffuse --
21 |     A.  Uh-huh.
22 |     Q.  -- hemorrhaging across his brain, what
23 | effect does that have or does that have the
24 | potential to have on behavior --
25 |     A.  Uh-huh.



1    Q.  -- things like that, within a reasonable

2    degree of medical probability?

3    A.  Well, again, it is small and it's less than

4    10 milliliters, you know, which is -- again, in

5    medical sense, that is -- that is not one that would

6    even put somebody into the hospital, that type of --

7    that -- that measurement of a subdural.  It would be

8    an observation type of thing, send somebody home.

9         It could have effects.  Headaches would be

10   a classic thing.  It could make somebody have

11   headaches, it could have eye pain, things of that

12   sort.

13        As far as having a true decrease in -- in

14   mental abilities, in my opinion, that wouldn't have

15   -- that wouldn't have been -- not with this -- not

16   with less than 10 milliliters.

17   Q.  Okay.

18        What if we added to that that prior to the

19   automobile wreck Mr. McBrayer was experiencing

20   mental issues of depression -- for lack of a better

21   word, I'll just use mental breakdown type

22   characteristics.  If you added that to a person

23   suffering from those mental issues, then involved in

24   a wreck, hitting his head causing diffuse bleeding

25   inside the skull, what effect might that have on

 1 | behavior?
 2 |     A.  Well, just -- just the -- the mental issues
 3 | in itself would add somebody acting irrational,
 4 | irradical, irrational and just not responding the
 5 | way a normal person would as far as a person without
 6 | the mental issues.
 7 |     Q.  I guess the question I'm trying to get is,
 8 | would the -- following trauma to the head, while
 9 | going through that, could that, within a reasonable
10 | degree of medical probability, exasperate the mental
11 | issues he was experiencing before the head trauma?
12 |     A.  Yes; but it would be just as much as just
13 | being in a car accident without a head trauma, as
14 | far as my opinion.
15 |     Q.  Okay.
16 |     A.  So just crashing your car in itself would
17 | be -- cause acceleration of the -- of that.
18 |     Q.  I gotcha.  Okay.  All right.
19 |         Okay.  We were talking about excited
20 | delirium.  And from what you've described, I take it
21 | you do agree, within a reasonable degree of medical
22 | probability, tasering somebody during an excited
23 | delirium episode would increase risk of death to the
24 | -- to the arrestee?
25 |         MR. WILLIAMS:  Object to form.



 1          THE WITNESS:  It potentially could,

 2      yes.

 3  BY MR. WEBSTER:

 4      Q.  Okay.

 5          What does the phrase unresponsiveness mean

 6  to you?

 7      A.  To me, it means that with physical or -- or

 8  verbal stimulation someone does not respond.

 9      Q.  Okay.

10          And is that a significant medical

11  condition, if people are not responding to stimuli?

12      A.  Yes.

13      Q.  Can that cause -- lead to death?

14      A.  Yes, it can.

15      Q.  Okay.

16          If -- if someone who is -- has paralegal --

17  paramedical, CPR type training, experiences somebody

18  who's unresponsive, what should that person do in

19  response to?

20      A.  Well, your normal would be your -- your

21  ABCs, airway -- make sure their airway's open, that

22  they're breathing and they have circulation.

23      Q.  All right.  So first of all, how do you

24  check and make sure the airway's open?

25      A.  You would go ahead and see if you -- if the



 1   person's breathing, go ahead and feel for breath and
 2   stuff of that sort.
 3        Q.   Feel for breath, how do you do that?
 4        A.   Put your hand up to their mouth or -- or
 5   see if -- their rise or fall of their chest.
 6        Q.   Okay.
 7             And then the B was what?  I'm sorry.
 8        A.   Breathing.
 9        Q.   Oh, okay.
10        A.   Would be again airway -- you know, again,
11   make sure the airway's open and the breathing; and
12   then the circulation would be taking pulses.
13        Q.   Okay.
14             And then the -- and C was taking pulses --
15        A.   Yes.
16        Q.   -- you said?
17             What are you looking for when you're
18   checking the pulse?
19        A.   To see if there's a rapid heart rate or too
20   slow.  First of all, is there a heart rate, is
21   somebody -- you know, is somebody deceased at this
22   point.  A rapid heart rate, slow heart rate,
23   irregular heart rate, anything of that sort.
24        Q.   Okay.
25             And if there is -- well, let me strike that



MARYANNE GAFFNEY-KRAFT, D.O.                          July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                                 38

```
 1   and ask this question.
 2          If someone has -- I know this sounds kind
 3   of crazy to ask it like this.  But if somebody has
 4   experienced death, do their -- does their heart
 5   continue to beat for a period of time after --
 6       A.  It's going to --
 7       Q.  -- the point of death?
 8       A.  -- depend on what type of death.  Cardiac
 9   death, no.
10       Q.  Okay.
11       A.  Brain death, yes --
12       Q.  Okay.
13       A.  -- to a point.
14       Q.  And brain death comes from what?
15       A.  A lack of oxygen to the brain.
16       Q.  Okay.
17          Now, a while back you were telling us about
18   how excited delirium including the struggle and the
19   use of the tasers and the presence of the chemicals
20   in the blood all create -- I think you used the
21   phrase perfect storm.
22       A.  Correct.
23       Q.  If we added to that during the process of
24   the struggle a restriction on breathing, what play,
25   if any, would that have in the cause of death?
```



MARYANNE GAFFNEY-KRAFT, D.O.                          July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                              39

1    A.  If you would add they're restricted of

2  breathing, yes.  A lack of oxygen -- restriction of

3  the breathing would lead to a decreased oxygen in

4  the blood, which would -- going to accentuate --

5  accentuate everything, just increase it up.

6    Q.  Obviously there are many ways to reduce

7  oxygen in breathing; but if it was done by means of

8  compression on the chest for a period of say seven

9  to nine minutes, could that act itself severely

10  restrict oxygen to the -- to the body?

11    A.  Yes, it could.

12    Q.  Are you familiar with the phrase

13  compressive asphyxia?

14    A.  Yes.  Traumatic --

15    Q.  What --

16    A.  -- compressive asphyxia.

17    Q.  What does that mean to you?

18    A.  That is where somebody -- a body's in a

19  position or something is on the body in a position

20  that does not allow the chest to rise.

21       When you breathe, when you inhale, just by

22  definition, you expand your chest so to get the --

23  to get the -- to get the oxygen into your lungs.  As

24  you exhale, your -- your chest deflates.  If you

25  cannot expand your chest, then you're -- then you



1   cannot intake oxygen into your lungs.

2           In compressive type of asphyxia,

3   classically you'll see petechiae and burst blood

4   vessels in the conjunctiva of the eyes and then

5   ultimately the face, especially if they -- someone

6   passes away from it.

7       Q.  Okay.

8           Now, as I -- have you seen medical study,

9   though, that suggests that, unlike choking from the

10  front with my hand on somebody, that chest

11  compressing asphyxia usually is not relat- -- is not

12  associated with petechiae in the eye?  Have you ever

13  seen medical literature to that effect?

14      A.  I have not.

15          I -- I've done a lot of positional

16  asphyxias; and in the cases that I have, they have

17  petechiae usually above the area of compression, not

18  only of the -- of the eyes, of the face, of the neck

19  area if it's above it and also a lot of times in the

20  gingiva of the -- of the mouth.

21      Q.  Okay.

22          Well, are -- are you familiar with an

23  periodical known as the Journal of Forensic Science?

24      A.  Yes.

25      Q.  Is that an arti- -- a periodical that you



1   ascribe to?

2        A.   Yes.

3        Q.   Have you seen the study by Ely and Hirsch

4   in the Journal of Forensic Science dated 2000 -- the

5   year 2000 --

6        A.   Off the top of my head, no.

7        Q.   I'm sorry.  Let me give you the title --

8        A.   Sure.

9        Q.   -- before you answer.  I apologize for

10  interrupting you.

11       A.   That's okay.

12       Q.   -- entitled Asphyxial Deaths and Petechiae:

13  A Review?

14       A.   On the -- no, I -- I don't remember if I

15  did or not, truthfully.

16            MR. WEBSTER:  Okay.

17            Let me -- let me -- let's mark this

18       Exhibit 2.

19            (Whereupon, Plaintiff's Exhibit 2 was

20       marked for identification.)

21  BY MR. WEBSTER:

22       Q.   I realize you haven't had a chance to look

23  at this then based on what you told us, but I would

24  like you to take a look at it very briefly.

25       A.   Yes.



```
 1        Q.  I'm not going to -- this is not intended to
 2   test your opinion about this article, 'cause I know
 3   you would otherwise want to read it and study it and
 4   things like that.  But I do want to ask you if
 5   you'll flip over to the third page, you'll see where
 6   I highlighted a couple of statements they made in
 7   there.  And I just want to ask you your opinion
 8   regarding those statements.
 9            The first one says -- and I quote --
10   considering all of the foregoing observations, it is
11   our contention that no relationship exists between
12   the develop of -- development of petechiae and the
13   presence or absence of asphyxia.
14            Do you agree or disagree with that --
15        A.  Well --
16        Q.  -- as a general rule of --
17        A.  I would --
18        Q.  -- practice?
19        A.  I would have to say, of course, the same --
20   considering all the foregoing observations -- which
21   I haven't read what the foregoing observations were,
22   which kind of puts me at a little bit of a --
23        Q.  I agree.
24        A.  -- at a disadvantage here.  But just a
25   statement that the presence or absence of a six --
```



 1  okay.  No relationship between the development of
 2  petechiae and the presence or absence of asphyxia.
 3        I honestly couldn't comment without reading
 4  the whole article, 'cause I -- I'm not quite sure --
 5        Q.  Okay.
 6        A.  -- what these foregoing observations are.
 7        Q.  All right.  Fair enough.
 8        And I'm not going to ask you to study the
 9  article, ask you -- let me ask you, though, about
10  the last sentence that I highlighted where it
11  says -- and I quote -- conversely, the occasional
12  absence of facial plethora and petechiae in victims
13  of chest compressions, traumatic asphyxia, is best
14  explained by overwhelming crushing forces
15  effectively compress the left ventricle and arrests
16  further cardiac output thereby precluding cephalic
17  venous congestion.
18        Would you agree with that statement?
19        A.  If I'm interpreting what they're saying --
20  which again, without reading the rest of the
21  article, I couldn't be sure -- if they're saying a
22  pressure is so severe on -- on somebody's chest that
23  their heart cannot beat anymore, because if they're
24  saying compresses the left ventricle and arrests
25  further cardiac output, which means you're dead,



 1  then I would say yeah, I would not expect petechiae
 2  at that case.
 3       Q.  Okay.
 4       A.  But again, I'm not reading the whole thing.
 5  But if they're saying that if you have a heavy
 6  enough pressure on your chest where your heart
 7  stops, then petechiae probably wouldn't be there,
 8  'cause your heart's not pumping anymore.
 9       Q.  Okay.
10           Do you have an opinion, within a reasonable
11  degree of medical probability, as to how much weight
12  would have to be on the chest -- first question, how
13  much weight to be on the chest to result in the
14  phenomenon they talk about in that last sentence in
15  the article?
16       A.  It's going to depend on the size of the
17  person, their musculature development.  I mean,
18  it's -- it's -- it's -- it's going to vary from
19  person to person.
20       Q.  Okay.
21           Can you plug in Mr. McBrayer's size in this
22  and come to a conclusion?
23       A.  Again, I -- I can tell you what his body
24  habitus is.  I mean, he was well developed, you
25  know, and well nourished; but as far as his physical



 1  | -- you know, he was actually mildly overweight.  But
 2  | as far as his physical, you know, muscles, as far as
 3  | -- I couldn't go, 'cause I -- I don't know what his
 4  | physical -- what's the word I'm looking for -- how
 5  | physically fit he is.
 6  |      Q.  Okay.
 7  |      A.  Put it that way.
 8  |      Q.  All right.
 9  |      A.  I can tell you what I saw with the body,
10  | but that doesn't necessarily apply to --
11  |      Q.  Okay.
12  |      A.  -- his physical fitness as a live person.
13  |      Q.  Okay.
14  |          Would -- would the weight of a man placing
15  | his knee on the back for a period of say two or
16  | three minutes be enough, in your opinion?
17  |      A.  Again, it's going to -- it's a case to case
18  | basis.  It would have to depend on this person's
19  | shape, how much of the -- you know, somebody having
20  | their knee on somebody's chest, if -- if -- if
21  | they're -- that's all that's on the chest and the
22  | whole body weight of the person is completely off
23  | the ground at that point other than the knee, that's
24  | one thing.  If the other -- if the same person's
25  | knee is on the ground taking some of the weight, it

 1  -- it just -- you wouldn't be able to -- you can't

 2  really -- there's not a -- there's not a formula you

 3  can use that fits every case.  You would have to

 4  look at all the individual cases.

 5        Q.  Okay.  Sounds -- that's fair enough.

 6            Suffice it to say, though, that placing a

 7  knee or a hand or an elbow with some or all of your

 8  body weight on it when a man's laying face down in

 9  the dirt, hands handcuffed behind his back, that

10  could contribute to a reduction in oxygen that is

11  already a bad situation with the excited delirium to

12  begin with, you would agree with that, wouldn't you?

13        A.  I would say --

14            MR. WILLIAMS:  Object to form.

15            All right.

16            THE WITNESS:  I would say it has the

17        potential to, again.

18  BY MR. WEBSTER:

19        Q.  Okay.

20            I had asked you about the prevalence of

21  excited delirium.  I didn't quite follow up with a

22  final question I had for that.

23            Have you done any study or research to find

24  out what the prevalence of excited delirium is

25  nationwide as an issue for police officers to



1   confront?

2         A.   No, I have not.

3         Q.   Okay.

4              Haven't read any police articles or seen

5   training videos or anything like that --

6         A.   No.

7         Q.   -- on excited delirium?

8              Okay.

9         A.   No.  I mean, as far as my studies of it

10  through -- through the -- this -- you know, through

11  medical training, yes; but as far as -- no, as far

12  as anything recently, no.

13        Q.   Well, when you say your research and your

14  training, does that touch on the prevalence of

15  excited delirium in our society?

16        A.   Again, not as far as -- prevalence is going

17  to have to with -- with -- you're going to have to

18  take the time frame that we're talking about.

19  So, you know, all I know is it's not -- it's not

20  common, it's -- you know, in my -- in my case as far

21  as my practice and my peers' practice, meaning

22  people I've worked with, we -- we don't commonly see

23  it.

24        Q.   Okay.

25             Kratom, by the way, you said you researched



 1 | that.  You did find out that kratom is actually
 2 | legal to use in the state of Georgia?
 3 |      A.  It -- it is right now as far as -- yes.
 4 |      Q.  Okay.
 5 |      A.  There -- there's been some actions to try
 6 | to make it illegal, but as far as -- and that's in
 7 | the federal realm.
 8 |      Q.  Right.
 9 |      A.  So yes.
10 |      Q.  And to your knowledge, it was legal to buy
11 | and use in 2019?
12 |      A.  As from my knowledge, yes.
13 |      Q.  Okay.
14 |          All right.  I'll -- I think I'm getting
15 | close to being through, but I want to ask you this
16 | questions (sic) back on the -- the topic of
17 | unresponsiveness.
18 |          I had asked you what a medically trained
19 | person should do to deal with unresponsiveness and
20 | you said that the ABCs, airway, breathing and
21 | cardiac checking the pulse stuff.  Can
22 | unresponsiveness be dealt with while an arrestee is
23 | in the back seat of an automobiles (sic) with his
24 | hands handcuffed behind his back and his feet
25 | strapped together?



 1              MR. WILLIAMS:  Object to form.

 2   BY MR. WEBSTER:

 3        Q.  Can it be dealt with effectively, I should

 4   say?

 5        A.  I'm going to -- what do you mean deal with?

 6        Q.  Well --

 7        A.  I -- I -- I guess I need to under- -- an

 8   explanation of that.

 9        Q.  Thank you.  That's fair enough.

10              What I'm asking you is, if a person in the

11   back seat of a automobile is handcuffed behind his

12   back, his feet are strapped together and he becomes

13   unresponsive while in that back seat, would you, as

14   a licensed physician, expect someone to be

15   effectively -- be able to effectively examine and

16   try to respond to the unresponsiveness while the

17   arrestee is in the back seat of that car?

18              MR. WILLIAMS:  Object to form.

19              THE WITNESS:  I would say no, they --

20        I would remove them from the vehicle.

21   BY MR. WEBSTER:

22        Q.  Why so?

23        A.  To be able to fully evaluate the person.

24        Q.  Okay.

25        A.  To fully evaluate the person and also to --



 1  as a medical professional, wanting to put him on a

 2  monitor and to see exactly what's going on.

 3      Q.  Okay.

 4          So in that -- and I realize this is a very

 5  limited analysis --

 6      A.  Uh-huh.

 7      Q.  -- and I realize I've kind of taken you out

 8  of the --

 9      A.  Uh-huh.

10      Q.  -- the crime lab setting; but you would

11  agree then that if somebody is in the back seat of a

12  car handcuffed, feet strapped, becomes unresponsive,

13  the car itself makes it very difficult for you to

14  deal with that unresponsiveness --

15          MR. WILLIAMS:  Object to the form.

16  BY MR. WEBSTER:

17      Q.  -- if not impossible?

18      A.  I -- yes.  I would have to remove the body

19  -- remove the -- remove the person to be able to

20  evaluate them and -- and -- and also treat them.

21      Q.  Okay.

22          Is there a frame of time -- if somebody

23  becomes unresponsive, is there a frame of time as to

24  how long you have to be able to save them from that

25  unresponsiveness?



1      A.  Well, again, the problem is we -- we

2  haven't established what the definition of

3  unresponsive is to the point meaning do they have a

4  pulse, are they breathing or are they -- or are they

5  just unconscious, where obvious -- are they just

6  unconscious, you know, classically, you know, passed

7  out, or are they breathing or is there circulation.

8           So without knowing those factors, I

9  couldn't say.  I mean, if the heart's not pumping,

10  then we have an emergency.  If you're not breathing,

11  that's an emergency.  But if you're breathing and

12  you have a heart rate and you're just not responding

13  because you're passed out, that's -- that's --

14  that's a different situation.

15      Q.  I understand.  Such --

16      A.  I mean, it's still going to -- it still, in

17  my opinion as a medical doctor, would -- would need

18  -- would -- would need attention; but as far as

19  without knowing those other things, I couldn't give

20  you a time frame.

21      Q.  Okay.  Let me -- let me put some things in

22  there then to -- just to see if you have an opinion.

23           If a person stops breathing while in the

24  back seat of a car with his hands handcuffed behind

25  his back, his legs strapped together, from the



1  moment he stops breathing, how long does he have to
2  be able to have any chance of recovering from that
3  condition?
4       A.  Again, you know, I can't put specific
5  numbers; but -- but they -- but, you know, again,
6  just thinking about basic CPR, you know, somebody
7  that you come up upon, they talk about the minutes.
8  You know, so we're talking about, you know, a period
9  of minutes that you would have to respond to that.
10 Again, how many, I couldn't tell you for sure.  I
11 would be definitely be within ten minutes.  You
12 know, it could be less, it could be more.
13          MR. WEBSTER:  Okay.  All right.
14          Let's go off the record for a
15      second.
16          THE VIDEOGRAPHER:  Off the record at
17      2:59.
18          (Off the record.)
19          THE VIDEOGRAPHER:  We are back on the
20      record at 2:59.
21          MR. WEBSTER:  Dr. Kraft, I have no
22      further questions.  Thank you very much for
23      your time.  You've been very helpful
24      today --
25          THE WITNESS:  You're welcome.



```
 1              MR. WEBSTER:  -- and I appreciate
 2       it.
 3                       EXAMINATION
 4    BY MR. WILLIAMS:
 5       Q.  Dr. Kraft, my name is Terry Williams; and I
 6    represent the defendant, Sheriff Gene Scarbrough of
 7    Tift County.  And so I'm going to just follow up
 8    with some questions based on what you've testified
 9    to thus far.
10              Going back to your classification of this
11    situation as a homicide -- and as I understand it
12    from what you've said and from looking at your
13    report, you determined that it was best
14    classified -- that's the term you used, best
15    classified -- as a homicide as far as manner of
16    death.  And am I correct in saying that it was
17    because there was interaction with deputies during
18    the events leading up to him passing away?
19       A.  Yes.  That is correct.
20       Q.  So -- but as you stated, the actions of the
21    deputies, both the use of the taser and the physical
22    restraint, by themselves would not have caused
23    death, correct?
24       A.  The findings at autopsy, yes.  As far as
25    the findings at autopsy which --
```



MARYANNE GAFFNEY-KRAFT, D.O.                              July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                                  54

```
 1        Q.  Right.
 2        A.  -- which again, per investigation, were
 3   result of the physical struggle and the -- and the
 4   tasing, yes --
 5        Q.  Right.
 6        A.  -- in themselves would not have caused his
 7   death.
 8        Q.  Right.
 9             To be clear about that, the findings that
10   you made during the autopsy did not indicate that
11   the use of the taser or the physical restraints
12   would have caused death by themselves?
13        A.  That is correct.
14        Q.  So it was really only the fact that he --
15   that Mr. McBrayer had drugs in his system, which
16   both were stimulants, and was stimulated already
17   because of whatever his excitement was, either from
18   the drugs or perhaps mental issues, that actually
19   led to the death; is that correct?
20        A.  (No response.)
21        Q.  In other words, those -- those factors had
22   to be present for the death to occur since it was --
23        A.  That -- that is correct.
24        Q.  -- based -- based on what you found --
25        A.  You had to have everything together.
```



1        Q.  All right.

2        A.  Yes.

3        Q.  So, in fact, the -- when the deputies

4   encountered Mr. McBrayer, as the video that you

5   watched earlier indicate, he already seemed to be in

6   excited state, correct?

7        A.  Yes.  He seemed -- according to the video

8   and from the reports that I had, he was -- he was

9   running around and he was -- he was acting

10  irrational and excited, yes.

11       Q.  All right.

12           He was yelling, talking fast, those kind of

13  things, correct?

14       A.  Yes.

15       Q.  And those are things -- symptoms that you

16  associate with evidence of excited delirium,

17  correct?

18       A.  That's a -- that's a part of it, yes.

19  That's what I -- yes.

20       Q.  All right.

21           The excited state and the delirious state,

22  both of those states can actually be caused by the

23  drugs that were in Mr. McBrayer's system, correct?

24       A.  Yes, they could have.  Yes.

25       Q.  Okay.



1        And we've already established that he had

2   cocaine in his system, correct?

3       A.  That is correct.

4       Q.  And he had this kratom herb or drug,

5   whatever it is, right?

6       A.  That is correct.

7       Q.  And kratom is also a stimulant, correct?

8       A.  Yes, it is.

9       Q.  And I've noticed -- I did a little research

10  on it -- kratom is actually -- has been known to

11  cause death in a certain number of people,

12  particularly when combined with other drugs such as

13  cocaine.

14       Are you familiar with that?  Did you see

15  that in your research?

16      A.  Yes, I did.

17      Q.  Okay.

18       And in case -- this situation we know that

19  Mr. McBrayer had both cocaine and kratom in his

20  system, correct?

21      A.  That is correct.

22      Q.  The combination of those two drugs may well

23  have caused his death without any other factors

24  being involved, true?

25      A.  It's possible, yes.



MARYANNE GAFFNEY-KRAFT, D.O.                          July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                                57

1        Q.  And I've seen other cases involving people

2   who have died with cocaine in their system, I've

3   done enough research to see there's research out

4   there that shows that cocaine itself can cause

5   disturbances in heart rhythm, true?

6        A.  Correct.

7        Q.  It can cause heart attacks, correct?

8        A.  Correct.

9        Q.  It can cause heart failure --

10       A.  Correct.

11       Q.  -- correct?

12           And it can cause respiratory failure,

13   correct?

14       A.  Secondary to the heart, yes.

15       Q.  Okay.

16           You agree that symptoms of cocaine

17   intoxication can include extreme agitation and

18   aggressive behavior?

19       A.  That is correct.

20       Q.  And we saw that with Mr. McBrayer in the

21   video, true?

22       A.  That is correct.

23       Q.  Cocaine also can cause hallucinations and

24   paranoia?

25       A.  That is correct.



MARYANNE GAFFNEY-KRAFT, D.O.                    July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                       58

1         Q.   We saw that also in the video?

2         A.   That is correct.

3         Q.   Cocaine can cause rambling speech and rapid

4    talking, correct?

5         A.   Correct.

6         Q.   We saw that in the video --

7         A.   Yes.

8         Q.   -- correct?   Okay.

9              I also noticed in -- with the kratom that

10   it's also described as a psychotropic chemical or

11   drug?

12        A.   Correct.

13        Q.   Okay.

14             And that can also cause mind-altering

15   effects on someone, such as hallucinations and

16   paranoia?

17        A.   That's -- yes.

18        Q.   Especially if combined with another drug

19   which also causes those same things, true?

20        A.   That is correct.

21        Q.   You found no evidence on autopsy that any

22   pressure that had been put on Mr. McBrayer's

23   torso/upper back doing the restraint caused any type

24   of physical injuries to him?

25        A.   I found evidence of some abrasions and --

 1  and bruising and things of that sort, but as far as
 2  -- as far as -- and -- and some of them, in my
 3  opinion, resulted from the restraint; but in
 4  themselves, they would not have caused his death.
 5       Q.  Okay.  Right.  But I -- I'm just really --
 6  I should have been more specific.
 7            There's no indication that there was any
 8  type of internal injuries caused from like a
 9  crushing -- such weight that would have caused
10  internal type injuries from restraint, there was
11  nothing found on autopsy on that?
12       A.  That is correct.
13       Q.  Okay.
14       A.  Everything was soft tissue.  There was no
15  bone fractures or internal organ injuries, other
16  than the -- the -- the bleeding -- the subdural
17  hemorrhage around the brain.
18       Q.  And the subdural bleeding that you saw --
19  which you've described as being pretty small, fairly
20  minor --
21       A.  That's correct.
22       Q.  -- correct?
23            -- would -- that would not have been
24  observable to deputies at the scene in the -- in the
25  dark dealing with Mr. McBrayer, would it?



1        A.  No, it would not.

2        Q.  Okay.

3            The abrasions and scrapes that you

4    described that you saw about Mr. McBrayer's face and

5    head, you really can't say how those would have been

6    caused, whether it would have been from the

7    automobile accident that he had, his own running

8    around, running into things or his face being down

9    in the dirt, true?  You wouldn't be able to --

10       A.  That is correct.  I couldn't say exactly

11   what caused them.

12       Q.  It could have happened during any of those

13   events?

14       A.  Yes.

15       Q.  Going back to the -- the taser, are you

16   familiar enough with -- with tasers to know how they

17   sound when they're being deployed?  I mean, have you

18   been around them enough or seen videos to know

19   how --

20       A.  As far as the -- if we're talking about

21   that pulse sound, yes.

22       Q.  Yeah.

23           So are you familiar with or have you ever

24   heard that if you hear those loud clicks, that

25   indicates the taser's not working, it's not

1  effectively delivering the electrical conduct?

2       A.  Actually I've never heard of that, no.

3       Q.  Okay.

4           That it'll sound differently if there's a

5  good contact?  You're not familiar enough with --

6       A.  No, I'm not.

7       Q.  Okay.

8       A.  Not that familiar with them.

9       Q.  Well, you -- do you agree, though, based

10 upon what we see in the video that Mr. McBrayer

11 never seems to show any effects from the taser

12 deployments?

13      A.  That is correct.  It does not -- the

14 classic response that normally you would see or that

15 you would expect to see, he did not have.

16      Q.  Right.  Which is the immobilization or the

17 -- the tightening up, the muscle constriction and

18 falling to the ground?

19      A.  Correct.

20      Q.  In fact, he continues to move and continues

21 talking throughout the time that the tasers that

22 are -- attempted to be deployed, correct?

23      A.  Per the video, yes.  Uh-huh.

24      Q.  And I know you watched one of the other --

25 other than the one we've seen today, you watched a



```
 1   different video, right --
 2        A.  Yes.
 3        Q.  -- of the same -- did you see the video
 4   where it shows the officers attempting to hold him
 5   down to get the handcuffs and the -- the restraints
 6   on him?
 7        A.  I did see -- I -- I have seen a video of
 8   that, yes.
 9        Q.  Okay.
10        And you --
11        A.  Again, I don't know if there's multiple
12   ones of it.  I know I've seen one at least.
13        Q.  And do you recall that during the time that
14   the officers -- or either got their hands on his
15   back or at some points a knee on his back from a
16   squatting position to hold him down that during that
17   time McBrayer is continuing to talk and yell and
18   move --
19        A.  Yes.
20        Q.  -- about?
21        A.  From -- from my -- right.  From my
22   observation, right, he was -- you know, he's still
23   moving and he's still talking, he's verbally
24   talking.  Uh-huh.
25        Q.  And would you agree from the beginning to
```



1    the end of the time when they finally get him fully

2    restrained and fully cuffed he's moving, he's

3    talking the entire time?

4         A.  On the video I saw, yes.

5         Q.  Yes.  Okay.

6             And doesn't that indicate to you that he

7    was able to breathe sufficiently, the fact that he

8    is talking and moving about?

9         A.  Yes.

10        Q.  Okay.

11            Does -- was there any indication, either

12   from the results of your autopsy or of what you saw

13   in the video, that there was a significant

14   restriction of his -- of McBrayer's ability to

15   breathe during this incident?

16        A.  Not that I have found, no.

17            MR. WILLIAMS:  Okay.

18            (A pause ensued.)

19   BY MR. WILLIAMS:

20        Q.  You talked a good bit earlier in your

21   deposition about the release of those catecholamines

22   during the excited delirium.  And -- and those are

23   released through the adrenal glands, right, and

24   basically --

25        A.  That is correct.



MARYANNE GAFFNEY-KRAFT, D.O.                                July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                                       64

1         Q.  -- we kind of refer to them generally as

2    adrenaline --

3         A.  Yes.

4         Q.  -- and norepinephrine?

5         A.  Yes, that's another name for them.  Uh-huh.

6         Q.  Okay.  So epinephrine and norepinephrine --

7         A.  Yes.

8         Q.  -- are two -- the two types?

9         A.  (Witness nods head affirmatively.)

10        Q.  Those will also be released during an --

11   just an excited state in general, correct?

12        A.  That is correct.

13        Q.  So when we -- we get scared by something or

14   that you're almost in a accident and your heart rate

15   goes up, that's that -- you're releasing those

16   catecholamines, correct?

17        A.  Yes.

18        Q.  And you would expected that Mr. McBrayer

19   would have been releasing those catecholamines from

20   the -- before he ever even got into the physical

21   altercation with the deputies, correct?

22        A.  That is correct.

23        Q.  Okay.

24            There's no way to measure now how much he

25   would have been experiencing before, during or after



 1  the -- the altercation with the deputies, correct?
 2       A.   That is correct.
 3            MR. WILLIAMS:  Hold on just a second.
 4            (A pause ensued.)
 5            MR. WEBSTER:  Okay.  You going to be
 6       just a second or you want to go off the
 7       record or --
 8            MR. WILLIAMS:  No.  I just have one
 9       thing.
10            MR. WEBSTER:  Oh, okay.
11            MR. WILLIAMS:  One note I had made
12       earlier, but it was on this document that
13       I...
14            MR. WEBSTER:  Okay.
15            (A pause ensued.)
16            MR. WILLIAMS:  Okay.  So...
17  BY MR. WILLIAMS:
18       Q.   None of the injuries that you saw on
19  autopsy, these blunt force trauma injuries that were
20  -- you often described as being super- --
21  superficial abrasions, some mild subdural --
22  subdural hematoma, subdural bleeding, none of those
23  would have been life-threatening injuries either,
24  correct?
25       A.   In my opinion, no.

1     Q.  Okay.

2         And because of the potential -- well,

3   because of the effects of the cocaine and the kratom

4   and the enlarged heart as being possible

5   explanations for his cause of death, you can't say,

6   to a reasonable degree of medical probability, that

7   he would have lived but for the use of the taser and

8   the altercation with the deputies, correct?

9     A.  It -- I always -- when -- when you use that

10  term, that always messes me up.  So I have to -- can

11  you ask it to me a different way just because...

12    Q.  So you can't say that Mr. McBrayer, with

13  these drugs he had in his system, with his enlarged

14  heart and the -- all the other things that were

15  going on, would have lived but for the use of the

16  taser and the restraint by the deputies in this

17  situation?  In other words, if they hadn't used the

18  taser and restrained him, he would have lived, you

19  can't say that to a reasonable degree of

20  probability?

21    A.  I cannot say that.  That is correct.

22    Q.  Because all these other things, the drugs

23  in his system, his excitement and all those things

24  could have led to his death?

25    A.  Yes, they could.



 1          Q.  Okay.

 2          A.  But I would say since it all happened,

 3    that's why I have to bring it into -- I cannot take

 4    one piece out without -- you just can't do it at

 5    postmortem.

 6          Q.  Right.  'Cause you have to --

 7          A.  Yes.

 8          Q.  -- look at all these potential factors?

 9          A.  That is correct.

10          Q.  You can't say that any particular one of

11    them would have caused his death regardless?

12          A.  That is correct.

13              MR. WILLIAMS:  Yeah.

14              All right.  Thanks.

15                        FURTHER EXAMINATION

16    BY MR. WEBSTER:

17          Q.  What you can say, though, Doctor, is --

18    within a reasonable degree of medical probability,

19    is that the struggle and the use of the tasers

20    contributed to the cause of death in this case?

21          A.  Yes.  They were additive to it, yes.

22          Q.  And they were so additive to it that in

23    classifying this case as either a homicide,

24    accidental death, natural causes, you were

25    satisfied, within a reasonable degree of medical



MARYANNE GAFFNEY-KRAFT, D.O.                    July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                          68

1   probability, that this death is classified as a
2   homicide?
3           MR. WILLIAMS:  Object to the form.
4           Go ahead.
5           THE WITNESS:  Yeah, I -- I -- I can't
6       say that they're any more important than
7       anything else but because they're there, I
8       have to call it a homicide.
9   BY MR. WEBSTER:
10      Q.  Okay.
11          So you're not changing your opinion on
12  classification and you're not changing your opinion
13  of the at least partial cause of death, the role of
14  the struggle and the use of the taser?
15      A.  That it -- that it was additive to
16  everything, yes.
17      Q.  Okay.
18          This question about still moving and
19  talking when they had his -- their knee and their --
20  and hands on his back and chest -- not on his chest.
21  His chest was on the ground.
22      A.  Correct.
23      Q.  But on his back and his -- and there is a
24  -- you did see in the videos a period of time when
25  Officer Tripp had his hand at the base of the



```
 1   neck?
 2         A.  I did see that, yes.
 3         Q.  Okay.
 4             First of all --
 5         A.  In the area of the back of the neck.
 6   Again, I -- without -- right.  I couldn't tell
 7   exactly where it was, but it was in the neck area.
 8         Q.  Okay.
 9             First of all, those actions, while they may
10   not be enough to stop breathing altogether, you do
11   agree, within a reasonable degree of medical
12   probability, that they would be sufficient to
13   restrict breathing, to lower the amount of oxygen he
14   would get into his body?
15             MR. WILLIAMS:  Object to form.
16             THE WITNESS:  Again, they potentially
17         could.  Without knowing exactly where these
18         -- where the -- where they were and the
19         amount of pressure, I couldn't say 100
20         percent.  I would -- but potentially they
21         had the potential of causing that --
22             MR. WEBSTER:  Okay.
23             THE WITNESS:  -- yes.
24   BY MR. WEBSTER:
25         Q.  All right.
```



```
1              And for the benefit of whoever is going to
2      listen to and read this deposition -- and we don't
3      know who exactly who all going to do yet -- when you
4      got Mr. McBrayer's body for the autopsy, you
5      described that his -- I'm trying -- his liv- -- his
6      livor -- I don't know how y'all -- you pronounce
7      that.  I always --
8          A.  Yes, livor.
9          Q.  -- say livor.
10         A.  Uh-huh.
11         Q.  -- was actually red and purple throughout
12     the back side of his body, the posterior side; is
13     that correct?
14         A.  That is correct.
15         Q.  And that's because as he lay there for two
16     days waiting for the autopsy blood settled down into
17     the back side of his back, pooled in his back and
18     torso?
19         A.  That is correct.
20         Q.  So I know you're trained and you're
21     experienced.  So I'm sure you can still see bruising
22     and distinguish bruising versus just normal pooling
23     through livor -- in the livor process; but you do
24     agree that if the back's already red and purple from
25     pooling of blood, that makes it far more difficult
```



MARYANNE GAFFNEY-KRAFT, D.O.                                         July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                                              71

```
 1   to assess extensive bruising and things of that
 2   nature on the back?
 3        A.  Not necessarily.  I mean, honestly, because
 4   the people who arrive at our office are in a body
 5   bag and they're always lying on their back, the
 6   majority of our people have red/purple posterior
 7   livor.  That's the majority.  And if there's a
 8   bruise there, especially on a Caucasian person, a
 9   white person, it -- I -- I can tell it.
10        Q.  You can still see a bruise even --
11        A.  Yeah.
12        Q.  -- amidst the red/purple livor?
13        A.  That -- yes, I can.
14        Q.  Okay.  All right.
15            One final question.  Do you know in -- in
16   producing the history of this case for you to form
17   your opinions, do you know exactly how many times
18   Mr. McBrayer was tasered by Officers Spurgeon and
19   Tripp?
20        A.  I can just say from what I wrote in my
21   summary and interpretation, and that was based on
22   the GBI investigation.  Let's see...
23            (A pause ensued.)
24        A.  I have it -- deploying the taser once,
25   reengage, recycle the taser (pronunciation) --
```



1   taser.  So that would be twice.

2            (A pause ensued.)

3       A.  And then we have the stun -- then we have

4   the drive -- the drive stun -- stunning, which is

5   not the probes but the actual -- so -- and that was

6   what I found at autopsy.  I found -- well, I -- I

7   found two probe areas on -- on the autopsy and then

8   I found this area of -- which is consistent with the

9   -- with -- consistent with the drive because that's

10  using the prongs that are built into the machine

11  that were on his right lateral torso area.

12      Q.  Does the body show evidence of whether

13  electricity went through it in any of those areas

14  that you saw?

15      A.  I just basically -- as far as electricity,

16  no, one hundred percent.  What I did see is I saw

17  puncture where the probes went in.  The puncture

18  wounds did show a localized hemorrhage around them,

19  and then where the drive -- drive stun was.

20           (A pause ensued.)

21      A.  Actually I did not -- there are some areas

22  of abrasion, eroded areas of the -- of red defects,

23  but I didn't see any hemorrhage associated with

24  those.

25      Q.  So those red defects, would that be



 1  evidence of electricity going in and through the

 2  drive stun?

 3       A.  Not necessarily, because if I hit you with

 4  them, I can make a -- I can make the same mark if I

 5  just hit you with it.

 6       Q.  So you've seen drive stun markings before,

 7  I assume?

 8       A.  Yes.

 9       Q.  Did his appear any different than any other

10  drive stun markings that you've seen?

11       A.  No, they did not.

12       Q.  Okay.

13           And finally, you would agree then that when

14  we were talking about how the use of a taser can

15  influence the adverse aspects of the excited

16  delirium, you would agree that multiple tasering

17  increases the risk and the role of that taser effect

18  on excited delirium?  In other words, if I stun up

19  once, you get something; but if I stun you two --

20       A.  Correct.

21       Q.  -- or three times, it increases the risk --

22       A.  It would in- -- right.  It would increase

23  the -- the norepinephrine and the epinephrine, the

24  catecholamines response and things of that sort,

25  yes.



1      MR. WEBSTER:  All right.

2      Thank you very much, Doctor.  You've

3  been very helpful.

4      THE WITNESS:  No problem.

5      MR. WEBSTER:  I appreciate your

6  time.

7      THE WITNESS:  You're welcome.

8      MR. WILLIAMS:  Thank you.

9      THE WITNESS:  Thank you.

10     MR. WILLIAMS:  Good to meet you.

11     THE WITNESS:  Good to meet you.

12     THE VIDEOGRAPHER:  This concludes the

13  deposition of Dr. Kraft.  We are off the

14  record at 3:23.

15     (Deposition concluded at 3:23 p.m.)

16     (Signature reserved.)

17

18

19

20

21

22

23

24

25



1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA:
     JASPER COUNTY:

4
             I hereby certify that the foregoing
5    deposition was taken down, as stated in the caption,
     and the colloquies, questions and answers were
6    reduced to typewriting under my direction; that the
     foregoing transcript is a true and correct record of
7    the evidence given.
             The above certification is expressly
8    withdrawn and denied upon the disassembly or
     photocopying of the foregoing transcript, unless
9    said disassembly or photocopying is done under the
     auspices of Esquire Deposition Solutions and the
10   signature and original seal is attached thereto.
             I further certify that I am not a relative
11   or employee or attorney of any party, nor am I
     financially interested in the outcome of the action.
12           This, the 25th day of July 2020.

13

14

15

16   _____
     Susan W. Tarpley, CCR
17   Georgia CCR B-1489

18

19

20

21

22

23

24

25



1                          D I S C L O S U R E

2

3     STATE OF GEORGIA    )      DEPONENT:

4     JASPER COUNTY       )      MARYANN GAFFNEY-KRAFT, DO

5

6

7              Pursuant to Article 8.B of the Rules and
      Regulations of the Board of Court Reporting of the
8     Judicial Council of Georgia, I make the following
      disclosure:
9
               I am a Georgia Certified Court Reporter.
10    I am here as an independent contractor for Esquire
      Deposition Solutions.
11
               Esquire Deposition Solutions was contacted
12    by the offices of Craig A. Webster, PC, to provide
      court reporting services for this deposition.
13    Esquire Deposition Solutions will not be taking this
      deposition under any contract that is prohibited by
14    OCGA 15-14-37 (a) and (b).

15             Esquire Deposition Solutions has no
      contract or agreement to provide court reporting
16    services with any party to the case, any counsel in
      the case or any reporter or reporting agency from
17    whom a referral might have been made to cover this
      deposition.
18
               Esquire Deposition Solutions will charge
19    its usual and customary rates to all parties in the
      case, and a financial discount will not be given to
20    any party in this litigation.

21
                              _Susan W. Tarpley_
22
                       _____
23                       Susan W. Tarpley, CCR
                         Georgia CCR B-1489
24

25



```
 1                    DEPOSITION ERRATA SHEET

 2

 3   Our Assignment No.  J5682131

 4   Case Caption:  McBrayer v. Hon. Gene Scarbrough

 5

 6

 7            DECLARATION UNDER PENALTY OF PERJURY

 8

 9            I declare, under penalty of perjury, that I

10   have read the entire transcript of my deposition

11   taken in the above-captioned matter or the same has

12   been read to me and the same is true and correct,

13   save and except for changes and/or corrections, if

14   any, as indicated by me on the DEPOSITION ERRATA

15   SHEET hereof, with the understanding that I offer

16   these changes as if still under oath.

17            Signed on the ____ day of _____ 2020.

18

19

20

21            _____

22                  Maryanne Gaffney-Kraft, DO

23

24

25
```



MARYANNE GAFFNEY-KRAFT, D.O.                                July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                                        78

```
 1                    DEPOSITION ERRATA SHEET

 2   Page _____ Line _____ should read: _____

 3   _____

 4   Reason for change: _____

 5   Page _____ Line _____ should read: _____

 6   _____

 7   Reason for change: _____

 8   Page _____ Line _____ should read: _____

 9   _____

10   Reason for change: _____

11   Page _____ Line _____ should read: _____

12   _____

13   Reason for change: _____

14   Page _____ Line _____ should read: _____

15   _____

16   Reason for change: _____

17   Page _____ Line _____ should read: _____

18   _____

19   Reason for change: _____

20   Page _____ Line _____ should read: _____

21   _____

22   Reason for change: _____

23

24   SIGNATURE: _____ DATE: _____

25               SUSAN W. TARPLEY, CCR, B-1489
```



MARYANNE GAFFNEY-KRAFT, D.O.                    July 15, 2020
MCBRAYER vs HON. GENE SCARBROUGH                          79

```
1                    DEPOSITION ERRATA SHEET

2     Page _____ Line _____ should read: _____

3     _____

4     Reason for change: _____

5     Page _____ Line _____ should read: _____

6     _____

7     Reason for change: _____

8     Page _____ Line _____ should read: _____

9     _____

10    Reason for change: _____

11    Page _____ Line _____ should read: _____

12    _____

13    Reason for change: _____

14    Page _____ Line _____ should read: _____

15    _____

16    Reason for change: _____

17    Page _____ Line _____ should read: _____

18    _____

19    Reason for change: _____

20    Page _____ Line _____ should read: _____

21    _____

22    Reason for change: _____

23

24    SIGNATURE: _____ DATE: _____

25              SUSAN W. TARPLEY, CCR, B-1489
```

