IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

MICHAELA UNDERWOOD, as the duly appointed
Administratrix of the Estate of James Aaron
McBrayer, Deceased;
SHERRI McBRAYER, Individually and as the
surviving spouse of James Aaron McBrayer,
Deceased, and; SAMUEL AARON McBRAYER,
by and through his mother and natural
guardian Angie McBrayer, and JORDAN JANICE
McBRAYER, the surviving children of James Aaron McBrayer,
Deceased,

    Plaintiffs,

v.                              CIVIL ACTION FILE NO.
                                  7:21-CV-00040-WLS

HON. GENE SCARBROUGH, Individually and in his
official capacity as Sheriff of Tift County,
Georgia, CLIFF HENDERSON, Individually and in
his official capacity as a Lieutenant Deputy
Sheriff of Tift County, Georgia ANTHONY RAYMOND
TRIPP Jr., Individually and in his official
capacity as Deputy Sheriff of Tift County, Georgia,
CONNOR BRENNEN SPURGEON,Individually and in his
official capacity as Deputy Sheriff of Tift County, Georgia,
and AXON ENTERPRISE, INC. of DE, a Delaware Corporation,

    Defendants.

      ************************************************************

    The deposition of GENE SCARBROUGH was taken by counsel

for the Plaintiff on February 3, 2022, Hall Booth Smith, 1564

King Road, Tifton, Georgia, commencing at 9:41 a.m. as

follows:

1          APPEARANCES OF COUNSEL:

2        For the Plaintiffs
                    John C. Spurlin
3                   Spurlin & Spurlin
                    P. O. Box 7566
4                   Tifton, Georgia 31763

5

6      For the Defendants
       Hon. Gene Scarbrough, Cliff Henderson,
7      Anthony Raymond Tripp, Jr., and Connor Brennen
       Spurgeon)

8
                    Terry E. Williams
9                   Williams, Morris and Waymire
                    4330 S. Lee Street, Bldg. 400, Ste. A
10                  Buford, Georgia 30518

11       For the Defendant

12                  AXON Enterprise, Inc. of DE
                    Amy L. Nguyen
13                  17800 N. 85th Street
                    Scottsdale, Arizona 85255
14

15

16       Also Appearing:  Jimmy Mixon, Videographer

17

18

19

20

21              **ADVANCED COURT REPORTING**
                   193 Brooksville Rd.
22              Dawson, Georgia 39842
                     229-352-8687
23

24

25

              **ADVANCED COURT REPORTING**

1                              I N D E X

2       Stipulations                          Page 4

3       Examination of SHERIFF GENE SCARBROUGH:

4            By Mr. Spurlin                    Page 5

5            By Ms. Nguyen                     Page 77

6            By Mr. Williams                   Page 87

7            By Mr. Spurlin                    Page 91

8        Disclosure of Reporter               Page 101

9        Certificate of Reporter              Page 102

10

11                            E X H I B I T S

12      Plaintiffs Exhibit 41 - Excerpt of Conner Brennen

13           Spurgeon's deposition

14      Plaintiffs Exhibit 42 - Excerpt of Anthony Ray

15           Tripp, Jr.'s deposition

16      Defendants Exhibit 4 - Tift County Sheriff's

17           Incident Report

18      Defendants Exhibit 9 - TASER Handheld Instructions

19

20

21

22

23

24

25

**ADVANCED COURT REPORTING**

1                      S T I P U L A T I O N S

2          The deposition is taken by Notice and agreement,

3     pursuant to the Georgia Civil Practice Act and all

4     other applicable laws, for the purposes allowed

5     thereunder, including discovery.  All formalities as

6     to the taking, transmitting and certification of said

7     deposition are waived, as is the notice of

8     filing.  Objections, except as to the form of the

9     question or the responsiveness of the answer, are

10    hereby reserved and may be asserted at the time of use

11    of the deposition.  Is that agreeable to everybody?

12         MR. WILLIAMS:  That's agreeable.

13         MR. SPURLIN:  Does he want to read and sign?

14         MR. WILLIAMS:  Yeah, we will reserve the right.

15

16

17

18

19

20

21

22

23

24

25

**ADVANCED COURT REPORTING**

1               P R O C E E D I N G S

2          (Whereupon, the witness was sworn.)

3       Thereupon,

4                GENE SCARBROUGH,

5       Having been called for examination, and having

6   first been duly sworn, was examined and testified as

7   follows:

8                CROSS EXAMINATION

9       BY MR. SPURLIN:

10      Q.   Sheriff Scarbrough, my name is Johnny

11  Spurlin, and I need to ask you quite a few questions.

12  But it's not an endurance test.  You've done these

13  before.  You can take as many breaks as you want.

14  Anytime you say, I want to go to the bathroom, we'll

15  stop.

16      A.   Right.

17      Q.   If I asked you a question that doesn't make

18  sense, if I use a word improperly, if I just ask you a

19  complex, convoluted, poor question you just say, I

20  don't understand.  I'll ask it differently.  Okay,

21  sir?

22      A.   Okay.

23      Q.   You know to answer out loud and you don't

24  probably say, Uh-huhs and Uh-uhs --

25      A.   Right.

1          Q.    -- but those are hard to distinguish later

2     on.  So, if you could avoid that.  I'm going to cut

3     right to it and not go through a bunch of

4     preliminaries.  You are the Sheriff from Tift County,

5     correct?

6          A.    Correct.

7          Q.    And how long have you been Sheriff?

8          A.    Working on my 10th year.

9          Q.    And as the Sheriff, are you the top of the

10    chain of command?

11         A.    Yes.

12         Q.    Okay.  And you are the chief policy maker

13    for the Tift County Sheriff's Department?

14         A.    Yes.

15         Q.    Okay.  And like any other business, you have

16    written policies?

17         A.    Correct.

18         Q.    And then you sometimes have commands that

19    are not in writing, correct?

20         A.    Correct.

21         Q.    Okay.  And you expect the written policies

22    to be followed?

23         A.    Correct.

24         Q.    And you expect the unwritten commands to be

25    followed?

**ADVANCED COURT REPORTING**

1          A.     Correct.

2          Q.     There are practices and procedures that are

3     in place at the Sheriff's Department that are not in

4     writing.

5          A.     Correct.

6          Q.     And some of that is to obey your shift

7     supervisor.

8          A.     Correct.

9          Q.     Follow the chain of command.

10         A.     Correct.

11         Q.     Those are expected to be followed the same

12    as a written policy, correct?

13         A.     Correct.

14         Q.     And training that you give officers and

15    deputies, do you expect them to follow that training?

16         A.     Correct.

17         Q.     Okay.  Whether it's in writing or verbal,

18    correct?

19         A.     Correct.

20         Q.     Whether you gave them that command, or

21    someone else gave them that command?

22         A.     Correct.

23         Q.     Whether they were trained by you or someone

24    in your department.

25         A.     Correct.

**ADVANCED COURT REPORTING**

1          Q.    Whether they were trained by you or somebody

2     else in law enforcement?

3          A.    Correct.

4          Q.    Whatever their training is, they're expected

5     to follow that on a daily basis, correct?

6          A.    Correct.

7          Q.    Now, I'm going to come back to this multiple

8     times.

9          A.    Okay.

10         Q.    But, I do want to go ahead and mention it

11    briefly.  You expect your deputies to be proficient in

12    their duties, correct?

13         A.    Correct.

14         Q.    To know what they're supposed to do?

15         A.    Correct.

16         Q.    To know the policies?

17         A.    Correct.

18         Q.    To know the procedures?

19         A.    Correct.

20         Q.    To follow the chain of command?

21         A.    Correct.

22         Q.    To follow those policies and procedures that

23    are in writing or verbal?

24         A.    Correct.

25         Q.    To follow their training, whether it's in

**ADVANCED COURT REPORTING**

1     writing or verbal?

2          A.   Correct.

3          Q.   And to do it in a proficient manner?

4          A.   Correct.

5          Q.   Now, when I say proficient, do you have a

6     specific percentage that they're supposed to

7     understand about their policies, procedures, practices

8     and training, and a level that they're supposed to

9     achieve?

10         A.   Not that I'm aware of.

11         Q.   Okay.  But they are, just like taking a test

12    in school, they are supposed to meet some level of

13    proficiency, correct?

14         A.   Correct.

15         Q.   And that involves number one, understanding

16    the policy, correct?

17         A.   Correct.

18         Q.   Number two, understanding what the policy

19    means, correct?

20         A.   Correct.

21         Q.   Okay.  Number three, understanding how to

22    apply the policy to a factual situation, correct?

23         A.   Correct.

24         Q.   Okay.  So, you would expect someone going

25    through training to understand the words that they've

1          been given, correct?

2               A.    Correct.

3               Q.    Understand the meanings of the words they've

4          been given, correct?

5               A.    Correct.

6               Q.    Understand how to apply those words out in

7          the field?

8               A.    Correct.

9               Q.    You can't sit by the phone and wait for a

10         deputy to call you every time a decision comes up.  Is

11         that correct?

12              A.    Correct.

13              Q.    He has got to be proficient in knowing how

14         to handle each situation himself, by himself, in the

15         field, correct?

16              A.    Correct.

17              Q.    And that would involve number one,

18         understanding what your policies are, right?

19              A.    Correct.

20              Q.    Understanding what your unwritten practices

21         and commands are.

22              A.    Right.

23              Q.    Understanding what the training requires of

24         him.

25              A.    Right.

**ADVANCED COURT REPORTING**

1          Q.   And finally, most importantly probably,

2     applying that to a different factual situation in the

3     field, correct?

4          A.   Correct.

5          Q.   Okay.  So, there are different fact patterns

6     that law enforcement people encounter on a daily

7     basis, correct?

8          A.   Correct.

9          Q.   Okay.  And you served as a state patrol for

10    many years, there were multiple different fact

11    patterns you might encounter, right?

12         A.   Yes.

13         Q.   For instance, if you stopped a car and were

14    trying to do a search or a seizure, there might be

15    multiple different fact patterns you would encounter

16    over your years, correct?

17         A.   Correct.

18         Q.   And you have to understand the basis for

19    being allowed to search, right?

20         A.   Correct.

21         Q.   And what the exceptions are to getting a

22    warrant?

23         A.   Yes.

24         Q.   And what probable cause is?

25         A.   Correct.

**ADVANCED COURT REPORTING**

1          Q.    And how it might change, depending upon the

2    facts?

3          A.    Correct.

4          Q.    In learning that, do you receive training in

5    hypothetical scenarios?

6          A.    I don't understand what you --

7          Q.    Yeah.  Let me try to help you.  I'm going to

8    go back to when you were a state trooper.

9          A.    Okay.

10         Q.    In the classroom setting, you might be given

11   a fact pattern.

12         A.    Right.

13         Q.    And you might say, are you allowed to search

14   under these facts?

15         A.    Right.

16         Q.    Sometimes the answer would be yes, sometimes

17   the answer would be no.  Right?

18         A.    Right.

19         Q.    And you had to understand that as a trooper

20   to know when you had probable cause to search and when

21   you didn't.  Right?

22         A.    That's correct.

23         Q.    And there's consequences if you're wrong.

24   Right?

25         A.    Correct.

```
 1          Q.   If you were wrong, when you did a search,
 2     then the evidence would be thrown out, right?
 3          A.   Correct.
 4          Q.   Now I'm going to move to the Sheriff's
 5     Department.  Okay?
 6          A.   All right.
 7          Q.   Is the same true in understanding your
 8     policies, practices, procedures and commands, that
 9     they have to know how to apply those to different fact
10     patterns?
11          A.   Depending on circumstances.  Correct.
12          Q.   Search and Seizure would be one?
13          A.   Absolutely.
14          Q.   Another one would be excessive force,
15     correct?
16          A.   Correct.
17          Q.   Another one would be when you can chase a
18     vehicle, and when you cannot chase a vehicle.
19          A.   Correct.
20          Q.   Okay.  And there are multiple others that we
21     won't go in, but you agree with that?
22          A.   Right.
23          Q.   They have lots of decisions they have to
24     make, correct?
25          A.   Correct.
```

**ADVANCED COURT REPORTING**

1      q.   And as the chief policy maker for the Tift

2   County Sheriff's Department, it's your responsibility

3   to make sure that they are trained and can apply that

4   in a proficient manner, correct?

5      A.   Correct.

6      Q.   They cannot, in the field, when making an

7   arrest or obtaining evidence, pick up the phone and

8   call headquarters and go through a 30-minute analysis,

9   can they?

10      A.   No, sir.

11      Q.   They are required, and you've tried to train

12   them, to make decisions based on different fact

13   patterns, correct?

14      A.   Correct.

15      Q.   And they are dependent upon themselves to do

16   that in a proficient manner?

17      A.   Correct.

18      Q.   Okay.  All right.  In your responsibility as

19   chief policy maker, does the Sheriff's Department

20   provide training to your officers in those areas?

21      A.   Yes, sir.

22      Q.   Okay.  And do you use hypothetical fact

23   patterns when you give them training?

24      A.   Sure.

25      Q.   Right.  That's common among all law

**ADVANCED COURT REPORTING**

1      enforcement --

2             A.    Right.

3             Q.    -- that you've been involved, isn't it?

4             A.    Right.

5             Q.    It was common in the State Patrol.

6             A.    Yes.

7             Q.    It's common in Sheriff's Department.

8             A.    Correct.

9             Q.    It's common in the Police Academy.

10            A.    Correct.

11            Q.    If you go back for higher levels of

12     training, that's a common thing that you use, right?

13            A.    Correct.

14            Q.    And have you received training yourself in

15     hypothetical fact patterns and how to apply those to

16     policies and procedures?

17            A.    Yes.

18            Q.    Okay.  And do you provide hypothetical fact

19     patterns to your deputies so that they will understand

20     and know how to apply policies and procedures?

21            A.    My training people do.

22            Q.    That's right.  And when I say you, thank you

23     for correcting me --

24            A.    Right.

25            Q.    -- I'm really talking about department wide.

**ADVANCED COURT REPORTING**

```
 1           A.   Right.   Right.
 2           Q.   You have people that you delegate things to.
 3           A.   Absolutely.
 4           Q.   But you are the chief policy maker.
 5           A.   Correct.
 6           Q.   And it's your responsibility to make sure
 7      they have that training.
 8           A.   Correct.
 9           Q.   And make sure they have that understanding.
10           A.   Correct.
11           Q.   And make sure they're proficient.
12           A.   Correct.
13           Q.   You just have other people that do the
14      training for you.
15           A.   That's right.
16           Q.   And you've delegated that authority to them.
17           A.   Correct.
18           Q.   And expect them to do it correctly.
19           A.   Correct.
20           Q.   And expect the deputies to become
21      proficient.
22           A.   Absolutely.
23           Q.   And the trainer to teach them where they are
24      proficient.
25           A.   Correct.
```

**ADVANCED COURT REPORTING**

1        Q.    Okay.  And if they are not proficient in an

2    area, they are supposed to recognize it and give them

3    further training, correct?

4        A.    Correct.

5        Q.    And have you, over the years, done further

6    training when people have not been proficient?

7        A.    Correct.

8        Q.    Okay.  Now, in your experience as the chief

9    policy maker, have y'all ever determined or made a

10   determination that any officer acted inappropriately,

11   in any fact pattern?

12       A.    Like, through an investigation of a

13   complaint or something?

14       Q.    Yes, sir.

15       A.    Yes.

16       Q.    Okay.  And what is the process if you find

17   that an officer has acted inappropriately or not

18   applied your policies correctly?

19       A.    There would be different levels of -- If we

20   found that the officer was guilty of some policy, then

21   there are different levels of punishment.

22       Q.    And I appreciate that.  Thank you for your

23   answer.  Number one, they could commit a crime which

24   would be the worse, right?

25       A.    Oh, yeah. Of course.

**ADVANCED COURT REPORTING**

1       Q.    A lesser level would be that they made a

2    mistake and just violated a policy, but they didn't

3    intend to do it.

4       A.    Correct.

5       Q.    It was just a misunderstanding?

6       A.    Right.

7       Q.    Not enough education?

8       A.    Correct.

9       Q.    Lack of experience?

10       A.    Correct.

11       Q.    And that's why you try to help them along

12    and give them more experience and training, right?

13       A.    Correct.

14       Q.    And what more training and experience do you

15    get if you find an officer is not applying a policy

16    accurately or properly in the field?

17       A.    We would go back and try to find, you know,

18    determine what they, how they violated the policy, and

19    then go from there and give them training they need to

20    correct that issue.

21       Q.    Okay.  Now, when you find that an officer,

22    I'm just going to use a hypothetical, uses excessive

23    force, is the education and training limited to that

24    officer or do you train the other officers so that

25    they will learn from officer number one's mistake?

**ADVANCED COURT REPORTING**

1          A.   It could be a combination of both?

2          Q.   Have there been times when you've used a

3     fact situation that wasn't handled correctly to train

4     other officers, so they don't repeat the mistake?

5          A.   Sure.

6          Q.   Can you give me some examples?

7          A.   Not right off the top of my head, I mean --

8          Q.   It's fine.  I am going to see if I can help

9     along by posing some --

10         A.   Right.

11         Q.   -- some possibilities.  I know there has

12    been a big deal about chase policies.

13         A.   Correct.

14         Q.   You would agree with that.

15         A.   Right.

16         Q.   During your tenure as Sheriff, there have

17    been lots of issues about whether we should or should

18    not have initiated a chase or called one off.

19         A.   Correct.

20         Q.   There's been litigation about that.

21         A.   Correct.

22         Q.   On multiple occasions.

23         A.   Absolutely.

24         Q.   Have you ever, in a chase situation, ever

25    reprimanded an officer for not acting properly?

**ADVANCED COURT REPORTING**

1   A. I'm sure we have but I can't, you know, --

2   Q. That's fine.

3   A. -- I can't pinpoint one.

4   Q. I'm going to try.  The one that I'm most

5 familiar with is the Rutland situation.

6   A. Right.

7   Q. You're familiar with that.

8   A. Right.

9   Q. You were deposed, I'm sure, in that case --

10   A. Right.

11   Q. -- were you not?  And there was a difference

12 of opinion among your deputies as to whether a chase

13 should have been initiated or not, correct?

14   A. Correct.  Correct.

15   Q. In fact, I believe one of your deputies had

16 called off the chase.

17   A. It was called off and then, then another

18 officer put it, put the chase back into effect.

19   Q. Right.  Refresh my memory.  I just don't

20 remember the names.  Who called off the first chase?

21   A. I believe it was Captain Reese.

22   Q. I believe it was too.

23   A. Lieutenant Colonel Brannen may have been the

24 one that initiated it, or one of, one of the deputies

25 initiated it and, I think, when they lost sight of it,

**ADVANCED COURT REPORTING**

1    at one point, Captain Reese called it off.  And then

2    he was spotted again, later, and they got behind him

3    and continued.  And the chase was back on.

4         Q.   Let me just see if I remember right.  My

5    understanding was, Officer Reese called it off because

6    it was going through a commercial part of town where

7    there were some daycare centers.

8         A.   That's correct.

9         Q.   Is that true?

10        A.   That's correct.

11        Q.   And it was a safety question.

12        A.   Right.

13        Q.   Okay.  And then one of your deputies

14   actually drove outside Tift County into Adel and

15   continued looking for him.  Is that true?

16        A.   Correct.  Down Union Road in Lenox.

17        Q.   Did he have authority to drive outside Tift

18   County –

19        A.   If he was in sight of the --

20        Q.   To do that?

21        A.   If he was in sight of the vehicle that was

22   in question, he did.

23        Q.   But he wasn't in sight of him, was he?  And

24   didn't he have to take about a 30-minute drive through

25   Cook County to try to locate him a second time?

**ADVANCED COURT REPORTING**

1           A.    I think --
2                 MR. WILLIAMS:  I object to you
3     misrepresenting the facts, but I don't see what this
4     has to do with this case.  If we're going to get into
5     the facts of that case, that's a long, I handled that
6     case, defense of that case.  It's a long set of facts
7     --
8                 ATTORNEY SPURLIN:  That's fine
9                 MR. WILLIAMS:  -- and you're completely off
10    base.
11                ATTORNEY SPURLIN:  But I am trying to get, I
12    asked the Sheriff a perfectly fair question, and he
13    said I can't remember any.  So, I'm trying to get --
14                MR. WILLIAMS:  That's fine.
15                ATTORNEY SPURLIN:  -- his memory.
16          Q.   (By Mr. Spurlin) Isn't that true?  Didn't he
17    go looking in Cook County for him when he didn't have
18    sight of him?
19          A.   I don't recall.  I do recall him picking it,
20    picking it back up in Cook County but the sheriff has
21    statewide authority.
22          Q.   Okay.
23          A.   Even though I'm out of my county, I can have
24    a still initiate a traffic stop.  If, you know, if we
25    have the evidence to support that stop.

**ADVANCED COURT REPORTING**

1      Q.   Sure.  So, if you are driving through Cook
2   County and see something, you can initiate a traffic
3   stop.
4      A.   Correct.
5      Q.   But you can't without plain view or
6   observation of a car, drive into Cook County and just
7   start your own search to see if you find somebody
8   violating a traffic rule, can you?
9      A.   Probably not.
10      Q.   And the deputy, the deputy when he went into
11   Cook County was not in hot pursuit.
12      A.   No.
13      Q.   Okay.  All right.  Was anyone reprimanded
14   for that?
15      A.   I'm not sure whether anybody was
16   reprimanded, but we changed our policy on the chase
17   procedures.
18      Q.   And I'm trying to get to through this
19   quickly.
20      A.   Right.
21      Q.   I honestly am.  How did you change your
22   policy?
23      A.   I don't know that it had anything to do with
24   him going out of Cook, out of Tift County but I don't
25   know if we actually changed the policy or not, but we,

**ADVANCED COURT REPORTING**

1       we've made, made them aware to not chase anybody in

2       the critical areas, like residential sections or

3       commercial.  And the number of vehicles that could

4       chase, be in the chase at any given time.  And when to

5       let go --

6            Q.   Yes sir.

7            A.   -- let another agency take over and stuff

8       like that.

9            Q.   I'm going to come back to this because I

10      think it applies to a lot of things.  But you agree

11      that you have to balance the benefit of catching a

12      potential criminal against the danger to other people,

13      when you initiate a chase?

14           A.   Yes.

15           Q.   Same thing, when you decide to use force.

16      You have to balance what crime you're trying to stop a

17      person for, with the amount of force you can use,

18      correct?

19           A.   Correct.

20           Q.   For instance, if somebody wrote a bad check,

21      you can't use a weapon or deadly force to apprehend

22      somebody for writing a bad check, can you?

23           A.   No.

24           Q.   But if they've killed somebody or robbed a

25      bank, can you then use the highest level of force?

**ADVANCED COURT REPORTING**

1          A.   Yes, sir.

2          Q.   If you're in hot pursuit of somebody who's

3     just shot somebody?  Can you, in that instance, use

4     deadly force?

5          A.   Yes.

6          Q.   Can you, if somebody simply runs a stop

7     sign?

8          A.   No.

9          Q.   Okay.  It's a balancing, is it not, Sheriff?

10          A.   Correct.

11          Q.   And you agree with that.

12          A.   Correct.

13          Q.   Okay.  And that balancing is something that

14     has to be done by the deputies in the field, correct?

15          A.   Correct.

16          Q.   And it's got to be done by them properly,

17     based on standards provided by you as the Sheriff,

18     correct?

19          A.   Correct.

20          Q.   You can't leave it to their total

21     discretion, to make up their own mind and be a cowboy.

22     You have to give them the rules and the standards,

23     correct?

24               MR. WILLIAMS:  Object to form.  Go ahead.

25          A.   Correct.  Depending on the circumstances.

1          Q.   And the policies and the practices we talk
2     about that are not written and the training is how you
3     give them the standards to use, right?
4          A.   Correct.
5          Q.   And in order for them to apply it to the
6     facts properly, they have to know the standards.
7          A.   Correct.
8          Q.   Understand the standards.
9          A.   Correct.
10         Q.   And know how to apply them to different fact
11    patterns.
12         A.   Correct.
13         Q.   Okay.  And it's the responsibility, as you
14    as the chief policy maker, to make sure that they do
15    that in a proficient manner.
16         A.   Correct.
17         Q.   Okay.  And if you determine that your
18    department misunderstands something, or is not
19    applying it properly, the buck stops with you.
20         A.   Correct.
21         Q.   And you've got to make sure that they get
22    the training they need to understand and then apply
23    those to a different fact pattern.
24         A.   Correct.
25         Q.   Gotcha.  Thank you, sir.  Have you ever had

**ADVANCED COURT REPORTING**

1          any, we talked about chases, have you ever had any

2          situations where officers have been found to use

3          excessive force?

4                A.   Not in, not during my tenure.

5                Q.   Never?

6                A.   Never.

7                Q.   Now, I'm going to ask you for a different

8          hierarchy.

9                A.   Okay.

10               Q.   Certainly, you could perceive a situation

11         where you found that an officer intentionally used

12         excessive force.

13               A.   Correct.

14               Q.   That'd be about as bad as you and I can

15         imagine.  Right?

16               A.   Correct.

17               Q.   Then there might be situations that are less

18         than that, where they might have gone over the line on

19         force, but it wasn't intentional.  They just made a

20         mistake or had poor training.

21               A.   Correct.

22               Q.   Have you ever had the second level?  Where

23         they may have misunderstood or misapplied your

24         policies and practices and needed more training?

25               A.   Not that I'm aware of, after the case or the

1     situation being investigated.

2          Q.   Okay.  Can you remember any investigations

3     about potential excessive force by any of your

4     deputies in your ten years?

5          A.   No.

6          Q.   Never been an issue before this case?

7          A.   Not that I'm aware of.

8          Q.   Okay.  Has there ever been any other issue

9     with Deputy Tripp involving his performance as an

10    officer?

11         A.   Prior to this?

12         Q.   Ever.  Before, after, now.

13         A.   He was involved in a pedestrian accident in

14    Cook County.

15         Q.   Okay.  Tell me what happened because I don't

16    think I've been made aware of that.

17         A.   He had gone, he was answering a call to an

18    accident, and he got off at, he went into Cook County.

19    And got, actually, actually south of Eldorado but

20    before he got to Cook County.  But he talked to the

21    driver of the truck.  And there were actually two

22    accidents but the first, the first driver, the guy

23    had, it was hit and run.  So, he went on and he didn't

24    realize that another truck had been involved in an

25    accident at the exit ramp in, south bound exit ramp in

ADVANCED COURT REPORTING

1    Lenox, so he got off and crossed the interstate,

2    headed back north and the guy run out in front of him,

3    and Deputy Tripp hit him.

4        Q.   Okay.  He was on I-75.

5        A.   Yes, sir.

6        Q.   In Cook County.

7        A.   In Cook County.

8        Q.   All right.  Is he allowed to patrol in Cook

9    County?

10       A.   He wasn't patrolling.  No.  Well, no, no.

11       Q.   I understand.

12       A.   Not unless he is in pursuit of --

13       Q.   Right.  If his patrol area is limited to

14   Tift County.

15       A.   Tift County, yes sir.

16       Q.   But then an exception to that as if he sees

17   a crime being committed, he can then pursue it into

18   Cook county.

19       A.   Correct.

20       Q.   In this case, the incident that he was

21   investigating, the accident, which county did it occur

22   in?

23       A.   It was in Tift County but once it became a

24   hit, he realized it was a hit and run, he had to go to

25   -- we don't have a turnaround at the county line.  He

**ADVANCED COURT REPORTING**

1          had to go all the way to Lenox to the first exit in,

2          after he left Tift County to turn around and come back

3          into Tift County.

4                Q.   I understand.

5                A.   And that's when that happened.

6                Q.   And this was a pedestrian incident?

7                A.   Yes sir.  Yes sir.

8                Q.   Okay.  And was he going at high speed?

9                A.   No.

10               Q.   Okay.

11               A.   He was entering, going down the ramp headed

12         back north.

13               Q.   Okay.

14               A.   I think it was 50 something miles an hour.

15               Q.   And somebody was on the ramp in front of

16         him?

17               A.   Well, actually, it was the pedestrian that,

18         that was involved in the two hit and runs, that run

19         across.

20               Q.   Okay.  Was it the driver?

21               A.   The driver.  He had abandoned the car.

22               Q.   Okay.  And was there any investigation of

23         his performance?

24               A.   Yes.

25               Q.   Okay.  And who did the investigation?

**ADVANCED COURT REPORTING**

1          A.    I don't know if, I think, GBI may have. I

2     can't remember.

3          Q.    Do y'all sometimes, in those situations,

4     refer those investigations to outside --

5          A.    Sure.  I don't investigate my own people.

6          Q.    Thank you.  And, and is there ever a

7     situation where you do investigate your own people?

8          A.    On minor issues, policy issues.

9          Q.    And I would assume that it depends on the

10    degree of the issue.

11         A.    Correct.

12         Q.    Would that be accurate?

13         A.    Correct.

14         Q.    If there's a potential crime, you surely

15    refer that to the GBI.

16         A.    Absolutely.

17         Q.    But if it's just to try to make our people

18    better, to understand policies and practices, do y'all

19    sometimes do an evaluation yourself?

20         A.    Correct.

21         q.    Okay.  And did, were there any findings in

22    this case that Deputy Tripp did anything improper?

23         A.    I don't guess it was improper.  But, I mean,

24    we're allowed to use our phones, but he was, I think

25    it was determined that he was on the phone when that

1       happened.

2               Q.   He was talking on --

3               A.   Talking or texting.  Talking, I guess.

4               Q.   -- on a phone when he hit the guy.

5               A.   That was determined later.  Yes, sir.

6               Q.   Okay.  Do you remember if he was on the

7       phone talking or texting?

8               A.   I don't know.  I don't remember.

9               Q.   Who made that determination?  Was it your

10      office or the GBI?

11              A.   No, it was actually the attorney's

12      investigator from, for the family of the deceased.

13              Q.   Okay.  The hit and run fellow was killed?

14              A.   Yes, sir.

15              Q.   Was that lawsuit settled?

16              A.   It is still litigating.

17              Q.   Okay.  And do you know who the lawyers are?

18              A.   King.

19              Q.   In Tifton?

20              A.   Yeah.

21              Q.   J. L. King.

22              A.   Yeah.

23              Q.   Okay.  And who is defending the Sheriff's

24      Department in that suit?

25              A.   Raleigh Rollins with --

1          Q.   I know Mr. Rollins.  He's a good lawyer.

2          A.   Yes, sir.

3          Q.   And a good fella.  When did that happen,

4     roughly?

5          A.   Sometime in '21.  I can't remember.

6          Q.   And I'm assuming there would be some phone

7     record to confirm he was on the phone.

8          A.   I don't know if that was determined or not.

9          Q.   Okay.  In your mind --

10         A.   It was a reflection through the window that,

11    and I missed it when I saw the video.

12         Q.   I got you.  Having re-examined the video you

13    can clearly see he had his phone up to his mouth.

14         A.   Correct.

15         Q.   Okay.  No dispute as far as the

16    investigation goes, in your mind.  He was on the phone

17    when --

18         A.   Correct.

19         Q.   Okay.  All right.  Any other incidents with

20    Mr. Tripp?

21         A.   No, sir.

22         Q.   Any other discipline he's ever received?

23         A.   No, sir.

24         Q.   What about Deputy Spurgeon?

25         A.   I am not aware of any.

1          Q.    Okay.   Had there ever been any incidents
2      where you as the chief policy maker have determined
3      that either of those two gentlemen needed any further
4      training, or assistance in understanding and applying
5      your policies, practices and commands?
6          A.    No, sir.
7          Q.    Okay.   You mentioned, maybe while we were
8      chatting before we started, that there's lots of
9      differences in being a Sheriff and being a State
10     Patrol.  Is that true?
11         A.    That is correct.
12         Q.    Are there a lot of similarities as well,
13     though, in law enforcement, with the State Patrol as
14     the Sheriff.
15         A.    There's some but the main thing I was
16     referring to was politics.
17         Q.    I understand.  I understand.  As the
18     Sheriff, you've got to listen to people and go to
19     funerals and do some of that kind of stuff, too.
20     Don't you.
21         A.    Instead of having two or three bosses, I got
22     43,000 bosses.
23         Q.    I understand.  Okay.  I'm going to ask you
24     some, you can talk as long as you want, some real
25     quick ones, I think.  Is it the policy of Tift County

1    that persons detained by Tift County Sheriff's

2    Deputies will be free from the use of excessive force?

3        A.   Yes.

4        Q.   And it's clearly established among your

5    department that they must make sure not to use

6    excessive force when they detain someone.

7        A.   Correct.

8        Q.   There's no dispute about that.  That's a

9    simple issue, is it not?

10       A.   Correct.

11       Q.   Okay.  And is it also your policy that

12   anyone should be free from excessive use of taser

13   applications?

14       A.   Correct.

15       Q.   And that's clearly established in your

16   department?

17       A.   Correct.

18       Q.   Okay.  And is it your policy as the Sheriff

19   that persons will receive the least amount of force

20   needed to do the job?

21       A.   Correct.

22       Q.   And that's clearly established in your, in

23   your area at the Sheriff's Department, correct?

24       A.   Correct.

25       Q.   Okay.  And we kind of touched on that

1    earlier.  You cannot use the higher levels of force

2    for very, very minor crimes and misdemeanors, correct?

3         A.   Correct.

4         Q.   Okay.  And that's the way you've trained

5    your deputies.

6         A.   Correct.

7         Q.   That's been the way the chain of command has

8    passed that down.

9         A.   Correct.

10         Q.   And that's clearly established among your

11    group of deputies that they can't do that.  Right?

12         A.   Correct.

13         Q.   Same thing, it's your policy that no one

14    should use force simply to inflict pain, correct?

15         A.   Correct.

16         Q.   And that's clearly established among your

17    department and the sheriff's deputies, correct?

18         A.   Correct.

19         Q.   Okay.  And it's your policy in your

20    department that they must balance the amount of force

21    needed with the government interest in apprehending

22    someone for whatever particular crime they've been

23    charged with, right?

24         A.   Correct.

25         Q.   And that's clearly established as well,

**ADVANCED COURT REPORTING**

1        correct?

2                A.   Correct.

3                Q.   Now, I know from Mr. Webster's deposition of

4        you earlier, that you really have never used a taser.

5        Is that correct?

6                A.   Never.

7                Q.   Have you ever had any training on the use of

8        the tasers?

9                A.   No, sir.

10               Q.   Have you as the chief policy maker made it a

11       policy of your department that we will use taser

12       weapons?

13               A.   Correct.

14               Q.   And you do understand that taser weapons are

15       potentially deadly?

16               A.   And, yeah, potentially yes.

17               Q.   I'm not saying every time.

18               A.   Right.

19               Q.   But it can cause death, correct?

20               A.   Correct.

21               Q.   And it's a potentially dangerous weapon.

22               MS. NYUGEN:  Object to form.

23               A.   I'm not, I think TASER puts a disclaimer on

24       their product as being a possibility.  But you know, I

25       mean, that's as much as I know about it.

1   Q.   I understand.  And you've delegated to your

2   subordinates, the training and the creation of

3   training materials for getting that information down

4   to your deputies in the field.

5   A.   The latest possible.

6   Q.   Okay.  All right.  Let's go ahead and talk

7   about that for a moment.  Specifically, about the

8   tasers.  And I'm not criticizing you.

9   A.   Correct.

10   Q.   I understand in a big department, you have

11   to delegate.

12   A.   Correct.

13   Q.   And you do delegate?

14   A.   Absolutely.

15   Q.   And you would agree that you are not the

16   expert on how to use a taser or when to use a taser.

17   A.   That's correct.

18   Q.   And you really can't give me any information

19   about how to use it and when you use, can you?

20   A.   No.  No, I absolutely know nothing about it

21   other than just the generalities.

22   Q.   Right.  And you've not gone through the

23   training?

24   A.   No.

25   Q.   You've not taken the course?

**ADVANCED COURT REPORTING**

1        A.   No.

2        Q.   Not read the materials?

3        A.   No.

4        Q.   Not involved yourself in training deputies?

5        A.   No, sir.

6        Q.   Who does for you?

7        A.   Captain Wingate Whitley and Major Danny

8   Torres.

9        Q.   Okay.  And can you tell me the extent of

10   their training in how to be the experts for the Tift

11   County Sheriff's Department in knowing how to use a

12   taser and when to use a taser?

13        A.   I, I am assuming they've been trained

14   through TASER International.

15        q.   Yes, sir.  And again, I'm not being

16   critical.  Tift County Sheriff's Department has not

17   gone and done their own development of materials?

18        A.   No.

19        Q.   Y'all have not gone and done investigations

20   yourself?

21        A.   No.

22        Q.   You've not gone and done any scientific

23   studies?

24        A.   No.

25        Q.   You've not developed your own training

1      slides and materials?

2              A.   No, sir.

3              Q.   Y'all have utilized TASER Axon's materials,

4      correct?

5              A.   Correct.

6              Q.   One hundred percent?

7                   MS. NYUGEN:  Object to form.

8              A.   To my knowledge.

9              Q.   Adopted it in its entirety?

10                  MR. WILLIAMS:  Object to form.

11                  MS. NGUYEN:  Same objection.

12             A.   I don't know if adopted, I mean, that's what

13     we use.

14             Q.   Right.  I mean, y'all decide, as the

15     Sheriff's Department, you as the chief policy maker,

16     what training your officers get, right?

17             A.   Correct.

18             Q.   And the decision was made, we will use

19     Axon's materials, correct?

20             A.   Correct.

21             Q.   We will use the materials with Axon's

22     copyright on the bottom, correct?

23             A.   Correct.

24             Q.   We'll use the warnings provided by Axon?

25             A.   Correct.

**ADVANCED COURT REPORTING**

```
1            Q.   We use the slideshow provided by Axon?
2            A.   Correct.
3            Q.   We make our deputies sign the forms prepared
4       by Axon?
5            A.   Correct.
6            Q.   None of that was independently created by
7       the Tift County Sheriff's Department?
8            A.   No.
9            Q.   None of that was independently created by
10      Captain Whitley or did you say Major Torres?
11           A.   Major Danny Torres.
12           Q.   Neither one of them did that?
13           A.   No.
14           Q.   They adopted that from Axon?
15           A.   Correct.
16           Q.   Who manufactures the taser weapon, correct?
17           A.   Correct.
18           Q.   All right.  And the training that Captain
19      Whitley received, and that Major Torres received came
20      from Axon, correct?
21                MS. NYUGEN:  Object to form.
22           A.   I'm not sure if it come directly from them,
23      but that's --
24           Q.   You wouldn't know?
25           A.   I wouldn't know where it came from.
```

1    Q.   But it didn't come independently from anyone
2    in the Sheriff's Department?
3    A.   No.
4    Q.   The Sheriff's Department itself doesn't have
5    any knowledge or information other than what it
6    obtained from Axon. Is that correct?
7    A.   Correct.
8    Q.   Didn't go to any other sources like the
9    Sheriffs Association, the National Association or
10   something to obtain information on taser usage?
11   A.   No.
12   Q.   Everything the Tift County Sheriff's
13   Department knows came from Axon materials, correct?
14   A.   As far as I know.
15   Q.   Okay.  When did y'all first start using
16   tasers?
17   A.   It was before I took office, so it has been,
18   been during Sheriff Vowell's tenure.
19   Q.   And have you become aware, through a
20   discussion with Captain Whitley or Major Torres or
21   anyone else in your department, of any changes in the
22   Axon training materials that Tift County has adopted?
23   A.   They've not made me aware of it.
24   Q.   Okay.  Would you be aware if y'all chose to
25   deviate from the training materials given by Axon?

1        A.    Correct.  Yes, sir.

2        Q.    And since you don't know about it, it has

3    not happened?

4        A.    No.

5        Q.    Okay.  What I said is true.  It has not

6    happened.

7        A.    Right.

8        Q.    And y'all have not done any investigation to

9    see if y'all agree with every recommendation of Axon

10   or not.

11       A.    Not to my knowledge.

12       Q.    And you've not done any investigation to see

13   if you should change any of the training materials

14   Axon's given?

15       A.    Not to my knowledge.

16       Q.    Sheriff, that sounds like you just adopted

17   it 100%.  Is that true?

18            MR. WILLIAMS:  Object to form.

19            MS. NYUGEN:  Object to form.  Asked and

20   answered.

21       A.    Yes.

22       Q.    Okay.  You expect them to be the experts on

23   that.  Right?

24       A.    Correct.

25       Q.    Okay.  And like lots of things, where we

1       rely on experts and doctors, you've chosen to rely

2       upon and adopt their training materials, right?

3              A.    Yeah because that's the product we use.

4              Q.    Right.  And the policy of the Tift County

5       Sheriff's Department is to follow those training

6       recommendations, correct?

7              A.    Correct.

8              Q.    To the letter, correct?

9              A.    Correct.

10             Q.    Without deviation, correct?

11             A.    Correct.

12             Q.    And no instruction has ever gone to a deputy

13      that you have that they can choose to follow or choose

14      to disregard those training recommendations?

15             A.    Correct.

16             Q.    Okay.  And you're aware of that, because as

17      the chief policy maker, you know that that's what

18      Torres and Whitley are teaching them, right?

19             A.    Correct.

20             Q.    Okay.  And you do agree that they need to

21      know in the field, if they're authorized to use that

22      taser, how to use it safely?

23             A.    Correct.

24             Q.    And they must know in the field when to use

25      that taser?

**ADVANCED COURT REPORTING**

1          A.    Correct.

2          Q.    And they must know in the field when to

3     refrain from using that taser.

4          A     Correct.

5          Q.    And they must know the circumstances when

6     they are not supposed to use that taser, correct?

7          A.    Correct.

8          Q.    And they are given that information by the

9     training provided by Tift County Sheriff's Department,

10    right?

11         A.    Correct.

12         Q.    And that includes hypothetical fact patterns

13    when they know when they can use it and when they

14    can't, right?

15         A.    Correct.

16         Q.    Okay.  And they're expected to follow that

17    training, right?

18         A.    Correct.

19         Q.    They do not have the authority in the field

20    to disregard that training and do whatever they want?

21         A.    Correct.

22         Q.    They do not have discretion in the field to

23    do whatever they want?

24         A.    Correct.

25         Q.    They are expected in the field to act

**ADVANCED COURT REPORTING**

1    consistently with that training material provided by

2    Axon?

3        A.    Correct.

4        Q.    And they are expected, by you, to understand

5    that material and become proficient in knowing how to

6    use it in the field?

7        A.    Correct.

8        Q.    Okay.  And that's what you expect Whitley

9    and Torres to pass down through the chain of command

10   to your new deputies, right?

11       A.    Correct.

12       Q.    And they are not supposed to be issued a

13   taser weapon until they understand and have the

14   proficiency to apply that in the field?

15       A.    Correct.

16       Q.    Okay.  Has there ever been an issue,

17   Sheriff, we've talked about chases, we've talked about

18   force, where y'all have decided that, well we don't

19   really understand this taser enough.  Let's get

20   everybody in a shift meeting or at the beginning of a

21   shift and go through this again with them?

22       A.    I'm sure there have been updates, but I'm

23   not, I'm not aware of any.

24       Q.    Okay.

25       A.    But --

**ADVANCED COURT REPORTING**

1          Q.   I'm not sure I asked a good question.  Let

2     me try again.  I know they have to have a

3     certification, right?

4          A.   Right.

5          Q.   Before they're issued a taser, they got to

6     go through the course with Torres or Whitley, right?

7          A.   Correct.

8          Q.   And that's a one-day course?

9          A.   Yes, sir.

10         Q.   And some of it is classroom?

11         A.   Correct.

12         Q.   Some of it is training materials from Axon?

13         A.   Correct.

14         Q.   And then some of it is actual usage of it?

15         A.   Correct.

16         Q.   Okay.  I'm not talking about that.

17         A.   Right.

18         Q.   And I'm not talking about recertification.

19    I'm just talking about where an issue has come up.

20    So, the shift supervisor having --

21         A.   Right.

22         Q.   -- been given information by you, or someone

23    else, says let's just talk about it before we send our

24    deputies out.  Is there any of that that's ever gone

25    on, to your knowledge?

1          A.   Not to my knowledge.

2          Q.   Would you know about it?  Or is that

3     delegated to somebody?

4          A.   That's delegated.  I mean, they don't come

5     to me with every --

6          Q.   I understand.  Help me with the chain of

7     command.  I certainly know Larry Taylor.

8          A.   Larry's retired now.

9          Q.   Right, he was your number one man for a long

10    time.

11         A.   He was Chief Deputy.

12         Q.   Was he the one to pass that information down

13    to the shift --

14         A.   Correct.

15         Q.   Okay.  And so, he might know.

16         A.   Correct.

17         Q.   Okay.  And you might not be involved in that

18    directly.

19         A.   That's correct.

20         Q.   Okay.  And when Larry retired, who took his

21    spot?

22         A.   Colonel Ray Merritt.

23         Q.   Okay.  Do you know if that has occurred with

24    Colonel Merritt?

25         A.   Not to my knowledge.

1    Q.    Okay.  Has there been any investigation
2    internally, in this situation with this taser, as to
3    whether our officers have been trained and understand
4    how to use the taser and when to use the taser?
5    A.    You mean as far as on this case?
6    Q.    Yes, sir.
7    A.    Not that I'm aware of because we turned it
8    over to GBI and I relied on their investigation.
9    Q.    I understand.  And that kind of goes back to
10   what I said earlier, where they might do some criminal
11   investigation --
12   A.    Correct.
13   Q.    -- or something but y'all might just want to
14   make sure that it never happens again.
15   A.    Right.
16   Q.    We educate our people better.  Hasn't been
17   any of that?
18   A.    Not, if it was, I was not made aware of it.
19   Q.    Okay.  Would I understand correctly Sheriff
20   that every deputy who's come through your department
21   has received training by your people directly in how
22   to apply fact patterns to policies and procedures?
23   A.    Correct.
24   Q.    That's a common training tool is it not?
25   A.    Correct.

1        Q.   And your understanding of the Police Academy

2    is they would have received the same type training on

3    hypothetical fact situations there?

4        A.   Correct.

5        Q.   Okay.  I know you've answered this question

6    before.  Excuse me, I just got to get it on this

7    record.  Do you know what excited delirium is?

8        A.   I do now but at the time I'd never heard of

9    it.

10       Q.   Okay.  Were you aware that the term existed

11   and just didn't know the definition?  Or had you never

12   heard the two words?

13       A.   I just never heard the, heard the

14   definition.

15       Q.   And having not gone through the Axon

16   training, you were not aware that was a term used in

17   their training materials?

18       A.   Correct.

19       Q.   Okay.  Do you now understand?

20       MS. NYUGEN:  Objection to form.

21       Q.   Do you now understand what the term means?

22       A.   I guess in layman's terms, it's just

23   elevated heart rate and excitement.

24       Q.   Okay.  Do you know, as a law enforcement

25   person, how people are trained to recognize that that

1        exists?

2            A.    I'm not aware of it because I have not been

3        trained so I'm not aware of it.

4            Q.    Yeah.   I'm not a law enforcement person.

5        But when you tell me it's elevated heart rate and I

6        see a guy out in the distance, I can't measure his

7        heart rate, right?

8            A.    Correct.

9            Q.    So, what symptoms or facts am I looking for

10        to identify a potential detainee as being under the

11        influence of excited delirium?

12            A.    I don't know.

13            Q.    I understand.   Do you know if your

14        department has an understanding of how to recognize

15        excited delirium?

16            A.    I'm not sure whether they've implemented

17        that or not through our training division.

18            Q.    You've not been part of any discussion with

19        anyone in your department about how to train officers

20        on recognizing excited delirium?

21            A.    No.

22            Q.    You've not been part of any discussion on

23        defining excited delirium for your officers?

24            A.    No.

25            Q.    And you've not ordered your delegates,

**ADVANCED COURT REPORTING**

1        Captain Whitley and Major Torres, to train anyone on

2        how to recognize excited delirium?

3             A.    No.

4             Q.    Since you found out that was part of the

5        Axon materials, have y'all implemented any efforts to

6        train your deputies, on understanding excited delirium

7        and in recognizing excited delirium?

8             A.    I've not been made aware of that.

9             Q.    Okay.  All right.  Now my years run

10       together, yours probably do too.  That became an issue

11       you became aware of a couple of years ago, did it not?

12            A.    In this case.

13            Q.    Right.  And that's been at least two years

14       ago, right?

15            A.    I believe that's correct.

16            Q.    And y'all have not initiating any effort to

17       train your deputies in understanding or recognizing it

18       since then.

19            A.    We may have but I'm not aware of it.

20            Q.    Okay.  All right.  Are you aware that there

21       are populations of people who should not have a taser

22       weapon used against them?

23                 MS. NYUGEN:  Object to form.

24                 MR. WILLIAMS:  Same objection.

25            A.    I'm not sure whether that, I'm aware of

                        **ADVANCED COURT REPORTING**

1        that, or I do know that when we were using pepper

2        spray, that there was a certain population, percentage

3        of the population it didn't affect.

4           Q.   Let me just ask you this.  I know you're not

5        the expert in this.

6           A.   Right.

7           Q.   I'm just generally asking your awareness as

8        the --

9           A.   Right.

10          Q.   -- chief policy maker.  You indicated that

11      there were warnings from Axon that a taser weapon

12      could potentially cause death?

13         A.   Correct.

14         Q.   And you were aware that it was more likely

15      in people who had heart issues or were mentally ill,

16      or who were under the influence of excited delirium?

17          MR. WILLIAMS:  Object to form.

18         A.   I'm not aware, I'm not aware of those.

19         Q.   Okay.  Were you aware of any group of people

20      or population of people that deputies were supposed to

21      be wary of using the taser or prohibited from using

22      the taser on?

23          MS. NYUGEN:  Object to form.

24         A.   Not to my knowledge.

25         Q.   Okay.  As we sit here today, is it the

**ADVANCED COURT REPORTING**

1    policy of the Tift County Sheriff's Department that a

2    deputy can use a taser weapon on any person regardless

3    of their underlying health.

4        A,   I don't know if, I don't know our people are

5    qualified to determine their health so I would say

6    yes.

7        Q.   Okay.  All right.

8        A.   It's discretionary.

9        Q.   I understand.  And the discretion they are

10   supposed to use is based on the training that has been

11   provided to them, right?

12       A.   Correct.

13       Q.   And the training that has been provided to

14   them is the Axon materials?

15       A.   Correct.

16       Q.   That you expect them to follow?

17            MS. NYUGEN:  Object to form.

18       A.   Correct.

19       Q.   Okay.  I mean, they just can't, you agree a

20   deputy can't just have unfettered discretion with no

21   standards and rules?

22       A.   No.  I think they have to feel threatened or

23   having to have to make a decision whether to contain a

24   person.

25       Q.   I understand.  So, you agree with me there

**ADVANCED COURT REPORTING**

1      are standards and rules they have to apply?

2          A.   Correct.

3          Q.   They just can't get mad at somebody and

4      shoot them?

5          A.   Correct.

6          Q.   And the standards and rules they are

7      provided are provided by the Sheriff's Department,

8      right?

9          A.   Correct.

10         Q.   Y'all choose what to provide them?

11         A.   Correct.

12         Q.   And expect them to follow that?

13         A.   Correct.

14         Q.   And y'all choose those rules that they have

15     to apply in the field?

16         A.   Correct.

17         Q.   And expect them to follow that?

18         A.   Correct.

19         Q.   It's not unfettered discretion, they just

20     can't do what they want?

21             MR. WILLIAMS:  Object to form.

22         A.   Correct.

23         Q.   They've got to follow the training and

24     standards you provide to them?

25         A.   But still, correct, but still they have,

**ADVANCED COURT REPORTING**

1      they have discretion depending on circumstances.

2           Q.   Within the rules, standards and guidance

3      that you've provided?

4           A.   Correct.

5           Q.   Got you.  I'm teasing you.  We've talked

6      about probable cause in search and seizure?

7           A.   Right.

8           Q.   A deputy can't have unfettered discretion to

9      violate the constitution and seize evidence without

10     probable cause, can he?

11          A.   Absolutely not.

12          Q.   He only has certain discretion within the

13     rules and guidance that's provided?

14          A.   Correct, correct.

15          Q.   And that ruling guidance in this context of

16     use of a taser has been provided by the Sheriff's

17     Department?

18          A.   Correct.

19          Q.   And the materials they've been trained with

20     have been the Axon materials?

21          A.   Correct.

22          Q.   All right.  Does it concern you that none of

23     your deputies understood and knew that the excited

24     delirium limitation existed?

25               MR. WILLIAMS:  Object to form.

**ADVANCED COURT REPORTING**

1              MS. NYUGEN:  Joined.

2         A.   I guess to somewhat but I, I relied on what

3    the GBI investigation, the crime lab and everyone else

4    involved in the case and they all stated that my

5    deputies did nothing wrong.  And that's, that's what I

6    have to rely on because I wasn't there.

7         Q.   Okay.  Well, I'm asking you about before an

8    investigation is done?  Does it concern you that your

9    deputies in the field are not proficient on knowing

10   the standards for how to use and when to use a taser

11   weapon?

12             MS. NYUGEN:  Object to form.

13             MR. WILLIAMS:  Object to form.

14        A.   I don't know that they're not.

15        Q.   Okay.  Well, if they don't understand what

16   the word excited delirium means and don't know how to

17   recognize it, then how can they, in the field, know

18   that I shouldn't use it against a particular person?

19             MR. WILLIAMS:  Object to form.

20             MS. NYUGEN:  Same objection.

21        A.   I don't know if they're capable of

22   determining why they can't use it.

23        Q.   Were you aware that the training materials

24   from Axon say you are not supposed to use it on

25   mentally ill persons or should be very wary of using

 1          it on mentally ill persons?

 2                    MS. NYUGEN:  Object to form, that is what it

 3          says.

 4                    MR. SPURLIN:  Ma'am, all you've got to say

 5          is object to form.

 6                    MS. NYUGEN:  No.  You're not going to

 7          mislead this witness and --

 8                    MR. SPURLIN:  You stood on your head about

 9          speaking objections earlier --

10                    MS. NYUGEN:  -- misrepresenting information

11          constantly.

12                    MR. SPURLIN:   No, I am not.

13                    MS. NYUGEN:  Yeah, you are.  And you know

14          it.

15              A.   What was the question?

16              Q.   Are you aware of any limitation on the use

17          of a taser weapon with someone who's mentally ill?

18              A.   No.

19              Q.   Are you aware of any limitation on using a

20          taser weapon on somebody who's under the influence of

21          drugs?

22              A.   No.

23              Q.   Are you aware of any limitation on using

24          taser weapons with someone suffering from a heart

25          issue?

ADVANCED COURT REPORTING

1          A.    No.

2          Q.    Okay.  Is it your position as the chief

3     policy maker that your deputies are not medical people

4     and cannot be expected to make those determinations

5     before utilizing the taser weapon?

6          A.    Correct.

7          Q.    Okay.  And you have made no effort as the

8     chief policy maker to educate your deputies on how to

9     determine any of those mental illness, excited

10    delirium, heart issues, drug usage, correct?

11         A.    I haven't.

12         Q.    Has your department?

13         A.    I'm not sure if my training officers have or

14    not.

15         Q.    Okay.  Have you read any of your deputies'

16    depositions in this case?

17         A.    No, sir.

18         Q.    Okay.  I'm going to paraphrase Deputy

19    Hancock, who seems like a nice young man, said he

20    could not identify any fact pattern for me at all as

21    far as when you should or should not use a taser

22    weapon in the field.  But he carries one.  Does that

23    concern you that he doesn't have any proficiency in

24    knowing the training, the standards, and when he

25    should use it in the field?

**ADVANCED COURT REPORTING**

1          MR. WILLIAMS:  Object to form.  Go ahead.

2     A.   My answer to that is if he took the

3     training, he should know.

4     Q.   Okay.  Would it, would it concern you if

5     Deputy Tripp and Deputy Spurgeon testified similarly?

6          MR. WILLIAMS:  Object to form.

7          MS. NYUGEN:  Same.

8     A.   Same answer.

9     Q.   Is it the policy of the Sheriff's Department

10    that an officer in the field has discretion to use an

11    unlimited amount of taser applications?

12         MR. WILLIAMS: Object to form.

13         MS. NYUGEN:  Object to form.

14    A.   I think depending on the circumstances.

15    Q.   Okay.  So, there are circumstances where an

16    officer could use the taser weapon fifteen times on a

17    detainee?

18    A.   If it shows no effect, but I don't think

19    they would, they would use one that much because it

20    wouldn't take that long to determine that it is not

21    effective.

22    Q.   How have you trained your officers in

23    determining whether an application of the taser

24    weapon, quote has any effect on the detainee?

25    A.   I'm not aware.

1        Q.   Well, you said if it has no effect.  How are
2    they supposed to determine if it has an effect?
3        A.   If they keep doing what they were doing?
4        Q.   Okay.
5        A.   As a result of the taser being applied.
6        Q.   All right.  Now, I understand that a taser
7    can completely incapacitate someone's muscular use, is
8    that your understanding?
9            MS. NYUGEN:  Object to form.
10           MR. WILLIAMS:  He has already testified he
11   doesn't have any experience with it.
12           MR. SPURLIN:  That's a speaking objection.
13           MR. WILLIAMS:  Well, my goodness, how many
14   times, you've asked him five or six times and he's
15   confirmed each time he hasn't had training, he's not
16   familiar with it but yet, you keep asking him.
17           MR. SPURLIN:  He said he had some knowledge.
18           MR. WILLIAMS:  Subject to the objection, you
19   can respond.
20           MR. SPURLIN:  For the record I object to the
21   speaking objections that we clearly have gone through
22   before.  Object to the form or object to the response,
23   is all that needs to be said.  To coach him and tell
24   him to say I don't have any training --
25           MR. WILLIAMS:  But wait a minute.

```
 1                    MR. SPURLIN:    -- when he's already said --
 2                    MR. WILLIAMS:  He's already said it several
 3         times, so it certainly not approaches --
 4                    MR. SPURLIN:  But he has the general
 5         knowledge.
 6                    MR. WILLIAMS:  What? It's ridiculous.
 7                    MR. SPURLIN:  Then why do you need to say
 8         it.  Just stop coaching.
 9                    MR. WILLIAMS:  Just to try to move this
10         deposition along.  How is that coaching him when he
11         has already said it three or four times?
12                    MR. SPURLIN:  You tell him to say to this
13         question.
14                    MR. WILLIAMS:  (Laughs)
15         A.    I've witnessed tasers being used.
16         Q.    My question is, is it possible that the
17         taser has an effect on a person's body without
18         completely incapacitating them?
19         A.    I've been made aware of that.
20         Q.    Right.  So, I could tase someone five times
21         and they not be completely incapacitated but all five
22         applications have some effect on his body, correct?
23                    MS. NYUGEN:  Object to form.
24         A.    I'm not sure.
25         Q.    Okay.  Could be affecting his heart rate?
```

**ADVANCED COURT REPORTING**

1              MS. NYUGEN:  Same objection.

2        A.   I'm not sure.

3        Q.   Could be affecting his endurance?

4              MS. NYUGEN:  Same objection.

5        A.   I'm not sure.

6        Q.   Could be causing cellular changes in his

7   muscles?

8        A.   I'm not sure.

9        Q.   But the policy of the Sheriff's Department

10  is he can keep doing that as long as the person is not

11  detained.  Is that correct?

12       A.   As far as I know.

13       Q.   Well, the TASER materials suggest that you

14  shouldn't use it more than three times for a duration

15  of fifteen seconds.  Do you have any knowledge of

16  that?

17             MS. NYUGEN:  Object to form.

18             MR. WILLIAMS:  Object to form.

19       A.   I may have read that somewhere but I'm not,

20  I'm not sure where it came from?  Or what, it maybe

21  something somebody said.  I'm not sure.

22       Q.   Have you instructed Captain Whitley and

23  Major Torres to tell your officers to ignore that?

24       A.   I've not told my instructors to ignore

25  anything.

**ADVANCED COURT REPORTING**

1          Q.    Okay.  Do you know if Captain Whitley or

2     Major Torres have told the deputies they're training

3     to ignore that?

4          A.    No.

5          Q.    Were you aware that Deputy Spurgeon said

6     using the 6+ six times for thirty seconds was

7     excessive force?

8               MS. NYUGEN:  Object to form.

9               MR. WILLIAMS:  Object to form.

10         A.    I'm not aware.

11         Q.    Would it concern you if he testified under

12    oath that he felt that was excessive force?

13              MR. WILLIAMS:  Object to form.

14              MS. NYUGEN:  Same objection.

15         A.    I'm not aware that he said that.

16         Q.    Okay.  You've never been made aware that he

17    testified in that manner.

18         A.    No.

19         Q.    Okay.  All right.  I am going to show you

20    what's marked as Plaintiff's Exhibit number 41.  You

21    see the front page of that deposition, Connor Brennan

22    Spurgeon?

23              (Whereupon, Exhibit 41, having previously

24    been marked for identification, was exhibited to the

25    witness.)

**ADVANCED COURT REPORTING**

1          A.    Yes, sir.

2          Q.    All right.  And it says that was the

3    deposition taken in the case of Sherri McBrayer vs

4    Gene Scarbrough --

5          A.    Okay.

6          Q.    -- in Tift Superior Court.  You were

7    familiar with that suit.

8          A.    Correct.

9          Q.    All right, then, I want you to turn to page

10   38 and I am going to read it to you and let you just

11   follow along if you don't mind.

12         A.    Okay.

13         Q.    Line 17 says, if his download showed that he

14   pulled the trigger four different times for four

15   different five second cycles and then you use the

16   drive stun twice for two five second cycles, you don't

17   feel that that's excessive force using the taser gun

18   combined between yours and Officer Tripp's actions.

19   His answer was yes sir.  Then the question was yes

20   what and his answer on the next page is, if that is

21   the case, then yes sir, I do.  Question you do what.

22   Answer, I believe that would be excessive.  Next

23   question.  If Officer Tripp used the taser four times

24   and you drive stunned twice, you agree that's

25   excessive force.  Is that what you're saying?  Answer,

**ADVANCED COURT REPORTING**

1      yes, sir.  Did I read it accurately?

2           A.   Yes, sir.

3           Q.   Were you aware of that prior to today?

4           A.   No, sir.

5           Q.   Okay.  All right.

6                MS. NYUGEN:  Can we take a break when you

7      get a chance?

8                MR. SPURLIN:  Yeah, we can take a break now.

9                (Whereupon, after a short break, the

10     deposition continued as follows:)

11          Q.   (By Mr. Spurlin) Sheriff are you aware of

12     the Tift County policy about deputies targeting a

13     detainee with an aiming at the chest with taser

14     weapon?

15          A.   Yes.

16          Q.   And what is the policy?

17          A.   Basically, to aim below chest level.

18          Q.   And that is what your expectation is for

19     your deputies in the field?

20          A.   Whenever, yeah, whenever possible.  But I

21     understand there are circumstances that --

22          Q.   I understand. Sometimes because of

23     circumstances you shoot where you can?

24          A.   Correct.

**ADVANCED COURT REPORTING**

1       Q.    But I'm talking about aiming.

2       A.    Right.

3       Q.    To intentionally aim at the chest would be a

4    violation of the Tift County policy?

5       A.    Intentionally, yes.

6       Q.    To intentionally aim for the head would be a

7    violation?

8       A.    Correct.

9       Q.    To intentionally aimed for the groin would

10   be a violation?

11      A.    Correct.

12      Q.    Okay.  So, if an officer did intentionally

13   target those areas that would violate your policy?

14      A.    Absolutely.

15      Q.    Okay.  I'm going to hand you an excerpt from

16   Tripp's deposition that I marked as Plaintiff's

17   Exhibit 42.  And again, I'm going to go through it a

18   little bit.  The first page just gives his name and

19   the date of June 10, 2020, when it was taken.

20           (Whereupon, Plaintiff's Exhibit 42, having

21   previously been marked for identification, was

22   exhibited to the witness.)

23      A.    Correct.

24      Q.    Now I want you to look with me and I'm going

25   to read a little bit.  Page 41, line 12.

**ADVANCED COURT REPORTING**

1          Question: "Did you intend to hit him in the
2     chest?  Or was that just kind of how it happened?"
3          Answer: "My intention was, yes, for one of
4     the prongs to go toward the chest area.  Ideally, if
5     you tase somebody, you want to tase him from a little
6     bit further distance than I actually did.  And the
7     reason for that is it gets more spread on these
8     prongs.  That's how a taser works.  I'm sure you
9     already know, a taser is shot in between the prongs.
10    It targets the muscle groups between those prongs.
11    So, the more spread you have the better off the more
12    effect you're going to have.  So ideally, no.
13    Ideally, you would want one towards the chest area,
14    and maybe one on the stomach area."
15          Did I read it accurately?
16       A.   Yes, sir.
17       Q.   Now the first sentence said my intention was
18    yes for one of the prongs to go toward the chest area.
19    If that is a true statement from Tripp that would
20    violate your policy.
21       A.   If that was his, yeah, true, true.
22       Q.   And then he says, ideally, you understand
23    what the word ideally means?
24       A.   Correct.
25       Q.   In a perfect world if he had a choice, his

1      choice would be one in the chest and one lower in the

2      stomach area.  That would violate your policy,

3      correct?

4           A.   Correct.

5           Q.   That's not an ideal shot?

6           A.   No.

7           Q.   That's not the way he was trained?

8           A.   Correct.

9           Q.   That's not the policy of your department?

10          A.   Correct.

11          Q.   And to intend to aim for the chest, for an

12     ideal shot of one in the chest and one in the abdomen,

13     would violate your policy?

14          A.   Correct.

15          Q.   And it would be excessive force?

16               MR. WILLIAMS:  Object to form.

17          A.   Again, based on the circumstances, I don't,

18     you know, timewise and his reaction to an event that

19     the perpetrator was creating, to have his mindset--

20          Q.   All right.

21          A.   He has discretion.

22          Q.   He doesn't have discretion to shoot him in

23     the chest or the groin?

24          A.   No, no he doesn't have discretion but he --

25               MR. WILLIAMS:  Object to form.

**ADVANCED COURT REPORTING**

1                    MS. NYUGEN:  Join.

2          A.    -- he has a discretion to use, to use his

3    weapon.

4          Q.    I understand.  Again, within the parameters

5    of the training materials, policies and procedures,

6    correct?

7          A.    Correct.

8          Q.    He doesn't have discretion to shoot him in

9    the groin or to shoot him in the chest intentionally?

10          A.    Correct.

11          Q.    He can't aim for the chest or the groin,

12    correct?

13          A.    Correct.

14          Q.    He just said his intent and his ideal shot

15    would be in the chest, correct?

16          A.    Correct.

17          Q.    That is a violation of your policy, is it

18    not?

19          A.    According to his statement, yes sir.

20          Q.    That would be excessive force, correct?

21                    MR. WILLIAMS:  Object to form.

22                    MS. NYUGEN:  Object.

23          A.    I guess.

24          Q.    Your policy is to give them training so that

25    they use the weapon properly with the right amount of

1    force, correct?

2        A.    Correct.

3        Q.    Shooting him in an area that's prohibited,

4    intentionally, the chest, the groin or the neck, would

5    be excessive force, would it not?

6            MR. WILLIAMS:  Object to form.

7        A.    Correct.

8        Q.    All right.  Let's see.  Does the Tift County

9    Sheriff's Department have a policy that anyone tased

10   will receive immediate medical care?

11       A.    I'm not sure if that's in policy but we try

12   to make that happen.

13       Q.    Let me try it differently.  Whether it's in

14   a written policy or an unwritten practice that you of

15   expect officers, has that been passed down that

16   anytime you tase somebody we want them to get

17   medically evaluated?

18       A.    I'm not sure.

19       Q.    Okay.  Is it possible that that's a practice

20   that's been passed down that you wouldn't know about?

21       A.    It's possible.

22       Q.    Okay.  Is there any policy or practice of

23   the Sheriff's Department that anyone who's tased and

24   is unresponsive after 10 minutes will receive

25   immediate medical care?

1          A.    I'm not sure.

2          Q.    Okay.  Do you have any explanation for why

3     the officers, or the deputies decided that they needed

4     to put him in the car?

5          A.    I wasn't there but I'm assuming that, for

6     his protection and theirs to hold him until they

7     decided what they were going to do.

8          Q.    Okay.  Well, at the time the decision was

9     made to put him in a car, was he unresponsive?

10          A.    I'm not aware of that.

11          Q.    Have you seen the videos?

12          A.    I've seen the video but I'm --

13          Q.    Okay.

14          A.    I don't recall.

15          Q.    Was he unconscious?

16          A.    Prior to putting him in the car?  No, he

17     wasn't, not to my knowledge.

18          Q.    Okay.  Did you see how they lifted him up

19     and put him in the car?

20          A.    I did but I don't recall.

21          Q.    Is there any policy, practice or procedure

22     that you passed down for how people are supposed to be

23     put in the car?

24          A.    They are, I believe they, we require them to

25     put them, sit them up in a sitting position, if

1  possible.  Sometimes that's not possible.  Depends on
2  how the defendant's reacting.
3      Q.   Would it be fair to say that, like all other
4  force, the deputies are supposed to use the least
5  amount of force available to get him in the car?
6      A.   Correct.
7      Q.   Okay.  And if he's not, not resisting at
8  that point, or he's not responsive, they should use
9  the least force possible to get him in the car without
10  hurting him.
11      A.   Correct.
12      Q.   Okay.  Did you know he was hobble strapped
13  at the point he was picked up?
14      A.   I'm not aware.
15      Q.   Were you aware he was handcuffed behind his
16  back?
17      A.   I think through testimony, he was hobbled
18  and handcuffed.
19      Q.   Were you aware that he was lifted up by his
20  handcuffed hands behind his back in a way that pushed
21  his hands and arms into an unnatural position behind
22  him, outside their normal range of motion?
23          MR. WILLIAMS:  Object to form.
24      A.   I can't remember whether, I saw the video
25  but was early on, I can't remember.

**ADVANCED COURT REPORTING**

1      Q.   I understand.  At that point, when he was

2      put in the car, was there any policy, practice,

3      procedure or training that you had given the deputies

4      that he should receive immediate medical care?

5      A.   By being placed in the car?

6      Q.   No, sir.  Thank you.  I appreciate the

7      clarification.  Based on all the facts that had

8      happened --

9      A.   Right.

10      Q.   -- based on the way he appeared, the way he

11      was reacting, the way he was tased, the struggle on

12      the ground --

13      MR. WILLIAMS:  (Inaudible).

14      Q.   Do I need to start over?  I'll start over so

15      you can edit it out.

16      Based upon the way he was acting, the way he

17      appeared to the officers, the fact he was tased

18      multiple times, the fact he had a lengthy struggle on

19      the ground with the officers, the fact he was

20      handcuffed, and hobble strapped, and the fact he was

21      unresponsive.  Did he need medical care at that point?

22      MR. WILLIAMS:  Object to form.

23      A.   I recall them checking on him, but I don't

24      recall whether it was before or after he was placed in

25      a car.

**ADVANCED COURT REPORTING**

1          Q.    I understand.  My question is, did he need

2     medical care, not for being checked on by a deputy?

3               MR. WILLIAMS:  Same objection.

4          A.    I'm not, I'm not clear on whether he was

5     showing any signs of, other than, you know, him

6     struggling with the officers, whether he needed

7     attention or not.  I mean, like I say, I wasn't there,

8     I don't know.

9          Q.    Was there any policy, based on any fact

10    you've become aware of, that required him to be

11    evaluated by an EMS person or a doctor at that point?

12         A.    Not that I'm aware of.

13         Q.    Okay.  Did anyone summon medical care

14    specifically for him?

15         A.    I know they summoned, the EMS was out there,

16    but I'm not sure who or why.

17         Q.    You're not aware they were summoned for

18    Spurgeon?

19         A.    No.

20         Q.    Okay.  You're not aware of the call went in

21    to check on Spurgeon and his leg?

22         A.    No.

23         Q.    Do you know who checked on Mr. McBrayer in

24    the car?

25         A.    No, sir.

**ADVANCED COURT REPORTING**

1        Q.   Okay.  I've deposed Deputy Hancock.

2        A.   Right.

3        Q.   And he acknowledged that he and Henderson

4   were the last ones there and had the least

5   information.

6        A.   Correct.

7        Q.   That he was the youngest one there, that he

8   had the least training, and he had no real medical

9   training?

10       A.   Correct.

11       Q.   Do you agree he was probably the least

12   qualified person to check on a McBrayer's health and

13   how he was doing in the car?

14       MR. WILLIAMS:  Object to form.

15       A.   I don't know.  I don't know.  I don't know

16   the training of the rest of the officers.

17       Q.   Okay.  Do you know why he was chosen?

18       A.   No.

19       Q.   Do you know who chose him?

20       A.   No, sir.

21       Q.   Okay.  It is the policy of your department

22   that any officer who may have been involved in

23   wrongdoing should not be involved in his own evidence

24   gathering or investigation?

25       A.   Correct.

**ADVANCED COURT REPORTING**

1        Q.   All right.  Do you agree that because Deputy

2    Tripp and Deputy Spurgeon may have been involved in

3    the use of excessive force, that they should not have

4    been involved in any investigation or evidence

5    gathering at the scene?

6        A.   Correct.

7        Q.   Should have been, I forget who all was

8    there, Henderson, Calderone, Hancock, or there was one

9    other guy.  It should have been one of them, right?

10        A.   Correct.

11        Q.   Okay.  For instance, if somebody went out

12    and looked for the taser parts it shouldn't have been

13    Tripp and Spurgeon, right?

14        MR. WILLIAMS:  Object to form.

15        A.   I'm not saying they shouldn't have then

16    looked for it, but they shouldn't have tampered with

17    it, once they found it.

18        Q.   I understand.

19        A.   If they found it.

20        Q.   Okay.  Sheriff, I appreciate your time.

21        A.   You're welcome.  Anytime.

22

23                  EXAMINATION

24        BY MS. NGUYEN:

25        Q.   Good morning, Sheriff.

**ADVANCED COURT REPORTING**

1          A.   Good morning.

2          Q.   I met you just briefly before the

3     deposition.  My name is Amy Nguyen and I represent

4     Axon Enterprises which is formerly TASER

5     International.

6          A.   Right.

7          Q.   Just a few areas of follow up.  First, I

8     know you haven't gone through the taser certification

9     program, correct?

10         A.   Correct.

11         Q.   Have you ever seen then the Taser training

12    materials that they put out that agencies can use in a

13    PowerPoint form?

14         A.   No.

15         Q.   Have you ever seen Axon's warnings about the

16    use of the taser device?

17         A.   I think I saw one sheet where they had a

18    disclaimer that, of what, of possibilities but what

19    the taser may cause but other than that, no.

20         Q.    Okay.  I'm just going to show you what has

21    been previously marked as Defense Exhibit 9.

22         (Whereupon, Defense Exhibit 9, having previously

23    been marked for identification, was exhibited to the

24    witness.)

25         Thank you.

**ADVANCED COURT REPORTING**

1              MR. SPURLIN:  You don't have anymore?

2              MS. NYUGEN:  I brought it when I first

3      introduced it.

4              MR. SPURLIN:  I understand.  You don't have

5      any more today?

6              MS. NYUGEN:  No.

7         Q.   (By Ms. Nguyen)  So this, in front of you,

8      this is a, you see that it's an eight page document.

9      This one's front and back but a total of eight pages.

10         A.   Which page?

11         Q.   What's that?

12             MR. SPURLIN:  Which page?

13         Q.   I was just asking you if you see it, this

14      document, it's front and back.

15         A.   Oh, oh.  Yeah, yeah.

16             MR. WILLIAMS:  The total number of pages.

17             MS. NYUGEN:  A total of eight pages.

18             MR. WILLIAMS:  I think the back page will

19      show, it is correct.

20         A.   Eight.

21         Q.   Eight pages.

22         A.   Yeah.

23         Q.   Okay.  Do you recall ever seeing this, this

24      full eight-page document?

25

**ADVANCED COURT REPORTING**

1          A.    No.

2          Q.    Thank you.  And so, because you haven't seen

3     this eight-page document, entitled TASER Handheld CEW

4     Warnings, instructions and Information to Law

5     Enforcement, are you able to testify to the contents

6     of this document?

7          A.    No ma'am.

8          Q.    Do warnings --

9          MR. SPURLIN:  Let me stop you one second.

10     Did you give a copy to the court reporter?

11          MS. NYUGEN:  No.  This has already been

12     previously introduced in a prior deposition.

13          MR. SPURLIN:  I understand, but you're using

14     it in his deposition, and I want to use it in his

15     deposition, so I think the court reporter's going to

16     need a copy of it.

17          MS. NYUGEN:  Well.  If you want a copy, you

18     can use the copy that I just showed the witness.

19          MR. SPURLIN:  Yep.  That is what I was

20     saying.

21          MS. NYUGEN:  Yeah.  It's the same.  Okay.

22          MR. WILLIAMS:  We don't want to have

23     different exhibits.

24          MS. NYUGEN:  Right.

25          MR. WILLIAMS:  Because it gets confusing.

**ADVANCED COURT REPORTING**

```
 1                    MR. SPURLIN:  It's the same number.
 2                    MR. WILLIAMS:  As long as it states, she
 3         doesn't, yeah,
 4                    MS. NYUGEN:  I use --
 5                    MR. WILLIAMS:  its already been introduced.
 6                    MS. NYUGEN:  -- sequential exhibits.  Right.
 7                    THE COURT REPORTER:  And I'll attach it to
 8         this transcript.
 9                    MR. SPURLIN:  Right.  I just want it
10         attached to this transcript.  So, that when I read
11         this transcript, it'll be there.
12                    THE COURT REPORTER:  Right.  And then same
13         thing for those Mr. Spurlin used.
14                    MR. WILLIAMS:  Those are new exhibits.
15                    MS. NYUGEN:  Those are new.
16                    MR. WILLIAMS:  That's been previously
17         identified.
18                    THE COURT REPORTER:  But even this being an
19         old one, I will still put it on the transcript, is
20         that okay?
21                    MS. NYUGEN:  Yeah, that's fine.
22                    MR. WILLIAMS:  That's fine.
23                    MS. NYUGEN:  That's fine.
24                    MR. SPURLIN:  And that is, of course, why I
25         used 41 and 42.
```

ADVANCED COURT REPORTING

1      Q.    (By Ms. Nguyen)   Okay.   Sheriff, do warnings

2   from a manufacturer equal, equate to your department's

3   policy?

4      A.    No.

5      Q.    And is there anything requiring you as a

6   Sheriff's Department to follow a manufacturer's

7   warnings?

8      A.    No.

9      Q.    And that includes Axon's warnings.

10      A.    Correct.

11      Q.    With regard to the training, is there

12   anything requiring you as a department, requiring you

13   to use the training materials that Axon puts out?

14      A.    Not to my knowledge but I mean, we would use

15   whatever product training depending on whatever

16   company we used.

17      Q.    Right?

18      A.    But --

19      Q.    Let me, it was a poor question.   In this

20   case, Axon has put some training materials together.

21      A.    Correct.

22      Q.    You understand that?

23      A.    Correct.

24      Q.    And as a Sheriff's Department, you can

25   either choose to use those training materials or say,

1    no, we aren't going to use them, we're going to use

2    something else.  Right?

3        A.    Correct.

4            MR. SPURLIN:  Object to the form.

5        Q.  (By Ms. Nguyen)  And in this instance, you

6    previously testified with Mr. Spurlin that your

7    department has chosen to use those training materials.

8    Is that right?

9        A.    That's correct.

10       Q.    But those, do those training materials equal

11    your policy on when to use taser devices?

12       A.    Correct.

13       Q.    Do you, do you as a department, create your

14    own policy with regard to the use of taser energy

15    weapons?

16       A.    Correct.

17       Q.    Okay.  So, that was my question.  You don't

18    take the taser training materials and say, I'm just

19    going to adopt this, and this is going to be our

20    policy.  Do you?

21       A.    No, it's not absolute.

22            MR. SPURLIN:  Object to the form.

23       Q.    And do you know, I know you haven't been

24    through the training, so I'm just asking if you know.

25    Do you know if the training materials that TASER puts

1   out, if they focus on simply how to use the devices or

2   do they also tell you when to use the devices?

3     A. I think, to some point it's all inclusive.

4     Q. Okay.  Do you understand as you sit here

5   today that your policy on, for your deputies to follow

6   on when to use the taser devices, that has to be

7   consistent with the law

8     A. Correct.

9     Q. You would agree with that?

10     A. Correct.

11     Q. And is that what you actually follow in

12   developing your policy, is the law.

13     MR. SPURLIN:  Object to the form.

14     A. Sure.

15     Q. And not just the TASER policy --

16     A. Yeah.

17     Q. But I'm talking about any policy.

18     A. Any policy has to coincide with the law.

19     Q. Right.  And so, my question to you is, is

20   you as a Sheriff's Department, did you take TASER's

21   training materials on how to use the device and just

22   say that's going to be our policy?

23     A. Not, to a certain degree, but totally

24   inclusive.

25     Q. Did you use it as some guidance in

1    developing that policy?

2         A.   Sure.

3              MR. SPURLIN:  Object to the form.

4         Q.   But that's not something that you would

5    equate training materials into that equals our policy?

6         A.   No, we don't, we don't take the training

7    from anybody and create policy, as word for word.

8         Q.   Right.  Just like with firearms, right.

9    Firearms have warnings.

10        A.   Correct.

11        Q.   Do you take firearm warnings and say that's

12   going to be our policy?

13             MR. SPURLIN:  Object to the form.

14        A.   Not inclusive.

15        Q.   Right.  But it's something that you can

16   consider in developing your policy, right?

17             MR. SPURLIN:  Object to the form.

18        A.   Right.

19        Q.   And when it comes to the use of the TASER

20   device, per your department policy, do you know of any

21   absolute prohibition saying you cannot deploy a taser

22   device more than three times?

23        A.   No.

24        Q.   Do you know of an absolute prohibition that

25   says you never can deploy a probe in the chest area?

**ADVANCED COURT REPORTING**

1    A. I'm not aware of one.

2    Q. Mr. Spurlin asked you some questions about

3 prior testimony of Deputy Spurgeon.  Right?  Those

4 are, I think they are probably still in front of you.

5 Plaintiff's Exhibit 41 is Deputy Spurgeon.  Can you

6 see that?

7    A. Yeah.

8    Q. And then Plaintiff's Exhibit 42 was Deputy

9 Tripp.

10    A. Correct.

11    Q. Now, you notice at the top of those

12 transcripts, that was from the State Court case,

13 right?

14    A. Right.

15    MR. SPURLIN:  Object to the form.

16    Q. And so, you aren't aware of any testimony,

17 let me know, are you aware of any testimony that

18 Deputy Spurgeon and Deputy Tripp gave in this case in

19 the federal matter?

20    A. No.

21    Q. And when Mr. Spurlin was asking you

22 questions about this testimony, he didn't let you

23 know, what they testified to in this matter in the

24 federal case, did he?

25    MR. SPURLIN:  Object to the form.  Sworn

```
 1           testimony is sworn testimony.
 2                     MS.  NGUYEN: Is that --
 3                     MR. WILLIAMS:  Speaking objection?
 4                     MS. NYUGEN:  Is your answer, no?
 5                     MR. SPURLIN:  Sure, it's a speaking
 6           objection.  I'm going to make another one too.
 7                     MR. WILLIAMS:  I thought you were opposed to
 8           this.
 9                     MR. SPURLIN:  Sworn testimony is admissible
10           in any case regardless of when it's taken, and
11           everyone knows what the federal rules say about that.
12                     MR. WILLIAMS:  That's correct.
13           Q.   (By Ms. Nguyen)  Sheriff, I'm sorry, your
14           answer to that question is no?
15           A.   I'm not aware.  No.
16           Q.   Okay.  That's all the questions I have,
17           Sheriff.  Thank you.
18                            EXAMINATION
19           BY MR. WILLIAMS:
20           Q.   Sheriff Scarbrough, I want you to take a
21           look at the, I don't know if this was previously
22           admitted.  Tift County Sheriff's Office conducted
23           energy weapons written policy.
24                     MR. WILLIAMS:  I don't have a marked copy.
25           I've got Defendant's Bates stamps seven through -
```

1           MR. SPURLIN:  I'll tell you which end, you

2      can do which is fine with me.  You can use that one.

3      You can email her an unmarked one if you would like

4      and she can substitute it later?  Because I'm not

5      trying to be difficult to anybody.  You got one?

6           MS. NYUGEN:  It's Defense Exhibit 4.

7           MR. WILLIAMS:  Okay.  Defense Exhibit 4, can

8      I just use this?

9           MS. NYUGEN:  Yeah, that's an extra.

10      Q.   (By Mr. Williams)  Let me hand you this

11      since we already marked and she can make it an

12      exhibit.

13           Do you recognize that exhibit as a copy of policy

14      from the Tift County Sheriff's Office on conducted

15      energy weapons?

16           (Whereupon, Defense Exhibit 4, having previously

17      been marked for identification, was exhibited to the

18      witness.)

19      A.   Correct.

20      Q.   And it's previously been testified that this

21      was a policy in place at the time of this incident is

22      that your understanding, do you know?

23           MR. SPURLIN:  Object to the form, leading.

24      A.   Yes, sir.

25      Q.   Okay.  Take a look at that and tell me if

1    you see any limitation on the number of times that a
2    taser can be used?
3        A.   No.
4        Q.   So, you don't see any.  Okay.  So, you're
5    not aware of any policy provision in the Tift County
6    Sheriff's Office that would prevent it, prohibit
7    discharges of a five second burst of a taser for more
8    than three times?
9            MR. SPURLIN:  Object to the form, leading.
10       A.   No, sir.
11       Q.   And as to aiming at the chest area, do you
12   see anything in the policy, written policy that
13   prohibits a deputy from aiming a taser at the chest
14   area?
15       A.   Not the chest area, no sir.
16       Q.   Let me direct your attention to item number
17   12.  Does that provide that the chest area is a
18   secondary target for the use of the taser?
19           MR. SPURLIN:  Object to the form, leading.
20       A.   The chest area creates center mass, so yes
21   sir.
22       Q.   So, in fact, let's just read.  Read the,
23   read number 12 into the record.  What does that, what
24   does that say?
25       A.   In preparation of firing when reasonable,

1          the TASER M26/X26 shall be pointed in a safe

2          direction, taken off safe and then aimed.  Center mass

3          of the subject's back in the primary aiming point and

4          center mass of the chest or legs are secondary

5          targets.

6               Q.   So, if it's a secondary target, is that

7          permissible to aim at?

8                    MR. SPURLIN:  Object to the form.

9               A.   Correct.

10              Q.   You previously testified you haven't been

11         through the training?

12              A.   No, sir.

13              Q.   You don't do the training?

14              A.   No, sir.

15              Q.   You, do you defer to your training officers

16         as to the implementation of the Tift County Sheriff's

17         Office policy in connection with the taser training

18         materials?

19

20              A.   Yes.

21              Q.   Do you recall Major Torres mentioning to

22         you, after this incident, that he had reviewed the

23         video regarding the use of the taser by Deputy Tripp

24         and Spurgeon.

25              A.   Yes, sir.

**ADVANCED COURT REPORTING**

1    Q. Do you believe that Major Torres did an

2  evaluation of that in regard to whether he believed

3  the tasers were used appropriately?

4     MR. SPURLIN:  Object to the form.

5    A. That was his belief as he related it to me.

6    Q. Okay.  All right.  No further questions.

7  Thank you.

8       FURTHER CROSS EXAMINATION

9  BY MR. SPURLIN:

10    Q. Sheriff, I can't let you go without keeping

11  you a little longer.

12    A. Yeah.

13    Q. I want you to look at Exhibit number 9 with

14  me.

15    A. Number 9?

16    Q. It's the TASER one.

17    A. Oh, the TASER?  Okay.

18    Q. Yes, sir.  You were asked some questions

19  about this?  You were aware whether you knew this

20  particular document was used or not, that your

21  delegates, Captain Whitley and Major Torres, used

22  TASER or Axon information in training, right?

23    A. Sure.  Yes.

24    Q. And number two, on this form it says read

25  and obey the warnings and materials provided by Axon,

1    correct?

2         A.    Correct.

3         Q.    And it says read, understand and follow all

4    current instructions, warnings and relevant TASER

5    training materials, correct?

6         A.    Correct.

7         Q.    It doesn't tell the officers who are being

8    certified they can use discretion to disregard the

9    instructions, warnings and TASER training materials,

10   does it?

11        A.    No.

12        Q.    Tells them to read, understand, follow and

13   obey, right?

14        A.    Correct.

15        Q.    And it says, failure to do so increases the

16   risk of death or serious injury, correct?

17        A.    Correct.

18        Q.    Okay.  And then in the middle of the page in

19   this block right here where a big warning --

20        A.    Correct.

21        Q.    -- sign is, it says, if not avoided, could

22   result in death or serious injury, correct?

23        A.    Correct.

24        Q.    And then the next warning at the bottom of

25   the page says CEW exposure causes certain effects,

 1          including physiologic and metabolic changes, stress
 2          and pain, correct?
 3               A.   Correct.
 4               Q.   So, even if the person is not completely
 5          incapacitated, this tells the person using the TASER
 6          weapon that exposure will have physiologic and
 7          metabolic changes, stresses and pain on the person,
 8          correct?
 9                    MS. NYUGEN:  Object to form, misstates
10          document.
11               A.   Possibly.
12               Q.   And it says those effects are cumulative,
13          right?  So, if you shoot them more than one time, they
14          add on to one another, correct?
15                    MR. WILLIAMS:  Object to form.
16                    MS. NYUGEN:  Same objection.
17               A.   Correct.
18               Q.   Isn't that what cumulative means?
19               A.   Correct.
20               Q.   Okay.  And then it says, in the last
21          sentence, repeated, prolonged or continuous CEW
22          applications may contribute to cumulative exhaustion,
23          stress, cardiac, physiologic, metabolic, respiratory
24          and associated medical risk, correct?
25               A.   Correct.

**ADVANCED COURT REPORTING**

1    Q.    Now, let me stop right there.  You were

2    asked some questions by Mr. Williams about your

3    written policy, correct?

4    A.    Correct.

5    Q.    When we began this deposition, I asked you

6    were there other things passed down through the chain

7    of command that were not in writing?  You said, yes,

8    correct?

9    A.    Correct.

10    Q.    And I asked you did you expect those to be

11    followed the same as written policies?  You said yes,

12    correct?

13    A.    Correct.

14    Q.    Verbal commands are expected to be followed,

15    correct?

16    A.    Correct.

17    Q.    Training from your delegates, Wingate,

18    Whitley and Captain I mean, Major Torres, are expected

19    to be followed, correct?

20    A.    Correct.

21    Q.    Whether they're in written policy or not,

22    correct?

23    A.    Correct.

24    Q.    Okay.  And you expected the people getting

25    this TASER certification to follow these warnings,

1           correct?

2                A.   Correct.

3                Q.   Okay.  Now, look at page two with me.  I'm

4           not going to read it all.  But if you'll look at the

5           second paragraph.  It talks about people who are

6           particularly susceptible, and I'm highlighting.  It

7           said including elderly, those with heart conditions,

8           those with asthma, those with pulmonary conditions,

9           those suffering from excited delirium, profound

10          agitation, severe exhaustion, drug intoxication,

11          chronic drug abuse or over exertions from a physical

12          struggle.  Is that a warning that you expected your

13          deputies to follow?

14               MS. NYUGEN:  Object to form.

15               A.   Where is that at now?

16               Q.   Yes, sir.  It's this paragraph right here.

17          The second one.

18               A.   Some individuals --

19               Q.   You can read it to yourself.

20               A.   Wait a minute.

21               Q.   Let me see.  It's on the back probably.

22               A.   Oh, it's on the back, back here.

23               Q.   Your copy's front and back, Sheriff.

24               A.   Okay.

25               MR. WILLIAMS:  Yeah, yeah, it's right there.

**ADVANCED COURT REPORTING**

1          A.    Okay.  From here, some individuals.  Right.

2          Q.    Read it to yourself.  When you look up, I'll

3     ask my question again.

4          A.    Okay.

5          Q.    The training materials did tell anyone who

6     read this and took the course that there are some

7     individuals who are more susceptible to injury or

8     death from the taser weapon, correct?

9                MR. WILLIAMS:  Object to form.

10               MS. NYUGEN:  Join.

11         A.    Correct.

12         Q.    And you expected your deputies to follow

13    that training in deciding when to use the taser

14    weapons, correct?

15               MS. NYUGEN:  Object to form.

16         A.    Depending on the circumstances.

17         Q.    All right.  But did Major Torres or Captain

18    Whitley ever tell any of the deputies what particular

19    circumstances they could use their discretion in to

20    use the taser weapon on any of those populations?

21         A.    I'm not aware.

22         Q.    Okay.  And you're not aware of any specific

23    training any deputy in the Tift County Sheriff's

24    Department ever received on a specific hypothetical

25    fact situation when they could violate those warnings?

1              MR. WILLIAMS:  Object to form.

2              MS. NYUGEN:  Object to form.

3         A.   I'm not aware of it.

4         Q.   And the warning at the bottom that's in the

5    box warns that exposure in the chest area has a

6    probability of inducing extra heartbeats, correct?

7         A.   Correct.

8         Q.   And it says cardiac capture can lead to

9    cardiac arrest, correct?

10        A.   Correct.

11        Q.   And then at the top of the next page.  It

12   has a drawing, and I know this was not in color, out

13   here with the lighter colors of the chest and the head

14   area being areas to try to avoid and it tells you to

15   try to avoid that in the writing.  Does it not?

16        A.   Correct.

17        Q.   Okay.  And it says, I'm reading number two,

18   when practicable avoid intentionally targeting certain

19   areas, which include the chest area, correct?

20        A.   Correct.

21        Q.   Okay.  Acknowledging that you should not

22   intentionally shoot and aim at the chest, right?

23             MR. WILLIAMS:  Object to form.

24             MS. NYUGEN:  Join.

25        A.   Correct.

1      Q.    Okay.  Did you ever instruct, or you ever

2    had any discussion with Torres or Whitley to tell the

3    deputies they're training to ignore that and that they

4    can use the chest area as an area to intentionally

5    target?

6      A.    No, sir.

7      Q.    Did you develop a policy that the training

8    materials and the trainees could ignore that and

9    intentionally target the chest?

10      A.    No.

11      Q.    Okay.  There was a question asked of you

12    about Tripp's testimony.  You remember being asked if

13    you read his sworn testimony, I gave you and if I

14    asked you a question about his sworn testimony in the

15    new case?

16      A.    Correct.

17      Q.    Is there any difference in sworn testimony

18    on Monday and sworn testimony on Tuesday?

19      A.    No.

20      Q.    It's supposed to be under oath and the

21    truth, right?

22      A.    Correct.

23      Q.    If Tripp told the truth the first time he

24    was deposed, closer in time to this, then he

25    intentionally targeted the chest in violation of those

**ADVANCED COURT REPORTING**

1       training materials, correct?

2             MS. NYUGEN:  Object to form.

3             MR. WILLIAMS:  Object to form.

4     A.   I guess, if he was telling the truth.

5     Q.   Okay.  You don't have a reason to believe he

6     would have lied about that, do you?

7             MS. NYUGEN:  Object to form.

8     A.   No.

9     Q.   That would have been against his interests.

10    A.   Correct.

11    Q.   Thank you.

12

13     (Whereupon, at 11.26 p.m. the deposition was

14    concluded, and Plaintiff's Exhibits 41 and 42 and

15    Defense Exhibits 4 and 9 were tendered to the reporter

16    for attachment hereto.  The witness chose to read and

17    sign his deposition.)

18

19

20

21

22

23

24

25

**ADVANCED COURT REPORTING**

1                    E R R A T A   P A G E

2                IN RE:   GENE SCARBROUGH

3    I, GENE SCARBROUGH, the witness herein, have read the
     transcript of my testimony and the same is true and
4    correct, to the best of my knowledge, with the exception
     of the following changes noted below, if any: (Please use
5    additional sheets if needed)

6

7    Page #  Line #      Correction Made    Reason for Correction

8    _____
     _____
9    _____
     _____
10   _____
     _____
11   _____
     _____
12   _____
     _____
13

14   Under penalties of perjury, I declare that I have read my
     foregoing transcript and, together with any changes made
     above, the facts stated herein are true.
15   Date:  _____      _____
16                           GENE SCARBROUGH, DEPONENT

17   Date:  _____      _____
                             WITNESS
18

19   Sworn to and subscribed before me,
     this ___ day of _____, 2022.
20

     _____
21   NOTARY PUBLIC
     My Commission Expires:
22

23   Return to: Advanced Court Reporting, 193 Brooksville Rd., Dawson, GA
              39842 or email kmasoncr@gmail.com
24

25

                    **ADVANCED COURT REPORTING**
                                            Page **100**

1                    D I S C L O S U R E

2
      STATE OF GEORGIA  )
3
      COUNTY OF TERRELL )
4
          Pursuant to Article 10 (b) of the Rules and
5
   Regulations of the Board of Court Reporting of the
6
   Judicial Council of Georgia. I make the following
7
   disclosure:
8
          I am a Georgia Certified Court Reporter and
9
   appeared as a sole practitioner.  I was contacted by
10
   the offices of Spurlin & Spurlin to provide court
11
   reporting services for the deposition.  The deposition
12
   was not taken under any contract prohibited by
13
   O.C.G.A. 9-11-28(c), and my usual and customary rates
14
   will be charged to all parties in the case.  A
15
   financial disclosure will be provided to any party
16
   that requests same.
17
          Witness my hand this the 28th day of February,
18
   2022.
19

20              *Katy Mason*

21              _____
                KATY MASON, CCR
22              #5632-8584-9957-9904

23

24

25

1                    C E R T I F I C A T E

2      STATE OF GEORGIA    )

3      COUNTY OF TERRELL   )

4          I, Katy Mason, Certified Court Reporter, before

5      whom the foregoing was taken, hereby certify that GENE

6      SCARBROUGH was duly sworn by me; that the testimony of

7      said deponent was taken down by me, and was later

8      reduced to written form by me; that the foregoing

9      pages are a true and correct record of the testimony

10     given by said deponent to the best of my ability; that

11     I am neither counsel for or related to the parties to

12     the action in which this deposition was taken, nor any

13     attorney or counsel employed by the parties hereto;

14     nor am I financially interested in the outcome of this

15     action.

16          Witness my hand this 28TH day of February, 2022.

17

18                        _____

19                        KATY MASON, CCR
                          #5632-8584-9957-9904

20

21

22

23

24

25

**ADVANCED COURT REPORTING**

ERRATA PAGE

IN RE:  GENE SCARBROUGH

I, GENE SCARBROUGH, the witness herein, have read the
transcript of my testimony and the same is true and correct,
to the best of my knowledge, with the exception of the
following changes noted below, if any: (Please use additional
sheets if needed)

| Page # | Line # | Correction Made | Reason for Correction |
|--------|--------|-----------------|----------------------|
| 66-71 | | It is Not a violation of the Tift County Sheriffs Office policies And Procedures or training for a deputy To intentionally aim a taser weapon at a person's chest. In fact, The written policy that deputies are trained on and expected to follow Allows the chest area To be a secondary target area | I was mistaken and my testimony was not correct. As I stated earlier in my testimony I have Never received training on the taser and know very little about How and when to use one. I delegate the Authority To officers who are certified Taser users and Trainers To establish the policies And Procedures and Provide training To the Deputies within The department |

Under penalties of perjury, I declare that I have read my
foregoing transcript and, together with any changes made
above, the facts stated herein are true.

Date: _03/07/2022_ _____
GENE SCARBROUGH, DEPONENT

Date: _03/07/2022_ _____
WITNESS

Sworn to and subscribed before me,
this _7_ day of _March_____, 2022.

_____
NOTARY PUBLIC
My Commission Expires: _Dec. 28, 2024_