IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| MICHAELA UNDERWOOD, as the duly appointed Administratix of the Estate of James Aaron McBrayer, Deceased, *et al.*, | : : : : : | |
| Plaintiffs, | : | |
| v. | : | CASE NO.: 7:21-CV-00040 (WLS) |
| HON. GENE SCARBROUGH, *et al.*, | : : : | |
| Defendants. | : : | |

**ORDER**

**I.   Introduction**

Before the Court is Defendant Axon's Motion (Doc. 47) to Exclude TASER-related Medical Causation Opinions of Medical Examiner. Therein, Defendant AXON moves to exclude the testimony of Dr. Maryanne Gaffney-Kraft ("Dr. Kraft") pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow. Pharms., Inc.*, 509 U.S. 579 (1993). For the reasons that follow Defendant AXON's Motion to Exclude TASER-related Medical Causation Opinions of Medical Examiner is **DENIED**.

**II.   Relevant Procedural History**

Plaintiff commenced the present action on April 9, 2021, by filing a Complaint alleging three (3) causes of action. (Doc. 1). Count One alleges Deprivation of Plaintiff's civil rights by Defendants Scarbrough and Henderson pursuant to 42 U.S.C. § 1983. (*Id.*). Count Two alleges Deprivation of Plaintiff's civil rights by Defendants Tripp and Spurgeon pursuant to 42 U.S.C. § 1983. Count Three alleges a Products Liability claim against Defendant Axon. (*Id.*). Plaintiff also seeks compensatory and punitive damages. (*Id.*).

Defendant Axon subsequently filed the presently pending Motion to Exclude TASER-related Medical Causation Opinions of Medical Examiner on August 31, 2022. (Doc. 47). Plaintiff filed a Response in Opposition (Doc. 65) on September 21, 2022. Defendant Axon filed a Reply (Doc. 71) on October 5, 2022.

### III. Discussion

#### A. Standard for Admissibility of Expert Opinions

The standard for admissibility of expert witness testimony is measured by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In making admissibility determinations, district courts are charged with the duty to perform the gatekeeping role of ensuring expert testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). "[T]he test of reliability is 'flexible'" in that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho*, 526 U.S. at 141–42 (1999) (quoting *Daubert*, 509 U.S. at 594) (emphasis in original); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) (recognizing district-court determinations of admissibility of expert testimony are reviewed for abuse of discretion). Even with this flexible standard, the Court must still "conduct an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

This gatekeeping role, however, should not "supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Before the expert's opinion testimony can reach a jury, the Court must determine that the offered expert testimony is "properly grounded, well-reasoned, and not speculative." *United States v. Frazier*, 387 F.3d 1244, 1296 (11th Cir. 2004) (Barkett, J., concurring) (quoting FED. R. EVID. 702, advisory committee

2

notes, 2000 amends.). This is critical because unreliable expert testimony has the power and potential to mislead or confuse a lay juror. *See id.* at 1260, 1263. Where there is factual dispute and experts reach differing conclusions, the Court is not authorized to "exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." FED. R. EVID. 702, advisory committee notes, 2000 amends.

Arriving at the conclusion of whether or not to admit expert testimony is no small feat. Fortunately, *Daubert* and its progeny provide guidance. The Court must engage in a three-part inquiry and consider whether,

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th 1998)). *Daubert* identified four, nonexclusive factors for assessing the reliability of an expert's reasoning or methodology. These factors include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey*, 298 F.3d at 1256 (citing *Daubert*, 509 U.S. at 593–94.) The Court may consider other relevant factors outside of the traditional *Daubert* factors, so long as the Court's gatekeeping inquiry is "tied to the facts of a particular case." *Kumho*, 526 U.S. at 150 (internal citation and quotations omitted).

While the Court has rigorous standards to apply in its *Daubert* inquiry, the proponent of the expert testimony also carries the burden to show that their expert's opinion is reliable by a preponderance of the evidence. *See Allison*, 184 F.3d at 1312; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). With this framework in mind, the Court will now assess the reliability of each the challenged expert's methodology.

### B. Relevant Facts

Dr. Kraft is the medical examiner with the Georgia Bureau of Investigation ("GBI"), who conducted a medical investigation into the cause of Plaintiff's death. (Doc. 54-1, Dr. Kraft's Report, at 1–7). Dr. Kraft concluded that Plaintiff's death was caused by "excited delirium," or the physiological response of the body to "struggle." (Doc. 55, Dr. Kraft's State Dep., at 16–18); (Doc. 54, Dr. Kraft's Dep., at 57). Excited delirium does not have a single cause. (Doc. 54, at 58). Instead, the potentially lethal physiological response can stem from a variety of stressors such as overexertion, mental or psychiatric distress, preexisting medical conditions, drug use, and physical pain, (*See* Doc. 54, at 57–60, 73, & 75–76). These stressors cause a person's adrenal glands to release catacholamines, classically epinephrine and norepinephrine, which increase their pulse, blood pressure, and heart's demand for oxygen. (Doc. 55, at 17–18, 63–64). At the same time, the muscle breakdown caused by exertion causes a release of potassium into the bloodstream. (Doc. 55, at 18). When the stressors end, catecholamine levels continue to rise, and potassium levels fall sharply to below normal levels — a period dubbed "post-struggle peril." (Id. at 20). During this post-struggle peril, the excited delirium may cause death because high levels of catecholamines increase stress on the heart while the lower-than-normal potassium increases the risk of cardiac arrhythmia. (Id).

Excited delirium is a controversial diagnosis in the wider medical community. (Doc. 54, at 62–63). It is, however, recognized as a valid diagnosis in the forensic pathologist community. (Doc. 54, at 66–67). For example, the National Association recognizes Excited Delerium. (*Id.*) Dr. Kraft attributes this disconnect to the difference in focus of forensic pathologists to other physicians. (*Id.*, at 67–68). In particular, forensic pathologists determine the cause and manner of death, and therefore, as a cause of death, excited delirium is more relevant to their community. (*See Id.*) By contrast, excited delirium is less relevant to other specialties who do not focus on causes of death in already deceased individuals. (*Id.*).

In Plaintiff's case, Dr. Kraft opined, the aggregate physiologic effect of the stressors he experienced in the early hours of the morning on the day he died caused excited delirium, which ultimately caused his death. (*See* Doc. 54-1, at 1–7). In particular, Dr. Kraft concluded that Plaintiff's cause of death was "excited delirium in conjunction with physical altercation,

4

including TASER controlled energy weapon ("TASER CEW") use, and cocaine and mitragynine toxicity." (Doc. 54-1, at 1); (Doc. 54, at 159). Dr. Kraft based this conclusion on an autopsy, toxicology report, vitreous testing results, the GBI investigative summary, the body-worn cameras of the police officers involved, photos taken form the scene, and a reference textbook which described excited delirium. (*Id.*, at 18–28).

With respect to the TASER's contribution to Plaintiff's death in particular, Dr. Kraft concluded to "within a reasonable degree of medical probability," that the officer's use of the TASERs on Plaintiff contributed to his cause of death from excited delirium. (Doc. 54, at 1, 5–7); (Doc. 55, at 67). Dr. Kraft opined that the pain of the officer's TASER deployment into Plaintiff, contributed to the aggregate physiological stress response which ultimately caused Plaintiff's death. (Doc. 54, at 110, 128).

### C. Defendant's Motion to Exclude Dr. Kraft's TASER-related Opinion

Defendant Axon argues that this Court should exclude Dr. Kraft's opinion that TASER use contributed to Plaintiff's death for two reasons. (Doc. 47, at 14–17) First, because Dr. Kraft's opinion is inadmissible speculation, and second, because Dr. Kraft's Opinions do not fit this case or assist the jury. The Court will address each in turn.

#### i. Inadmissible Speculation

Defendant contends that because Dr. Kraft did not actually know whether Plaintiff was experiencing pain, her opinion that it increased Plaintiff's stress response is mere speculation, and, therefore, is inadmissible. (Doc. 47, at 15).

This Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. In evaluating Dr. Kraft's evidence under the *Daubert* regime, this Court must therefore determine whether her conclusions are "genuinely scientific," rather than mere "unscientific speculation offered by a genuine scientist." *Allison*, 184 F.3d at 1317–1318 (citing *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)).

Dr. Kraft is familiar with the mechanics, performance, and effects on the human body of TASER Controlled Energy Weapons ("TASER CEWs") as a forensic pathologist. (Doc. 54, 42–43). She has included the use of TASER CEWs as a contributing cause of

death in approximately ten previous cases. (*Id.*, at 48). Dr. Kraft opined that the pain caused by TASER CEW deployments increases the body's stress response. (*See* Doc. 54, at 16–23.). Dr. Kraft therefore concluded that, because Plaintiff had suffered a number of TASER CEW deployments, the pain caused by those deployments caused physiological changes which contributed to Plaintiff's death from excited delirium. (*See Id.*); (*See* Doc. 55., at 120–21).

The TASER CEWs Officers Tripp and Spurgeon could be deployed in two ways: (1) probe mode, and (2) drive-stun. (Doc. 47-7, at 12–21). In probe mode, the TASER CEW shoots two probes from a distance into a target which penetrate the target's skin, muscle, and fat. (Id., at 115); (Doc. 58, at 57). If the probes successfully penetrate, they can form a circuit within the target's body, potentially incapacitating the muscle between the probes—an effect dubbed neuromuscular incapacitation ("NMI"). (Doc. 57, at 93–95). Probe mode may also cause the target pain. (*See* Doc. 58, at 95). In drive-stun mode, the TASER CEW is discharged directly into the target and causes pain through electricity arcing between the two electrodes pressed into, but not necessarily puncturing, the target's skin. (Doc. 54, at 133–35). Drive-stun mode is not intended to achieve NMI, instead it aims to achieve "pain-compliance." (Doc. 54, at 112–13).

Officer Tripp deployed his TASER CEW into Plaintiff in probe mode. (*See* Doc. 47-7, at 13–21, 24). Both probes punctured Plaintiff's chest through his skin and into his subcutaneous tissue. (Doc. 54-1, at 3). Officer Tripp then activated his TASER CEW four times each for a duration of five seconds. (Doc. 47-7, at 13). Although the spread of the probes made it unlikely that the deployments caused NMI, the probes discharged electricity through Plaintiff's tissue for at least 5 seconds. (Doc. 47-7, at 24). Officer Spurgeon deployed his TASER CEW into Plaintiff in drive-stun mode. (*See* Doc. 47-7, at 21–24). According to the Bryan Chiles' report analyzing the deployment, Officer Spurgeon's deployment had the potential to cause "pain-compliance" for at least 5.2 seconds. (*Id.*, at 24).

Here, Defendant AXON argues that Dr. Kraft did not have sufficient basis to opine that the TASER CEW deployments into Plaintiff caused him physical pain. The Court disagrees. There is, in fact, ample basis from which Dr. Kraft could have reached such a conclusion. The Court will provide a few examples. First, Dr. Kraft's autopsy revealed

6

physical injuries from the TASER probe punctures. (Doc. 54-1, at 3). Second, because Dr. Kraft was familiar with TASER CEWs as a medical pathologist, she was aware that Tasers are *designed* to cause pain in drive-stun mode. (Doc. 54, at 115). Third, as a medical examiner, Dr. Kraft has dealt with approximately 10 previous cases in which law enforcement TASER CEWs contributed a death. (Doc. 54, at 47–48). Fourth, Dr. Kraft has reviewed papers on the physiological effects of TASER CEW deployment. (Doc. 54, at 116). Fifth, Dr. Kraft experienced the painful effects of a similar CEWs when one was deployed on her in drive-stun mode. (Doc. 54, at 179–80). There is no reason to conclude, as Defendant Axon suggests, that Dr. Kraft failed to apply "the same level of intellectual rigor that characterizes the practice of an expert" in her field of medical pathology in reaching her opinion that the TASER CEW deployments on Plaintiff caused him physical pain, thereby contributing to the excited delirium which caused his death.

To cast doubt on Dr. Kraft's conclusion, Defendant AXON offers its own theory about why the TASER CEW deployments did not cause Plaintiff physical pain. (*See* Doc. 47, at 11). Defendant AXON's theory is that Plaintiff was experiencing a "mind-body disconnect" caused by adrenaline, drug intoxication, and psychiatric symptoms. (*Id.*). Dr. Kraft conceded in her deposition that Defendant Axon's mind-body disconnect theory was plausible. (*See Id.*, at 120–128). Defendant Axon, in positing its alternative theory invites this Court, essentially, to exclude Dr. Kraft's medical opinion because Defendant's mind-body disconnect theory better explains the circumstances surrounding Plaintiff's death. (*See* Doc. 47, at 15). Balancing the evidence in such a way, however, far exceeds this Court's gatekeeping role in a *Daubert* inquiry and invades the province of the fact finder. Accordingly, the Court will not exclude Dr. Kraft's TASER-related medical opinion in favor of Defendant Axon's alternative theory.

In sum, Dr. Kraft had sufficient basis from which to conclude that Defendant experienced physical pain which contributed to his excited delirium. Accordingly, the Court will not exclude Dr. Kraft's conclusion as inadmissible speculation.

### ii. Fit for the Case and Assisting the Jury

Defendant Axon next argues that the Court should exclude Dr. Kraft's TASER related medical testimony because her opinions "do not fit this case or assist the jury." (Doc.

47, at 16). Rule 702, in addition to reliability, also requires expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue. *Daubert*, 509 U.S. at 591 (citing FED R. EVID. R. 702). In other words, expert testimony must not only be reliable, but also helpful. *United States v. Williams*, 865 F.3d 1328, 1338 (11th Cir. 2017) (citing *Daubert*, 509 U.S. at 591). Rule 702, accordingly, requires expert testimony to have "a valid scientific connection to the pertinent inquiry"—commonly called "fit." *Id.* Dr. Kraft's testimony is offered to explain "the role the Taser played in contributing to [Plaintiff's] death—essentially, causation. (Doc. 65, at 4). Accordingly, the Court must determine if her TASER related medical testimony is sufficiently connected to the elements of Plaintiff's case.

As jurisdiction over Plaintiff's products liability claim is based in supplemental jurisdiction, the Court will apply federal procedural law and Georgia substantive law. *See McDowell v. Brown*, 392 F.3d 1283, 1294–1295 (11th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938)). Plaintiff, in Count III of the Complaint, alleges a "failure to warn" products liability claim. (Doc. 1, at 27 ¶¶ 59–68). Because Plaintiff's products liability claim is before this Court pursuant to supplemental jurisdiction, Georgia law defines the pertinent inquiry. *See McDowell*, 392 F.3d at 1294.

To prevail on a failure to warn products liability claim, a plaintiff bears the burden to show that the product was the "cause-in-fact" and "proximate cause" of plaintiff's injury. *See Mann v. Taser Int'l Inc.*, 588 F.3d 1291, 1304 (11th Cir. 2009) (citing *Atlanta Obstetrics & Gynecology Group, P.A. v. Coleman*, 398 S.E.2d 16, 17 (1990). A defendant's conduct is not the "cause in fact," if the event would have occurred without it. *Mann*, 588 F.3d, at 1304 (citing *Gen. Motors Corp. v. Davis*, 233 S.E.2d 825 (Ga. Ct. App. 1977)). Under Georgia law, when, by nature of the situation, causation may be resolved by expert medical evidence alone, that evidence must be based on, at least, reasonable medical probability. *Allison.*, 184 F.3d at 1320 (11th Cir. 1999) (citing *Maurer v. Chyatte*, 326 S.E.2d 543, 545 (1985). In presenting an opinion on causation, an expert must both express some basis for both "the confidence with which his conclusion is formed, and the probability that his conclusion is accurate." *Rangel v. Anderson*, 202 F. Supp 3d. 1361, 1371 (S.D. Ga 2016) (citing *Zwiren v. Thompson*, 578 S.E. 2d 862, 865 (2003)).

Defendant Axon argues that "because Dr. Kraft cannot demonstrate to a reasonable degree of medical certainty the TASER CEW exposures had a physiological effect on [Plaintiff] . . . Dr. Kraft should not be permitted to speculate on this key question." (Doc. 47, at 16). The Court must first note that because Plaintiff's death can, of course, only be resolved by expert medical advice, the correct inquiry is whether Dr. Kraft concluded, to a reasonable degree of medical *probability* that the TASER CEW deployments contributed to Plaintiff's death.[1]

Here, based on Georgia substantive law, the relevant inquiry is whether Dr. Kraft's TASER-related medical testimony can assist a factfinder in determining whether Plaintiff would have died without the TASER deployments. Dr. Kraft must present this conclusion to a reasonable degree of medical probability, and she must state with confidence the basis for her opinion and the probability that it is accurate.

Dr. Kraft's testimony meets this burden for two reasons. First, as noted, Dr. Kraft points to ample evidence upon which she based her opinion. (*See* Doc. 54-1, at 3, 47–48, 115, 116, & 179–80). Second, Dr. Kraft is clear that TASER deployment contributed to Plaintiff's cause of death within a reasonable degree of medical probability. (Doc. 55, at 66–67) (Doc. 54, at 32, 33, 107–108, 142).

Defendant points to instances in which Dr. Kraft conceded that the other stressors Plaintiff experienced *might* have been sufficient to cause Plaintiff's death, as evidence that Dr. Kraft's opinion is insufficient to establish that the TASER was the "but-for" cause of Plaintiff's death and therefore would be unhelpful to the factfinder. (Doc. 47) (citing Doc. 54, at 145). A review of the record, however, indicates although Dr. Kraft was willing to concede sometimes that there are other hypothetical combinations of stressors which might have been sufficient to cause Plaintiff's death, her opinion in this case remains that the TASER deployments contributed, in this particular situation, to Plaintiff's death. For example, in her state case deposition Dr. Kraft was asked:

---

[1] Defendant Axon's brief cites *Allison* for the applicable standard for medical causation in Georgia, asserting that Dr. Kraft's evidence is "inadmissible in this case unless the opinion is 'to a reasonable degree of medical or scientific certainty.'" 184 F.3d at 1320. This out of context quote from *Allison* seriously misconstrues the Georgia standard for medical causation in Defendant Axon's favor. *See id.*

9

> Q. If they hadn't used the taser and restrained him, he would have lived, you cannot say that to a reasonable degree of probability.
>
> A. I cannot say that. That is correct.

(Doc. 55, at 66). Yet shortly after Dr. Kraft was asked:

> Q. What you can say, though, Doctor, is – within a reasonable degree of medical probability, is that the struggle and the use of the tasers contributed to the cause of death in this case?
>
> A. Yes. They were additive to it.

(Id., at 67). And in her deposition in this case Dr. Kraft was asked:

> Q. And so all of those stressors that we listed, head injury, enlarged heart, vehicle collision, cocaine, kratom, physical exertion of running, police interaction, charging Deputy Tripp, and the prolonged struggle could have, within a reasonable degree of medical probability, caused his death even without the TASER deployments.
>
> A. That is correct.

(Doc. 54, at 145). Yet shortly after Dr. Kraft was asked:

> Q. After having gone through all that examination and having reviewed your report, is there anything about your report . . . that you feel should be changed for any reason?
>
> A. No, there is not . . .
>
> Q. Is it fair then, to say that Mr. McBrayer's death was caused by the . . . totality of these conditions that you described in your report, excited delirium, physical altercation, TASER use, cocaine, and kratom toxicity? They all combined together to cause his death, as opposed to acting independently of each other.
>
> A. That is correct.

(*Id.*, at 159–161). Even though Dr. Kraft conceded some hypothetical situations in which factors other than the TASER CEW deployments would have been sufficient to cause death, the record, in context, reveals that Dr. Kraft was clear in her opinion that the TASER CEW deployments, to a reasonable degree of medical probability, contributed to Plaintiff's death. This fact places Dr. Kraft's testimony in the classic trial position of testing her opinion by

10

cross-examination, since she provides the support for her findings and her opinion and stands by her opinion. The Court, therefore, rejects Defendant's argument that such concessions render her opinions unhelpful to the factfinder.[2]

In sum, because Dr. Kraft presented her conclusion that the TASER deployments into Plaintiff were, to a reasonable degree of medical probability, a contributing cause of Plaintiff's death, and Dr. Kraft sufficiently articulated the ample basis for this opinion, this Court finds that her testimony is sufficiently connected to the facts of the case to survive scrutiny under Rule 702 and *Daubert*. Her testimony would aid the jury in understanding how TASER is employed, how it effects body tissue, and to what degree, if any, the TASER deployments contributed to Plaintiff's death.

## IV. Conclusion

For the foregoing reasons, Defendant Axon's Motion (Doc. 47) to Exclude TASER-related Medical Causation Opinions of Medical Examiner is **DENIED** as to all evidence and argument, subject to Defendant Axon's right to renew specific objection based on the evidence at trial, and not addressed herein.

**SO ORDERED**, this 15th day of September 2023.

                                         /s/W. Louis Sands
                                         **W. LOUIS SANDS, SR. JUDGE**
                                         **UNITED STATES DISTRICT COURT**

---

[2] Although neither party mentions the case in their briefs for the present motion, the Eleventh Circuit inquiry in *Mann v. Taser Int'l* is too similar to the instant case for this Court leave unaddressed. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302–04 (11th Cir. 2009). In *Mann*, the Eleventh Circuit excluded the testimony of a medical expert who opined that the use of a Taser "probably made the situation worse," when analyzing the death of a plaintiff who died of excited delirium during a police encounter. *Id. Mann*, however, is distinguishable from the instant case because, as the Eleventh Circuit remarked, the medical expert in *Mann* failed to "state that the use of the Taser was a cause or contributing cause of death" to any degree of probability or certainty. *Id.* Here, unlike *Mann*, Dr. Kraft clearly articulated her conclusion that the TASER deployments were, to a reasonable degree of medical probability, a contributing cause of Plaintiff's death.