## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

MICHAELA UNDERWOOD, as the     :
duly appointed Administratix of the     :
Estate of James Aaron McBrayer,     :
Deceased, *et al.*,     :     CASE NO.: 7:21-CV-00040 (WLS)
    :
    Plaintiffs,     :
v.     :
    :
HON. GENE SCARBROUGH, *et al.*,     :
    :
    Defendants.     :
_____ :

### ORDER

Before the Court is Defendant Scarbrough; Defendants Tripp, Spurgeon, and Henderson's Motions (Doc. 45-4 & 45-5) for summary judgment. For the reasons that follow, Defendants Scarbrough, Tripp, Spurgeon and Henderson's Motions for summary judgment are **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I.   RELEVANT PROCEDURAL BACKGROUND

Plaintiffs commenced the present action on April 9, 2021, by filing a Complaint alleging three (3) causes of action. (Doc. 1). Count One alleges Deprivation of Mr. McBrayer civil rights by Defendants Scarbrough and Henderson pursuant to 42 U.S.C. § 1983. (*Id.*) Count Two alleges Deprivation of Mr. McBrayer's civil rights by Defendants Tripp and Spurgeon pursuant to 42 U.S.C. § 1983. (*Id.*) Count Three alleges a Products Liability claim against Defendant Axon. (*Id.*) Plaintiffs also seek compensatory and punitive damages. (*Id.*) Defendants Scarbrough, Tripp, Spurgeon, and Henderson filed their answer on June 07, 2021. (Doc. 10).

Defendants Scarbrough; and Defendants Tripp, Spurgeon and Henderson filed Motions for summary judgment (Docs. 45-4 & 45-5) on August 31, 2022. (Doc. 45). Therein, Defendants Scarbrough; and Defendants Henderson, Spurgeon, and Tripp contend that they are entitled to summary judgment on Plaintiffs' Section 1983 claims. (Docs. 45-4 & 45-5).

1

Plaintiffs filed a Response (Doc. 67) on September 21, 2022. On October 19, 2022, Defendants Scarbrough; and Defendants Henderson, Spurgeon, and Tripp filed Replies to Plaintiffs' Response (Docs. 78 & 79).

All parties have filed their respective responses, and the motion for summary judgment are fully briefed and ripe for ruling.

## II.   RELEVANT FACTUAL BACKGROUND

The following facts are derived from Plaintiffs' Complaint (Doc. 1); Defendants' Answer to the Complaint (Doc. 10); the Parties' Statements of Material Facts (Docs. 45-3 & 67-2); Defendants Scarbrough, Tripp, Spurgeon, and Henderson's Motions for summary judgment (Docs. 45-4 & 45-5); Plaintiffs' Response to Defendants' Motions for summary judgment (Doc. 67); Defendants' Scarbrough, Tripp, Spurgeon, and Henderson's Reply to Plaintiffs' response (Docs. 78 & 79); the Depositions in the record (Docs. 50–56, 58, 60, 63 & 74); and all exhibits attached to the foregoing documents. Where relevant, the factual summary also includes undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to Plaintiffs as the nonmoving party. See Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

On April 24, 2019, Mr. James Aaron McBrayer was involved in a single vehicle accident on Hall Road in Tift County, Georgia. (Doc. 1 ¶ 9). This collision occurred "in the area of [Mr. McBrayer's] family property." (*Id.*) As a result of this accident, which left Mr. McBrayer's car in a ditch, Mr. McBrayer received a severe head injury. (*Id.*)

After the accident, Mr. McBrayer appears to have exited his vehicle and "went on to his family's property." (Doc. 1 ¶ 10). Mr. McBrayer subsequently began to yell for help. (*Id.*) Neighbors in the vicinity heard Mr. McBrayer's yells and called 911. (*Id.*) Those neighbors "reported that they heard someone crying out for help." (*Id.*) The neighbors did not provide any additional pertinent information when calling 911. (*Id.*) The 911 dispatcher sent Defendant Sheriff's Deputy Connor Spurgeon ("Defendant Spurgeon") to the scene. (*Id.*)

When Defendant Spurgeon arrived at the scene he found Mr. McBrayer's vehicle—a silver truck—in a ditch on the side of the road. (Doc. 1 ¶ 11); (Doc. 40, at 18). Upon inspection

of the vehicle, Defendant Spurgeon noted that the vehicle had been in a wreck, as evidenced by the fact that the airbags had deployed and that there was nobody near the vehicle. (Doc. 40, at 18).

Shortly thereafter, Ms. Angie McBrayer, Mr. McBrayer's ex-wife allegedly stated that Mr. McBrayer needed a medical evaluation and treatment. (Doc. 1, at ¶ 11); (Doc 40, at 18). While Ms. McBrayer and Defendant Spurgeon were talking, Defendant Sheriff's Deputy Anthony Tripp, Jr. ("Defendant Tripp") arrived at the scene. (Doc. 1, at ¶ 12); (Doc. 39, at 26); (Doc. 45-3, at 2 ¶ 5); (Doc. 50, at 26 ¶ 26). The record is unclear whether Defendant Tripp stopped to speak with Defendant Spurgeon and Ms. McBrayer. What is clear, however, is that Defendant Tripp set off alone to "see if we could determine who was—who was asking for help. (Doc., 1 ¶ 12); (Doc. 39, at 26 & 40); (Doc. 40, at 23).

Defendant Tripp subsequently encountered Mr. McBrayer at 381 Hall Road. (Doc. 51, at 24–25). When Defendant Tripp encountered Mr. McBrayer, Mr. McBrayer was leaning up against a building, in a crouched position with his elbows on his knees. (Doc. 50, at 31). While Defendant Tripp did not identify himself as a police officer or use his vehicle's emergency lights or sirens, at the time he encountered Mr. McBrayer, Defendant Tripp was in uniform and driving a marked police vehicle. (Doc. 46-3, at 2 ¶ 3, 3 ¶ 8); (Doc. 67-2, at ¶ 1) (Doc. 50, at 26, 248).

Defendant Tripp approached Mr. McBrayer by driving his vehicle closer. (Doc. 45-3, at 2 ¶¶ 8-9); (Doc. 64-1, at 2 ¶ 1). Defendant Tripp drove his vehicle closer to Mr. McBrayer, but before they could communicate, Mr. McBrayer got up and ran away from Defendant Tripp, around the building. (Doc. 45-3, at 2 ¶ 9) (Doc. 67-2, at 2 ¶ 2) (Doc. 50, at 32–33). Mr. McBrayer then circled back to the front of the building, crouching behind a backhoe bucket under a lean-to approximately thirty-five (35) feet from Defendant Tripp. (Doc. 45-3, at 2 ¶ 10); (Doc. 67-2, at 2); (Doc. 50, at 33–33). During this time, Mr. McBrayer was yelling things such as "God hates you," and talking about the devil. (Doc. 45-3, at 2 ¶ 6) (Doc. 67-2, at 2 ¶ 1); (Doc. 50, at 36).

Deputy Tripp then drew his Taser and instructed Mr. McBrayer to stop and show his hands several times. (Doc. 45-3, at 2 ¶ 11); (Doc. 67-2, at 2 ¶ 3) (Doc. 50, at 36). Defendant Tripp testified that Mr. McBrayer's flight and behavior were inconsistent with someone who

needed help, and that Mr. McBrayer's behavior, based on Defendant Tripp's training and experience as a law enforcement officer, raised the possibility that he was using drugs. (Doc. 45-3, at 3 ¶ 16) (Doc. 67-2, at 3 ¶ 5); (Doc. 50, at 38–39). Defendant Tripp also testified that he did not know at this time whether Mr. McBrayer "was the reason that somebody [else] was yelling for help." (Doc. 50, at 35).

The encounter escalated after Defendant Tripp ordered Mr. McBrayer to show him his hands and Mr. McBrayer ran at Defendant Tripp. (Doc. 45-3, at 3 ¶ 20); (Doc. 67-2, at 3 ¶ 7); (Doc. 50, at 46). Perceiving Mr. McBrayer to be hostile, Defendant Tripp deployed his Taser into Mr. McBrayer's chest when Mr. McBrayer was approximately ten (10) feet from Defendant Tripp. [1] (Doc. 45-3, at 3 ¶ 24); (Doc. 67-2, at 4 ¶ 10); (Doc. 50, at 52–53); (*See* Doc. 48-9, at 6). According to Defendant Tripp, Mr. McBrayer seemed to be unaffected, in that neuromuscular incapacitation ("NMI") was not achieved, as evidenced by the fact that Mr. McBrayer continued to run toward Defendant Tripp. (Doc. 50, at 55).

Given that Mr. McBrayer continued to run toward Defendant Tripp, Defendant Tripp backpedaled establishing a distance of approximately twenty (20) feet. (Doc. 50, at 57). At this point, Mr. McBrayer fell to his hands and knees. (*Id.*, at 57). Believing that Mr. McBrayer was surrendering, Defendant Tripp approached. (*Id.*, at 58). As Defendant Tripp approached, Mr. Mc Brayer got back up and ran at Defendant Tripp again. (*Id.*) While the exact sequence of events is unclear, what is clear is that Mr. McBrayer struck Defendant Tripp in the face and Defendant Tripp reactivated his Taser. (*Id.*, at 62). During the encounter, Defendant Tripp activated the Taser four (4) times. (Doc. 48-9, at 12).

At this point, Defendant Spurgeon arrived on the scene. (Doc. 51, at 29). When Defendant Spurgeon attempted to take Mr. McBrayer into custody, Defendant Spurgeon's kneecap was dislocated. (Doc. 51, at 31–32). Defendant Spurgeon fell onto Mr. McBrayer and proceeded to wrestle with him on the ground. (Doc. 51, at 31–33). Defendant Spurgeon then

---

[1] When a Taser is deployed in "prong-mode," the weapon shoots two probes which are designed to pierce the target's skin and tissue. (Doc. 48-, at 7–14). Once the probes are deployed, the officer may then "trigger" the Taser which sends high voltage pulses through the probes, which, ideally, creates a circuit within the targets body incapacitating the muscles in between the probes—an effect dubbed neuromuscular incapacitation ("NMI"). (Doc. 48-, at 7–14). Whether NMI is achieved, however, depends on a number of factors such as (1) the spread of the probes, (2) whether the probes form a closed circuit, and (3) the location of the probes on the subject's body. (*Id.* at 11).

drew his Taser and applied the weapon to Mr. McBrayer twice in "drive-stun"[2] mode. (Doc. 51, at 35); (Doc. 48-9, at 10–11). According to Defendant Spurgeon, there was no opportunity to find out more about what was going on with Mr. McBrayer, or to deescalate the situation, prior to this sequence of events. (Doc. 51, at 40–43).

Deputies restrained Mr. McBrayer on the ground for several minutes while waiting for backup to arrive. (Doc. 51, at 46). During this time, Defendant Spurgeon called on the radio for an EMS dispatch for his knee injury. (Doc. 81, at 45). In order to maintain control, Deputies applied pressure to Mr. McBrayer's torso and, according to Defendant Spurgeon, Mr. McBrayer continued to actively resist detention. (Doc. 51, at 45–47).

Once backup arrived, deputies then handcuffed Mr. McBrayer and placed him in a hobble strap. (Doc. 45-3, at 12 ¶ 95); (Doc. 67-2, at 13 ¶ 36). Deputies then lifted Mr. McBrayer into the back seat of a patrol car. (Doc. 51, at 47).

At some point after Mr. McBrayer was placed in the patrol car, he stopped breathing. (Doc. 45-3, at 14 ¶¶ 112-117); (Doc. 67-2, at 18 ¶ 46). Mr. McBrayer was not given a medical assessment before he stopped breathing. (Doc. 51, at 173). Mr. McBrayer was pronounced dead at the scene. (Doc. 54-1, at 6).

## III.    STANDARD OF REVIEW

### A.  Motion for Summary Judgment Standard

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

[2] When a Taser is deployed in "drive-stun" mode, the officer places the Taser electrodes directly against the target's skin and trigger the weapon. (Doc. 48-9, at 21). Drive-stun applications do not create the potential for NMI, instead, they are designed to cause pain to the target, thereby creating "pain-compliance." (*Id.*)

     (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).[3]

     Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

     The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Moreover, to avoid summary judgment after the movant has met its burden, the nonmoving party must "do more

---

[3] Pursuant to Local Rule 56 the movant for summary judgment shall attach to the motion a separate statement of the material facts about which the movant contends there is no genuine dispute to be tried. M.D. Ga. L.R. 56. The respondent shall attach to their response a separate statement of material facts to which respondent claims there exists a genuine dispute to be tried. Here, both parties have complied with Local Rule 56.

than simply show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587-88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. LAW AND ANALYSIS

### A. Defendants Tripp, Spurgeon and Henderson's Motion for Summary Judgment

Defendants Tripp, Spurgeon and Henderson ("Deputy Sheriff Defendants") move for summary judgment on Plaintiffs' claims under 42 U.S.C. § 1983 for violations of Plaintiffs' civil rights. (Doc. 45-5, at 1). Plaintiffs allege that the Deputy Sheriff Defendants deprived Mr. McBrayer of his due process rights under the Fourteenth Amendment of the United States Constitution; and his right to be free from an unreasonable seizure under the Fourth Amendment to the United States Constitution and Article I, Section I. Paragraph 13 of the Constitution of the State of Georgia. (Doc. 1, at 15–16 ¶ 35, 26 ¶ 55). The Deputy Sheriff Defendants make various arguments, the Court will address each in turn.

#### 1. Qualified Immunity

The Deputy Sheriff Defendants, assert that they are entitled to the protection of Qualified Immunity for Plaintiffs' claims for violations of his Fourth and Fourteenth Amendment rights. (Doc. 45-5, at 10). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

There are two parts to the qualified immunity analysis: (1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct. *Id.* at 232. Whether qualified immunity is available as a defense is a question of law for the court. *Ansley v. Heinrich*, 925 F.2d 1139, 1348 (11th Cir. 1991).

The Eleventh Circuit has held that:

> To be eligible for qualified immunity, the official must first establish that he was performing a discretionary function at the time the alleged violation of federal law occurred. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was clearly established at the time he did it.

*Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (internal quotation marks omitted) (citations omitted). Thus, in the Eleventh Circuit, the Court first determines whether Defendants Tripp, Spurgeon and Henderson were engaged in a discretionary function before moving on to determine whether Plaintiffs have presented relevant facts that Defendant committed a constitutional violation, and that violation was clearly established at the time of the Deputy Sheriff Defendants' conduct. "To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities." *Id* at 1332 (internal quotations marks omitted) (citation omitted).

In this case, the Deputy Sheriff Defendants are law enforcement officers who are being sued for apprehending and detaining a suspect. (*See generally*, Docs. 50 & 51). Plaintiffs do not object to this characterization. (*See* Doc. 67). Additionally, the record evidence shows that Defendants were acting in their capacity as law enforcement officers at the time of the incident. Accordingly, the Court finds that the Deputy Sheriff Defendants were engaged in a discretionary function, the Court, therefore, turns to whether Plaintiffs have presented relevant facts that the Deputy Sheriff Defendants committed a constitutional violation, and, if so, whether that violation was clearly established at the time of the violation.

### i.    Fourth Amendment Claims

Plaintiffs allege that the Deputy Sheriff Defendants, by detaining Mr. McBrayer without reasonable suspicion, and using excessive force against Mr. McBrayer, violated his "right to be free from all unreasonable seizure under the 4th Amendment of the United States Constitution." (Doc. 1, at 25 ¶ 53). The Deputy Sheriff Defendants argue that they are entitled to summary judgment on the claims arising under the Fourth Amendment because the record demonstrates that Defendants Tripp and Spurgeon's conduct did not violate the Fourth Amendment, and even if it did, their conduct did not violate clearly established law, thus entitling Defendants Tripp and Spurgeon to qualified immunity. (Doc. 45-5, at 20).

### a.    Constitutional Violation

The Court's first inquiry is whether the facts, taken in the light most favorable to Plaintiffs, show that the Deputy Sheriff Defendants violated Mr. McBrayer's Fourth Amendment Rights. The Deputy Sheriff Defendants' use of force on Mr. McBrayer raises two issues. Whether the deputies, in the first place, had the authority to detain, or "seize," Mr. McBrayer, and second, whether the force they used to detain him—including the applications of their Tasers—was excessive. The Court will address both.

Under the Fourth Amendment, officers may detain a person if, based on the totality of the circumstances, that officer has reasonable suspicion that "criminal activity may be afoot." *United States v. Arvizu*, 543 U.S. 266, 273 (2002) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *Terry v. Ohio*, 392 U.S. 1, 31 (1968). The determination of reasonable suspicion must be based on "commonsense judgments and inferences about human behavior." *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000) (citing *Illinois. v. Wardlow*, 528 U.S. 119, 125 (2000). If officers lacked the right to detain a person, then any force they used was, *per se*, unreasonable. *Derowitsch v. Granger*, 783 Fed. Appx. 979, 984 (11th Cir. 2019) (citing *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000)). Although an individual may, ultimately, turn out to be engaged in perfectly lawful conduct, officers may detain the individual to resolve the ambiguity. *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (citing *Wardlow*, 528 U.S. 119, 125 (2000)). The analysis hinges upon the information available to the officer at the time of detention. *See Lewis*, 674 F.3d at 1305.

Detention begins when an officer restricts a person's freedom of movement. *West v. Davis*, 767 F.3d 1063, 1071 (11th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)). The parties do not dispute that Deputy Tripp "drew his Taser and shined his flashlight at [Mr.] McBrayer, telling him to stop and show his hands several times." (Doc. 45-3, at 2 ¶ 11) (Doc. 67-2, at 2 ¶ 3). When Deputy Tripp pointed his Taser and told Mr. McBrayer to stop, Mr. McBrayer's movement was restricted, and, accordingly, the Court finds that Mr. McBrayer's detention within the meaning of the Fourth Amendment began then. The Court will only consider what information was available to Deputy Tripp at the time he detained Mr. McBrayer.[4]

Here, Plaintiffs allege that Deputy Tripp "had no reason to suspect that Mr. McBrayer had committed any crime." (Doc. 1, at 17–18 ¶ 41).[5] The facts, even if construed in the light most favorable to Plaintiffs, compel a different conclusion; there were a number of circumstances from which Deputy Tripp could reasonably conclude that criminal activity might be "afoot." Defendant Tripp responded to a 911 call about somebody yelling for help, and then when Defendant Tripp arrived, he observed Mr. McBrayer's vehicle crashed into a ditch. (Doc. 50, 21–30). Defendant Tripp then heard yelling and, when he followed the sound of the yelling, he found Mr. McBrayer. (Doc. 45-3, at 2 ¶ 5-6); (Doc. 67-2, at 2 ¶ 1). Deputy Tripp testified that he believed that Mr. McBrayer's flight and behavior were inconsistent with someone who needed help, and there might be someone else who needed assistance because of Mr. McBrayer's actions. (Doc. 45-3, at ¶ 3); (Doc. 67-2, at 2 ¶1). And when Deputy Tripp found Mr. McBrayer, he suspected that Mr. McBrayer might have been using intoxicants from his behavior. (Doc. 45-3, at 3 ¶ 16) (Doc. 67-2, at 3 ¶ 5). As the Deputy Sheriff Defendants

---

[4] The Deputy Sheriff Defendants appear to suggest that the fact that Mr. McBrayer subsequently attacked the Sheriff Defendants is relevant to determining whether Mr. McBrayer's Detention was reasonable. (Doc. 45-5, at 16). The Court, however, will consider only the circumstances that were apparent before Mr. McBrayer's detention began in determining the reasonableness of that detention. Accordingly, the Court finds Mr. McBrayer's subsequent attack irrelevant at this stage of the analysis.

[5] The Court notes that it has great difficulty deciphering Plaintiffs' arguments in its briefs, as the Court has noted in other Orders in this case (*See* Docs. 81 & 84), For example, much of Plaintiffs' reply brief refers to "Tiers" of encounters between civilians and police which, as a Georgia state criminal law issue, has little relevance to Plaintiffs' Section 1983 federal constitutional claims. To the extent possible, however, the Court will attempt to appropriately recharacterize Plaintiffs' arguments to respond to the issues presented by Defendants in their Motion for summary judgment.

correctly note, these circumstances could create, at least, a reasonable suspicion that Mr. McBrayer had been driving under the influence of alcohol or drugs or might be a danger to the person who was calling for the help. (Doc. 45-5, at 15). Accordingly, the Court finds, as a matter of law, that Defendant Tripp had, at least, reasonable suspicion of criminal activity. Accordingly, Deputy Tripp's detention of Mr. McBrayer, by itself, did not violate Mr. McBrayer's Fourth Amendment rights.

Plaintiffs next allege that Defendants Tripp and Spurgeon "used excessive force in holding Mr. McBrayer down," and that their use of Tasers was "objectively unreasonable and constituted excessive force against Mr. McBrayer." (Doc. 1, at 24 ¶¶ 51-52). The undisputed facts, and the facts construed in the light most favorable to the Plaintiffs, compel a different conclusion.[6]

After Deputy Tripp pointed his Taser at Mr. McBrayer, Mr. McBrayer ran toward Deputy Tripp with his arms raised, screaming unintelligibly. (Doc.  45-3, at 3 ¶ 20); (Doc. 67-2, at 3 ¶ 7); (Tripp Body Camera, at 0:40, *et seq*). Deputy Tripp deployed his Taser in "prong mode" and the probes struck Mr. Mc Brayer in the chest. (Doc., 45-3, at 3 ¶ 24 & 4 ¶ 25); (Doc. 67-2, at 4 ¶¶ 10-11). When Defendant Tripp triggered the Taser Mr. McBrayer did not collapse in a manner that suggested that the Taser achieved NMI. (Doc. 45-3, at 4 ¶ 30); (Doc. 67-2, at 5 ¶ 13). The Taser appeared to have only a deterrent effect on Mr. McBrayer, who ran back a short distance and got down on all fours. (Doc. 45-3, at 4 ¶ 29); (Doc. 67-2, at 5 ¶ 13). Defendant Tripp triggered his Taser a second time and ordered Mr. McBrayer to "stop and get down." (Doc. 45-3, at 4 ¶ 31); (Doc. 67-2, at 5 ¶ 13).

At this point, Defendant Tripp thought Mr. McBrayer was surrendering, and Defendant Tripp began moving toward Mr. McBrayer. (Doc. 45-3, at 5 ¶¶ 33-34); (Doc. 67-2, at 5 ¶ 13). As Defendant Tripp approached, Mr. McBrayer got up and charged Defendant Tripp who triggered his Taser a third time. (Doc. 45-3, at 4 ¶ 34); (Doc. 67-2, at 5 ¶ 13). Again, the Taser had no apparent effect. (Doc. 45-3, at 4 ¶ 35); (Doc. 67-2, at 5 ¶ 13). Mr. McBrayer

---

[6] Although for the purposes of the instant motions, the Court must view the facts in the light most favorable to the nonmoving party, the Court need not consider characterizations by the nonmoving party which are blatantly contradicted by the record, such as a video recording. *Baxter v. Roberts*, 54 F.4th 1241, 1258–59 (11th Cir. 2002) (citing *Scott*, 54 F.4th at 380). Accordingly, when the video recordings plainly show a particular fact, the Court will accept that fact as true for the purposes of this motion, unless Plaintiff points to some other part of the record which genuinely calls that fact into question.

then hit Defendant Tripp in the face and knocked him down. (Doc. 50, at 62).[7] After getting up, Defendant Tripp triggered his Taser a third time, which again, had no apparent effect on Mr. McBrayer. (Doc. 45-3, at 4 ¶ 37); (Doc. 67-2, at 5 ¶ 15).

Defendant Spurgeon then arrived in his patrol vehicle, disembarked and approached Mr. McBrayer and began giving commands for Mr. McBrayer to put his hands behind his back. (Doc. 45-3, at 5–6 ¶¶ 40, 43); (Doc. 67-2, at 6 ¶¶ 17, 19). Mr. McBrayer was talking about Jesus, God and the devil, and seemed agitated and was "flailing about." (Doc. 45-3, at 6 ¶ 45, 45); (Doc. 67-2, at 6 ¶ 19). At first, Mr. McBrayer was on his hands and knees but when Defendant Spurgeon moved to cuff Mr. McBrayer's left wrist, Mr. McBrayer pulled away and flailed his arms. (Doc. 45-3, at 6 ¶ 47); (Doc. 67-2, at 6 ¶ 19). Deputy Spurgeon went to the ground with Mr. McBrayer and began struggling with him. (Doc. 45-3, at 7 ¶ 50); (Doc. 67-2, at 7 ¶ 21). During the struggle, Deputy Spurgeon's patella was dislocated. (Doc. 45-3, at 6 ¶ 48); (Doc. 67-2, at 7 ¶ 20).

Once Mr. McBrayer was on the ground, both Defendant Tripp and Spurgeon attempted to get Mr. McBrayer's arms under control while Mr. McBrayer resisted these attempts. (Doc. 45-3, at 7 ¶ 54); (Doc. 67-2, at 7 ¶ 22). Defendants Tripp and Spurgeon commanded Mr. McBrayer to roll over, with no apparent effect. (Doc. 45-3, at 7 ¶ 55); (Doc. 67-2, at 7 ¶ 22). As Mr. McBrayer continued to resist Defendants Tripp and Spurgeon's attempts to control him, Deputy Spurgeon applied his Taser in drive-stun mode to Mr. McBrayer's side. (Doc. 45-3, at 8 ¶ 59); (Doc. 67-2, at 7 ¶ 22). Despite the Taser application, Mr. McBrayer remained on his back and continued to wriggle and resist with his arms. (Doc. 45-3, at 8 ¶ 58); (Doc. 67-2, at 7 ¶ 22). Deputy Spurgeon applied the taser in drive-stun mode a second time. (Doc. 45-3, at 7 ¶ 61); (Doc. 67-2, at 7 ¶ 22). After about 30 seconds of further

---

[7] Paragraph 35 of the Deputy Sheriff Defendants' Statement of Undisputed Facts which says that "McBrayer hit Deputy Tripp in the face, knocking him down." (Doc. 45-3, at 5 ¶ 36). Plaintiffs' response "As to paragraph thirty-six (36), Plaintiffs again state that the bodycam shows what it shows but submit that the bodycam video does not show Mr. McBrayer hitting Defendant Tripp in the face of knocking him down Plaintiffs do agree that Defendant Tripp testified at page 62 of his deposition that Mr. McBrayer struck him in the face and knocked him down." (Doc. 67-2, at 5 ¶ 14). The Court is unclear from Plaintiffs' response if Plaintiffs dispute that Mr. McBrayer hit Defendant Tripp. However, because Defendant Tripp testified that Mr. McBrayer hit Defendant Tripp, the video shows that Defendant Tripp was knocked down, and Plaintiffs have pointed to no portion of the record which contradicts Defendant Tripp's testimony, the Court will credit Defendant Tripp's testimony that Mr. McBrayer hit him in the face and knocked him down as true as record evidence in support of Defendants' assertion of a fact as to which no genuine material dispute exists.

wrestling on the ground, Defendants Tripp and Spurgeon managed to get Mr. McBrayer rolled onto his front. (*See* Tripp Body Cam, at 1:55 *et seq.*) While Mr. McBrayer was face down on the ground, Defendant Tripp placed his knee and hand on Mr. McBrayer's neck. (Doc. 50, at 125–128).

For the next several minutes until other officers arrived, Defendants Tripp and Spurgeon attempted to gain control of Mr. Breyer's arms to place Mr. McBrayer in handcuffs while Mr. Breyer resisted these efforts.[8] (Tripp Body Cam, at 2:23). When other deputies arrived, a deputy grabbed Mr. McBrayer's legs and Mr. McBrayer began to struggle more. (Doc. 45-3, at 12 ¶ 92); (Doc. 67-2, at 12 ¶ 34). Eventually, four deputies managed to place Mr. McBrayer in handcuffs and a hobble strap. (Doc. 45-3, at 11–12 ¶¶ 93, 95); (Doc. 67-2, at 12 ¶ 34, 13 ¶ 36). After being placed in handcuffs and a hobble strap Mr. McBrayer stopped resisting. (Tripp Body Cam 10:40 *et seq.*)

The right to make an arrest or an investigatory stop carries with it the right to use, at least some, physical coercion to effect it. *Lee*, 284 F.3d at 1197. The Fourth Amendment, however, also protects the right to be free from the use of excessive force during an arrest. *Johnson*, 18 F.4th at 1273 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). Whether force is reasonable depends on "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737–738 (11th Cir. 2010) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)).

A law enforcement official is entitled to qualified immunity for use of force during an arrest if an objectively reasonable officer could have believed the use of force was not excessive. *Brown*, 608 F.3d at 737–738. A court should examine objective reasonableness using

---

[8] Plaintiffs dispute that Mr. McBrayer continued to resist Defendants Tripp and Spurgeon's attempts to gain control of him while Mr. McBrayer was face down on the ground until he was placed in handcuffs. (*See* 67-2, at 8 ¶ 27). However, Deputy Tripp and Spurgeon both testified that Mr. McBrayer actively resisted their attempts to place him in handcuffs during that time. (Doc. 50, at 189–90); (Doc. 51, at 45). The Court notes that Defendant Tripp's body camera appears to corroborate Defendant Trip and Spurgeon's testimony, and certainly does not contradict it. (Tripp Body Camera, at 2:23 *et seq.*) Plaintiffs direct the Court to no portion of the record which suggests that Mr. McBrayer stopped resisting Deputy Tripp and Spurgeon before he was in handcuffs. *See* (Doc. 67); *See* (Doc. 67-2) Accordingly, even construing the record in the light most favorable to Plaintiffs, the Court finds that Mr. McBrayer continued to actively resist Defendants Tripp and Spurgeon until he was placed in handcuffs. Therefore, as to this issue, no genuine dispute of material fact remains.

the following, non-exhaustive, factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety to the officers or others," (3) "whether [the subject] is actively resisting arrest or attempting to evade arrest by flight, and (4) the relationship between the need for force and the amount of force used. *Mobley v. Palm Beach Cty. Sheriff Dept.*, 783 F.3d 1347, 1355 (11th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Under this standard, a court must judge an officer's use of force "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" *Johnson*, 18 F.4th at 1272 (citing *Brown*, 608 F.3d at 1272).

Here, each of the factors explained in *Mobley* support a finding that the force Defendants Tripp and Spurgeon used was not excessive. The Court will address each in turn.

First, although the potential crimes that formed the basis of Defendant Tripp's suspicion were relatively minor (e.g., driving under the influence), by the time Defendants Tripp and Spurgeon applied the bulk of the force to Mr. McBrayer, they suspected him of much more serious offenses. For example, Mr. McBrayer charged at Defendant Tripp with his arms raised, which Defendant Tripp, understandably, interpreted as indicating that Mr. McBrayer would assault him, an offense which, later, Mr. McBrayer completed when he hit Defendant Tripp in the face. The Eleventh Circuit has found that officers may use greater force in response to similar or lesser offenses. *Mobley*, 783 F.3d at 1356 (holding that officers did not use unreasonable force when they beat and repeatedly Tased a non-compliant man who was suspected of assaulting a police officer with a deadly weapon); *Spencer v. City of Orlando, Fla.* 725 F. Appx 928, 931 (2018) (holding that officers did not use unreasonable, in this case deadly, force when a suspect who, while initially stopped for a minor traffic infraction, fled from officers and drove aggressively during the ensuing chase). Accordingly, the severity of Mr. McBrayer's suspected crimes cuts in favor of a finding that Defendant Tripp and Spurgeon's use of force was reasonable.

Second, throughout the encounter, Mr. McBrayer posed a serious danger to Defendants Tripp and Spurgeon. As noted, Mr. McBrayer struck Defendant Tripp in the face. Deputy Spurgeon's knee was seriously injured in the struggle with Mr. McBrayer. As a result, Deputy Spurgeon needed surgery, ongoing medical care, and physical therapy; and missed work for six (6) months. (Doc. 45-3, at 7 ¶¶ 51-52) (Doc. 67-2, at 7 ¶ 21). These actual injuries

14

suffered by Defendants Tripp and Spurgeon show that Mr. McBrayer posed substantial danger to their safety, and likely continued to pose one until he was under control. Accordingly, the danger to the officers cuts in favor of a finding that Defendant Tripp and Spurgeon's use of force was reasonable.

Third, until Mr. McBrayer was handcuffed and hobble strapped he continued to actively resist Deputy Tripp and Spurgeon's attempts to detain him. Although Plaintiffs contend that Mr. Breyer stopped resisting once he was on the ground, the Court, as discussed at length in footnote 7, finds that, even taking the facts in the light most favorable to the Plaintiff, Mr. McBrayer actively resisted Defendants Tripp and Spurgeon until he was placed in handcuffs. Accordingly, Mr. McBrayer's continued resistance to Defendants Tripp and Spurgeon's attempts to detain him cut in favor of a finding that Defendant Tripp and Spurgeon's use of force was reasonable.

Fourth, the force that the officers used, namely, the four Taser applications by Defendant Tripp in prong mode, the two Taser applications by Defendant Spurgeon in drive stun mode, and the physical struggle to handcuff and hobble strap Mr. McBrayer falls well within the force the Eleventh Circuit has found reasonable to use on suspects who are resisting being handcuffed. *Mobley*, 783 F.3d at 1356 (holding that officers did not use unreasonable force when they beat and repeatedly Tased a man who refused to surrender his hands to be cuffed); *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1330–1336 (11th Cir. 2004) (holding that officers did not use unreasonable force when an officer stepped on a man's face who resisted handcuffing); *Callwood v. Jones*, 727 Fed. Appx. 552, 558–560 (11th Cir. 2018) (holding that officers did not use unreasonable force when officers tased a suspect who was resisting officers on the ground 13 times).[9] Moreover, as soon as Mr. McBrayer was handcuffed, deputies

---

[9] Plaintiffs attempt to distinguish *Callwood* on the grounds that the man who was the subject of the repeated Taser applications in *Callwood* was observed by officers entering homes in the presence of officers which was a more serious crime than officers initially suspected Mr. McBrayer of committing. (Doc. 67, at 18). Plaintiffs' argument, however, identifies a distinction without a legally significant difference. For the purposes of the excessive force analysis, the Court must examine the force that officers used, not only in proportion to the original crime officer's suspected of, but also in the context of the risk a suspect's subsequent conduct poses to officers, and the level of resistance to the officer's attempts to detain the suspect. In *Callwood* the officer's repeated applications of the Taser were reasonable, not based on the suspect's initial offense, but his continued resistance which placed officers in danger. Accordingly, the Court is unconvinced by Plaintiffs' attempt to distinguish *Callwood*.

stopped applying force to him until they picked him up and moved him to the car. (Tripp Body Camera at 10:30 et *seq.*) The Eleventh Circuit treats "the point at which a suspect is handcuffed and poses no risk of danger to the officer," as a "pivotal point for excessive force claims." *Mobley*, 783 F.3d at 1356. In other words, severe force applied to suspects after being handcuffed and no longer posing a threat to officers is generally excessive, but force applied when a suspect "has not given up and stopped resisting," is not necessarily excessive. *Id.* (citing *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008)); *Lee*, 284 F.3d at 119). Accordingly, the fact that Defendants Tripp and Spurgeon applied force only when Mr. McBrayer was actively resisting and then ceased the application of force once Mr. McBrayer was safely handcuffed cuts in favor of a finding that Defendant Tripp and Spurgeon's use of force was reasonable.

In sum, each of the *Mobley* factors cut in favor of a finding that Defendants Tripp and Spurgeon's force was reasonable, and the analysis of those factors reveals ample Eleventh Circuit authority finding that officers were not unreasonable in using greater force than Defendants Tripp and Spurgeon did on Mr. McBrayer, in situations which warranted less force. The Court, therefore, finds that Defendant Tripp and Spurgeon, as a matter of law, reasonably believed that the force they applied to Mr. McBrayer was, objectively, not excessive. Accordingly, Defendants Tripp and Spurgeon's use of force against Mr. Brayer did not violate his Fourth Amendment Right to be free from excessive force during a detention.

### b.    Clearly Established Law

Even assuming for the sake of argument, that Defendants Tripp and Spurgeon's use of force violated Mr. McBrayer's Fourth Amendment rights, they would still be entitled to qualified immunity because Plaintiffs cannot show that the right they violated was sufficiently clear—the second part of the qualified immunity analysis.

In the Eleventh Circuit, a constitutional right is clearly established for qualified immunity purposes when it is, "sufficiently clear that every reasonable official would have understood what he is doing violates that right," *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Typically, a Plaintiff can show that a constitutional violation was clearly established by pointing to case, in existence at the time, in which the Eleventh Circuit or the United States Supreme Court has found a violation based on "materially similar facts." *Johnson,* 18 F.4th at 1274.

Here, the Court's discussion of Eleventh Circuit Authority has shown that the Circuit consistently finds cases in which officers have used more force, with less justification to be reasonable. In light of this, the Court certainly cannot find that every reasonable official would have known that applying force in such a way to Mr. McBrayer violated his Fourth Amendment rights. Accordingly, even if the Court assumes that Deputy Tripp and Spurgeon's use of force violated Mr. McBrayer's Fourth Amendment rights, that right was not clearly established, and, therefore, Deputy Tripp and Spurgeon would still be protected by qualified immunity.

In sum, therefore, because the Court finds that Defendants did not violate Mr. McBrayer's Fourth Amendment rights, Defendants are entitled to qualified immunity for Plaintiffs' Fourth Amendment claims. Accordingly, the Court **GRANTS** the Deputy Sheriff Defendants' Motion for summary judgment with respect to Plaintiffs' 4th Amendment Claims.

### ii.    Denial of Medical Care

Plaintiffs allege that the Deputy Sheriff Defendants, by failing to recognize Mr. McBrayer's need for medical assessment and medical care, deprived Mr. McBrayer of "due process under the Fourteenth Amendment of the United States Constitution." (Doc. 1, at 26 ¶ 55). The Deputy Sheriff Defendants argue that they are entitled to summary judgment on the claims for denial of medical care under the Eighth Amendment because the record shows that Defendants Tripp, Spurgeon, and Henderson were not deliberately indifferent to Mr. McBrayer's serious medical need, and even if they were, their conduct did not violate clearly established law, thus entitling the Deputy Sheriff Defendants to qualified immunity. (Doc. 45, 27–30).

### a.    Constitutional Violation

The Court's first inquiry is whether the facts, taken in the light most favorable to Plaintiffs, show that the Deputy Sheriff Defendants violated Mr. McBrayer's Fourteenth Amendment Due Process Rights by denying him medical care.

Claims of deliberate indifference to serious medical needs, typically, invoke the Eighth Amendment prohibition against "cruel and unusual punishment" in situations when prisoners are denied medical care while incarcerated. *City of Revere v. Mass. General Hosp.*, 463 U.S. 239, 243–234 (1983). Eighth Amendment protections, however, attach only after the state has

secured "a formal adjudication of guilt." *Id.* (citing *Ingraham v. Wright*, 430 U.S. 651, 671–672, n.40 (1977)). The Due Process Clause, however, also requires the responsible government actors to provide care to persons who have been injured while being apprehended by police. *Mann v. Taser Intn'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (citing *City of Revere*, 463 U.S. at 244). Nonetheless, claims by plaintiffs who have been injured while being apprehended by police are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment. *Mann*, 588 F.3d at 1306 (citing *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1574 (11th Cir. 1985).

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. Const. amend VIII. The Eighth Amendment, however, extends beyond proscribing "physically barbarous" punishments. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). In *Estelle*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'. . .  proscribed by the Eighth Amendment. *Id.* at 104–105. To establish that the Deputy Sheriff Defendants were deliberately indifferent to Mr. McBrayer's serious medical needs, Plaintiffs must show: (1) Mr. McBrayer had a serious medical need; (2) the Deputy Sheriff Defendants were deliberately indifferent to the risk posed by that need; and (3) causation between that indifference and Mr. McBrayer's injury. *Goebert v. Lee Cty*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citing *Tessier v. Sheriff of Monroe Cty, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005)).

After placing Mr. McBrayer in handcuffs and a hobble strap, Deputies left Mr. McBrayer face down on the ground for approximately one (1) minute, during this time Mr. McBrayer can be heard moaning unintelligibly. (Tripp Body Camera, at 10:00 *et seq.*) Deputies then picked Mr. McBrayer up by his handcuffed arms and legs and placed him into the back of a patrol car. (*Id.* at 10:55, *et seq.*) Despite Mr. McBrayer's weight being suspended nearly entirely from his handcuffed arms behind his back, he made no sound of protest or discomfort. (*Id.* at 10:59 *et seq.*) Deputy Spurgeon admitted that it would have been "uncomfortable" for Mr. McBrayer to be carried in such a position. (Doc. 51, at 188). When Mr. McBrayer was placed in the car deputies were aware he was unconscious; Defendant Tripp testified that "he believed [Mr. McBrayer] had passed out," and Defendant Spurgeon testified "he didn't become unconscious until he was in the vehicle." (Doc. 50, at 271–272); (Doc. 51,

at 173–174). When Mr. McBrayer was placed in the back seat of a patrol car, face down, he was entirely motionless. (Hancock Body Camera, at 1:47 *et seq.*) Plaintiffs point out that Mr. McBrayer "does not appear to be breathing"—an observation the Court finds it hard to disagree with. (Doc. 67-2, at 12 ¶ 35); (Hancock Body Camera, at 1:47 *et seq.*)

After placing Mr. McBrayer in the patrol car, Deputies then closed the doors of the car, leaving Mr. McBrayer alone in the vehicle and unmonitored. (Tripp Body Camera, at 11:30 *et seq.*) Several minutes later, Defendant Henderson instructed Deputy Dallas Hancock to check on Mr. McBrayer. (Hancock Body Camera, at 5:00 *et seq.*) Deputy Hancock opened the door and asked Mr. McBrayer "hey, you still here man?" and shook Mr. McBrayer. (*Id.* at 5:20 *et seq.*) Mr. McBrayer remained entirely limp, and again, the Court cannot disagree with Plaintiffs' assessment that Mr. McBrayer did not appear to be breathing. (*Id.*) Approximately nine (9) minutes after Mr. McBrayer was placed in the car, Deputy Henderson opened the patrol car door and shone his flashlight on Mr. McBrayer and shook him, Mr. McBrayer appeared to be completely limp, and once again, did not appear to be breathing. (Henderson Body Camera, at 9:30 *et seq.*) Deputy Henderson asked Deputy Tripp "he's still breathing and all that?" (Henderson Body Camera, at 9:05 *et seq.*) Defendant Tripp then touched Mr. McBrayer's neck, and "felt what [he] believed to be a pulse." (Doc. 50, at 113).

Approximately nine (9) minutes after Mr. McBrayer was placed in the patrol car, EMS arrived. Henderson Body Cam at 8:40 et seq. Deputy Spurgeon had called for EMS during the struggle with Mr. McBrayer. (Doc. 45-3, at 11 ¶ 91); (Doc. 67-2, at 12 ¶ 34). The call for service, however, was for Deputy Spurgeon's knee injury and did not mention Mr. McBrayer. (Tripp Body Camera, at 5:20 *et seq.*) When EMS arrived, they did not check on Mr. McBrayer, instead, they began to assess Deputy Spurgeon. (Henderson Body Camera, at 8:20 *et seq.*) Several minutes after EMS arrived, Defendant Henderson informed EMS "he's passed out on the back seat, he's on something." (Henderson Body Camera, at 9:42 *et seq.*) EMS then walked over to the patrol car and began to assess Mr. McBrayer through the open door. EMS determined that "the decedent was found to be in cardiac arrest." (Doc. 48-4, at 7) Mr. McBrayer was pronounced dead at the scene. (*Id.*)

Plaintiffs argue that the Deputy Sheriff Defendants conduct amounted to deliberate indifference to Mr. McBrayer's serious medical need. (Doc. 67, at 24). The Court will address each of the elements Plaintiffs are required to show in turn.

First, Plaintiffs must show that Mr. McBrayer had a serious medical need.  A serious medical need is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would recognize as needing medical attention. *Hill v. Deklab Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 2009), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Because Mr. McBrayer was not diagnosed as needing medical care until after the conduct Plaintiffs complain of, the question is whether a lay person would recognize him as needing medical attention. Unconsciousness alone, even to a layperson, "should serve as a strong indicator of the need for immediate medical attention, at least where . . . context doesn't indicate a benign explanation." *Patel v. Lanier Cty. Ga.*, 969 F.3d 1173, 1189 (11th Cir. 2020) (holding that a reasonable jury could infer that a detainees needs were serious because he was lying unconscious on the floor of the police vehicle, breathing fast and the vehicle was very hot). The Eleventh Circuit has also held, specifically, that excited delirium, the ultimate cause of Mr. McBrayer's death can present a serious medical need. *Mann*, 588 F.3d at 1307.

Here, the Deputy Sheriff defendants argue that Mr. McBrayer "had not displayed a medical problem that required treatment beyond having EMS check him after they arrived." (Doc. 45-5, at 28). The Court disagrees. The record is undisputed that, at the time Mr. McBrayer was placed in the back of the patrol car, he was unconscious. Both Defendants Tripp and Spurgeon testified that Mr. McBrayer was "passed out," or "unconscious," and the body camera footage corroborates their observations. (Doc. 50, at 271–272); (Doc. 51, at 173–174); (Hancock Body Camera, at 1:47 *et seq.*) And each time deputies checked on Mr. McBrayer they found him unconscious. (Hancock Body Camera, at 5:00 *et seq.*)

The Deputy Sheriff Defendants further argue that, to a lay deputy, Mr. McBrayer's condition was consistent with someone "who is highly intoxicated and/or had worn themselves out"—an apparently benign explanation. The Court finds this argument, unpersuasive. Although intoxication may cause unconsciousness, it does not follow that, if police find someone unconscious who they suspect might also been intoxicated, the person's

unconsciousness does not still suggest a need for immediate medical attention. Moreover, Mr. McBrayer was not merely unconscious when he was placed in the back of the patrol car, he appeared to have stopped breathing—a much more severe sign of medical need that is not consistent with mere intoxication or exhaustion. (Tripp Body Camera, at 11:22 *et seq.*); (Henderson Body Camera, at 9:42 *et seq.*) Even if intoxication might be considered a benign explanation for unconsciousness, a lay person would understand that ceasing breathing presents a serious medical need. Accordingly, the Court finds that a reasonable jury could conclude that Mr. McBrayer had a serious medical need that was obvious enough for a lay person to recognize.

Second, Plaintiffs must show that the Deputy Sheriff Defendants were deliberately indifferent to Mr. McBrayer's serious medical need. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). In order to prove deliberate indifference, the Eleventh Circuit requires a plaintiff to show (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that exceeds gross negligence. *Wade v. McDade*, 67 F.4th 1363, 1370–1374 (11th Cir. 2023).

Imputed or collected knowledge cannot serve as a claim of deliberate indifference. *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008); *see Farmer v. Brennan*, 511 U.S. 825, 835–40 (1994). Plaintiffs must, therefore, provide evidence that each defendant was subjectively aware of Mr. McBrayer's serious medical need. Here, the record shows that Defendants Tripp, Spurgeon and Henderson were aware that Mr. McBrayer was unconscious. Deputy Tripp testified that "he believed [Mr. McBrayer] had passed out," Defendant Spurgeon testified that Mr. McBrayer "didn't become unconscious until he was in the vehicle." (Doc. 50, at 271–272); (Doc. 51, at 173–174. And a reasonable jury could certainly infer that Defendant Henderson was aware of Mr. McBrayer's condition because Defendant Henderson watched the other deputies place Mr. McBrayer in the patrol car, and he demonstrated awareness that Mr. McBrayer might be in medical distress when he instructed Deputy Hancock to check on Mr. McBrayer. Accordingly, the Court finds that there are sufficient facts in the record to support a finding that each Deputy Sheriff Defendant had subjective awareness of Mr. McBrayer's medical need.

Next, Plaintiffs must show that the Deputy Sheriff Defendants disregarded the risk that they were aware of. Here, there are sufficient facts in the record to show that the Deputy Sheriff Defendants disregarded the risks to Mr. McBrayer because despite having the knowledge that Mr. McBrayer was unconscious, no deputy attempted to render any medical aid to Mr. McBrayer, and, even when EMS arrived, the Deputy Sheriff Defendants allowed EMS to examine Officer Spurgeon's knee injury—which while severe, was not an emergency—for several minutes, before calling EMS over to assess Mr. McBrayer whom they quickly assessed as in cardiac arrest and began resuscitation efforts. Accordingly, the Court finds that there are sufficient facts in the record to show that the Deputy Sheriff Defendants disregarded the risk.

Next, Plaintiffs must show that the Deputy Sheriff Defendants' conduct amounted to more than gross negligence. Deliberate indifference may be inferred from an unexplained delay in treating a known or obvious serious medical condition. *Harris v. Coweta Cty*, 21 F.3d 388, 393–394 (11th Cir. 1994) (citing *Brown v. Hughes*, 894 F.2d 1533, 1537–38 (11th Cir. 1990)). The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. Harris, 21 F.3d at 393–394.

Here, the officers failed to administer *any* aid to Mr. McBrayer from the time that they placed him in the car, apparently not breathing, and the time he was assessed by EMS nearly ten (10) minutes later. (*See* Tripp Body Camera, at 11:00–20:30 *et seq.*) Deputy Sheriff Defendants Tripp, Spurgeon, and Henderson were trained to perform CPR. (Doc. 50, at 16); (Doc. 51, at 178); (Doc. 52, at 71). The only officer asked to check on Mr. McBrayer was, Deputy Hancock who admits he was the least trained officer to evaluate someone's medical needs. (Doc. 53, at 54). Even when EMS arrived, the Deputy Sheriff Defendants, as noted, allowed them to assess Deputy Spurgeon's knee for several minutes without alerting them to Mr. McBrayer's condition.

The Eleventh Circuit has, on more than one occasion, found that there was sufficient evidence for a jury to find that officers were more than grossly negligent for failing to render aid to someone who is unconscious, and possibly not breathing. *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (holding that because a delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive, Defendants were deliberately

indifferent for not rendering aid for 14 minutes); *Patel*, 969 F.3d at 1190 (holding that an officer with first responder training's conduct amounted to more than gross negligence by refusing to respond or to enlist the help of a medical professional when aware of severe heatstroke symptoms, including unconsciousness). Accordingly, the Court finds that there are sufficient facts in the record to support a finding that the Deputy Sheriff Defendants were more than grossly negligent. And, as a result, because there are also sufficient facts in the record to establish that the Deputy Sheriff Defendants had a subjective knowledge of the risk to Mr. McBrayer, and they disregarded that risk, the Court finds that a reasonable jury could conclude that the Deputy Sheriff Defendants were deliberately indifferent.[10]

Third, Plaintiffs must show that the Deputy Sheriff Defendants' deliberate indifference caused Mr. Breyer's injury. A Section 1983 claim requires proof of an affirmative causal connection between a defendant's conduct and the alleged constitutional deprivation. *Troupe v. Sarasota Cty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005) (citing *Zatler v. Wainright*, 802 F.2d 397, 401 (11th Cir. 1986)). A detainee who complains that a delay in medical treatment rose to a constitutional violation, in order to establish causation, must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment. *Hill*, 40 F.3d at 1188, *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. at 739.

Here, Defendants argue that, because Plaintiffs have failed to offer medical evidence that some different response from Defendant, such as earlier CPR or quicker EMS response time) would have saved Mr. McBrayer's life, no reasonable jury could conclude that the officer's delay in medical treatment caused Mr. Breyer's death. (Doc. 78, at 8–9). Although Plaintiffs' ability to establish causation is complicated by their lack of their own medical expert, there is enough evidence in the record from Dr. Maryanne Gaffney-Kraft, the medical examiner who conducted Mr. McBrayer's autopsy, for a reasonable jury to conclude that even

---

[10] The Deputy Sheriff Defendants contend that by calling EMS before Mr. McBrayer was placed into the patrol car, the Deputy Sheriff defendants "discharge[ed] any medical responsibility to him. (Doc. 45-5, at 29). If the Deputy Sheriff Defendants had called EMS specifically to treat Mr. McBrayer, it might well be evidence that they did not disregard his need. That is not the case here, however. Instead, Defendant Spurgeon called EMS to treat his injured knee, not because Mr. McBrayer might have been in medical need, and when EMS arrived, the Deputy Sheriff Defendants had EMS examine Deputy Spurgeon for several minutes before alerting them to Mr. McBrayer's medical need. (Tripp Body Camera, at 5:20 *et seq.*); (Henderson Body Camera, at 8:20 *et seq.*, 9:42 *et seq.*) Accordingly, the Court finds the Deputy Sheriff Defendants' argument that Deputy Spurgeon's EMS call discharged their responsibility to Mr. McBrayer, unpersuasive.

basic CPR might have reduced the chances of Mr. McBrayer's death. For example, Dr. Kraft testified:

> Q. If a person stops breathing while in the back seat of a car with his hands handcuffed behind his back, his leg strapped together, from the moment he stops breathing, how long does he have to be able to have any chance of recovering from that condition?
>
> A. [] I can't put specific numbers; but . . . we're talking about . . . a period of minutes that you would have to respond to that. Again, how many, I couldn't tell you for sure. I [sic] it would definitely be within ten minutes. You know, it could be less, it could be more.

(Doc. 55, at 52). A reasonable jury, as noted, could conclude from the body camera videos that Mr. McBrayer had stopped breathing by the time he was put in the back of the patrol car. EMS finally began CPR nearly 11 minutes later. (*See* Tripp Body Camera, at 11:10-22:21). A jury could, therefore, infer from Dr. Kraft's testimony that the Defendant Sheriff Deputies, who were each trained in CPR, missed the approximately ten-minute window in which CPR might have given Mr. McBrayer a chance of recovering. Accordingly, the Court finds that a reasonable jury could conclude that the Deputy Sheriff Defendants' delay in providing medical treatment caused Mr. McBrayer's injury.

In sum, a reasonable jury could conclude that Plaintiffs have met each of the elements of a deliberate indifference to serious medical needs claims. *See Goebert*, 510 F.3d 1312, 1326 (11th Cir. 2007).

**b.    Clearly Established Law**

The Court turns, next, to whether the Deputy Sheriff Defendants violated clearly established law when they were deliberately indifferent to Mr. McBrayer's serious medical need. In the Eleventh Circuit, a constitutional right is clearly established for qualified immunity purposes when it is, "sufficiently clear that every reasonable official would have understood what he is doing violates that right," *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021) (citing *Mullenix*, 577 U.S. at 11).

Here, as noted, the Eleventh Circuit has, on more than one occasion, found that officers were deliberately indifferent when they failed to render aid to someone who is

unconscious, and possibly not breathing. *Bozeman*, 422 F.3d 1265, 1273 (11th Cir. 2005) (holding that because a delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive, Defendants were deliberately indifferent for not rendering aid for 14 minutes); *Patel*, 969 F.3d at 1190 (holding that an officer with first responder training's conduct amounted to more than gross negligence when he refused to respond or to enlist the help of a medical professional when aware of severe heatstroke symptoms, including unconsciousness). Accordingly, the Court finds that Mr. McBrayer's right to medical care was sufficiently established to put the Deputy Sheriff Defendants on notice that their conducted violated Mr. McBrayer's rights.

In sum, therefore, because the Court finds that a reasonable jury could conclude that Deputy Sheriff Defendants violated Mr. McBrayer's Fourteenth Amendment rights by being deliberately indifferent to Mr. McBrayer's serious medical need, and Mr. McBrayer's right was clearly established under Eleventh Circuit authority, a genuine issue of material fact exists as to Plaintiffs' Fourteenth Amendment claim. Accordingly, the Court **DENIES** the Deputy Sheriff Defendants' Motion for summary judgment with respect to Plaintiffs' Fourteenth Amendment claim.

### 2.     Deprivation of Family Association

The Deputy Sheriff Defendants move for summary judgment on Plaintiffs' deprivation of family association claim. (Doc. 45-5, at 32). In their reply brief, Plaintiffs indicate that they wish to withdraw their claim for deprivation of family association, and do not oppose the Deputy Sheriff Defendants' motion. (Doc. 67, at 31).[11]  Accordingly, the Court **GRANTS** the Deputy Sheriff Defendants' Motion for summary judgment with respect to Plaintiffs' deprivation of family association claim.

### 3.     Plaintiffs' State Law Claims

---

[11] Under Federal Rule of Civil Procedure 41(a), a party may voluntarily move to dismiss a claim without leave of the Court only before either an answer or a motion for summary judgment is filed. FED R. CIV. P. 41(a). After this, a party may only voluntarily dismiss a claim with leave of the Court. Accordingly, because Plaintiffs have not properly filed a motion to dismiss their deprivation of family association claim, the Court will treat their "withdrawal" as a lack of opposition to the Deputy Sheriff Defendants' motion for summary judgment with respect to Plaintiffs deprivation of family association claim.

The Deputy Sheriff Defendants move for summary judgment on Plaintiffs' state law claims asserting various defenses under state law. (Doc. 45-5, at 33–35). Plaintiffs respond that state law defenses are inapplicable, because this is a Section 1983 action. In their reply, the Deputy Sheriff Defendants assert a novel argument: that they are entitled to summary judgment because Section 1983 does not provide a recovery under state law. The Court will attempt to disentangle these arguments.

The complaint alleges three causes of action: two causes of action alleging claims under Section 1983 against Defendants Scarbrough, Henderson, Tripp, and Spurgeon; and one cause of action alleging products liability claims against Defendant Axon. As part of their Section 1983 claims, Plaintiffs allege that Defendants Scarbrough, Henderson, Tripp and Spurgeon, violated various provisions of the Constitution of Georgia, which are "enforceable" through Section 1983. (Doc. 1, at 15–16 ¶ 35, 24 ¶ 51, 25 ¶ 53, 26 ¶ 55, 26–27 ¶ 58). The Complaint further provides that "all damages sought herein are brought under the auspices of 42 U.S.C. Section 1983 and 1988 and through the statutory and common law recognized in the State of Georgia pertaining to damages." (Doc. 1, at 31 ¶ 70). The Court sees no reason to conclude that the complaint states any causes of action under purely state law (e.g., a state law tort for violations of the Georgia Constitution), and to the extent that Plaintiffs intended to articulate any state law causes of action, the Court finds that they were not articulated with enough specificity to put Defendant, or this Court, on notice that Plaintiffs were alleging any purely state law claims.

Even though the complaint does not articulate any purely state law claims, the Deputy Sheriff Defendants move for summary judgment on Plaintiffs' state law claims asserting that the claims are barred by official immunity and 911 immunity; they fail on the merits; and that the justification doctrine shields the officers from liability—all defenses under Georgia State law. (Doc. 45-5, at 35–38). In their original motion, the Deputy Sheriff Defendants fail to make any argument that Section 1983 does not provide a cause of action for violations of state law. Plaintiffs, in their response, correctly, point out that the state law defenses that the Deputy Sheriff Defendants raise are inapplicable to the Section 1983 claims Plaintiffs raise. (Doc. 67, at 37–38).

The Deputy Sheriff Defendants, in their Motion for summary judgment, perhaps realizing their oversight, assert in their Reply "it is settled beyond dispute that section 1983 does not provide a cause of action for violations of state law." The Court agrees. Section 1983 creates a remedy only for deprivations of federal rights. *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002) (citing *Paul v. Davis*, 424 U.S. 693, 698–99 (1976)). Thus, Plaintiffs may not use Section 1983 to recover for violations of the Georgia Constitution, if any.

The court, however, may not consider arguments not properly presented in a party's initial brief or raised for the first time in the reply brief, and such arguments are deemed waived. *In re Egeidi*, 571 F.3d 1156, 1163 (11th Cir. 2009). Even though the Court may agree with the Deputy Sheriff Defendants contention that Section 1983 does not furnish a remedy for violations of the Georgia Constitution, the Deputy Sheriff Defendants' oversight has deprived Plaintiffs of the opportunity to respond and explain why this Court should not grant summary judgment on Plaintiffs' Section 1983 claims for violations of the Georgia constitution.

Accordingly, the Court finds that, because Plaintiffs have not alleged any purely state law claims, the Court **GRANTS** the Deputy Sheriff Defendants' Motion for summary judgment with respect to any state law claims Plaintiffs may have intended to raise, if any. The Court **DENIES WITHOUT PREJUDICE** the Deputy Sheriff Defendants' Motion for summary judgment with respect to Plaintiffs' Section 1983 Claims for violations of the Georgia Constitution, Plaintiffs are **ORDERED** to submit, if they wish to, briefs **within twenty-one (21) days of the entry of this Order**, responding to the Deputy Sheriff Defendants' arguments that they are entitled to summary judgment because Section 1983 does not provide a remedy for violations of the Georgia Constitution. Thereafter, the Court will address Defendants' motion.

### 4.    Punitive Damages

The Deputy Sheriff Defendants move for summary judgment on Plaintiffs claim that they are entitled to punitive damages for the Deputy Sheriff Defendants' violations of Mr. McBrayer's constitutional rights. (Doc. 45-5, at 36). Plaintiffs allege that they are entitled to punitive damages because the Deputy Sheriff Defendants acted with "deliberate indifference, willfulness, wantonness and reckless disregard for the safety of others." (Doc. 1, at 35 ¶ 82).

The Deputy Sheriff Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for punitive damages because the Deputy Sheriff Defendants did not show the requisite "callous indifference" to Mr. McBrayer's rights. (Doc. 45-5, at 36–37)

Punitive Damages are available in a Section 1983 case when a defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others. *Hooks v. Brewer*, 919 F. Appx 923, 931 (11th Cir. 2020) (citing *Smith v. Wade*, 461 U.S. 30, 55 (1983)). Because the Court has already found that there is a triable issue of about whether the Deputy Sheriff Defendants were deliberately indifferent to Mr. McBrayer's serious medical needs, there is also sufficient evidence that the Deputy Sheriff Defendants were recklessly or callously indifferent to Mr. McBrayer's constitutional rights. *Herr v. Armor Corr. Health Servs., Inc.* 494 F. Supp 3d 1197, 1204 (M.D. Fla. 2020) ("as there is a triable issue whether [defendant] was deliberately indifferent to [plaintiff's] serious medical needs, there is also sufficient evidence [defendant] was recklessly or callously indifferent to [plaintiff's] constitutional rights"); *see Jenkins v. Corizon Health Inc.*, 2020 WL 5269405 *8 (S.D. Ga. 2020) ("because this court finds there is a genuine issue of material fact as to whether Augustin was deliberately indifferent to Alexander's medical needs, Plaintiffs' punitive damages claim likewise survives").

Defendant Deputy Sheriffs, next, argue, in their reply brief for the first time, that they are entitled to summary judgment because punitive damages are extinguished by a party's death. As noted, the Court will not consider arguments not properly presented in a party's initial brief or raised for the first time in the reply brief, and such arguments are deemed waived. *In re Egeidi*, 571 F.3d at 1163. The Court, therefore, declines to consider the Defendants argument that any ability to recover punitive damages are extinguished by Mr. McBrayer's death.

Accordingly, the Court **DENIES** the Deputy Sheriff Defendants' Motion for summary judgment with respect to Plaintiffs' claims for punitive damages.

### 5.    Claims against Defendant Henderson

The Deputy Sheriff Defendants move for summary judgment on Plaintiffs' failure to intervene claim against Defendant Henderson. (Doc. 45-5, at 27). Plaintiffs have failed to make arguments in opposition to Defendants' motion in their response. (Doc. 67). The Court, however, may not grant summary judgment solely by virtue of a party's default. *Jones v. Pandey*, 390 F. Supp. 3d 1371, 1375 (M.D. Ga. 2005) (citing *Tr. of Cent. Pension Fund of Int'l Union of Operating Eng'g and Participating Emps. v. Wolfe Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004)). Instead, the Court must conduct an independent review of the record to determine whether summary judgment is appropriate. *Id.*

A police officer may be liable under Section 1983 for failure to intervene for failing to take reasonable steps to protect the victim of another officer's unreasonable force. *See Ensley v.* Soper, 142 F. 3d 1402, 1407 (11th Cir. 1998) (citing *Thompson v. Boggs*, 33 F.3d 847, 857 (7th Cir. 1994)). For an officer to be liable for failing to stop other officers using excessive force, however, the officer must be in a position to intervene. *Ensley*, 142 F.3d at 1407. The record shows that by the time Deputy Henderson arrived, Mr. McBrayer was already in handcuffs. (Doc. 52, at 26). As noted, when Mr. McBrayer was handcuffed, deputies stopped applying force to detain him until they picked him up and moved him to the car. (Tripp Body Camera, at 10:30 *et seq.*). Defendant Henderson, therefore, was not present for the alleged violations of Mr. Breyer's Fourth Amendment rights. There is no genuine dispute of material fact about whether Defendant Henderson was in a position to intervene and, therefore, Defendant Henderson cannot be liable for failure to do so.

Accordingly, the Court **GRANTS** the Deputy Sheriff's Motion for summary judgment with respect to Plaintiffs' failure to intervene claim against Defendant Henderson.

### B.    Defendant Scarbrough's Motion for Summary Judgment

Defendant Scarbrough, the Tift County Sheriff at the time of the incidents leading to Mr. McBrayer's death, moves for summary judgment on Plaintiffs' claims under 42 U.S.C. § 1983 for violations of Mr. McBrayer's civil rights. (Doc. 45-4, at 1). Plaintiffs allege that Defendant Scarbrough deprived Mr. McBrayer of his due process rights under the Fourteenth Amendment of the United States Constitution; and his right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution and Article I, Section

I. Paragraph 13 of the Constitution of the State of Georgia. (Doc. 1, 12–16 ¶¶ 29-36). Defendants Scarbrough makes various arguments, the Court will address each in turn.

### 1.    Qualified Immunity

Defendant Scarbrough asserts that he is entitled to the protection of Qualified Immunity for Plaintiffs' claims for violations of Mr. McBrayer's Fourth and Fourteenth Amendment rights. (Doc. 45-4, at 3–13). In the Eleventh Circuit, as noted, the Court first determines whether Defendant Scarbrough was engaged in a discretionary function before moving on to determine whether Plaintiffs have presented relevant facts that Defendant Scarbrough committed a constitutional violation, and that violation was clearly established at the time of his conduct.

"To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities." *Id* at 1332 (internal quotations marks omitted) (citation omitted). *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). In this case, Defendant Scarbrough is a supervisory law enforcement officer who is being sued for conduct that fell within his official duties to make policies and supervise officers. (*See* Doc. 1, 12–16 ¶¶ 29-36). Plaintiffs do not object to this characterization. (*See* Doc. 67-1). Accordingly, the Court finds that Sheriff Scarbrough was engaged in a discretionary function, and therefore turns to whether Plaintiffs have presented relevant facts that Defendant committed a constitutional violation, if any, and whether that violation was clearly established at the time of that violation.

### i.    Fourth Amendment Claims

Plaintiffs allege that Defendant Scarbrough exhibited deliberate indifference to the training, supervision and discipline of Defendants Tripp, Spurgeon, and Henderson by failing to train them on "how to properly deal with mentally injured persons such as Mr. McBrayer or how to effectively recognize and respond to suspects clearly exhibiting symptoms of Excited Delerium," and failed to train them on "unlawful arrests and use of force." (Doc. 67-1, at 2). Under Section 1983, however, a supervisor can be held liable only if the supervised official committed an underlying violation of a constitutional right. *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) (citing *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008)).

Here, the Court has already found that, as matter of law, Defendants Tripp and Spurgeon did not use excessive force against Mr. McBrayer in violation of his Fourth Amendment rights. Defendant Scarbrough, therefore, cannot be held liable under Section 1983 for violating Mr. McBrayer's Fourth Amendment rights.

Accordingly, the Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to Plaintiffs' Fourth Amendment Claims.

ii.     **Denial of Medical Care**

Plaintiffs allege that Defendant Scarbrough exhibited deliberate indifference to the training, supervision, and discipline of Defendants Tripp, Spurgeon, and Henderson by failing to train them "on how to safely load a retrained person into the back seat of patrol car," "how to recognize the obvious and serious need for medical attention to a restrained person," or "to actually provide such medical attention to a restrained person who has clearly exhibited signs and symptoms of becoming unresponsive." (Doc. 61-1, at 2).

In the Eleventh Circuit, it is well established that supervisor officials are not liable under Section 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability. *Belcher v. City of Foley*, 30 F.3d 1390, 1996 (11th Cir. 1994). Liability for supervising officials under Section 1983 occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional violation. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). In this case, Defendant Scarbrough did not personally participate in the events leading to Mr. McBrayer's death. (Doc. 56, at 72, 75). Plaintiffs, therefore, must establish a causal connection between the actions of Defendant Scarbrough, and the Deputy Sheriff Defendants' deliberate indifference to Mr. McBrayer's serious medical need. *See Hartley*, 193 F.3d at 1269.

The standard for supervisory liability for the actions of a subordinate is "extremely rigorous." *Wade*, 67 F. 4th 1363, 1376 (11th Cir. 2023) (citing *Braddy v. Fla. Dep't' of Lab. & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)). To establish a causal connection, Plaintiffs must establish one of the following things: (1) a history of widespread abuse put the responsible supervisor on notice of the need to correct the alleged violation and the supervisor failed to do so, (2) the supervisor directed subordinates to act unlawfully or knew that the subordinates

would act unlawfully and failed to stop them from doing so, or (3) the supervisor adopted an improper custom or policy that led to the deliberate indifference. *Thompson v. Adkinson*, 861 Fed. Appx. 806, 810–811 (11th Cir. 2021) (citing *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008)).[12]

Here, Plaintiffs have failed to allege any previous event which might put Defendant Scarbrough on notice that he needed to correct some violation. (*See* Doc. 1, 12–16 ¶¶ 29-36). And there is no evidence in the record that Defendant Scarbrough directed his subordinates unlawfully, or knew that, in Mr. McBrayer's case specifically, they would act unlawfully. Accordingly, the question is whether there is sufficient evidence for a reasonable jury to conclude that Defendant Scarbrough adopted an improper custom or policy that led to the deliberate indifference to Mr. McBrayer's serious medical need.

Plaintiffs point to five parts of the record which they say support a finding that Defendant Scarbrough's conduct lead to the Deputy Sheriff Defendants deliberate indifference. (Doc 67-1, at 13). Four of the facts Plaintiff points to are irrelevant, misleading, and for some, both. And the last is insufficient, by itself, to lead a reasonable jury to conclude that there was a causal connection between Defendant Scarbrough's actions and the Deputy Sheriff Defendants' indifference.

First, Defendant Tripp does not know what "unconscious" means. (Doc. 67-1, at 13). This takes Defendant Tripp's testimony badly out of context. Defendant Tripp testified:

> Q. You knew he was unconscious when he was loaded into the car, right?
>
> A. No, sir, I don't know that to be a fact.
>
> Q. Did you believe he was unconscious?
>
> A. I believed that he had passed out.
>
> Q. Passed out?
>
> A. Yes, sir.
>
> Q. Okay. What's the difference in unconscious and passed out?

---

[12] In their brief, Plaintiffs rely on the "failure to train" standard announced in *City of Canton v. Harris*. (Doc. 67-1, at 3) (citing *City of Canton v. Hariss*, 489 U.S. 378, 389–90 (1989)). However, as Defendant Scarbrough correctly notes in his reply brief, *City of Canton*, and its progeny in the Eleventh Circuit, deals with municipal liability for failure to train, rather than supervisory liability. *See e.g., Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Although the less rigorous standard in *City of Canton* might reduce Plaintiffs' burden, here, it is inapposite.

> A. I mean, in my mind, unconscious – or I'm sorry. In my mind, passed out is – I mean, if you drink too much, you pass out.
>
> Q. Does it mean not awake?
>
> A. In my mind, yes.
>
> Q. Okay. I mean, isn't that the same thing as being unconscious?
>
> A. I don't know. I'm not sure what unconscious is - - I mean, I don't know the definition of unconscious.

(Doc. 50, at 272).

According to the Meriam Webster a synonym for the word "conscious," is "awake." *Conscious*, Merriam-Webster Dictionary Online (Sep. 2023) https://www.merriam-webster.com/dictionary/conscious. It follows therefore, that a perfectly reasonable interpretation of the word "unconscious," would be "not awake," which Defendant Tripp testified was his understanding of the word. In context, therefore, Defendant Tripp appears to be satisfactorily aware of the definition of unconscious. Accordingly, the Court finds this out of context quote irrelevant to the analysis of Defendant Scarbrough's supervisor liability.

Second, Defendant Scarbrough admitted that he was aware of the fact that Deputy Hancock had the least training and had no real medical training, and that he was the one put in charge of "checking" on Mr. McBrayer. (Doc. 67-1, at 13). Deputy Hancock had graduated from the police academy a few months before the events leading to Mr. McBrayer's death and was still in his field training period.  (Doc. 53, at 14). It is, therefore, no real surprise that he had the least training among the Deputies. The fact that, despite this, Defendant Henderson ordered Deputy Hancock to check on Mr. McBrayer cannot be attributed to Defendant Scarbrough, because Defendant Scarbrough was not directing officers on the scene. Accordingly, the Court finds that Defendant Scarbrough's admissions about Deputy Hancock's training irrelevant to the analysis of Defendant Scarbrough's supervisor liability during the incident at issue.

Third, Defendants Tripp and Spurgeon were not disciplined in any matter for the death of Mr. McBrayer. (Doc. 67-1, at 13). Failing to discipline officers for constitutional violations may be evidence of an improper custom or policy, but only when a plaintiff establishes a pattern of similar violations. *Ireland v.* Prummell, 53 F.4th 1274, 1290 (11th Cir. 20220.

Moreover, the fact that Defendant Scarbrough failed to discipline the deputies *after* Mr. McBrayer's death, necessarily, cannot be causally connected to Mr. McBrayer's death. Accordingly, the Court finds that the fact that Defendant Scarbrough did not discipline Defendants Tripp and Spurgeon irrelevant to the analysis of Defendant Scarbrough's supervisor liability.

Fourth, Defendant Scarbrough "has not required any policy that requires a person who has been tased multiple times to be evaluated by EMS or medical personnel before putting the detainee in a patrol car. In support of this contention, Plaintiffs cite Defendant Scarbrough's deposition.  The relevant part reads as follows:

Q. Based upon the way he was acting, the way he appeared to the officers, the fact he was tased multiple times, the fact that he had a lengthy struggle on the ground with officers, the fact he was handcuffed, and hobble strapped, and the fact he was unresponsive. Did he need medical care at that point?

A. I recall them checking on him, but I don't recall whether it was before or after he was placed in a car.

Q. I understand. My question is, did he need medical care, not for being checked on by a deputy?

A. I'm not, I'm not clear on whether he was showing any signs of, other than, you know, him struggling with the officers, whether he needed attention or not. I mean, like I say, I wasn't there, I don't know.

Q. Was there any policy, based on any fact you've become aware of, that required him to be evaluated by an EMS person or doctor at that point?

A. Not that I'm aware of.

(Doc. 56, at 75) (cleaned up).

Plaintiffs have failed to direct the Court to any part of the record or relevant caselaw which suggests that a policy which fails to require medical evaluations after multiple applications of a taser is constitutionally insufficient. The Court's independent review of the record also reveals that the Tift County Sheriff's Department does, in fact, have a policy on medical evaluation after tasers are deployed which provides that "subjects who do not appear to be fully recovered within 10 minutes after being tased shall be evaluated by medical

34

personnel." Plaintiffs may be correct that there is no policy with the exact wording they supply, but a policy exists which prescribes when medical evaluations are appropriate after Tasers have been deployed. Even to the extent that there is a difference between what Plaintiffs apparently assert would be an ideal policy, and the policy implemented by Sheriff Scarbrough, Plaintiff has provided no evidence that the difference is so significant as to meet the extremely rigorous supervisory liability standard. Accordingly, the Court finds that Plaintiffs' assertion that Tift County Sheriff's department lacked the specific policy requiring medical evaluation after multiple taser applications before being placed in a patrol car cannot, alone, support a finding of supervisor liability for Defendant Scarbrough.

In sum, because Plaintiffs have failed to identify sufficient facts which could lead a reasonable jury to conclude that there was a causal connection between Defendant Scarbrough's actions and the Deputy Sheriff Defendants' deliberate indifference to Mr. McBrayer's serious medical need, the Court finds, as a matter of law, that Defendant Scarbrough cannot be found liable as a supervising official under Section 1983 with respect to Plaintiffs' claims of deliberate indifference to serious medical needs.

Accordingly, the Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to Plaintiffs' Fourteenth Amendment Claims.

### 2. State Law Claims

Defendant Scarbrough moves for summary judgment on Plaintiffs' state law claims. (Doc. 45-5, at 13). As noted with respect to Plaintiffs' claims against the Deputy Sheriff Defendants, Plaintiffs do not allege purely state law claims, only claims under Section 1983. Accordingly, the Court **GRANTS** the Deputy Sheriff Defendants' Motion for summary judgment with respect to any state law claims Plaintiffs may have intended to raise, if any.

### 3. Punitive Damages

Defendant Scarbrough moves for summary judgment on Plaintiffs' claims for punitive damages. Because the Court has already granted summary judgment with respect to Plaintiffs' Section 1983 Claims, Plaintiffs are, of course, not entitled to punitive damages on those claims. Accordingly, the Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to Plaintiffs' claims for punitive damages.

### 4.    Sheriff Scarbrough in his Official Capacity

Defendant Scarbrough moves for summary judgment on Plaintiffs' claims against him in his official capacity arguing that he is protected by Eleventh Amendment Immunity, and because *res judicata* bars Plaintiffs' claims.

### A.    Eleventh Amendment Immunity

Defendant Scarbrough asserts that he is entitled, with respect to claims against him in his official capacity, to the protection of Eleventh Amendment Immunity. (Doc. 45-5, at 14).

Eleventh Amendment immunity bars suits brought in federal court when the "State itself is sued and when an 'arm of the state' is sued." *Manders v. Lee*, 338 F.3d 1304, 1328 (11th Cir. 2003) (*en banc*) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30 (1997)).  The Eleventh Circuit, in *Manders*, set out the four-factor test used to determine whether an entity is an "arm of the state" in carrying out the function at issue: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309 (citing *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm.*, 226 F.3d 1226, 1231–34 (11th Cir. 2000)). When a Georgia sheriff is performing law enforcement functions as an "arm of the state," he is entitled to Eleventh Amendment immunity from a Section 1983 claim for money damages or other retrospective relief brought against him in his official capacity. *See Purcell v. Toombs Cty.*, 400 F.3d 1313, 1325 (11th Cir. 2005) (concluding that a Georgia Sheriff "functions as the arm of the State [not the County] when promulgating policies and procedures governing conditions of confinement" at a county jail, and, therefore, the Sheriff in his official capacity was entitled to Eleventh Amendment immunity); *accord Burgest v. Colquitt Cnty.*, 177 Fed. Appx 852, 855 (11th Cir. 2005) (per curiam) (affirming summary judgment in favor of the sheriff sued in his official capacity on claims related to plaintiff's detention and arrest based on Eleventh Amendment Immunity). Here, the Deputy Sheriff Defendants were performing functions related to Mr. McBrayer's detention and arrest, and any of Defendant Scarbrough's policies the deputies would have followed would have been pursuant to those detention and arrest functions. Defendant Scarbrough in his official capacity, therefore, would be entitled to Eleventh Amendment immunity.

As a result, the Court need not reach the question of whether *res judicata* bars Plaintiffs' claims against Defendant Scarbrough in his official capacity.

Accordingly, the Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to any claims against him in his official capacity.

**CONCLUSION**

In sum, Defendants Scarbrough, Tripp, Spurgeon, and Henderson's Motion for summary judgment (Doc. 45) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

In more detail, the Court **GRANTS** Defendants Tripp, Spurgeon, and Henderson's Motion for summary judgment with respect to Plaintiffs' Fourth Amendment Claims.

The Court **DENIES** Defendants Tripp, Spurgeon, and Henderson's Motion for summary judgment with respect to Plaintiffs' Fourteenth Amendment Claims.

The Court **GRANTS** Defendants Tripp, Spurgeon, and Henderson's Motion for summary judgment with respect to Plaintiffs' deprivation of family association claim.

The Court **GRANTS** Defendants Tripp, Spurgeon and Henderson's Motion for summary judgment with respect to any state law claims Plaintiffs may have raised.

The Court **DENIES WITHOUT PREJUDICE** Defendants Tripp, Spurgeon, and Henderson's Motion for summary judgment with respect to Plaintiffs' Section 1983 claims for violations of the Georgia Constitution. Plaintiffs are **ORDERED** to submit, if they wish to, a brief **within twenty-one (21) days of the entry of this Order**, responding to the Deputy Sheriff Defendants' arguments that they are entitled to summary judgment because Section 1983 does not provide a remedy for violations of the Georgia Constitution. Thereafter, the Court will address Defendants' motion.

The Court **DENIES** Defendants Trip, Spurgeon, and Henderson's Motion for summary judgment with respect to Plaintiffs' claim for punitive damages.

The Court **GRANTS** Defendants Tripp, Spurgeon, and Henderson's Motion for summary judgment with respect to Plaintiffs' claim for failure to intervene against Defendant Henderson.

The Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to Plaintiffs' Fourth Amendment claims against Defendant Scarbrough in his individual capacity.

The Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to Plaintiffs' Fourteenth Amendment Claims against Defendant Scarbrough in his official capacity.

The Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to any state law claims Plaintiffs may have raised in connection with Section 1983.

The Court **GRANTS** Defendant Scarbrough's Motion for summary judgment with respect to any claims against him in his official capacity in connection with Section 1983.

Accordingly, the only claims that remain in the above-styled action are Plaintiffs' supervisory liability claims against Defendant Henderson, Plaintiffs' deliberate indifference to serious medical need claims against Defendants Tripp, Spurgeon, and Henderson; Plaintiffs' Section 1983 claims for violations of the Georgia Constitution pending further briefing; and Plaintiffs' products liability claim against Defendant Axon.

**SO ORDERED**, this 27th day of September 2023.

/s/ W. Louis Sands_____
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**