### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA
### VALDOSTA DIVISION

MICHAELA UNDERWOOD, as the     :
duly appointed Administratix of the     :
Estate of James Aaron McBrayer,     :
Deceased, *et al.*,     :     CASE NO.: 7:21-CV-00040 (WLS)
    :
     Plaintiffs,     :
v.     :
    :
HON. GENE SCARBROUGH, *et al.*,     :
    :
     Defendants.     :
_____ :

## ORDER

Before the Court is Defendant Axon Enterprise, Inc.'s ("Defendant Axon") Motion for Summary Judgment (Doc. 48). For the reasons that follow Defendant Axon's motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I.   RELEVANT PROCEDURAL BACKGROUND

Plaintiffs commenced the present action on April 9, 2021, by filing a Complaint alleging three (3) causes of action. (Doc. 1). Count One alleges Deprivation of Plaintiffs' civil rights by Defendants Scarbrough and Henderson pursuant to 42 U.S.C. § 1983. (*Id.*) Count Two alleges deprivation of Plaintiffs' civil rights by Defendants Tripp and Spurgeon pursuant to 42 U.S.C. § 1983. (*Id.*) Count Three alleges a Products Liability claim against Defendant Axon. (*Id.*) Plaintiffs also seek compensatory and punitive damages. (*Id.*) Defendant Axon filed its answer on August 02, 2021. (Doc. 21).

Defendant Axon filed a Motion (Doc. 48) for summary judgment on August 31, 2022. Therein, Defendant Axon contends that it is entitled to summary judgment on Plaintiffs' products liability claims. (Doc. 48). Plaintiffs filed a Response (Doc. 64) on September 21, 2022. On October 17, 2022, Defendant Axon filed a Reply (Doc. 77) to Plaintiffs' Response.

All parties have filed their respective responses, and the motion for summary judgment is fully briefed and ripe for ruling.

**II.  RELEVANT FACTUAL BACKGROUND**

The following facts are derived from Plaintiffs' Complaint (Doc. 1); Defendant Axon's Answer to the Complaint (Doc. 21); the Parties' Statements of Material Facts (Docs. 48-2 & 64-1); Defendant Axon's Motion (Doc. 48) for Summary Judgment; Plaintiffs' Response (Doc. 64); Defendant Axon's Reply (Doc. 77) to Plaintiffs' Response; the depositions in the record (Docs. 50–56, 58, 60, 63 & 74); and all exhibits attached to the foregoing documents. Where relevant, the factual summary also includes undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to Plaintiffs as the nonmoving party. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

On April 24, 2019, Mr. James Aaron McBrayer was involved in a fatal encounter with police officers. (*See* Docs. 48-2 & 64-1). Mr. McBrayer had been involved in a single vehicle accident on Hall Road, which occurred in the area of Mr. McBrayer's family property. (Doc. 1 at ¶ 9) As a result of this accident, which left Mr. McBrayer car in a ditch, Mr. McBrayer received a severe head injury. (*Id.*) After the accident, Mr. McBrayer appears to have exited his vehicle and "went on to his family's property" where he began to yell for help. (Doc. 1 ¶ 10). Sheriff's Deputy Anthony Raymond Tripp ("Defendant Tripp") and Sheriff's Deputy Connor Spurgeon ("Defendant Spurgeon") responded to a 911 call reporting a man yelling for help. (*Id.*)

Shortly after the deputies arrived, Ms. Angie McBrayer, Mr. McBrayer's ex-wife allegedly stated that Mr. McBrayer needed a medical evaluation and treatment. (Doc. 1 ¶ 11). While Ms. McBrayer and Defendant Spurgeon were talking, Defendant Tripp arrived at the scene. (Doc. 1 6 ¶ 12). Defendant Tripp set off alone to "see if we could determine who was— who was asking for help." (Doc. 1 ¶ 12); (Doc. 50 at 25–26).

Defendant Tripp subsequently encountered Mr. McBrayer who was leaning up against a building, in a crouched position with his elbows on his knees. (Doc. 50 at 31). Defendant Tripp approached Mr. McBrayer by driving his vehicle closer. (Doc. 1 ¶ 13); (Doc. 50 at 31). Before they could communicate, Mr. McBrayer got up and ran away from Defendant Tripp, around the building. (Doc. 50 at 32). Mr. McBrayer then circled back to the front of the building, crouching behind a backhoe bucket under a lean-to approximately thirty-five (35)

feet from Defendant Tripp. (Doc. 50 at 33–33). During this time, Mr. McBrayer was yelling things such as "God hates you," and talking about the devil. (Doc. 50 at 36).

Deputy Tripp then drew his Taser and instructed Mr. McBrayer to stop and show his hands several times. (*Id.*) Defendant Tripp testified that Mr. McBrayer's flight and behavior were inconsistent with someone who needed help, and that Mr. McBrayer's behavior, based on Defendant Tripp's training and experience as a law enforcement officer, raised the possibility that he was using drugs. (Doc. 50 at 38–39).

The encounter escalated after Defendant Tripp ordered Mr. McBrayer to show him his hands and Mr. McBrayer ran at Defendant Tripp. (Doc. 50 at 46). Perceiving Mr. McBrayer to be hostile, Defendant Tripp deployed his Taser into Mr. McBrayer's chest when Mr. McBrayer was approximately ten (10) feet from Defendant Tripp.[1] (Doc. 50 at 52–53). According to Defendant Tripp, Mr. McBrayer seemed to be unaffected, in that neuromuscular incapacitation ("NMI") was not achieved, as evidenced by the fact that Mr. McBrayer continued to run toward Defendant Tripp. (Doc. 50 at 55).

Given that Mr. McBrayer continued to run toward Defendant Tripp, Defendant Tripp backpedaled establishing a distance of approximately twenty (20) feet. (Doc. 50 at 57). At this point, Mr. McBrayer fell to his hands and knees. (*Id.* at 57). Believing that Mr. McBrayer was surrendering, Defendant Tripp approached. (*Id.* at 58). As Defendant Tripp approached, Mr. McBrayer got back up and ran at Defendant Tripp again. (*Id.*) While the exact sequence of events is unclear, what is clear is that Mr. McBrayer struck Defendant Tripp in the face and Defendant Tripp reactivated his Taser. (*Id.* at 62). During the encounter, Defendant Tripp activated the Taser four (4) times. (Doc. 48-9 at 6).

At this point, Defendant Spurgeon arrived on the scene. (Doc. 51 at 29). When Defendant Spurgeon attempted to take Mr. McBrayer into custody, Defendant Spurgeon's kneecap was dislocated. (Doc. 51 at 31–32). Defendant Spurgeon fell onto Mr. McBrayer and

---

[1] When a Taser is deployed in "prong-mode," the weapon shoots two probes which are designed to pierce the target's skin and tissue. (Doc. 48-9 at 7–14). Once the probes are deployed, the officer may then "trigger" the Taser which sends high voltage pulses through the probes, which, ideally, creates a circuit within the targets body incapacitating the muscles in between the probes—an effect dubbed neuromuscular incapacitation ("NMI"). (Doc. 48-9 at 7–14). Whether NMI is achieved, however, depends on a number of factors such as (1) the spread of the probes, (2) whether the probes form a closed circuit, and (3) the location of the probes on the subject's body. (*Id.* at 11).

proceeded to wrestle with him on the ground. (Doc. 51 at 31–33). Defendant Spurgeon then drew his Taser and applied the weapon to Mr. McBrayer twice in "drive-stun"[2] mode. (Doc. 51 at 35); (Doc. 48-9 at 10–11). The Deputies restrained Mr. McBrayer on the ground for several minutes while waiting for backup to arrive. (Doc. 51 at 46). During this time, Defendant Spurgeon called on the radio for an EMS dispatch for his knee injury. (Doc. 50 at 111). In order to maintain control, Deputies applied pressure to Mr. McBrayer's torso and, according to Defendant Spurgeon, Mr. McBrayer continued to actively resist detention. (Doc. 51 at 45–47).

Once backup arrived, deputies handcuffed Mr. McBrayer and placed him in a hobble strap. (Doc. 51 at 47–48). Deputies then lifted Mr. McBrayer into the back seat of a patrol car. (*Id.*) At some point after Mr. McBrayer was placed in the patrol car, he stopped breathing. (*See* Tripp Body Camera at 11:00–20:30 *et seq.*) Mr. McBrayer was not given a medical assessment before he stopped breathing. (Doc. 51 at 173). Mr. McBrayer was pronounced dead at the scene. (Doc. 54-1 at 6).

## III.   MOTION FOR SUMMARY JUDGMENT STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[2] When a Taser is deployed in "drive-stun" mode, the officer places the Taser electrodes directly against the target's skin and triggers the weapon. (Doc. 48-9 at 21). Drive-stun applications do not create the potential for NMI, instead, they are designed to cause pain to the target, thereby creating "pain-compliance." (*Id.*)

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).[3]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. Appx. 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita*, 475 U.S. at 587).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Moreover, to avoid summary judgment after the movant has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted).

---

[3] Pursuant to Local Rule 56 the movant for summary judgment shall attach to the motion a separate statement of the material facts about which the movant contends there is no genuine dispute to be tried. M.D. Ga. L.R. 56. The respondent shall attach to their response a separate statement of material facts to which respondent claims there exists a genuine dispute to be tried. Here, both parties have complied with Local Rule 56.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587-88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. LAW AND ANALYSIS

Defendant Axon moves for summary judgment on Plaintiffs' claims against it. (Doc. 48-1 at 2–3). The Court will discuss the arguments Defendant Axon makes in favor of summary judgment in turn.[4]

As jurisdiction over Plaintiffs' products liability claim is based in supplemental jurisdiction, the Court will apply federal procedural law and Georgia substantive law. *See McDowell v. Brown*, 392 F.3d 1283, 1294–1295 (11th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938)). Because Plaintiffs' products liability claim is before this Court pursuant to supplemental jurisdiction, Georgia law defines the pertinent inquiry. *See McDowell*, 392 F.3d at 1294.

### A. Strict Products Liability: Failure to Warn

Defendant Axon moves for summary judgment on Plaintiffs' strict products liability claim based on a failure to warn theory. (Doc. 48-1 at 3–19). In Georgia, to prevail on a failure to warn products liability claim, a plaintiff bears the burden to show: (1) the defendant had a duty to warn, (2) defendant breached that duty, and (3) the breach was the proximate cause of plaintiff's injury. *Powell Duffryn Terminals v. Calgon Carbon Corp.*, 4 F. Supp 1198, 1203 (S.D. Ga. 1998), *aff'd* 176 F.3d 494 (11th Cir. 1999) (citing *Powell v. Harsco Corp.*, 433 S.E.2d 608, 610 (Ga. Ct. App. 1993)); *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). A manufacturer has a duty to warn of nonobvious foreseeable dangers from the normal use of

---

[4] The Court will note, again, the great difficulty it has encountered in deciphering Plaintiffs' claims and arguments in their filings and briefs throughout this case, as the Court has noted in other Orders in this case. (*See* Docs. 81, 84, & 85). To the extent possible, however, the Court will attempt to appropriately recharacterize Plaintiffs' arguments, without making arguments for Plaintiffs, to respond to the issues presented by Defendant Axon in its Motion for Summary Judgment.

its product. *Thornton v. E.I. Du Pont De Nemours and Co., Inc.*, 22 F.3d 284, 298 (11th Cir. 1994) (citing *Poppell v. Waters*, 190 S.E.2d 815, 817 (1972)). A manufacturer breaches this duty if they (a) fail to provide an adequate warning of the product's potential risks, or (b) fail to adequately communicate that warning to the ultimate user. *Thornton*, F.3d at 289; *Wilson Foods Corp. v. Turner*, 460 S.E.2d 532, 543 (Ga Ct. App. 1995).

### i.     Adequacy of Warnings

Defendant Axon argues that it is entitled to summary judgment because its product warnings for the Taser X26P were sufficient (Doc. 48-1 at 17–20). Plaintiffs allege that Defendant Axon's warnings provided insufficient information about the symptoms of excited delirium and the dangers of deploying controlled energy weapons ("CEWs") on people suffering from excited delirium. (Doc. 1 at 29–30 ¶ 66).

### a.     Taser X26P Warnings

Deputy Tripp and Spurgeon were equipped with the Taser X26P, manufactured by Defendant Axon. (Doc. 48-9 at 7). Major Daniel Torres, a certified Taser instructor, provides Taser training for the Tift County Sheriff's Office ("TCSO"). (Doc. 48-2 at 12 ¶ 44); (Doc. 64-1 at 22, ¶ 22). Both Defendants Tripp and Spurgeon attended Major Torres' Taser certification course in 2018. (Doc. 48-2 at 12 ¶ 44); (Doc. 64-1 at 22, ¶ 22). The Taser certification course was 8 hours which included a slideshow presentation provided by Defendant Axon, a written test, and a practical portion with hands-on Taser drills. (Doc. 48-2 at 12–13 ¶ 45); (Doc. 64-1 at 22, ¶ 22). The slideshow contained warnings about the risks of Tasers, generally, and about the risks of using Tasers on individuals who may be medically compromised. (*See* Doc. 48-8). The slideshow also instructed officers to "Review and understand TASER current product warnings." (Doc. 48-8 at 4).

Major Torres testified that he printed off Defendant Axon's most current warnings and gave them to the trainees to review. (Doc. 48-11 at 10–11). Both Defendants Tripp and Spurgeon testified that they reviewed the warnings that Major Torres gave them. (Doc. 50 at 84); (Doc. 51 at 61). Defendant Axon's warnings provided that "any use of force including the use of a [Taser], involves risks that a person may get hurt or die due to the effects of the [Taser], physical incapacitation, physical exertion, unforeseen circumstances or individual susceptibilities. The warnings also provided the following section:

**Physiologic and Metabolic Effects**. [Taser] use causes physiologic and/or metabolic effects that may increase the risk of death or serious injury. These effects include changes in blood chemistry, blood pressure, respiration, heart rate and rhythm, and adrenaline and stress hormones, among others. In human studies of electrical discharge from a single [Taser] of up to 15 seconds, the effects on acid/base balance, creatine kinase, electrolytes, stress hormones and vital signs were comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques.

Some individuals may be particularly susceptible to the effects of CEW use. These susceptible individuals include those with heart conditions, asthma or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle. In a physiologically or metabolically compromised person, any physiologic metabolic change may cause or contribute to sudden death.

(Doc. 48-10 at 3).

### ii.    Legal Sufficiency of Warnings

Questions of adequacy of warnings are "peculiarly questions for the jury." *Suzuki Motor of Am., Inc. v. Johns*, 830 S.E.2d 549, 558 (Ga. Ct. App. 2019) (citing *Key Safety Sys. v. Bruner, Inc.* 780 S.E.2d 389, 392 (Ct. App. Ga. 2015)). For a warning to be adequate, it must provide "a complete disclosure of the existence and extent of the risks involved." *Thornton*, 22 F.3d at 289; O.C.G.A. § 51-1-11(c).

Defendant Axon makes two arguments that its warnings are sufficient as a matter of law. First, that it had no duty to provide "in-depth information on medical conditions."[5] Axon contends that because excited delirium is a "controversial diagnosis" in the medical community which is difficult to diagnose, it was beyond its responsibility as a "public safety product manufacturer" to train end users on how to recognize the condition. (Doc. 48-1 at 15–17). Plaintiffs' medical expert, however, opined that from the body camera footage, there was sufficient evidence for a trained individual to determine that Mr. McBrayer might have been suffering from excited delirium. (Doc. 54 at 204–05). There is, therefore, enough

---

[5] Defendant Axon, in its brief, characterizes this as an "independent ground" for summary judgment, yet fails to cite any authority, relevant or otherwise, which supports summary judgment on this ground independently. The Court finds, therefore, that Defendant Axon's argument that it did not have a duty to provide in-depth information about excited delirium is more properly characterized as an additional argument regarding the sufficiency of their Taser X26P warnings, rather than an independent ground for summary judgment.

evidence in the record to show that an individual with training might have been able to recognize excited delirium—training which Plaintiffs contend the deputies lacked as a result of Defendant Axon's insufficient warnings. As such, the Court will not invade the province of the fact finder to find, as a matter of law, that a controversy surrounding excited delirium relieves any duty Defendant Axon might have had to warn about the condition.[6]

Moreover, the adequacy of a warning must be evaluated in conjunction with the knowledge and expertise of those who would be reasonably expected to use the product. *Thornton*, 22 F.3d at 289 (citing *Stiljes v. Ridco Exterminating Co.*, 343 S.E.2d 715, 719 (Ga. Ct. App. 1986), *aff'd* 347 S.E.2d 568 (Ga. 1986)). The Court is, therefore, unpersuaded by Defendant Axon's argument that its responsibility to train end users, law enforcement officers, is somehow diminished as a "public safety product manufacturer." To the contrary, Defendant Axon had a duty to anticipate the knowledge and expertise of law enforcement officers. Law enforcement officers might well have required more information about the symptoms of excited delirium than would have been appropriate to another, more informed, end user. Accordingly, the Court finds that Defendant Axon did not, as a matter of law, have a diminished duty to provide education about excited delirium as a "public safety product manufacturer."

Second, Defendant Axon argues that because "[Defendant Axon's product warnings encompass the precise circumstances presented by [Mr. McBrayer], they were adequate as a matter of law." (Doc. 48-1 at 17). Even when the subject matter of a warning may encompass the risks involved with a product's use, however, Georgia Courts have emphasized that fact issues may still remain as to the warning's adequacy such as the warning position, color and size print or whether to use symbols which would call the user's attention to the warnings or cause the user to be more likely to read the label and warning than not. *Tuttle v. Dexcom, Inc.*,

---

[6] Defendant Axon argues that the opinions of its "excited delirium expert" should be sufficient to establish that excited delirium is too controversial for Defendant Axon to have a duty to warn about it. (Doc. 48-1 at 16). The Court, however, must construe the evidence in a light most favorable to Plaintiffs as the nonmoving party. See Fed. R. Civ. P. 56; *Matsushita*, 475 U.S. at 587. Accordingly, the Court finds that Dr. Kraft's testimony is record evidence which demonstrates that a genuine dispute of material fact remains.

2021 WL 8998920 at *11 (N.D. Ga. 2021) (citing *Battersby v. Boyer*, 526 S.E.2d 159, 163 (Ga Ct. App. 1999)).

Here, Plaintiffs do not merely allege that Defendant Axon's warnings failed to mention excited delirium, or that the circumstances contained within the warnings do not, at least in some way, pertain to Mr. McBrayer's condition on the night of his death. (*See* Doc. 64 at 8–10). Rather, Plaintiffs contend that Defendant Axon failed to include information, which adequately conveyed the risk of death of deploying a Taser X26P on a person exhibiting Mr. McBrayer's symptoms. (*Id.*) Plaintiffs contend that including the following warning, which was included in Defendant Axon's 2013 training materials, in its 2018 materials, would have prevented Mr. McBrayer's death:

**Arrest-Related Death (ARD) Warning Signs**
Should one or more of the following behaviors manifest, the suspect may
require immediate medical assistance due to pre-existing conditions,
possible overdose, cocaine psychosis, excited delirium, etc.
- Bizarre or violent behavior
- Signs of overheating/profuse sweating
-Disrobing
-Violence toward/attacking glass, lights, and reflective surfaces
-Superhuman strength and endurance
-Impervious to pain – self-mutilation
-Loss of consciousness
-Disturbance in respiratory pattern.

(Doc. 64 at 9). The speaker notes to the slide say "instruct your officers to watch for these danger signs. (*Id.*) If a suspect exhibits any of these signs, get the subject medical attention as quickly as possible as these people may be at elevated risk for arrest-related deaths. (*Id.*)

Although the Taser X26P warning materials warn generally that CEWs may cause physiological and metabolic changes which increase the risk of death, the warning Plaintiffs submit is more detailed, in a form more likely to be understood by law enforcement officers, gave specific instructions to obtain medical attention, and Plaintiffs contend that a warning such as this should have been displayed more conspicuously than the Taser X26P warnings given to Defendants Tripp and Spurgeon. (*See* Doc. 64 at 9). The differences between the warnings given with the Taser X26P, and the warnings Plaintiffs allege should have been given, raise precisely the factual issues of warning sufficiency which are "peculiarly questions for the jury." *See Suzuki Motor of Am.*, 830 S.E.2d at 558. Accordingly, the Court finds that a reasonable

jury could find that Defendant Axon's warnings were insufficient, and therefore, a genuine dispute of material fact remains as to the sufficiency of those warnings.[7]

### iii.   Causation

Defendant Axon argues that it is entitled to summary judgment because Plaintiffs cannot prove that any alleged breach of duty by Defendant Axon caused Mr. McBrayer's death. (Doc. 48-1 at 6–13). Plaintiffs must prove that Defendant Axon's failure to warn was both the "proximate cause" and the "cause-in-fact" of Plaintiffs' injury. *See Mann v. Taser Int'l Inc.*, 588 F.3d 1291, 1304 (11th Cir. 2009) (citing *Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman*, 398 S.E.2d 16, 17 (1990)). Defendants do not contest proximate causation. (*See* 48-1 at 6–9). Instead, Defendant Axon contends that Plaintiffs cannot prove "cause-in-fact" for two reasons: (1) Plaintiffs cannot produce admissible evidence that the Taser X26P caused Mr. McBreyer's death, and (2) Plaintiffs cannot show that a better or different warning would have prevented Defendants Tripp and Spurgeon from deploying their Taser X26Ps on Mr. McBrayer.

A defendant's conduct is the "cause in fact," if the event would not have occurred without it. *Mann*, 588 F.3d at 1304 (citing *Gen. Motors Corp. v. Davis*, 233 S.E.2d 825 (Ga. Ct. App. 1977)). Generally, issues of causation are for the jury to resolve, and a trial court should

---

[7] In support of its contention that the Taser X26P warnings were sufficient as a matter of law, Defendant Axon cites a smorgasbord of court opinions throughout the country in which courts have evaluated the sufficiency of Taser warnings in product liability suits. (Doc 48-1, 17–18) The Court's review of this authority reveals, however, that while the opinions evaluate the sufficiency of Taser warnings, they are distinct from the instant case because they involve different injuries to plaintiffs, different warning language, different warning standards required by state law, the law of different circuits, and different procedural postures. *See Marquez v. Phoenix*, 693 F.3d 1167, 1173 (9th Cir. 2012) (evaluating different Taser warning language under Arizona law); *Salinas v. San Jose*, 2013 WL 2450114 *6 (N.D. Cal. 2013) (evaluating different Taser warning language under California law where plaintiff died from cardiac arrhythmia); *Williams v. Cleveland, Miss.*, 2012 WL 3614418 at *1 (N.D. Miss. 2012) (evaluating different Taser warning language under Mississippi law); *Butler v. TASER Int'l, Inc.* 2012 WL 3867105 (N.D. Tex. 2012) (evaluating different Taser warning language under Texas law where plaintiff was a police officer who suffered injuries when a Taser was deployed on him during training) *aff'd*, 736 F.App'x 371 (5th Cir. 2013); *Kandt v. TASER Int'l*, 2012 WL 2861583 at *1 (N.D. N.Y. 2012) (evaluating different Taser warning language under New York law where plaintiff was a police officer who suffered a vertebral fracture when a Taser was deployed on him during training); *Carroll v. Harris Cnty., Tex.*, 2011 WL 2457517 (S.D. Tex. 2011) (evaluating different Taser warning language under Texas law where Taser increased risk of death from "psychotic delirium"); *Lee v. Nashville & Davidson Cnty.*, 595 F. Supp 2d 1101, 1127–28 (M.D. Tenn. 2009) (evaluating different Taser warning language under Tennessee law).

not resolve causation issues except in "plain and undisputed cases." *Mann*, F.3d at 1304 (citing *Ogletree v. Navistar Int'l Trans. Corp.*, 535 S.E.2d 545, 548 (2000)).

> a.     **Medical Causation**

Defendant Axon argues that it is entitled to summary judgment because Plaintiffs have no admissible evidence that Defendant Axon's Taser X26P caused Mr. McBrayer's death. This argument, essentially, renews Defendant Axon's objections made in its Motion (Doc. 47) to Exclude Taser-related Medical Opinions of Dr. Maryanne Gaffney-Kraft, who conducted the medical investigation into Mr. McBrayer's death, which the Court has already denied. (*See* Docs. 47, 48-1, & 83). In that motion, Defendant Axon argued that Dr. Kraft's opinion was inadmissible speculation and that Dr. Kraft's opinions do not fit this case or assist the jury. Although the Court explained, at length, its reasons for rejecting Defendant Axon's arguments about Dr. Kraft's testimony in its Order (Doc. 47) on September 27, 2023, the Court will briefly discuss the reasons here, including addressing Defendant Axon's discussion of *Mann v. Taser International*, and then the Court will turn to whether summary judgment is warranted for lack of medical causation.

Under Georgia law, when, by nature of the situation, causation may be resolved by expert medical evidence alone, that evidence must be based on, at least, reasonable medical probability. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir. 1999) (citing *Maurer v. Chyatte*, 326 S.E.2d 543, 545 (Ga. Ct. App. 1985)). In presenting an opinion on causation, an expert must express some basis for both "the confidence with which his conclusion is formed, and the probability that his conclusion is accurate." *Rangel v. Anderson*, 202 F. Supp 3d. 1361, 1371 (S.D. Ga. 2016) (citing *Zwiren v. Thompson*, 578 S.E.2d 862, 865 (Ga. 2003)).

In Plaintiffs' case, Dr. Kraft opined, the aggregate physiologic effect of the stressors Mr. McBrayer experienced in the early hours of the morning on the day he died caused excited delirium, which ultimately caused his death. (*See* Doc. 54-1 at 1–7). In particular, Dr. Kraft concluded that Mr. McBrayer's cause of death was "excited delirium in conjunction with physical altercation, including [Taser] controlled energy weapon use, and cocaine and mitragynine toxicity." (Doc. 54-1 at 1); (Doc. 54 at 159). Dr. Kraft based this conclusion on an autopsy, toxicology report, vitreous testing results, the Georgia Bureau of Investigation

investigative summary, the body-worn cameras of the police officers involved, photos from the scene, and a reference textbook which described excited delirium. (Doc. 54 at 18–28).

With respect to the Taser X26P's contribution to Mr. McBrayer's death in particular, Dr. Kraft concluded to "within a reasonable degree of medical probability," that Defendant Tripp's and Spurgeon's use of the Taser X26P on Mr. McBrayer contributed to his cause of death from excited delirium. (Doc. 54 at 1, 5–7); (Doc. 55 at 67). Dr. Kraft opined that the pain of the officer's Taser deployment into Mr. McBrayer, contributed to the aggregate physiological stress response which ultimately caused Mr. McBrayer death. (Doc. 54 at 110, 128).

Defendant Axon first contended that because Dr. Kraft did not actually know whether Mr. McBrayer was experiencing pain, her opinion that it increased Mr. McBrayer's stress response is mere speculation, and, therefore, is inadmissible. (Doc. 47 at 15). The Court found that Dr. Kraft had sufficient basis from which to conclude that Defendant experienced physical pain which contributed to his excited delirium. (Doc. 83 at 7). Accordingly, the Court declined to exclude Dr. Kraft's conclusion as inadmissible speculation. (*Id.*)

In the present motion, Defendant Axon now argues that *Mann* instructs the Court to grant summary judgment in their favor because the Eleventh Circuit in *Mann* granted summary judgment when they found that plaintiffs' medical causation expert did not testify with sufficient certainty, under Georgia law, that a Taser caused the death of decedent. (*See* Doc. 48-1 at 7) (citing *Mann*, 588 F.3d at 1304)). The Court agrees with Defendant Axon to the extent that the facts of *Mann* are highly similar to the facts of the present case. *Mann*, however, is nonetheless distinguishable because, unlike the expert in *Mann*, Dr. Kraft articulated her conclusion that the Taser contributed to Mr. McBrayer's death with sufficient certainty to establish medical causation.

In *Mann*, the Eleventh Circuit excluded the testimony of a medical expert who opined that the use of a Taser on the decedent "probably made the situation worse," when analyzing the death of an arrestee who died of excited delirium during a police encounter. *Mann*, 588 F.3d at 1304–05. Defendant Axon argues that Dr. Kraft's opinions are no less certain than the medical expert's opinion in *Mann*, and the Court should, therefore, exclude them. (Doc. 48-1 at 7).

A review of the record in this case, however, indicates that although Dr. Kraft was willing to concede sometimes that there are other hypothetical combinations of stressors which might have been sufficient to cause Mr. McBrayer's death, her opinion in this case remains that the Taser deployments contributed, in this particular situation, to Mr. McBrayer's death. For example, in her state case deposition Dr. Kraft was asked:

> Q.   If they hadn't used the taser and restrained him, he would have lived, you cannot say that to a reasonable degree of probability.
> A.   I cannot say that. That is correct.

(Doc. 55 at 66). Yet shortly after Dr. Kraft was asked:

> Q.   What you can say, though, Doctor, is – within a reasonable degree of medical probability, is that the struggle and the use of the tasers contributed to the cause of death in this case?
> A.   Yes. They were additive to it.

(*Id.* at 67). Even though Dr. Kraft conceded some hypothetical situations in which factors other than the Taser deployments would have been sufficient to cause death, the record, in context, reveals that Dr. Kraft was clear in her opinion that the Taser deployments, to a reasonable degree of medical probability, contributed to Mr. McBrayer's death. (*See* Doc. 83 at 9–11). This fact places Dr. Kraft's testimony in the classic trial position of testing her opinion by cross-examination, since she provides the support for her findings and her opinion and stands by her opinion. The Court, therefore, finds that Dr. Kraft's testimony is admissible evidence for Plaintiffs to prove medical causation in the present case.

Thus, Defendant Axon's argument that summary judgment is warranted because Dr. Kraft's evidence is inadmissible, fails. The Court finds that a reasonable jury could find from Dr. Kraft's testimony that the deployment of the Taser X26P was the "cause-in-fact" of Mr. McBrayer's death, and therefore, a genuine dispute of material fact remains as to whether the Taser X26P caused Mr. McBrayer's death.

**b.    Warning Causation**

Defendant Axon next argues that Plaintiffs cannot establish that Defendant Axon's alleged insufficient warnings caused Mr. McBrayer's death because they have no "warning expert" and "have never specified what additional instructions or information could have changed the outcome here." (Doc. 48-1 at 8). To prevail on a failure to warn claim, a plaintiff must present "evidence supporting a reasonable inference that the warning provided by the

defendant would prevent the injury." *Cessna v. Ethicon, Inc.*, 2020 WL 2121392 at *4 (M.D. Ga. 2020) (citing *R&R Insulation Servs., Inc. v. Royal Indem. Co.*, 705 S.E.2d 223, 233 (Ga. Ct. App. 2010)). Such an inference cannot be based upon evidence which is too "uncertain or speculative," or which raises merely "conjecture or possibility." *Niles v. Bd. of Regents of Univ. Sys. of Ga.*, 473 S.E.2d 173, 175–76 (Ga Ct. App. 1996) (citing *Derry v. Clements*, 397 S.E.2d 594, 596 (Ga. Ct. App. 1990)). Issues of causation, however, are "not susceptible to summary adjudication except in the most plain and palpable cases." *R&R Insulation Servs.*, 705 S.E.2d at 234–35. Defendant Axon's argument fails for two reasons.

First, Defendant Axon asks the Court to place burdens on Plaintiffs unwarranted by Georgia law. The Court is unaware of any requirement under Georgia law which requires a "warning expert" to establish causation. Although an expert on warnings might well be one route to establishing a reasonable inference that a warning by Defendant Axon would have prevented Mr. McBrayer's injury, it is by no means the only one recognized by Georgia law. Similarly, the Court is unaware of a requirement under Georgia law which places the burden on Plaintiffs to specify precisely which instructions would have changed the outcome.[8] In any case, Plaintiffs have supplied such suggested warnings in the form of the 2013 Arrest-related death warnings discussed above. Accordingly, the Court finds Defendant Axon's argument that Plaintiffs cannot establish causation for lack of a "warning expert," or that they were required to, and failed to specify which warnings would have changed the outcome, unpersuasive.

Second, there is enough evidence to support a reasonable inference that a different warning might have changed Defendants Tripp's and Spurgeon's decision to deploy their

---

[8] The only authority Defendant Axon points to which supports this standard is a case decided in the Southern District of West Virginia. (See Doc. 48-1 at 8) (citing *Cisson v. C.R. Bard, Inc.*, 2013 WL 57000513 at *8 (S.D. W. Va. 2013)). The Court in *Cisson*, in analyzing a failure to warn products liability claim, nominally under Georgia law, relied on the proposition that "the plaintiff should not prevail in a warnings suit if the record is bereft of evidence as to what type of warning might have prevented the accident," to conclude that plaintiff had failed to produce enough evidence to survive summary judgment. *Cisson*, 2013 WL 5700513 at *8. In stating this proposition, however, the Court in *Cisson* did not cite to Georgia law, instead citing to a treatise on products liability law generally. *Id.* Accordingly, this statement of Georgia law, particularly by a federal district court in West Virginia, does not persuade this Court that Plaintiffs have a burden to specify precisely which warnings could have changed the outcome.

Taser X26P's. Plaintiffs contend that Defendants Tripp and Spurgeon were under-informed about the condition of excited delirium, and the record supports this contention. Although both deputies testified that they had read Defendant Axon's warning materials, when asked about Excited Delerium, they displayed limited knowledge of the condition. (Doc. 50 at 84); (Doc. 51 at 61). Defendant Tripp testified:

> Q. Okay. But as we sit here, the night that you deployed [your Taser X26P] you had no understanding of what excited delirium was, right?
> A. Correct. I didn't know enough about excited delirium.

(Doc. 50 at 348). And Defendant Spurgeon testified:

> Q. As you sit here today, do you know what excited delirium is?
> A. Not medic - - Not the medical definition of it, no.
> Q. What is your understanding of it? Not necessarily the medical definition.
> A. That it's someone that's within - - the not – they're not within their right state of mind, that there could be additional contributing factors that are making them act a certain way. That type of thing.

(Doc. 51 at 63).

Moreover, and critically, the Arrest Related Death Warning Signs slide instructed officers to get the suspect "medical attention as quickly as possible as these people may be at elevated risk for arrest-related deaths." (Doc. 63 at 19). Mr. McBrayer exhibited many of the symptoms of arrest related death, as indicated by the slide, such as bizarre and violent behavior, violence toward lights, imperviousness to pain, loss of consciousness, and disturbance in respiratory pattern. (*See e.g.*, Tripp Body Camera at 0:40, *et seq.* (showing Mr. McBrayer running at Defendant Tripp with his arms raised, screaming unintelligibly after Defendant Tripp shone his flashlight at Mr. McBrayer)); (Doc. 51 at 29 (Defendant Spurgeon testifying Mr. McBrayer was flailing around and talking about "Jesus and the Devil and God")); (Doc. 51 at 39 (Defendant Spurgeon testifying the Taser "had no effect" on Mr. McBrayer)); (Doc. 50 at 271 (Defendant Tripp testifying that Mr. McBrayer was unconscious when he was loaded into the back of the patrol car)); (Doc. 50 at 310 (Defendant Tripp testifying that Mr. McBrayer was breathing heavily)). And Plaintiffs' medical expert opined that even basic CPR might have reduced the risk of Mr. McBrayer's death, and that from the time Mr. McBrayer stopped breathing there was approximately a ten-minute window in which CPR might have given Mr. McBrayer a chance of recovering. (Doc. 55 at 52). Accordingly, a reasonable jury could find from the evidence in the record that, as a result of Defendant Axon's Taser X26P warnings,

Defendants Tripp and Spurgeon were underinformed about the condition excited delirium, and, had they recognized it and summoned medical help promptly—rather than delaying CPR for nearly 11 minutes—Mr. McBrayer would have survived. (*See* Tripp Body Camera at 11:10-22:21).[9]

Defendant Axon contends that the 2013 training slide is "irrelevant and misrepresented" because it "does not purport to be a list of excited delirium symptoms and does not advise against the use of Tasers on people with those symptoms, merely to "consider having EMS standing by." The Court disagrees. The slide identifies a cluster of symptoms many of which Mr. McBrayer exhibited, which significantly overlap with symptoms of excited delirium, and suggests that officers have medical personnel available to treat the suspect—treatment which, as Plaintiffs' medical expert opined, might have given Mr. McBrayer a chance of recovering. Accordingly, the Court finds the slide to be relevant evidence in support of Plaintiffs' products liability claim and rejects Defendant Axon's argument to the contrary.

As noted, issues of causation are "not susceptible to summary adjudication except in the most plain and palpable cases," and, here, there is enough evidence in the record for a reasonable jury to find that a different warning might have changed Defendants Tripp's and Spurgeon's decision to deploy their Taser X26Ps. A genuine dispute of material fact exists, therefore, as to whether additional Taser X26P warnings would have prevented Mr. McBrayer's death.

In sum, Defendant Axon's argument that it is entitled to summary judgment because Plaintiffs cannot prove either medical or warning causation, fails, because a genuine dispute of material fact remains as to whether the Taser X26P deployments caused Mr. McBrayer's death, and whether additional Taser X26P warnings would have prevented his death. Accordingly, the Court **DENIES** Defendant Axon's Motion for summary judgment with respect to Plaintiffs' failure to warn claim.

---

[9] Defendant Axon argues that because the deputies testified that they had "no option but to use force" and "the Taser CEW was the best option, no additional information would have mattered one iota." (Doc. 48-1 at 9). The Court, however, declines this invitation to weigh or interpret the deputies' testimony when Plaintiffs have identified portions of the record which support a different interpretation.

### B.    Strict Products Liability: Design Defect

Defendant Axon next moves for summary judgment on Plaintiffs' strict products liability claim based on a design defect theory, to the extent Plaintiffs allege one. (Doc. 48-1 at 9). Defendant Axon argues it is entitled to summary judgment because Plaintiffs have failed to produce evidence that the Taser X26P is unreasonably dangerous. (Doc. 48-2 at 11–12).

Under Georgia Law, a product design is defective if the risks inherent in the product design outweigh the utility or benefit derived from the product. *Lindsey v. Navistar Intern. Transp. Corp.*, 150 F.3d 1307, 1314–15 (11th Cir. 1998) (citing *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671 (Ga. 1994)). Although generally, weighing the risk-utility analysis is left to the jury, to survive summary judgment, a plaintiff "must produce evidence from an expert who is qualified to conduct the risk-utility analysis and to opine that the risks inherent in [the product] design outweigh the utility or benefit derived from the product." *Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374, 1384 (N.D. Ga. 2014) (citing *Dean v. Toyota Indus. Equip. Mfg., Inc.*, 540 S.E.2d 233, 237 (Ga. Ct. App. 2000)).

Here, Plaintiffs have produced no such expert. As Defendant Axon correctly notes, the only expert about the safety of the Taser X26P in the record comes from Defendant Axon's expert, Dr. Jeffery Ho M.D., a researcher who has conducted human testing and published peer-reviewed articles on the physiological effects of CEWs on the human body. (Doc. 48-1 at 12). Dr. Ho opined that Tasers are one of the "safest and most widely studied tools that [Law Enforcement Officers] use and has failed to demonstrate unforeseen clinical risk in human study." (Doc. 48-5 at 12). The Court, therefore, finds that there is no genuine dispute of material fact regarding whether the Taser X26P was an inherently dangerous product. Accordingly, to the extent Plaintiffs attempt to allege a design defect claim at all, the Court **GRANTS** Defendant Axon's Motion for summary judgment with respect to Plaintiffs' design defect claim.[10]

---

[10] Defendant Axon also argues that it is entitled to summary judgment on Plaintiffs' design defect claim because Plaintiffs cannot prove causation. Because the Court has granted summary judgment on other grounds, there is no reason to reach the merits of Defendant Axon's causation argument.

### C.    Duty to Train

Defendant Axon next moves for summary judgment on Plaintiffs' "failure-to-train" claim, to the extent Plaintiffs allege one because it had no duty to train Georgia peace officers. (Doc. 48-1 at 13–14). Plaintiffs counter that even if Defendant Axon had no original duty to train, it undertook to provide such training, and is therefore liable for negligence in that undertaking. (Doc. 64 at 11).

The Court will do its best to disentangle these arguments. Count III of the Complaint, which contains Plaintiffs' allegations against Defendant Axon, discusses only products liability, without mention of a failure-to-train or negligence claim. (Doc. 1 at 27–30 ¶¶ 59-68). The Court is therefore skeptical that Plaintiffs' Complaint alleges a separate failure-to-train claim at all. Despite this, Defendant Axon appears to be under the impression that Plaintiffs did, in fact, allege such a claim as evidenced by the arguments in Defendant Axon's brief that it is entitled to summary judgment on that claim. (Doc. 48-1 at 13–14). Although Plaintiffs, at the pleading stage, did not articulate a failure-to-train claim with enough specificity to put Defendant or this Court on notice that they were pursuing such a claim, Defendant Axon's failure to make a formal motion to dismiss such a claim, and subsequent acknowledgement of that claim in its Motion for Summary Judgment, has left the Court no choice but to address any failure-to-train claim on its merits.

Further complicating matters, Plaintiffs, in their response to Defendant Axon's failure-to-train claim, seize the opportunity to argue that even if Defendant Axon did not have an original duty to train Georgia law enforcement, by providing warnings and instruction materials to TCSO, they assumed such a duty, and were negligent in that undertaking. (Doc. 64 at 11). The Court notes, for the purposes of the record, that Plaintiffs have failed to make any formal motion to amend their complaint to add such a claim. Although the Court, as discussed, must address a failure-to-train claim on the merits, it declines to allow Plaintiffs to insert a previously unalleged negligence in the undertaking claim into the lawsuit made for the first time in their response brief to a motion for summary judgment. The Court, therefore, turns to whether Defendant Axon is entitled to summary judgment on any failure-to-train claim Plaintiffs may have made.

A "failure-to-train" claim is a mechanism by which a municipality may be held liable for a failure to train employees which leads to a constitutional deprivation under 42 U.S.C. § 1983. *See Gold v. Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Canton v. Harris*, 489 U.S. 378, 385 (1989)). A private entity may be liable for a failure-to-train claim under Section 1983, but only when it performs a function "traditionally within the exclusive prerogative of the state." *See Craig v. Floyd Cnty. Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citing *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997)). When it performs such a function, it becomes the "functional equivalent of the municipality" for purposes of Section 1983 liability. *Id.*

Defendant Axon argues that it does not have authority to train TCSO deputies or dictate when or on whom [Tasers] should be used." (Doc. 48-1 at 14).[11] The Court will, generously, construe this as arguing that Defendant Axon was not performing a state function, thereby defeating any failure-to-train claim against it and, with this, the Court agrees.

The record here reflects that Defendant Axon had two points of contact with the training conducted by Major Torres for TCSO which Defendants Tripp and Spurgeon attended: (1) Major Torres was certified by Defendant Axon as a CEW trainer, and (2) Major Torres downloaded a slideshow and the Taser X26P warnings from Defendant Axon's website which were made available for use in such trainings at the discretion of the trainer. (Doc. 48-2 at 12–13 ¶¶ 44-48); (Doc. 64-1 at 12 ¶ 22). Neither of these superficial contacts with TCSO

---

[11] Defendant Axon also argues that TCSO and the Georgia Peace Officer Standards and Training Council ("GA POST") have "the non-delegable duty to train officers and set appropriate use-of-force standards, including training and standards for the use of Taser CEWs." (Doc. 48-1 at 14). Defendant Axon cites no authority for this position except for the Georgia Statutes which, generally, assign GA POST and municipalities the responsibility to train peace officers. (*See* Doc. 48-1 at 13–14) (citing O.C.G.A. § 35-8-1 & 2; O.C.G.A. § 35-8-7(15)-16)). Defendant Axon's interpretation, however, turns the doctrine of "non-delegable duty" in the context of failure-to-train claims on its head. The non-delegable duty doctrine prevents municipalities from discharging liability for constitutional deprivations by delegating traditional state functions to private contractors. *See Ireland v. Prummell*, 53 F.4th 1274, 1289–1290 (11th Cir. 2022); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) (noting that a county's duty to provide medical care to prisoners is not absolved by contracting with a private medical services entity to provide medical services). In other words, the non-delegable duty doctrine is a sword with which Plaintiffs can strike municipalities when private companies cause constitutional deprivations when performing traditional state functions, not a shield with which private companies can deflect liability when performing such functions. Accordingly, the Court finds Defendant Axon's argument that the nondelegable doctrine absolves it from liability for a failure-to-train claim, unpersuasive.

trainings were by themselves, or taken together, sufficient for the Court to conclude that Defendant Axon was acting as "the functional equivalent" of TCSO. And Plaintiffs have identified no other portion of the record, and the Court can find none, which indicates that Defendant Axon had a greater involvement with TCSO CEW training than certifying Major Torres and providing a slideshow and warnings for the training. (*See* Doc. 64 at 10–13).[12]

Moreover, the slideshow provided by Defendant Axon, makes clear that Taser training does not usurp the role of law enforcement agencies in setting use of force policies. Both Defendant Axon and Plaintiffs agree that the slideshow supplied by Defendant Axon trains deputies on "how to use CEWs, but when to use the Taser weapon is written in the [TCSO] policy." (Doc. 48-2 at 16 ¶ 52) (Doc. 64-1 at 12 ¶ 24). The training materials themselves, therefore, make clear to both trainer and trainee that Defendant Axon was not assuming a state function by providing the slides.

The Court, as a result, finds that Defendant Axon was not performing a state function, and, consequently, cannot be liable for any constitutional deprivation that may have resulted from Major Torres' training of Defendants Tripp and Spurgeon. Accordingly, the Court **GRANTS** Defendant Axon's Motion for Summary Judgment (Doc. 48) with respect to Plaintiffs' failure-to-train claim, to the extent alleged.

## IV. CONCLUSION

For the foregoing reasons, Defendant Axon's Motion for Summary Judgment (Doc. 48) is **GRANTED-IN-PART** and **DENIED-IN-PART**. In more detail: (1) the Court **DENIES** Defendant Axon's Motion for Summary Judgment with respect to Plaintiffs' failure to warn claim; (2) the Court **GRANTS** Defendant Axon's Motion for Summary Judgment with respect to Plaintiffs' design defect claim, if any, and to the extent alleged; and (3) the

---

[12] Plaintiffs assert in their brief that TCSO "relies 100% on Axon materials for its training." (Doc. 64 at 13). For this proposition, however, Plaintiffs cite a portion of Defendant Tift County Sheriff Gene Scarbrough's deposition in which he testifies merely that Defendant Axon's slideshow was used in the training. (*See* Doc. 56 at 56). In fact, as Major Torres testified, Defendant Axon's slideshow was only part of the curriculum used in the training. (Doc. 48-11 at 9). Plaintiffs' assertion that TCSO "relies 100% on Axon materials for its training" is, therefore, unsupported by the record and, as a result, as to this issue, no genuine dispute remains.

Court **GRANTS** Defendant Axon's Motion for Summary Judgment with respect to Plaintiffs' failure-to-train claim, to the extent alleged.

     **SO ORDERED**, this 31st day of October 2023.

               /s/ W. Louis Sands

               **W. LOUIS SANDS, SR. JUDGE**
               **UNITED STATES DISTRICT COURT**